# UNREPORTED CASES

12 of 12 DOCUMENTS

**AMERICAN BIO MEDICA CORPORATION, Plaintiff, v. PENINSULA DRUG ANALYSIS CO., INC.; JAMES T. RAMSEY; PHAMATECH, INC.; DIPRO DIAGNOSTIC PRODUCTS, INC.; DIPRO DIAGNOSTIC PRODUCTS OF NORTH AMERICA, INC., Defendants.**

Civil Action No. 99–218–SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*1999 U.S. Dist. LEXIS 12455*

**August 3, 1999, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**COUNSEL:** For plaintiff: Daniel F. Wolcott, Jr., Esquire, Gregory A. Inskip, Esquire, Joanne Ceballos, Esquire, Potter, Anderson & Corroon LLP, Wilmington, Delaware.

For plaintiff: Charles Michael Tobin, Esquire, Hopkins & Sutter, Washington, D.C.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Matthew B. Lehr, Esquire, Maryellen Noreika, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Edward W. Moore, Esquire, Dallas, Texas.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Doreen L. Costa, Esquire, Neil P. Sirota, Esquire, Steven R. Gustavson, Esquire, Of Counsel, Baker & Botts, L.L.P., New York, New York.

For Phamatech, Inc., defendant: Kevin W. Goldstein, [*2] Esquire, Ratner & Prestia, Wilmington, Delaware.

For Phamatech, Inc., defendant: Steele N. Gillaspey, Esquire, Of Counsel, Gillaspey, Harms & Associates, San Diego, California.

**JUDGES:** Sue L. Robinson, District Judge.

**DISPOSITION:** Defendants' motions to dismiss granted in part and denied in part. Defendants' motions to transfer venue granted.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: August 3, 1999

Wilmington, Delaware

**ROBINSON,** District Judge

**I. INTRODUCTION**

Pending before the court are motions to dismiss or transfer venue filed by defendants Dipro Diagnostic Products of North America, Inc. ("Dipro"), Phamatech, Inc. ("Phamatech"), and Peninsula Drug Analysis Co., Inc. and James T. Ramsey ("Peninsula" and "Ramsey," respectively). (D.I. 17, 25 and 49) Plaintiff American Bio Medica Corporation ("ABMC") opposes said motions. ABMC owns the rights to U.S. Design Patent No. D404812, which patent issued on January 26, 1999. ABMC is a New York corporation engaged in the manufacture, worldwide distribution and sale of the Rapid Drug Screen, a product covered by the patent at issue. According to ABMC, when the Rapid Drug Screen was developed in 1995, it was the first vertical, hands free test for the detection of the presence of drug residue in urine. Until February [*3] 1999, ABMC purchased test strips from defendant Phamatech for incorporation into the Rapid Drug Screen. ABMC alleges that Phamatech initiated production of its own vertical test kit (Quick Screen) in 1998 or earlier, using proprietary informa-

tion it acquired by reason of its supply relationship with ABMC.

Defendant Phamatech is a California corporation. According to ABMC, Phamatech distributes Quick Screen through the auspices of defendants Peninsula and Ramsey, among others. Defendant Dipro is a Delaware corporation that, according to ABMC, acquires directly or indirectly from Phamatech an accused product called Rapid Response and distributes that product through Peninsula and Ramsey, among others. Peninsula is a Virginia corporation and Ramsey is the sole stockholder and an employee of Peninsula.

Plaintiff ABMC initiated this lawsuit on April 7, 1999 against defendants for design patent infringement, violation of the Lanham Act, and other acts of unfair competition. A day later, on April 8, 1999, Phamatech filed suit in the United States District Court for the Southern District of California seeking a declaratory judgment that ABMC's design patent is invalid, and joining other [*4] federal and state claims essentially mirroring the claims and operative facts at issue. By decision issued June 21, 1999, Judge Keep of the Southern District of California found that the California court could exercise specific personal jurisdiction over ABMC; however, applying the "first-filed" rule, she stayed the California case pending disposition of the instant motions.

## II. FACTS

The facts are essentially undisputed. Prior to the filing of the complaint, none of the accused products had been sold to a Delaware resident. In the fall of 1998, defendant Peninsula did ship an order of ABMC's Rapid Drug Screen to a Delaware resident, Pace Electric of New Castle, Delaware. Sometime thereafter and prior to January 1999, Peninsula stopped handling ABMC's product. In January 1999, defendant Ramsey and a third party met with a representative of Pace to discuss a possible business relationship for the sale and distribution of the Phamatech/Dipro product, Rapid Response, in Delaware. These discussions took place in Hawaii and Maryland. Although there are averments of record indicating that some agreement was reached (D.I. 32), it is the court's understanding that no actual sales [*5] or movement of defendants' products occurred in Delaware prior to the filing of the complaint.

Prior to April 1999, Peninsula sent direct mail postcards to Delaware as part of a mass mailing to potential customers in more than 20 states. n1 Both Ramsey and Phamatech maintain national Internet websites that can be accessed from Delaware. It is the court's understanding that these websites include promotional material about the allegedly infringing products, including information

on ordering and shipping; however, orders cannot be consummated directly through the websites.

> n1 Approximately 60 out of a total of 6,000 postcards were directed to Delaware residents. No responses are recorded.

## III. DISCUSSION

### A. Personal Jurisdiction

ABMC, as plaintiff, bears the burden of establishing that this court may exercise personal jurisdiction over defendants. When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a prima facie case with the record [*6] viewed in the light most favorable to the plaintiff. See *Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1462 (D. Del. 1991); Computer People, Inc. v. Best Int'l Group, Inc., 1999 Del. Ch. LEXIS 96, No. Civ. A. 16648, 1999 WL 288119,* at *4 & n.5 (Del. Ch. Apr 27, 1999). There is no question but that this court can exercise personal jurisdiction over defendant Dipro, a Delaware corporation. The focus of the following discussion, therefore, is whether the exercise of personal jurisdiction over the remaining defendants comports with the law of the Federal Circuit. n2

> n2 According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995).*

Pursuant to *Rule 12(b)(2) of the Federal Rules of Civil Procedure*, a court may dismiss [*7] a suit for "lack of jurisdiction over the person." According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987).* The principle pronounced above is traditionally described in this court as a two-step analysis. The court will determine, first, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendants' rights to due process.

