# TAB 5

LEXSEE 2004 US DIST LEXIS 19760

**eSPEED, INC.; CANTOR FITZGERALD, L.P.; CFPH, L.L.C., and eSPEED GOVERNMENT SECURITIES, INC., Plaintiffs, v. BROKERTEC USA, L.L.C.; BROKERTEC GLOBAL, L.L.C., GARBAN, LLC; ICAP PLC; OM AB; and OM TECHNOLOGY (U.S.), INC., Defendants.**

**Civil Action No. 03–612–KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 19760*

**September 13, 2004, Decided**

**PRIOR HISTORY:** *eSpeed, Inc. v. BrokerTec USA, L.L.C., 2004 U.S. Dist. LEXIS 20589 (D. Del., Sept. 9, 2004)*

**DISPOSITION:** [*1] Motion of defendant ICAP Plc to dismiss for lack of personal jurisdiction granted. Plaintiffs' contingent cross motion to compel discovery denied.

**COUNSEL:** Jack B. Blumenfeld, Esquire and Julia Heaney, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, counsel for plaintiffs.

Of counsel: Gary A. Rosen, Esquire, Law Offices of Gary A. Rosen, P.C., Philadelphia, Pennsylvania; David J. Wolfsohn, Esquire, Alan C. Promer, Esquire, and Michele D. Hangley, Esquire, Hangley Aronchick Segal & Pudlin, Philadelphia, Pennsylvania.

Richard L. Horwitz, Esquire and David E. Moore, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, counsel for defendants.

Of counsel: James W. Dabney, Esquire, Peter L. Simmons, Esquire, and Henry C. Lebowitz, Esquire, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

JORDAN, District Judge

### I. INTRODUCTION

This is a patent infringement case. Jurisdiction is proper under *28 U.S.C. § 1338*. The plaintiffs filed their Complaint on June 30, 2004, naming [*2] BrokerTec USA L.L.C. ("BrokerTec"), BrokerTec Global, L.L.C., Garban, L.L.C. ("Garban"), OM Technology (U.S.), Inc., OM AB, and ICAP Plc ("ICAP") as defendants. (Docket Item ["D.I."] 1.) Presently before me is ICAP's Motion to Dismiss for Lack of Personal Jurisdiction, pursuant to *Federal Rule of Civil Procedure 12(b)(2)*. (D.I. 161; the "Motion".) For the reasons that follow, ICAP's Motion will be granted.

### II. BACKGROUND

#### A. The Parties

The plaintiffs are all corporate entities recognized under the laws of the State of Delaware and have their principal places of business in New York, New York. (D.I. 1, PP 2–4; *see also* D.I. 512.) Defendants BrokerTec, BrokerTec Global, L.L.C., and Garban are all limited liability companies organized under Delaware law and have their principal places of business in Jersey City, New Jersey. (*Id., PP* 5–7.) ICAP is a corporation organized and existing under the laws of the United Kingdom and has a principal place of business in the United States in Jersey City, New Jersey. (*Id.,* P 8.)

#### B. Factual Background

Shortly after ICAP filed its Motion, the parties stipulated to and engaged in [*3] jurisdictional discovery. (*See* D.I. 185.) Because the plaintiffs have the burden of proving that it is proper for me to exercise personal jurisdiction over ICAP in this District, *see  Provident Nat'l Bank v. California Federal Sav. & Loan Asso., 819 F.2d*

*434, 437 (3d Cir. 1987)*, the following is taken largely from the plaintiffs' recitation of the facts (*see* D.I. 271 at 3-10), unless noted otherwise.

The plaintiffs allege that all of the defendants are willfully and intentionally infringing *U.S. Patent No. 6,560,580* B1 (issued May 6, 2003), which is entitled "Automated Auction Protocol Processor". (*See* D.I. 1, Ex. A.) ICAP, one of the six named defendants, is a public limited company incorporated in England and listed on the London Stock Exchange. (D.I. 162 at 2; D.I. 271 at 3.) n1 ICAP claims that it is not registered to conduct business in Delaware and that it has no registered agent for service of process in Delaware or any other state within the United States. (*Id.*) ICAP also asserts that it does not transact business, perform any work or services, or engage in any persistent course of conduct in Delaware. (*Id.*) ICAP characterizes itself as a "holding [*4] company" that is the "ultimate parent of a group of companies whose principal business is that of a worldwide voice and electronic interdealer broker of a variety of financial instruments in the wholesale markets." (D.I. 162 at 2.)

> n1 In support of its factual assertions pertaining to jurisdiction, ICAP cites the Declaration of Helen Broomfield, the Company Secretary of ICAP (attached to D.I. 162 as Ex. 1).

In its 2003 Annual Report, ICAP described itself as the "world's largest voice and electronic interdealer broker" with "more than 2,800 staff, operating from 21 offices worldwide." (D.I. 271 at 3-4.) Further, ICAP defines itself as the parent company of an array of entities that are members of the "ICAP Group" (hereinafter the "ICAP Group" or the "Group"). (*Id.* at 4.) ICAP owns 100% of the twelve American subsidiaries that are a part of the Group. n2 (*Id.* at 4.) The Group is managed, as a whole, by the ICAP Board of Directors (the "Board"). (*Id.*) The Board approves the ICAP Group's budget and makes [*5] regular internal audit visits to the Group's operating companies in the United States. (*Id.* at 5, 9.) ICAP earns about 35 percent of its profits from its operations in the United States. (*Id.* at 9.)

> n2 BrokerTec and Garban are two of ICAP's subsidiaries. (D.I. 271 at 6.) Furthermore, the following members of the ICAP Group have filed certificates of amendment or correction in Delaware between 1999 and 2003: First Brokers Securities LLC, Garban Capital Markets LLC, Garban Corporates LLC, Garban Futures LLC, Garban Information Systems (Americas) LLC, Garban Securities LLC, Garban LLC, ICAP Services North America LLC, Wembley Asset Management LLC,

and Wrightson ICAP LLC. (*Id.* at 8 (citing D.I. 275, Ex. 30).)

ICAP, together with its BrokerTec n3 and Garban subsidiaries, maintains two websites, namely, www.icap.com and www.brokertec.com. (*Id.* at 6.) These websites allow users to access and use the ICAP Group's accused electronic trading platforms n4 from anywhere in the world. (*Id.*)

> n3 ICAP acquired BrokerTec, a Delaware company, on May 7, 2003. (*Id.* at 7.)

[*6]

> n4 BrokerTec's Electronic Trading Network ("ETN") and Garban's Electronic Trading Community ("ETC"). (D.I. 271 at 6.)

### III. STANDARD OF REVIEW

Pursuant to *Rule 12(b)(2) of the Federal Rules of Civil Procedure*, a court may dismiss a suit for lack of jurisdiction over the person. According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987)*. This principle is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process.

*Rule 4(e)(1) of the Federal Rules of Civil Procedure* [*7] states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, *10 Del. C. § 3104(c)*, has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause. n5 *La Nuova D&B S.p.A. v. Bowe Co. Inc., 513 A.2d 764, 768 (Del. 1986)*. I must nevertheless determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the

Delaware long-arm statute and with defendant's constitutional rights to due process. *Intel Corp. v. Silicon Storage Tech., Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998); see generally, Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).*

n5 According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995).* The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed. Cir. 1998).* The Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done.

[*8]

As noted previously, once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred between the forum state and defendant to support jurisdiction. n6 *Provident Nat'l Bank, 819 F.2d at 437; see also Ace & Co., Inc. v. Balfour Beatty PLC, 148 F. Supp. 2d 418, 422 (D. Del. 2001)* (plaintiff must present facts that "establish with reasonable particularity" that the defendant is subject to personal jurisdiction). The plaintiff may demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities with the forum state. *American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc., 1999 U.S. Dist. LEXIS 12455, 1999 WL 615175 (D. Del. Aug. 3, 1999).* General jurisdiction does not require that the defendant's contacts are related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. *Id.*

N6 In this case, the parties agreed to conduct jurisdictional discovery shortly after ICAP filed its Motion (*see supra* at p. 2). The plaintiffs have filed a Contingent Cross Motion to Compel Discovery on the Issue of Personal Jurisdiction (D.I. 272) asking me to order ICAP to more fully respond to certain of the plaintiffs' jurisdictional discovery requests.

The parties had an ample opportunity to conduct jurisdictional discovery, and the plaintiffs have not persuaded me that ICAP improperly obstructed the course of that discovery. Furthermore, as discussed more fully *infra* at n.7, the discovery that the plaintiffs seek to compel is immaterial to the disposition of ICAP's Motion. Therefore, I will decide ICAP's Motion on the basis of the record currently before me, and the plaintiffs' Motion to Compel (D.I. 272) will be denied.

[*9]

The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply services or things in this State;
(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;
(5) Has an interest in, uses or possesses real property in the State; or
(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*10 Del. C. § 3104(c).* The above provisions have been construed "liberally so as to provide jurisdiction to the maximum extent possible" in order "to provide residents [*10] a means of redress against those not subject to personal service within the State." *Boone v. Oy Partek Ab, 724 A.2d 1150, 1156–57 (Del. Super. 1997).*

IV. DISCUSSION

ICAP asserts that it is not subject to jurisdiction in Delaware under any section of the Delaware long-arm statute. (D.I. 162 at 4–5.) The plaintiffs say that ICAP is subject to specific jurisdiction, under *10 Del. C. § 3104(c)(1),* on the basis of its website activities and its

subsidiaries' actions in Delaware. (D.I. 271 at 11–16, 20.) The plaintiffs also argue that ICAP is subject to general jurisdiction under *10 Del. C. § 3104(c)(4)* because it has "made continuous and systematic filings in Delaware relating to the formation, operation and cancellation" of its subsidiaries in Delaware (*see supra* at n.2). (*Id.* at 19.)

First, I am unpersuaded that it is appropriate to exercise specific jurisdiction over ICAP in Delaware on the basis of its website activity alone. "Where the defendant is clearly doing business through its website in the forum state, and where the claim relates to or arises out of use of the website," it is proper to exercise [*11] specific jurisdiction over a defendant. *See Toys 'R' Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452–54 (3d Cir. 2003)* (specific jurisdiction exists if "the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its website to the state, knowingly interacting with residents of the forum state via its website, or through sufficient other related contacts."). In this case, the plaintiffs have come forward with evidence showing that ICAP's websites are accessible to computer users anywhere in the world. Mere accessibility of a website, though, is not a matter of much moment. It is interactivity and the conducting of business over the Internet that carries jurisdictional consequences. *Toys 'R' Us, 318 F.3d at 452* (exercise of personal jurisdiction proper where commercial website's interactivity reflected specifically intended interaction with residents of the forum state) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)*). There is no evidence here that ICAP has any customers in Delaware, let alone customers who accessed ICAP's websites, downloaded the [*12] BrokerTec ETN or the Garban ETC, and then conducted trades from Delaware.n7 (*See* D.I. 271 at 20, 23.) Not only have the plaintiffs failed to show that ICAP specifically intended to interact with Delaware residents through its website, they have failed to show that there were any ICAP customers in Delaware who were actually capable of conducting electronic trading via ICAP's websites. Therefore, the plaintiffs have failed to prove that ICAP purposefully availed itself of conducting activity in Delaware by directly targeting its websites to Delaware or knowingly interacting with residents of Delaware through its websites, *see Toys 'R' Us, 318 F.3d at 453*, and I decline to exercise personal jurisdiction over ICAP on the basis of its website alone.

> n7 For that matter, there is no evidence that people in Delaware accessed ICAP's websites at all, *i.e.,* while surfing the Internet. I am aware of the plaintiffs' request to compel further discovery from ICAP pertaining to the "ICAP Website Report" compiled by a company called Webtrends (*see* D.I.

