

Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

PUBLIC VERSION

April 17, 2007

**Philip A. Rovner**
Partner
provner@potteranderson.com
302-984-6140    Direct Phone
302-658-1192    Fax

April 10, 2007

**BY E-FILE AND HAND DELIVERY**

The Honorable Mary Pat Thynge
United States Magistrate Judge
United States District Court
　for the District of Delaware
U.S. Courthouse
844 King Street
Wilmington, DE  19801

**CONFIDENTIAL, FILED UNDER
SEAL PURSUANT TO PROTECTIVE
ORDER**

**IN CAMERA REVIEW**

Re:　Honeywell International, Inc. *et al.* v. Apple Computer, Inc. *et al.*
　　D. Del., C.A. Nos. 04-1338, 04-1337, 04-1536

Dear Magistrate Judge Thynge:

　　We write on behalf of Fuji Photo Film Co, Ltd., now FUJIFILM Corporation, and Fuji Photo Film U.S.A., Inc., now FUJIFILM U.S.A., Inc. ("Fuji") to seek an order pursuant to Section 3(e) of the Scheduling Order to compel discovery of all factual data and documents, including document HW019751-55, which Honeywell has "clawed back", and photographs and databases relating to "teardowns" (i.e., dismantling of products) performed by Plaintiffs ("Honeywell"), as well as access to the physical products torn down.　The product selection, teardown and documentation process followed by Honeywell is described at pages 84-124, 128-37 of the deposition of Teddy J. Wood (Ex. 1), the Honeywell engineer in charge.　Honeywell has refused to produce such documentation, photographs and samples on work product and attorney-client privilege grounds and invoked the privilege repeatedly to limit testimony on the process to generalities.　Ex. 1 at 85-88, 101, 104-08, 110-11, 112-13, 122-28, 134-36, 138-41.　Such discovery is relevant to Fuji's understanding of the full scope of Honeywell's claims and claim interpretation and more specifically, to Fuji's laches and non-infringement defenses.

　　The teardown data, documentation and photographs are not attorney-client privileged because they are factual information collected by technical personnel, not confidential communications between an attorney and a client for the purpose of obtaining legal advice.

The Honorable Mary Pat Thynge
April 10, 2007
Page 2

"Only where the document is primarily concerned with legal assistance does it come with [attorney-client or work product] privileges; technical information is otherwise discoverable." *Loctite Corp. v. Fel-Pro, Inc.*, 667 F.2d 577, 582 (7th Cir 1981). Fuji seeks only the factual data and related materials not otherwise available to Fuji, not Honeywell's legal analysis of why certain products were deemed to be either infringing or non-infringing. Furthermore, to the extent privilege and/or work product immunity attached to the materials, Honeywell has waived such protection or the exception of Fed.R.Civ.P. 26(b)(3) applies. *In camera* review of the documents at issue, which should be listed on Honeywell's privilege log, is requested.

Honeywell has drawn an unreasonable line by preventing discovery of technical and factual information and documents. *See Simon v. G.D. Searle & Co.*, 816 F.2d 397, 403 (8th Cir. 1987). Honeywell's instructions not to answer or limitations on answers to questions and withholding of documents and examined samples extend to the most basic facts--the identification, manufacturers and photographs of such products. *See, e.g.,* Wood Deposition at 122, 138-40, Ex. 1. To the extent such testimony and withheld documents "show[ ] technical efforts and results, which [do] not reveal litigation concerns or [are] not shown to be directly responsive to such concerns, [they are] not protected work product." *Adams v. Gateway, Inc.*, 2003 WL 23787856, * 14 (D. Utah) (Ex. 17 hereto); *see Simon*, 816 F.2d at 403. Honeywell's claw back of HW019751-755 is exemplary of its inappropriate liberal interpretation of attorney-client privilege and work product immunity. Honeywell argues that the document is privileged based on          being a recipient; however,           received the information in her business role as            (as Honeywell identified her in its privilege log)            . The clawed back document and other requested discovery neither request nor provide legal opinion or advice.

Fuji also seeks access to all physical products tested by Honeywell so Fuji can perform analysis of its own. Fuji requests access to the entirety of products considered, not only those alleged to be infringing and not only those of the named defendants. The universe of physical specimens does not reflect attorneys' opinions or tactics; they speak for themselves, providing purely factual information.

Fuji's requested discovery does not reveal the mental impressions of an attorney because the products torn down were selected by engineers, not lawyers, and no lawyer comments were recorded. Ex. 1 at 95-96, 136-137. Fed.R.Civ.P. 26(b)(3) entitles a party to discover factual work product if the party can show "substantial need of the materials" and inability "without undue hardship to obtain the substantial equivalent of the materials by other means." *In re Cendant Corp.*, 343 F.3d 658, 663 (3d Cir. 2003). Such is the case here.

Fuji has a substantial need for the documents and things at issue to test the bases for Honeywell's charges of infringement. *See Loctite Corp.*, 667 F.2d at 582. Honeywell's knowledge of other, unaccused products is relevant at least to Fuji's laches defense and to the alleged commercial success of the invention. With regard to laches, the results of the pre-filing analysis of products go to the ease with which Honeywell could identify potentially infringing products, and with regard to commercial success, the results go to Honeywell's ability to show

The Honorable Mary Pat Thynge
April 10, 2007
Page 3

the requisite nexus between the accused products' commercial success and the claimed invention, enabling Fuji to compare relative sales of accused products and those not accused. *See* Rovner 3/12/07 letter at 6 (D.I. 733). To the extent Fuji deems non-infringement of certain LCD modules to be ripe for summary judgment, Honeywell's failure to accuse other LCD Modules similar to accused Fuji LCD modules would be very instructive.

Honeywell's privilege log fails to fill the gap in information by not identifying the products or manufacturers that were the subject of the teardowns. *See, e.g.*, Ex. 2 entries 1624, 1638. Although some entries identify manufacturers, *e.g.*, Ex. 2, entries 1627, 1629, these entries fail to provide adequate information as to what products were actually analyzed. Moreover, the entries provide no detail as to inform whether the identified document contains factual work product, which Fuji is entitled to receive. Indeed, given Mr. Wood's leading role in the teardown process and number of entries authored by him, it is likely such entries relate to improperly withheld facts. Honeywell has the burden of showing that the documents reflected in its privilege log are protected, and without *in camera* review, Fuji is left to Honeywell's improperly overbroad definition of what is privileged or constitutes work product. Consequently, Fuji seeks *in camera* review of these documents.

Regardless of whether privilege or work product immunity attached to the requested materials and technical data, Honeywell has waived any such protection. In support of its desired breadth of discovery, Honeywell argued in open court that its teardown process resulted in "about a 50% hit rate" (i.e., one-half of the products were believed to infringe). September 9, 2005 transcript at 22-23, Ex. 3. Nevertheless, counsel subsequently instructed witnesses not testify as to the hit rate. Ex. 1 at 122; Brafman Deposition at 177, Ex. 4. Similarly, to rebut Fuji's laches defense, Honeywell selectively produced (at the Rule 30(b)(6) deposition regarding laches) exhibits that set forth the dates Honeywell became aware of each accused product of only the then remaining defendants, and on which it performed a teardown. *See* Brafman Exs. 5-8 (Exs. 5-8 hereto). Honeywell refuses to even identify other torn-down products.

Honeywell further waived protection by selectively disclosing information obtained from their teardown process to other entities. For example, in support of its infringement claims, Honeywell provided to Fuji annotated photographs of a Fuji product taken during Honeywell's teardowns. Ex. 9. Honeywell did not produce these photographs in discovery. This was not an isolated incident and is likely to have been a general practice. Mr. Wood testified that
                                                 in support of its infringement claims. Ex. 1 at 146. Some presentations to third parties sharing such data have been produced. *See* presentations to
           Exs. 10-13, and presentation to            Ex. 14. The            presentation includes photographs showing Honeywell's measurement of lens arrays rotated at              ,--the very same information contained in HW019751-55, which Honeywell is clawing back as privileged and work product. Even if Honeywell did not disclose the results of the teardown of products deemed by it to be non-infringing, voluntary, partial and selective disclosure is inconsistent with the adversary system and is a waiver of privilege and work-product immunity. *See Chubb Integrated Systems Limited v. The National Bank of Washington*, 103 F.R.D. 52, 63 (D.D.C. 1984), *citing Permian Corp. v. U.S.*, 665 F.2d 1214, 1219 (D.C. Cir. 1981); *United States of Am.*

The Honorable Mary Pat Thynge
April 10, 2007
Page 4

*v. Mass. Inst. of Techn.*, 129 F.3d 681, 685 (1st Cir. 1997). Honeywell should not be permitted to selectively use the technical data as a sword in support of their arguments, and later hide behind the shield of privilege and work product. Partial disclosures are waivers as to the subject matter of those disclosures. *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1426, n.12 (3d Cir. 1991). In any event, "documents showing business or negotiation strategy are not matters of litigation strategy protected by the work product privilege." *Adams*, 2003 WL at *15.

During a telephonic meet and confer on these issues, Honeywell's counsel expressed the overly simplified view that if defendants are able to conduct discovery into unaccused products, so too should Honeywell. This position ignores Judge Jordan's prior ruling that Honeywell satisfy its Fed.R.Civ.P. 11 obligation and identify accused products. Ex. 3 at 27-29. Fuji's requested discovery does not affect the considerations reflected in Judge Jordan's ruling, namely that Honeywell have a reasonable basis for alleging infringement, that it not be allowed to undertake a fishing expedition into defendants' products and that Honeywell, not defendants, come forward first. *Id.* Judge Jordan's subsequent discovery rulings reflect Honeywell's limited scope of discovery and obligation to identify specific accused products. *See* Oct. 7, 2005 Memorandum Order at 4, Ex. 15; May 18, 2005 Memorandum and Order at 9, Ex. 16. Nothing in this request justifies altering Judge Jordan's order limiting Honeywell's discovery to accused products. For the reasons discussed above, Fuji merely seeks narrow discovery on the products accused of infringement by Honeywell and those not accused. Honeywell knows the identify of such products while Fuji has no way of obtaining such information.

During the meet and confer Honeywell continued to press an unreasonably broad definition of privilege and work product. Honeywell attempted to equate its questioning regarding defendants' bases for non-infringement with Fuji's current request for technical data. While Honeywell's questioning seeks legal opinion and reasoning—the connection between technical data and the legal conclusion of non-infringement—Fuji's requested discovery seeks only technical data. Honeywell's counsel also argued that Fuji could not show the requisite need for the requested discovery because the defendants have access to, and are experts in, their own products. In reality, Fuji only has access to its own accused products, not the myriad of products torn down, catalogued and saved, but not accused, or at least not publicly accused, by Honeywell.

In response to Fuji's position that Honeywell waived privilege and work product protection, Honeywell's counsel argued that Mr. Brafman's statement in court that Honeywell had achieved "about a 50% hit rate" in finding infringement was a statement of "generalities," not to be deemed a waiver. Mr. Brafman's statement was no generality, but rather a summary of the results of the teardown exercise. Disclosures of conclusions and summaries waive privilege. *See*, e.g., *Electro Scientific Industries, Inc. v. General Scanning, Inc.*, 175 F.R.D. 539, 543-44 (N.D. Cal. 1997); *United States ex rel Martin Marietta Corp.*, 886 F. Supp. 1243 (D. Md. 1995). In response to Fuji's argument that Honeywell's partial and selective disclosures to defendants and potential licensees were waivers, Honeywell's counsel noted that certain disclosures were made pursuant to Rule of Evidence 408; however, Rule 408 does not excuse a waiver. *See*

The Honorable Mary Pat Thynge
April 10, 2007
Page 5

*Bausch & Lomb Inc. v. Alcon Laboratories, Inc.*, 173 F.R.D. 367, 384 (WDNY 1995) (predominant view is that disclosure of privileged information during settlement conference is a waiver). Rule 408 only limits admissibility of certain information, for certain purposes. Honeywell's voluntary disclosure of information it now deems privileged or protected as work product is a waiver of such protection, regardless of its admissibility under Rule 408.

We look forward to discussing the foregoing with Your Honor at the Court's earliest convenience.

Respectfully,

Philip A. Rovner
provner@potteranderson.com

PAR/mes/788438
Enc.
cc: Thomas C. Grimm, Esq. (w/encls.) – by ECF and E-mail
    Manufacturer Defendants (w/encls.) – by ECF and E-Mail

# Exhibit 1

# REDACTED

# Exhibit 2

# <u>REDACTED</u>

# Exhibit 3

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

**1**

```
1            THE UNITED STATES DISTRICT COURT
2          IN AND FOR THE DISTRICT OF DELAWARE
3                    - - -
4   HONEYWELL INTERNATIONAL, INC.   :  CIVIL ACTIONS
    et al.                         :
5                                  :
              Plaintiffs,    :
6                                  :
         v.                        :
7                                  :
    AUDIOVOX COMMUNICATIONS CORP.,  :
8   et al.                         :
                                   :   NO. 04-1337 (KAJ)
9           Defendants.            :
    _____            :
10  HONEYWELL INTERNATIONAL, INC.   :
    et al.                         :
11                                 :
              Plaintiffs,    :
12                                 :
         v.                        :
13                                 :
    APPLE COMPUTER, INC.,  et al.,  :
14                       :   NO. 04-1338 (KAJ)
              Defendants.           :
15                    - - -
16              Wilmington, Delaware
            Friday, September 9, 2005 at 10:40 a.m.
17            TELEPHONE CONFERENCE
18                    - - -
19  BEFORE:    HONORABLE KENT A. JORDAN, U.S.D.C.J.
                      - - -
20
    APPEARANCES:
21
22   ASHBY & GEDDES
     BY:  STEVEN J. BALICK, ESQ.
23
          and
24
25                Brian P. Gaffigan
                  Registered Merit Reporter
```

**2**

```
1   APPEARANCES: (Continued)
2
     MORRIS NICHOLS ARSHT & TUNNELL
3    BY:  THOMAS C. GRIMM, ESQ.,
4         and
5    ROBINS KAPLAN MILLER & CIRESI, L.L.P
     BY:  MARTIN R. LUECK, ESQ.,
6         MATTHEW L. WOODS, ESQ., and
          STACIE E. OBERTS, ESQ.
7    (Minneapolis, Minnesota)
8         and
9    HONEYWELL INTERNATIONAL
     BY:  J. DAVID BRAFMAN, ESQ.
10
          Counsel on behalf of Honeywell
11        International, Inc., and Honeywell
          Intellectual Properties, Inc.
12
13   SMITH KATZENSTEIN & FURLOW
     BY:  ROBERT J. KATZENSTEIN, ESQ.
14
          and
15
     HOGAN & HARTSON, LLP
16   BY:  ROBERT J. BENSON, ESQ.
     (Los Angeles, California)
17
          Counsel for Seiko Epson Corp.,
18        Kyocera Wireless Corp.
19
     YOUNG CONAWAY STARGATT & TAYLOR
20   BY:  JOHN W. SHAW, ESQ.
21        Counsel for Olympus Corporation,
          Olympus America, Inc., Sony Corporation,
22        And Sony Corporation of America
23        and
24
25
```

**3**

```
1   APPEARANCES:  (Continued)
2
     KENYON & KENYON
3    BY:  ROBERT L. HAILS, ESQ.
          (Washington, District of Columbia)
4
5         and
6    KENYON & KENYON
     BY:  JOHN FLOCK, ESQ.
          (New York, New York)
7
          Counsel for Sony Corporation, and Sony
8         Corporation of America
9         and
10   KENYON & KENYON
     BY:  RICHARD M. ROSATI, ESQ.
11        (New York, New York)
12        Counsel for Olympus Corporation, and
          Olympus America, Inc.
13
14   RICHARDS LAYTON & FINGER
     BY:  WILLIAM J. WADE, ESQ.
15
          and
16
     WEIL GOTSHAL & MANGES
17   BY:  STEPHEN J. RIZZI, ESQ.
          (New York, New York)
18
          Counsel for Matsushita Electrical
19        Industrial Co. And Matsushita
          Electical Corporation of America
20
21
22
23
24
25
```

**4**

```
1   APPEARANCES:  (Continued)
2
     FISH & RICHARDSON, P.C.
3    BY:  THOMAS L. HALKOWSKI, ESQ.
4         Counsel for Nokia, Inc., Casio, Inc., Casio
          Computer and Apple Computer Inc.
5
6         and
7    FISH & RICHARDSON, P.C.
     BY:  JOHN T. JOHNSON, ESQ., and
          LEWIS E. HUDNELL, III, ESQ.
8    (New York, New York)
9         Counsel for Casio, Inc., Casio Computer
10        and
11   FISH & RICHARDSON, P.C.
     BY:  KELLY C. HUNSAKER, ESQ.
12   (Redwood City, California)
13        Counsel for Apple Computer Inc.
14        and
15   FISH & RICHARDSON, P.C.
     BY:  LAUREN A. DEGNAN, ESQ.
16   (Washington, District of Columbia)
17        Counsel for Nokia, Inc.
18
19   RICHARDS LAYTON & FINGER
     BY:  CHAD M. SHANDLER, ESQ.
20        and
21   HARRIS BEACH, LLP
     BY:  NEAL L. SLIFKIN, ESQ.
22   (Pittsford, New York)
23        Counsel for Eastman Kodak
24
25
```

