

Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**Philip A. Rovner**
Partner
provner@potteranderson.com
302 - 984-6140  Direct Phone
302 - 658-1192  Fax

July 12, 2007
Public Version: July 19, 2007

**BY CM/ECF AND HAND DELIVERY**

The Honorable Mary Pat Thynge          **PUBLIC VERSION**
United States Magistrate Judge
United States District Court
  for the District of Delaware
U.S. Courthouse
844 King Street
Wilmington, DE  19801

        Re:    Honeywell International, Inc. *et al.* v. Apple Computer, Inc. *et al.*
               D. Del., C.A. Nos. 04-1338, 04-1337, 04-1536

Dear Magistrate Judge Thynge:

    We write on behalf of Defendants FUJIFILM Corporation and FUJIFILM U.S.A., Inc.
(collectively "Fuji") to seek an order pursuant to Section 3(e) of the Scheduling Order to compel
Plaintiff to fully comply with the Court's May 17, 2007 oral order on Fuji's letter motion seeking
the production of Honeywell's teardown information and collected data.  Although Honeywell
did produce a three-page spreadsheet (Ex. A) and photographs related to the listed teardowns,
Honeywell withheld factual information and documents in its possession that the Court ordered
be produced.  Fuji raised this issue with Honeywell by letter of June 14, 2007 (Ex. B).
Honeywell rejected Fuji's complaint by letter of June 22, 2007 (Ex. C).

    The produced spreadsheet was limited to products of active defendants, but was not limited
to teardowns occurring prior to the filing of the complaint.  Indeed, a review of exhibits produced
by Honeywell at a Rule 30(b)(6) deposition on defendants' laches defenses confirms that
Honeywell omitted from the produced spreadsheet at least products of now-settled defendants
REDACTED          (Compare Brafman Ex. 7 and 8, attached hereto as Exs. D and E,
to Ex. A).  There is no doubt that the products torn down by Honeywell included modules from
products of all of the defendants named in Honeywell's complaint, which Honeywell accused of
infringing the '371 patent, and their suppliers (assuming Rule 11, Fed. R. Civ. P. was complied
with).  During the May 17, 2007 conference with Your Honor, Honeywell was ordered to

The Honorable Mary Pat Thynge
July 12, 2007 – Public Version July 19, 2007
Page 2

produce notes and teardown information regarding the accused products of *all* entities that are or were ever a defendant. In this regard, Your Honor stated:

> Going back to the first Fuji issues, I do think that the breakdown that was done by Honeywell is relevant. I think the notes that were put on the spreadsheet are also relevant but ... only going to the products that are alleged to infringe, *any defendant in this case, any defendants' products that are alleged to infringe*, modules that are alleged to infringe. Ex. F, 5/17/07 Tr. at 36:8-14 (emphasis added).

> ... But understand *my ruling was limited to those that you accused.* Ex. F. 5/17/07 Tr. at 60:9-10 (emphasis added).

Honeywell somehow narrowly interpreted this ruling to mean only the *remaining* defendants. Fuji had earlier rejected an offer to limit production of photographs of "all remaining accused products" Ex. G.

The major point of contention between the parties was whether information regarding *unaccused* products must be produced, not whether information regarding former defendants' accused products was to be produced. Honeywell never sought, either in its papers or during oral argument, to limit the requested discovery to products of only active defendants. Indeed, there would be no persuasive rationale for such a limitation: factual information collected by Honeywell regarding an accused product is relevant to Fuji's defenses and its understanding of the scope of Honeywell's claims, whether the product is that of a current defendant, a former defendant that settled or a stayed customer defendant. Honeywell never made this distinction and neither does the May 17, 2007 ruling. In fact, Honeywell makes no mention of stayed customer defendants whose products were also accused of infringement in its letter.

As a justification for limiting its production to only active defendants, Honeywell argues that it "expect[s] that [settled] parties would object to having information about their modules continuing to be part of the case, having settled this matter." (Ex. C, Oberts 6/22/07 letter at ¶ 2.) However, settled parties' objections are not the standard by which privilege or relevancy is judged. This court has already ruled that the factual teardown information is not protected by the attorney-client privilege or work product doctrine. The hypothetical objections of settled parties do not bear on whether such information should be produced, especially when the information is based on an analysis of publicly available products, or if confidential, Fuji and the other remaining defendants are all subject to a protective order to which such settled parties are also bound.

The produced spreadsheet also fails to include all relevant factual information captured during the teardown process. Honeywell again took an unduly narrow interpretation of Your Honor's ruling, admittedly producing only information already disclosed by Honeywell in its interrogatory answers. (*See* Ex. C, Oberts 6/22/07 letter at ¶ 3.) Although Your Honor did note the relevance of Honeywell's interrogatory answers, the ruling is broadly directed to all factual

The Honorable Mary Pat Thynge
July 12, 2007 – Public Version July 19, 2007
Page 3

information collected from the teardown examination, of which Honeywell's interrogatory
answers are but a part.

> I do think the products, the degree of rotation, the issues that go directly to the
> orientation of the components and the modules, [sic, the] *factual information as a
> result of the examinations that were done, are relevant and the defendants should
> have those.* To the extent that basically goes to the *facts of infringement, I think
> they're entitled to have that as part of their evaluation.* Ex. F, 5/17/07 Tr. at
> 36:19-25 (emphasis added).

The ruling merely identified the interrogatory answers as an example when *outlining* the *type* of
information to be produced (Ex. F, 5/17/07 Tr. at 37:4-38:1) but rejected Honeywell's argument
that the interrogatory answers were sufficient. Ex. F, 5/17/07 Tr. at 25:15-26:3.

Other factual information that Honeywell captured but did not produce includes, for
example, the dates the teardowns were performed and names of the individual engineers that
performed the teardowns. (Ex. H, Wood 2/28/07 Tr. at 127:24-128:14) Additionally, Ted Wood,
Honeywell's engineer leading the teardown effort, testified that each module/product collected
underwent the same general examination during the teardown process. This included an
REDACTED                                             (Ex. H, Wood 2/28/07 Tr. at
102:4-19) The examination also included            REDACTED

                                                                                        (Ex.
H, Wood 2/28/07 Tr. at 102:22-107:22) Also, some LCD modules were          REDACTED

                                    The produced spreadsheet does not include the factual
information captured from these steps. Such discovery is relevant to Fuji's understanding of the
full scope of Honeywell's claims and claim interpretation and more specifically, to Fuji's laches
and non-infringement defenses.

Furthermore, there is no indication that the original spreadsheet actually was redacted.
Rather, Honeywell appears to have created the spreadsheet specifically in response to the Court's
order. This is not what the Court contemplated or ordered. During the May 17 conference, the
Court clearly ordered the production of a redacted version of the existing spreadsheet, which
Honeywell more than once unsuccessfully tried to avoid producing. (*See, e.g.*, Ex. F, 5/17/07 Tr.
at 64:4-64:15, 65:20-66:23) The produced spreadsheet is a blatant disregard of the Court's order.

Given the missing information and the absence of any indication of redactions in the
produced spreadsheet, Honeywell has forced Fuji to seek an order specifically calling for the
production of the original documents containing the relevant information redacted only to the
extent necessary to remove information excluded by Your Honor, namely, information
concerning products not accused of infringement, attorney notes, if any, and information
concerning patents other than the '371 patent. Production of the original documents is necessary
to ensure completeness of the response and compliance with the Court's May 17, 2007 ruling.
This is the only way Fuji can be sure that all relevant information is produced. In the alternative,

The Honorable Mary Pat Thynge
July 12, 2007 – Public Version July 19, 2007
Page 4

Fuji seeks an *in camera* review of the original spreadsheet and other documents in which teardown-related information was recorded, so the Court can issue more specific guidelines for Honeywell to follow in producing the relevant information.

Respectfully,

/s/ Philip A. Rovner

Philip A. Rovner
provner@potteranderson.com

PAR/mes/807795
cc.  Thomas C. Grimm, Esq. (w/encls.) – by ECF and E-mail
     Manufacturer Defendants (w/encls) – by ECF and E-mail

# EXHIBIT A

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT B

# STROOCK

June 14, 2007

Via Email and Facsimile
Lawrence Rosenthal
Direct Dial 212-806-6660
Facsimile 212-806-6006
lrosenthal@stroock.com

Stacie E. Oberts, Esq.
Robins Kaplan Miller & Ciresi
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402

Re:  Honeywell International Inc., et al. v. Apple Computer, Inc., et al.
     Court File No. C.A. No. 04-1338-KAJ (consolidated)
     Your File No.: 019896.0229
     Our File No.: 208801.0921

Dear Ms. Oberts:

We are writing in response to Honeywell's production of the teardown spreadsheet (HW023711-713). In short, Honeywell has blatantly disregarded the court's ruling, having drawn its own line of relevant, unprotected information to produce, rather than following the court's ruling. Additional information must be produced.

As an initial matter, the produced spreadsheet includes only information related to the active defendants' products. Although Honeywell had offered to produce such limited information prior to the conference with the court, Magistrate Judge Thygne's ruling was not so limited. She ruled that notes and information regarding the accused products of *all* entities that are or were ever a defendant in the various cases be produced. 5/17/07 Tr. at 36:8-18. This would included Seiko-Epson, which intervened.

Furthermore, Honeywell captured factual information that is not reflected in the produced spreadsheet. For example, Honeywell captured the dates the teardowns were performed and names of the individuals that performed the teardowns (Wood 2/28/07 Tr. 127:24– 128:14); yet, this information is not included in the produced spreadsheet.

Additionally, Ted Wood testified that each module/product collected underwent the same general examination during the teardown process. This included an optical test to measure the luminance distribution of the display device. Wood 2/28/07 Tr. 102:4-19. The examination also included disassembling and documenting each component used within the LCD modules, including, *inter alia*, existence of gap between optical elements. Wood 2/28/07 Tr. 102:22-107:22. Also, some LCD modules were reassembled to a set of criteria in a specific way to be retested to determine its light

STROOCK & STROOCK & LAVAN LLP • NEW YORK • LOS ANGELES • MIAMI
180 MAIDEN LANE, NEW YORK, NY 10038-4982 TEL 212.806.5400 FAX 212.806.6006 WWW.STROOCK.COM

Stacie Oberts, Esq.
June 14, 2007
Page 2

profile. "Gap," "luminance" and "light profile" all bear on the '371 patent. The produced spreadsheet does not include the factual information captured from these steps.

Given the missing information and the absence of any indication of redactions in the produced spreadsheet, Honeywell clearly created the spreadsheet specifically for production in response to the court's ruling. This was not contemplated by the court's ruling and is inappropriate. To ensure completeness of the response and compliance with the court's ruling, we demand that Honeywell produce the original documents containing the relevant information (including the information identified above as missing from the produced spreadsheet) redacted only to the extent consistent with the court's ruling. Only in this way can we be sure that all relevant information is produced. Redacting a copy of an existing Excel spreadsheet is much less burdensome than creating a new spreadsheet, which is apparently what Honeywell has done.

Given the relevance of the teardown information to expert discovery, the time it took to produce the deficient spreadsheet and the impending deadline for expert reports, please let us know within one week whether you will produce the original documents and when you will be producing them; otherwise, we will seek redress from the court.

Very truly yours,

Lawrence Rosenthal

cc:     Matthew L. Woods, Esq.
        Thomas C. Grimm, Esq.
        Elizabeth L. Brann, Esq.
        Elizabeth Niemeyer, Esq.
        Andrew M. Ollis, Esq.
        Neil Sirota, Esq.
        Matthew W. Siegal, Esq.
        Ian G. DiBernardo, Esq.
        Kevin C. Ecker, Esq.
        Angie Hankins, Esq.
        Phillip Rovner, Esq.