*Rule 4(e)(1) of the Federal Rules of Civil Procedure* states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, *10 Del. C. § 3104(c)*, has been construed "broadly . . . to confer jurisdiction to the maximum extent possible [*8] under the due process clause." *LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986).* As noted by this court in *Intel Corp. v. Silicon Storage Tech., Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998),* "the Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, nor does it substitute federal due process analysis for state long-arm analysis." Accord *Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd., 611 A.2d 476, 480–81 (Del. 1992); Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods. Inc., 1991 Del. Ch. LEXIS 113, Civ. A. No. 12036, 1991 WL 129174,* at *3 (Del. Ch. July 10, 1991); *Ramada Inns v. Drinkhall, 1984 Del. Super. LEXIS 599, No. Civ. A. 83 C–AU–56, 1984 WL 247023,* at *2 (Del. Super. May 17, 1984). Therefore, the court must determine that the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendants' constitutional rights to due process. n3

> n3 The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we . . . defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed. Cir. 1998).* Thus, in *Luker,* the Federal Circuit's analysis followed that of the Sixth Circuit's holding in *R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc., 811 F.2d 967 (6th Cir. 1987):* "'This Ohio [long-arm] statute has been construed to extend to the outer limits of due process, and thus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations.'" *Luker, 45 F.3d at 1544* (quoting *Dribeck, 811 F.2d at 969).* By contrast, as noted above, the Delaware state courts do not collapse the long-arm inquiry into the due process inquiry and neither shall this court.

[*9]

Delaware's long-arm statute provides:

> (c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;
>
> (3) Causes tortious injury in the State by an act or omission in this State;
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State
>
> . . . .

*Del. Code Ann. tit. 10, § 3104(c)(1) – (4).*

As explained by the Delaware Supreme Court in LaNuova,

> the conduct embraced in subsections (1) and (2), the transaction of business or performance of work and contracting to supply services or things in the State, may supply the jurisdictional basis for suit only with respect to claims which have a nexus to [*10] the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction.
>
> . . .
>
> Similarly, where the claim is one for tortious injury under subsection (c)(3),
>
> a single "act or omission" in the State in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

*LaNuova, 513 A.2d at 768.* Therefore, in order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts occurring in Delaware actually constitute "transacting business" in Delaware, i.e., that defendants "purposefully avail[ed] themselves] of the privileges and benefits of Delaware law." *Computer People, Inc., 1999 WL 288119,* at *8; see also *Thorn EMI N. Am. v. Micron Tech., Inc., 821 F. Supp. 272, 274 (D. Del. 1993)* (stating that the designated conduct "must be directed at residents of the State of [*11] Delaware and the protection of its laws"). With this requirement in mind, courts have concluded that "mere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware." Id. (citing *Moore v. Little Giant Indus., Inc., 513 F. Supp. 1043, 1047 (D. Del. 1981); Waters v. Deutz Corp., 460 A.2d 1332, 1335 (Del. Super. 1983).* The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is "part of a general business plan . . . to solicit business in Delaware and deliver products to customers in Delaware." *Thorn EMI, 821 F. Supp. at 274.*

Plaintiff alleges in its complaint seven causes of action, including unlawful use of the trademarks and service marks of the Rapid Drug Screen in violation of the Lanham Act and common and state law trademark rights; violation of the design patent "by making, using and/or selling the ABMC design . . ."; and engaging in unfair competition and deceptive trade practices. (D.I. 1) Although the products at issue have not been made, used, or sold in Delaware, plaintiff [*12] asserts that, "through offers and extensive planning to sell the infringing product in Delaware, defendants have engaged in a course of conduct that readily meets the nexus requirements of sections 3104(c)(1), (2), and (3)." (D.I. 57 at 7–8)

The record demonstrates that defendants Peninsula and Ramsey have offered to sell n4 allegedly infringing products to Delaware residents through what appears to be a concerted marketing effort. The marketing effort includes national advertisements accessible to Delaware residents (the internet website), out-of-state sales negotiations with a Delaware resident, n5 and the mailing of promotional materials to Delaware residents. Given the history of these defendants' relationship with plaintiff, the record adequately demonstrates that these activities are directed at Delaware residents, constitute "transacting business," and are sufficiently related to plaintiff's causes of action to satisfy the requirements of *10 Del. C. § 3104(c)(1).* n6 Cf. *Computer People, Inc., 1999 WL 288119,* at *8. n7

n4 Plaintiff did not specifically allege such in its complaint; however, *35 U.S.C. § 271*(a) reads "whoever without authority makes, uses, **offers to sell,** or sells any patented invention . . . infringes the patent." (Emphasis added)

[*13]

n5 The out-of-state sales negotiations with Pace Electric are viewed in tandem with defendants' other conduct as evidence of a general business plan directed at Delaware residents and the protection of its laws.

n6 As noted, the court is satisfied that the activities described above are "part of a general business plan" and not isolated, unrelated events. In the past, this court has demanded as well proof that the activities have had a "tangible effect" in Delaware. See, e.g., *Intel Corp., 20 F. Supp. 2d at 696* (". . . SST's solicitations in Delaware [have not] been shown to have had any tangible effect on Intel's sales here."). Sales are lost generally because of the sale of competing products. Given the fact that liability under *35 U.S.C. § 271*(a) can now rest on mere **"offers to sell,"** the court is reluctant to require proof of actual sales and is not sure what other "tangible effect" is contemplated. Therefore, the court will not require evidence of "tangible effects" in this case.

n7 Although the court noted that, "as a general matter telephone calls and an e-mail [to a Delaware resident] do not, in and of themselves, automatically constitute 'transacting business' within Delaware sufficient to invoke jurisdiction under § 3104(c)(1)," the court looked at the specific factual context and held that these contacts were insufficient because they could not be a basis for the plaintiff's causes of action.

[*14]

The court further finds that the exercise of personal jurisdiction over these defendants comports with federal due process considerations. The Supreme Court in *International Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945),* held that

due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id. at 316* (citation omitted). The Court in *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*, added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." *Id. at 475 n.18.* Therefore, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case [*15] that the presence of some other considerations would render jurisdiction unreasonable." *Id. at 477.* In Luker, the Federal Circuit suggested a three–prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair? See *Luker, 45 F.3d at 1545–46.* The court has already answered the first two inquiries in the affirmative and has not discovered in the record any compelling evidence which suggests that the exercise of personal jurisdiction over these defendants would be unreasonable.