273 at 7); however, that information is immaterial, since the plaintiffs haven't even shown, in the first instance, that ICAP has customers in Delaware who are able to actually conduct business through any ICAP websites. For this reason, and for the reasons stated *supra* at n.6, the plaintiffs' request to compel further discovery pertaining to Webtrends will be denied.

[*13]

I am also unpersuaded by the plaintiffs' second argument that the actions of ICAP's subsidiaries may be attributed to ICAP for the purpose of establishing specific jurisdiction. (*Id.* at 16.) As ICAP points out, "under the agency theory only precise conduct known to be instigated by the parent is attributed to the parent" for jurisdictional purposes. (D.I. 296 at 4–5 (citing *C.R. Bard v. Guidant Corp., 997 F. Supp. 556, 558–59 (D. Del. 1998)).*) The record shows that ICAP owns twelve American subsidiaries that are a part of the ICAP Group, and that ICAP's Board manages the ICAP Group as a whole. However, there is no evidence that ICAP's Board exerted some particular control over BrokerTec, Garban, or other American subsidiaries, such that the conduct of those subsidiaries in Delaware would be attributed to ICAP. n8 Thus, the plaintiffs have failed to meet their burden of proving with reasonable particularity that exercising specific jurisdiction over ICAP is appropriate in this case.

> n8 To the extent that the plaintiffs are attempting to assert jurisdiction over ICAP under an alter ego theory, that theory is applicable only when "the party asserting jurisdiction [has established] some fraud, injustice, or inequity in the use of the corporate form." *Ace & Co., Inc. v. Balfour Beatty PLC, 148 F. Supp. 2d 418, 425 (D. Del. 2001)* (quoting *C.R Bard, 997 F. Supp. at 559*). The plaintiffs have not come forward with any evidence to establish those things in this case.

[*14]

In order for me to exercise general jurisdiction over ICAP, the plaintiffs must prove that ICAP has continuous or systematic contacts with Delaware. *American Bio Medica Corp., 1999 U.S. Dist. LEXIS 12455, 1999 WL 615175 at *2.* The plaintiffs say that ICAP "regularly transacts business within Delaware through the repeated formation, purchase, and operation of business entities" in Delaware. (D.I. 271 at 7.) The plaintiffs also argue that the ICAP Group has "merged and amended the articles and certificates for Delaware companies on numerous occasions." (*Id.* at 7–8.)

I am unpersuaded by the plaintiffs' argument that, because ICAP bought BrokerTec and the ICAP Group filed amended certificates for certain subsidiaries in Delaware, ICAP has continuous or systematic contacts with Delaware. First, when ICAP bought BrokerTec, BrokerTec was already an established Delaware corporation. ICAP did not take any steps to form or incorporate BrokerTec in Delaware. Second, there is no evidence on the record before me that ICAP, through its Board or otherwise, has done anything to disregard the separate corporate status and management that its subsidiaries have. There is evidence on the record that members [*15] of the Board occasionally travel to the United States on business; however, there is no evidence that they travel to Delaware. Furthermore, the fact that certain subsidiaries filed certificates of amendment in Delaware does not mean that ICAP filed those certificates, or even knew that they were being filed. The plaintiffs have not set forth any reason why the activities, in Delaware, of ICAP's subsidiaries should be imputed to ICAP itself. Because I find that the plaintiffs have not demonstrated with reasonably particularity that ICAP has continuous or systematic contacts with Delaware, I will not exercise general jurisdiction over ICAP.

Finally, the plaintiffs ask that I exercise jurisdiction over ICAP pursuant to *Federal Rule of Civil Procedure 4(k)(2)*, on the basis that ICAP has sufficient minimum contacts with the United States as a whole. (D.I. 271 at 29.) Personal jurisdiction pursuant to *Rule 4(k)(2)* may be exercised if (1) ultimately, the plaintiff's claim arises under federal law, (2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, and (3) the federal court's exercise of personal jurisdiction [*16] over the defendant does not offend the Constitution or other federal law. *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 258 (3d Cir. 2000)*.

In this case, the plaintiffs' patent infringement claims arise under federal law. However, ICAP asserts that it would properly be subject to jurisdiction in New Jersey, because that is where BrokerTec and Garban are headquartered. (D.I. 296 at 20.) Because ICAP is admittedly within the jurisdictional reach of New Jersey, I decline to exercise jurisdiction over ICAP under *Rule 4(k)(2)*. See *ISI Int'l, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001)* ("A defendant who wants to preclude use of *Rule 4(k)(2)* has only to name some other state in which the suit could proceed.")

V. CONCLUSION

For these reasons, ICAP's Motion (D.I. 161) will be granted and the plaintiffs' Contingent Cross Motion to Compel Discovery (D.I. 272) will be denied. An appropriate order will follow.

**ORDER**

For the reasons set forth in the Memorandum Opinion issued today, it is hereby ORDERED that defendant ICAP Plc's Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 161) is GRANTED and [*17] the plaintiffs' Contingent Cross Motion to Compel Discovery (D.I. 272) is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

September 13, 2004
Wilmington, Delaware

# TAB 6

LEXSEE 2004 US DIST LEXIS 3940

**PHILIPS ELECTRONICS NORTH AMERICA CORPORATION and U.S. PHILIPS CORPORATION, Plaintiffs, v. CONTEC CORPORATION, COMPO MICRO TECH, INC., SEOBY ELECTRONICS CO., LTD., REMOTE SOLUTION CO., LTD., F/K/A HANGO REMOTE SOLUTION, INC., Defendants.**

Civil Action No. 02–123–KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 3940*

**March 11, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by *Philips Elecs. N. Am. Corp. v. Contec Corp., 220 F.R.D. 415, 2004 U.S. Dist. LEXIS 4255 (D. Del., 2004)*
Reargument denied by, Motion to strike denied by, Summary judgment granted, in part, summary judgment denied, in part by *Philips Elecs. N. Am. Corp. v. Remote Solution Co., 2004 U.S. Dist. LEXIS 19807 (D. Del., Sept. 9, 2004)*

**DISPOSITION:** [*1] Defendant Remote Solution's motion to dismiss for lack of personal jurisdiction denied.

**COUNSEL:** For PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, U.S. PHILIPS CORPORATION, plaintiffs: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For COMPO MICRO TECH, INC., defendant: Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For HANGO REMOTE SOLUTION, INC., defendant: David L. Finger, David L. Finger, Esq., Wilmington, DE.

For REMOTE SOLUTION CO., LTD., third-party defendant: David L. Finger, David L. Finger, Esq., Wilmington, DE.

For COMPO MICRO TECH, INC., counter-claimant: Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, U.S. PHILIPS CORPORATION, counter-defendants: Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**MEMORANDUM ORDER**

I. INTRODUCTION

This is a patent infringement case. Jurisdiction is proper under *28 U.S.C. § 1338*. Presently before me is a Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion") filed [*2] by defendant Remote Solution Co., Ltd. ("Remote Solution") pursuant to *Federal Rule of Civil Procedure 12(b)(2)*. (Docket Item ["D.I."] 105.) For the following reasons, Remote Solution's Motion will be denied.

II. BACKGROUND

Plaintiffs Philips Electronics North America Corporation and U.S. Philips Corporation (collectively, "Philips"), both Delaware corporations, filed an action on February 12, 2002, alleging that Contec Corporation ("Contec"), also a Delaware corporation, was infringing *U.S. Patent No. 4,703,359* n1 (the "'359 patent") and *5,872,562* n2 (the "'562 patent"), both owned by Philips. n3 The technology disclosed in the *'359* and *'562* patents is directed to remote control units ("RCUs") for controlling home appliances from different manufacturers and categories. *See* '359 patent, col 1, lns. 15–17; '562 patent, col 1, lns. 13–16 (attached to D.I. 1 as Exs. A and B). On September 17, 2002, Philips filed an amended complaint joining Remote Solution and others as additional defendants in this action. (D.I. 41, 42.) Remote Solution is a Korean corporation with its principal place of business in Kimcheon City, Kyongbuk, Korea. [*3] (D.I. 41, Ex. A at P 6.) Philips alleges

that Remote Solution "manufactures and designs RCUs that infringe the patents in suit under a manufacturing and purchase agreement with Contec, and is subject to personal jurisdiction in [the District of Delaware]." (*Id.* at P 12.) One of the types of RCUs accused of infringement in this case is Remote Solution's model RT U49C. (*Id.*)

n1 The '359 patent, entitled "Universal Remote Control Unit With Model Identification Capability," names as inventors Robin B. Rumbolt, William R. McIntyre, and Larry E. Goodson. The '359 patent issued on October 27, 1987 and was assigned to Philips on May 25, 1993. (D.I. 42, Ex. A at P 16.)

n2 The '562 patent, entitled "Universal Remote Control Transmitter With Simplified Device Identification," names as inventors Donald P. McConnell and William R. McIntyre. The '562 patent issued on February 16, 1999 and was assigned to Philips on the same day. (D.I. 42, Ex. A at P 17.)

n3 Defendants Contec Corporation and Seoby Electronics Co. are no longer involved in this case, having submitted to a Consent Judgment on August 28, 2003. (D.I. 258.)

[*4]

Remote Solution filed its Motion on January 24, 2003, arguing that this court cannot properly exercise personal jurisdiction over it under Delaware's long-arm statute, *10 Del. C. § 3104*, or consistent with the requirements of the *Due Process Clause*. (D.I. 106 at 4, 9.) In support of its Motion, Remote Solution submitted the Declaration of its Director, Suk-Kyu Park. (*Id.*, Ex. A.) In his declaration, Mr. Park stated that Remote Solution does not have any offices, facilities, subsidiaries or employees in Delaware; is not registered to do business in Delaware; has not contracted to supply services or things in Delaware; has no sales force in Delaware; has derived no revenues from sales in Delaware; does not own any property, assets or bank accounts in Delaware or maintain any offices in Delaware. (*Id.* P 4, 7–10.) According to Mr. Park, Contec is Remote Solution's only customer for the accused RT U49C RCU. (*Id.* P 5.) Mr. Park further stated that Remote Solution maintains a website to provide information about its products, but Remote Solution does not accept orders through its website. (*Id.* P 12.)

After Remote Solution filed its Motion, the parties conducted jurisdictional [*5] and substantive discovery until September 15, 2003. (D.I. 286 at 2.) The following facts are taken from Philips' opposition to Remote

Solution's Motion. (D.I. 286.) Since Philips' factual allegations are not directly controverted, they are taken as true for purposes of determining jurisdiction in this court. *See Beverly Hills Fan Co. V. Royal Sovereign Corp., 21 F.3d 1558, 1563 (Fed. Cir. 1994).*

In 1997, Remote Solution decided to expand its RCU sales by entering the United States consumer market. (*Id.* at 5 (citing deposition testimony of Suk–Kyu Park at D.I. 287, Ex. 14).) To that end, Remote Solution hired David Ahn, a native Korean living in California, as its exclusive sales agent in the United States. (*Id.*) Mr. Ahn established Hango Electronics, Inc., d/b/a Remote Solution ("HEI") in California, for the sole purpose of soliciting customers in the United States on behalf of Remote Solution. (*Id.* (citing deposition testimony of David Ahn at D.I. 287, Ex. 3).) HEI is an independent corporation of which Mr. Ahn is the sole owner and employee. (*Id.*)

In 1999, HEI entered into a Manufacturing and Purchase Agreement with Contec, L.P., a New York limited [*6] partnership, wherein Contec L.P. retained HEI to design and manufacture RCUs and sell them to Contec L.P. n4 (D.I. 287, Ex. 15 at 1.) HEI also agreed to "defend any suit or proceeding brought against Contec L.P. to the extent that such suit or proceeding is based on a claim that the [RCUs] constitute an infringement of any valid United States ... patent ...." (*Id.* at 3.) In 2000, with Mr. Ahn's consent, HEI changed its name to Remote Solution, the name under which Mr. Ahn conducts business in California. (*Id.* at 6.)

n4 The relationship between Contec L.P. and Contec Corporation was fleshed out at oral argument. At some point in time, Contec L.P., a New York entity, merged with Contec LLC, another New York entity, which then merged with Contec Corporation, a Delaware entity. (D.I. 338 at 67:16–25.)