5

```
1   APPEARANCES:  (Continued)
2
3       POTTER ANDERSON & CORROON, LLP
        BY:  RICHARD L. HORWITZ, ESQ.
4
            Counsel for Concord Cameras, Dell, Inc.
5           Fujitsu Limited, Fujitsu America, Inc.,
            Fujitsu Computer Products of America, Inc.,
6           Toshiba Corporation, Toshiba America, Inc.,
            Wintek Electro-Optics Corporation, Sanyo
7           Electric Co. Ltd. and Sanyo North America,
            Philips Electronics North America Corp.
8           and Samsung SDI
9           and
10      FINNEGAN HENDERSON FARABOW GARRETT & DUNNI
        BY:  BARRY W. GRAHAM, ESQ.
11          (Washington, District of Columbia)
12          Counsel for Nikon Corporation, Nikon Inc.
13          and
14      KATTEN MUCHIN ROSENMAN
        BY:  MICHAEL A. DORFMAN  ESQ.
15          (Chicago, Illinois)
16          Counsel for Sanyo Electric Co. Ltd.
            and Sanyo North America
17
            and
18
        OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
19      BY:  CARL E. SCHLIER, ESQ.
            (Alexandria, Virginia)
20
            Counsel for Toshiba America
21
            and
22
        VINSON & ELKINS
23      BY:  RODERICK B. WILLIAMS, ESQ.
            (Austin, Texas)
24
            Counsel for Dell, Inc.
25
            and
```

6

```
1   APPEARANCES:  (Continued)
2
3       MILBANK TWEEK HADLEY & McCLOY, LLP
        BY:  CHRISTOPHER E. CHALSEN, ESQ.
4           (New York, New York)
5           Counsel for Fujitsu Limited, Fujitsu
            America, Inc., Fujitsu Computer Products
6           of America, Inc.
7           and
8       FINNEGAN HENDERSON FARABOW GARRETT & DUNNI
        BY:  YORK FAULKNER, ESQ.
9           (Reston, Virginia)
10          Counsel for Wintek Electro-Optics
            Corporation
11
            and
12
        HOWREY SIMON ARNOLD & WHITE, LLP
13      BY:  ALAN M. GRIMALDI, and
            NELSON M. KEE, ESQ.
14          (Washington, District of Columbia)
15          Counsel for Philips Electronics
            North America Corp.
16
            and
17
        PAUL HASTINGS JANOFSKY & WALKER, LLP
18      BY:  STEPHEN  S. KORNICZKY, ESQ.
            (San Diego, California)
19
            Counsel for Samsung SDI
20
            and
21
        CONCORD CAMERA CORP.
22      BY:  SCOTT L. LAMPERT, ESQ.
            (Hollywood, Florida)
23
            Counsel for Concord Camera
24
25
```

7

```
1   APPEARANCES:  (Continued)
2
3       SACHNOFF & WEAVER
        BY:  BRIAN D. ROCHE, ESQ.
4           (Chicago, Illinois)
5           Counsel for Argus a/k/a Hartford
            Computer Group, Inc.
6
7       POTTER ANDERSON & CORROON, LLP
        BY:  PHILIP A. ROVNER, ESQ.
8
9           and
10      STROOCK & STROOCK & LAVAN LLP
        BY:  LAWRENCE ROSENTHAL, ESQ.
11          (New York, New York)
12          Counsel for Fuji Photo Film Co., Ltd.
            And Fuji Photo Film U.S.A. Inc.
13
        DUANE MORRIS
14      BY:  D. JOSEPH ENGLISH, ESQ.
            (Washington, District of Columbia)
15
16          Counsel for Audiovox Communications Corp.
17      YOUNG CONAWAY STARGATT & TAYLOR
        BY:  ADAM WYATT POFF, ESQ.
18
19          and
20      GREENBLUM and BERNSTEIN, PLC
        BY:  MICHAEL J. FINK, ESQ.
21          (Reston, Virginia)
22          Counsel for Pentax Corporation,
23          Pentax U.S.A, Inc.
24
25
```

8

```
1   APPEARANCES:  (Continued)
2
3       BOUCHARD MARGULES & FRIEDLANDER
        BY:  KAREN L. PASCALE, ESQ.
4
5           and
6       OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
        BY:  ANDREW M. OLLIS, ESQ.
7           (Alexandria, Virginia)
8           Counsel for Optrex America, Inc.
9       McCARTER & ENGLISH
        BY:  THOMAS D. WALSH, ESQ.
10
11          Counsel on behalf of Optrex America
12      CONNOLLY BOVE LODGE & HUTZ
        BY:  JAMES MICHAEL OLSEN, ESQ.
13
14          Counsel on behalf of Sony Ericsson AB
            and Sony Ericsson, Inc.
15
16
17
18
19
20
21
22              - oOo -
23          P R O C E E D I N G S
24          REPORTER'S NOTE:  The following proceedings were
25      held in open court, beginning at 10:40 a.m.)
```

21

1  decide whether we got a case against you or not. That just
2  isn't how it works.
3      MR. LUECK: Well, Your Honor, I believe we have
4  made that showing. And what we have done is we've gone out
5  and bought a large number of products from a wide range of
6  customers or end manufacturing defendants. We've torn them
7  down. We've given the defendants detailed information on
8  what we believe is the infringement. We identified the
9  eight product ranges where we found it.
10      The modules come from module makers overseas.
11  We have no access to those individuals. And I think we've
12  satisfied our Rule 11 burden, we satisfied the pleading
13  burden on it, and then it becomes an issue of whether or
14  not this is reasonably calculated to lead to admissible
15  information, which we believe it is, and then it is an issue
16  of looking at the relative burdens. And in our view on
17  burden, we have a right to recover for damages going six
18  years back from the date of the complaint. These models
19  change rapidly and often. And we simply have no access to
20  records that would show us what those models have been.
21      THE COURT: Well, let me ask this, because
22  maybe we're talking past each other. When you say you have
23  satisfied your initial burden, is the assertion that you are
24  making that we have identified products, we've told them the
25  products that infringe and the only question is whether,

22

1  through various generations of different models of this
2  product, somehow there is some difference? Or is there
3  something else going on that I'm not getting.
4      MR. LUECK: No, I think you have captured it.
5  We've identified what the products are that have infringed
6  and we've specified what those types of products are and
7  we've given them specific model numbers as to ones we've
8  been able to purchase and tear down, but that doesn't mean
9  that we know all of the generations of those products that
10  they have introduced in the past.
11      THE COURT: All right. I'm going to ask the
12  gentleman who spoke on behalf of Matsushita, the Weil
13  Gotshal attorney if he will speak up at this point and
14  answer that point, which is: Hey, we're not just on some
15  wholesale fishing expedition. We've identified a product
16  and a product line and we just need to know the different
17  model numbers in that product line so that we're sure that
18  we've had a chance to investigate this product thoroughly,
19  which is what I understand Mr. Lueck to be saying. What is
20  your response to that?
21      MR. BRAFMAN: Your Honor, this is David Brafman
22  from Honeywell.
23      I'd just like to add one further point which is
24  our tear-down rate, on average it's about a 50 percent hit
25  rate under our belief of infringement across all these

23

1  products. So it's not a wild fishing expedition as it is
2  made to sound. It is that we found products, a large
3  percentage of them do hit and we just don't have access to
4  the models that change every six months.
5      THE COURT: All right. Mr. -- I'm sorry, I've
6  forgotten your name, sir.
7      MR. RIZZI: It's Steve Rizzi from Weil Gotshal.
8      THE COURT: Mr. Rizzi, I apologize for not
9  holding on to that name. Go ahead.
10      MR. RIZZI: That's okay. I think along those
11  lines, Your Honor, there is room to meet in the middle here
12  from our perspective and, in fact, one of the cases that
13  Honeywell cited in its correspondence I believe is
14  instructive -- the IP Innovation case out of the Northern
15  District of Illinois -- I think is somewhat similar in the
16  sense that case involved certain chips that were found
17  in various models of televisions that were accused of
18  infringement, the basis for infringement being this specific
19  chip. And what the plaintiff did originally was identify
20  specific television models that they believe included the
21  chip and were infringing. And there, the Court allowed
22  discovery of other models of televisions that included that
23  same chip. So discovery in the case were structured
24  around other future generations or products but only those
25  products that included the same chip as the specific models

24

1  of televisions that were identified by plaintiff.
2      We think structuring it along those lines is
3  reasonable and does provide a framework that does allow
4  for a manageable case as well. And that we believe it is
5  possible to identify, for example, other products that
6  utilize the same LCD modules incorporated in these specific
7  products that are alleged to infringe and that we don't
8  believe that that would present an unreasonable burden,
9  and we don't dispute that plaintiffs would be entitled to
10  that type of information.
11      THE COURT: All right. Mr. Lueck.
12      MR. LUECK: Yes. What we asked for, Your Honor,
13  is the modules that were identified in the infringing
14  products and similar modules. And the problem we have is if
15  you were to go to these module makers, some of the modules
16  infringe, some of the modules don't. The module makers do
17  not know what products they go into for the customers.
18  Literally, the only way for anyone to find that out is to
19  ask them for the historical products. And we've offered to
20  take anything that they have and look at it and tell them
21  whether it infringes.
22      I don't believe the burden is as great as the
23  defendants are saying. We've narrowed it down to specific
24  products we've torn down. We don't know all of the
25  historical model numbers. That's the information we're

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

25

1  asking for.
2       THE COURT:  All right.
3       MR. WILLIAMS:  Your Honor, this is Rick Williams
4  for Dell.
5       THE COURT:  Yes.
6       MR. WILLIAMS:  I'd like to weigh in on this.  In
7  the complaint, the products they're looking for include
8  cellular phones, digital cameras, PDAs, portable DVD
9  players, laptop computers.  In the case of Dell, they
10  identified six models of Dell laptop computers out of a
11  total current 17 models.
12       The first thing, all of Dell's laptops are
13  readily available to purchase over the Internet and they can
14  get them within a week's time and evaluate them.
15       They have not identified any PDAs, which Dell
16  also sells.
17       Dell resells digital cameras and digital video
18  cameras.  They have not identified any of those as being
19  accused against Dell.
20       So we're faced with the dilemma, out of all
21  these categories, they say they'd like information on --
22       THE COURT:  We'll, we're not --
23       MR. WILLIAMS:  -- them going down the list and
24  giving them information.
25       THE COURT:  Hold on.  Because I get the feeling

26

1  we're still talking past one another here.  Maybe positions
2  have shifted as a result of the conversation we're having,
3  but what I hear what Mr. Lueck is saying is not I want
4  information about broad categories of products.  I want
5  information about a specific product identified and
6  different generations of that same identified product.  That
7  is, has a model changed?  And if it has changed, would you
8  please identify what the newer different model is of that
9  identified product?  Not category of products but a
10  specified product.
11       Mr. Lueck, have I misunderstood you?
12       MR. LUECK:  Well, I think that is narrower than
13  we seek, Your Honor.  I mean if it's going to be tied to
14  specific model numbers, we don't know what the past model
15  numbers these devices are marketed under.  Basically what
16  we're asking for is which of your products had the modules
17  that had the infringing technology or the similar technology
18  in them so we can tie them back to the module makers and
19  know what modules were imported into the United States.
20       THE COURT:  All right.  I interrupted.
21       MR. LUECK:  That could be a different model
22  number than what we have, we just don't know that, and we
23  have no other way of finding out.
24       THE COURT:  The gentleman from Dell, I
25  interrupted you, sir.  Go ahead.

27

1       MR. WILLIAMS:  No, Your Honor.  Again, they
2  identified six models out of 16-17.  They could certainly
3  get the other models.  Through the tear-down, they could
4  purchase them as easily as Dell could absorb the expense and
5  tell us the modules in fact they're accusing of infringement
6  rather than asking us to go back and conduct a unilateral
7  analysis of our products and say, well, maybe this module
8  infringes or maybe this one doesn't.  And I think the burden
9  should be on them in the first instance to say a particular
10  LCD module in a particular computer model we contend meets
11  the elements of the claims in our patent instead of
12  vice-versa.
13       THE COURT:  All right.  And I am going to have
14  to get into a criminal proceeding here in a few minutes, so
15  I won't have an opportunity to resolve other issues that you
16  may have besides this one.
17       My understanding of what is being asked for has
18  shifted a little bit in the course of this conversation.
19  So instead of trying to argue in terms of what it is you
20  are asking for, let me tell you what I think you can
21  legitimately ask for and we can get this thing moving
22  forward.
23       I said in the order that I put out last May that
24  Honeywell was required to specifically identify accused
25  products.  And that's what I meant.  Not that Honeywell was

28

1  entitled to say, you know, we think all your cellular phones
2  infringe so we want you to tell us everything about all your
3  cellular phones.  What I mean is if you've got a basis for
4  believing that a manufacturer's cellular phones are
5  infringing, and I mean you can say we've done this tear-down
6  on these specific products and these things appear to us to
7  infringe, well, then you are absolutely entitled to conduct
8  additional discovery with respect to those products, that
9  is, were earlier generations than the one you tore down.
10  Also, have they come out with subsequent generations of that
11  same model which could also be infringing?
12       But what you are not entitled to do is to say
13  you manufacture 15 different kinds of cell phones.  We tore
14  down three.  Tell us about your other 12.  Because I agree
15  with the defendants that now what you are doing is you are
16  telling manufacturers, you know what?  You got one or two
17  things that are bad.  We want to you do an analysis of
18  everything you make and tell us whether you are guilty on
19  those fronts, too; and that is not what the law requires,
20  and it's not what I'm going to require them to do.
21       If you want to go out, you want to buy them, you
22  want to do the tear-downs, you want to get information that
23  prompts you to be able to say "now I know that this specific
24  model also infringes," then you can certainly do that.  And
25  then you would be in an area where you could be requiring

Honey v. Audiovox/Apple: Telephone Conference 9/9/2005 10:40:00 AM

29

1 additional discovery from them. But to ask them to come
2 forward in the first instance, which is what it really comes
3 down to, is not right.
4    So I hope this straightens out where my thinking
5 is on it and gives you guidance about what I'm expecting the
6 parties to be willing to do. To the extent manufacturers
7 are prepared to say, you know what? For us, it's not such a
8 burden as to make it impossible to give you something more
9 broad than what the judge has ordered happen, that is fine
10 with me. But what I do expect to happen at this juncture is
11 for you guys to come together with a specific set now of
12 identified products and manufacturers of the models of LCD
13 modules that go into those products so that we can go about
14 having the proper defendants in the suit.
15    To the extent there was any thought that I was
16 putting the burden exclusively on the defendant retailers or
17 intermediate sellers, to third-party people in, that is not
18 necessarily the case. I'm not going to get to that issue
19 today, though, because we don't have time to fully explore
20 it, but I expect Honeywell to be active in finding out who
21 those manufacturers are and that is one of the reasons why
22 I gave only a conditional stay, because one of the pieces
23 of information Honeywell is entitled to get as to those
24 identified products and product lines is who is the maker of
25 the LCD that is going in to that product, that generation of

30

1 product and maybe, I don't know, the generations before and
2 after that model.
3    So you guys absolutely on the defense side have
4 to give that information up. And then if we can't have some
5 sensible plan that the parties agree to on how to try to
6 bring those folks in, I'll get into the mix on that, too. I
7 would think that overseas marketers of LCD modules who have
8 big clients in the United States incorporating those things
9 into their products are not going to want to upset their
10 clientele by playing games with jurisdiction. And
11 particularly in the aftermath of the Federal Circuit's
12 CEA decision, which I remember well, I would think people
13 would be thinking hard about how they're going to play
14 the personal jurisdiction defenses here. But that is a
15 discussion for another day.
16    For now, I want you to get off of the
17 who-goes-first issue because Honeywell you guys are going
18 first. You identify what is infringing. Let's get those
19 manufacturers on notice and let's get the case going
20 forward.
21    When can I expect to hear back from you about a
22 plan for getting that done, Mr. Lueck?
23    MR. LUECK: Within a week, Your Honor. If I
24 could ask for just one clarification, recognizing you have
25 something else going.