EXHIBIT C

## ROBINS, KAPLAN, MILLER & CIRESI LLP

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel: 612-349-8500 Fax: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

STACIE E. OBERTS
612-349-8235
SEOberts@rkmc.com

June 22, 2007

*Via Facsimile*

Lawrence Rosenthal, Esq.
Stroock, Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

Re:    *Honeywell Int'l, et al v. Apple Computer, Inc., et al*
        Our File No.: 019896-0229

Dear Mr. Rosenthal:

I write in response to your June 14, 2007 letter regarding Honeywell's production of the teardown spreadsheet. Honeywell has not, as you assert, "blatantly disregarded the court's ruling." To the contrary, Honeywell carefully reviewed the transcript of May 17, 2007, as Magistrate Thynge suggested, and provided exactly what was ordered. There is no additional information that needs to be produced, and Honeywell will not produce the "original documents" as you request.

First, you are incorrect that Magistrate Thynge ordered that information be produced for *"all* entities that are or were ever a defendant in the various cases." The citation you provided does not support your assertion. More fundamentally, as you know, the substantial majority of members of the LCD industry have resolved their differences with Honeywell with regard to the McCartney Patent. We do not see how information regarding their modules would be relevant to the remainder of this case. Moreover, we would expect that these parties would object to having information about their modules continuing to be part of the case, having settled this matter.

Second, Magistrate Thynge simply never ordered Honeywell to provide the teardown dates and testing results. To the contrary, she ordered the production of information that was disclosed in Honeywell's contention interrogatories, including the angles of rotation and the orientation of the components. (5/17/07 transcript, p. 37:17-25). That is exactly the information that was provided in the redacted teardown sheet that was produced. Fuji now has detailed interrogatory answers regarding Honeywell's contentions, as well as the spreadsheet and photographs to corroborate those contentions. As such, any complaint by Fuji that it cannot confirm the veracity of Honeywell's contentions is unavailing. We also note that Honeywell has already provided, in

MP3 20230799.1

ATLANTA·BOSTON·LOS ANGELES·MINNEAPOLIS·NAPLES·SAINT PAUL·WASHINGTON, D.C.

Lawrence Rosenthal, Esq.
June 22, 2007
Page 2

response to other interrogatories, the dates Honeywell conducted the teardowns. As to the testing results, nowhere in the transcript is there any ruling that such information should be produced.

Finally, Honeywell did not "create" the spreadsheet specifically for production in response to the court's ruling as you assert. If you recall, at the May 17 hearing, *you* proposed that Honeywell "manipulate" the Excel spreadsheet to avoid producing information not subject to the Court's order (p. 27:3-4). This is exactly what Honeywell did. As such, your complaints regarding the format of the spreadsheet are misplaced.

Very truly yours,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

*Stacie E. Oberts* /KKS

Stacie E. Oberts

SEO/sdg
cc:   Matthew L. Woods
      Elizabeth L. Brann
      Elizabeth A. Niemeyer
      Andrew M. Ollis
      Neil P. Sirota

MP3 20230799.1

# EXHIBIT D

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT E

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

EXHIBIT F

1          THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE DISTRICT OF DELAWARE

3                    - - -

4    HONEYWELL INTERNATIONAL, INC.      :    CIVIL ACTION
     et al.                            :
5                                      :
                Plaintiffs,            :
6                                      :
7          v.                          :
                                       :
     APPLE COMPUTER, INC., et al.,     :
8                                      :    NO. 04-1338 (***)
                Defendants.            :
9                    - - -

10                 Wilmington, Delaware
11         Thursday, May 17, 2007 at 11:02 a.m.
                 TELEPHONE CONFERENCE
12                   - - -

13    BEFORE:   HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE

14                   - - -

15    APPEARANCES:

16

17         MORRIS NICHOLS ARSHT & TUNNELL
           BY:  THOMAS C. GRIMM, ESQ.
18
                    and
19
           ROBINS KAPLAN MILLER & CIRESI, L.L.P
20         BY:  MATTHEW L. WOODS, ESQ.,
                STACIE E. OBERTS, ESQ.
21              (Minneapolis, Minnesota)

22                  and

23

24                              Brian P. Gaffigan
                                Registered Merit Reporter
25

SHEET 2                                    2

```
 1   APPEARANCES:  (Continued)
 2
 3      ROBINS KAPLAN MILLER & CIRESI, L.L.P
 4      BY:  ANTHONY FROIO, ESQ.
              (Boston, Massachusetts)
 5
               Counsel on behalf of Honeywell
 6               International, Inc., and Honeywell
                 Intellectual Properties, Inc.
 7
 8      YOUNG CONAWAY STARGATT & TAYLOR
        BY:  KAREN L. PASCALE, ESQ.
 9
           and
10
        OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
11      BY:  ANDREW M. OLLIS, ESQ.
              (Alexandria, Virginia)
12
               Counsel for Optrex America, Inc.
13
14      POTTER ANDERSON & CORROON, LLP
        BY:  DAVID E. MOORE, ESQ.
15
           and
16
        BAKER BOTTS, L.L.P.
17      BY:  ROBERT MAIER, ESQ.
             NEIL P. SIROTA, ESQ.
18           ROBERT C. SCHEINFELD, ESQ.
              (New York, New York)
19
               Counsel for Hitachi, Ltd., Hitachi
20               Displays, Ltd., Hitachi Display Devices,
                 Ltd., Hitachi Electronic Devices (USA),
21               Inc.
22
23
24
25
```

                                            3

```
 1   APPEARANCES:  (Continued)
 2
 3      POTTER ANDERSON & CORROON, LLP
        BY:  PHILIP A. ROVNER, ESQ.
 4
           and
 5
        STROOCK & STROOCK & LAVAN LLP
 6      BY:  LAWRENCE ROSENTHAL, ESQ.
              (New York, New York)
 7
               Counsel for Fuji Photo Film Co., Ltd.
 8               and Fuji Photo Film U.S.A. Inc.
 9
10                     - oOo -
11             P R O C E E D I N G S
12      REPORTER'S NOTE:  The following telephone
13   conference was held in chambers, beginning at 11:02 a.m.)
14        THE COURT:  Good morning, this is Judge Thynge.
15   Before we begin, who us on the line on behalf of Honeywell,
16   please?
17        MR. GRIMM:  Good morning, Your Honor.  Tom
18   Grimm.  And with me are Matt Woods, Stacie Oberts and Tony
19   Froio.
20        THE COURT:  All right.  Thank you.
21        MR. WOODS:  Good morning, Your Honor.
22        THE COURT:  Good morning.  Who is on the line on
23   behalf of Optrex?
24        MS. PASCALE:  This is Karen Pascale, Your Honor.
25   And also on the line is Andy Ollis from the Oblon Spivak
```

                                            4

```
 1   firm.
 2        THE COURT:  All right.  Thank you.
 3        Who is on the line on behalf of Fuji.
 4        MR. ROVNER:  Your Honor, this is Phil Rovner
 5   from Potter Anderson.  And with me on the line is Lawrence
 6   Rosenthal from Stroock in New York.
 7        THE COURT:  All right.  Good morning.
 8        MR. ROSENTHAL:  Good morning, Your Honor.
 9        THE COURT:  Who is other line on behalf of
10   Hitachi?
11        MR. MOORE:  Good morning, Your Honor.  It's
12   David Moore from Potter Anderson.  With me on the line are
13   Rob Scheinfeld, Neil Sirota and Rob Maier.
14        (Unidentified speaker):  Good morning.
15        THE COURT:  Good morning.
16        Counsel, before you begin to talk, I would like
17   you to state your names so that we can have a correct
18   transcript.  Is everybody still there?
19        (The attorneys respond, "yes.")
20        THE COURT:  There are a number of issues that we
21   need to address today but there are a couple of things I
22   also want to ask about as well.  Awhile ago, there was a
23   motion to amend or for leave to file a second amended
24   complaint.  And from what I can tell, the only opposition
25   that is left in the case is Wintek.  Does Honeywell know
```

                                            5

```
 1   whether or not I need to decide this issue or has it been
 2   resolved?
 3        MR. WOODS:  Your Honor, I believe that that
 4   refers to the amended complaint with regard to the
 5   accounting.  And, obviously, I cannot tell you.  And this is
 6   Matt Woods.  I do not know what Wintek's current position is
 7   on that.  I can check on that but I do not know.
 8        THE COURT:  All right.  Let's get to the issues
 9   that are involved in this matter.  And I think the first one
10   that was filed -- let me see.  They were all filed about the
11   same time but we might as well get with the Optrex one first
12   because that is the first one I received.
13        Oh, there was one other thing I wanted to bring
14   up with you, and I'm saying this in all of my cases.  When
15   we have discovery disputes in which we have the 48 hour and
16   24 hour submission time, I literally mean 48 and 24 hours.
17   I don't know whether counsel is aware but when a notice is
18   filed with the Court on the e-filing system that we have and
19   it's a notice and it's a sealed document, I can't get access
20   to that document because it's sealed so I have to wait until
21   a copy is actually provided to me.  I expect that when you
22   file it with the court or list it on the e-filing of the
23   court, I do expect that that document to also be downstairs
24   in the Clerk's Office immediately.  Okay?  So that is for
25   future reference.
```

SHEET 3                                                  6

1        All right. Let's begin with the Optrex
2  situation.
3        MR. OLLIS: Good morning, Your Honor. This is
4  Andy Ollis speaking on behalf of Optrex.
5        THE COURT: Okay. And it sounds like yours
6  dovetails a little bit with Fuji's.
7        MR. OLLIS: It does. That is I think a subset
8  of the Fuji motion.
9        THE COURT: Okay.
10       MR. OLLIS: The Optrex motion is more limited in
11 its focus; specifically, on a statement that was made by
12 counsel for Honeywell, David Brafman, at a hearing in 2005
13 in which he stated that Honeywell teardown rate on average
14 was about 50 percent as a result of their investigation to
15 try to find infringing products.
16       THE COURT: Yes, the hit rate.
17       MR. OLLIS: Right, the hit rate. During two
18 different depositions of Honeywell personnel, Optrex
19 inquired about the hit rate in Honeywell's investigation.
20 The first was during the laches deposition in which
21 Honeywell offered David Brafman to testify about various
22 issues relating to laches. At that time, when the issue or
23 the question was raised what was the hit rate, Honeywell
24 instructed Mr. Brafman not to answer on the basis I think
25 primarily of attorney work product.

                                                        7

1        During Mr. Brafman's deposition, it was
2  learned that Mr. Wood, Honeywell engineer, was the principal
3  technical person in charge of Honeywell's teardown
4  investigation and, consequently, the defendants noticed
5  Mr. Wood's deposition as well. And so a couple months
6  later, we took the deposition of Ted Wood and there was a
7  substantial amount of testimony provided relating to the
8  teardowns that Honeywell did.
9        THE COURT: Well, what was the type of testimony
10 that was provided?
11       MR. OLLIS: Well, for example, we inquired about
12 the specific module characteristics that Honeywell was
13 looking at to decide which modules should be selected for
14 teardowns. And there was various testimony on a number of
15 the factors along those lines that was offered. In
16 addition, they, Honeywell and Mr. Wood specifically provided
17 a fair amount of testimony about each specific step that was
18 gone through in general, system modules, once they actually
19 were torn down.
20       And then, as I think was referenced, for
21 example, in the Fuji motion, there was a fair amount of
22 information learned in general about the types of
23 information that was recorded about each module but that is
24 at least some of the main points that come to mind. But it
25 was fairly extensive testimony. This wasn't a situation

                                                        8

1  where no testimony at all was allowed on this subject.
2        So Optrex, our particular interest and focus was
3  to, among other things, simply confirm the statement that
4  Mr. Brafman offered in 2005 in the context of a question
5  about what scope of discovery was appropriate. And he
6  indicated that trying to figure out which modules were, had
7  two baths and I guess with rotation. It was not a simply a
8  fishing expedition. It could be determined without too much
9  difficulty.
10       And so we wanted to confirm that fact and that
11 statement, number one. And then, number two, ask a few more
12 questions just to make sure we understood the extent and
13 scope of that statement and link it I assume to all of the
14 earlier testimony that Mr. Wood had given relating to the
15 teardown process.
16       So the Optrex focus on this was fairly limited
17 and I think there may have been some question as raised in
18 Honeywell's letter about the exact extent of the scope of
19 the discovery that Optrex was liking for. At this point,
20 we are looking principally for testimony relating to
21 Mr. Brafman's statement. So it's a fairly limited inquiry.
22       THE COURT: Well, why don't you tell me what
23 type of testimony you're looking for.
24       MR. OLLIS: Well, first and foremost, I'd like
25 confirmation from a witness under oath, and preferably