The court concludes otherwise with respect to defendant Phamatech. The conduct attributed to Phamatech includes the following: 1) Phamatech manufactures allegedly infringing products; 2) Phamatech arranges for the distribution of its product through defendants Peninsula and Ramsey; and 3) Phamatech advertises its product through an Internet website accessible to Delaware residents. As noted previously, however, there had been no actual sales of infringing product in Delaware prior to the filing [*16] of the complaint. Neither is there evidence relating Phamatech to Peninsula and Ramsey's marketing efforts directed at Delaware residents. Although plaintiff asserts that "Phamatech intentionally established a chain of distribution that it knew, or reasonably could have foreseen, had a termination point in Delaware" (D.I. 62 at 11), the record does not demonstrate the existence of ongoing commercial relationships with retailers and customers **in Delaware**.

The facts of record are distinguishable, therefore, from the facts in *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed. Cir. 1994)*, cited by plaintiff. In that case, the court concluded that the alleged infringers were placing accused products into the chain of commerce, which included shipping products into the forum for sale to customers through an intermediary. Because the commercial relationship with the intermediary was ongoing and the accused products in fact had been shipped into the forum, the court found the defendant amenable to the exercise of personal jurisdiction: "From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the [*17] intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum]." *Royal Sovereign, 21 F.3d at 1564.* Instantly, there is no evidence demonstrating that Phamatech directed Peninsula and Ramsey's sales efforts at Delaware residents; there certainly is no evidence of any ongoing commercial relationships between Phamatech, Peninsula/Ramsey, and Delaware residents. The final conduct designated is Phamatech's Internet website. Assuming for purposes of this motion that a website with product information constitutes an "offer to sell," in the absence of evidence that Delaware residents actually accessed this website, the court declines to find that Phamatech transacted business in Delaware, consistent with *10 Del. C. § 3104(c)(1)* and (3). n8

n8 Plaintiff does not assert general jurisdiction under § 3104(c)(4).

**B. Venue**

Generally, in reviewing a motion for transfer of venue, this court gives great [*18] deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties. Given the court's conclusion that it cannot exercise personal jurisdiction over defendant Phamatech, the manufacturer of the accused products, transfer of this case to the Southern District of California is warranted.

**IV. CONCLUSION**

For the reasons stated, defendants' motions to dismiss are granted in part and denied in part. Defendants' motions to transfer venue are granted.

An appropriate order shall issue.

LEXSEE 2005 US DIST. LEXIS 17532

**DAVLYN MANUFACTURING CO., INC., Plaintiff, v. H&M AUTO PARTS, INC.,
d/b/a H&M COMPANY INCORPORATED, HENRY C. HIGHT, JR., and TAPE &
TECHNOLOGIES INCORPORATED, Defendants.**

**CIVIL ACTION No. 04-5516**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

*2005 U.S. Dist. LEXIS 17532*

**August 18, 2005, Decided
August 22, 2005, Filed**

**PRIOR HISTORY:** *Tape & Techs. v. Davlyn Mfg. Co.,
2005 U.S. Dist. LEXIS 8291 (W.D. Tex., May 6, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, an assignee of a
patent, filed an infringement action against defendants, a
Texas corporation, its shareholder, another corporation,
and others. The Texas corporation and its shareholder
filed a motion to dismiss for lack of personal jurisdiction
or, in the alternative, a motion to transfer.

**OVERVIEW:** The shareholder and his wife developed
an oven gasket that allegedly infringed the assignee's
patent while they were employed by the other corporation,
which was established by the shareholder's father. The
court held that it lacked personal jurisdiction over the
Texas corporation because the Texas corporation had
neither designed its product to target the needs of Penn-
sylvania consumers, nor established channels for pro-
viding regular advice to Pennsylvania customers, nor
marketed its product to consumers either directly, or in-
directly, through a distributor or sales agent. Moreover,
the assignee failed to show that the Texas corporation and
the shareholder were true successors or alter egos of the
other corporation. Although the shareholder was an offi-
cer, shareholder and employee of both corporations, and
although the Texas corporation's headquarters were lo-
cated at the same address as one of the offices of the other
corporation, the shareholder owned only 5.6 percent of
the other corporation's stock and the other corporation
made no claims with respect to any patent rights for the
product developed by the shareholder.

**OUTCOME:** The court granted the motion of the Texas
corporation and the shareholder to dismiss the action
against them for lack of subject matter jurisdiction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction
& In Rem Actions > Personal Jurisdiction*
*Civil Procedure > State & Federal Interrelationships >
Application of State Law*
*Patent Law > Jurisdiction & Review > Personal Juris-
diction & Venue > General Overview*
[HN1] Questions of personal jurisdiction in patent actions
are governed by Federal Circuit law, rather than that of the
regional circuit in which the actions arise.

*Civil Procedure > Jurisdiction > Personal Jurisdiction
& In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction
& In Rem Actions > Personal Jurisdiction*
*Patent Law > Jurisdiction & Review > Personal Juris-
diction & Venue > General Overview*
[HN2] In order to establish personal jurisdiction in a
patent infringement action over a non-resident defendant,
a plaintiff must show both that jurisdiction exists under
the forum state's long-arm statute, and that the exercise of
jurisdiction would be consistent with the requirements of
due process.

*Civil Procedure > Jurisdiction > Personal Jurisdiction
& In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction
& In Rem Actions > Personal Jurisdiction*

2005 U.S. Dist. LEXIS 17532, *

[HN3] Pennsylvania's long-arm statute is coextensive with the limits of due process, extending jurisdiction to the fullest extent allowed under the Constitution of the United States.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN4] In order to be subject to personal jurisdiction, due process requires that a non-resident defendant have certain "minimum contacts" with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. The minimum contacts requirement helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN5] Under the "minimum contacts" test, a defendant may be subject to personal jurisdiction under one of two theories. Where the defendant has maintained continuous and systematic contacts with the forum state, he will be subject to "general jurisdiction"; where, instead, the plaintiff's cause of action arises from the defendant's more limited forum-related activities, he may be subject to "specific jurisdiction."