According to Mr. Ahn, Remote Solution's business plan was to sell as many RCUs as possible. (*Id.*) As a result of his extensive efforts to market the RCUs, Mr. Ahn acquired Contec, TiVo, Inc., Harman Kardon, [*7] Inc. and Hy–Tek Manufacturing Co., Inc. as customers for Remote Solution. (*Id.*) Remote Solution does not design its own remote controls, rather, it manufactures them according to its customers' specifications. (*Id.* at 7.) Contec is a Delaware corporation with its principal place of business in New York, and its primary business is to sell refurbished cable set top boxes and RCUs to major cable companies in the United States. (*Id.* at 10.) Contec's customers include Comcast, which provides cable television services to residents of Delaware. (*Id.*) Generally,

Remote Solution knows who Contec's customers are because Remote Solution marks the RCUs with those customer's logos. (*Id.*; D.I. 287, Ex. 10.) Remote Solution knew that Comcast was one of Contec's customers, as it sent drawings of the Comcast logo to Contec via email on April 24, 2002. (D.I. 287, Ex. 36.)

In 2000, Remote Solution established a subsidiary in the United States, Hango Remote Solution, Inc. ("Hango"). (D.I. 286 at 8.) Remote Solution was a 70% shareholder in Hango and Mr. Ahn owned the remaining 30%. (*Id.*) About half of Hango's revenue came from sales of Remote Solution's RCUs, Hango's primary [*8] business was marketing an MP3 player called Personal Jukebox. (*Id.* at 8-9.) Ultimately, however, Hango's business failed, and the company folded in December 2002. (*Id.* at 9.) Thereafter, Remote Solution began litigating this case on Hango's behalf as well as its own, filing an answer to the complaint and a motion to amend the answer to include a crossclaim against Contec for indemnification in the event Hango is found liable for patent infringement. (*Id.* at 9; *see also* D.I. 287, Ex. 2 at 8.)

Remote Solution has sold at least 1,969,849 of the accused RCUs in the United States since November 22, 2000. (D.I. 286 at 2 (citing Expert Report of Kerry Ruoff at D.I. 287, Ex. 1).) Based on the records obtained from TiVo, one of Remote Solution's customers, Philips discovered that at least 2,000 infringing RCUs manufactured by Remote Solution for TiVo have been sold or used in Delaware since March 31, 1999. (D.I. 286 at 3, 13.) According to TiVo's records, 1,738 residents of Delaware subscribed to TiVo's service between March 31, 1999 and May 28, 2003. (*Id.* (citing Declaration of Matthew P. Zinn at D.I. 287, *Ex. 39 P 12*).) Because TiVo sells its digital video [*9] recorders ("DVRs") bundled with the RCUs manufactured by Remote Solution, it is likely that more than 1,500 Remote Solution RCUs are being used for TiVo recorders in Delaware today. (*Id.* (citing D.I. 287, Ex. 39 PP 6, 17).) Furthermore, since January 1, 2000, more than 1,000 DVRs bundled with RCUs manufactured by Remote Solution were sold in Delaware at two retailers, specifically, 654 were sold at BestBuy and 406 were sold at Circuit City. (*Id.* (citing Declaration of Scott Jacobi at D.I. 287, *Ex. 40 P 7*; Declaration of Mark Smucker at D.I. 287, *Ex. 41 P 9*).)

## III. DISCUSSION

When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. *Intel Corp. v. Broadcom Corp., 167 F. Supp. 2d 692, 699 (D. Del. 2001)* (citing *Wright v. American Home Products, 768 A.2d 518, 526 (Del. Super. 2000)*).

To satisfy this burden, Philips must make a *prima facie* showing that this court may exercise personal jurisdiction over Remote Solution. *Id.* After discovery has begun, the plaintiff must sustain this burden [*10] by "establishing jurisdictional facts through sworn affidavits or other competent evidence." *Id.* (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984)*).

Determining whether Remote Solution is subject to personal jurisdiction requires a two-part analysis. *Id.* at 700; *see also Siemens Aktiengesellschaft v. LG Semicon Co., Ltd., 69 F. Supp. 2d 622, 624 (D. Del. 1999)*. First, I must determine whether the language of Delaware's long-arm statute, *10 Del. C. § 3104(c)*, reaches Remote Solution. *Broadcom, 167 F. Supp. at 700*. Second, if I find that Remote Solution's conduct gives rise to personal jurisdiction under the long-arm statute, I must then determine whether subjecting Remote Solution to jurisdiction in Delaware would comport with the *Due Process Clause of the Fourteenth Amendment to the United States Constitution. Id.* (citing *Intel Corp. v. Silicon Storage Tech, Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998)*).

### A. Jurisdiction over Remote Solution is Proper Under § 3104(c)(1) of Delaware's Long-Arm Statute

Philips contends that Remote Solution is subject to jurisdiction [*11] under *sections 3104(c)(1) and (c)(4)* of the Delaware long-arm statute (D.I. 286 at 17, 20), which provide:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
> ***
> (1) Transacts business or performs any character of work or service in the State;
> ***
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State ...

*10 Del. C. §§ 3104(c)(1) & (c)(4)*. Delaware state courts have interpreted the "transacting business" provision of *§ 3104(c)(1)* as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *See La Nuova D & B, S.p.A. v.*

*Bowe Co., 513 A.2d 764, 768 (Del. 1986)*. The Federal Circuit has held that, where a defendant has "purposefully shipped the accused [*12] [product] into [the forum state] through an established distribution channel ... no more is usually required to establish specific jurisdiction." *Beverly Hills Fan, 21 F.3d at 1564.* Moreover, in order to meet the requirements of § 3104(c)(1), Remote Solution's actions must be directed at residents of Delaware and the protection of Delaware laws. *See Thorn EMI N. Am. v. Micron Technology, 821 F. Supp. 272, 274 (D. Del. 1993)* (citing *Sears, Roebuck & Co. v. Sears, 744 F. Supp. 1289, 1292 (D. Del. 1990)).*

Philips argues that Remote Solution has shipped the accused RCUs into an established distribution channel as part of a general business plan that results in sales of the accused products in Delaware. (D.I. 286 at 18.) In response, Remote Solution argues that it merely had a general plan to serve the national market and that its activities were not directed specifically toward Delaware. (D.I. 309 at 2, 4.)

I find that Philips has presented competent evidence that an established distribution channel exists through which accused RCUs manufactured by Remote Solution are shipped to, distributed, and sold in Delaware. First, the [*13] evidence shows that Remote Solution and Contec have enjoyed a close business relationship since at least as early as 1999, when, in a manufacturing and purchase agreement governed by New York law, Remote Solution agreed to defend one of Contec's predecessors against any claims of patent infringement. Furthermore, Remote Solution is seeking indemnification from Contec for Hango, Remote Solution's defunct subsidiary, in the event Hango is found liable for patent infringement in this case. Philips has also presented competent evidence that Remote Solution knew that Comcast, a major provider of cable television services in the State of Delaware, was one of Contec's customers for the accused RCU. Given all of these facts, and in light of Remote Solution's ongoing business relationship with Contec, it was reasonably foreseeable that the accused RCUs would make their way into the Delaware market through Contec's customers. Documents obtained from Remote Solution show that Contec was selling the accused RCUs to Comcast, such that Remote Solution knew or should have known that the accused RCUs were being sold or distributed in Delaware. *See Thorn EMI, 821 F. Supp. at 275-76.* [*14]

Finally, Philips has competent evidence that the accused RCUs are present in Delaware in large numbers, and were present in Delaware prior to its filing suit, as a result of Remote Solution manufacturing the accused RCUs for TiVo. Because Philips has presented competent evidence of an established distribution channel that caused the ac-

cused RCUs to be sold and distributed in Delaware, and that the accused RCUs are actually present in Delaware, I find that jurisdiction over Remote Solution is proper under § 3104(c)(1), and I need not address the issue of whether jurisdiction over Remote Solution is proper under § 3104(c)(4). n5

n5 Remote Solutions relies upon *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp., 293 F. Supp. 2d 423, reconsideration denied, 293 F. Supp. 2d 430 (D. Del. 2003)* (granting defendant's motion to dismiss for lack of personal jurisdiction in patent infringement case) in support of its motion to dismiss. There are key factual distinctions between this case and *Commissariat.* First, unlike the plaintiff in *Commissariat,* Philips requested and conducted jurisdictional discovery which uncovered evidence of actual sales and the presence of the accused device in Delaware prior to and subsequent to the date the complaint was filed, evidence that was lacking in *Commissariat.* Second, that Remote Solution (1) agreed to defend a predecessor of Contec from patent infringement and (2) is seeking indemnification from Contec should Hango be found liable for patent infringement is evidence of Remote Solution's close business relationship with Contec, and its knowledge of the established distribution channel through which its products were being sent into Delaware. Thus, the quantum of evidence upon which to rest personal jurisdiction in this case is significantly greater than in *Commissariat.*

[*15]

B. Exercising Jurisdiction over Remote Solution in Delaware Comports With the Requirements of the *Due Process Clause*

Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)*. In considering whether jurisdiction may extend to a defendant, courts should primarily consider whether the defendant has purposely availed itself of the forum state's law, *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*, and whether the defendant reasonably could have anticipated being haled into the courts of the forum state, *World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291–92, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)*. Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interests of the plaintiff and the

forum state. *Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 114, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).*

In this case, the accused RCUs arrived in Delaware through [*16] Remote Solution's purposeful shipment of them through an established distribution channel. *See Beverly Hills Fan, 21 F.3d at 1565.* Philips has "stated all of the necessary ingredients for an exercise of jurisdiction consonant with the requirements of due process," namely, that Remote Solution placed the accused products in the stream of commerce, that it knew the likely destination of the products, and that its conduct and connections with Delaware were such that they should reasonably have anticipated being brought into court here. *Id. at 1566.*

Finally, litigating this case in Delaware would not place such a burden on Remote Solution as to offend traditional notions of fair play and substantial justice, especially since Remote Solution has executed an agreement to defend Contec L.P. against all claims of patent infringement, which proves that Remote Solution was well aware of and prepared for the possibility of litigation where Contec did business, including Delaware. Nor has Remote Solution shown that it does not have the resources to fairly litigate this case in Delaware. *See Thorn EMI, 821 F. Supp. at 276.* Moreover, "Delaware [*17] has an abiding interest in protecting the property rights of its residents[,]" *id.,* including corporate citizens such as Philips. Thus, exercising jurisdiction over Remote Solution in this case comports with the requirements of the *Due Process Clause.*

IV. CONCLUSION

For these reasons, it is hereby ORDERED that Remote Solution's Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 105) is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
March 11, 2004

# TAB 7

LEXSEE

**RED SAIL EASTER LIMITED PARTNERS, L.P., a Delaware limited partnership, DELPHI EASTER PARTNERS LIMITED PARTNERSHIP, a New York limited partnership, Plaintiffs, v. RADIO CITY MUSIC HALL PRODUCTIONS, INC., a Delaware corporation, ROCKEFELLER GROUP, INC., a New York corporation, SPECTACULAR PARTNERS, INC., a Delaware corporation, EASTER SHOW LIMITED PARTNERSHIP, a Delaware limited partnership, Defendants**

Civil Action No. 12036

Court of Chancery of Delaware, New Castle

1991 Del. Ch. LEXIS 113

June 12, 1991, Submitted
July 10, 1991, Decided

**PRIOR HISTORY:** [*1]

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff limited partners brought an action against defendants, partnership, corporate partner, corporate parent and corporate grandparent, alleging that they breached duties arising out of the limited partnership agreement. The corporate grandparent filed a motion to dismiss the complaint for lack of personal jurisdiction.