31

1    The issue that we've had is just identifying who
2 the manufacturers of the modules are that are coming into
3 the U.S. And hearing what Your Honor has said regarding
4 those modules, can we ask about historical products that
5 have those modules or similar modules in them?
6    THE COURT: Well, when you say the "same" or
7 "similar," you know, the "same," absolutely. When you say
8 "similar," that is a big door, because, what do you mean
9 when you say "similar?"
10    MR. LUECK: Right. Here is what I mean when I
11 say "similar," Your Honor. A light source, an LCD panel,
12 two lens arrays, one of which is misaligned.
13    THE COURT: If you want to say, if you want to
14 frame your discovery in a manner that incorporates your
15 specific allegations of infringement, fine.
16    MR. LUECK: That is exactly what we're asking
17 for. And that we would frame it exactly that way.
18    THE COURT: All right. Does everybody
19 understand the discovery I'm telling them they're entitled
20 to?
21    (Pause.)
22    THE COURT: I'm not hearing anybody say no.
23    MR. HORWITZ: Your Honor?
24    THE COURT: Yes, go ahead.
25    MR. HORWITZ: This is Rich Horwitz. And I'll

32

1 defer to others if I'm missing something here, but I think
2 the problem with what Mr. Lueck just said is he may be
3 asking for things that led us to the stay motion in the
4 first instance.
5    THE COURT: No. What led to the stay motion in
6 the first place is I'm not going to have the folks who are
7 reselling things, reselling the LCD module as a part of
8 their own product defending in the first instance.
9    MR. HORWITZ: I'm sorry. I understand that,
10 Your Honor. What I meant was that some of the people that
11 are the resellers may not have the information that would
12 respond to the broad question that Mr. Lueck just posed.
13    THE COURT: Well, and if you don't have it, you
14 don't have it.
15    MR. HORWITZ: Okay.
16    THE COURT: I mean I'm not saying anybody has to
17 make anything up, but if you've got the information, you
18 need to give it up because they're entitled to get behind
19 your products and get it to people who are making them if
20 they can get jurisdiction over them. And that's all.
21    Like I said, the personal jurisdiction issue,
22 that's for another day. But finding out who the
23 manufacturers are, that's something that is supposed to have
24 been happening over the course the last four months and it's
25 distressing to hear that we've been not moving forward on

# Exhibit 4

# REDACTED

# Exhibit 5

# <u>REDACTED</u>

# Exhibit 6

# REDACTED

# Exhibit 7

# REDACTED

# Exhibit 8

# REDACTED

# Exhibit 9

# REDACTED

# Exhibit 10

# REDACTED

# Exhibit 11

# REDACTED

# Exhibit 12

# REDACTED

# Exhibit 13

# REDACTED

# Exhibit 14

# REDACTED

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 04-1337-KAJ (Consolidated) |
| v. | ) ) | |
| AUDIOVOX COMMUNICATIONS CORP., AUDIOVOX ELECTRONICS CORPORATION, NIKON CORPORATION, NIKON, INC., NOKIA CORPORATION; NOKIA INC., SANYO ELECTRIC CO., LTD., and SANYO NORTH AMERICA CORPORATION, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| SEIKO EPSON CORPORATION, | ) ) | |
| Intervenor. | ) ) | |
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 04-1338-KAJ |
| APPLE COMPUTER, INC.; ARGUS A/K/A HARTFORD COMPUTER GROUP, INC.; CASIO COMPUTER CO., LTD.; CASIO, INC.; CONCORD CAMERAS; DELL INC.; EASTMAN KODAK COMPANY; FUJI PHOTO FILM CO., LTD.; FUJI PHOTO FILM U.S.A., INC.; FUJITSU LIMITED; FUJITSU AMERICA, INC.; FUJITSU COMPUTER PRODUCTS OF AMERICA, INC.; KYOCERA WIRELESS CORP.; MATSUSHITA ELECTRICAL INDUSTRIAL CO.; MATSUSHITA ELECTRICAL CORPORATION OF AMERICA; NAVMAN NZ LIMITED; NAVMAN U.S.A. INC.; OLYMPUS CORPORATION; OLYMPUS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

AMERICA, INC.; PENTAX CORPORATION;　　)
PENTAX U.S.A., INC.; SONY CORPORATION;　)
SONY CORPORATION OF AMERICA; SONY　　)
ERICSSON MOBILE COMMUNICATIONS AB;　)
SONY ERICSSON MOBILE　　　　　　　　　　)
COMMUNICATIONS (USA) INC.; TOSHIBA　　)
CORPORATION; and TOSHIBA AMERICA,　　　)
INC.,　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
SEIKO EPSON CORPORATION,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Intervenor.　　　　　　　　　　　)
_____　　)

OPTREX AMERICA, INC.,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　　　　　　　　)    Civil Action No. 04-1536-KAJ
　　　　　　　　　　　　　　　　　　　　　　　　)
HONEYWELL INTERNATIONAL INC., and　　　)
HONEYWELL INTELLECTUAL PROPERTIES　　)
INC.,　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　　　　　)

## MEMORANDUM ORDER

In these consolidated cases, Honeywell International, Inc. and Honeywell

Intellectual Properties, Inc. (collectively "Honeywell") have sued 35 defendants, C.A.

Nos. 04-1338-KAJ and 04-1337-KAJ, and have been sued in turn, C.A. No. 04-1536-

KAJ. Several third-party defendants have also been brought into the fray. In all of the

cases, the underlying issue is whether Liquid Crystal Display ("LCD") modules

incorporated into consumer electronics products infringe Honeywell's U.S. Patent No.

5,280,371 (the "'371 patent" or "patent-in-suit"). The extraordinary number of

2

defendants includes many who are retailers of products that incorporate LCD modules, or are consumer device manufacturers that only acquire LCD modules from other manufacturers, rather than being manufacturers of the modules themselves.[1] Given that number and variety of defendants, I have attempted for several months to bring the parties to a consensus position on how best to organize the cases so that the litigation can proceed on an efficient and appropriate basis, with suit proceeding against the Manufacturers in the first instance. (See D.I. 119 in C.A. 04-1337-KAJ.)

Among other things, on May 18, 2005, I issued a Memorandum Order stating that "large-scale litigation like this requires the business and strategic legal interests of the plaintiff to cede some ground to case management imperatives." (Id. at 7.) I ruled that dealing first with the Manufacturers "is the fairest and most efficient way to proceed." (Id. at 8.) To that end, I stayed the cases against the Non-manufacturer Defendants, with the exception of permitting Honeywell to take some limited discovery to determine the identity of Manufacturers whom it may wish to sue as infringers. I ordered the parties "to confer and provide me with proposed language respecting permissible discovery activities directed at the non-manufacturer defendants during the stay." Unfortunately, despite two in-person conferences with counsel, which involved literally dozens of attorneys, and despite the direction given in the Memorandum Order

---

[1] For ease of reference, I will refer herein to the manufacturers of LCD modules as the "Manufacturers," and to the retailers and the consumer device manufacturers as the "Non-manufacturer Defendants". These definitions do not pertain to third-party defendants. For case organization and scheduling purposes, those defendants who are both consumer device manufacturers and manufacturers of LCD modules shall be treated as Non-manufacturer Defendants only to the extent that they do not manufacture LCD modules in certain of their products; otherwise they shall be treated as Manufacturers, unless otherwise ordered.

in May, these cases are still not progressing. It is apparent that I have not been

sufficiently clear in previous statements to guide the parties toward a mutually

acceptable resolution of the allowable discovery against the Non-manufacturer

Defendants. I now have a request from Honeywell seeking yet another in-person

conference of the parties and the court. (D.I. 139.) Because I do not believe further

discussion will be productive and will only increase the substantial costs associated with

these cases, I will not again convene the platoons of attorneys involved. Instead, I am

providing the following direction[2] and schedule for discovery against the Non-

manufacturer Defendants.

    IT IS HEREBY ORDERED that:

---

[2]The directions given here are consistent with what I have previously told the parties. During the last conference with the counsel, I stated:
    I said in the order that I put out last May that Honeywell was required to specifically identify accused products. And that's what I meant. Not that Honeywell was entitled to say, you know, we think all your cellular phones infringe so we want you to tell us everything about all your cellular phones. What I mean is if you've got a basis for believing that a manufacturer's cellular phones are infringing, and I mean you can say we've done this tear-down on these specific products and these things appear to us to infringe, well, then you are absolutely entitled to conduct additional discovery with respect to those products, that is, were earlier generations than the one you tore down. Also, have they come out with subsequent generations of that same model which could also be infringing?
    But what you are not entitled to do is to say you manufacture 15 different kinds of cell phones. We tore down three. Tell us about your other 12. Because I agree with the defendants that now what you are doing is you are telling manufacturers, you know what? You got one or two things that are bad. We want to you do an analysis of everything you make and tell us whether you are guilty on those fronts, too; and that is not what the law requires, and it's not what I'm going to require them to do.
    If you want to go out, you want to buy them, you want to do the tear-downs, you want to get information that prompts you to be able to say "now I know that this specific model also infringes," then you can certainly do that. And then you would be in an area where you could be requiring additional discovery from them. But to ask them to come forward in the first instance, which is what it really comes down to, is not right. (Transcript of September 9, 2005 Conference, at pp. 27-29.)

1. Within 21 days, each Non-manufacturer Defendant shall provide to Honeywell the identity of the Manufacturers of LCDs incorporated into that Defendant's products and product lines which have been identified by Honeywell with specificity (e.g., by make and model number). To the extent Honeywell identifies the products in which the so-called "unknown" modules are incorporated, as referred to in Honeywell's May 27, 2005 letter proposal to defense counsel (see D.I. 135 at p. 3, ¶ 2; D.I. 138 at p. 1, ¶ 1), the Non-manufacturer Defendants shall also identify the Manufacturers of those modules. The information to be provided to Honeywell shall include the following: (a) an identification of the supplier and LCD module number for the products Honeywell has specifically identified as infringing the patent-in-suit; (b) an identification of other versions (i.e., earlier or later generations) of the specifically identified products that utilize the same LCD module as in the specifically identified products, or other versions of the same LCD module, if any; and (c) an identification of other versions of the identified products that include other LCD modules with substantially the same structure as the LCD module or modules contained in the specifically identified products, if any. To the extent a Non-manufacturer Defendant and Honeywell have already reached a mutually agreeable basis for the exchange of information about Manufacturers, this paragraph 1 shall not apply to that Non-manufacturer Defendant.

2. Within 30 days, Honeywell shall file an amended complaint, or a new complaint to be added to these consolidated cases, in which, consistent with the obligations imposed by the Federal Rules of Civil Procedure, Honeywell names as defendants any Manufacturers it wishes to accuse of infringing the patent-in-suit.

3. Except for the Non-manufacturer Defendants that have resolved their disagreements with Honeywell concerning information exchange, within 7 days after receipt of a service copy of an amended or new complaint as referenced above, each Non-manufacturer Defendant shall forward a copy of such amended or new complaint to the newly sued Manufacturers who supply LCD modules to that defendant. At the same time, such Non-manufacturer Defendants shall forward the contact information for Honeywell's attorneys of record in these consolidated cases and provide to the Manufacturers copies of this Memorandum Order and the May 18, 2005 Memorandum Order, emphasizing the public interest in having Honeywell's infringement claims tested first in litigation against the LCD module Manufacturers. The Non-manufacturer Defendants shall use reasonable, good-faith efforts to persuade the Manufacturers that supply them with allegedly infringing LCD modules to waive formal service of process and to accept service of the amended or new complaint directly from Honeywell's attorneys of record. Any Manufacturer that waives formal service and accepts such service shall have 90 days to answer, move, or otherwise plead, as provided in Federal Rule of Civil Procedure 12(a)(1)(B).

4. Upon compliance with sections 1 through 3 above, the suits against the Non-manufacturer Defendants shall be entirely stayed. The stay shall be without prejudice to Honeywell's seeking an order for further discovery from the Non-manufacturer Defendants, subject to any agreement Honeywell may have with any such defendant concerning discovery.

5. Upon appearance of all Manufacturers named in the amended or new complaints, or such earlier time as agreed upon by Honeywell, Optrex America, Inc.,

6

and Seiko Epson Corporation, those Manufacturers who have appeared as defendants

in the consolidated cases, shall promptly meet with Honeywell, Optrex America, Inc.,

and Seiko Epson Corporation to discuss a schedule for remaining pretrial activities and

shall report to the court with a joint proposed scheduling order to govern the remaining

pretrial activities with respect to those parties.

      6. In any event, a report on progress toward establishing a schedule for bringing

to trial claims against Manufacturers shall be submitted no later than January 9, 2006.

UNITED STATES DISTRICT JUDGE

October 7, 2005
Wilmington, Delaware

7

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 04-1337-KAJ |
| v. | ) ) ) | |
| AUDIOVOX COMMUNICATIONS CORP., AUDIOVOX ELECTRONICS CORPORATION, NIKON CORPORATION, NIKON, INC., NOKIA CORPORATION; NOKIA INC., SANYO ELECTRIC CO., LTD., and SANYO NORTH AMERICA CORPORATION, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 04-1338-KAJ |
| APPLE COMPUTER, INC.; ARGUS A/K/A HARTFORD COMPUTER GROUP, INC.; CASIO COMPUTER CO., LTD.; CASIO, INC.; CONCORD CAMERAS; DELL INC.; EASTMAN KODAK COMPANY; FUJI PHOTO FILM CO., LTD.; FUJI PHOTO FILM U.S.A., INC.; FUJITSU LIMITED; FUJITSU AMERICA, INC.; FUJITSU COMPUTER PRODUCTS OF AMERICA, INC.; KYOCERA WIRELESS CORP.; MATSUSHITA ELECTRICAL INDUSTRIAL CO.; MATSUSHITA ELECTRICAL CORPORATION OF AMERICA; NAVMAN NZ LIMITED; NAVMAN U.S.A. INC.; OLYMPUS CORPORATION; OLYMPUS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |



AMERICA, INC.; PENTAX CORPORATION; )
PENTAX U.S.A., INC.; SONY CORPORATION; )
SONY CORPORATION OF AMERICA; SONY )
ERICSSON MOBILE COMMUNICATIONS AB; )
SONY ERICSSON MOBILE )
COMMUNICATIONS (USA) INC.; TOSHIBA )
CORPORATION; and TOSHIBA AMERICA, )
INC., )
 )
               Defendants. )
 )
——————————————————————— )

OPTREX AMERICA, INC., )
 )
            Plaintiff, )
 )
          v. )     Civil Action No. 04-1536-KAJ
 )
HONEYWELL INTERNATIONAL INC., and )
HONEYWELL INTELLECTUAL PROPERTIES )
INC., )
 )
               Defendants. )

### MEMORANDUM ORDER

**Introduction & Background**

In these three actions, Honeywell International Inc., a Delaware corporation, and

Honeywell Intellectual Properties Inc., an Arizona corporation, (collectively "Honeywell")

have asserted that their rights under U.S. Patent No. 5,280,371, issued January 18,

1994, (the "'371 patent) have been infringed. The '371 patent claims a liquid crystal

display ("LCD") apparatus said to provide enhanced brightness and clarity when

compared with prior art LCDs. (See '371 patent, attached to C.A. No. 04-1338-KAJ

Docket Item ["D.I."] 1 at Ex. 1, col. 1 lines 48-61; col. 6, lines 1-42.) In Civil Action No.

04-1337-KAJ, Honeywell asserts the '371 patent against 8 defendants. (C.A. No. 04-

1337-KAJ D.I. 39.) In Civil Action No. 04-1338-KAJ, it asserts the same patent against another 27 defendants.[1] In Civil Action No. 04-1536-KAJ, Optrex America, Inc., a New York corporation, ("Optrex") has sued for a declaratory judgment that it does not infringe Honeywell's rights under the '371 patent and that the patent is invalid. (C.A.No. 04-1536-KAJ D.I. 1.)

Pending before me are several motions bearing on the management of these cases.[2] Honeywell seeks consolidation of the actions. (C.A. No. 04-1338-KAJ D.I. 134; C.A. No. 04-1536-KAJ D.I. 14) A third party, Seiko Epson Corporation, a Japanese company, ("Seiko Epson") seeks to intervene because it is the original manufacturer of LCDs said to be the infringing component in some of the defendants' consumer electronics. (See C.A No. 04-1337-KAJ D.I. 50; C.A. No. 04-1338-KAJ D.I. 136 at 7-9); Optrex, another seller of allegedly infringing LCDs to defendants in the suits filed by Honeywell, seeks to have its case tried first.[3] (C.A. No. 04-1536-KAJ D.I. 23.) And several of the defendants in the actions brought by Honeywell have filed motions to

---

[1]Honeywell chose to file two separate suits simultaneously because a conflict of interest of one of its law firms prevented that firm from representing Honeywell against certain of the defendants, but it now seeks consolidation of the actions. (See C.A. No. 04-1338-KAJ D.I. 135 at n. 1.)

[2]A chart listing the motions filed by the parties is appended.

[3]Federal Rule of Civil Procedure 7(b)(1) provides in pertinent part that, "[a]n application to the court for an order shall be by motion ... ." It is the custom and expectation of this court that, unless otherwise ordered by the court, an application like Optrex's should be made by way of formal motion. That expectation was not met in this instance. Failure to abide by Rule 7 necessarily brought with it a failure to abide by Local Rule 7.1.1, respecting the certification of counsel required with all non-dispositive motions. Solely because Optrex's request, which came by way of a letter, can be readily disposed of in light of my rulings on the motions properly made, I have considered it and address it herein.

stay the litigation against them while Honeywell first tries its infringement claims against the manufacturers of the LCDs. (See, e.g., C.A. No. 04-1337-KAJ D.I. 60, 63, 101, and 112; C.A. No. 04-1338-KAJ D.I. 95, 158, 161, 181, and 189.)