                                                        9

1  Mr. Wood, since he was the one in charge of the
2  investigation, confirming Mr. Brafman's statement that
3  the resulting testimony was about -- excuse me -- the
4  infringement investigation did in fact result in about a
5  50 percent hit rate. And then, number two, I just want to
6  understand a little bit more about that to make sure we
7  understand the time period that is covered there, confirm
8  that it's the same investigation that Mr. Wood had testified
9  about, but it would probably be less than five minutes of
10 follow-up testimony from the Optrex perspective.
11       THE COURT: All right. Who is going to be --
12 have you completed your arguments?
13       MR. OLLIS: Just very briefly, Your Honor. I
14 think as already set forth in our letter, this issue is
15 related to damages, laches and commercial success. I won't
16 go into that now.
17       As far as some of the positions in the Honeywell
18 letter, arguing that this was simply a general statement,
19 Optrex disagrees. This case is not like the Vecco case
20 where there was a statement that Honeywell pointed to
21 relating to improper accounting entries made by a specific
22 individual. Here, Honeywell specifically and intentionally
23 if you will, named that individual. They identified the
24 actual hit rate. And we think we're entitled to take some
25 discovery on that. They waived that fact and we're entitled

SHEET 4

10

1  to learn a little bit more about it and confirm it.
2       And unlike the Vecco case, for example, here
3  there was substantial testimony provided by Honeywell
4  employees on this general topic. So this is not a single
5  isolated statement that has to be taken into context of the
6  fact that a lot of discovery has already been provided on
7  this investigation and that there is no good reason to draw
8  the line where Honeywell has drawn it.
9       And with that, we'll I'll leave it for now.
10      THE COURT: All right. Now, regarding
11 Honeywell's position on Optrex's request.
12      MS. OBERTS: Your Honor, this is Stacie Oberts
13 on behalf of Honeywell. There are a couple of things I
14 would like to comment on which Mr. Ollis referred to.
15      First, he had said that one of the reasons why
16 they need information regarding the hit rate is to confirm
17 the difficulty Honeywell had in determining infringement.
18 That testimony has been put forth. Mr. Wood testified about
19 how he went about tearing down, the factual basis about how
20 he went about tearing down the product, how long it took
21 to do a typical teardown. So I believe those facts have
22 already been confirmed. I don't believe that there is any
23 need for testimony regarding the hit rate to further confirm
24 that.
25      As to testimony confirming Mr. Brafman's

11

1  statement, that was a statement that was made back in
2  September of 2005. Judge Jordan invited Honeywell to
3  continue doing its teardown to accuse additional products in
4  this litigation. As such, that hit rate, at any point in
5  time, has changed and has evolved.
6       In addition, who is Optrex specifically looking
7  for? For any given defendant, that hit rate may be
8  different. We do not believe that the statement Mr. Brafman
9  made was a waiver. At the time of that statement, the
10 defendants, the customer defendants were trying to argue
11 that while Honeywell was looking for additional products,
12 they argued it was a fishing expedition, and all Mr. Brafman
13 was trying to convey is the fact that we were finding
14 widespread infringement. So it was not a fishing expedition
15 to expect the customer defendants to look across their
16 product line.
17      Now, in response to Mr. Ollis's comments on
18 In Re: Vecco, this case is instructive in this instance.
19 In that case, some general conclusory statements were
20 made but it didn't disclose any specific information,
21 any specific documents or any specific discussion.
22 Mr. Brafman's comments was similarly, as in In Re: Vecco,
23 basically a conclusory statement about its work product,
24 so it is not a waiver of a privilege.
25      And I would briefly like to address, Optrex

12

1  didn't go into it in detail but the argument that this is
2  related to laches, commercial success and noninfringing
3  alternatives. As the Court is well aware, the defendants
4  have taken great pains to limit this case to those products
5  that are specifically accused. While they have refused to
6  provide information regarding its own products that would
7  support those positions, they now expect to delve into the
8  privilege nature of Honeywell's work product to support
9  that part of their case. And, frankly, it's unfair that
10 Honeywell would be required to waive privilege while the
11 defendants are not required to produce documents on those
12 same products.
13      THE COURT: All right. Is there anything
14 further that needs to be said on this issue?
15      MS. OBERTS: The only other thing I would say
16 on this issue, they have said this would only take five
17 minutes. I think we would have some concern as to how,
18 whether or not it really would take five minutes of
19 testimony and whether it would extend into a such lengthier
20 deposition. And we just have some concern. As we laid out
21 in our paper, Optrex proceeded with Mr. Wood's deposition
22 over two months after knowing that this was Honeywell's
23 position and never raised it. And so it would be, what
24 they're asking for is to reopen Mr. Wood's deposition on
25 topics that frankly they knew Honeywell's position before

13

1  they went into it.
2       THE COURT: That's interesting because that is
3  an argument I think Hitachi is making against you in their
4  case, but that is okay, and their position.
5       Okay. Let me hear from Fuji and what Fuji is
6  looking for because I think Fuji is looking for something a
7  lot more.
8       MR. ROSENTHAL: Yes, Your Honor. I guess to be
9  logical, I will deal with -- this is Lawrence Rosenthal --
10 I will deal with what I refer to as second clawback letter
11 which deals with teardowns in which I cite Mr. Brafman's hit
12 rate statement as one of the waivers which took place.
13      By way of background, one of the documents
14 produced and then clawed back was an e-mail from one of the
15 Honeywell technical troops to Ms. Yeadon who was on her way
16 to Sanyo to negotiate a license describing one of Sanyo's
17 products putting forth the results of teardown. That is the
18 only way I could interpret it.
19      The broader issue is the teardown process
20 itself. It is true that in a general way, Mr. Wood
21 described the process: what he looked for, how he did it,
22 how long it took, how he recorded the information. But as
23 soon as one tries to inquire past the generalities to the
24 specifics --
25      THE COURT: What type of specifics?

SHEET 5

## 14

1  MR. ROSENTHAL: Specifically, the products
2  examined, the results of the examination. In fact, I think
3  the most telling is, I think it was on page 86 of his
4  transcript, he lists the people who were involved in the
5  initial formulation of the procedure which he describes and
6  he lists three lawyers and two technical people and when an
7  attempt was made to inquire as to who did what and what
8  happened, who specified what, that was cut off by Honeywell.
9      So the test that Honeywell applies for its
10 privilege is, in essence, is their attorney in some way
11 involved in the transaction; and if it is, then everything
12 that that attorney is in any way involved in, whether he did
13 the work or just organized it or whatever, becomes either
14 attorney-client privilege or work product privilege.
15     THE COURT: I think their emphasis is on work
16 product privilege.
17     MR. ROSENTHAL: Right. In this particular case,
18 they seem to be relying on the work product privilege, Your
19 Honor, and I think that is where we have to focus our
20 attention.
21     The Federal Rules of Civil Procedure codify the
22 fact this is a limited privilege, it's not an absolute
23 privilege. The particular work product we contend that the
24 information that we're asking for, which is not what the
25 lawyers concluded but merely what the technical people found

## 15

1  when they examined the product, is technical information
2  which is not work product in this particular case.
3      THE COURT: Well, what type of technical
4  information are you looking for, are you saying you didn't
5  get the technical information from?
6      MR. ROSENTHAL: I'll be specific, Your Honor.
7      THE COURT: Okay.
8      MR. ROSENTHAL: They described that the process
9  of tearing down was to literally open up a product and
10 then take out the module and then break open the module and
11 they recorded the number of lens arrays. They recorded
12 whether or not there was rotation in one or another of
13 the lens arrays. And they recorded that information in a
14 spreadsheet which included the identification of the product
15 and the module. The lawyers had nothing to do with that
16 process. They did not make entries. The spreadsheet merely
17 has the --
18     THE COURT: Well, my understanding is, Lawrence,
19 you are not just interested in the ones that infringe, they
20 found infringing or at least you feel they were infringing,
21 you are interested in the ones that you did the teardowns
22 on.
23     MR. ROSENTHAL: Yes, I do, Your Honor.
24     THE COURT: So tell me why.

## 16

1  MR. ROSENTHAL: It is because before this
2  complaint was filed, Fuji adopted several structures which
3  either had a rotation of 35 degrees or had only a single
4  lens and we have a very strong interest in understanding
5  what was not accused of infringement during this run up
6  to the lawsuit. That is the reason why we want to go to
7  not only to what was infringed but what was not deemed
8  infringed.
9      Now, as to the stuff that was infringed, it is
10 clear that there is several waivers, aside from the hit
11 rate. Much of this material was given to the various
12 potential licensees, defendants, all of whom are
13 characterized as adversaries. The people they gave this
14 information to were not Honeywell's friends, they were
15 people Honeywell was extracting money from. And, therefore,
16 by following the practice of giving this information to your
17 adversaries, that is a waiver under the law in the Third
18 Circuit.
19     Westinghouse, as Judge Jordan noted, says --
20 first of all, it talks about how giving it to an adversary
21 is perhaps the most important kind of waiver you can have.
22 The other point it makes is there is not much difference
23 between the work product and privilege where fairness, as to
24 the fairness test. And, here, we have classic selective
25 production. They produce it when it serves their purpose.

## 17

1  They produced in fact when they're not trying to clawback
2  presentations given to Chi Mei and Sanyo.
3      We, Fuji, received a letter with an analysis.
4  What is interesting is that the modules cited in the
5  analysis were not even listed in the charts which they rely
6  upon as saying they made full disclosure of what they did of
7  Fuji's products. They didn't even refer to the prefiling
8  investigation but they certainly gave it to Fuji. And my
9  guess is, and it hasn't been denied, they've given it to
10 almost every or every licensee, potential licensee defendant
11 in an attempt to settle this case.
12     So I think that the waiver is clear. I think
13 the fairness is clear. Let me address the issues of where
14 this would play a role.
15     First of all, obviously, Fuji is interested in
16 knowing whether products such as it sold pre-complaint were
17 in fact not charged with infringement.
18     Second of all, to the extent that products were
19 torn down and not charged with infringement, those products
20 represent a body of products which we believe are no
21 different from the body of products which were accused of
22 infringement from the viewpoint of commercial success of the
23 product. That is where Honeywell is going. They look to
24 the commercial success of the ultimate product; in our case,
25 digital still cameras. We should be able to investigate

SHEET 6

whether or not a digital still camera which was not accused of infringement is any more successful or less successful than one accused of infringement.

The laches defense.

THE COURT: Let me ask you this, Larry. Don't have you out there anyhow the world in which there were different types of cameras and the world in which there are cameras that are being accused of infringement?

MR. ROSENTHAL: Well, Your Honor, we don't have the world as to -- well, let me take a step back a little bit about the world. As far as we are concerned, we can't reproduce, which is the general issue of necessity under Rule 26, we can't reproduce the exercise that Honeywell did (A) because we may not, at this date, be able to find the products that they examined; (B), we don't even know what products they examined.

THE COURT: Well, you know the products that they accused of infringement; right?

MR. ROSENTHAL: But that body of products does us little good because as best as we can determine --

THE COURT: Well, let me back up a little bit. You know the body of products that they accuse of infringement; correct?

MR. ROSENTHAL: Yes.

THE COURT: And your client probably has an idea

of the body of products that were out there in different years, the total body of products that were out there in different years.

MR. ROSENTHAL: Your Honor, the total body of products which are out there in different years is the camera body, not the module body.

THE COURT: That's right.

MR. ROSENTHAL: We don't have a clue as to what modules were in each of the products and just because, for example, Sony, who was a manufacturer of digital still cameras, was accused of infringement, we don't know which of the Sony products are in fact accused, which have the modules in question. We can't make any comparative analysis of the commercial success issue other than an analysis of our own products.