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Evidence > Procedural Considerations > Burdens of Proof*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN6] The United States Court of Appeals for the Federal Circuit has established a three-prong test for determining whether the exercise of specific jurisdiction is consistent with due process. Specific jurisdiction properly exists where: (1) the defendant "purposefully directed" its activities at residents of the forum state; (2) the claim arises out of or relates to those activities; and (3) the exercise of personal jurisdiction would be reasonable and fair. While the plaintiff bears the burden of establishing purposeful minimum contacts, upon this showing, defendants must prove that the exercise of jurisdiction is unreasonable. In deciding a motion to dismiss for lack of personal jurisdiction, the court need not treat the plaintiff's allegations

as true, but may consider affidavits and weigh any other relevant evidence in making the jurisdictional determination.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN7] Where the sale of a product is not simply an isolated occurrence, but arises from the seller's attempts to serve, directly or indirectly, the market for its product in other states, it is not unreasonable for a court to find that the seller has purposefully availed himself of the privilege of doing business in the forum state. Thus, personal jurisdiction may properly be exercised over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN8] The United States District Court for the Eastern District of Pennsylvania finds that a defendant does not "purposefully direct" his activities at a forum state merely by selling a component part to a nationwide distributor of home appliances with the awareness that appliances containing the defendant's product may ultimately be sold in the forum state. There must be some additional evidence of the defendant's purpose and intent to serve the forum state, such as state-specific marketing or design, the provision of customer support services, or an exclusive contractual relationship with a distributor in the forum state. The United States Supreme Court has held that "foreseeability alone" is not a sufficient benchmark for personal jurisdiction under the Due Process Clause.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Mergers & Acquisitions Law > General Business Considerations > Successor Liabilities*
[HN9] Where an individual or a corporation has insufficient contacts with the forum state to satisfy due process, a court may nonetheless exercise personal jurisdiction if the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction before that court. The alter ego and successor doctrines are closely related, and look to whether the later-formed entity is a mere continuation of its predecessor, as well as whether there are any indicia of fraud, illegality, or in-

justice. In making these determinations, the court should consider the nature of the corporate entities' ownership and control, including commonality of stockholders or officers; common use of employees, business locations, or sales systems; common marketing or trademarking; similarity of core business lines; and commingling of funds and assets. The court should also consider the sufficiency of consideration paid for the transfer of the predecessor's assets or product line, as well as any other indicia of fraudulent intent in the creation of the second entity.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Mergers & Acquisitions Law > General Business Considerations > Successor Liabilities*
[HN10] The justification for imposing alter ego or successor jurisdiction is to prevent corporations from escaping liability by hiding behind sham entities.

COUNSEL: [*1] For DAVLYN MANUFACTURING CO., INC., Plaintiff: GARY ALLEN ROSEN, PATRICK MADAMBA, JR., LAW OFFICES OF GARY A. ROSEN, PC, PHILADELPHIA, PA.

For H&M AUTO PARTS, INC., doing business as H&M COMPANY INCORPORATED, Defendant: RICHARD M. JORDAN, WHITE AND WILLIAMS, PHILADELPHIA, PA.

For HENRY C. KNIGHT, JR., TAPE & TECHNOLOGIES INCORPORATED, Defendant: CLINE H. WHITE, LOEFFLER TUGGEY PAUERSTEIN, SAN ANTONIO, TX; ANTHONY J. DIMARINO, III, MCSHEA TECCE, P.C., PHILADELPHIA, PA.

JUDGES: J. CURTIS JOYNER, J.

OPINIONBY: J. CURTIS JOYNER

OPINION:

### MEMORANDUM AND ORDER

JOYNER, J.

Via the instant motion, Defendants Tape & Technologies, Incorporated and Henry C. Hight, Jr. seek, once again, to dismiss this patent infringement action for lack of personal jurisdiction. For the reasons that follow, De-

fendants' motion shall be granted and this action shall be dismissed with respect to the moving Defendants only.

### Facts

Plaintiff Davlyn Manufacturing Co., Inc. ("Davlyn"), a Pennsylvania corporation, is the assignee of three patents describing oven door gaskets used to seal the heat within conventional home ovens. Plaintiff filed the instant patent infringement action against Defendant [*2] H&M Auto Parts, Inc. ("H&M") on November 29, 2004, alleging that H&M's sale of oven door gaskets and clips to Electrolux Home Products ("Electrolux/Frigidaire"), the maker of Frigidaire brand appliances, infringed upon Plaintiff's patents. Plaintiff amended its Complaint on December 21, 2004, joining Defendants Tape & Technologies, Incorporated ("T&T") and Henry C. Hight, Jr ("Hight Jr.").

Defendant H&M is a Texas corporation headquartered in San Antonio, with additional offices in El Paso and Helotes. (Flack Depo., pp. 45, 47-50). H&M does business in Pennsylvania and does not contest this Court's jurisdiction. (Flack Depo., pp. 91-93). H&M was established in 1957 by Henry Hight, Sr. ("Hight Sr."), who is a current 60% shareholder. (Hight Aff. P 4). The remaining seven shareholders, who all hold positions as officers and directors, are Hight Sr.'s children: Defendant Henry C. Hight, Jr., Robert Hight, Stephen Hight, Susannah Herman, Hallie Rowe, Joe Hight, and Nancy Flack. (Flack Depo., pp. 10-11; Pl. Exh. D; Hight Aff. P 4).

During the time that they were employed at H&M, Defendant Hight Jr., a Vice President of H&M, and his wife, Sylvia Hight, a sales employee, developed an oven [*3] gasket for use in home ovens. (Flack Depo., pp. 65-67; Hight Aff. P 11). In 2003, they arranged for a Chinese vendor to manufacture the allegedly infringing oven gaskets, and Hight Jr. made two sales on behalf of H&M. (Flack Depo., pp. 31-32, 64-65). In June of 2003, 11,000 gaskets were shipped to Electrolux/Frigidaire. (Id. at pp. 65, 82-84; Pl. Exh. O). In August of 2003, 3,000 gaskets were shipped to G.E. Roper Corporation ("GE"), the maker of General Electric brand appliances. (Flack Depo., pp. 65, 82-84; Pl. Exh. O).