**OVERVIEW:** The partnership was a Delaware limited partnership and the corporate partner, and its corporate parent were Delaware corporations. The corporate grandparent was a New York corporation. The court noted that the only acts in Delaware that the corporate grandparent had done involved filings necessary to form and merge several wholly-owned subsidiaries. The court held that because the wrongs alleged did not arise from the business that the corporate grandparent conducted in Delaware, that Del. Code Ann. tit. 10, § 3104(c)(1) did not authorize service of process upon it in this case. The minimal connection that the corporate grandparent had with Delaware was insufficient to have predicated service of process on Del. Code Ann. tit. 10, § 3104(c)(4). The court held that the activities of the grandparent corporation's subsidiaries in Delaware could not be attributed to the corporate grandparent because they were not alter egos of the corporate grandparent. Finally, the court held that it was not enough to defeat a Del. R. Civ. P.

12(b)(2) or (5) motion to dismiss that the limited partners imagined that an act in Delaware might have been related to the wrong alleged.

**OUTCOME:** The court granted the corporate grandparent's motion to dismiss.

**CORE TERMS:** subsidiary, service of process, partnership, conspiracy, personal jurisdiction, general partner, incorporation, authorize, tortious, partner, exercise personal jurisdiction, conspiracy theory, partnership agreement, non-resident, formation, omission, wholly-owned, furtherance, transacted, conspired, invoke, controlling shareholder, ancillary agreements, course of conduct, sole stockholder, real estate, grandparent, enumerated, persistent, registered

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN1] The question whether to exercise personal jurisdiction over a non-resident defendant involves a two part inquiry: (1) may the defendant constitutionally be required to litigate the plaintiff's claim in this jurisdiction given the defendant's conduct, its relationship with the forum and the claims sought to be adjudicated; and (2) does the Delaware statutory law authorize exercise of the constitutional power to compel such adjudication in the courts of this state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN2] See Del. Code Ann. tit. 10, § 3104(c).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN3] Del. Code Ann. tit. 10, § 3104(c)(3) authorizes service of process when there is a tortious injury in the state by an act or omission in this state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN4] Del. Code Ann. tit. 10, § 3104 (c)(4) addresses a situation in which a defendant is generally affiliated with the forum jurisdiction. That is, subsection (c)(4) will apply when a defendant has had contacts with this state that are so extensive and continuing that it is fair and consistent with state policy to require that the defendant appear in the state and defend a claim even when that claim arose outside of this state and causes injury outside of this state.

**COUNSEL:**

William Prickett, Esquire, and Ronald A. Brown, Jr., Esquire, of PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE, Wilmington, Delaware; Attorneys for Plaintiffs.

William D. Johnston, Esquire, and Melanie K. Sharp, Esquire, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; OF COUNSEL: Ronald S. Rauchberg, Esquire, and Michael D. Povman, Esquire, of PROSKAUER ROSE GOETZ & MENDELSOHN, New York, New York; Attorneys for Defendants Radio City Music Hall Productions, Inc., Rockefeller Group, Inc. and Spectacular Partners, Inc.

Joseph A. Rosenthal, Esquire, of MORRIS, ROSENTHAL, MONHAIT & GROSS, P.A., Wilmington, Delaware; Attorney for Easter Show Limited Partnership.

**JUDGES:**

Allen, Chancellor.

**OPINIONBY:**

ALLEN

**OPINION:**

MEMORANDUM OPINION

This is an action by the limited partners of a Delaware limited partnership against the partnership, its corporate general partner, and the corporate parent and grandparent of the general partner. The allegation is that defendants have breached duties arising out of the limited partnership agreement and certain ancillary agreements between the limited partners and the general partner and its parent. Pending is a motion of the corporate grandparent -- Rockefeller Group, [*2] Inc. -- to dismiss the complaint for lack of personal jurisdiction.

Plaintiffs, Red Sail Limited Partners, L.P., and Delphi Easter Partners Limited Partnership, are the only limited partners of Easter Show Limited Partnership. The principal defendants are: the general partner, Spectacular Partners, Inc.; its sole stockholder, Radio City Music Hall Productions, Inc.; and Rockefeller Group, Inc., the sole stockholder of Radio City. Easter Show is a Delaware limited partnership, and Spectacular Partners and Radio City are both Delaware corporations. Rockefeller Group is a New York corporation.

Rockefeller Group has moved for dismissal under Rule 12(b)(2) and (5). It claims that no facts exist that would justify the assertion of personal jurisdiction over it by this court because it was not a party to the partnership agreement or any of the other agreements at issue; it does no business in Delaware; and it has done no act in Delaware related to this transaction. It affirms that it did cause the incorporation of Radio City Music Hall Products, Inc., as a Delaware corporation (as well as certain other subsidiaries), and it acknowledges that that required a filing in Delaware, but it asserts [*3] that that act was years ago and has no relationship whatsoever with the claims that plaintiffs would require it now to defend in this jurisdiction. This sole contact, unrelated to the facts alleged to constitute a wrong, is, it says, insufficient under the International Shoe line of cases n1 to support this court's exercise of personal jurisdiction over it.

n1 See, e.g., International Shoe Co. v. Washington, 326 U.S. 310 (1945); Shaffer v. Heitner, 433 U.S. 186 (1977); Burger King v. Rudzewicz, 471 U.S. 462 (1985); Burnham v. Superior Court of California, 110 S.Ct. 2105 (1991).

Plaintiffs respond that, in Sternberg v. O'Neil, Del. Supr., 550 A.2d 1105 (1988), the Delaware Supreme Court interpreted International Shoe and its progeny to permit the courts of this state to exercise personal jurisdiction over the parent of a wholly-owned subsidiary incorporated in Delaware on any cause of action arising out of the [*4] operation of that subsidiary. n2

n2 This principle is breath-taking in scope. It would apply for example to support jurisdiction over a New York corporation that owned a Delaware subsidiary whose employee was involved, during the course of his employment, in an intersection collision in Los Angeles.

* * *

Rockefeller Group's principal place of business is New York City. Its principal activity is developing, owning, and operating real estate. The record contains no evidence that Rockefeller Group owns real estate in Delaware or that it otherwise conducts business in Delaware. The only acts in Delaware that Rockefeller Group has done involve filings necessary to form and to merge several wholly-owned subsidiaries. Neither the formation nor the merger of any of those corporations constitute any part of the facts alleged in the complaint as a wrong. The record establishes that, before April of 1984, Rockefeller Group created four Delaware subsidiaries and caused two of those subsidiaries to merge into one of the other too. [*5] One of these two remaining Delaware subsidiaries is Radio City, the other is not a party to this litigation or otherwise associated with the agreements at issue.

The record also contains evidence of activity in Delaware by subsidiaries of Rockefeller Group. In April of 1984 a subsidiary of Rockefeller Group registered to do business in Delaware. This subsidiary, however, is in no way involved in this case.

* * *

[HN1] The question whether to exercise personal jurisdiction over a non-resident defendant involves a two part inquiry: (1) may the defendant constitutionally be required to litigate the plaintiff's claim in this jurisdiction given the defendant's conduct, its relationship with the forum and the claims sought to be adjudicated; and (2) does the Delaware statutory law authorize exercise of the constitutional power (if it exists in the circumstances) to compel such adjudication in the courts of this state.

I need not express an opinion on the constitutionality of requiring one in the position of Rockefeller Group to defend litigation of this sort in Delaware since I am firmly of the view that the language of the statutory enactment plaintiffs invoke to justify service of process -- [*6] Section 3104 of Title 10 of the Delaware Code -- cannot be stretched to cover this case without breaking the necessary connection between statutory words and common usage of the English language. See Trans-Americas Airlines, Inc. v. Kenton, Del. Supr., 491 A.2d 1139, 1142-43 (1985).

Plaintiffs invoke three subsections of Section 3104(c) as authorizing service of process on Rockefeller Group in this case. The pertinent statutory language is as follows:

[HN2]

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

* * *

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. (emphasis added)

[*7]

Application of these words to the acknowledged facts of Rockefeller Group's involvement with the alleged wrongs does not require great subtlety or the recitation of legal precedent. It is rather straight-forward.

In organizing subsidiary corporations in Delaware, Rockefeller Group has transacted business in this state (subsection (c)(1)), but the claims sought to be litigated here breach of contract and breach of alleged fiduciary duties, or wrongful participation or conspiracy in either - - in no sense relates to those activities in Delaware. Compare Papendick v. Bosch, Del. Supr., 410 A.2d 148 (1979), cert. denied, 446 U.S. 909 (1980). Section 3104 expressly requires that where substituted service is employed under its terms, the wrong alleged must arise from the "acts enumerated." As the wrongs here alleged do not arise from the business that Rockefeller Group transacted in Delaware, subsection (c)(1) of Section 3104 does not authorize service of process upon it in this case.

[HN3] Subsection (c)(3) authorizes service of process when there is a tortious injury in the state by an act or omission in this state. Since the only act in Delaware that [*8] Rockefeller Group can be said to have done is to cause the formation and merger of its subsidiaries, and since those acts themselves are no part of any wrong (in this state or outside of it), this subsection offers plaintiffs no ground to require Rockefeller Group to appear in this action. n3

n3 In so concluding I need not express any view on the question whether a financial impact on a Delaware corporation (arising for example from the misappropriation of trade secrets) is "tortious injury in the State" within the meaning of this section.

These two sub-sections address specific personal jurisdiction -- that is, jurisdiction to adjudicate a specific claim that itself is associated in some way with the forum jurisdiction. [HN4] Subsection (c)(4) addresses a situation in which a defendant is generally affiliated with the forum jurisdiction. That is, subsection (c)(4) will apply when a defendant has had contacts with this state that are so extensive and continuing that it is fair and consistent with state policy to require that [*9] the defendant appear here and defend a claim even when that claim arose outside of this state and causes injury outside of this state. See Sternberg v. O'Neil, 550 A.2d at 1117; Sears, Roebuck & Co. v. Sears plc, 744 F. Supp. 1297, 1302-04 (D. Del. 1990). Plainly, the minimal connection that Rockefeller Group has had with this state would be insufficient to predicate service of process on Section 3104(c)(4). There is here no "persistent course of conduct in the State" nor is there any suggestion that Rockefeller Group "derives substantial revenue from services, or things used or consumed in the State." Therefore, subsection (c)(4) is unavailing to plaintiffs.

I conclude therefore that Section 3104 does not authorize this court to exercise jurisdiction over Rockefeller Group. This conclusion is not inconsistent with the holding in Sternberg v. O'Neil, Del. Supr., 550 A.2d 1105 (1988). That case addressed the constitutional issue that questions of personal jurisdiction over non-resident defendants inevitably raises. It did not concern the separate question whether Delaware law authorized service of process, since the defendant [*10] there had appointed an agent and so was "present" in the state. Id. at 1109 (citing Pennsylvania Fire Ins. Co. v. Gold Issue Mining and Milling Co., 243 U.S. 93, 95 (1917). n4

n4 The present case is also different in this respect from In re USACafes, L.P. Lit., Del. Ch., Cons. C. A. 11146, Allen, C. (June 7, 1991), where the directors of a Delaware corporation were subject to service of process under the director's longarm statute, 10 Del. C. § 3114.

In Sternberg, the Delaware Supreme Court held that it was consistent with traditional notions of fair play and substantial justice -- that is, it was constitutional -- to require a foreign corporation that had long owned all of the stock of a Delaware corporation to appear and defend

a double derivative suit charging the directors of the Delaware company and its parent with breach of fiduciary duty.