On May 16, 2005, I held a consolidated pretrial conference in these cases pursuant to Federal Rule of Civil Procedure 16. At that time, I heard argument on the various motions and issued preliminary rulings. This Order confirms those rulings and provides a further explication for them. For the reasons stated herein, as well as those stated in open court at the Rule 16 conference, Seiko Epson's motion to intervene is granted, Honeywell's motion to consolidate is granted in part, Optrex's request is granted to the extent stated herein, and the motions to stay submitted by defendants in the Honeywell-filed cases are granted. In short, Honeywell will be required to litigate its infringement claims in the first instance against the manufacturers of the accused LCDs, not against the many customers of those manufacturers who incorporate the LCDs into their consumer electronics.

**Standard of Review**

Motions to intervene are entrusted to the discretion of the court. See Kleissler v. U.S. Forest Service, 157 F.3d 964, 969 (3d Cir.1998) ("We will reverse a district court's determination on a motion to intervene as of right if the court has abused its discretion by applying an improper legal standard or reaching a conclusion we are confident is incorrect.") Intervention as of right is governed by Federal Rule of Civil Procedure 24(a), which states in relevant part, "[u]pon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the

4

property or transaction which is the subject of the action and the applicant is so situated

that the disposition of the action may as a practical matter impair or impede the

applicant's ability to protect that interest, unless the applicant's interest is adequately

represented by existing parties." That rule has been interpreted

> to require proof of four elements from the applicant seeking intervention
> as of right: first, a timely application for leave to intervene; second, a
> sufficient interest in the litigation; third, a threat that the interest will be
> impaired or affected, as a practical matter, by the disposition of the action;
> and fourth, inadequate representation of the prospective intervenor's
> interest by existing parties to the litigation.

*Kleissler*, 157 F.3d at 969.

A district court also generally has broad discretion when deciding whether to

consolidate or stay proceedings. *See Bechtel Corp. v. Laborers' International Union*,

544 F.2d 1207, 1215 (3d Cir. 1976) ("A United States district court has broad power to

stay proceedings."); *Blake v. Farrell Lines, Inc.*, 417 F.2d 264, 266 (3d Cir. 1969) ("the

trial judge, under Rule 42(a), is given the broad authority to 'make such orders

concerning proceedings therein as may tend to avoid unnecessary costs or delay'").

With respect to consolidation, Federal Rule of Civil Procedure 42(a) provides

that, "[w]hen actions involving a common question of law or fact are pending before the

court, it may order a joint hearing or trial of any or all the matters in issue in the actions;

it may order all the actions consolidated; and it may make such orders concerning

proceedings therein as may tend to avoid unnecessary costs or delay."

The power to stay proceedings "is incidental to the power inherent in every court

to control the disposition of the cases on its docket with economy of time and effort for

itself, for counsel, and for litigants." *Cheyney State College Faculty v. Hufstedler*, 703

5

F.2d 732, 738 (3d cir. 1983) (quotation omitted). When considering a motion to stay, the court considers the following factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues and trial of the case; (3) whether discovery is completed; and (4) whether a trial date has been set. *United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 217 (D. Del. 1991).

**Discussion**

These cases are the second set of LCD technology cases to come before this court on a grand scale. The first set, in which the lead case is *Commissariat Á L'Energie Atomique v. Samsung, et al.*, C.A. No. 03-484-KAJ (consolidated), involved the plaintiff ("CEA") suing a host of manufacturers, distributors, and retailers of LCDs or products containing them. After sorting through the various motions to stay and to consolidate, I concluded that consolidation of cases against the manufacturer defendants was appropriate because those cases involved common questions of law and fact pertaining to infringement. *See id.*, May 13, 2004 Mem. Order at 5-6. However, I declined to consolidate the cases involving non-manufacturer defendants because no sound reason was given for immediately addressing what could only be the derivative liability of those defendants. *See id.* For that same reason, I stayed the cases against the non-manufacturer defendants, observing, "litigation against or brought by the manufacturer of infringing goods takes precedence over a suit by the patent owner against customers of the manufacturer." *Id.* at 7 (quoting *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990).

6

I was persuaded then and remain persuaded that large-scale litigation like this requires the business and strategic legal interests of the plaintiff to cede some ground to case management imperatives. It is impracticable to try an infringement case against 40 some defendants or third-party defendants with many different accused devices, and it is unwise to attempt any such thing when liability depends exclusively upon infringement being found as to an LCD component that the defendants do not manufacture and when at least some of the manufacturers of the LCDs are before the court and are willing to stand behind their products in this litigation.[4]  *Cf. Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989) (noting that the "customer suit exception" to the preference for allowing a first-filed action to proceed first is based on "the manufacturer's presumed greater interest in defending its actions against charges of patent infringement").

Honeywell has been frank to say that it deliberately avoided suing the manufacturers to avoid "the complications faced by this Court in the French government's LCD action, C.A. No. 03-484 [i.e., the *CEA* suit]." (C.A. No. 04-1338-KAJ D.I. 147 at 3, ¶ 2.) Honeywell also accurately assesses the several motions to stay and the motion to intervene as an effort by the movants to "recast [Honeywell's lawsuits] as a case against LCD suppliers ... ." (C.A. No. 04-1338-KAJ D.I. 167 at 5.) What Honeywell fails to appreciate is that, from the perspective of the host of defendants

---

[4]Optrex and Seiko Epson are before the court already. Other LCD manufacturers identified as "Curitel, Philips, Wintek, and Samsung SDI" have been named in a third party complaint (*see* C.A. No. 04-1338-KAJ D.I. 167 at 5), and LCD manufacturers identified as "Arima Display, AU Optronics, CPT, Hannstar, Hitachi, Primeview, Quanta Display, Inc., ST-LCD, TM Display, and Tottori Sanyo" have not been named or appeared in any of the cases to date. (*See id.*)

Honeywell has chosen to sue, and in the interest of judicial economy, dealing with the manufacturers first is the fairest and most efficient way to proceed. It is not a complication to be resisted.

Thus, Honeywell's motions to consolidate will be granted because the cases certainly do involve common questions of law and fact which make sense to handle for certain purposes on a consolidated basis. See Fed.R.Civ.P. 42(a). Whether a single trial against all the non-manufacturer defendants makes sense is a question for another day. For now it is sufficient to order that trial and pretrial activities with respect to the dispute between Honeywell and those manufacturer defendants presently before the court will be handled on a consolidated basis. Any pretrial activities with respect to Honeywell's claims against the non-manufacturer defendants will also be handled, for the time being, on a consolidated basis. It is likely that the claims against and by the manufacturer defendants will later be separated out for pretrial proceedings as well as a separate trial. As further noted herein, however, there will be some discovery permitted of the non-manufacturer defendants, so all will remain in the case for the time being.

The motion to intervene filed by Seiko Epson will also be granted, because it puts a willing manufacturer defendant in the forefront of litigation aimed squarely at its product. Seiko Epson correctly claims that it has met the test for intervention as of right under Rule 24(a). Its motion is timely; discovery has not even begun in the case and case management issues are only now being addressed. It has a sufficient interest in the litigation; indeed, as a manufacturer of the product component which is at the heart of these cases, it has a compelling interest. It can rightly claim that its interests will be impaired or affected, as a practical matter, by the disposition of the action, unless it is

8

involved in the case directly and able to make its positions known. Finally, because it is uniquely situated to understand and defend its own product, its interests are not adequately represented by existing parties to the litigation.

For evidently similar reasons, Optrex has taken affirmative steps to insert itself in this litigation and to have the opportunity to have the dispute over its LCDs heard before the suits against the non-manufacturer defendants are permitted to go forward. As stated at the May 16 conference, I agree that the dispute between Honeywell and the manufacturers should go forward first. To that extent, Optrex's request to proceed with its claims on a priority basis will be granted.

As to the several motions to stay, they too are granted to the extent stated in open court. The non-manufacturer defendants will not be given a complete and immediate stay of all proceedings involving them, because I will permit Honeywell certain limited discovery to learn who the suppliers of LCDs are for the various devices that Honeywell must now specifically identify as accused products.[5] I will otherwise stay the litigation against the non-manufacturer defendants, however, since a stay would not unduly prejudice Honeywell, it will vastly simplify the issues and trial of the case against the manufacturer defendants, and it comes at time when discovery has not even begun and no trial date has been set. *See United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F. Supp. 212, 217 (D. Del. 1991) (setting forth test for propriety of a stay). At the

---

[5]At the case management conference, I granted a defense request that Honeywell be required to identify the products it is accusing of infringement. To date, it has only stated that "[a]t least some of the LCD screen-containing products manufactured, imported, offered for sale, and/or sold by [the named defendants] infringe the '371 patent literally and/or under the doctrine of equivalents ... ." (C.A. No. 04-1338-KAJ D.I. 1 at ¶ 53.)

appropriate time, a separation of the suits against the manufacturer and non-manufacturer defendants may well be warranted, for ease of case administration.

At the close of the case management conference, I instructed the parties to confer and provide me with proposed language respecting permissible discovery activities directed at the non-manufacturer defendants during the stay. A further and separate order will be entered following the parties' filing or filings in that regard.

**Conclusion**

For the reasons stated in open court on May 16, 2005 and herein, it is hereby ORDERED that

(1)    Honeywell's motions to consolidate (C.A. No. 04-1338-KAJ D.I. 134; C.A. No. 04-1536-KAJ D.I. 14) are GRANTED to the extent that Civil Action Nos. 04-1337-KAJ, 04-1338-KAJ and 04-1536-KAJ are consolidated for the present for all purposes, with a consolidated case caption to be suggested by the parties by June 17, 2005;

(2)    Seiko Epson's motions to intervene (C.A. No. 04-1337-KAJ D.I. 50 and C.A. No. 04-1338-KAJ D.I. 136) are GRANTED;

(3)    Optrex's request to proceed with its dispute in advance of Honeywell being permitted to proceed with its litigation against the non-manufacturer defendants (C.A. No. 04-1536-KAJ D.I. 23) is GRANTED to the extent described herein; and

(4)    the several motions to stay (C.A. No. 04-1337-KAJ D.I. 60, 63, 101 and 112; C.A. No. 04-1338 D.I. 95, 158, 161, 181 and 189) are GRANTED to the extent

10

described herein, with a further order regarding the stay to be proposed by the parties

no later than June 17, 2005.

UNITED STATES DISTRICT JUDGE

May 18, 2005
Wilmington, Delaware

11

## HONEYWELL V. AUDIOVOX, ET AL.

| C.A. No | Defendant | Pending Motions |
|---|---|---|
| **04-1337** | Audiovox Communications | 1) Motion to Stay (D.I. 112) |
| | Audiovox Electronics | 1) Customer defendants' Motion to Stay (D.I. 101) |
| | Nikon Corporation<br>Nikon Inc. | 1) Motion to Stay (D.I. 60) |
| | Nokia Corporation<br>Nokia Inc. | 1) Motion for leave to file third party complaint (D.I. 57)<br><br>2) Motion to Stay (D.I. 63)<br><br>3) Joinder in Toshiba's Motion to Bifurcate filed in C.A. No. 04-1138 at D.I. 164 (D.I. 97) |
| | Sanyo Electric Co.<br>Sanyo North America | No Motions |
| | Curitel Communications (Third Party Deft) | No Motions |
| | Toshiba Corp. (Third Party Deft) | No Motions |
| | Seiko Epson Corporation (non-party) | 1) Motion to Intervene (D.I. 50) |

**HONEYWELL V. APPLE COMPUTER, ET AL.**

| C.A. No | Defendant | Pending Motions |
|---|---|---|
| 04-1338 | Apple Computer | 1) Joinder (D.I. 172) in Toshiba's motion to bifurcate (D.I. 164)<br><br>2) motion to stay (D.I. 181) |
| | Argus a/k/a Hartford Computer | 1) motion to stay (D.I. 181) |
| | Casio Computer<br>Casio Inc. | 1) Joinder (D.I. 172) in Toshiba's motion to bifurcate (D.I. 164) |
| | Concord Cameras | 1) Joinder (D.I. 172) in Toshiba's motion to bifurcate (D.I. 164)<br><br>2) motion to stay (D.I. 181) |
| | Dell Inc. | 1) Joinder (D.I. 172) in Toshiba's motion to bifurcate (D.I. 164)<br><br>2) motion to stay (D.I. 181) |
| | Eastman Kodak | 1) Joinder (D.I. 194) in Toshiba's motion to bifurcate (D.I. 164)<br><br>2) motion to stay (D.I. 181) |
| | Fuji Photo Film<br>Fuji Photo Film USA | 1) motion for more definite statement, for stay, and for partial dismissal (D.I. 95)<br><br>2) motion to transfer (D.I. 97)<br><br>3) brief filed (D.I. 156) in support of Seiko Epson's motion to intervene (D.I. 136)<br><br>4) briefs filed (D.I. 166, 183) in support of Toshiba's motion to bifurcate (D.I. 164) |
| | Fujitsu Limited<br>Fujitsu America<br>Fujitsu Computer | 1) Joinder (D.I. 172) in Toshiba's motion to bifurcate (D.I. 164) |
| | Kyocera Wireless | 1) motion to stay (D.I. 158) |

| | | |
|---|---|---|
| | Matsushita Electrical Industrial<br>Matsushita Electrical Corp. | 1) Joinder (D.I. 172) in Toshiba's<br>motion to bifurcate (D.I. 164) |
| | Navman NZ<br>Navman USA | 1) motion to stay (D.I. 181) |
| | Olympus Corp.<br>Olympus America | 1) motion to stay (D.I. 161) |
| | Pentax Corporation<br>Pentax USA | 1) motion to stay (D.I. 158)<br><br>2) Joinder (D.I. 172) in Toshiba's<br>motion to bifurcate (D.I. 164) |
| | Sony Corp.<br>Sony Corp. Of America | 1) Joinder (D.I. 172) in Toshiba's<br>motion to bifurcate (D.I. 164)<br><br>2) motion to stay (D.I. 189) |
| | Sony Ericsson Mobile AB<br>Sony Ericsson Mobile USA | 1) Joinder (D.I. 196) in motion to stay<br>(D.I. 158) |
| | Toshiba Corporation | 1) motion to bifurcate (D.I. 164) |
| | Toshiba America | no motions |
| | Philips Electronics (3rd pty dft) | no motions |
| | Wintek Electro-Optics (3rd pty<br>dft) | no motions |
| | Optrex America (3rd pty dft) | no motions |
| | Seiko Epson (non-party) | 1) motion to intervene (D.I. 136) |
| | **PLAINTIFFS - HONEYWELL** | 1) motion to consolidate and for stay<br>(D.I. 134) |

**OPTREX AMERICA INC. V. HONEYWELL.**

| C.A. No | Defendant | Pending Motions |
|---------|-----------|-----------------|
| 04-1536 | Honeywell International | 1) Motion to consolidate and for stay (D.I. 14) |
| | Honeywell Intellectual Properties | 1) Motion to consolidate and for stay (D.I. 14) |

## Stackel, Mary Ellen

| | |
|---|---|
| **From:** | ded_nefreply@ded.uscourts.gov |
| **Sent:** | Wednesday, May 18, 2005 9:17 AM |
| **To:** | ded_ecf@ded.uscourts.gov |
| **Subject:** | Activity in Case 1:04-cv-01338-KAJ Honeywell Intl Inc., et al v. Apple Computer Inc., et al "Order on Motion to Stay" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from rwc, entered on 5/18/2005 at 9:16 AM EDT and filed on 5/18/2005
**Case Name:**    Honeywell Intl Inc., et al v. Apple Computer Inc., et al
**Case Number:**    1:04-cv-1338
**Filer:**
**Document Number:** 202

**Docket Text:**
MEMORANDUM ORDER - granting [95] Motion to Stay, granting [134] Motion to Consolidate Cases, granting [136] Motion to Intervene, granting [158] Motion to Stay, granting [161] Motion to Stay, granting [181] Motion to Stay, granting [189] Motion to Stay . Signed by Judge Kent A. Jordan on 5/18/05. (Attachments: # (1) Attachment to Order) (rwc, )

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=5/18/2005] [FileNumber=44120-0]
[c9f78550c6c9e8596c9b251165299ec0be0034e3f6ff435c343066d2ae93207d14f4f
a73e6e4efdeb96dbf5a01057c02fd435254313d9414b6e86b5adab49996]]
**Document description:** Attachment to Order
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=5/18/2005] [FileNumber=44120-1]
[ab1ca3f45a9709e08f46d49bc99215feab3a2bdb4c7a476c90d96f8e1ae7582cf911f
415ccdc0d5794f15f0c7a0bd29c957f7383a144858f890dc0c99e3086c8]]

**1:04-cv-1338 Notice will be electronically mailed to:**

Arthur G. Connolly , III    aconnollyIII@cblh.com,

Frederick L. Cottrell , III    cottrell@rlf.com

Francis DiGiovanni    fdigiovanni@cblh.com, sfaulk@cblh.com

Amy Elizabeth Evans    aevans@crosslaw.com,

5/18/2005

Thomas C. Grimm     tcgefiling@mnat.com

Thomas Lee Halkowski     halkowski@fr.com, sub@fr.com

Richard L. Horwitz     rhorwitz@potteranderson.com,
dmoore@potteranderson.com;nmcmenamin@potteranderson.com;achin@potteranderson.com;mbaker@potteranderson.