Q. So you are saying to me you do not know which Sony products were accused of infringement by Honeywell?

A. I know of some. I don't know of all. And I also do not know which cameras are accused because the accusation in Sony's case was module focused. And, therefore, I don't know which camera included which module. We're not in the module business. We don't compete with Sony in the module business. We happen to have assembled LCD modules for use in our cameras and for no other use at all. So we do not have the body of knowledge or the availability of the sea of

devices that were examined by Honeywell. And that is our necessity. We have no way of replicating it.

This is not like the golf club case which Mr. Woods cites where it is the defendant who cut open nine or seven golf clubs of its own so that the sea of golf clubs to be examined is finite and the plaintiff is in no worse position than the defendant in figuring out what to cut open and what not to cut open.

THE COURT: Why is it relevant to you to know what accused products were examined by Honeywell of the other defendants?

MR. ROSENTHAL: Your Honor, again, it's a two-sided coin. On the one side, the products which are accused, if they are all two-sheet products rotated between two and 11 degrees, that is very telling. On the other hand, and that is in juxtaposition if they didn't accuse. So that it's the entire body.

Now, that which is accused, I think the waiver case is particularly strong. That is what they used to obtain the licenses that they already have or to attempt to obtain licenses with the defendants who are still in the case. So that's with the waiver.

And that is where the fairness also plays, because I think if you read anything out of the Third Circuit cases, it's the rejection entirely of the concept

of selective production. Nothing is inadvertent about the production except possibly the one e-mail which was clawed back. Everything else was purposeful. The Chi Mei and Sanyo presentations, the disclosure to adversaries or potential licensees or defendants. That is all purposeful. There is nothing inadvertent. In most of the cases where they deny the remedy are generally the inadvertent cases. Judge Jordan's case in bankruptcy ...

THE COURT: I have your idea on what your thoughts are concerning this particular topic. Thank you.

Honeywell.

MS. OBERTS: Thank you, Your Honor. This is Stacie Oberts on behalf of Honeywell. Let me start where Mr. Rosenthal left off.

First of all, with regard to what was disclosed to potential licensees, Mr. Rosenthal has not accurately depicted what exactly was disclosed. What was provided to potential licensees was a few snapshots of the products, a couple products that were torn down. It was not as broad as Mr. Rosenthal would like to make out. The other thing that was disclosed to potential licensees were the basic facts that confirmed that infringement such as two baths and what angle of rotation. That same factual information has been provided to each and every one of the defendants in detailed interrogatory answers.

SHEET 7

**22**

1    THE COURT: Before you go on, Stacie, let me ask
2    you about this summary sheet or analysis sheet that was made
3    by, through Mr. Wood or by Honeywell. What does a sheet in
4    general contain?
5    MS. OBERTS: Yes, Your Honor. What it is is
6    it's a spreadsheet. What Mr. Wood testified in-depth was
7    when Honeywell began its investigation, the attorneys at
8    Honeywell set forth a series of guidelines and criteria of
9    what information they were looking for, a criteria of what
10   products to select and how to go about doing that teardown
11   process. This was all done at the direction of Honeywell's
12   in-house attorneys. They then brought in Mr. Wood and his
13   technical team who acted solely at the direction of those
14   lawyers. The information that was gathered and how it was
15   gathered represents the thought processes and mental
16   impressions of the in-house attorneys.
17   THE COURT: Tell me what information was
18   gathered and put on the spreadsheet.
19   MS. OBERTS: Essentially, Your Honor, it was
20   what products were torn down. It included certain
21   information. I don't want to give out too much information
22   to waive privilege but, for instance, whether lenticular
23   arrays were found. If lenticular arrays were found, what
24   was the angle of rotation. There was also, because
25   attorneys had specific questions, they would ask Mr. Wood to

**23**

1    look at certain things. I don't want to reveal what those
2    specific substances were because I am somewhat concerned I
3    would waive privilege but it was concerns we had going
4    forward to prove infringement, certain information we would
5    ask him to look into. And he would record comments in the
6    spreadsheet, whether or not certain things the attorneys
7    were looking for were in fact present in the products that
8    he was tearing down.
9    It included basically the order, the orientation
10   of the various components of the various modules. It also
11   included certain comments. I'm trying to think of every-
12   thing. But everything that was recorded was based on
13   certain information that the attorneys themselves asked him
14   to look to.
15   THE COURT: And what did you plan to do with
16   this information after you got it?
17   MS. OBERTS: What happened was as Mr. Wood
18   gathered the information for the attorneys, then the
19   attorneys looked at the information to determine whether
20   or not to accuse a product of infringement, which goes to
21   the heart of the attorney work product doctrine.
22   THE COURT: Well, maybe so, but I'm not 100
23   percent certain about that. What is the intent? What are
24   you using that information for now? In other words, you
25   decided what you are going to accuse and now you are going

**24**

1    to go after them. Is that information going to be conveyed
2    to anybody else?
3    MS. OBERTS: The information has only been
4    conveyed to the particular defendants regarding those
5    particular products that have been accused. We've put forth
6    detailed interrogatory responses which contain all of the
7    factual information from those teardowns that support our
8    infringement assertions for those modules we accuse. It
9    also clearly includes a number of modules and a number of
10   defendants or a number of corporations who may not even
11   been involved in this lawsuit or haven't been accused of
12   infringement.
13   THE COURT: Okay. I have a general --
14   MS. OBERTS: In addition, Your Honor, just so
15   you are aware, the spreadsheet does include information
16   regarding other Honeywell patents in Honeywell's patent
17   portfolio, so there is information on that spreadsheet that
18   do not relate specifically to this invention and this
19   patented invention.
20   THE COURT: Is there a way that you can modify
21   this spreadsheet so if the Court orders certain information
22   to be produced, it can be produced?
23   MS. OBERTS: It would be difficult, Your Honor.
24   We would have concerns about producing information regarding
25   products that aren't involved in this litigation or

**25**

1    corporations or companies that aren't even involved in the
2    litigation.
3    THE COURT: I understand that argument, Stacie.
4    I just asked a question.
5    MS. OBERTS: Okay.
6    THE COURT: If the Court decides that portions
7    of that spreadsheet are to be produced, what would you have
8    to go through to have those portions produced and only those
9    portions?
10   MS. OBERTS: It would be somewhat extensive. We
11   would have to obviously get rid of all of the comments and
12   all of the modules that aren't at issue. Frankly, Your
13   Honor --
14   THE COURT: Well, that depends --
15   MS. OBERTS: -- to the extent that it relates to
16   our infringement allegations, that factual information from
17   a spreadsheet has been conveyed to the defendants in our
18   interrogatory answers.
19   THE COURT: Yes, but this is a document proving
20   that your interrogatory answers are correct. Right?
21   MS. OBERTS: Nobody has questioned whether or
22   not our interrogatory answers are accurate at this point.
23   THE COURT: Well, I think that is exactly what
24   is happening in this motion. That is part of it. Discovery
25   doesn't sit there and say, gee, once we have answered

United States District Court - Honorable Mary Pat Thynge

SHEET 8                                           26

1    interrogatories, we're not going to give you the documents
2    that support it. We do have interrogatories, requests for
3    admission and production of documents; right?
4              MS. OBERTS: Right. And this is much broader
5    than that. I read their motion as requesting everything we
6    did in our pre-suit investigation.
7              THE COURT: I understand that, Stacie.
8              MS. OBERTS: We could --
9              THE COURT: I haven't made a ruling yet. I just
10   asked a very simple question about the spreadsheet and also
11   pointing out to you that discovery on certain issues doesn't
12   mean that just because you have answered it in one form of
13   discovery, you wouldn't be obligated to produce it in
14   another form. That's all.
15             MS. OBERTS: And it could be done but it would
16   take a little bit of time to be able to go through, to make
17   sure that the redactions of the additional information are
18   not disclosed.
19             THE COURT: Okay. Now, Lawrence, what
20   additional stuff did you want to say or did you cover all
21   your arguments that Fuji has brought on this issue, on the
22   two things that Fuji has brought?
23             MR. ROSENTHAL: Well, no, I just covered one.
24   Let me just make a quick observation about what Ms. Oberts
25   just indicated.

                                                 27

1              THE COURT: No, I asked you a specific question.
2    Lawrence?
3              MR. ROSENTHAL: An Excel spreadsheet, by its
4    very nature, is easy to manipulate. And I wonder whether
5    I'm going to face the same modules presented by experts in
6    an infringement stage of this case. Right now, we're just
7    in the discovery and validity stage.
8              But let me raise the other --
9              THE COURT: Lawrence?
10             MR. ROSENTHAL: Yes.
11             THE COURT: Lawrence, just hold on for one
12   minute. I'm going to comment about your last comment,
13   please. And that is that was your choice. That's what the
14   defendants wanted. I just point that out to you.
15             Now, I asked you to address, tell me whether
16   you've addressed everything. You said no. Please address
17   the second point.
18             MR. ROSENTHAL: Yes, Your Honor. The second
19   issue involves a narrower question. By way of background,
20   the documents produced indicated that there was an attempt
21   or at least consideration of licensing a bunch of Honeywell
22   patents, including what was then just an invention
23   disclosure of the '371 patent to a company named Hoseidon
24   who was Honeywell's partner in producing LCDs. The trail
25   gets cold very quickly after the few documents that were

                                                 28

1    produced.
2              The 30(b)(6) witness on laches and licensing
3    has no knowledge. But the first page of perhaps the first
4    document in this series is a memo from a Mr. Clark, a
5    Honeywell employee in charge of a group working on the
6    displays for avionics, principally for Boeing, and that
7    group had I think had 10 principal members and maybe another
8    16 or 17 support members. The memo goes to everybody plus a
9    lawyer and there is a lawyer on the 16 support people side.
10   And the subject is valuation. How do we know what to charge
11   Hoseidon for the many properties that we're contemplating
12   licensing? It gives a list of the products that are not at
13   issue and it asks specific questions about valuation in
14   paragraph three which Mr. Woods would have us redact. And
15   those questions are not only addressed to the lawyer,
16   they're addressed, some of them are addressed to the entire
17   26 member group. And even the questions addressed to the
18   lawyer are not seeking legal advice, they're seeking facts.
19   And I don't think that's an attorney-client privilege
20   communication.
21             The second aspect of the letter, in fact, one of
22   the inventors, Mr. McCartney, filled out a questionnaire on
23   valuation as to at least three of his inventions, two of
24   which were produced but not the one directed to the '371
25   patent. Here, Mr. Woods is offering to trade what is truly

                                                 29

1    not a protectable communication, an inventor telling a
2    business group what he thinks the patent is worth and who
3    would we sell to, what market it would be sold in. These
4    are all very telling and very important issues. We're
5    supposed to trade to get that document for the paragraph
6    three of the clawed-back document.
7              In any event, I think that this is an easier,
8    narrower question. I think that there was a waiver in the
9    production and it wasn't one that went on unnoticed and that
10   the document was used in the deposition of Mr. Brafman in
11   the presence of Honeywell's outside counsel. And two months
12   later, the attempt is made to claw back the first page of
13   this document.
14             THE COURT: Now, I just want to make sure we're
15   clear on the record, you're talking about Exhibit A attached
16   to your submission, which is docket entry 763?
17             MR. ROSENTHAL: That's correct, Your Honor.
18   That document, we were, of course, in agreement with
19   Mr. Woods. We have one copy of that, which I have.
20             THE COURT: I just want to make sure. The
21   document we're talking about is the document attached as
22   Exhibit A. Is it dated August 18th, 1992 and it's at
23   paragraph three of the first page of that document?
24             MR. ROSENTHAL: Exactly, Your Honor.
25             THE COURT: Okay.