Defendant H&M contends that, at some point prior to October 2003, Hight Sr. decided to discontinue the sale of oven gaskets, and instructed Hight Jr. and Sylvia Hight not to make any further sales or purchases of gaskets on behalf of H&M. (Flack Depo., pp. 30-37, 106-107, 114-115). Hight Sr. also allegedly told Hight Jr. and Sylvia Hight that "he wouldn't like" it if they purchased the gaskets on their own, independently of H&M. (Id. at p. 34). Nevertheless, Hight Jr. and Sylvia Hight made additional, allegedly unauthorized, purchases under the H&M name, and as well as at least one additional sale to Electrolux/Frigidaire, which was invoiced on December 19,

2003. ( [*4] Id. at pp. 31-32, 74-78, 95; Pl. Exhs. P, R). H&M became aware of some of these purchases because the shipping and billing address used was that of H&M's Helotes office, where Hight Jr. and Sylvia Hight are headquartered. (Flack Depo., pp. 32-33; Pl. Exhs. P, R).

On January 16, 2004, H&M was notified by a letter from Plaintiff's counsel that its sale of oven gaskets potentially infringed upon Davlyn's patents. (Pl. Exh. Q). H&M did not respond to Plaintiff's correspondence until April 12, 2004, when Nancy Flack, President of H&M, wrote, "We understand that there are patent issues. After the receipt of your letter we discontinued all sales to Frigidaire on this item." (Pl. Exh. V).

Shortly after H&M's receipt of the January 16, 2004 letter from Plaintiff's counsel, Sylvia Hight sent the following e-mail from her H&M e-mail account to the Chinese manufacturer regarding a purchase order that had been placed on January 16, 2004: "We have been having many issues here regarding the patent and the potential lawsuit ... I'll need to forward the P.O. But because of the potential suit. I need to write and wire it another way ... I'll wire the money but I think I need to send it by another [*5] company name." (Pl. Exh. R). A subsequent email from Sylvia noted, "The company name that we are going to use is 'H M Tape & Technologies Company." (Pl. Exh. R). Thereafter, a purchase order dated January 30, 2004 was issued by "H M Tape & Technologies" for 50,000 units from the Chinese manufacturer, for shipment to "H & M Tape & Technologies" at the address of H&M's Helotes office. (Pl. Exh. S).

Hight Jr. incorporated HM Tape & Technologies Incorporated on February 4, 2004, and formally changed the company's name to Tape & Technologies Incorporated on April 5, 2004. (Pl. Exhs. F, G). The business address of T&T's registered agent, Hight Jr., is the same address as H&M's Helotes office. (Pl. Exh. G).

**Procedural History**

Davlyn filed its Complaint against H&M on November 29, 2004 before the United States District Court for the Eastern District of Pennsylvania, unaware that the allegedly infringing gaskets were being sold by any other company. Defendant H&M was served with the Complaint on December 9, 2004, and Defendant Hight Jr. was notified of the suit at some point prior to December 13, 2004. (Flack Depo., pp. 91-93). Plaintiff first learned that another company was involved [*6] in the sale of the gaskets on December 21, 2004, by the following correspondence from H&M's counsel: "H&M made one small sale of the accused product to both Frigidaire and GE. However, once they received the cease and desist letter from your client, they made no further sales ... I have a copy of an email from Louise Wang at Electrolux (Frigidaire) stating, 'this is to confirm that Tape & Technol-

ogy was the supplier who was selling us the fiberglass door seal from Feb.04 to Oct.04.'" (Pl. Exh. P). Upon receiving notice of T&T's involvement, Davlyn amended its Complaint on December 21, 2004, adding T&T and Hight Jr. as defendants. On January 5, 2005, Davlyn was served with a complaint in a declaratory judgment action that had been filed by T&T in the United States District Court for the Western District of Texas on December 16, 2004.

On January 10, 2005, Defendants T&T and Hight Jr. moved to dismiss this action for lack of personal jurisdiction, or in the alternative, to transfer the action to the United States District Court for the Western District of Texas. This Court denied the Motion without prejudice, and granted 60 days leave to conduct jurisdictional discovery.

On January 31, 2005, Plaintiff [*7] Davlyn moved before the United States District Court for the Western District of Texas to dismiss the action pending there, or in the alternative, to transfer venue to the Eastern District of Pennsylvania. Upon consideration of the record, the court found that T&T and Hight knew of the pending suit against H&M in the Eastern District and "clearly filed [the declaratory judgment action] in anticipation of litigation." *Tape & Techs. v. Davlyn Mfg. Co., 2005 U.S. Dist LEXIS 8291 at 8, 2005 WL 1072169 at 3 (W.D. TX. 2005).* While recognizing that the evidence "weighed against the exercise of the Court's discretion to hear the declaratory judgment action," the court denied the motion to dismiss only because "there exists some question as to whether the Eastern District of Pennsylvania would be able to exercise personal jurisdiction over Plaintiff." *Tape & Techs., 2005 U.S. Dist LEXIS 8291 at 10, 2005 WL 1072169 at 4.*

Before this Court, Defendants T&T and Hight Jr. now renew their motion to dismiss or, in the alternative, to transfer.

**Standard of Review: Personal Jurisdiction**

[HN1] Questions of personal jurisdiction in [*8] patent actions are governed by Federal Circuit law, rather than that of the regional circuit in which the actions arise. *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995).*

[HN2] In order to establish personal jurisdiction in a patent infringement action over a non-resident defendant, a plaintiff must show both that jurisdiction exists under the forum state's long-arm statute, and that the exercise of jurisdiction would be consistent with the requirements of due process. *Commissariat a l'Energie Atomique v. Chi Mei Optoelectronics Corp., 395 F.3d 1315, 1319 (Fed. Cir. 2005).* Of course, [HN3] Pennsylvania's long-arm statute is coextensive with the limits of due process, extending jurisdiction to the "fullest extent allowed under

2005 U.S. Dist. LEXIS 17532, *

the Constitution of the United States." *Resnick v. Manfredy, 52 F. Supp. 2d 462, 466 (E.D. Pa. 1999).*

[HN4] In order to be subject to personal jurisdiction, due process requires that a non-resident defendant have certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *LSI Indus. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1375 (Fed. Cir. 2000)* [*9] (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)).* The minimum contacts requirement helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum state. *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1565 (Fed. Cir. 1994)* (citing *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)).*

[HN5] Under the "minimum contacts" test, a defendant may be subject to personal jurisdiction under one of two theories. Where the defendant has maintained continuous and systematic contacts with the forum state, he will be subject to "general jurisdiction"; where, instead, the plaintiff's cause of action arises from the defendant's more limited forum-related activities, he may be subject to "specific jurisdiction." *LSI Indus., 232 F.3d at 1374-75* (citing *Burger King Corp, 471 U.S. at 472-73; Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984)).* [*10]