Plaintiffs argue that, after Sternberg, this court must be authorized to exercise jurisdiction under Section 3104 over [*11] an out-of-state parent of a Delaware corporation because Section 3104 has been "construed to confer jurisdiction to the maximum extent possible under the due process clause." LaNuova D & B. S.p.A. v. Bowe Co., Inc., Del. Supr., 513 A.2d 764, 768 (1988). In my opinion, the Supreme Court did not intend in LaNuova to direct the trial court to ignore the specific words of Section 3104 and to henceforth analyze all questions arising under Section 3104 only in the broad terms of fundamental fairness that guide determination of the constitutional question. The Supreme Court commands that this statute be given a liberal construction so that its purpose is achieved, but it has not directed that the application of statutory words to the facts in hand be slighted.

Nor on the current record can the activities of Rockefeller Group's subsidiaries in Delaware be attributed to Rockefeller Group. n5 Courts in Delaware will ignore the separate corporate existence of a subsidiary and attribute its activities in Delaware to the parent only if the subsidiary is the alter ego or a mere instrumentality of the parent, or if the subsidiary acts as the agent of the parent. Buechner v. Farbenfabriken Bayer Aktiengesellschaft, Del. Supr., 154 A.2d 684 (1959); [*12] Sears, Roebuck & Co., 744 F. Supp. at 1304; Mobile Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 265-72 (D. Del. 1989). The record contains no evidence that either basis for imputing the acts of the subsidiary to the parent apply to Radio City or to the Rockefeller Group subsidiary that registered to do business here.

N5 Indeed, the record does not disclose any such activities in Delaware, except the filing by Radio City of the incorporation documents of Spectacular Partners and the filing by Spectacular Partners of the limited partnership documents. Thus, while those Rockefeller Group subsidiaries are plainly "present" in Delaware by reason of their incorporation, they do not do business generally in this state for purposes of Section 3104(c).

* * *

Finally, plaintiffs assert personal jurisdiction over Rockefeller Group based on a conspiracy theory of jurisdiction. It cites Istituto Bancario Italiano SpA v. Hunter Eng. Co., Inc., Del. Supr. 449 A.2d 210 (1982), [*13] but that case too dealt with the constitutional fairness

issue, not with statutory construction. In all events, the claim is that Rockefeller Group conspired with its wholly owned subsidiary to breach the partnership agreement and the ancillary agreements, and that the formation of Spectacular Partners and Easter Show were acts in Delaware in furtherance of that conspiracy.

A theory of personal jurisdiction based upon an alleged conspiracy between a foreign corporation and its wholly owned Delaware subsidiary is very close to being merely another way to assert that a controlling shareholder may always be sued in Delaware on any claim made against the subsidiary. A controlling shareholder does by definition control (or have the power to control) the acts of its subsidiary. Thus, an attempt to apply a conspiracy theory to parent-subsidiary corporations in order to extend the reach of Section 3104 raises particular concerns. I need not address those concerns, however, because, assuming that Rockefeller Group may be subjected to the compulsion of legal process under Section 3104 if any party with whom it is in conspiracy could be served under Section 3104, still plaintiffs have failed [*14] to show that any of the defendants could be served under the terms of that statute. In other words, if the conspiracy theory means Rockefeller Group may be sued in any jurisdiction in which an act in furtherance of the conspiracy occurred, plaintiffs have failed to make a prima facie case that the only Delaware acts -- filing of the Spectacular Partners incorporation document and of the limited partnership documents -- were part of a conspiracy to breach duties created by the funding of the limited partnership obligations. It is not enough to sustain service of process under Section 3104 when challenged on a motion under Rule 12(b)(2) or (5) that plaintiffs might imagine that an act in Delaware might possibly be related to the wrong alleged and that a non-resident defendant might possibly have participated in some way in that action ("conspired"). Plaintiffs' obligation is to come forward with some evidentiary support for such speculation. See Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc., Del. Ch., C. A. No. 11514, Allen, C. (Feb. 13, 1991). Here they have not done so.

The motion to dismiss is therefore *GRANTED*.

# TAB 8

LEXSEE 114 F. APP'X 449

**SHERIFF SAUDI, CAPTAIN, Appellant v. ACOMARIT MARITIMES SERVICES, S.A.**

No. 03–1609

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*114 Fed. Appx. 449; 2004 U.S. App. LEXIS 19443; 2004 AMC 2695*

**April 22, 2004, Argued**
**September 17, 2004, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by *Saudi v. Acomarit Maritimes Servs., 2005 U.S. LEXIS 3363* (U.S., Apr. 18, 2005)

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Pennsylvania. D.C. Civil Action No. 01–cv–04301. (Honorable Michael M. Baylson). *Saudi v. Acomarit Maritimes Servs., S.A., 245 F. Supp. 2d 662, 2003 U.S. Dist. LEXIS 1479 (E.D. Pa., 2003)*

**DISPOSITION:** Affirmed.

**COUNSEL:** JOE ALFRED IZEN, JR., ESQUIRE (Argued), Bellaire, Texas, Attorney for Appellant.

THOMAS R. NORK, ESQUIRE (Argued), Bell, Ryniker, Letourneau & Nork, Houston, Texas, Attorney for Appellee.

**JUDGES:** Before: SCIRICA, Chief Judge, ROSENN and GREENBERG, Circuit Judges.

**OPINIONBY:** SCIRICA

**OPINION:**

[*450] OPINION OF THE COURT

SCIRICA, *Chief Judge.*

In this personal injury suit, petitioner appeals a *Fed. R. Civ. P. 12(b)(6)* dismissal by the District Court for lack of specific and general personal jurisdiction. We will affirm.

**I.**

Plaintiff Sheriff Saudi was employed as a "mooring master" by American Eagle Tankers, a global maritime services company. As a mooring master, Saudi was assigned by his employer to moor supertankers or vessels on the high seas for the purpose of on-loading and off-loading petroleum [*451] and other cargo. Supertankers [**2] are often unable to enter American ports in the continental United States because the vessels' drafts exceed the depth of domestic ports.

Defendant Acomarit Maritimes Services, S.A. is an international ship management company. Acomarit is a Swiss company with headquarters in Bermuda. It neither engaged in business in Pennsylvania nor registered to do business in Pennsylvania. It does not maintain offices in Pennsylvania or an agent for service of process. It manages vessels, including supertankers, handling the vessels' crewing and provisioning, and ensuring that it arrives at its intended destination. Acomarit managed the Marine Atlantic, the supertanker involved in plaintiff's accident.

On May 17, 1999, Saudi left a vessel managed and operated by his employer, disembarked on to a tender vessel, and was placed aboard the Marine Atlantic supertanker. At the time, the Marine Atlantic was at anchor sixty miles southeast of Galveston, Texas, in international waters. The crane transferring Saudi to the tender vessel collapsed, causing him to fall fifty feet into the Gulf of Mexico. Saudi alleges he was lashed by the wire support cable of the crane and suffered extensive injuries including [**3] a broken arm, nerve damage, broken ribs, injured lungs, as well as lost wages and income.

**II.**

Saudi filed an admiralty and maritime action in the United States District Court for the Southern District of Texas against the owner of the Marine Atlantic, the manufacturer and servicer of the allegedly defective crane, the owner of the crude oil being stored on the Marine Atlantic, and Acomarit. *Saudi v. Marine Atlantic, 159*

*F. Supp. 2d 469 (S.D. Tex. 2000)*. He alleged claims of negligence, unseaworthy vessel, breach of warranty of merchantability, and strict liability in tort. *Id. at 472.* On February 1, 2000, the federal court in Texas granted without prejudice Acomarit's motion to dismiss for lack of personal jurisdiction. The court held Saudi failed to demonstrate sufficient minimum contacts to Texas or to the United States to establish specific or general personal jurisdiction in Texas or general jurisdiction under *Fed. R. Civ. P. 4(k)(2)*. *Id. at 483.* n1

> N1 Saudi has also filed actions in connection with his accident against various defendants in at least five federal jurisdictions, as well as in Texas and Wisconsin state courts. *See Saudi v. Northrop Grumman Corp.*, 273 F. Supp. 2d 101 (D.D.C. 2003) (products liability action); *Saudi v. S/T Marine Atlantic, 2001 U.S. Dist. LEXIS 14155, 2001 WL 893871 (S.D. Tex. Feb. 20, 2001)* (maritime negligence action); *Saudi v. Valmet-Appleton, Inc.*, 219 F.R.D. 128 (E.D. Wis. 2003) (products liability action); *Saudi v. V. Ship Switzerland, S.A.*, 93 Fed. Appx. 516, 517, 2004 U.S. App. LEXIS 5923 (Mar. 31, 2004). The record indicates he has not been able to establish personal jurisdiction in any of the federal courts against Acomarit.

[**4]

On May 16, 2001, Saudi filed a complaint in Pennsylvania state court, seeking actual and punitive damages against Acomarit for negligently failing to properly inspect and maintain the Marine Atlantic's crane, as well as negligently failing to make the Marine Atlantic safe for performing the operations for which he was hired. Saudi alleged jurisdiction was proper in Pennsylvania because Acomarit "employed" Thomas Garrett, a resident of Nazareth, Pennsylvania, who carried out Acomarit's business partly from Pennsylvania. Acomarit timely removed to federal court under *28 U.S.C. § 1332* and *28 U.S.C. § 1331*, as the case involved admiralty and maritime jurisdiction under *28 U.S.C. § 1333.*

Acomarit filed a motion to dismiss for lack of personal jurisdiction, which was denied with leave to refile by July 30, 2002. After a limited period of discovery, Acomarit [*452] filed a renewed motion to dismiss for lack of personal jurisdiction, which the District Court granted on January 31, 2003. *Saudi v. Acomarit Maritimes Servs., S.A*, 245 F. Supp. 2d 662, 667 (E.D. Pa.2003). The court found it lacked general jurisdiction because Acomarit's contacts with Pennsylvania were sporadic [**5] at best, rather than continuous and systematic, *id. at 669, 675*; and that it lacked specific jurisdiction because Saudi did

not allege that Acomarit purposefully directed its activities at the forum. The court found the Southern District of Texas's ruling on *Fed. R. Civ. P. 4(k)(2)* jurisdiction did not amount to claim preclusion, since a final adjudication on the merits (one of the requirements for claim preclusion) cannot result from a dismissal without prejudice for lack of personal jurisdiction. But the court rejected *Rule 4(k)(2)* jurisdiction on its merits, holding there was no nexus to the United States since the accident took place outside the territorial waters of the United States and had no effect inside the United States. *Id. at 679–80*. The court also rejected Saudi's motion to compel discovery, finding that Acomarit properly complied with Saudi's discovery requests. *Id. at 681*. Saudi filed this timely appeal.