Robert J. Katzenstein !     rjk@skfdelaware.com, eys@skfdelaware.com

Glenn Christopher Mandalas     gmandalas@ycst.com, corporate@ycst.com;corpcal@ycst.com;hhall@ycst.com

David Ellis Moore     dmoore@potteranderson.com, slynch@potteranderson.com

Karen L. Pascale     kpascale@bmf-law.com, jspeakman@bmf-law.com

Adam Wyatt Poff     apoff@ycst.com, corporate@ycst.com;corpcal@ycst.com

Leslie A. Polizoti     lpolizoti@mnat.com, lpolizoti@mnat.com

Avelyn M. Ross     aross@velaw.com

Philip A. Rovner     provner@potteranderson.com, mstackel@potteranderson.com;nmcmenamin@p!
otteranderson.com

Chad Michael Shandler !     shandler@rlf.com, pstewart@RLF.com

John W. Shaw     jshaw@ycst.com, corporate@ycst.com;ptorterotot@ycst.com;corpcal@ycst.com

William J. Wade     wade@rlf.com, wheeler@rlf.com

Roderick B. Williams     rickwilliams@velaw.com

**1:04-cv-1338 Notice will be delivered by other means to:**

5/18/2005

# EXHIBIT 17

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
(Cite as: Not Reported in F.Supp.2d)

H

Adams v. Gateway, Inc.
D.Utah,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Utah, Central
Division.
Phillip M. ADAMS and Phillip M. Adams &
Associates, L.L.C., Plaintiff(s),
v.
GATEWAY, INC., Defendant(s).
No. 2:02-CV-106 TS.

Dec. 30, 2003.

ORDER FN1 GRANTING MOTION TO COMPEL
DOCUMENTS WITHHELD ON THE BASIS OF
PRIVILEGE

FN1. This order will be filed in two versions, one
sealed and the other unsealed with text redacted. The
sealed order is entitled Sealed Order Granting
Motion to Compel Documents Withheld On the
Basis of Privilege, while the unsealed order will be
entitled Order Granting Motion to Compel
Documents Withheld On the Basis of Privilege. *The
position of redacted text will not be evident in the
redacted unsealed version.* Counsel for Gateway and
Adams will have an opportunity to specify their
view on appropriate redactions before the redacted,
unsealed version is filed.NUFFER, Magistrate J.
*1 Adams,FN2 a holder of patents to detect and
cure defects in floppy disk controllers used in
computers, filed this suit alleging that Gateway
infringed on his patents.FN3 Adams also alleges
that Gateway breached a non-disclosure agreement
he and Gateway entered into in July 2000 during
business negotiations.FN4 This order deals with
privilege claims made by Gateway in responding to
requests for production of documents.

FN2. While there are two plaintiffs in this suit,
Phillip M. Adams and Phillip M. Adams &
Associates, L.L.C., this order will refer to Plaintiffs
as "Adams."

FN3. Count I, Second Complaint, docket no. 39,
filed April 17, 2003.

FN4. *Id.,* Count II.

Table of Contents.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

Nature of This Dispute.     1

Procedural History of This Motion and Development of the Record.     2

Factual Setting.     5

Discussion of Applicable Law and Documents in This Case.     9

    Overview of Discussion.     9

    General Discussion of Privileges.     9

       Basic Elements of Privileges.     9

       Articulations of the Privileges.     10

          Work Product Privilege.     10

          Attorney-Client Privilege.     14

       Summary of Privilege Standards.     15

    Testing the Limits of the Privileges.     16

    General Analysis in This Case.     20

       Attorney-Client Privilege.     20

       Work Product Privilege.     23

          Method of Review.     28

          Substantial Need and Undue Hardship.     29

    List of Documents Submitted to the Court.     31

    Analysis of Specific Documents.     33

       Documents Regarding Computers Yet in ManufacturingExhibit Q.     33

       Analysis of Exhibits A-F (Sample Documents).     35

       Exhibits G Through N.     42

ORDER.     46

    Preparing for Production.     46

    Completing the Record.     47

    Attorneys' Fees and Expenses.     48

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Nature of This Dispute

Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege FN5 was filed because Gateway, in response to Adams' various requests for production of documents, asserted privilege objections to the requests. Nearly 1,000 documents are withheld on claim of attorney-client and/or work product privilege.FN6 The privilege logs presented are voluminous and Adams, with an equally thorough listing of objections to the claim of privilege, has contested almost every designation of protection. FN7 Issues between these parties on the validity of privilege claims arose as early as June 2003,FN8 well before this motion was filed in September 2003.

FN5. Docket no. 81, filed September 3, 2003.

FN6. Adams' Memorandum, page 6.

FN7. *See* privilege logs included as Exhibit A to Adams' Memorandum in Support of Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege, docket no. 82, filed September 3, 2003, ("Adams' Memorandum"). The exhibits to Adams' Memorandum were filed separately under seal as Exhibits in Support of Plaintiff's Motion to Compel Documents Improperly Withheld on the Basis of Privilege, as docket no. 83, on September 3, 2003.

FN8. Plaintiff's Memorandum in Support of Motion to Compel and Statement re Efforts to Resolve Discovery Dispute, docket no. 62, filed under seal June 3, 2003, pages 13-16.

Adams seeks to compel production of these documents, claiming that they are improperly withheld. The decision on this motion will determine whether that claim of privilege is valid and, if so, to what extent. The decision on privilege does not mean the documents are outside the scope of the protective order which protects trade secrets in this case.FN9

FN9. Docket no. 47, filed September 30, 2003.

Procedural History of This Motion and Development of the Record

**\*2** Extraordinary caution has been exercised in the handling of this issue because of the nature of the privilege issue and its significance to each party. The court has attempted to give Gateway a full and complete opportunity to sustain its burden of proof on the claims of privilege, and this has necessitated in camera and ex parte delivery of some materials. Almost all materials submitted by both parties on this issue have been sealed because of the trade secrets involved.

Shortly after Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege FN10 was filed, in a hearing on another motion, the parties were advised that the privilege motion would be heard Tuesday, October 21, 2003. The court directed Gateway to bring witnesses to that hearing.FN11

FN10. Docket no. 81, filed September 3, 2003.

FN11. Minute entry of September 15, 2003, docket no 91.

At the hearing Tuesday, October 21, 2003, Gateway did not present witnesses, but had filed three declarations of Mark Walker relating factual background from its viewpoint.FN12 The court had reviewed the memoranda FN13 filed by counsel and heard argument by counsel for the parties, Mr. Gregory Phillips for Plaintiffs and Mr. John Posthumus for Defendant. At the hearing, the court orally gave its preliminary impressions as to the issues.

FN12. Declaration of Mark Walker, dated June 27, 2003, filed as Exhibit 5 to Gateway's Opposition to Plaintiff's Motion to Compel, docket no. 69, filed under seal June 30, 2003; Supplemental Declaration of Mark Walker, dated August 27, 2003, not filed with the court, noted in the e-mail dated September 9, 2003, lodged in the file, but marked as Exhibit R on this motion; Declaration of Mark Walker, dated October 3, 2003, filed as Exhibit 1 to Defendant's Response to Motion to Compel Documents ("Gateway Memorandum"), docket no. 106, filed under seal October 14, 2003.

FN13. Adams' Memorandum; Gateway Memorandum; and Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege, docket no. 109, filed October 20, 2003

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

("Adams' Reply Memorandum").

In the course of the October 21st hearing, the court proposed a review of a sampling of documents. Documents were selected by Adams from the privilege log, provided to the court (and not to Adams) from the Gateway files, and marked as Exhibits AF for the hearing. Gateway then addressed each of those Sample Documents in support of its privilege claims, and also provided additional documents marked as Exhibits G and H to show the context of the Sample Documents.

At the conclusion of the hearing, the court directed that Gateway provide any further documents to the court which might support its claim of privilege for the Sample Documents. The court also allowed Gateway to provide a narrative proffer of the factual context of the documents and evidentiary support beyond the three declarations of Mark Walker, already on file. The parties were also ordered to reserve the dates of November 18 and 19, 2003, for further hearing. Gateway was ordered to secure the presence of Mark Walker, Dave Harrell, Mike Holstein, Ron Naves, and Thomas Stepp, as a further opportunity for Gateway to fulfill its burden of proof on its claims of privilege and to give Adams an opportunity to cross-examine.FN14

FN14. Order, docket no. 110, filed October 22, 2003.

Gateway did provide further documents which support its claim of privilege for the Sample Documents. A list of those additional documents, identifying them to the privilege log, was provided to Plaintiff. The documents, however, were not provided to Plaintiff. The documents were marked as Exhibits I-N.

Gateway also provided a narrative proffer of the factual context of the Sample Documents in the form of a letter dated October 31, 2003, marked as Exhibit O. A redacted copy was provided to Adams. It is marked as Exhibit P.

**\*3** By various e-mails in the first week of November, Gateway advised that it was unable to secure the attendance of Mr. Holstein and Mr. Naves at the contemplated November hearing; FN15 and finally Gateway did not intend to rely on testimony from two of the proposed witnesses;

that Gateway believed its proof from these individuals was so interwoven with privileged matters that their testimony (or depositions in lieu of testimony) should occur outside the presence of Adams and Adams' counsel. Thus, the hearing set November 18 and 19, 2003, was stricken and Gateway was directed FN16 to submit declarations supporting its privilege claims to the court, with supporting exhibits, for in camera review. Gateway and Adams were also allowed to file and serve further memoranda on this motion, with any supporting exhibits.FN17

FN15. E-mails of November 7, 2003; November 11, 2003; and November 13, 2003, all lodged in the file.

FN16. Order Regarding Motion to Compel Documents Withheld on the Basis of Privilege, docket no. 117, filed November 14, 2003.

FN17. *Id.* There was, however, a further order extending time-frames, the Order Modifying Deadlines, docket no. 120, filed November 21, 2003.

In this time frame, the court issued its sealed ex parte order which reflected the court's analysis of the issues to that point in time, with the court's preliminary views on the privilege claims.FN18 Much of that order is repeated, but modified, in this order.

FN18. Docket no. 116, filed November 14, 2003.

Adams filed Plaintiffs' Supplemental Submission Re Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege ("Adams' Supplemental Memorandum").FN19 Gateway faxed the court copies of the Fourth Declaration of Mark Walker, the Declaration of Mike Holstein, and the Declaration of Ron Naves, and filed its Ex Parte Supplemental Brief in Response to Court's Sealed Order Regarding Motion to Compel Documents Withheld on the Basis of Privilege ("Gateway Supplemental Brief").FN20 A redacted version was served on other counsel. Gateway also submitted a binder entitled "November 2003 Gateway Privileged Documents for *In Camera* Review" containing numerous additional exhibits.

FN19. Docket no. 123, filed December 3, 2003.



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

FN20. Docket no. 124, filed December 3, 2003.

Factual Setting

The most concise explanation of the factual setting is provided in Walker's third Declaration: FN21

FN21. Declaration of Mark Walker, dated October 3, 2003, filed as Exhibit 1 to Gateway Memorandum.

4. From about May 2000 to about March 2001, the Gateway Legal Department conducted an investigation pertaining to sale of Gateway branded computers (referred to as the "Gateway Legal Investigation").
* * *
6. Specifically, at the time the Gateway Legal Investigation was commenced, the Gateway Legal Department was aware of published news reports of the Toshiba settlement, other qui tam and class action lawsuits against other computer manufacturers,.
7. On May 10, 2000, Dr. Adams' counsel, Greg Phillips, called me and indicated that Dr. Adams wished to meet with Gateway about licensing his patents to Gateway and serving as a consultant to Gateway.... On May 16, 2000, I sent a summary of my conversation with Mr. Phillips to Ron Naves, the head of the litigation management group at that time, and Teigue Thomas, an in-house litigator who reported to Mr. Naves at that time..
* * *
8. Mr. Naves and I were responsible for overseeing the Gateway Legal Investigation. This Investigation was conducted in order to obtain information that was used by the Gateway Legal Department to provide legal advice to Gateway executives in anticipation of legal action.
*4 * * *
9. During the Gateway Legal Investigation Mike Holstein was the lead person as to the technical investigation necessary to ascertain the information necessary to complete the Gateway Legal Investigation, and was assisted by four Gateway Non-Attorney Personnel.
10. One aspect of the Gateway Legal Investigation comprised assessing computers that Gateway was preparing to launch....
11. As a part of the Legal Investigation, Gateway also assessed the computers that Gateway had previously sold....

* * *
13. All of the Gateway Non-Attorney Personnel as well as the non-attorney staff in the Gateway Legal Department worked under the ultimate direction and supervision of the Gateway Legal Department in connection with the Gateway Legal Investigation.

Gateway lists ten attorneys, eight non-attorney legal staff members, and 52 non-attorney personnel who were involved in this effort.FN22

FN22. Exhibit A-1, November 2003 Gateway Privileged Documents for *In Camera* Review.

Gateway's characterization of what it calls the "Gateway Legal Investigation" clearly attempts to fit the structure of its efforts into the case law of attorney-client and work product privilege. Attorneys were at the apex of the Gateway effort.

Gateway met with Adams in Salt Lake City in July 2000 and in San Diego in February 2001.FN23 Those dates mark the beginning and end of business negotiations between the parties to this suit. That is the same time frame as the so-called Gateway Legal Investigation. Thus, some documents as to which privilege is claimed reflect negotiation strategy concerns separate and apart from litigation.

FN23. Adams' Memorandum, 3-4.

In its most recent filings, Gateway makes a concentrated effort to place its investigation in a litigation context.

Gateway claims these facts mean that the issues investigated in 2000-2001 were not "real world" issues important to Gateway retail sales, product reliability and consumer satisfaction, but were only relevant in a scenario created by Adams.FN24

FN24. *Id.* at 8.

Gateway never viewed the alleged FDC defect as a product liability issue. Rather, Gateway has viewed the alleged FDC defect as a litigation issue ... FN25

FN25. *Id.* at 10. [Citations omitted.]

Gateway's conclusory assertions are not verified by its own record. As will be seen later,; and



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

Gateway's Chief Technical Officer was consulted on the issue.

Gateway's Supplemental Brief and the most recent declarations provide more detail about multiple pending lawsuits in the industry and the litigation threats FN26 Gateway faced when it began its investigation. Gateway expands on its knowledge of Adams' involvement in that litigation FN27 and its internal reactions after contact from Adams' attorney and the intensive involvement of its legal staff and outside counsel in managing the project. FN28 The thrust of Gateway's factual development is to build an overwhelming sense of "litigation preparation" as opposed to "product development."

FN26. *Id.* at 4-6.

FN27. *Id.* at 7-8.

FN28. *Id.* at 7-8.

Regardless of the instigation and collateral context, the investigation had at its core the diagnosis and resolution of potential problems. The reliability of Gateway's retail computer products were at issue. It may have been that Gateway became aware of the FDC issues by hearing about litigation possibilities, but, Gateway's self-interest as a retailer of computer products motivated its investigation.

**\*5** Adams cites a letter from Gateway to its suppliers and a letter from Gateway's outside counsel to Adams' counsel to show that Gateway had a significant business purpose in its response to the FDC issues. The letters state:
Gateway is committed to providing products that meet the highest levels of quality and need you [Gateway suppliers] to verify that the FDC components provided by you to Gateway operate according to specifications.FN29

FN29. Exhibit 1 to Adams' Supplemental Memorandum.

Gateway continues to strive to provide its customers with the best products and services in the industry. To that end, the company is always interested in improving its technology and addressing customer issues as they arise. FN30

FN30. Exhibit 2 to Adams' Supplemental

Memorandum.

Discussion of Applicable Law and Documents in
This Case Overview of Discussion

This order will first examine the elements of the claimed privileges, their articulations in case law, and the limits of the privileges. Then, the general setting of the FDC Assessment Investigation will be analyzed by those principles, followed by determination of the validity of the privilege claims as to specific documents. Finally, the order concludes with disposition of this motion and a procedure for implementation.

General Discussion of Privileges

Basic Elements of Privileges:

Gateway asserts that the documents at issue are protected by the attorney-client privilege, the work product privilege, or both. The attorney-client privilege applies where the following elements are met:
(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.FN31

FN31. 8 John Henry Wigmore, *Evidence,* § 2292 (McNaughton rev.1961).

The work product doctrine was first enunciated in *Hickman v. Taylor* FN32 and is now codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. The work product doctrine protects (1) documents and tangible things prepared in anticipation of litigation or for trial, (2) by or for another party or his representative, (3) unless the party seeking discovery can show both a substantial need for the materials, and that he is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means.FN33 Work product includes "[s]ubject matter that relates to the preparation, strategy, and appraisal of the strengths and weaknesses of an action, or to the activities of the attorneys involved, rather than to the underlying evidence." FN34

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

FN32. 329 U.S. 495 (1947).