**30**

1   MR. ROSENTHAL: Mr. Woods is offering to give us
2   the whole document excluding paragraph three.
3   THE COURT: Okay. And this document was
4   produced when? And it was used in Mr. Brafman's deposition
5   on December 21st. And when did they ask for it back?
6   MR. ROSENTHAL: They asked for it back February
7   14th.
8   THE COURT: Didn't I just decide a similar issue
9   against you where you mistakenly gave a document and because
10   of the timeliness?
11   MR. ROSENTHAL: Not Fuji, Your Honor.
12   THE COURT: Okay.
13   MR. ROSENTHAL: Or at least not this case.
14   THE COURT: Okay. But the protective order
15   requires that you are supposed to I think give notice about
16   it within a certain period of time?
17   MR. ROSENTHAL: Yes, a certain period of time.
18   To be fair, it says after discovery.
19   THE COURT: Okay.
20   MR. ROSENTHAL: I think it's ten days.
21   THE COURT: But this was made an exhibit to Mr.
22   Brafman's deposition and he was questioned on it?
23   MR. ROSENTHAL: Yes, he was, Your Honor. He
24   didn't know very much but he was the only person we had at
25   the moment on this laches issue.

**31**

1   THE COURT: Okay. Thank you.
2   Who is going to be making the argument for
3   Honeywell?
4   MR. WOODS: Your Honor, Matt Woods here for
5   Honeywell.
6   THE COURT: All right.
7   MR. WOODS: Okay. I think the focus of
8   Honeywell's position really is with regard to something
9   that Mr. Rosenthal did not mention and that really is the
10   valuation documents that are the result of what appears to
11   be this global effort to value certain intellectual property
12   with respect to Hoseidon.
13   THE COURT: Are these documents the ones that
14   attached to his Exhibit A that follow that or what?
15   MR. WOODS: Let me take a look, Your Honor, at
16   his Exhibit A. Some them are. But, more particularly, is
17   there is one document that Mr. McCartney, one of the named
18   inventors of the '371 patent, created in response to this
19   effort. And our view, in terms of trying to resolve this,
20   was, a proposal was made to the defendants and we never got
21   a response to that proposal.
22   THE COURT: Why don't you lay out what the
23   proposal was, Matt, for the record.
24   MR. WOODS: The proposal is that we would
25   produce the McCartney valuation document. We would ask for

**32**

1   a redaction of the paragraph three on Brafman Exhibit 10.
2   THE COURT: Okay. Thank you.
3   MR. WOODS: And then we would ask -- that they
4   could have Brafman Exhibit 10, they could have the McCartney
5   valuation document, and we would simply like there to be an
6   understanding that that would not constitute any broader
7   waiver. For example, if they want to go and talk to
8   Mr. Udseth about legal advice he rendered or perhaps given
9   some of the issues that have been percolating that they
10   somehow think this is somehow a broader waiver relating to
11   things that occurred ten years later.
12   The concern we have, quite frankly, is simply,
13   yes, they want to look at this issue. That's fine. And we
14   offered to produce it to them, but we never got a response.
15   We made that offer before McCartney's deposition, we made it
16   during McCartney's deposition, we made it after McCartney's
17   deposition. And in each case, all the defendants looked at
18   us and said we're still evaluating.
19   So our view is that we can move past this issue
20   very quickly by going forward with that resolution, with
21   that proposal we've made.
22   THE COURT: Okay. Lawrence, do you wish to have
23   any further response, particularly with the point that was
24   made by Matt at the end about what was offered?
25   MR. ROSENTHAL: Your Honor, it was offered, and

**33**

1   I wrote a letter refusing it because I didn't agree that I
2   had to give up a right which my client was entitled to
3   see -- not my client, their lawyer was entitled to see
4   paragraph three and to keep it in exchange for an obviously
5   erroneously withheld valuation document having no
6   relationship to privilege or otherwise excused, especially
7   since two others were produced. In fact, if you look at our
8   papers --
9   THE COURT: I am.
10   MR. ROSENTHAL: Samples of the form are
11   attached. Not the form, obviously, unfortunately but if you
12   look at the questions, you look at the information and it's
13   very telling, very factual.
14   THE COURT: What I would like to find out is
15   what exhibit would you like me to look at?
16   MR. ROSENTHAL: Your Honor, if you look at
17   Exhibits B and C. B are the two McCartney's which are hard
18   to read.
19   THE COURT: Yes.
20   MR. ROSENTHAL: C is one from Yakimowicz who is
21   a co-inventor writing on still a third patent, not at issue
22   here. I think the categories of subject matter are very
23   telling.
24   THE COURT: At least in B and C. Let me see
25   what C is. Some of them I can read. The answers are very

SHEET 10

34

1  difficult to read. Is that the --
2         MR. ROSENTHAL: It's very difficult to read B
3  but C is more legible. You can read what was written in
4  response to C.
5         THE COURT: It has the number 32 at the top?
6         MR. ROSENTHAL: It has the number 32 at the top.
7         THE COURT: And, Matt, do you have anything else
8  you wish to add?
9         MR. WOODS: Yes, Your Honor. I would in this
10 respect. I think the cases that we cited in the brief,
11 particularly the Whatley case, show that this particular
12 type of issue is an inherently tricky one because it is
13 clear when lawyers get involved in the valuing of
14 intellectual property, there are certain areas and certain
15 times when privilege can be triggered.
16        Now, I'm not going to tell you on behalf of
17 Honeywell that everything that is done here is being done
18 purely from a business standpoint. I think there is a
19 blending, as we recognize and acknowledge in our brief or in
20 our letter brief. The primary issue in my mind is we've
21 never tried -- we've always been willing to produce this
22 document when we understood the issue. The question is
23 simply that we don't want to have it thrown back in our
24 face. To a certain extent, as we learned from the prior
25 motions that Your Honor has been considering, every time

35

1  Honeywell tries to provide information, it is thrown back in
2  our face as, oh, my gosh, now there is a huge waiver and you
3  are entitled to get into the deepest, darkest secrets of
4  your dealings, Honeywell, between you and your attorneys.
5         THE COURT: Well, you know what, Matt? I might
6  relieve you of that problem because for this particular
7  issue, I'm going to be ordering that the document that was
8  clawed back, which is Exhibit A to Fuji's attachment, will
9  be produced. However, I don't view that as an overall broad
10 waiver of a whole host of things that could arise from this
11 document to the extent attorney-client privilege would more
12 apply.
13        My view of what this document addresses and
14 certainly the response documents I guess of subsection B and
15 C of what Fuji has submitted appears to be focused on
16 business aspects. The only question I could suggest is
17 subsection B of 3, and that is the question that is out
18 there, and to the extent that that question could arguably
19 go, possibly be seeking legal advice, I understand the
20 concern there. The rest of it appears to be to me more so
21 directed to business and certainly B and C, Exhibits B and C
22 to Fuji talks about predominantly who could potentially use
23 this, who do you think would be interested, let's talk about
24 some thoughts. Under assumptions and notes, there could be
25 legal advice provided by the attorneys. I don't know.

36

1         MR. WOODS: Your Honor, with that clarification,
2  we think that is a fine way of proceeding. And with the
3  clarification, Your Honor has just given, that is all we
4  have really been seeking and we're prepared to move forward
5  on that basis.
6         THE COURT: Well, that is the circumstances and
7  that is essentially my ruling on this particular point.
8         Going back to the first Fuji issue, I do think
9  that the breakdown that was done by Honeywell is relevant.
10 I think the notes that were put on the spreadsheet are also
11 relevant but only going to the documents, only going to the
12 products that are alleged to infringe, any defendant in this
13 case, any defendants' products that are alleged to infringe,
14 modules that are alleged to infringe. I am not going to
15 order that you produce the entire spreadsheet, nor include
16 products or analyses that you did of products that are not
17 alleged to infringe, either products or modules that are
18 alleged to infringe.
19        I do think the products, the degree of
20 rotation, the issues that go directly to the orientation of
21 the components and the modules, on factual information as
22 a result of the examinations that were done, are relevant
23 and the defendants should have those. To the extent that
24 basically goes to the facts of infringement, I think they're
25 entitled to have that as part of their evaluation. And

37

1  again, I'm doing this in part because I don't think this is
2  something that is going to be reproducible in any way, shape
3  or form.
4         I am not going to order that specific questions
5  that attorneys may have asked, may have asked about -- and
6  this is where there is going to be a fine line because I
7  haven't seen these documents to be able to make a complete
8  ruling on this but I'm trying to outline to you the subject
9  matters that I do think are discoverable that I don't think
10 necessarily fall solely into the attorney work product
11 because in part they already have been disclosed in answers
12 to interrogatories. So that is going to be produced.
13        And it may be I might have to look at one of
14 these things to try to give you a better read. I just
15 haven't seen one of these spreadsheets and have no idea what
16 all they contain. I mean I know that it was very difficult
17 for Stacie to explore or explain that to me but I do think
18 that some guidance as to what was disclosed or should have
19 been disclosed in answer to contention interrogatories as
20 to why a particular product infringes, a product that is
21 accused of infringement infringes is the area that would be
22 covered under the spreadsheets and how the breakdown was
23 done and that type of technical information and, as I said,
24 the angle of rotation, the orientation of the components of
25 the modules, that type of thing. So that's the best

SHEET 11

**38**

1  guidance I can give you on that.
2          On the issue that was brought up by Optrex, I
3  know that the whole argument that everybody has made here is
4  that this 50 percent representation is somehow a waiver for
5  life by Honeywell. I find that some of the arguments that
6  defendants have made today are basically the reverse of the
7  arguments that they made not too long ago on the issue
8  about when Honeywell was asking for certain information on
9  commercial success against the manufacturers as well as the
10  consumers or the end-product users. And I kind of find that
11  some of the defendants arguments are really arguing out of
12  both sides of their mouths.
13          I'm trying to go back to what Optrex was looking
14  for because yours is a more narrower one and I want to get a
15  better understanding of it. You are specifically looking
16  for what?
17          MR. OLLIS: Your Honor, this is Andy Ollis.
18  First of all, I'd like confirmation of the simple statement
19  that Mr. Brafman has made. He stated in court that the
20  teardown rate on average is about a 50 percent hit rate
21  under our belief of infringement across all these products.
22          THE COURT: Well, then you are going to be
23  wanting to know the products that haven't been accused,
24  right?
25          MR. OLLIS: No, we weren't actually -- Optrex

**39**

1  was not necessarily interested in -- we're interested but
2  we're not requesting at this time that Honeywell be forced
3  to identify all of the products that were not accused.
4          THE COURT: Okay.
5          MR. OLLIS: However, they have introduced the
6  final conclusion of their investigation, which is, at the
7  end, there was a 50 percent hit rate.
8          THE COURT: Where did they introduce their final
9  conclusion absent a statement made in court?
10          MR. OLLIS: That is where it was introduced,
11  Your Honor.
12          THE COURT: Okay. That was introduced in a
13  comment to Judge Jordan, but where is the evidence that it's
14  going to be used in this case for trial?
15          MR. OLLIS: Your Honor, I don't know whether --
16  there is no other evidence I have seen at this point.
17          THE COURT: Okay.
18          MR. OLLIS: But they introduced that fact. And
19  our position is that at least as to that specific fact, they
20  have waived that information. And another way to look at
21  it, Your Honor, at least simply with respect to this fact,
22  is even if you took the most conservative approach and
23  looked at this as a general description of subject matter
24  on a privilege log, for example, and you are saying, well,
25  this is just a general description of what is on the log,

**40**

1  Honeywell was refusing to even allow their witness to
2  confirm the accuracy of this statement on the log itself,
3  which we certainly think we're entitled to confirm that fact
4  at a minimum and, hopefully a little bit further, to link it
5  to earlier testimony. But at a minimum, we think we're
6  entitled to confirm the accuracy of that description, if you
7  will, even if it is considered a general statement or
8  description.
9          THE COURT: Well, I'm trying to figure out,
10  without getting into what other products or modules were
11  evaluated that weren't accused, how were you planning to
12  necessarily do that?
13          MR. OLLIS: Well, I think, number one, Your
14  Honor, I'd like to understand the time frame of the
15  investigation that is covered, which again I think that if
16  one takes a look at a typical privilege log type entry,
17  either the time or the date would certainly be fair game.
18  And then, number two, I would just like to confirm this is
19  describing the same investigation that Mr. Wood had
20  testified to previously. Those are the main points.
21          THE COURT: I'm going to allow those two points.
22  That's fine.
23          MR. OLLIS: Thank you.
24          MS. OBERTS: Your Honor, this is Stacie Oberts.
25  If I may comment. You know, if all Optrex is looking is to

**41**

1  confirm the 50 percent rate, we could do this through a
2  potentially either stipulation or a request for admission.
3  I don't see why we need to open up a deposition if all they
4  seek to do is to confirm that hit rate.
5          THE COURT: Well, that is an offer that is being
6  made to them. But if they want to take deposition, that's
7  fine. If you want to do it by a stipulation, that is fine,
8  too. But I'm going to allow them to reopen the deposition
9  for a minimal purpose, and that's not much.
10          MR. OLLIS: Thank you, Your Honor.
11          MS. OBERTS: Your Honor, one other comment I
12  would ask is on the teardown spreadsheet and what you have
13  ruled would be produced. I would just ask if we be given
14  a couple weeks to be able to prepare that just because of
15  the delicate nature of it. We want to make sure that
16  information that is still privileged and doesn't fall within
17  what Your Honor ruled doesn't accidently and inadvertently
18  become disclosed.
19          THE COURT: I understand that Stacie. I wasn't
20  suggesting you have to produce it tomorrow. What time
21  period realistically do you think you can get that done by?
22          MS. OBERTS: We could get it done in two weeks,
23  Your Honor.
24          THE COURT: All right. So you have your two
25  weeks.