[HN6] The Federal Circuit has established a three-prong test for determining whether the exercise of specific jurisdiction is consistent with due process. Specific jurisdiction properly exists where: (1) the defendant "purposefully directed" its activities at residents of the forum state; (2) the claim arises out of or relates to those activities; and (3) the exercise of personal jurisdiction would be reasonable and fair. *3D Sys. v. Aarotech Lab., 160 F.3d 1373, 1378 (Fed. Cir. 1998)* (citing *Akro Corp., 45 F.3d at 1545-46).* While the plaintiff bears the burden of establishing purposeful minimum contacts, upon this showing, defendants must prove that the exercise of jurisdiction is unreasonable. *Elecs. for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1350 (Fed. Cir. 2003)* (citing *Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001)).* In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat the plaintiff's allegations as true, but may consider affidavits and weigh any other relevant evidence in making the jurisdictional determination. *Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34, 42 (D.D.C. 2003).* [*11]

**Discussion**

## I. Specific Jurisdiction Under the Stream of Commerce Theory

Defendants T&T and Hight Jr. maintain that this action must be dismissed for lack of personal jurisdiction because neither T&T nor Hight Jr. purposefully directed the sale of allegedly infringing oven gaskets at the forum state of Pennsylvania.

Defendant T&T is a Texas corporation with no offices, employees, agents, or customers in Pennsylvania. (Hight Aff. P 4, 8, 13). T&T's president, Defendant Hight Jr., is a Texas resident with no Pennsylvania business contacts. (Id. at P 3, 14). T&T denies having ever sold, offered for sale, distributed, or advertised its products within Pennsylvania. (Id. at P 13). Since its incorporation in February of 2004, T&T has sold oven gaskets and clips to only one customer, Electrolux/Frigidaire, located in Springfield, Tennessee. (Id. at P 5).

Plaintiff, however, maintains that Defendants T&T and Hight Jr. purposefully directed their activities at the forum state of Pennsylvania by placing oven gaskets and clips in the stream of commerce via a nationwide distributor of home appliances. Electrolux/Frigidaire makes "Frigidaire" brand appliances, as well [*12] as residential ovens for Sears' "Kenmore" brand. (Flasher Aff. P 4). Frigidaire and Kenmore brand products are sold through established channels of distribution throughout the United States, including in Pennsylvania. (Id. at P 4). Electrolux/Frigidaire's website, for example, identifies 20 authorized retailers selling Frigidaire ovens in Pennsylvania within a 50 mile radius of Philadelphia, as well as seven authorized Frigidaire service providers in the same region through which replacement gaskets may be purchased. (Pl. Exh. CC). It is common knowledge that Frigidaire and Kenmore brand appliances, including residential ovens, are widely available for sale throughout Pennsylvania. Gary Flasher, a project manager at Davlyn, was able to locate without difficulty at least two Frigidaire ovens being offered for sale locally which incorporated clip gaskets "of the exact style, materials, and other characteristics as the Accused Product." (Flasher Aff., P 6-8). While T&T admits that Electrolux/Frigidaire is a manufacturer and distributor of ovens, and that Electrolux/Frigidaire incorporates T&T's gaskets and clips into ovens intended for sale, it asserts that "T&T has no control, nor [*13] knowledge except in a general sense, of the oven gaskets and clips' final destination." (Hight Aff. P 9).

The Supreme Court in *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)* first addressed the question of whether constitutionally sufficient minimum contacts are satisfied where a defendant places a product in the "stream of commerce." The Court found that, [HN7] where the sale

of a product is not simply an isolated occurrence, but arises from the seller's attempts "to serve, directly or indirectly, the market for its product in other states," it is not unreasonable for a court to find that the seller has purposefully availed himself of the privilege of doing business in the forum state. *World-Wide Volkswagen Corp., 444 U.S. at 297.* Thus, personal jurisdiction may properly be exercised over a corporation "that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen Corp., 444 U.S. at 297-298.* The Court did not, however, specify the degree of actual interaction that a seller must have with the forum state to demonstrate [*14] his intent or expectations with respect to serving a broader market.

In *Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987),* the Supreme Court was evenly divided as to what would constitute sufficient minimum contacts under a stream of commerce theory. Justice O'Connor, writing for four members of the Court, found that the mere placement of a product into the stream of commerce, without more, does not demonstrate that a defendant "purposefully directed" his activities toward the forum state. *Asahi Metal Industry Co., 480 U.S. at 112.* Justice O'Connor proposed that, even if the defendant is aware that his product may be swept into the forum state, some additional evidence of purpose or intent must be found - for example, "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi Metal Industry Co., 480 U.S. at 112.* Justice Brennan and three others instead suggested [*15] that evidence of such "additional conduct" is not necessary for a finding of constitutionally sufficient minimum contacts. "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi Metal Industry Co., 480 U.S. at 117.* While maintaining the requirement that a defendant purposefully avail himself of business in the forum state, Justice Brennan found Justice O'Connor's "stream of commerce-plus" approach to be a "marked retreat" from the standard set forth in World-Wide Volkswagen. *Asahi Metal Industry Co., 480 U.S. at 118-120.*

In light of the conflicting positions set forth in Asahi, the Federal Circuit has declined to adopt a position as to whether mere placement of a product in the stream of commerce and awareness of its potential destination will subject a defendant to jurisdiction in a forum state. n1 *Commissariat a l'Energie Atomique, 395 F.3d at 1322 n. 7;* [*16] see also *Beverly Hills Fan Co., 21 F.3d at 1566.* In all the relevant cases addressed by the Federal Circuit to date, the defendants' contacts with the forum state have been sufficient to satisfy even the more stringent test set forth by Justice O'Connor in Asahi. In Beverly Hills Fan Co., for example, the defendant, a ceiling fan manufacturer, shipped its fans directly to the forum state of Virginia for sale by a distributor with several retail outlets in Virginia. The fans ultimately sold in Virginia clearly identified the defendant as the source of the product, and were accompanied by a warranty that the defendant would honor. The court concluded that the defendant manufacturer's "conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Beverly Hills Fan Co., 21 F.3d at 1566.* Likewise, in *Viam Corp. v. Iowa Export-Import Trading Co., 84 F.3d 424 (Fed. Cir. 1996),* a foreign defendant entered into an exclusive marketing and distribution agreement with an Iowa corporation that distributed its product throughout the United States and in the forum state [*17] of California. Beyond simply placing its product into the stream of commerce, the foreign corporation "knowingly and intentionally exploited the California market through its exclusive distributor's advertising in California, and by establishing channels for providing regular advice in California." *Viam Corp., 84 F.3d at 428-29.*

n1 Although this Court is obligated to apply Federal Circuit law in this patent infringement action, we note that the Third Circuit has likewise declined to adopt a position with respect to this issue. See *Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 207 n. 13 (3rd Cir. 1998); Renner v. Lanard Toys, 33 F.3d 277, 283 (3rd Cir. 1994);* but see *Portella v. Life-Time Truck Prods., Inc., 127 F. Supp. 2d 652, 658-59 (E.D. Pa. 2000)* (adopting Justice O'Connor's approach as the "best-reasoned" and most likely to be adopted by the current Supreme Court).