### III.

We review *de novo* the District Court's dismissal of a party for lack of personal jurisdiction , *Pinker v. Roche Holdings, Ltd, 292 F.3d 361, 368 (3d Cir. 2002)*, [**6] but we review factual findings for clear error. *Pennzoil Products Co. v. Colelli & Assoc., Inc., 149 F.3d 197, 200 (3d Cir. 1998)*. We review for abuse of discretion the District Court's discovery rulings. *Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 707, 72 L. Ed. 2d 492, 102 S. Ct. 2099 (1982)*. We have appellate jurisdiction under *28 U.S.C. § 1291.*

### IV.

#### A. Personal Jurisdiction in Pennsylvania

Saudi claims that the District Court erred in dismissing his suit for lack of personal jurisdiction. *Fed. R. Civ. P. 4(e)* allows a district court to assert personal jurisdiction over a non-resident to the extent allowed by the law of the forum state. *Time.Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984)*. Pennsylvania's long-arm statute provides that a court may exercise personal jurisdiction over non-residents "to the fullest extent allowed under the Constitution of the United States." *42 Pa. Cons. Stat. Ann. § 5322(b).*

The *Due Process Clause of the Fourteenth Amendment* guarantees *in personam* jurisdiction [**7] may only be asserted over a nonresident defendant corporation if that defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)* (quotation omitted). In assessing personal jurisdiction, the court must resolve the question based on the circumstances that the particular case presents. *Burger King v. Rudzewicz, 471 U.S. 462, 485, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).*

A court may exercise personal jurisdiction over a de-

114 Fed. Appx. 449, *452; 2004 U.S. App. LEXIS 19443, **7;
2004 AMC 2695

fendant if the defendant has specific or general contacts with the forum. Specific jurisdiction is appropriate only if the cause of action is related to or arises out of the defendant's forum-related activities, so that it should reasonably expect to be haled into court. *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 (3d Cir. 1996); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8, 80 L. Ed. 2d 404, 104 S. Ct. 1868. The defendant must have [*453] "purposefully directed his activities as residents of [**8] the forum" and the litigation must have resulted from alleged injuries that "'arise out of or relate[] to those activities.'" *BP Chem. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000) (quoting *Burger King*, 471 U.S. at 472). This determination is both claim-specific and defendant-specific. *See Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir. 2001); *Rush v. Savchuk*, 444 U.S. 320, 332, 62 L. Ed. 2d 516, 100 S. Ct. 571 (1980).

If the cause of action does not "arise out of" the defendant foreign corporation's activities, a court may assert general jurisdiction if the corporation has "continuous and systematic" contacts with the forum state. *466 U.S. at 414–15.* The standard for evaluating whether minimum contacts satisfy the test for general jurisdiction is more stringent than the test applied to questions of specific jurisdiction. *See Noonan v. Winston Co.*, 135 F.3d 85, 93 (1st Cir. 1998).

### 1. Specific Jurisdiction

The District Court found no basis to exercise specific personal jurisdiction over Acomarit, as Saudi presented no evidence demonstrating the underlying accident arose [**9] out of or related to Acomarit's contacts with or activities in Pennsylvania, such that Acomarit "should reasonably expect being haled into court" in Pennsylvania. *245 F. Supp. 2d at 669* (quoting *Vetrotex, 75 F.3d at 151*). Saudi's claims against Acomarit relate only to an accident which occurred in the Gulf of Mexico, not in Pennsylvania or its territorial waters, and Saudi's alleged injury did not arise from any activities Acomarit "purposefully directed" at Pennsylvania. *Id.* We find no error.

### 2. General Jurisdiction

Saudi contends Acomarit had sufficient continuous and substantial contacts with Pennsylvania to establish general jurisdiction over Acomarit through its alleged employee Thomas Garrett. He claims that Osprey-Acomarit Ship Management employee Thomas Garrett was actually a "hidden" employee of Acomarit. According to Saudi, Acomarit hired Garrett as its port captain and entered into a joint venture with American Automar to form a company called Osprey-Acomarit Ship Management ("Osprey-Acomarit"), placed Garrett on that company's payroll, and hid the fact that Acomarit used a resident agent in the United States to carry out its business. [**10]

Even if Garrett was employed by Acomarit, Saudi has not shown sufficient contacts with Pennsylvania through Garrett's employment to warrant general jurisdiction over Acomarit. At most, Garrett traveled to and from Pennsylvania to Osprey-Acomarit's office in Maryland, where he had an office, sent some reports from his home in Pennsylvania, and made some telephone calls and some e-mails to and from Pennsylvania. There is no evidence that Acomarit conducted or solicited any business in Pennsylvania. With the exception of one vessel that paid a port call after the Saudi accident, no Acomarit-managed vessels entered Pennsylvania waters. As such, these actions in Pennsylvania are not sufficient to establish "continuous and systematic" contacts with Pennsylvania. *See, e.g., BP Chem. Ltd.*, 229 F.3d at 262 (finding lack of continuous and systematic contacts where the defendant corporation has no personnel or facilities in the forum and has not advertised or solicited business in the forum); *Nichols v. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993) (finding insufficient "continuous and substantial activities" to justify general jurisdiction despite defendant's [**11] solicitation activities and employment of representatives in the forum state). The District Court did not abuse its discretion in finding lack of general [*454] personal jurisdiction over Acomarit in Pennsylvania.

### B. *Fed. R. Civ. P. 4(k)(2)*

#### 1. Claim Preclusion and Issue Preclusion as Applied to the *Rule 4(k)(2)* Claim

The federal court in Texas dismissed Saudi's case without prejudice for lack of personal jurisdiction. Acomarit contends Saudi already litigated whether jurisdiction lies under *Fed. R. Civ. P. 4(k)(2)*, so he should have been estopped from litigating the *Rule 4(k)(2)* claim before the District Court here. *See Saudi v. S/T Marine Atlantic*, 159 F. Supp. 2d 469, 479–83 (S.D. Tex. 2000). Two types of estoppel might be applicable: res judicata (claim preclusion) and collateral estoppel (issue preclusion).

Claim preclusion does not apply here. Three elements are required for claim preclusion to take effect: (1) a final judgment on the merits must have been rendered in a prior suit; (2) the same parties or their privies are involved; and (3) the subsequent suit is based on [**12] the same cause of action as the original. *Lubrizol Corp. v. Exxon Corp*, 929 F.2d 960, 963 (3d Cir. 1991). The first prong has not been satisfied here. The federal court in Texas dismissed Saudi's suit for lack of personal jurisdiction, rather than issuing a judgment "on the merits." *See Fed. R. Civ. P. 41(b)*; *Compagnie des Bauxites de Guinee v. L'Union*

114 Fed. Appx. 449, *454; 2004 U.S. App. LEXIS 19443, **12;
2004 AMC 2695

*Atlantique S.A. d' Assurances, 723 F.2d 357, 360 (3d Cir. 1983).* Furthermore, dismissals without prejudice are not considered to be "final judgments" as required for claim preclusion to take effect. *Trevino-Barton v. Pittsburgh Nat'l Bank, 919 F.2d 874, 877–78 (3d Cir. 1990).* As the District Court correctly concluded, claim preclusion does not bar Saudi from bringing the current *Rule 4(k)(2)* action.

It is possible that issue preclusion, might bar Saudi's *Rule 4(k)(2)* action. n2 Issue preclusion may apply to non-merits judgments which are conclusive as to those matters actually adjudged. *See Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1209 (10th Cir. 2001)* ("Although the dismissal for lack of personal [**13] jurisdiction in the Puerto Rico district court does not have res judicata effect, it does have collateral estoppel effect, preventing the relitigation of issues decided in the Puerto Rico district court"); *Okoro v. Bohman, 164 F.3d 1059, 1063 (7th Cir. 1999).* To establish issue preclusion, Acomarit must demonstrate: "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Burlington N. R.R. v. Hyundai Merchant Marine Co., 63 F.3d 1227, 1232 (3d Cir. 1995)* (quoting *In re Braen, 900 F.2d 621, 628–29 n.5 (3d Cir. 1990), cert. denied, 498 U.S. 1066, 112 L. Ed. 2d 845, 111 S. Ct. 782 (1991)).* It appears all four elements may have been met here. The Southern District of Texas decided the same *Rule 4(k)(2)* issue that Saudi now raises, namely whether Acomarit was subject to personal jurisdiction based upon [*455] nationwide contacts. *See Saudi, 159 F. Supp. 2d at 479–83, and Saudi, 245 F. Supp. 2d at 676–681.* This issue was litigated [**14] in the Texas action, the Texas court issued a valid judgment regarding *Rule 4(k)(2)* jurisdiction, and the issue of *Rule 4(k)(2)* jurisdiction was essential to the Texas judgment in determining whether there was personal jurisdiction over Acomarit. *See  159 F. Supp. 2d at 479–83.* Nonetheless, the able District Court did not specifically address issue preclusion and so we are reluctant to rule on it here, especially since we believe plaintiff cannot prevail on the merits.

> n2 While counsel for Acomarit mainly focused its arguments on claim preclusion, their arguments appear to encompass issue preclusion as well. Counsel wrote in two separate briefs, "the Court correctly noted that the *issue* of *Rule 4(k)(2)* jurisdiction was 'previously resolved in the Texas litigation,'" App. 496, and "the *issue* of *Fed. R. Civ. P. 4(k)(2)* jurisdiction has already been decided by the United States District Court for the Southern District of Texas and serves as res judicata to bar the re-litigation of that claim in this case" (emphasis added). Furthermore, counsel for Acomarit supported its contentions by citing to  *Montana v. Supreme Court of the United States, 440 U.S. 147, 153–55, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979),* a case addressing issue preclusion.

[**15]

## 2. *Rule 4(k)(2)* Discussion on the Merits

Even if Saudi were permitted to bring a claim of personal jurisdiction under *Fed. R. Civ. P. 4(k)(2),* his claim would fail. *Rule 4(k)(2)* allows a federal court to exert jurisdiction over a foreign defendant where the defendant lacks sufficient contacts in a single state to bring it within the reach of the state's long arm statute, yet has enough contacts with the United States as a whole to make jurisdiction constitutional. Thomas A. Coyne, *Federal Rules of Civil Procedure* II–25 (2d ed. 2002). The rule, enacted in December 1993, provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Therefore, to establish personal jurisdiction, there must be: (1) a claim arising under federal law; (2) the defendant must be beyond the jurisdictional reach of any state [**16] court of general jurisdiction; and (3) the defendant must have sufficient contacts with the United States so that the court's exercise of personal jurisdiction over the defendant comports with the due process requirements of the Constitution or other federal law. *See BP Chem. Ltd., 229 F.3d at 262*; *United States v. Swiss American Bank, Ltd., 191 F.3d 30, 38 (1st Cir. 1999).* The third prong of the test under *Rule 4(k)(2)*—minimum contacts—is similar to that of personal jurisdiction for a particular state: "general jurisdiction is available when the defendant's contacts unrelated to the litigation are 'continuous and systematic.'" *BP Chemicals, 229 F.3d at 262* (citing  *Helicopteros, 466 U.S. at 416.* n3 [*456] Saudi claims he presented sufficient contacts with the United States, described by the Texas court as a "laundry list" but not elaborated on, *see 159 F. Supp. 2d at 483,* to ensure due process has been satisfied. He also argues his injury necessarily has an effect within the United States.

114 Fed. Appx. 449, *456; 2004 U.S. App. LEXIS 19443, **16;
2004 AMC 2695

n3 In *Leasco, 468 F.2d 1326*, a case decided before *Rule 4(k)(2)* was promulgated, the Court of Appeals for the Second Circuit stated:

> The *Restatement (Second) of Conflict of Laws, § 27*, lists various bases for the exercise of judicial jurisdiction over an individual who is not present. Those relevant here are doing business in the state, *§ 35*; doing an act in the state, *§ 36*; and causing an effect in the state by an act done elsewhere, *§ 37*.

*468 F.2d at 1340*. The Second Circuit chose three of the many factors under the Restatement which apply to the facts of that particular case.

*See also, e.g., United States v. Swiss American Bank, Ltd., 191 F.3d 30 (1st Cir. 1999)* (performing a *Rule 4(k)(2)* minimum contacts test but not limiting its analysis to the three factors described above); *Chew v. Dietrich, 143 F.3d 24 (2d Cir. 1998)* (same); *World Tanker Carriers Corp., 99 F.3d 717 (5th Cir. 1996)* (same); *Central States v. Reimer Express World Corp., 230 F.3d 934, 946 (7th Cir. 2000)* (ERISA case); *Doe v. Unocal Corp., 27 F. Supp. 2d 1174 (C.D. Ca. 1998)*; aff'd, *248 F.3d 915 (9th Cir. 2001)*; *SEC v. Knowles, 87 F.3d 413, 416–19 (10th Cir. 1996)* (involving a contract dispute); *Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A., 197 F.3d 1070, 1074–76 (11th Cir. 1999)* (tort case involving communication of misinformation).