FN33. Fed.R.Civ.P. 26(b)(3).

FN34. *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989,* 133 F.R.D. 515, 519 (N.D.Ill.1990)(quoting 4 *Moore's Federal Practice* ¶ 26.64[1] (1989).

Articulations of the Privileges:

Work Product Privilege

The fountainhead case on the work product privilege is *Hickman v. Taylor.* FN35 *Hickman* concerned a boat accident, in which the tug J.M. Taylor sank while helping to tow a car float. Five of nine crew members drowned in the accident. The tug owners employed a law firm, which included attorney Fortenbaugh, to defend against potential lawsuits by representatives of the deceased crew members and to sue for damages to the tug. As part of his investigation, Mr. Fortenbaugh interviewed the survivors and took signed statements from them. In addition, he interviewed other people thought to have information about the accident and prepared memoranda of what they told him. Subsequently, the petitioner, a representative of one of the deceased crew members, sued the tug owners.FN36

FN35. 329 U.S. 495 (1947).

FN36. *Id.* at 498.

*6 During the course of discovery, the petitioner filed a number of interrogatories. At issue was the 38th interrogatory which read:
State whether any statements of the members of the crews of the Tugs "J. M. Taylor" and "Philadelphia" or of any other vessel were taken in connection with the towing of the car float and the sinking of the Tug "John M. Taylor." Attach hereto exact copies of all such statements if in writing, and if oral, set forth in detail the exact provisions of any such oral statements or reports. FN37

FN37. *Id.* at 498-99.

While admitting that he had taken statements from the survivors, attorney Fortenbaugh refused to provide the statements on the ground that they were privileged material obtained in preparation for

litigation. The district court held that the material was not privileged and ordered Fortenbaugh, as counsel for the tug owners, to produce all written statements of the witnesses, to state in substance all facts learned through his oral interviews of the witnesses, and to produce all of Mr. Fortenbaugh's memoranda containing statements of fact by the witnesses. The Third Circuit reversed, holding that the information sought was part of the "work product of the lawyer" which was privileged under the Federal Rules of Civil Procedure.FN38

FN38. *Id.* at 499-500.

In considering whether the material should be produced, the Supreme Court noted that the witnesses were available to the party seeking discovery, stating "[Petitioner] has sought discovery as of right of oral and written statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired." FN39 The court further noted that "petitioner was free to examine the public testimony of the witnesses taken before the United States Steamboat Inspectors." FN40

FN39. *Id.* at 508.

FN40. *Id.* at 509.

The Supreme Court characterized the discovery as an invasion, without necessity.
We are thus dealing with an attempt to secure the production of written statements and mental impressions contained in the files and the mind of the attorney Fortenbaugh without any showing of necessity or any indication or claim that denial of such production would unduly prejudice the preparation of petitioner's case or cause him any hardship or injustice.FN41

FN41. *Id.*

The Court noted that the essence of what the petitioner was seeking either had already been revealed to him or was available to him directly from the witnesses.FN42

FN42. *Id.*

The Court then outlined the policy reasons for an attorney work product privilege:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

In performing his various duties, ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways-aptly though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.FN43

FN43. *Id.* at 510-11 (citation omitted).

*7 The Court stated the protection it recognized was limited by the discovery rules:
We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration. And production might be justified where the witnesses are no longer available or can be reached only with difficulty. Were production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning.FN44

FN44. *Id.* at 511-12.

The Third Circuit's opinion also articulated limitations on what might have protection in an attorney's files:
[O]ne is tempted to say that the lawyer's files are impregnable against any inquiry from outside. But that depends upon what the lawyer puts in them. A piece of a machine which has hurt someone, a document needed to show a fact, many things required in a lawsuit find their way from client's hands to lawyer's file and are not to be concealed until the day of the trial for that reason. But here we are dealing with intangible things, the results of the lawyer's use of his tongue, his pen, and his head, for his client.FN45

FN45. *Hickman v. Taylor,* 153 F.2d 212, 223 (3d Cir.1945).

*Hickman* protected an attorney's assembly of information from exposure to the adversary. The sources of the information were third parties, available to the adversary. The content of the information was pre-existing fact. *Hickman* recognized that information in the possession of an attorney might be discoverable, but prevented invasion of the attorney's mind, which is the attorney's workplace, and its products. *Hickman* prevented an adversary from unjustly benefitting from the attorney's efforts in the litigation arena. As Justice Jackson stated in his concurring opinion, "a common law trial is and always should be an adversary proceeding. Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary ." FN46

FN46. *Id.* at 516.

### Attorney-Client Privilege

*Upjohn Co. v. United States* FN47 is the current leading statement of the federal common law on attorney-client privilege in the corporate setting. *Upjohn* rejected the rule limiting the privilege to a corporate "control group." The case illustrates application of the attorney-client privilege in a complex corporate setting like that presented here.

FN47. 449 U.S. 383 (1981).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

The Upjohn Company undertook an internal investigation of possibly improper foreign payments. The investigation was initiated by a letter prepared by counsel, but sent out over the Chairman's signature. The letter announced counsel's authority to conduct the "highly confidential" investigation and requested that managers make certain specific inquiries, respond to a questionnaire, and direct all responses to counsel. Counsel also conducted interviews of managers and other employees.FN48

FN48. *Id.* at 386-87.

**\*8** The Supreme Court protected the attorney questionnaires and other information related to the investigation. Alternative availability of the information was key in the court's holding:
Application of the attorney-client privilege to communications such as those involved here ... puts the adversary in no worse position than if the communications had never taken place.FN49

FN49. *Id.* at 395.

The Court specifically noted that all the employees who communicated with counsel were available to be deposed on the very subjects of the communications with counsel.
Here the Government was free to question the employees who communicated with Thomas and outside counsel. Upjohn has provided the IRS with a list of such employees, and the IRS has already interviewed some 25 of them. While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney-client privilege.FN50

FN50. *Id.* at 396.

*Upjohn* also found work product protection in addition to attorney-client protection:
The notes and memoranda sought by the Government here ... are work product based on oral statements. If they reveal communications, they are, in this case, protected by the attorney-client privilege. To the extent they do not reveal communications, they reveal the attorneys' mental

processes in evaluating the communications.FN51

FN51. *Id.* at 401.

### Summary of Privilege Standards

Attorney-client privilege protects communications to and from attorneys in furtherance of obtaining legal advice. It protects opinions, advice, and direct communications to facilitate opinions and advice.

Work product privilege protects an attorney's subjective analysis and substantive efforts in, or in anticipation of, litigation from use by the adverse party. It protects trial preparation efforts on behalf of a client.

Neither privilege is intended to protect underlying or independent facts.

### Testing the Limits of the Privileges

Hard issues arise, testing the limits of these privileges:

Litigation worldview: Some parties argue that "litigation is an ever-present possibility in American life," FN52 so that risk reduction with a view to litigation pervades all business activities and cloaks them with privilege.

FN52. *Wikel v. Wal-Mart Stores,* 197 F.R.D. 493, 495 (N.D.Okla.2000)(quoting *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.,* 967 F.2d 980, 984-85 (4th Cir.1992)).

Increased Lawyer Presence: Lawyers have increased presence in all parts of business life. Increased regulation and risks, and perhaps an overabundance of law school graduates, and the increased desire for multi-disciplinary solutions, mean that more lawyers are present in more places other than the traditional law office. In the corporate setting, lawyers have responsibilities outside traditional lawyering.
[I]nhouse attorneys can serve multiple functions within the corporation. In-house counsel may be involved intimately in the corporation's day to day business activities and frequently serve as integral players in business decisions or activities. Accordingly, communications involving in-house counsel might well pertain to business rather than legal matters. The privilege does not protect an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

attorney's business advice. Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys. FN53

FN53. *United States v. ChevronTexaco Corp.,* 241 F.Supp.2d 1065, 1076 (N.D.Cal.2002)(citing *In re Fischel,* 557 F.2d 209, 211 (9th Cir.1977)).

**\*9** Expert technical work done for attorneys: In the course of litigation, more expert technical work is performed to meet the needs of more complex cases. This accustoms courts and lawyers to finding privilege for work totally unrelated to law school curriculum. Some of this work may, however, also be necessary for reasons independent of litigation.

*In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989* FN54 illustrates the application of the privileges in a modern factual situation. After a DC-10 crash resulting in many deaths, lawsuits were filed immediately, beginning the day after the crash. "General Electric assigned attorneys overall responsibility for everything concerning the accident," making evaluation of work product claims difficult.FN55 The court noted that General Electric's view of the effect of lawyer supervision would protect all documents in General Electric's investigation.

FN54. 133 F.R.D. 515 (N.D.Ill.1990).

FN55. *Id.* at 520.

The question then is whether a written communication between General Electric employees (either not sent through an attorney, or sent with a copy to an attorney) or simply a memorandum written for the file as are some of the documents in question, concerning some aspect of the accident investigation, becomes work product because the ultimate findings of the employees will be conveyed to the attorneys who are in charge of the litigation. If that is the case, it is hard to imagine what documents, other than the public NTSB Report, General Electric would be required to produce concerning its findings as to the cause of the accident, given the timing of the first lawsuit (and even if it had been later, the near certainty that any large air crash will result in lawsuits).FN56

FN56. *Id.* at 520 (footnotes omitted).

The court also noted that "General Electric almost certainly had more than one purpose in preparing many of the documents in question" including "defense of lawsuits resulting from the crash," "the NTSB investigation," and "a desire 'to improve its aircraft products, to protect future pilots and passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts for production of said aircraft." ' FN57

FN57. *Id.* at 519-20 (quoting *Soeder v. General Dynamics Corp.,* 90 F.R.D. 253, 255 (D.Nev.1980)).

This last issue, a mixed purpose for preparation of documents, has led a district judge in this court to make work product protection available only if "the primary motivating purpose behind the creation of the [materials was] to assist in pending or impending litigation" FN58 This test restrains the work product privilege to its intended area-the attorney's workplace, in litigation preparation and strategy. It is consistent with the limitations on the privilege recognized in *Hickman,* and the paradigm that the "scope of the privilege should be 'strictly confined within the narrowest possible limits.' " FN59

FN58. *McEwen v. Digitran Sys. Inc.,* 155 F.R.D. 678, 682 (D.Utah 1994)(quoting *United States v. Gulf Oil Corp.,* 760 F.2d 292, 296 (Temp.Emer.Ct.App.1985)). *See also United States ex rel. [Redacted] v. [Redacted],* 209 F.R.D. 475 (D.Utah 2001).

FN59. *Air Crash,* 133 F.R.D. at 518 (quoting *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983))(quoting 8 *Wigmore, Evidence* § 2291 (McNaughton rev.1961)).

When the privilege shelters important knowledge, accuracy declines. Litigants may use secrecy to cover up machinations, to get around the law instead of complying with it. Secrecy is useful to the extent it facilitates the candor necessary to obtain legal advice. The privilege extends no further.FN60

FN60. *Id.* (quoting *Matter of Feldberg,* 862 F.2d 622, 627 (7th Cir.1988)).

**\*10** Gateway argues that the "primary motivating



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

purpose" test is not an accurate reformulation of the requirement of Rule 26(b)(3) that a document protected by the work product privilege be prepared "in anticipation of litigation." Gateway prefers the "because of" test espoused by some courts. FN61 The "primary motivating purpose" test generally results in non-privileged status for documents prepared in support of a business transaction when those documents analyze potential litigation outcomes as a part of the "due diligence" in structuring a deal. For example, application of the "primary motivating purpose" test would deny protection to a legal analysis of a potential IRS challenge to a merger structure because the analysis was performed to determine viability of the merger, not because there was an actual, present threat of litigation.FN62 The "primary motivating purpose" for the analysis was the merger, not the litigation itself. But the "because of" test protects the document, since the document was prepared "because of" the potential for litigation. Similarly, the "primary motivating purpose" test might deny protection to an analysis of potential litigation prepared for a commercial transaction, or a merger or joint undertaking, or a financial reserve analysis, though the documents were surely prepared "because of" the possibility of litigation.FN63

FN61. *United States v. Adlman,* 134 F.3d 1194 (2d Cir.1998).

FN62. *Id.* at 1195.

FN63. *Id.* at 1199-1200.

These test semantics really miss the point. The case cited by Gateway is clear that the *content* of the documents is determinative, not the *cause* for their preparation:
We see no basis for adopting [the primary motivating purpose] test under which *an attorney's assessment of the likely outcome of litigation* is freely available to his litigation adversary merely because the document was created for a business purpose rather than for litigation assistance.
* * *
Conversely, it should be emphasized that the "because of" formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been created in *essentially similar form irrespective of the litigation.* It is well established

that work-product privilege does not apply to such documents.FN64

FN64. *Id.* at 1200-02 (emphasis added).

For a document to be protected under the work product privilege, it must be within the province protected in *Hickman;* it must reflect the thinking of the attorney by being an expression from her, or, if a communication to her, it must reflect back her inquiry. If there is an independent sound reason for the document's creation-a business purpose-and the document does not reflect the assembly and sifting of information by counsel, or preparation and legal strategy, then there should be no "work product" protection.

General Analysis in This Case

The analysis Gateway makes is almost entirely a *structural* analysis, ignoring *content* and *purpose* of documents. Gateway structured its efforts to resemble statements in case law pertaining to attorney-client and work product privileges, but these privileges do not embrace all of the large-scale corporate activities Gateway undertook.                    .

Attorney-Client Privilege

**\*11** The factual scenario as represented by Gateway does not lend itself to a finding of broad protection by the attorney-client privilege. There is simply too much horizontal activity in Gateway's projects which had significant purposes independent of legal considerations.

In *Upjohn,* the communications to and from attorneys were specifically focused on gathering critical information, and rendering legal advice, based on that information. The communications were channeled in very limited paths. The scenario in this case is not of that nature. This appears to be a broad-based technical project in which lawyers participated and as to which their insight, advice and even opinions were probably sought. *Lawyer oversight* was advisable in a complex business challenge, fraught with legal implications. That does not make a communication or document attorney-client privileged. *Lawyer input* may have been sought and given on factual scenarios and technical solutions. That also does not make a communication or document attorney-client privileged. There may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

have been communications of "legal advice" or communications of factual material essential to such advice in the interface between the Gateway Legal Investigation. Those communications would be attorney-client privileged, but most of the documents listed in the privilege logs do not appear, by their subject matter and listed parties, to be that sort of communication.

Gateway claims that attorney-client privilege protection can be given to communications between non-attorney employees, citing cases .FN65 This is true, within the limits of the case law. Consistent with the attorney-client protection granted to factual communications from the client to the attorney, communications between non-attorney corporate employees "for the purpose of obtaining legal advice" FN66 will be protected. However, "the purpose of obtaining legal services must be present." FN67

FN65. Gateway Supplemental Brief, page 18.

FN66. *Cuno, Inc., v. Pall Corp.*, 121 F.R.D. 198, 203 (E.D.N.Y.1988). Gateway quotes extensively from an unpublished decision in *AT & T Corp. v. Microsoft Corp.*, No. 02-0164, 2003 WL 21212614 (N.D.Cal. Aug. 18, 2003) because its broad language appears to protect any "[c]ommunications containing information compiled by corporate employees for the purpose of seeking legal advice and later communicated to counsel." *Id.* at *3. This statement in the opinion notwithstanding, that court only protected documents with "analysis and discussion of AT & T's patents;" a memorandum comparing patents written "after a meeting with corporate counsel," and a document relating to facts discussed at that meeting. *Id.* The language in the opinion that Gateway relies on is broader than the court's orders. *Cuno's* language is more precise and reflective of the result in the case. *IBJ Whitehall Bank & Trust Co. v. Cory & Assoc.*, No. 97 C 5827, 1999 WL 617842 (N.D.Ill. Aug. 12, 1999) was consistent with *Cuno* in denying protection to "[c]ommunications from a client that neither reflect the lawyer's thinking nor are made for the purpose of eliciting the lawyer's professional advice or other legal assistance." *Id.* at *4 (quoting *United States v. Frederick,* 182 F.3d 496, 500 (7th Cir.1999)).

FN67. *Cuno,* 121 F.R.D. at 203.

The presence of that purpose is determined from inspection of the document. Where "an inspection of the document itself fails to support a finding that the primary purpose of the document was to seek legal advice or services" the privilege will be denied. *Id.* For a communication between non-attorney employees to be held privileged, it must be "apparent that the communication from one employee to another was for the purpose of the second employee transmitting the information to counsel for advice" or the document itself must "reflect the requests and directions of counsel." FN68

FN68. *Id. See also Santrade, Ltd., v. General Elec. Co.,* 150 F.R . D. 539, 545 (E.D.N.C.1993):
A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds. First, in instances where the client is a corporation, documents subject to the privilege may be transmitted between non-attorneys to relay information requested by attorneys. Second, documents subject to the privilege may be transmitted between non-attorneys (especially individuals involved in corporate decision-making) so that the corporation may be properly informed of legal advice and act appropriately. (Citations omitted).
The court declined to protect communications "made for the primary purpose of communicating business or technical information." *Id.* at 544.