42

1    MS. OBERTS:  Thank you.
2        THE COURT:  Now, there was another issue.  There
3    is another issue out there, counsel.  And one of the points
4    that was brought up I think by Optrex -- Karen, I think I
5    got a letter from you.
6        MS. PASCALE:  Yes, Your Honor.
7        THE COURT:  -- concerning extending the schedule
8    because I think Honeywell had asked for an extension for six
9    months, did they not, at one time?
10       MR. WOODS:  Yes, Your Honor.  This is Matt
11   Woods.  That is correct.
12       THE COURT:  I think we're just going to cut
13   through this and I'm giving a six-month extension for
14   discovery and we'll work with it from there.  That's what
15   the Court is ruling right now.
16       MR. WOODS:  Thank you, Your Honor.
17       THE COURT:  So redo the scheduling order and
18   give me the time periods through when the motions for
19   summary judgment and the case dispositive motions would be
20   due.
21       MR. WOODS:  We'll work on that, Your Honor.
22       THE COURT:  Okay.  Thank you.  I'm going to take
23   a five minute break, if you don't mind, counsel.  You might
24   want to take a five minute break, too, and we'll be right
25   back with this.  I should tell you that my cutoff time today

43

1    is probably about quarter to 1:00 Eastern time because I
2    have to go on the bench shortly thereafter.  So just a short
3    break, counsel.  Be right back.
4        MR. WOODS:  Thank you.
5        (Brief recess taken.)
6        THE COURT:  Let's get started.
7        The next issue as I understand it is the Hitachi
8    matter, as I put it.
9        MR. WOODS:  Yes, Your Honor.
10       THE COURT:  All right.  Now, my understanding is
11   Honeywell wants to take additional depositions or continue
12   their deposition of three individuals; is that correct?
13       MR. WOODS:  That is correct, Your Honor.  This
14   is Matt Woods for Honeywell.
15       THE COURT:  Okay.  Now, Matt, what I need to
16   note from you, because I did read through all the materials
17   and I read through all the exhibits on all this stuff, is
18   specifically what topics are you claiming that were not
19   covered with Hitachi originally with these Hitachi witnesses
20   originally?
21       MR. WOODS:  Your Honor, I will give you a
22   general answer and then we'll go into specifics.  Generally,
23   these relate to licensing, marketing and sales, basically
24   more on the damages side, the details of the Georgia-Pacific
25   analysis, and so to bring that, to put a finer point on it.

44

1        For example, given the time limits, we were able
2    to authenticate the licenses that Hitachi produced but we
3    were not able to explore in any detail the provisions of
4    those licenses, the royalties that were sent back and forth
5    or, more fundamentally, how those amounts were derived or
6    driven.  So, that is an example on licensing.
7        With regard to sales and marketing, the sales
8    information that Hitachi produced was fairly detailed.  We
9    were able to get a basic rundown of how the sales documents
10   were organized, but then we were not able to take it and
11   explore what periods of time we all have, what they
12   represent and then, more fundamentally, how Hitachi's
13   modules are marketed, priced and distributed.  And, again,
14   one of the issues, as Your Honor is well aware of, is the
15   whole issue of indirect sales.  So we did not get the
16   opportunity to explore, once those modules are manufactured
17   and how they're accounted for, then let's talk about the
18   distribution channels, how they're priced and how they deal
19   with their customers in terms of marketing.
20       So those are the specific topics which, given
21   the time limits, we were not able to get into.
22       THE COURT:  Okay.  Did you complete any of three
23   witnesses?
24       MR. WOODS:  No.  No, we did not.  I think we
25   made more progress with the first witness than the latter

45

1    two, and that was just in the order that Hitachi presented.
2    If it's a question of trying to talk about what is
3    reasonable here in terms of a time limit to avoid a burden
4    on Hitachi, we certainly would undertake to do that.  The
5    problem we've had is that Hitachi's view has been no time.
6    And if we could go in there saying, for example, and again I
7    mean certainly we could get this done in no more than two
8    days, and I would endeavor to try to get it done, candidly,
9    in a single day, but with the foreign translations, that
10   just creates an issue, but certainly no more than two.  And
11   I would be happy to engage in a discussion with Mr. Sirota
12   to try to drive that to a smaller amount.
13       THE COURT:  All right.  And there is something
14   else you are looking for, too, I think.
15       MR. WOODS:  Yes, Your Honor.  That has to do
16   with the document production and the scope of the accused
17   and the accused modules.  And I can address that, if Your
18   Honor wants.
19       THE COURT:  Briefly.
20       MR. WOODS:  Okay.  It relates to the size of
21   Hitachi document production.  They produced about 450,000
22   pages of paper.  Within that document production, it was
23   unclear, to a very, very large extent, what modules are
24   reflected within that document production because, as was
25   exemplified in some samples that we were talking with

**46**

1  Hitachi about in the very lengthy meet-and-confer process,
2  very often there would be pages of paper that showed
3  elements of Claim 3 but not the entirety of Claim 3 or
4  would not identify them in the context of the modules. And
5  so as a result of that process, this meet-and-confer
6  process, Hitachi has agreed to provide some supplemental
7  identifications, some supplemental correlations. In other
8  words, saying for these modules, XY&Z, these documents
9  relate to them, so sort of like an a Rule 33(d)
10  identification.
11      THE COURT: Is it your understanding, and I
12  wasn't certain about that and I'll ask Hitachi the same
13  question, that it's going to be like a Rule 33(d)
14  identification to say that -- I'm assuming all these
15  document are Bates numbered.
16      MR. WOODS: That's my assumption, too. But
17  when Hitachi did this originally, before the technical
18  depositions in January, they actually produced additional
19  documents before the 450,000 that they initially produced to
20  us. These were new documents to us. What Honeywell is
21  seeking at this point, Your Honor, is we want clarification
22  with this, with Hitachi and with the Court with regard to
23  the modules at issue. Because it is our position that given
24  the condition of Hitachi's original production, we're not in
25  a position to accuse additional modules on that without more

**47**

1  Rule 33(d) type identifications.
2      And if Hitachi wants to do that, as it has
3  agreed to do with regard to modules which it says directly
4  comes into the U.S., that is fine with Honeywell. But if
5  Hitachi is not willing to do that with regard to other
6  modules, we can live with that. We just want it to be
7  understood here and now, Your Honor, that those are not part
8  of the case.
9      And so we're not seeking an advisory opinion.
10  We don't need the Court to issue any declaration regarding
11  res judicata. I think perhaps our language in our request
12  was perhaps a bit overzealous, quite candidly. I think what
13  we need to do is have a clear statement that any module,
14  unless Hitachi provides the correlation and identification
15  of the type that it has agreed to do with regard to the USA
16  modules, then any additional modules just simply aren't part
17  of the case. And if it wants to do more, we'll take it all
18  on. If they doesn't want to take it on, we'll leave it for
19  another day and another case. But what we can't do at this
20  point is have no resolution about trying to handle that
21  450,000 pages of paper which really are not decipherable at
22  this point in time without further input from Hitachi.
23      I think that does it, Your Honor, for that
24  second point.
25      THE COURT: Okay.

**48**

1      All right. What is Hitachi's position?
2      MR. MAIER: Yes, Your Honor. This is Robert
3  Maier. And I'll be fielding this one for Hitachi.
4      THE COURT: All right.
5      MR. MAIER: As to the first issue that Mr.
6  Woods raises regarding the 30(b)(6) deposition, I think
7  Your Honor indicated that you have reviewed the papers and
8  the correspondence. And as a preliminary matter, I think
9  Hitachi feels as though it would be incredibly unfair for
10  that 30(b)(6) deposition to now be reopened. The deposition
11  proceeded in accordance with a schedule that Honeywell
12  insisted upon. Hitachi provided an alternative scheduling
13  solution.
14      THE COURT: Rob, before you go on, and I know
15  this is difficult because of the delay factor with the fact
16  that I'm on a phone, one of the things Honeywell did say in
17  its submission was that they're proposing to take these
18  continued depositions in Tokyo. And does that assist? I
19  mean is that where your people are located?
20      MR. MAIER: It is, Your Honor, and that is
21  somewhat, somewhat more convenient than Osaka was.
22      THE COURT: Yes, 340 miles away. I can see why.
23      MR. MAIER: Yes, that is true. However, I
24  think we also need to consider these depositions would be
25  continued approximately six months after the first session.

**49**

1  And so what will happen is these three witnesses, now that
2  they have already been inconvenienced once and taken from
3  their commitments at work and at home for the depositions in
4  Osaka and for preparation of the entirety of notice for all
5  22 disparate topics, we would be forced to go through that
6  same procedure again in order to prepare for an additional
7  round of depositions. That's precisely, Your Honor, what I
8  think Hitachi was trying to avoid, during the scheduling
9  discussions in October and November and December, was
10  inconveniencing and burdening Hitachi with a second round of
11  essentially the same thing.
12      THE COURT: All right. I understand your
13  arguments on that point. Is there anything else you wish to
14  add on that particular point?
15      MR. MAIER: No, Your Honor. I think that is
16  sufficient on the deposition issue.
17      THE COURT: Okay. Now about the document
18  production issue?
19      MR. MAIER: The document production issue, Your
20  Honor, is one that is somewhat perplexing to us in that
21  Honeywell fought very adamantly early on in this case for
22  Hitachi to produce documents relating to the entirety of
23  potentially relevant modules, the entire universe of
24  potentially relevant modules in this case.
25      Initially, as you will recall, Judge Jordan

**50**

1  limited discovery to only those modules that Honeywell had
2  identified with specificity by module number. There were
3  substantial meet-and-confer efforts between Hitachi and
4  Honeywell and, as a result, Hitachi ultimately and
5  begrudgingly agreed to produce documents relating to
6  essentially all of its relevant modules.
7         THE COURT: I'm sorry. Rob?
8         MR. MAIER: I'm having a difficult time. There
9  is a -- okay. Just try. I don't know what the sound is in
10 the background that is causing some problems every time you
11 talk.
12        MR. MAIER: Okay. I'll try again.
13        THE COURT: Are you on a speakerphone?
14        MR. MAIER: I am.
15        THE COURT: Yes, that might be part of the
16 problem. Okay. I am, too, and that is -- that may be part
17 of the problem.
18        MR. MAIER: Okay. Well, I'll pick up the line,
19 Your Honor.
20        THE COURT: Oh, thank you. That's a lot better.
21        MR. MAIER: You are very welcome.
22        And so as a result of those initial
23 meet-and-confer efforts, Hitachi ultimately agreed to
24 produce what was a substantial number of documents and that
25 required a substantial effort from Hitachi, substantial cost