In the instant case, Plaintiff has presented no evidence of additional [*18] conduct or contacts which would indicate that T&T purposefully directed its activities at the forum state of Pennsylvania. While T&T admits to a "general" awareness that its oven gaskets may be incorporated into ovens sold in various states, including Pennsylvania, it has no control over whether the gaskets end up in Pennsylvania as opposed to any other state, and has taken no purposeful steps to ensure that it reaps the benefits of Pennsylvania business. T&T does not ship its products to Pennsylvania. Unlike the defendant in *Viam*

*Corp.*, T&T has no exclusive distribution agreement with Electrolux/Frigidaire, and T&T is by no means the only company that sells oven gaskets for incorporation into Frigidaire ovens. Electrolux/Frigidaire does not market or advertise T&T's oven gaskets, let alone identify them by name, as in *Beverly Hills Fan Co.*, given that each gasket is merely one minor component of a larger and independently functional product, the home oven. Plaintiff has offered no evidence to suggest that consumers purchasing Frigidaire ovens are aware that the oven's heat-sealing gaskets were originally sold by a Texas corporation. T&T does not provide consumers, either directly [*19]   or indirectly, with a warranty for its products. Even if the purchaser of a Frigidaire oven were to contact an authorized Frigidaire service provider in Pennsylvania for a replacement gasket, there is no evidence that T&T would be involved in the replacement process in any way. In sum, T&T has neither designed its product to target the needs of Pennsylvania consumers, nor established channels for providing regular advice to Pennsylvania customers, nor marketed its product to consumers either directly, or indirectly, through a distributor or sales agent. See *Asahi Metal Industry Co., 480 U.S. at 112*. Thus, T&T's contacts with the forum state of Pennsylvania are clearly inadequate to satisfy Justice O'Connor's test of "stream of commerce-plus." It is arguable, however, that T&T's placement of oven gaskets into the nationwide stream of commerce, combined with its general awareness of their final destination, might be sufficient to satisfy Justice Brennan's less exacting standard for minimum contacts.

Despite the absence of clear guidance from either the Federal or Third Circuits, this Court must take a position with respect to the resolution of the instant action. Accordingly, [*20] [HN8] we find that a defendant does not "purposefully direct" his activities at a forum state merely by selling a component part to a nationwide distributor of home appliances with the awareness that appliances containing the defendant's product may ultimately be sold in the forum state. In keeping with the stream of commerce theory proposed by Justice O'Connor in *Asahi*, there must be some additional evidence of the defendant's purpose and intent to serve the forum state, such as state-specific marketing or design, the provision of customer support services, or an exclusive contractual relationship with a distributor in the forum state. The Supreme Court has held that "foreseeability alone" is not a sufficient benchmark for personal jurisdiction under the *Due Process Clause*, and we believe that adoption of the broad minimum contacts test enunciated by Justice Brennan in Asahi would run afoul of this prescription. *World-Wide Volkswagen Corp., 444 U.S. at 295*; see *Portella v. Life-Time Truck Prods., Inc., 127 F. Supp. 2d 652, 658-59 (E.D. Pa. 2000)*.

As this Court's jurisdiction over Defendants T&T and Hight Jr. would be grounded on the mere foreseeability [*21] that T&T's oven gaskets might be incorporated into products ultimately sold in Pennsylvania, we decline to exercise it. Absent some other justification for the exercise of personal jurisdiction, this Court must dismiss the claims raised by Plaintiff against Defendants T&T and Hight Jr.

**II. Jurisdiction Under the Alter Ego or Successor Theories**

Plaintiff contends that, even if Defendants T&T and Hight Jr. themselves had insufficient contacts with the forum state of Pennsylvania to satisfy the requirements of due process, this Court should nonetheless exercise jurisdiction because these Defendants are the alter egos or successors of H&M, a corporation with substantial and ongoing Pennsylvania contacts.

[HN9] Where an individual or a corporation has insufficient contacts with the forum state to satisfy due process, a court may nonetheless exercise personal jurisdiction if the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction before that court. *Minn. Mining & Mfg. Co. v. Eco Chem, 757 F.2d 1256, 1265 (Fed. Cir. 1985)* (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc., 519 F.2d 634 (8th Cir. 1975)*). [*22]   The alter ego and successor doctrines are closely related, and look to whether the later-formed entity is a mere continuation of its predecessor, as well as whether there are any indicia of fraud, illegality, or injustice. See generally, *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., 62 F. Supp. 2d 13, 19-20 (D.D.C. 1999)*; *Richard v. Bell Atl. Corp., 946 F. Supp. 54, 61 (D.D.C. 1996)*. In making these determinations, the court should consider the nature of the corporate entities' ownership and control, including commonality of stockholders or officers; common use of employees, business locations, or sales systems; common marketing or trademarking; similarity of core business lines; and commingling of funds and assets. See *Lucas v. Gulf & Western Industries, Inc., 666 F.2d 800, 805-806 (3rd Cir. 1981)*; *Gammino v. SBC Communs., Inc., 2005 U.S. Dist. LEXIS 5077 at 11-12 (E.D. Pa. 2005)*; *Material Supply Int'l, Inc., 62 F. Supp. 2d at 19-20*. The court should also consider the sufficiency of consideration paid for the transfer of the predecessor's assets or product line, as well as any other indicia [*23]   of fraudulent intent in the creation of the second entity. *Material Supply Int'l, Inc., 62 F. Supp. 2d at 19-20*; *Valley Finance v. United States, 203 U.S. App. D.C. 128, 629 F.2d 162, 172 (D.C. Cir. 1980)*.