[**17]

We do not believe that the "minimum contacts" presented by Saudi are sufficient to establish personal jurisdiction over Acomarit. As the District Court noted, Saudi presented even fewer contacts with the United States than the moving party in *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254 (3rd Cir. 2000)*. In *BP Chemicals,* we found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of *Rule 4(k)(2)* jurisdiction. *Id. at 258*. Although the defendant Taiwanese corporation exported its products to the United States, held an ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training, we held the cumulative effects of these contacts did not meet the requirements for general personal jurisdiction under *Rule 4(k)(2)*. *Id. at 258–59*. In this case, there appear to be fewer jurisdictional connections than in *BP Chemicals*. Saudi's accident occurred outside the United States, and Saudi presents no evidence that Acomarit solicited or transacted business in the United States. The District Court did not err in finding lack of sufficient [**18] contacts with the United States.

## C. Motion to Compel Discovery and Impose Sanctions

Finally, Saudi alleges Acomarit abused the discovery process and blocked discovery of jurisdictional facts. He alleges Acomarit committed unauthorized redactions, submitted meritless objections to requests for telephone bills and financial records showing reimbursements in Pennsylvania, and made unsupported claims that documents were destroyed and cannot be produced. Saudi claims that he is entitled to a finding of personal jurisdiction based on this alleged willful obstruction of discovery. The District Court found no abuse of discovery. It noted, "Despite [Saudi's] insistence that Acomarit has not produced documents in its possession, [Saudi] has not produced any evidence to prove that Acomarit is withholding documents." *Saudi, 245 F. Supp. at 681*. We see no abuse of discretion.

### V.

For the reasons stated above, we will affirm the judgment of the District Court.

# TAB 9

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2005 WL 3032535 (D.Me.)

(Cite as: 2005 WL 3032535 (D.Me.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Maine.
Richard SMITH, Plaintiff,
v.
PAT & JANE EMBLEMS, INC., Defendant.
**No. Civ. 05-127-P-H.**

Nov. 10, 2005.
Richard Smith, Camden, ME, Plaintiff pro se.

Aquafortis LLC, Paul A. Kelley Jr, Manager, Camden, ME, Plaintiff, pro se.

John A. Ciraldo, Perkins, Thompson, Hinckley & Keddy, Portland, ME, Lead Attorney, Attorney to be Noticed, Jennifer H. Pincus, Perkins, Thompson, Hinckley & Keddy, Portland, ME, Attorney to be Noticed, for Pat & Jane Emblems Inc, Defendant.

RECOMMENDED DECISION ON
DEFENDANT'S MOTION TO DISMISS AND
PLAINTIFF'S MOTION
RESPECTING SERVICE OF PROCESS

KRAVCHUK, Magistrate J.

*1 On July 6, 2005, Plaintiff Richard Smith, presently a Maine resident, filed suit under the Copyright Act against Defendant Pat & Jane Emblems, Inc. ("Emblems"), a Taiwanese manufacturer who allegedly manufactured and shipped to a New York distributor certain lapel pins that violated Smith's copyrights. In addition to copyright infringement, Smith alleges various common law torts. Smith's effort to accomplish service of process on Emblems was complicated by the fact that Smith does not know the physical address of the Emblems office in Taiwan, only its post office box address. Smith sent his complaint to Emblems by mail to the post office box, by fax and by email and also attempted to serve Emblems by serving a copy of the complaint and a summons upon certain individuals affiliated with American entities that do business with Emblems. On September 13, 2005, Emblems filed a motion to dismiss the action on the ground that service was not properly effectuated and also based on a lack of personal jurisdiction. (Def.'s Mot. to Dismiss, Docket No. 4.) On September 15, 2005, Smith filed a motion asking the Court to find that service was proper under the circumstances or to facilitate his efforts to effectuate proper service. (Pl.'s Mot. re. Service, Docket No. 5.) The Court referred both motions to me on October 18, 2005, for recommended decision. I recommend that the Court dismiss the complaint without prejudice.

Legal Standard

Because Smith's copyright infringement claim presents a federal question, this Court's ability to exercise "personal" jurisdiction over Emblems falls under the Fifth Amendment due process clause rather than its Fourteenth Amendment analogue. *United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 618 (1st Cir.2001); *Richards v. Tsunami Softgoods, Inc.,* 239 F.Supp.2d 80, 82 (D.Me.2003) . "Under the Fifth Amendment, the federal court's power to assert personal jurisdiction is geographically expanded due to the absence of the federalism concerns that are normally present in a diversity case." *Richards,* 239 F.Supp.2d at 82 (citing *United Electrical, etc. v. 163 Pleasant St.,* 960 F.2d 1080, 1085 (1st Cir.1992)). As a consequence, "a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." *Swiss Am. Bank,* 274 F.3d at 618. Nevertheless, in order to hale a defendant into a particular federal district court, a plaintiff must effectuate service of process in compliance with a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3032535 (D.Me.)

**(Cite as: 2005 WL 3032535 (D.Me.))**

federal statute or civil rule. *Id.; 163 Pleasant St.,* 960 F.2d at 1085; *Richards,* 239 F.Supp.2d at 82. In this regard, Federal Rule 4(k) states that a particular federal district court's power to "summons" a defendant is territorially limited. Ignoring certain inapplicable special situations, [FN1] the service of a summons from this Court "is effective to establish jurisdiction over the person of a defendant" only if that defendant could otherwise be subjected to the jurisdiction of a Maine state court of general jurisdiction. Fed.R.Civ.P. 4(k). [FN2] However, in the event that the defendant is beyond the reach of the forum state's long-arm statute, service of a summons from this Court will still be effective if the plaintiff can establish that the defendant, although subject to the laws of the United States, "is not subject to the jurisdiction of the courts of general jurisdiction of *any* state." Fed.R.Civ.P. 4(k)(2) (emphasis added). [FN3]

> FN1. For example, Rule 4(k)(1)(D) recognizes that certain federal statutes authorize service upon individuals who might not otherwise be within the reach of the forum state's long-arm statute. Unfortunately for Smith, the Copyright Act is not among them. *Richards,* 239 F.Supp.2d at 82.

> FN2. Rule 4 was amended in 1993. Among other changes, former subsection 4(f) was restated in a new subsection 4(k).

> FN3. This provision was added to the Federal Rules in 1993 in order to "correct[ ] a gap in the enforcement of federal law [when] the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contacts with any single state to support jurisdiction under state long-arm legislations or [any] Fourteenth Amendment limitation on state court territorial jurisdiction." *Id.* (advisory comm. notes re.1993 amendments at 50); *see also Swiss Am. Bank,* 274 F.3d at 618

(describing the provision as "closing the loophole").

*2 As the foregoing discussion implies, if Emblems does not have sufficient contacts with Maine to come within the reach of Maine's long-arm statute, but does have sufficient contacts with another state to support an exercise of jurisdiction by a federal district court in that forum, then a summons issued by this Court would lack the power to subject Emblems to this Court's jurisdiction even if Smith were to scrupulously adhere to all of the requirements of service set forth in Rule 4(f). *Richards,* 239 F.Supp.2d at 88. The calculus that has been developed in this federal Circuit to address the 4(k)(2) inquiry involves the following order and burdens of proof:

1. The plaintiff first attempts to demonstrate that the state long-arm statute grants either "specific" or "general" personal jurisdiction over the defendant and that such grant does not exceed constitutional limits;

2. If the plaintiff fails to carry the preceding burden, he or she must make the following *prima facie* showing on the Rule 4(k)(2) provision: (a) the claim arises under federal law; (b) personal jurisdiction is not available under any situation-specific federal statute and (c) the defendant's contacts with the nation as a whole suffice to satisfy the applicable constitutional requirements. *Richards,* 239 F.Supp.2d at 87 (citing *United States v. Swiss Am. Bank, Ltd.,* 191 F.3d 30, 41 (1st Cir.1999)). In addition, the plaintiff "must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state." *Swiss Am. Bank,* 191 F.3d at 41.

3. If the plaintiff carries the second burden, then it falls to the defendant to "produce evidence which, if credited, would show either that one or more specific states exist in which it would be subject to suit or that its contacts with the United States are constitutionally insufficient." *Id.*

4. If the defendant fails to run with this burden, then the Court may presume that no state court of general jurisdiction has personal jurisdiction over the defendant. However, if the defendant carries

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3032535 (D.Me.)

**(Cite as: 2005 WL 3032535 (D.Me.))**

its burden, the plaintiff must decide whether to: (a) move for a transfer; (b) voluntarily discontinue his action in the forum in which it is currently pending; or (c) contest the defendant's assertion that it is subject to the jurisdiction and process of the other specified forum(s). *Id.* at 42.

### Mr. Smith's Allegations

The complaint [FN4] contains the following material allegations. Richard Smith is a graphic artist and holds copyrights in certain of his works. (Compl. ¶¶ 10, 17, 32.) Smith currently resides in Maine. Smith previously licensed a New York business entity know as The Education People ("TEP") to market products bearing the likeness of his copyrighted work. (*Id.* ¶ 9, 34, 39-40.) TEP contracted with Pat & Jane Emblems, Inc., a Taiwanese manufacturer, to produce certain goods, including a "Circle of Children" or "Circle of Kids" lapel pin, made in the likeness of Smith's copyrighted work. (*Id.* ¶¶ 3, 13- 14, 33, 35-36.) Emblems produced the goods and shipped them to yet another party, Metro-Pack Inc., a New York business entity that operates a warehouse and distribution center located in Newburgh, New York. (Compl.¶¶ 7-8, 36, 62-63.) The goods ordered by TEP, made by Emblems and warehoused and distributed by Metro-Pack were sold primarily in a mail order catalog marketplace, although possibly in other markets as well. (*Id.* ¶ 48.) The catalog in question was produced for TEP by Bookcrafters, Inc., a denizen of Illinois, and printed by Berlin Industries, Inc., alleged to be a Delaware corporation with facilities in Delaware, Illinois and Nevada. (*Id.* ¶¶ 49- 53.) Berlin mails the catalogs to individuals living in states throughout the country, including Maine. (*Id.* ¶ 54.) Orders for the products advertised in the catalogs are routed to Metro-Pack for processing and shipment. (*Id.* ¶ 64.)

> FN4. Smith filed an amended complaint after the filing deadlines were terminated respecting the pending motions and after the motions were referred for recommendation. (Amended Compl., Docket No. 15.) The amended complaint adds several defendants but does not

appear to change the basic nature of Smith's claims against Emblems. Smith did not file a motion to amend in conjunction with the amended complaint. The electronic docket reflects that on November 9, 2005, Emblems filed a motion to dismiss the amended complaint. (Docket No. 17.)

**\*3** Smith and TEP previously litigated two copyright infringement actions in the United States District Court for the Southern District of New York which arose from TEP's continued production and/or distribution of certain copyrighted work after Smith revoked or otherwise discontinued the license to reproduce his work and after the initial lawsuit was settled. (*Id.* ¶¶ 10-11, 40-46.) According to Smith, Emblems infringed his copyrights by manufacturing and shipping to Metro-Pack additional products based on Smith's copyrighted work subsequent to the revocation of the license and/or the settlement of his first suit against TEP. ( *Id.* ¶¶ 2.)

Smith describes Emblems as "an alien entity with no known physical business holdings or real property in this country, although it regularly exports goods to the United States of America." (*Id.* ¶ 6.) According to Smith, "Pat & Jane [Emblems] produced goods bearing Smith's Artwork, sold them to TEP, and exported them to the United States." (Compl.¶ 36.) Smith alleges that Emblems "may have assigned, licensed, sold or otherwise transferred Smith's Artwork to other Parties. .... Pat & Jane [Emblems] may sell products in other markets or to other customers unknown to the Plaintiff." (*Id.* ¶ 37.) Other than these theoretical allegations of shipment to unknown individuals, Smith's complaint is based entirely on the alleged production and shipment of infringing goods made for TEP and shipped to Metro-Pack in New York. ( *Id.* ¶ 62.)