In other words, a document passed between non-attorneys must reflect its integration into the legal advice communication chain to be eligible for attorney-client privilege protection. This requirement is no different than the rule for communications between attorneys and clients, and must be applied to evaluate all communications for which Gateway claims attorney-client protection. The presence or absence of attorney or non-attorney recipients is not determinative. We must see if the document itself (a) shows that the communication was for the purpose of transmitting information to counsel for advice or (b) reveals the requests and directions of counsel. Even when a document is originated by a lawyer, if "a lawyer mixes legal and business advice the communication is not privileged unless 'the communication is designed to meet problems which can fairly be characterized as predominantly legal." ' FN69 Other than the fact that attorneys were ostensibly at the head of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

project, many of the documents reviewed do not show their integration into the giving of legal advice.

FN69. *Cuno,* 121 F.R.D. at 204 (citing 2 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 503(a)(1)(01) at 503-22).

### Work Product Privilege

**\*12** The work product privilege would also appear to be generally inapplicable. Gateway claims it began the Gateway Legal Investigation with general knowledge of floppy disk controller litigation. Gateway says its Legal Investigation, chaired by lawyers, was all undertaken in anticipation of litigation. Therefore, Gateway says, the materials prepared in the Investigation are the protected, privileged efforts of counsel and their representatives.

It is possible to say that every action taken has implications of litigation preparation or avoidance. Driving on a freeway, designing a refrigerator, writing text for a parking lot sign, laying concrete for a sidewalk all have potential litigation and legal consequences. No one in any sophisticated setting takes action without considering applicable legal standards and litigation and regulatory risks. But like the *Air Crash* investigation, the Gateway efforts had mixed purposes. Fundamental to those efforts was the resolution of the essential business and technical issue -. Gateway's Investigation was not undertaken with the primary motivating purpose of litigation preparation. There were legal and litigation concerns, but the technical integrity of the Gateway product was the principal motivation.

The drug manufacturer G.D. Searle claimed that documents prepared in its risk management department were protected by the work product privilege. But they were permitted to be discovered. [W]e do not believe it can be said that the risk management documents were prepared for purposes of litigation.... The risk management department was not involved in giving legal advice or in mapping litigation strategy in any individual case. The aggregate reserve information in the risk management documents serves numerous business planning functions, but we cannot see how it enhances the defense of any particular lawsuit. Searle vigorously argues that its business is health

care, not litigation, but that is not the point. Searle's business involves litigation, just as it involves accounting, marketing, advertising, sales, and many other things. A business corporation may engage in business planning on many fronts, among them litigation. FN70

FN70. *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 401 (8th Cir.1987).

*G.D. Searle* draws a distinction between *general legal* concerns and *specific litigation* concerns. The work product doctrine does not protect material prepared with legal concerns; but protects material relevant to an "individual case" or a "particular lawsuit."

Gateway was evaluating and developing solutions for computers. It was doing so to ensure the integrity of its products, and wanted to do so in a way to avoid patent infringement, liability to consumers, and governmental liability. There was a *potential* for litigation, and those considerations were the duties of the Gateway attorneys, but Gateway's interest in soundness of its efforts was the foundation of its efforts. If resolved, the litigation risks greatly diminished, but that does not mean the potential for litigation was the sole or principal reason to investigate and resolve.

**\*13** Gateway will argue that it never would have made any inquiry without Adams' provocation and the threat of litigation. However, this is belied by Gateway's communications to its suppliers, stating its investigation was intended "to [provide] products that meet the highest levels of quality ... to verify that the FDC components provided by you to Gateway operate according to specifications." FN71 Gateway's letter to Adams said, "Gateway continues to strive to provide its customers with the best products and services in the industry. To that end, the company is always interested in improving its technology and addressing customer issues as they arise." FN72 Thus it appears the Investigation was undertaken as an implementation of a business concept. "[D]ocuments that reflect only the logistics or mechanics of implementing business concepts will not, on their face, reflect reasoning about the anticipated litigation and do not appear to be informed by concerns about that litigation." FN73 Such documents are not protected by the work product privilege.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

FN71. Exhibit 1 to Adams' Supplemental Memorandum.

FN72. Exhibit 2 to Adams' Supplemental Memorandum.

FN73. *ChevronTexaco Corp.,* 241 F.Supp.2d at 1084.

Further, the fact that a large and technical effort is *instigated* by an adverse inquiry or litigation should not enable that effort to be shrouded in privilege. *Hickman* made clear that the privilege runs counter to liberal discovery policy. Giving protection to Gateway's effort would run counter to the more basic policy favoring availability of evidence to those who have a claim of harm.

Gateway argues that compilations of facts, distant from the attorney thought process, may be protected work product.FN74 The portion of the case cited was characterized by the court as nothing more than its "brief observations ... which may be relevant." FN75 This dictum was offered in a case which considered the "Government's effort to compel the testimony of [an] Attorney on her recollection of her client's statements during the course of her representation of the client." FN76 Those facts do not support the dictum and are as far from this case as they are close to *Hickman.*

FN74. Gateway Supplemental Brief at 24.

FN75. *In re Grand Jury Subpoena,* 282 F.3d 156, 161 (2d. Cir.2002).

FN76. *Id.* at 158.

Another case Gateway cites for the same proposition that purely factual material is protected work product considered a report prepared by a consultant at a lawyer's request.FN77 That single document was delivered directly to the attorney, who was concerned about an OSHA investigation and suit by an employee. This document clearly fell within the limited "zone of privacy" contemplated by *Hickman.* FN78

FN77. *Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252 (3rd Cir.1993).

FN78. *Id.* at 1265 (concurring opinion).

Gateway's underlying technical response is not privileged nor protected, and should not be, for sound policy reasons. Work of that nature is not within the protection envisioned by *Hickman.* It is much more "information" than "work-product." It is not reflective of attorney thought processes, but is formulated by technical concerns. It is not pre-existing factual data assimilated, refined, and molded by counsel in such a way as to reveal litigation strategy.

More importantly in this case, the Investigation is the event which gives rise to Adams' infringement allegations. The Gateway Investigation was a technical effort. Adams claims that Gateway infringed on his patents which detect and resolve defects in floppy disk controllers.

**\*14** If the Investigation received attorney work product protection, then any effort to develop a product in an area where patents existed would begin with an organizational structure as Gateway used here. Lawyers would supervise the project, on the hypothesis that litigation might result, making legal supervision and analysis appear necessary to avoid litigation. The documents for the project would be liberally stamped with notations of privilege, as has happened here, and the claim of privilege would be then be asserted in litigation. If successfully asserted, the effect of the privilege would be to protect all the potentially infringing activity from discovery.

That scenario is far removed from the facts of *Hickman,* and from the language of Rule 26(b)(3). It would encourage a view of life as "trial preparation" and extend the privilege far from the attorney's trial strategy sanctuary.

There was undoubtedly a level in Gateway at which attorney analysis and direction was exercised in a way that work product protection is justified. There were certainly communications among counsel and between counsel and technical staff which are entitled to protection. How is the line drawn between the technical activities and the protected communications and work product? There was no line-drawing in Gateway's mind. Documents were contemporaneously blanketed with designations of protection, and nearly a thousand are now designated in the privilege logs. Gateway understandably wanted to protect the entire process.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Therefore, we cannot rely on Gateway's designations.

### Method of Review

Gateway, as "the party seeking to invoke the privilege has the burden of establishing all of its essential elements.... [A] claim of privilege must be established on a document by document basis." FN79

FN79. *Air Crash Disaster,* 133 F.R.D. at 518 (quoting *Lawless,* 709 F.2d at 487).

We must look at each document to see if it is a protected communication or if it qualifies as work product. Generally, this documentation will fall into two categories:
. Documentation showing concrete litigation-related preparation, direction or response will be protected work product.
. Documentation showing technical efforts and results, which does not reveal litigation concerns or is not shown to be directly responsive to such concerns, is not protected work product.

Each of these initial tests has some qualification. It is possible that even facially technical material may be prepared in such tight response to litigation-motivated direction that it reveals attorney thought process or strategy related to litigation. Therefore, some context for the technical documents may be needed to evaluate privilege claims.FN80 If an attorney asked a specific question intended to evaluate a litigation claim, such as the number of computers sold to a potential claimant, then a reply analyzing sales summary data might be protected. However, consistent with *Hickman* and *Upjohn,* the sender of the reply might be deposed as to that same information and required to disclose the underlying documentary evidence. And some documents containing privileged work product may also have discoverable technical contents. Finally, the fact that attorneys were or were not recipients or originators of documents is not a definitive test.FN81

FN80. This is consistent with the *Air Crash* analysis which did not require production of a document where:
the subject matter of the document concerns preparation or strategy, or the appraisal of the strengths or weaknesses of General Electric's case, or the activities of the attorneys in preparing their case, or is at least "primarily concerned with legal assistance," and not simply underlying evidence (unless communicated to an attorney in a privileged attorney-client communication).
*Air Crash Disaster,* 133 F.R.D. at 520.

FN81. *Air Crash Disaster,* 133 F.R.D. at 520.
[S]ince Rule 26 clearly protects party, and not just attorney, preparation, the fact that a particular communication may not go to an attorney does not prevent its being work product. At the same time, if an attorney is simply a "mail drop" for the purposes of trying to create a screen against discovery, and the content of the document indicates it is neither work product nor a communication subject to the attorney-client privilege, the fact that a document is sent through an attorney cannot prevent its having to be produced.

**\*15** There is another important factor. Gateway was negotiating with Adams at the same time it was making its investigation. Gateway's good faith negotiations with Adams show Gateway had significant business interests which were at issue in the investigation. These issues may have been similar to those in potential litigation. Documents showing business or negotiation strategy are not matters of litigation strategy protected by the work product privilege.

### Substantial Need and Undue Hardship

Even if a document is protected factual work product, Adams' "substantial need of the materials" and inability "without undue hardship to obtain the substantial equivalent of the materials by other means" may entitle him to production.FN82 The facts of this case mean these elements may be more easily satisfied than in some cases. Documents from the Gateway efforts are the essence of the Investigation *and* the core of Adam's complaint, which alleges that Gateway's diagnosis and cure infringed on Adams' patents. What Gateway has designated as documents relating to the Gateway Legal Investigation may be evidence of the wrongs alleged in this litigation, or evidence of Gateway's exoneration.

FN82. Fed.R.Civ.P. 26(b)(3).

This case is not like *Hickman.* Each party does not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

have equal access to independently obtainable pre-
existing facts. Adams is not seeking to convert
Gateway's diligence in trial preparation to his own
use, but he has substantial need of the materials
which are the substance of the alleged infringing
acts.

Adams could be denied the factual work product
documents, and be forced to depose each of the
individuals identified, and to rely on their
recollections of highly technical matters, but
depositions would be a comparatively lengthy and
expensive effort, with results of doubtful value
compared to contemporaneous documentary
evidence. Most of the documents they created are
not work product. As to any work product items
which are "factual" work product, substantial need
and undue hardship will probably be present by the
inherent nature of the technical project Gateway
undertook.

Of course, documents showing legal direction or
analysis of the efforts and results might be highly
protected as "opinion" work product not
discoverable simply by showing substantial need and
undue hardship.

   List of Documents Submitted to the Court FN83

FN83. The exhibits marked for purposes of this
motion as Exhibits A-R were filed under seal as
docket no. 118, on November 17, 2003. Concurrent
with the filing of this order, the court is filing an
unsealed Index of Exhibits AR.

At the conclusion of the October 21, 2003, hearing,
the court received various exhibits. The following
documents were selected by Adams from the
privilege log, provided to the court (and not to
Adams) from the Gateway files, and marked as
exhibits for the hearing:

Exh. No. Date     DescriptionA8/1/00E-mail Dave Harrell to Chris Wetzel et al.B
7/31/00 E-mail Chris Wetzel to Hassan Karimian et al.with enclosureC7/31/00E-
mail Mark Walker to Bill Elliott et al. withenclosureD11/13/00Gateway Floppy
 Disk Controller TestE1/29/01E-mail Salah Din to Mike Holstein et al. with
attachments/other documentsF1/31/01E-mail Mike Holstein to Ron Naves et al. with
attachments

**16** In support of its privilege claims, Gateway
addressed each of the above-listed documents in turn
at the hearing, and also provided the following

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



documents which were marked at the hearing:

```
Exh. No. Date    DescriptionG6/22/00E-mail Ron Naves to Mark Walker et al.H11/
22/00    E-Mail Mike Holstein to Ron Naves et al.
```

Gateway claims that the latter list of documents shows the context of the former listed documents, supporting its claims of privilege. By the court's October 22, 2003, order, Gateway provided further documents which support its claim of privilege for the documents marked as Exhibits A through F. A list of those documents, identifying them to the privilege log, was provided to Plaintiff. The documents, however, were not provided to Plaintiff. The documents are:

```
Exh. No. Date    DescriptionI5/16/00E-mail Walker to Naves5/17/00E-mail Thomas
to Zdrojeski et al.5/17/00E-mail Naves to Thomas et al.J7/17/00E-Mail Naves to
Walker  K   7/21/00E-mail Kammin to Naves7/24/00E-mail Naves to Elliot et
al.    L   11/8/00E-mail Naves to Ashkin et al.M11/9/00E-mail Holstein to
Din et al.  N2/26/01Holstein summary of meeting between Holsteinand
counsel
```

Gateway also provided a narrative proffer of the factual context of the documents and support beyond the three declarations of Mark Walker, already received. That letter dated October 31, 2003, is marked as Exhibit O. A redacted copy was provided to Adams. It is marked as Exhibit P.

### Analysis of Specific Documents

This section of the order will examine specific documents under the criteria outlined in this order.

### Documents Regarding Computers Yet in ManufacturingExhibit Q

As Walker's declaration (cited above) notes, Gateway separately assessed "the computers Gateway was preparing to launch" FN84 and "exposure for computers that Gateway had previously sold." FN85

FN84. Gateway Memorandum, page 3.

FN85. *Id.,* page 4.

Gateway admits that some documents relating to the Investigation are not protected by any privilege. Gateway claims to have produced all documents "that concern business and technical issues" of assessment of computers Gateway was preparing to launch.FN86 Adams asserts that the documents he received in this category are "approximately seventy pages of correspondence that Gateway exchanged with its suppliers," FN87 and that he has received none of the internal Gateway documents related to this effort.FN88

FN86. *Id.,* pages 5-6.

FN87. Adams' Memorandum, page 5.

FN88. *Id.,* page 1.

One document which Gateway claims is in this category was listed in the privilege logs but produced, Gateway says, "despite the attorney-client privilege designation." FN89 It is a series of e-mails from July 31, 2000, through August 1, 2000,.FN90 The series of e-mails apparently had several attachments at some time in their delivery, but only one attachment is included with the compilation produced for Adams. That attachment declares it "is protected under the Attorney/Client privilege." FN91 The title of the first e-mail refers to a major component of the new computers, the "Brookings board." The e-mail series and attachment are marked as Exhibit Q.

FN89. Gateway Memorandum, page 5.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

FN90. This compilation of materials is marked as Exhibit C to Adams' Memorandum filed separately under seal as Exhibits in Support of Plaintiff's Motion to Compel Documents Improperly Withheld on the Basis of Privilege, docket no. 83, filed September 3, 2003.

FN91. *Id.,* page 8.

*17 Recipients of Exhibit Q included persons at MSI, a supplier of components (including the floppy disk controller) to Gateway; technical staff at Gateway; and Mark Walker and Ron Naves, legal counsel at Gateway. The three pages of e-mail and five pages of enclosure are largely technical discussion.

Under the criteria in this order, Exhibit Q is not attorney-client privileged. The e-mail and attachment are not communications of legal opinions, nor questions and answers between counsel and responsive information elicited to facilitate legal advice. Exhibit Q is not work-product privileged because the documents do not show concrete litigation-related preparation, direction or response so focused that it reveals direction. They show technical efforts and results. The documents were also provided to third parties at a Gateway supplier.FN92

FN92. *See* e-mail headers including an address at msi.com.tw and various salutations to MSI in the e-mail series.

Gateway mis-designated Exhibit Q as protected; however, Gateway now apparently recognizes that documents of its nature are not protected. Gateway should review and redesignate any similar documents.

Analysis of Exhibits A-F (Sample Documents)

Gateway also admitted that two documents selected for sampling at the October 21 hearing are not privileged, even though they were listed in the privilege logs.FN93 Examination of these documents, designated Exhibits A and B, illustrates positions Gateway has taken on privilege, demonstrates the changes in Gateway's position on privilege, and provides a comparison with the criteria in this order.

FN93. *See* Letter, October 31, 2003, submitted by Gateway and marked as Exhibit P.