**51**

1  but Hitachi did so at Honeywell's insistence.
2         THE COURT: Okay. But it is my understanding
3  what Honeywell is complaining about is the documents
4  produced, they can't tell what documents go with what
5  module.
6         MR. MAIER: Understood, Your Honor. And it is
7  somewhat difficult in some of these instances to correlate
8  the technical drawings to module numbers. And so in view
9  of that and in view of some more recent meet-and-confer
10 efforts, Hitachi, as a first cut, agreed to produce what
11 we're deeming the correlation documents. And I'll disagree
12 with Mr. Woods' characterization these are new documents.
13 They're in fact not. They're documents that were produced
14 some time ago, but they were produced as they're kept in the
15 ordinary course of business. And as they're ordinarily
16 kept, it's more difficult to correlate those technical
17 drawings to module numbers.
18        And so in view of that concern from Honeywell,
19 Hitachi, as a first cut, produced the set of correlation
20 documents for only those modules that Honeywell specifically
21 accused of infringement by module number. There were fur-
22 ther discussions thereafter and Honeywell was dissatisfied
23 with that. And where we have come to at this point is an
24 agreement that Hitachi will now produce those same types of
25 correlation documents which again have already been produced

**52**

1  but will now be reproduced in an order that is easier for
2  Honeywell to deal with, producing those correlation
3  documents as to all modules that are sold directly into the
4  U.S. by Hitachi.
5         As an additional agreement, Hitachi has also
6  recognized to the extent Honeywell can show that any foreign
7  sold modules are ultimately imported to the U.S. by a
8  third-party, we would also agree to provide the same types
9  of correlation documents for those modules. But Honeywell
10 is dissatisfied with that as well. What they're asking is
11 what would be a Herculean effort by any extent for Hitachi
12 to produce those same types of correlation documents, to
13 correlate its entire production for modules that aren't sold
14 in the United States and, as far as we can tell, do not
15 arrive in the United States.
16        THE COURT: Well, my understanding is you are
17 saying Hitachi doesn't directly sell into the United States.
18        MR. MAIER: That's correct, Your Honor.
19        THE COURT: Okay.
20        MR. MAIER: And to address Mr. Woods' second
21 point, I do think in the context of res judicata, what they
22 are seeking, in any event, is some type of advisory opinion
23 as to some future hypothetical litigation to some future
24 hypothetical court about issues that haven't even been
25 addressed in this case.

**53**

1         THE COURT: Well, on that particular issue, I
2  don't care whether you call it res judicata or whatever, I'm
3  not going to make a ruling on that in any event at this
4  stage of the game. I do think it is requesting the Court to
5  make a determination that we don't need to make because we
6  don't know yet. So I do think it is asking for an advisory
7  approach to this.
8         Regarding the depositions, you will produce the
9  individuals for deposition but they will be limited to the
10 type of questions that Mr. Woods outlined to the Court in
11 this transcript, which is the reason why I asked the
12 questions that I did. It will be for one day deposition.
13        Now, on the issue of the documents, that's
14 probably a thornier issue in this matter. What would it
15 take, Rob, for you to do it for all the modules that
16 arguably could be infringing?
17        MR. MAIER: Are you talking about all of the
18 modules that are sold worldwide, Your Honor?
19        THE COURT: Yes. Yes, I am because my
20 understanding is that you produced -- let me just understand
21 what you said. You said that you produced quite a few
22 documents regarding modules that are sold worldwide that
23 could fall into an argument of infringement. Is that what
24 you said?
25        MR. MAIER: Potentially, Your Honor. Again,

SHEET 15

**54**

1  assuming those documents ever arrived in the United States.
2          THE COURT: Assuming those modules ever came
3  into the United States. I understand that.
4          MR. MAIER: Correct.
5          THE COURT: But absent that point, are you
6  saying that how you went about deciding what documents to
7  produce or deciding the information on the certain modules
8  you based it upon an agreement with Honeywell about what
9  category or how potentially that they could infringe if they
10  were brought into the United States?
11          MR. MAIER: That is correct, Your Honor. That
12  was the result of the substantial of the substantial meet
13  and confer early on and it was the result between an
14  agreement between Hitachi and Honeywell as to what types of
15  modules might fall into such a category.
16          THE COURT: All right. And I asked you the
17  question as to what type of effort it would take for you to
18  be able to get the correlation documents. I'm assuming
19  this: I'm assuming that there is this world of documents
20  that have been produced and I don't know whether they've
21  been Bates numbered or not. I'm assuming that there are
22  ways to be able to sit there and say, okay, this group of
23  documents apply to module A, this group of documents apply
24  to module B, this group of documents applies to module C,
25  that is, the technical documents apply. And I'm getting the

**55**

1  read from you that, no, it's not that simple.
2          MR. MAIER: It's more difficult than that, Your
3  Honor, because of the way the documents are kept in
4  Hitachi's system until ordinary course of business. And so,
5  for example, as I understand it, in connection with the
6  current agreement to produce those correlation documents for
7  only direct U.S. sold modules, that has required substantial
8  effort and that is only the U.S. direct sold modules.
9          THE COURT: What do you mean by "substantial
10  effort?"
11          MR. MAIER: I don't know the exact specifics of
12  it, Your Honor, but I can say it's my understanding that it
13  requires a substantial effort for the personnel at Hitachi
14  in Japan to collect and correlate documents that relate to
15  each particular module number and then provide them to us in
16  that manner.
17          THE COURT: It's my understanding, are all these
18  documents predominantly technical documents?
19          MR. MAIER: That is correct, Your Honor. And I
20  think, that is another point that we addressed in our
21  letter, which is, these are technical documents and they
22  relate to infringement issues which we view as completely
23  irrelevant until Honeywell makes some showing that a module
24  is imported into the United States. It's a --
25          THE COURT: Okay.

**56**

1          MR. MAIER: I'm sorry, Your Honor.
2          THE COURT: Isn't that putting the cart before
3  the horse? I mean you are saying they have to have this
4  proof before you even have to produce it is what you are
5  saying. They have to affirmatively show that some modules
6  are imported into the United States or a product containing
7  the modules are imported into the United States.
8          MR. MAIER: I think that is exactly right, Your
9  Honor. And I think that is consistent with what Judge
10  Jordan's positions were early in the case in arranging the
11  schedule as he did and Your Honor's position to date. I
12  think that discovery, the technical discovery of infringe-
13  ment issues for foreign sold modules, again, in the absence
14  of a showing that those modules are imported into the United
15  States, has been off limits. I think that has been a
16  consistent view for every one in the case to date.
17          THE COURT: All right. I understand your
18  arguments.
19          Matt, do you have anything further on that
20  particular point.
21          MR. WOODS: Just a couple, Your Honor. I mean
22  Mr. Maier has referred to it as a Herculean task. If it's
23  Herculean for Hitachi to do this, these are Hitachi's
24  module, these are Hitachi's documents, these are Hitachi's
25  language, then it's super-Herculean for Honeywell to do it.

**57**

1  And that is basically our point, Your Honor.
2          We just need to know, if those documents, if
3  additional modules are going to be part of this case, then
4  be we need to be able to have the same type of Rule 33(d)
5  identifications. And we believe that Hitachi can make that
6  decision, and we'll live with whichever way it wants to go.
7  But I don't think that Judge Jordan made any decision about
8  these indirect sales, and I do believe Your Honor is right
9  when there is an element of putting the cart before the
10  horse, especially given one of the things we have to go back
11  and talk about with the witness, the witnesses on the
12  additional day that Your Honor has granted is exactly these
13  type of issues, which is distribution, distribution chains.
14          THE COURT: I understood that. But, Matt, let's
15  go back and what is your belief as to what Judge Jordan had
16  previously ruled?
17          MR. WOODS: I'm sorry, Your Honor?
18          THE COURT: I'm sorry. What is your position
19  on what Judge Jordan had previously ruled regarding what
20  document discovery, what information you could get from
21  defendants?
22          MR. WOODS: Well, Judge Jordan never made any
23  findings with regard to limiting discovery until somehow
24  Honeywell can show that the module actually makes it into
25  the United States. I mean, candidly, Your Honor, that has

**58**

1 been the issue that has been lingering. And Your Honor has
2 seen that in some of the mediations and some of the other
3 discovery issues that have come up. Judge Jordan never made
4 a ruling with regard to that.
5        THE COURT: His ruling was, though, that you
6 were supposed to accuse -- was it, they were supposed to be
7 document production and you were supposed to make your
8 accusation?
9        MR. WOODS: That is correct, Your Honor. Now,
10 Hitachi produced the entirety of what Mr. Maier was saying,
11 those which it viewed as potentially relevant. If Hitachi
12 wants to put those modules into play, we're saying it's
13 unfair for Hitachi to give the documents but then not
14 provide the additional discovery, the Rule 33(d). I mean
15 you can't pick and choose, you can't pick and choose the
16 Rules of Civil Procedure.
17        If they're going to put those documents in play
18 by producing them, then there is an obligation to do the
19 correlation. If they don't want to put them into play,
20 that's fine, and if they don't want to do the correlation
21 because it's a Herculean task, given how long, given the
22 history of this case, we can accept that. But what is
23 unfair, what is absolutely unfair and unacceptable is for
24 Hitachi to put forth 450,000 pages of Japanese documents
25 which they admit are not correlated to specific modules and

**59**

1 then somehow expect Honeywell to do that which they,
2 themselves claim they can't do or it's extremely difficult.
3        That's why I opened my comments, Your Honor,
4 with what we're really seeking here is clarity, is clarity
5 with regard to how we're going to handle Hitachi's document
6 production. And we are, Honeywell can live with, in the
7 confines and context of Judge Jordan's prior ruling, we can
8 certainly live with the notion of they're going to produce
9 only the correlation for that which has been coming directly
10 into the United States and that which has been expressly
11 accused. We can live with that. I just think we all need
12 to be on the same page, that that's what we're going to
13 proceed on.
14        THE COURT: Well, my ruling is this. I find it
15 a little bit difficult to believe that Hitachi doesn't have
16 some means to know the technical documents associated with
17 each module because isn't that, either what they were
18 making or wanted to be made, I just find that a little bit
19 unbelievable that they don't have that information or
20 couldn't do it to begin with. So I'm going to be order that
21 Hitachi provide the correlation documents. And it can be
22 done. It can be done as simply, if they're Bates numbered,
23 to say these following numbers apply to X module Y. These
24 following numbers applies to module C. I just find it very
25 difficult to believe that Hitachi itself, with the way it

**60**

1 organizes its records, cannot correlate what technical
2 documents apply to each module. I don't know how you get
3 off first base in making them then. So I'm going to order
4 that Hitachi does that.
5        How much time are you going to need, Rob, to
6 respond?
7        MR. MAIER: Your Honor, I can say that it's
8 taken approximately several weeks to a month to undertake
9 that effort for only the U.S. direct sold modules. Now
10 we're talking --
11        THE COURT: Well, how far back did you go? How
12 far back was this production?
13        MR. MAIER: Six years, Your Honor.
14        THE COURT: Okay. That's what I thought.
15        MR. MAIER: Yes. And now we're talking about a
16 much larger universe of product. So it would be very
17 difficult for me to even give you an estimate at this point.
18        THE COURT: Well, I would suggest you get it
19 done as soon as possible. And that you advise your client
20 that there is a bit of a difficulty for this Court to
21 understand how it's so difficult for them to do the
22 correlation of matching technical documents to a particular
23 module. It just doesn't make complete sense to me. It
24 really doesn't. And I recognize that the further you go
25 back, maybe the more difficult it is because it may be