In this action, Plaintiff has failed to show to this Court's satisfaction that Defendants T&T and Hight Jr. are true successors or alter egos of Defendant H&M. This

2005 U.S. Dist. LEXIS 17532, *

Court does recognize that Defendant Hight Jr. is an officer, shareholder, and employee of both T&T and H&M, and that T&T's headquarters are located at the same address as one of H&M's offices. This Court further recognizes that Hight Jr., as T&T's agent, is currently in the business of selling the same allegedly infringing oven gaskets he once sold as an agent of H&M, and to at least one of the same customers. However, the jurisdictional discovery that has been conducted since this Court's last order reveals a credible explanation of why T&T and Hight Jr. should not be considered successors or alter egos of H&M.

Hight Jr. owns only 5.6% of H&M's stock and does not participate significantly in the management, control, or day-to-day business decisions of H&M. (Flack Depo., pp. 112, 121; [*24] Hight Aff. P 4). H&M and Hight Jr. both maintain that there is no corporate relationship whatsoever between H&M and T&T. (Id. at pp. 105-106; Hight Aff. P 6). Nancy Flack, the president of H&M, avers that Hight Jr.'s 2004 creation of T&T resulted from a family rift concerning H&M's business line that occurred as early as October of 2003, at least three months before H&M was notified of a potential patent dispute. (Id. at pp. 30-37). H&M contends that the allegedly infringing gasket was designed by Hight Jr. and Sylvia Hight, and that H&M authorized Hight Jr. to make only two sales of sample gaskets on its behalf in 2003. (Id. at pp. 65-67, 82-84). Hight Sr. then determined that he was not interested in pursuing the oven gasket product line, and allegedly instructed Hight Jr. to stop purchasing and selling the gaskets on behalf of H&M. (Id. at pp. 33-37, 106-107, 114-115). H&M maintains that any invoices for gaskets issued after October 2003 were not authorized by H&M. (Id. at pp. 31-32, 74-78, 95). Furthermore, H&M makes no claims with respect to any patent rights for the product developed by Hight Jr. (Id. at pp. 108-109; Hight Aff. P 11).

Plaintiff asserts [*25] that T&T was created for the purpose of shielding H&M from patent litigation. However, every allegedly incriminating fact identified by Plaintiff is adequately rebutted by Nancy Flack's description of the events at issue. While Plaintiff contends that the timing of T&T's formation suggests an attempt to shield H&M from liability, this Court finds credible Nancy Flack's description of the October 2003 conflict between Hight Jr. and Hight Sr. with respect to H&M's sale of oven gaskets. And while Sylvia Hight's e-mails to the Chinese manufacturer may suggest an attempt by T&T to avoid liability for patent infringement, Plaintiff has offered no evidence beyond Sylvia Hight's use of an H&M e-mail address to suggest that H&M in any way authorized, or was even aware of, this course of action. Plaintiff also makes much of the fact that no consideration was paid by T&T to H&M for its gasket business, and that Hight Jr.'s gasket sales continued "seamlessly" through

the transition from H&M to T&T. However, as H&M admits that Hight Jr. and Sylvia Hight developed the gaskets, and now denies having any claim to the product's patent rights, the course of events highlighted by Plaintiff seems less [*26] troubling. If Hight Jr. and Sylvia Hight initially introduced their gaskets as a potential H&M product line, and were informed that H&M was not interested in pursuing this line of business, it should come as no surprise that Hight Jr. would subsequently decide to sell his product through a corporation of his own creation. If H&M has no rights to the product at issue, it is likewise logical than no consideration would be paid for the transfer of H&M's "interest" in the product. Plaintiff's final piece of evidence suggesting a link between H&M and T&T is that Hight Sr. provided T&T with a $ 25,000 start-up loan. However, Plaintiff has offered nothing to suggest that this $ 25,000 was anything other than a legitimate family loan from a successful father to a son who is starting his own business. Moreover, Hight Jr. also contributed over $ 150,000 of his own money towards the formation of T&T, $ 65,960 of which was deposited in late 2003, long before H&M even knew of the possibility of a patent infringement action by Davlyn. (Pl. Exh. I).

[HN10] The justification for imposing alter ego or successor jurisdiction is to prevent corporations from escaping liability by hiding behind sham entities. [*27] While the facts highlighted by Plaintiff tend to suggest that Hight Jr. was aware of the pending patent dispute when he incorporated T&T, Plaintiff has failed to set forth sufficient evidence demonstrating that H&M authorized or anticipated the creation of T&T, or had any expectation that T&T's formation would help H&M escape liability. In fact, the testimony of H&M's representative, Nancy Flack, indicates that Hight Sr., who owns 60% of H&M's stock, instructed Hight Jr. in October of 2003 not to make any additional purchases or sales of oven gaskets, either on H&M's behalf or on Hight Jr.'s own behalf. (Flack Depo., p. 34; Hight Aff. P 4)B. Thus, Plaintiff's assertion that T&T was created for the purpose of shielding H&M from jurisdiction or liability is grounded in little more than speculation. This Court finds that Plaintiff has failed to meet its burden of demonstrating that personal jurisdiction over Defendants would be proper under a theory of alter ego or successor liability.

## III. Defendants' Motion in the Alternative to Transfer

As this Court finds that it cannot exercise jurisdiction over Defendants T&T and Hight Jr. consistent with the requirements of due process, [*28] the claims against them must be dismissed, and Defendants' motion in the alternative to transfer this case to the Western District of Texas is moot. Plaintiff's action against Defendant H&M may proceed before this Court, and Plaintiff is free to

2005 U.S. Dist. LEXIS 17532, *

pursue its claims against Defendants T&T and Hight Jr. in a more appropriate forum.

An appropriate Order follows.

**ORDER**

AND NOW, this 18th day of August, 2005, upon consideration of the Renewed Motion to Dismiss, Or, In the Alternative, to Transfer of Defendants Tape & Technologies Incorporated and Henry C. Hight, Jr. (Doc. No. 35) and all responses thereto (Docs. No. 36, 37, 38), it is hereby ORDERED that the Motion is GRANTED. It is FURTHER ORDERED that this matter is DISMISSED as to Defendants Tape & Technologies Incorporated and Henry C. Hight, Jr. only.

BY THE COURT:

J. CURTIS JOYNER, J.