### Defendant's Affidavits

Emblems has submitted affidavits from Attorney Kenneth Africano, counsel for TEP in the New York litigation and counsel for Emblems herein, and from Patrick Chu, the president of Emblems.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3032535 (D.Me.)

**(Cite as: 2005 WL 3032535 (D.Me.))**

(Docket No. 4, Elec. Attach. 1 & 2.) Mr. Africano's affidavit corroborates Smith's allegations concerning the business relationship that exists among TEP, Metro-Pack and Emblems and also relates that the license between Smith and TEP was discontinued around 1999. (Africano Aff. ¶¶ 4-5.) According to Africano, this litigation arises out of TEP's "erroneous" acceptance of approximately $16,000 in orders for a certain "Circle of Children" lapel pin and $500 in orders for another pin. (*Id.* ¶ 5.) In the second of the prior suits, the jury returned a verdict for Smith in the sum of $35,000 and found that TEP has not intentionally violated Smith's copyrights. (*Id.* ¶ 6.) Africano further states that the subject pins were made by Emblems in Taiwan and shipped to Metro-Pack's New York facility, and that none of the underlying "dealings" have any nexus to Maine. (*Id.* ¶ 11.) He also relates that Smith lived and worked in New York at the time of the events that give rise to this action. (*Id.*)

Mr. Chu's affidavit relates that Metro-Pack is not a subsidiary or affiliate of Emblems, that none of the principals of Emblems have any ownership interest in Metro-Pack and that Metro-Pack's principal, one Mr. Sgombich, is not and never has been an officer, director, employee or agent of Emblems. (Chu Aff. ¶ 3.) Chu further relates that Emblems has its sole place of business in Taiwan and is not incorporated in, owns no property or office in and maintains no personnel or agents anywhere in the United States. ( *Id.* ¶ 7.) Chu avers that Emblems has never had any business dealings with Maine and has never shipped products to Maine. (*Id.* ¶¶ 10-11.) According to Chu, Metro-Pack's Newburgh, New York facility is the only location to which it has shipped goods in the United States. (*Id.* ¶ 12.) Both Mr. Chu and Mr. Africano offer further averments regarding the quality of Mr. Smith's efforts to date to serve Emblems. Neither offers any opinion regarding Emblems's amenability to service of process issued by any of the United States District Courts for the District of New York.

### Mr. Smith's Responsive Proffer

*4 In support of his motion regarding service and in opposition to Emblems's motion to dismiss,

Smith submitted five exhibits that reflect the steps he has taken to date to serve Emblems with the complaint and summons. (Docket No. 5, Exs. A-E.) He has also filed some invoices that appear to reflect shipments from Emblems to Metro-Pack (Docket No. 7, Exs. B, C, E), a copy of an April 14, 2005, judgment entered in the New York litigation against TEP (*id.,* Ex. D), and a copy of a publication prepared by the Maine Arts Commission in August 2004 titled, "Proceedings from the Blaine House Conference on Maine's Creative Economy" (*id.,* Ex. F). None of these documents appear to have any tendency to establish that Emblems has any jurisdictional contacts with the State of Maine. Smith also fails to controvert any of the sworn statements made by Mr. Africano or Mr. Chu on the jurisdictional question.

### Discussion

Mr. Smith's first challenge is to demonstrate that Maine's long-arm statute grants either specific or general jurisdiction over Emblems. Smith notes that neither of the affidavits submitted by Emblems disavows an agency relationship between Emblems and TEP. (Pl .'s Opp'n to Def.'s Mot. to Dismiss at 4, Docket No. 7.) Although this is true, Smith did not attempt to serve Emblems by personally serving TEP or its principal. He did, however, serve Mr. Sgombich of Metro-Pack with the complaint and summons. Additionally, it is not Emblems's burden to demonstrate the absence of jurisdictional contacts; it is up to Smith to demonstrate the existence of such contacts. Smith also digresses into a discussion of whether there might exist an agency relationship between Metro-Pack and TEP. Although he considers it a matter of "grave concern," the relationship of those parties does not speak to Emblems's own contacts with the State of Maine. (*Id.* at 6.) Next Smith argues that the Africano and Chu affidavits ought to be disregarded because they are not evidence. (*Id.*) This is, of course, incorrect. Like other sworn testimony, statements made in affidavits can be competent evidence. Smith offers no contradictory evidence on the material question of Emblems's contacts with Maine and his complaint does not allege any actual contacts by Emblems either. As a fallback, Smith requests that the Court grant him leave to conduct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3032535 (D.Me.)

**(Cite as: 2005 WL 3032535 (D.Me.))**

jurisdictional discovery, postulating that agency relationships or business affiliations may exist between or among Emblems, Metro-Pack, TEP and/or Berlin Industries that would prove sufficient to meet the jurisdictional contacts test. (*Id.*) With regard to the agency or affiliation issue, Mr. Chu has averred that Emblems owns no property in the United States and has no agents here, either.

Because the record is devoid of any evidence that Emblems has either general and systematic contacts or litigation specific contacts with Maine, the Court should move on to the subsequent inquiries. With regard to jurisdictional discovery, the Court has broad discretion to permit or deny it. *Noonan v. Winston Co.,* 135 F.3d 85, 94 (1st Cir.1998). The only Maine contacts that any of the third-parties have with this forum involve the alleged distribution of catalogs to Maine residents by Berlin Industries and the possible shipment of goods from Metro-Pack's facility in response to theoretical orders placed by Maine residents. In order for these Maine contacts to be relevant to the question of this Court's jurisdiction over Emblems, discovery would have to demonstrate that Metro-Pack or Berlin shipped the catalogs or goods to Maine residents for Emblems. [FN5] Smith's own allegations reflect that Metro-Pack and Berlin advertised and distributed the goods for TEP, not for Emblems. [FN6]

> FN5. As noted by Judge Carter in *Richards,* the First Circuit Court of Appeals has cautioned that "sales by an independent distributor ... or separately incorporated subsidiary normally do not count as 'contacts' of the manufacturer or parent corporation." 239 F.Supp.2d at 86 n. 3 (quoting *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik,* 295 F.3d 59, 63 n. 3 (1st Cir.2002)).

> FN6. Smith argues that because the State of Maine wants to develop a "creative economy," it would want a state court to exercise jurisdiction over Emblems in order to protect a local artist's creative work. I find Maine's generalized interest in developing a creative economy to be

insufficient to give rise to personal jurisdiction over a foreign corporation that has no generalized, systematic contacts with Maine and has not engaged in any forum contacts that contributed to the claim at issue.

*5 Turning to the Rule 4(k)(2) prima facie test, Smith must demonstrate that his claim arises under federal law, that personal jurisdiction is not available under any situation-specific federal statute and that the defendant's contacts with the nation as a whole suffice to satisfy the applicable constitutional requirements. In addition, he "must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state." *Swiss Am. Bank,* 191 F.3d at 41. Smith's copyright claim arises under a federal law, the Copyright Act, which does not afford this Court with the power to effectuate nationwide or global summonses beyond the territorial limits of Maine's long-arm statute. *Janmark Inc. v. Reidy,* 132 F.3d 1200, 1201 (7th Cir.1997); *Richards,* 239 F.Supp.2d at 87. Thus, Smith meets the first two prongs of the test. The third test is whether Emblems has sufficient minimum contacts with the Nation as a whole to satisfy Fifth Amendment due process precepts. *Swiss Am. Bank,* 191 F.3d at 41; *Quick Techs. v. Sage Group Plc,* 313 F.3d 338, 344 (5th Cir.2002). The most significant record evidence regarding forum contacts reflects that Emblems exports goods to New York in response to commercial orders placed by TEP, a United States domiciliary. Even if these contacts are not sufficient to support a finding that "general jurisdiction" exists, *see Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408 (1984), these contacts are likely sufficient to support a finding that specific jurisdiction exists because these exports and the related contracts (all New York contacts) reflect that Emblems has purposefully directed its commercial activities at a United States forum and the litigation arises directly out of certain of these individual contacts (contracts and exports), which are alleged to amount to contributory infringement, *see, e.g., Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 638 (S.D.N.Y.2000) (finding that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3032535 (D.Me.)

**(Cite as: 2005 WL 3032535 (D.Me.))**

foreign defendant's mere licensing of domestic defendants' production and distribution of copyright infringing articles likely gave rise to personal jurisdiction over foreign defendant); *Quick Techs.*, 313 F.3d at 344 (addressing Lanham Act claim and dismissing case against foreign defendant because the defendant's United States contacts were not systematic and the plaintiff's claims did not arise out of the defendants' alleged contacts); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-473 (1985) (discussing the specific jurisdiction standard). In effect, due process would not be offended because the exercise of personal jurisdiction under these circumstances would not "offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales,* 466 U.S. at 414 (internal quotation marks omitted). Thus, I conclude that Smith meets his third *prima facie* test.

*6 The fourth hurdle in Smith's path requires him to certify that, "based on the information that is readily available to [him, Emblems] is not subject to suit in the courts of general jurisdiction of any state." *Swiss Am. Bank,* 191 F.3d at 41. Smith fails to clear this final hurdle. Although Smith asserts that he would "be left to question whether he has *any* remedy available ... in *any* U.S. Court" in the event that his complaint is dismissed (Pl.'s Opp'n at 2), he simply fails to assert in a positive fashion that no other state could legitimately issue process and subject Emblems to its jurisdiction. The obvious state that jumps to mind here is New York given that all of Smith's allegations about Emblems's contacts with the United States describe contacts with New York. Whether the New York long-arm statute would reach Emblems under the circumstances of this case is something the parties have simply declined to address. I decline to address that question in the absence of any briefing by the parties, although I note that Emblems appears to assume that New York courts would have personal jurisdiction over it, which seems reasonable to me. (Def.'s Mot. to Dismiss at 9-10, arguing that New York is the proper venue for this litigation). However, I do note that the reach of New York's long-arm statute is not coextensive with the limits of due process, so that the preceding discussion does not resolve the issue. *See Jacobs v. Felix Bloch Erben Verlag fur Buhne Fime und Funk KG,* 160 F.Supp.2d 722, 739 (S.D.N.Y.2001) (discussing section 302(a)(1) of New York's long-arm statute). Because the initial burden falls upon Smith and he has failed to shoulder it, it would be inappropriate for this Court to presume that Rule 4(k)(2) authorizes this Court to determine his cause. *Swiss Am. Bank,* 191 F.3d at 41-42. Nor would it seem to be appropriate for this Court to *sua sponte* consider a transfer as Smith has argued against such a resolution to the pending motions and there are legitimate concerns over Smith's adherence to Rule 4's service requirements, although they are likely surmountable. *See* Rule 4(d).

### Conclusion

For the reasons set forth above, I RECOMMEND that the Court GRANT Defendant Pat & Jane Emblems's Motion to Dismiss (Docket No. 4). I further recommend that the Court DENY Plaintiff Richard Smith's Motion Respecting Service (Docket No. 5) because the absence of personal jurisdiction over the defendant renders the motion moot; even if service were properly effectuated, that would not cure Smith's failure to demonstrate this Court's personal jurisdiction over Emblems.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

*7 Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Slip Copy, 2005 WL 3032535 (D.Me.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 3032535 (D.Me.)

**(Cite as: 2005 WL 3032535 (D.Me.))**

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2864206 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss of Defendant, Pat & Jane Emblems, Inc. and Incorporated Memorandum of Law (Sep. 13, 2005)

• 2005 WL 2098253 (Trial Pleading) Complaint (Jul. 06, 2005)

• 2:05cv00127 (Docket) (Jul. 06, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.