Exhibit A is an e-mail dated August 1, 2000, from Dave Harrell to Chris Wetzel, entitled "daily run rates for Brookings and other data." It had an attachment, but that attachment is not part of Exhibit A. Ron Naves and Mark Walker, both attorneys, are among the recipients of that e-mail. The e-mail deals with delivery dates and production schedules for the new product discussed in Exhibit Q. This document "concern[s] business and technical issues", and should be in the category of documents Gateway says it produced. FN94 But it was designated as privileged and was not produced.

FN94. Gateway Memorandum, pages 5-6.

Because Gateway admitted Exhibit A should be produced, Gateway did not offer any context to show it was integral to a larger litigation preparation effort. Under the criteria in this order, it should be produced. It is purely a communication on business and technical issues and was not solicited or prepared to enable formulation of a legal opinion or advice, nor does it reflect any anticipation of litigation.

Exhibit B is an e-mail dated July 31, 2000, from Chris Wetzel to Harran Karimian, with an attached enclosure The e-mail thus deals with the same subject as Exhibits A and Q, and is chronologically close to them. Some of the text of the Exhibit B e-mail is identical with some of the text of Exhibit Q. The Exhibit B e-mail deals with technical and production issues,. Gateway properly decided this document is not privileged, even though it refers to contact with lawyers for Gateway and another computer manufacturer.

*18 Gateway does claim privilege as to the attachment to Exhibit B, principally based in the references in Exhibit B to lawyers.FN95 This is a strange position to take-that the document referring to lawyers is *not* privileged while the "attachment" containing no reference to lawyers *is* privileged.

FN95. Gateway Supplemental Brief, page 28.

The attachment document was apparently authored by YC Woon, a Gateway engineer. It contains four pages of text, two pages of diagrams, and 12 pages



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

of test data print-outs..

Gateway also claims that this document is work product because it was prepared pursuant to a plan launched by Exhibit C, which will be examined next. Further, "Gateway asserts that the Woon report also constitutes 'fact' or 'ordinary' work product because Woon drafted this document as a direct result of the [Gateway] legal investigation," FN96 apparently basing this assertion on the internal references to lawyers in the non-privileged Exhibit B.

FN96. Exhibit O, page 3.

Exhibit C is a compilation of three e-mails, dated July 28 through 31, 2000, and an enclosure. Two of the e-mails have a header declaring "ATTORNEY-CLIENT PRIVILEGE AND CONFIDENTIAL." Each of the e-mails has an attorney recipient, and the latest e-mail is drafted by Mark Walker, an attorney. The initial e-mail in the series was drafted by Mike Holstein, who Gateway asserts "was the lead person as to the technical investigation necessary to ascertain the information necessary to complete the Gateway Legal Investigation." FN97 That initial e-mail attaches a one-page "Work Plan" describing work to be performed at MSI Monday, July 31, 2000. The e-mails and attached document are therefore integral to the technical response to the technical issues. The e-mails and attachment are entirely technical in nature,. They are not different in content or purpose from Exhibits A or Q.

FN97. Declaration of Mark Walker dated October 3, 2003, filed as Exhibit 1 to Gateway Memorandum, ¶ 9.

Gateway's most recent effort to protect Exhibit C actually reveals the technical nature of this document and its relative detachment from legal concerns:

Gateway does claim that this technical material was necessary so "that the Law Department could assess future products," and that even though it is a "compilation of facts" it is "properly protected under the work product doctrine." FN98

FN98. Id.

First of all, a claim of privilege in this area is inconsistent with Gateway's prior assertion that it

has produced all documents "that concern business and technical issues".FN99 This is the subject matter area of Exhibit Q, produced by Gateway, discussed previously.

FN99. Id., pages 5-6.

Second, Gateway's claim of privilege attempts to fit the factual material of Exhibit C in that category of factual information that is so tightly connected with an attorney's inquiry that it effectively reflects the attorney's thought, strategy or analysis. This is just not the case.

It does not appear, from any of the documents offered by Gateway to provide a context for the "Legal Investigation," that the Exhibit C e-mails and attachment and the attachment portion of Exhibit B are integrally responsive to any inquiry or direction from counsel acting as such, to provide opinions, legal advice or litigation strategy. They are generally responsive to a massive technical project which had legal implications, but they are at the far end of the spectrum in that project, reflecting a relatively neutral technical effort which Adams alleges infringes on his rights.

**\*19** The attachment to Exhibit C is the Work Plan, drafted by a non-lawyer. The attachment to Exhibit B, prepared by a non-lawyer, is the summary of the activity outlined in the work plan. These items may have been prepared under the ultimate direction of lawyers at Gateway, and reported to those lawyers, but the documents are neither attorney-client privileged nor work product. They are remote to the legal analysis Gateway was performing and are in their substance a business and technical study. If these documents were "fact" or "ordinary" work product, Adams' substantial need and undue hardship in obtaining the information through other means, such as depositions, and the substantially inferior quality of such alternative evidence would require production of them.

Exhibit D is a document which on its face appears to be purely technical. It is dated November 13, 2000.. There is no suggestion of privilege on its face, except for two notations that it is confidential, for Gateway internal use only. It describes itself as produced by Advance Engineering, Consumer Desktop Development, and bears copyright notation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Page 20

In the court's view, Exhibit D is the classic example of what is not privileged in this case. It has no appearance of relationship to litigation or attorney direction. It is a procedure to test computers. Gateway says it was "created to provide a basis for the final report to the Law Department." FN100 It was reportedly drafted by Salah Din, a Gateway engineer, in response to a request from Mike Holstein.FN101

FN100. Gateway Supplemental Brief, page 31.

FN101. Exhibit O, page 4.

The "request" to which Gateway refers is Exhibit H, an e-mail drafted by Mike Holstein, dated November 22, 2000. Exhibit H appears to 'charter' a technical effort resulting in analysis and issuance of "a joint recommendation to Legal." The Exhibit H e-mail states that "Holstein (CTO) will lead the technical effort with support from Salah Din (Consumer desktops)," and that Salah Din will "[d]efine and document a recommended test plan/ process." FN102 Exhibit H provides further support for the view that Exhibit D is a technical document,. The result of the plan in Exhibit H was to be a final report to the legal team, but there is no legal analysis in Exhibit D, only a technical working guide.

FN102. Exhibit H, page 1.

Exhibit E is dated January 29, 2001, and is an e-mail from Salah Din to Mike Holstein and others with technical material attachments, some of which are handwritten and some of which are pre-printed. Gateway says it contains "only technical considerations" and was not "directly sent or received by attorneys," but that "the purpose of [the] technical work product was ... to discover factual information in anticipation of litigation." FN103

FN103. Gateway Supplemental Brief, pages 31-32.

While an understanding of the technical documents is beyond the court's ability, they all appear to relate to systems diagnosis and testing. The e-mail deals entirely with technical considerations. The documents are not directed to or produced by attorneys, and are not marked with any confidential designation.

*20 This exhibit is not privileged. It had purpose, value and motivation for Gateway independent of litigation in Gateway's self-described efforts to "meet the highest levels of quality[;] to verify that the FDC components provided by [suppliers] to Gateway operate according to specifications," FN104 "to provide its customers with the best products and services in the industry," and improv[e] its technology and address[ ] customer issues as they arise ." FN105 Exhibit E also documents the Gateway technical project. If it were work product, it would be producible to Adams because of the substantial need and undue hardship he would face without it.

FN104. Exhibit 1 to Adams' Supplemental Memorandum.

FN105. Exhibit 2 to Adams' Supplemental Memorandum.

Exhibit F is an e-mail dated January 31, 2001, from Mike Holstein to Ron Naves and others, with two attachments. The e-mail header states the subject is "ATTORNEY/CLIENT PRIVILEGE AND CONFIDENTIAL." The e-mail places its attachments in the context of "strategy" for the "meeting with Dr. Adams," and encloses a "draft summary."

One attachment is a narrative, with a header that it is "ATTORNEY/CLIENT PRIVILEGE AND CONFIDENTIAL." Its three pages of small print precisely detail the issues, tests and results. The document contains a twenty-word sentence reflecting legal analysis, and two paragraphs outlining the negotiation contacts with Adams. The twenty-word sentence should be redacted, but the balance of the document should be produced. Neither the one sentence nor the header make the entire document work product or attorney-client communication. Again, if the document were work product, Adams' substantial need and the undue hardship of obtaining information through alternative means would require its production, redacted.

The second attachment is simply a spreadsheet which lists all computers manufactured by Gateway and the supplier of parts. It appears to be the sort of list that would exist in any manufacturer's records, apart from any connection to the Investigation. Nothing in the e-mail or narrative attachment make

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

the listing attachment appear privileged, though Gateway claims it was necessary "to complete its legal investigation." FN106

FN106. Exhibit O, page 4.

Gateway insists that though "the underlying factual information contained in the document may be discoverable ... the document itself is protected work product." FN107 This document is another example of Gateway's misconception of the value of the heirarchal *structure* of its "Investigations" as a defensive shield against any inquiry. Gateway itself admits the entire contents of the document are discoverable but seeks to protect it from discovery.

FN107. Gateway Supplemental Brief, page 33.

Summary of Decision on Exhibits A-F

Of the six exhibits selected by Adams for judicial review on this motion,
. Exhibit A and the cover e-mail in Exhibit B were admitted by Gateway to be non-privileged, contrary to Gateway's listing on the privilege logs;
. The attachment to Exhibit B, Exhibit C and its attachment, Exhibit D, and Exhibit E are not privileged in any degree and are clearly and solely technical documents addressing a business issue.
*21 . Exhibit F (except for a one-sentence redaction) and its attachments are not privileged.

Exhibits G Through N

Gateway also submitted eight exhibits to show the context of Exhibits A through F, in support of its privilege claims. These additional exhibits, G through N, are also listed on the privilege logs. Each of them, except Exhibit N, contains internal privilege labeling. This section of the order will consider the impact of these documents, and their status as privileged or not.

Exhibit G, an e-mail series in June 2000, exclusively between Gateway attorneys, was written at the early end of the chronology and contains analysis of legal risks and litigation strategy. It is clearly inter-attorney work product and analysis. It does not, however, support the conclusion that any part of Exhibits A through F are so integral to that analysis that they are privileged. One cannot see, looking at Exhibit G, that Exhibits A through F are

responsive to litigation strategy and analysis. Exhibit G also contains paragraphs simply describing technical issues and negotiation postures, which would probably not be privileged if they were in any other document.

Exhibit H is an e-mail of November 22, 2000, written by the lead technical person on the FDC Assessment Investigation to attorneys and technical staff. It was described above in the discussion of Exhibit D. Exhibit H is largely similar to the narrative enclosure in Exhibit F and with similar redaction could be produced.

Exhibit I is an e-mail series in May 2000 near the time of the first contact between Adams and Gateway. As an exchange exclusively between Gateway's attorneys, with purely strategic content, it is protected.

Exhibit J is an e-mail between legal staff at Gateway (attorneys and a paralegal) and outside counsel, with high-level planning, strategizing and risk analysis. It is, like Exhibit I, classic work product.

Exhibit K is a two e-mail compilation in July 2000. The first e-mail is from a Gateway business manager to Ron Naves, counsel, with purely factual information. The second e-mail is among legal staff discussing business strategy, with a single reference to litigation issues. Redaction of the second paragraph in the July 24, 2000, e-mail would enable the document to be produced.

Exhibit L is a single e-mail dated November 8, 2000, from Ron Naves to various technical and legal staff noting legal implications of the FDC Assessment Investigation. As such, it is a protected document, under attorney work product and attorney-client privileges. Of the documents marked on this motion, it is the best *Upjohn*-like example of an attorney-client communication.

Exhibit M is a single e-mail from Mike Holstein, the technical lead on the FDC Assessment Investigation, to various other technical staff, with "cc" copies to legal staff. While it refers to an attachment, none is included with this exhibit. The e-mail provides assignments in the technical task at hand. Gateway admits the information contained in it is discoverable, but contends the document itself is not.FN108 The document does not refer to nor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

reflect an integral connection with the e-mail of a day before, Exhibit L. Exhibit M illustrates the dividing line between what the court regards as protected and not protected in this case. There were legal concerns, reflected in Exhibit L. But they were an outcome of a larger practical and technical concern,. Exhibit M is directed to that larger practical and technical concern. Further, the subject matter of Exhibit M,, is the subject matter of the infringement claim in this suit. Exhibit M is not privileged.

FN108. Gateway Supplemental Brief, page 35.

**\*22** Exhibit N does not designate its authorship, but Gateway proffers it as "Holstein's final report on the technical aspect of the legal investigation" submitted to inside and outside counsel in February 2001. FN109 While the majority of the report pertains to business strategy, it is interwoven with legal, litigation and investigatory implications. It is work product and attorney-client privileged.

FN109. Exhibit O, page 4.

While Exhibits G through N were offered to buttress the claims of privilege for the other Exhibits, they do not provide anything more than a general context-that lawyers were supervising a project of an overwhelmingly technical nature,. There were legal implications, as there always are in business, and there were litigation possibilities, but the sample documents Exhibits A through F do not fall into the "attorney's workplace" intended to be protected by the work product privilege, and few of them are really attorney-client communications, though that designation was apparently sprinkled across them when they were created.

### ORDER

IT IS HEREBY ORDERED that Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege FN110 is GRANTED.

FN110. Docket no. 81, filed September 3, 2003.

### Preparing for Production

IT IS FURTHER ORDERED that Gateway shall, consistent with the standards set forth in this order, re-evaluate its privilege claims as to the documents now listed on its privilege logs.

IT IS FURTHER ORDERED that Gateway will produce on or before January 5, 2004, FN111

FN111. Without separate order of the court, this deadline shall not be stayed by any objection or appeal of this order, to ensure that this already lengthy process is not further prolonged.

a. to Adams, all documents as to which Gateway no longer claims privilege;
b. to the court, two copies of all documents as to which this order denies privilege protection, including, to the extent not produced under subparagraph a., the attachment to Exhibit B, Exhibits C-E, Exhibits F and H (with a one sentence redaction), Exhibit K (with redaction of the second paragraph of the July 24 e-mail) and Exhibit M, as those exhibits are identified in the Sealed Exhibits Related to Sealed Order Regarding Motion to Compel Documents Withheld on the Basis Of Privilege; FN112

FN112. Docket no. 118, filed November 17, 2003.

c. to the court, two copies of all remaining documents as to which Gateway believes it is entitled to claim privilege under the terms of this order, with any narrative argument. A redacted copy of the argument should be simultaneously provided to Adams' counsel; and
d. to the court and Adams, a list of all documents in each of the foregoing categories, with a complete description of the documents, so that the list of documents compiled under subparagraph c. is a sufficient privilege log. FN113

FN113. *See AT & T Corp. v. Microsoft Corp.,* 2003 WL 21212614 at \*2 quoting *In re Community Psychiatric Centers,* 1993 WL 497253 at \*4 (C.D.Cal.).

The second copy of the documents listed in subparagraph b. will be available for Adams' counsel to retrieve from the court when this order is no longer subject to objection before the district judge. The magistrate judge will review the documents listed in subparagraph c. and issue a later ruling thereon.

### Completing the Record

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

IT IS HEREBY ORDERED that Gateway shall file, under seal, for in camera review only, executed copies of the Fourth Declaration of Mark Walker, the Declaration of Mike Holstein, and the Declaration of Ron Naves.

*23 IT IS FURTHER ORDERED that Gateway shall within ten days file, under seal, a copy of the redacted version of Defendant's Ex Parte Supplemental Brief in Response to Court's Sealed Order Regarding Motion to Compel Documents Withheld on the Basis of Privilege.FN114 That version was served on other counsel and should be in the record.

FN114. Docket no. 124, filed December 3, 2003.

IT IS FURTHER ORDERED that Gateway shall prepare, file and serve an index to the exhibits in the binder entitled "November 2003 Gateway Privileged Documents for *In Camera* Review" within ten (10) days. The index shall relate each document in the binder to the privilege log. The court is concurrently filing an Index of Exhibits AR, referred to in this order.FN115

FN115. Gateway also designated an "Exhibit R" in its binder entitled "November 2003 Gateway Privileged Documents for *In Camera* Review." The court has re-designated that Exhibit R in the binder (an e-mail from Mark Walker to Ron Naves, dated May 31, 2000) as "Exhibit R-1," and asks that Gateway refer to it as such in its index to the binder.

IT IS FURTHER ORDERED that the binder now in the possession of the court shall be filed, under seal, for in camera review only.

IT IS FURTHER ORDERED that this Sealed Order shall only be served on counsel for Adams and Gateway. A proposed unsealed, redacted version of this order is sent to Adams and Gateway concurrent with the filing of this order. IT IS FURTHER ORDERED that Gateway and Adams shall, on or before December 29, 2003, return this document via fax or e-mail to the magistrate judge, with a copy to each other, with clear markings on any portions they believe should be redacted so that the final redacted version may be filed and served on other parties.

Attorneys' Fees and Expenses

IT IS FURTHER ORDERED that Adams' counsel shall file and serve, on or before December 29, 2003, an Affidavit of Attorneys Fees and Expenses incurred in making this motion. Any response by Gateway to the Affidavit should be filed and served on or before January 9, 2003.

D.Utah,2003.
Adams v. Gateway, Inc.
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