**61**

1 modules that they're no longer using, but at the same time,
2 I just have some difficulty that they couldn't do that
3 correlation easier than what is being represented.
4        So I'll order it. Just start producing it and
5 we'll see how it goes along. I'm not going to put a time
6 limit on but I also don't expect it to continue on to the
7 end of discovery either.
8        MR. MAIER: Your Honor, may I ask for one point
9 of clarification?
10        THE COURT: Sure.
11        MR. MAIER: And that is to the extent that
12 Hitachi may sell modules, for example, that Hitachi sells
13 for the foreign market, there may be modules -- there may be
14 some small subset of modules that Hitachi is aware that only
15 are only sold for use in Japan. Do we need to provide those
16 same correlation documents for those foreign sold and
17 products that are likely never imported into the United
18 States?
19        THE COURT: I don't have a problem with you not
20 producing as long as you are willing to certify they are not
21 sold beyond Japan.
22        MR. WOODS: Your Honor, Matt Woods here. I
23 think we could confirm that via deposition or very limited,
24 very limited --
25        THE COURT: I don't have a problem with that,

SHEET 17

**62**

1  Rob, if they're willing to live by the representation.
2      MR. MAIER:  Thank you, Your Honor.
3      THE COURT:  Okay?  I don't have a problem with
4  that at all.
5      All right.  I think we have covered all issues.
6  I know there is one issue still out there that I still have
7  to address, and that deals with the issue concerning
8  Honeywell's argument, I believe it was Honeywell's argument
9  on commercial success, and I haven't finished that up yet
10  but I will try to address it as soon as possible.
11      Matt, I would appreciate if you would get back
12  to me.  For your information, the docket numbers that were
13  involved on the issue of your leave to file a second amended
14  complaint in the 04-1338 case, it was docket entry 515.
15      MR. WOODS:  I will, Your Honor.  We'll get back
16  to you very quickly on that, as soon as I can.  I will reach
17  out to Wintek.
18      THE COURT:  Well, yes.  They're the only one
19  that is left that I can figure out that would have any
20  interest in opposing it because I think that the other
21  defendants are no longer in the case.  I think.
22      MR. WOODS:  Okay.
23      THE COURT:  Yes, Wintek is the only one that I
24  could find.
25      MR. WOODS:  We'll confirm and then we'll get

**63**

1  back to Your Honor.  It may take a day.
2      THE COURT:  That's fine.  No, don't worry about
3  it.  I have plenty of other stuff to do but I'm trying to
4  clean up what outstanding motions are out there.  I'm
5  trying to make sure that we get through those, that one and
6  the issue, the letter memoranda that was sent to me concern-
7  ing the commercial success arguments raised by Honeywell.
8  Those are two points that I'm aware of that have not been
9  addressed by the Court yet.
10      MR. ROSENTHAL:  Your Honor, this is Lawrence
11  Rosenthal.  Just by way of clarification, on your order on
12  the clawback teardown issue, there are several things that I
13  don't think Your Honor addressed yet.  One was the actual
14  document which was clawed back.
15      THE COURT:  Wait a minute.  Which document was
16  that, Lawrence?
17      MR. ROSENTHAL:  Unfortunately, we don't have a
18  physical copy because I presume Mr. Woods didn't give it
19  to Your Honor.  That was the e-mail from the Honeywell
20  technical person to Ms. Yeadon describing a particular Sanyo
21  module while she was enroute to Sanyo to negotiate, one
22  presumes.
23      THE COURT:  I'm going to allow that document to
24  be produced.  However, within the framework, the same
25  framework, as I said, for the spreadsheets.

**64**

1      MR. ROSENTHAL:  All right.  And, Your Honor,
2  too, ancillary to the spreadsheet.  First, we ask for
3  permission to examine the physical modules.
4      THE COURT:  You know, and that issue was not
5  addressed by anyone, you're right.  Neither one of you made
6  any argument about that.
7      Is there a problem with having the actual
8  modules examined by the defendants?  The modules that you
9  did the teardown for that were actually accused?
10      MS. OBERTS:  Your Honor, we do have some
11  concern.  We would be providing the redacted spreadsheet
12  with the information that we gathered based on those
13  physical modules.  And as I stated before, the investigation
14  into these modules relates to other patents in Honeywell's
15  portfolios.
16      THE COURT:  I'm not asking you to identify those
17  other patents.  I haven't said that.  You have a module that
18  was torn down.  And what you are asking for, Lawrence, is
19  what?  You want to be able to look at which module it was?
20      MR. ROSENTHAL:  We would like to be able to look
21  at the physical module, probably send an expert or someone.
22      THE COURT:  Why don't we do this?  First of all,
23  why don't you get the document and see how that helps and
24  then we'll go and address the issue of whether you get the
25  physical module.  To me, the module that was used, that was

**65**

1  torn down, I'm kind of sitting there, even if it was torn
2  down for other reasons, for other Honeywell patents, I'm not
3  exactly certain that necessarily eliminates its relevance or
4  somehow protects it from not be produced or made available
5  for examination to the defendants.
6      MS. OBERTS:  Your Honor, why not then, if
7  Mr. Rosenthal would like to see the actual modules, in place
8  of the spreadsheet, they could look at the physical module
9  that we tore down and it would alleviate Honeywell's
10  concerns about information on the spreadsheet that is
11  privileged.  We would allow them access to those modules
12  that have been specifically accused for these defendants.
13  They could look at those, and that would basically provide
14  them with the information that would be on the spreadsheet
15  that is relevant to this litigation.
16      THE COURT:  No, it doesn't, because it doesn't
17  provide them with the information that you thought relevant
18  to this litigation or your client, and the analysis that
19  your client came up with.
20      MS. OBERTS:  But, Your Honor, wouldn't the
21  module itself confirm?  It appears to me what Fuji is
22  looking for is to confirm the accuracy of the interrogatory
23  responses that we provided.  And the physical modules would
24  confirm those contentions.  And we could agree to just
25  provide the physical modules, themselves as opposed to

SHEET 18

**66**

1  redacting the detailed spreadsheet which includes comments
2  of attorneys and privileged information.
3      MR. ROSENTHAL: Your Honor, I don't think that
4  the physical modules replace the spreadsheet, and I would
5  observe that it's very doubtful, but I will examine every
6  physical model. So I will examine, I will cause to be
7  examined those where the spreadsheet raises an issue in my
8  mind. And I think that there seems to be -- I think the two
9  are unrelated.
10     MS. OBERTS: Your Honor, if I may make one
11 comment. It appears what you were going to rule was that
12 the spreadsheet would be produced and then if there were
13 problems, then to provide the modules themselves. Perhaps
14 to protect the privilege on Honeywell's part, we could
15 flip that and we could do the physical modules and if, for
16 whatever reason, Fuji has concerns, we could address whether
17 information from the spreadsheets should then be disclosed.
18     MR. ROSENTHAL: Your Honor, I think that is
19 truly putting the cart before the horse.
20     THE COURT: I'm going to just put it this way.
21 I have already ruled they get the spreadsheets with the
22 limitations. And I recognize that may be a labor you may
23 have to go through but that you are going to go through it.
24     I'm putting the modules on hold because the
25 spreadsheets may provide adequate information. And

**67**

1  certainly if I require the modules to be produced, it's
2  going to be at a location that is convenient for Honeywell
3  and it's going to be a one time, one shot deal. It's not
4  going to be having these modules transported some place
5  else. You are going to have to go to the source.
6      MR. ROSENTHAL: Your Honor, that is not a
7  problem at all.
8      THE COURT: But I'm not ruling those modules
9  necessarily get produced now.
10     MR. ROSENTHAL: And the last loose end is
11 Mr. Woods, in his settlement proposal, volunteered to
12 produce the photographs. We presume he is going to stick
13 by that offer.
14     MS. OBERTS: Your Honor, if I may raise a
15 comment. We were trying to get past this issue that Fuji
16 had raised seeking all of this information, and what
17 Honeywell had agreed to do was to provide photographs that
18 it had took for those modules for the defendants that were
19 specifically accused of infringement. Fuji rejected that
20 offer and basically asked for all photographs for all
21 products that Honeywell tore down.
22     THE COURT: Well, I already ruled that you
23 weren't going to give the information on all products that
24 Honeywell tore down so the photos would only be related to
25 those products that you tore down and accused.

**68**

1      MS. OBERTS: That is correct, Your Honor. But,
2  you know, perhaps then maybe we could do the photos instead
3  of the spreadsheet. You know, we just have concerns.
4      THE COURT: Stacie. Stacie, understand, you are
5  not getting away from the spreadsheets. I have ordered them
6  produced. Also produce the photos. That may eliminate the
7  need for the modules.
8      MS. OBERTS: Okay.
9      THE COURT: Okay? It may. I don't know. But
10 understand, my ruling was limited to those that you accused.
11 I never said that you were supposed to produce everything,
12 did I?
13     MS. OBERTS: No, Your Honor.
14     THE COURT: All right. I would suggest that
15 counsel get a copy of this transcript to assist you in what
16 we're supposed to do.
17     Anything else at this time, counsel? My time
18 has run out. I've got an obligation to be on the bench in
19 about five minutes.
20     MR. ROSENTHAL: No, Your Honor. Thank you very
21 much for your time.
22     THE COURT: Thank you, counsel. Have a great
23 weekend.
24     (Telephone conference ends at 12:39 p.m.)
25

# EXHIBIT G

ROBINS KAPLAN MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

MATTHEW L. WOODS
612-349-8272

April 16, 2007

**Via E-Mail**

Lawrence Rosenthal, Esq.
Strook, Stroock & Laven LLP
180 Maiden Lane
New York, NY 10038

Re:  Honeywell International Inc., etc. al., v. Apple Computer Inc., et al.
     File No.: 019896.0229

Dear Larry:

I write with regard to the second discovery motion filed by Fuji on April 10, 2007, seeking to compel discovery relating to Honeywell's pre-suit investigation. We will respond to that motion in accordance with court procedure, but wanted to raise an issue with you in the interim.

Candidly, we were surprised that Fuji proceeded with the motion after the substance of the parties' meet and confer conference held on March 20. At the conclusion of that lengthy conference, it was our understanding that the parties were going to consider the various arguments made during that conference and talk again before any motion practice was filed. We believe in this regard that Fuji's filing of this letter was premature. We also do not know to what extent, if any, the other remaining defendants share the concerns outlined in Fuji's motion. Certainly, they did not formally join in that motion.

In keeping with our view of the continuing obligation to discuss discovery matters, Honeywell remains concerned about the privileged nature of its pre-suit analysis. As you know, Fuji has been apprised, as per Judge Jordan's Order, of the modules accused of infringement as well as the basis for the infringement. Moreover, Honeywell and Fuji had an early agreement regarding the sharing of such information. We believe that the information previously provided obviates any claimed need for further discovery regarding Honeywell's pre-suit analysis. Nevertheless, in an effort to resolve this matter, Honeywell would be willing to produce the photographs taken of all remaining accused modules (including photographs of all remaining defendants' accused modules) as long as such production would not be used to claim a waiver of any applicable privilege. I have copied this letter to the counsel for other remaining defendants to the extent it is important that they consider this proposal as well.

MP3 20221347.1

ATLANTA · BOSTON · LOS ANGELES · MINNEAPOLIS · NAPLES · SAINT PAUL · WASHINGTON, D.C.

Lawrence Rosenthal, Esq.
April 16, 2007
Page 2

To the extent that Fuji's motion seeks discovery regarding modules which have not been accused of infringement, Honeywell is willing to extend the proposal set forth above to include photographs of non-accused modules (of remaining defendants) on the same condition that such production will not be treated as a waiver and on the further condition that the defendants produce discovery regarding all of their modules. As mentioned during the meet and confer process, we think Judge Jordan's ruling regarding the scope of discovery applies to both sides; if Fuji or any other defendants seek to revisit that ruling, then it must be done so in a way which maintains a level playing field for both sides.

In accordance with conversations between Leslie Polizoti and Phil Rovner, I understand that Honeywell's response is due on Tuesday, April 24, 2007. Accordingly, I would appreciate having a response to this letter by close of business, Monday, April 23.

Very truly yours,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Matthew L. Woods

MLW/sdg
c:    Thomas C. Grimm
      Leslie A. Polizoti
      Stacie E. Oberts
      Neil P. Sirota
      Elizabeth L. Brann
      Andrew M. Ollis
      Elizabeth A. Niemeyer
      David H. Ben-Meir

MP3 20221347.1

# EXHIBIT H

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY