TAB A

1                    THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                - - -

4    HONEYWELL INTERNATIONAL, INC.     :    CIVIL ACTION
     et al.                            :
5                                      :
                Plaintiffs,            :
6                                      :
           v.                          :
7                                      :
     APPLE COMPUTER, INC., et al.,     :
8                                      :    NO. 04-1338 (***)
                Defendants.            :
9
                                 - - -

10
                         Wilmington, Delaware
11           Thursday, February 22, 2007 at 4:37 p.m.
                         TELEPHONE CONFERENCE
12
                                 - - -

13
     BEFORE:    HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE
14
                                 - - -

15   APPEARANCES:

16

17        MORRIS NICHOLS ARSHT & TUNNELL
          BY:  THOMAS C. GRIMM, ESQ.
18
               and
19
          ROBINS KAPLAN MILLER & CIRESI, L.L.P
20        BY:  MATTHEW L. WOODS, ESQ.
               (Minneapolis, Minnesota)
21
                    Counsel on behalf of Honeywell
22                  International, Inc., and Honeywell
                    Intellectual Properties, Inc.
23

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

SHEET 2

2

1    APPEARANCES:  (Continued)

2

3        YOUNG CONAWAY STARGATT & TAYLOR
         BY:  KAREN L. PASCALE, ESQ.

4             and

5        OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
         BY:  ANDREW M. OLLIS, ESQ.
6             (Alexandria, Virginia)

7             Counsel for Optrex America, Inc.

8

9        YOUNG CONAWAY STARGATT & TAYLOR
         BY:  MONTE' TERRELL SQUIRE, ESQ.

10            Local Counsel for Sony Corporation, Sony
              Corporation of America, Olympus Corporation
11            and Olympus America, Inc.

12            and

13       KENYON & KENYON
         BY:  ROBERT L. HAILS, ESQ.
14            (Washington, District of Columbia)

15            Counsel for Sony Corporation, and Sony
              Corporation of America
16

17       POTTER ANDERSON & CORROON, LLP
         BY:  PHILIP A. ROVNER, ESQ.
18
              and
19
         STROOCK & STROOCK & LAVAN LLP
20       BY:  LAWRENCE ROSENTHAL, ESQ.
              (New York, New York)
21
              Counsel for Fuji Photo Film Co., Ltd.
22            and Fuji Photo Film U.S.A. Inc.

23

24

25

---

4

1    APPEARANCES:  (Continued)

2

3        DUANE MORRIS, LLP
         BY:  GARY W. LIPKIN, ESQ.

4             and

5        DUANE MORRIS, LLP
         BY:  DONALD R. McPHAIL, ESQ.
6             (Washington, District of Columbia)

7             Counsel for Innolux Display Corporation

8

9        YOUNG CONAWAY STARGATT & TAYLOR
         BY:  ANDREW A. LUNDGREN, ESQ.

10            Counsel on behalf of Pentax Corporation
              and Pentax U.S.A. Inc.
11

12       FISH & RICHARDSON, P.C.
         BY:  THOMAS L. HALKOWSKI, ESQ.
13
              Counsel for Apple Computer, Inc.
14            and Nokia Inc.

15

16       BOUCHARD MARGULES & FRIEDLANDER
         BY:  JOHN M. SEAMAN, ESQ.
17
              Counsel for Citizen Watch Co., Ltd.;
18            Citizen Displays Co., Ltd.

19       SMITH KATZENSTEIN & FURLOW
         BY:  ROBERT KARL BESTE, III, ESQ.
20
              and
21
         HOGAN & HARTSON, LLP
22       BY:  ROBERT J. BENSON, ESQ.
              (Los Angeles, California)
23
              Counsel for Seiko Epson Corp.,
24            Sanyo Epson Imaging Devices Corporation,
              and Kyocera Wireless Corp.
25

---

3

1    APPEARANCES:  (Continued)

2

3        POTTER ANDERSON & CORROON, LLP
         BY:  RICHARD L. HORWITZ, ESQ.

4             Counsel for Hitachi Displays, Ltd., Wintek
              Corp., Wintek Electro-Optics Corporation,
5             Samsung SDI America, Inc. and Samsung
              SDI Co., Ltd.
6

7             and

         FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
8        BY:  ELIZABETH A. NIEMEYER, ESQ.
              (Washington, District of Columbia)
9

10            Counsel for Toppoly Optoelectronics, Wintek
              Corp., Wintek Electro-Optics Corporation

11            and

12       BAKER BOTTS, L.L.P.
         BY:  NEIL P. SIROTA, ESQ.
13            (New York, New York)

14            Counsel for Hitachi, Ltd., Hitachi
              Displays, Ltd., Hitachi Display Devices,
15            Ltd., Hitachi Electronic Devices (USA),
              Inc.
16

17            and

         MILBANK TWEED HADLEY & McCLOY, LLP
18       BY:  CHRISTOPHER J. GASPAR, ESQ.
              (New York, New York)
19
              Counsel for Fujitsu Limited, Fujitsu
20            America Inc., and Fujitsu Computer Products
              of America Inc.
21

22       CONNOLLY BOVE LODGE & HUTZ
         BY:  FRANCIS DiGIOVANNI, ESQ.
23
              Counsel on behalf of Sony Ericsson AB
24            and Sony Ericsson, Inc.

25

---

5

1    APPEARANCES:  (Continued)

2

3        KATTEN MUCHIN ROSENMAN, LLP
         BY:  TIMOTHY J. VEZEAU, ESQ.
4             (Chicago, Illinois)

5             Counsel on behalf of Sanyo North America
              Corporation
6

7    (Also present:  Counsel attending by telephone.  List of
     telephone participants put together by Mr. Timothy Vezeau.)

8

9

10                      - oOo -

11              P R O C E E D I N G S

12       REPORTER'S NOTE:  The following telephone

13   conference was held in chambers, beginning at 4:37 p.m.)

14       THE COURT:  Please be seated.

15       Well, thank you so much for attending.  All

16   right.  Brian, can you hear the telephone participants?

17       THE COURT REPORTER:  Yes, Your Honor.

18       THE COURT:  And, Rich, you went through the

19   process of putting them all together?

20       MR. HORWITZ:  Everyone is on the phone.  There

21   haven't been any beeps for awhile.  This list was prepared

22   by Tim Vezeau's office.  And we haven't tried to check to

23   see who is on and who is not on but this is probably the

24   universe of who might be on.

25       THE COURT:  Can the people on the phone hear me?

---

6

1    MR. VEZEAU:  Yes, Your Honor.
2    (Beeping sound.)
3    (Laughter.)
4    THE COURT:  As soon as I finished asking the
5  question.
6    All right.  I'll try to speak up as loud as
7  possible because the phone is turned away from me and it's
8  headed towards the court reporter so he can hear.  So I'll
9  just ask if you do address the Court that you speak up,
10  please.  Were you able to hear that?
11    MR. VEZEAU:  Your Honor, this is Tim Vezeau.  I
12  was able to hear that on the phone.
13    THE COURT:  Is anybody else on the phone with
14  you, Tim?
15    MR. VEZEAU:  Sure, there were many beeps.  We
16  presented a list, as Rich said, of the people who said they
17  were going to be on the line.  It was quite voluminous so we
18  were hoping to avoid the lengthy roll call.
19    THE COURT:  Oh, no, no.  Spare me that.  That's
20  fine.  I just wanted to make sure.
21    My understanding today is that we were going to
22  be discussing what is going to happen in the future of this
23  case, specifically, a scheduling order.  If there are other
24  matters that need to be discussed, we will address it.
25    So let's get started.  And, Matt, if you are

7

1  going to, I didn't want to make you move from where you
2  were, but I would strongly suggest that if you are going to
3  talk to move the microphone towards you and anybody else who
4  is going to be speaking in this room to try to make the
5  effort to get to the microphone.  You didn't need to
6  formally stand at the podium but the microphones at least
7  help you project.
8    MR. WOODS:  Certainly, Your Honor.  I'm
9  concerned about the folks on the phone.
10    THE COURT:  Do you want to stand over here?
11    MR. WOODS:  That makes more sense.
12    THE COURT:  That's fine.
13    MR. WOODS:  Thank you, Your Honor.
14    THE COURT:  As long as the two most important
15  people in this room able to hear you are me and Brian, and
16  it's not necessarily in that order.
17    (Mr. Woods walks over to the telephone.)
18    THE COURT:  Okay.
19    MR. WOODS:  Thank you, Your Honor.  You are
20  correct, what brings us here today is to put into implement-
21  ation a scheduling order in light of Your Honor's guidance
22  from our January hearing.  And since that point in time,
23  the parties have gotten together with a teleconference and
24  exchanged some correspondence with regard to a variety of
25  ideas for, in fact, placing that scheduling order.  I think

8

1  it might be good to start out on what there has been
2  agreement on.
3    THE COURT:  That should be probably the shortest
4  part of the discussion.
5    MR. WOODS:  It's actually pretty good, Your
6  Honor.
7    THE COURT:  Okay.  Good.
8    MR. WOODS:  There has been an agreement between
9  Honeywell and the manufacturer defendants at least to extend
10  the schedule by three months.  I say at least because it is
11  Honeywell's position that because of some lingering issues
12  that remain unanswered which I will address today that it
13  may be appropriate to extend the schedule further.  And I'll
14  address those in a minute.  But at a minimum, the parties
15  have agreed to extend by three months.
16    The second point of agreement is that the
17  manufacturer defendants and Honeywell have agreed to defer
18  for now the filing and submission of expert reports on the
19  issues of infringements and damages.
20    There is a lingering issue with regard to the
21  phraseology of when that deferral will cease to be deferred;
22  and I don't know if Mr. Rovner I going to speak to that.  I
23  can speak to that as well.  But as a general matter, there
24  has been agreement that those reports do not need to be
25  filed at least toward the near term.

9

1    So those are the points of agreement, Your
2  Honor.  And I think that that was largely the issue that
3  we thought we needed to move forward on when we concluded
4  January's conference.
5    So what I would like to do now is focus in
6  on some of the issues that we're concerned about, that
7  Honeywell is concerned about in terms of whether three
8  months is truly realistic here.  And I think Your Honor
9  actually raised this in January when you were questioning us
10  as to whether we really thought we could get it done in that
11  time frame.  And it's our view we would rather do this once
12  and be as realistic as we can be and not have to come back
13  to you later.  At the same point in time, I think we all
14  share a desire to get the case moving forward and get
15  discovery wrapped up.
16    So there are really two subissues, Your Honor,
17  that are of our concern.  The first one has to do with the
18  size of, the size and recency of defendants' document
19  productions.  Honeywell originally served -- and when I say
20  "defendants," I'm referring to the manufacturer defendants.
21  Honeywell originally served its discovery back in March of
22  last year.  After some motion practice, Judge Jordan ordered
23  that those document productions be substantially complete by
24  October.
25    Now, it has come to pass that substantial

10

1  document productions continue to be made in January and in
2  February and it appears will continue to be made in March.
3  Now, it is not my intent at this moment in time to be
4  pointing fingers or claiming that there has been something
5  inappropriate here. We're focusing on a scheduling order,
6  and that is my focus and Honeywell's focus.
7       The reality is for whatever reason, we are
8  still receiving documents today, documents which should have
9  been produced originally, and we're trying to analyze them,
10 we're trying to synthesize them and we're trying to build
11 our discovery efforts around them. Some of those -- I can
12 address these on individualized basis, but as a general
13 matter, a lot of these documents are going to require
14 translation from foreign languages, some of them are going
15 to require working with opposing parties to deal with
16 electronic databases, a lot of these things are e-mails and
17 there are a variety of other sub-detailed issues, which I
18 can address if Your Honor wants to, all on an individualized
19 basis. There is an individual story for each defendant.
20      The point we have here is that when we
21 encountered, we went out and did a round of depositions, it
22 really became clear there were more documents to be produced
23 and we're now in a situation where we really don't think the
24 document productions will truly be complete or substantially
25 complete until mid March, and so that puts us under the gun

11

1  of getting it done within the three months. That is one big
2  piece of our concern.
3       The second issue which bears on the amount of
4  time relates to primarily to the customer defendants and
5  that has to do with whether or not it's an issue that I
6  raised in January and the question is whether or not
7  Honeywell should be entitled to get some limited, limited
8  discovery from the customer defendants with regard to the
9  issue of commercial success. We know from Judge Jordan's
10 original order; and, Your Honor, you confirmed that as well;
11 that the current scheduling order is going to say the first
12 trial will be on validity. And one of the key factors in
13 this case will be the commercial success of products using
14 modules which use in fact the claimed structure. And this
15 was an issue as was explained in our meet and confer
16 beforehand.
17      Let me back up for a second, Your Honor. This
18 was a topic that was addressed telephonically. There was
19 some correspondence that was exchanged subsequent to that
20 teleconference. I think it's safe to say right now what we
21 have is a threshold issue primarily between Honeywell and
22 the customer defendants. I don't believe, as I'm looking
23 out at the courtroom, I don't believe the manufacturer
24 defendants have weighed in, one way or the other. I would
25 submit, however, that the manufacturer defendants' positions

12

1  on the issue of commercial success is relevant to the scope
2  of discovery that we may possibly need and that was
3  something that was raised in the correspondence that I sent,
4  i.e., is in fact commercial success at issue? Is it in
5  dispute? What information can they share?
6       Our view right now is there is a threshold sort
7  of fundamental issue. The customer defendants do not
8  believe that that type of discovery is warranted under the
9  circumstances. Our view is that there is no way to do a
10 proper Graham v John Deere analysis if you don't have that
11 second piece of the question. Yes, we have gotten some data
12 from the manufacturer defendants, data on sales, but the
13 patent speaks very clearly about the need and the value of
14 the invention being providing better energy efficiency and
15 that translates into things such as battery power savings,
16 energy consumption, things which the module maker doesn't
17 have any information on, only the end product maker is going
18 to be the one who has that information.
19      There are a lot of layers to this, and I can go
20 on and explain it in any detail that Your Honor would like.
21 But essentially what brings us here today is the fact that
22 the customer defendants are really not willing to agree to
23 any type of discovery and so further discussions upon the
24 scope and extent of that discovery have not gone forward.
25 It is Honeywell's request today that if Your Honor ordered

13

1  or acknowledged that there would be right to some form of
2  limited discovery and then directed the parties to go back
3  and work together some more within a short time frame, that
4  we could come up with a fair discovery plan that minimizes
5  the impact upon the customer defendants.
6       There have been certain comments made by
7  individual customer defendants who may speak today that
8  discovery against them is particularly unwarranted.
9  Honeywell is certainly of a mind that one size might not
10 fit all in this circumstance. The problem we have, Your
11 Honor, is that we can't even get past go to even begin the
12 discussion because the customer defendants have said they
13 are not interested. They will not provide this without
14 further guidance.
15      So we would ask, if Your Honor is not prepared
16 to do that today, at least allow us to do some briefing on
17 this to show how, in fact, under Graham vs. John Deere, it
18 is going to be absolutely critical, if we're going to do a
19 proper analysis with regard to secondary of indicia of
20 nonobviousness, we've got to marshal an appropriate record
21 that will withstand scrutiny under the Federal Circuit. If
22 not, we're basically going to be, Honeywell is going to be
23 relegated to fighting with one hand tied behind its back.
24 And so that is how we would like to proceed in that respect.
25 And, again, I can address any particularized comments.

## 14

1  Assuming that we either get the discovery or
2  that we at least have the opportunity to brief it, to
3  explain it, that bears once again on the issue of the amount
4  of time that is necessary. Now, Judge Jordan, when he
5  addressed this issue originally back in May of 2005 made it
6  very clear that he was preserving this issue for another
7  day. And if Your Honor is interested in that, I can provide
8  you with the materials. But this issue was expressly
9  raised. And Judge Jordan, after some colloquy with
10  Mr. Lueck, my partner and with Mr. Horwitz, said I will
11  reserve that issue about whether or not you can get
12  discovery on commercial success for another day. And that
13  is why we believe the time is appropriate to consider that
14  now as we're talking about a scheduling order and how we're
15  going to get this case resolved.
16  So given that issue, given the issue about
17  the document productions, we are concerned, Your Honor.
18  Candidly, I would like to get this all done in three months.
19  I just don't think it's realistic, and I think candidly six
20  months is going to be probably more realistic. It's not
21  what I want but I would rather do this once and not come
22  back to you again.
23  We got this information within the past
24  24 to 36 hours so we have not had a chance to talk with the
25  manufacturer defendants at least with regard to whether

## 15

1  there is any willingness to extend beyond the original three
2  months extension. But that at least would be our proposal
3  at least as a starting point is to do six months and that is
4  it.
5  A few other issues that are outstanding are, one
6  aspect of the issue on the commercial success discovery
7  relates to what the manufacturer defendants are going to do
8  with regard to their invalidity assertions. Judge Jordan
9  originally thought it would make sense for those defendants
10  to elect a group of people who will try the first case.
11  That was when there were a number of additional parties who
12  have now resolved their differences with Honeywell. I think
13  the field has narrowed somewhat.
14  I don't know what the defendants' current
15  thinking is on that but Judge Jordan was of the view that
16  there should be some election about that point in time. And
17  really what I'm thinking is there needs to be a three-way
18  conversation here with the manufacturer defendants, the
19  customer defendants and Honeywell as to, okay, if we're
20  going to try the validity issues first and the claims and if
21  these issues are going to be first against the manufacturer
22  defendants, then we really need to understand what issues
23  need to be fully discovered and fully presented; and the
24  only way, as I'm suggesting here, that we get that done is
25  if we really have all parties at the table.

## 16

1  The customer defendants have stated very clearly
2  that they will not feel bound by the results of this first
3  trial, and so I feel an obligation to make sure that they
4  are part or kept abreast of what is going on because it will
5  be Honeywell's position that they are bound. That they
6  have been afforded an opportunity to participate, they have
7  chosen not to do that, and so it's important for Honeywell
8  in terms of efficiency not to repeat what is essentially the
9  same trial. So that is one outstanding issue as well.
10  And then the final question, Your Honor, it has
11  to do with the disclosure of opinions of counsel. To the
12  extent the manufacturer defendants are going to rely upon
13  any opinions of counsel, both for willfulness and as it may
14  bear on the issue of inducement to infringe under the DSU
15  standard, the new DSU standard that we talked about last
16  January, we believe a deadline needs to be set. It needs to
17  be set with some amount of time in the discovery period for
18  Honeywell to review the opinions if they are in fact pro-
19  duced and then produce some follow-on discovery. Honeywell
20  is very flexible on that but unfortunately the manufacturer
21  defendants have not been willing to agree to a deadline of
22  any sort. They just view the issue as premature.
23  So that is it in a nutshell. I realize that is
24  a fair amounts of issues. Unless Your Honor has some
25  questions, I'll cede it over to Mr. Rovner and Mr. Horwitz.

## 17

1  THE COURT: All right. Thank you.
2  MR. HORWITZ: Your Honor, I'm going to talk
3  about the customer defendants issues.
4  THE COURT: Why don't you come up here,
5  Mr. Horwitz, so that the customer defendants, whoever is on
6  the line, can hear you.
7  MR. HORWITZ: Okay. (Approaching telephone.)
8  Mr. Woods is right, we had a conference call and
9  there was some correspondence that went back and forth.
10  I'll talk about the discovery that they're looking for
11  first, and then the second issue.
12  Our position is one size does fit all and the
13  one size is there shouldn't be any discovery against any
14  of the customer defendants in this phase of the case. I
15  won't get into the details now but what Mr. Woods says is
16  limited in the description that he gave us and what he put
17  in his letter. I'm not sure what they wouldn't ask for if
18  we were in the case: all the sales information, product
19  information, everything else.
20  But turning really to the nub of the issue, we
21  believe that they are getting, and have already received,
22  everything they need from the manufacturers. He talked
23  about commercial success of the products. That is not what
24  their patent covers. Their patent has claims in it. Those
25  claims go to the LCD module. That is what is either

18

1  commercially successful or is not commercially successful.
2        They're going to try to have fights which they
3  raised with Judge Jordan when this case first started about
4  damages.  What is the value of this module?  That is not
5  what this is about.  That is not what commercial success is
6  about.  Claims don't talk about the kinds of things that
7  Mr. Wood has talked about today and has raised in the
8  letters, things like battery life.  That is not part of the
9  claimed invention.
10        Now, just as we've said throughout, the
11  customers don't have technical information that would apply
12  to other phases of the case or that would apply here as
13  well.  What the customers say is -- and I don't think this
14  is any surprise -- we want something that is clear, that
15  won't fail the battery.  Now it's up to the manufacturer to
16  decide how are they going to meet those goals.
17        And Honeywell will say the way the manufacturer
18  has chose to meet those goals is to infringe the patent.
19  Obviously, the manufacturers disagree, but those are the
20  facts, those are the specifications that are relevant.
21  It's not the once removed step that the customers would say
22  it's the performance that they want.  It's then up to the
23  manufacturer to provide the technical resources to meet that
24  performance goal.  So I think that they're doing it on
25  purpose, but they're talking about the wrong context.

19

1        Also on commercial success, I don't think this
2  is any surprise that many of the manufacturers will be
3  providing the evidence which will go to whether there are
4  noninfringing alternatives.  I don't think it will come as
5  any surprise, to the Court or to Honeywell or to anybody in
6  this room, that people will say that there are noninfringing
7  alternatives that have already been implemented even if you
8  were to read the patent the way they read the patent, which
9  the manufacturer defendants obviously disagree with.
10        So, again, all of the evidence that is really
11  going to go to what commercial success is about in this
12  case, which is commercial success of the invention which
13  goes to the module, that is going to come from the
14  manufacturers.  It's not going to come from the customers.
15  That's all on that.
16        There may be some points that other individual
17  customers may want to raise with respect to their
18  circumstances, but if I could go for a minute to the other
19  point that Mr. Woods raised.  And that is the notion of an
20  agreement to be bound to participate.  That is an issue
21  that was raised with Judge Jordan.  It was raised in
22  conversations among the parties.  It was raised in proposed
23  orders that were given to Judge Jordan back in 1995 when we
24  had a hearing.
25        THE COURT:  How about 2005?

20

1        MR. HORWITZ:  I'm sorry, 2005.  This case, it
2  seems like it has been going on forever.
3        THE COURT:  Well, after December I have to agree
4  with you, but go on.
5        MR. HORWITZ:  We had a hearing in May, May 16,
6  and then the parties were told to submit forms of order to
7  the judge.  Honeywell's form of order had a specific
8  provision that says all parties will be bound by the first
9  trial whether you're there or not.  The judge did not
10  include any such provision and never included any such
11  provision in any scheduling order that he has entered.  So
12  we think, as I said and others said when we were on the
13  phone with you in January, this is just another chance with
14  a new judge to argue for something.
15        There are no changed circumstances whatsoever
16  between 2005, when they raised this issue, and today.  So we
17  think that we shouldn't be required to take a position, the
18  Court shouldn't be required to decide anything about it, and
19  the law is what the law is.  It's not something that should
20  be considered at this time or forced on anybody at this
21  time.
22        Those are my comments, unless Your Honor has any
23  questions.  And if there are any customer defendants that
24  want to speak specifically to their circumstances, it might
25  be a good time now before Mr. Rovner takes over on the other

21

1  issues.
2        MR. HAILS:  Your Honor, my name is Bob Hails.  I
3  represent Sony Corporation.
4        THE COURT:  I'm sorry.  Sony?
5        MR. HAILS:  Sony, that's correct.  And just for
6  the record, the way I understand what Mr. Woods is asking
7  for, we're trying to handle this, this threshold issue, and
8  the design for any kind of plan would be left for another
9  day.  And so we do have some unique issues, but it seems to
10  be premature to address them at this time.  We do join with
11  what Mr. Horwitz is saying, but if we're getting down to
12  the second layer analysis how it's going to be applied
13  against specific parties, I think you will see some
14  divergence.
15        THE COURT:  All right.  So you agree with
16  Mr. Horwitz that no discovery should be taken, but if the
17  Court allows it, you have some particular --
18        MR. HAILS:  There are additional issues to be
19  addressed.  Correct.
20        THE COURT:  The question I have about what has
21  been suggested so far, Mr. Hails, is that if the Court goes
22  that route, what I think is being proposed by Honeywell is
23  to give the opportunity to exist between Honeywell and the
24  customer defendants, that, for unique circumstances, to see
25  if they can come up with something as to what the limited

22

1  discovery would be and who had certain unique circumstances
2  because the indication from Honeywell, from Mr. Woods is
3  that he recognizes that one size does not fit all.
4          MR. HAILS:  I think I understand you correctly.
5  That's right.  And I think these are to be addressed with
6  Mr. Woods and we can come up with some type of proposal or
7  at least narrow the issues to be resolved.
8          THE COURT:  All right.  Is there anybody on the
9  phone who wants to say anything at this time?
10         MR. VEZEAU:  Your Honor, this is Tim Vezeau.
11 Thank you.
12         Sanyo, much like Sony, has peculiar circum-
13 stances and I think that Matt did address that.  That would
14 constrain, if you will, any discovery from its customers
15 since we have settled.  So I think if that was envisioned by
16 his comments, I was going to address that, but I don't think
17 it's going to be necessary, if I understand his comments.
18         THE COURT:  All right.  With that caveat,
19 Mr. Rovner, are you going to be addressing concerns
20 regarding the manufacturer defendants of the group?
21         MR. ROVNER:  Yes, Your Honor.
22         THE COURT:  All right.
23         MR. ROVNER:  Your Honor, on behalf of the
24 manufacturer defendants, for the most part we agree with
25 Mr. Woods, but there is a few clarifications we would like

23

1  to make.
2          We have reached agreement or we thought we had
3  reached agreement on a three-month extension of most dates.
4  We're talking about extension of fact discovery, extension
5  on the claim construction briefing, those types of things.
6  We have left open all of the other dates for like for
7  trial, pretrial hearing, claim construction hearing,
8  summary judgment hearing, but we did reach agreement on
9  the three-month extension of dates that the parties had
10 obligations in which to meet.
11         Ironically, the three-month extension came at
12 Mr. Woods request.  Some time ago, about four weeks ago,
13 five weeks ago, he contacted manufacturer defendants and
14 said let's propose.  We proposed a three-month extension.
15 We got together we agreed.
16         THE COURT:  Let me ask you, do you have a
17 problem with the six-month extension?
18         MR. ROVNER:  Well, we do have a problem with the
19 six-month extension.
20         THE COURT:  What is the problem?
21         MR. ROVNER:  The problem is we don't think it's
22 necessary.  This case has been going on for a long time, and
23 we're not putting blame on anyone, but at some point we need
24 to get this done.  And while we agreed to three months and
25 probably, without, while we have not been able to confer

24

1  with the other manufacturer defendants, we feel something
2  along the lines of maybe four months, maybe a little bit,
3  somewhere around four months would probably be okay.  We're
4  already, at this point, three months takes us to a fact
5  discovery cutoff of August 31.  I think I could get
6  agreement from our side we would take it to about the end of
7  September, maybe into October, but six months we just don't
8  think is necessary.
9          THE COURT:  Hold on for one second, Phil.
10         And maybe because I don't have a scheduling
11 order in front of me right now, but let's just talk about
12 the three-month extension that takes you to August.  What
13 was going to be on the schedule after that?
14         MR. ROVNER:  After that would be briefing on
15 claim construction and summary judgment.  For the most part,
16 that would be it.  And expert discovery.  Expert discovery
17 would begin, as I understand it, 90 days before the close of
18 fact discovery, with the exception of expert discovery and
19 reports on infringement and damages, which the parties have
20 agreed to defer.  We somewhat differ on how long we will
21 defer them to.  We believe we should defer issues until
22 after the first trial, Mr. Woods says it should be some
23 other time, but that is basically a side issue.
24         THE COURT:  So the discovery on, the discovery
25 that would go forward is discovery you're saying would be

25

1  done under the present situation where the parties agree
2  that would be done some time in August and that would
3  include expert discovery on invalidity?
4          MR. ROVNER:  On all issues other than
5  infringement and damages.
6          THE COURT:  Okay.  And then you would have your
7  briefing on claim constructions and the purpose of validity
8  and then you would also have your briefing on summary
9  judgment?
10         MR. ROVNER:  Well, claim construction and -- on
11 all issues, yes, and summary judgment, yes.
12         THE COURT:  And the first thing is going to go
13 to trial is the invalidity aspect of this case?
14         MR. ROVNER:  Yes.
15         THE COURT:  Okay.  And your problem going out to
16 six months takes you until when?  What would it take you to
17 if it was extended for six months?
18         MR. ROVNER:  The end of fact discovery would
19 be three months from August 31 so it would be the end of
20 November.
21         THE COURT:  Does anybody in this courtroom think
22 we're going to have a District Court Judge before the end of
23 November 2007?
24         Does anybody from Delaware think we're going to
25 have a District Court Judge before the end of November 2007?

United States District Court - Honorable Mary Pat Thynge

26

```
 1          (Laughter.)
 2       THE COURT:  Off the record.
 3          (Brief discussion held off the record.)
 4       THE COURT:  There is a part of me that sits
 5  there and says I understand the concerns that everybody has
 6  but I'm kind of sitting here going let's hurry up and rush
 7  and get all this briefing done and put it out there and have
 8  it sit and wait.
 9       MR. ROVNER:  Well, Your Honor, to answer your
10  question, it's not so much that what goal are we shooting
11  for and we don't want to just get it done and wait, but
12  our point is that the six months, if you have six months,
13  things tend to enlarge unnecessarily.  We don't believe
14  that the discovery that Mr. Woods seeks now is really any
15  different than what he sought when he asked for the
16  three-month extension and he has raised some issues about
17  substantial compliance with document production, those type
18  of issues.  And maybe he has some, a point or two on some of
19  those issues, but three months will take care of it.  And if
20  we go to four, then I think we can live with that.  We just
21  don't think expanding the extension, doubling the proposed
22  extension is necessary regardless of what we do at the end
23  of that three-month or six-month period.
24       THE COURT:  Is your concern that if the Court
25  gives the extension that is requested by Honeywell, that at
```

27

```
 1  the end of that time period, whatever that time period is,
 2  that we'll just be revisiting that issue again or is your
 3  concern something else?
 4       MR. ROVNER:  No, I agree with Mr. Woods we don't
 5  want to come to the court every few months asking for more
 6  time and having to reset all the dates.  We agree on that
 7  point.  I don't think that we need six months and that we'll
 8  be coming back to Your Honor.  I don't think we'll need an
 9  extension, if we get an extension of four months or four
10  and-a-half months, we won't be coming back to Your Honor.  I
11  think that is plenty of time.
12       That's my point.  We'd like to get, once the
13  discovery is done, once the expert discovery is done and the
14  briefing is done, then we'll be ready.  And I do think by
15  that time we will have a judge assigned and we'll be off and
16  running and we'll have all those other things done.  If we
17  extend the fact discovery cutoff until the end of November,
18  briefing and all the other issues will be later on, then --
19       THE COURT:  So your concern is that briefing
20  would be pushed out and probably not completed until maybe
21  January 2008?
22       MR. ROVNER:  Or later, yes.
23       THE COURT:  Or later.  All right.
24       MR. ROVNER:  But we can live with -- I mean we
25  want to meet Mr. Woods halfway.  We thought his extension,
```

28

```
 1  his request for three months was reasonable.  He now asks
 2  for six, so I mean something like four to four and-a-half
 3  seems to be a fairer compromise.
 4       THE COURT:  I understand what you are saying.
 5  Okay.  Was there any other point that you wish to bring up?
 6       MR. ROVNER:  Other than the extension of
 7  time, we agreed basically upon deferring those two expert
 8  reports.  We do disagree on the disclosing opinions of
 9  counsel.  We think that setting a date during this phase
10  really is unnecessary with all the things that relate to
11  that decision.  We think that since willful infringement
12  clearly is not an issue in the first trial, we think that
13  the defendants' election should be some time later, should
14  be deferred, there is no reason not to defer it and we think
15  after the first trial is an appropriate time, where we will
16  be completing most likely expert discovery on infringement
17  issues as well.  So we think that is an appropriate time.
18  And Mr. Woods really has presented no reason why it needs
19  to go now.
20       THE COURT:  I'm just thinking aloud right now,
21  and this probably is a question that I'm throwing up to both
22  Phil and Matt.  And that is, what was the thought or did
23  anybody sit there and picture, after you get done with this
24  phase, do you go for JMOL, depending upon what the outcome
25  is, and then we do that for awhile and then maybe -- I'm
```

29

```
 1  assuming that the patents are held valid on that phase, the
 2  first phase.  Let's assume the patents are held valid and so
 3  we do JMOLs.  And how many years is it before we actually
 4  have a case on infringement?
 5       MR. ROVNER:  Well, that is one thing.  And
 6  people in this room can correct me if I'm wrong.  I believe
 7  that Judge Jordan did leave that issue to be decided at a
 8  later date.  The issues that were raised with him at that
 9  time in May of '05 was how do we get to the first trial, who
10  was at the first trial, and what those issues are.  And that
11  is what he decided.
12       With respect to where we go from there, my
13  recollection is that we were going to proceed with the other
14  issues after the first trial and that wouldn't be awaiting
15  all the other issues that might result in a jury decision.
16       THE COURT:  In a jury trial?
17       MR. ROVNER:  A bench trial.
18       THE COURT:  Well --
19       MR. ROVNER:  In a jury trial.  I'm sorry.
20       THE COURT:  In a jury trial.  This is not a
21  bench trial, from what I understand.
22       MR. ROVNER:  Correct.
23       THE COURT:  You can make it a bench trial, if
24  you want, but I don't know if I would be one to necessarily
25  give that to somebody.  But after the first phase is done, I
```

30

1    guess one resolution of it, a practical resolution is that
2    if the defendants, the manufacturing defendants are
3    unsuccessful on a showing that the patent is invalid, then
4    that doesn't make any sense to me that you wait until you
5    get done with the whole rigamarole of post-trial briefing.
6    It seems to me that you continue to move on to the next
7    phase and it goes to the infringement, but that is a closer
8    call. It's quite conceivable that you can brief until the
9    cows come home that the patents, you disagree with the jury
10   that they are valid and then get to the other phase of the
11   case sooner rather than later.
12          I personally don't see any reason, because
13   you've got a decision and somebody has got a pretty tough
14   road to hoe, to say that the decision was wrong. That is my
15   personal two cents and I'll gladly tell whoever comes on the
16   bench afterwards why I had that two-cent feeling.
17          MR. ROVNER: I think that is what the group felt
18   as well.
19          THE COURT: Okay.
20          MR. WOODS: The only thing I would add to that,
21   Your Honor, is the fact that clearly discovery, although the
22   first trial was envisioned to be on validity issues only,
23   discovery was on all issues and so there was never any sense
24   of bifurcation of discovery, which is again part of the
25   reason we believe all issues should be discovered now so

31

1    that we don't build in additional periods of delay down the
2    road.
3          THE COURT: Well, what is left on the other
4    issues?
5          MR. WOODS: I'm sorry, Your Honor? Maybe I'm
6    not following.
7          THE COURT: All right. What are left? I know
8    that you have been taking discovery in this case. I know
9    that you've made trips over to Japan and other Asian
10   countries so the feeling I was getting is that there was a
11   tremendous amount of discovery going on that covered both
12   infringement and validity issues.
13          MR. WOODS: I think that is correct, Your Honor.
14   I think discovery is clearly progressing on all fronts right
15   now and I think that the only issues in the current vision
16   of the parties, setting aside the difference on the time
17   line, would be some time frame for the filing and submission
18   of expert reports on infringement.
19          THE COURT: That's something that could
20   probably be done relatively quickly. I mean there is nobody
21   sitting in this courtroom right now that hasn't lined up an
22   expert on all the points. There is somebody that you have
23   consulted with because there are just too many parties in
24   this case, and that expert, those experts are in a bad way.
25          MR. ROVNER: Your Honor, we've agreed to defer

32

1    those experts reports. The only issue is --
2          THE COURT: No. No.
3          MR. ROVNER: I think what Mr. Woods was trying
4    to make clear is we are not deferring discovery on those
5    issues of infringement or damages. They are going forward.
6          THE COURT: No, no, I understand. I understand
7    that. But it would seem to me that is something that could
8    be done relatively quickly. Experts usually can get reports
9    done, and I just found out recently how they get them done
10   so quickly and why they're 90 pages long. I'll reserve my
11   comments about what I thought about that when I found it
12   out, but in any event, okay. So the issue here is now three
13   months vs. six months and the issue on does Honeywell get
14   anything from the customers regarding commercial success.
15   And the other issue was the issue of --
16          MR. WOODS: The opinions of counsel.
17          THE COURT: -- opinions of counsel. Let me
18   ask you this: Why do you need opinions of counsel now?
19          MR. WOODS: Your Honor, if we're going to do
20   discovery both on willful infringement and under the DSU
21   case, the Federal Circuit acknowledged that whether or
22   not you get an opinion of counsel has a bearing on the
23   inducement issues that we may be dealing with. So if we
24   don't get those opinions now and the discovery closes, it's
25   going to have to occur some time because it's clearly

33

1    relevant under the new DSU standard. One of the factors
2    that the Federal Circuit expressly talked about was a
3    defendant got an opinion of counsel and it was a good
4    opinion of counsel, et cetera, et cetera.
5          THE COURT: Well, let me just focus that. If
6    they're opposing it, and I happen to agree with them, I
7    think it would be a tough road for them to hoe and say you
8    can get it later on.
9          MR. ROVNER: We're not saying that. We're
10   willing perfectly to give discovery.
11          THE COURT: The timing and when that discovery
12   occurs, that is in dispute.
13          MR. ROVNER: Exactly.
14          THE COURT: Not whether it will occur.
15          MR. ROVNER: Correct.
16          MR. WOODS: And that is the concern here, Your
17   Honor, there was never a sense of bifurcation of discovery.
18   And if we don't get it at some point before the discovery
19   period ends, whether that is three months, four months or
20   six months, we're essentially saying there is going to have
21   to be another period at some point in time, perhaps even
22   before infringement, depending upon how infringement issues
23   that we talked about in January get resolved.
24          THE COURT: Okay. I understand what you are
25   saying. Because your concern is once, whatever happens,

34

1 whenever you get to trial on the validity issues, and if the
2 outcome is in your favor, you want to be able to move on to
3 a trial or quickly into that framework of getting the other
4 issues, the infringement and damage issues resolved.
5          MR. WOODS:  Absolutely, Your Honor.
6          THE COURT:  All right.
7          MR. ROVNER:  And we agree with that.  We just
8 believe that the period should be -- he is entitled to it,
9 to pursue that and we just don't believe it's appropriate
10 now.  But we agree that after the first trial, assuming it
11 goes his way, that we would entertain that.
12          THE COURT:  All right.  I understand.
13          MR. ROVNER:  And those are the only other issues
14 that we have as a general manufacturer defendant group.
15          THE COURT:  And how much did getting the willful
16 opinions factor into the need for the six months?
17          MR. WOODS:  I would think that is probably on
18 the tail end, Your Honor.  I think that is probably the
19 smaller portion.  I think our concern is that if we're not
20 getting complete discovery document productions until
21 March and if we are going to get some limits discovery on
22 customers, that will take some time to gin up, and I think
23 most of what we're asking for is based on those two issues.
24          THE COURT:  All right.
25          MR. ROVNER:  Just one last thing.  The first

35

1 time that the issue of willful infringement and opinions of
2 counsel came up was in Mr. Woods' letter of February 14th,
3 the first time we ever heard of it.
4          MR. WOODS:  No, that's not true, Your Honor.
5          MR. ROVNER:  That's what I heard.
6          MR. WOODS:  I raised this issue in a letter of
7 December 31st or December 30th, excuse me, when I asked all
8 manufacturer defendants to tell me what their position was
9 and we raised it again.
10          MR. ROVNER:  I don't recall that, but if it's
11 December 30, it still is a recent phenomenon.  Thank you.
12          THE COURT:  Now, did the manufacturing
13 defendants have any comment about Mr. Woods' comments
14 concerning commercial success?
15          MR. ROVNER:  Well, we don't.
16          THE COURT:  I mean one of the things that was
17 represented by the customer defendants was that, gee, the
18 manufacturing defendants are going to have all this
19 information.  It's going to be no problem.
20          MR. ROVNER:  Well, we don't that will be a
21 problem.  I'll let the individual manufacturer defendants
22 speak on that issue, but we agree with the manufacturer
23 defendants that the stay should not be lifted.
24          THE COURT:  Why?
25          MR. ROVNER:  Well, for the reason Mr. Horwitz

36

1 gave, it's unnecessary.
2          THE COURT:  That's the only reason that as a
3 group you have?
4          MR. ROVNER:  Well, we think that -- well, my
5 view is; and I've not shared this, we have not discussed
6 this; but what I have tried to say is that this issue that
7 Mr. Woods is raising now was an issue that apparently he had
8 all along and had never raised it before, never requested
9 it in the context of a request for a three-month extension.
10 The manufacturer defendants are consistent.  We want to get
11 this case resolved.  We want discovery to end.  We don't
12 want this used as a means to enlarge discovery.  We don't
13 think it's necessary for the reasons that Mr. Horwitz
14 mentioned.
15          MR. WOODS:  Your Honor, if I may.
16          THE COURT:  Yes.
17          MR. WOODS:  It was raised at literally the first
18 status conference in front of Judge Jordan on May 16, 2005.
19 These are the submissions that I shared with Mr. Horwitz in
20 the letter that I sent to all customer and manufacturer
21 defendants.  It was expressly raised by Mr. Lueck on the
22 pages that I provided to you there that were copied to
23 opposing counsel.  Mr. Horwitz expressly addressed it, as
24 is highlighted there, and the judge in the following page
25 expressly stated he was reserving that issue for another

37

1 day.  This is, by no means, the first time Honeywell has
2 raised this issue.
3          MR. ROVNER:  Your Honor, let me just correct
4 what Mr. Woods apparently thinks I said.  I meant it was
5 never raised when he asked for the three-month extension.
6          THE COURT:  And that --
7          MR. ROVNER:  It certainly was raised in 2005.
8          THE COURT:  And that I understood.  I understand
9 that's what your comments were.
10          MR. ROVNER:  Okay.  Thank you.
11          THE COURT:  I'm going to take a couple minutes,
12 counsel, if you don't mind, for me to read through this.
13 Let me at least read through it, Mr. Horwitz, before you
14 make any comments.
15          MR. HORWITZ:  Okay.
16          THE COURT:  You don't have to stand.  You can
17 sit.
18          (Pause.)
19          THE COURT:  Okay.  Where are pages 41 through
20 45?  It jumps from page 41 to 46.
21          MR. WOODS:  Your Honor, I did give you the
22 excerpts because those are the ones I cited to opposing
23 counsel in my letter.  I do not believe pages 41 through 45,
24 I do not have them because I do not believe they addressed
25 the specific topic, it went on to other issues afterwards,

**38**

1  but I'm sure Mr. Horwitz will correct me. I know in the
2  responsive letter I got from Mr. Horwitz, I did not see any
3  counter citations, but there may have in fact been some
4  other colloquy.
5      MR. HORWITZ: Your Honor, I have the full
6  transcript, if you would like to see it.
7      THE COURT: Oh, I would love to see it. Thank
8  you.
9      MR. HORWITZ: My only point, Your Honor, was
10 just to say that what we said was something to be
11 considered later, just as Mr. Wood said, and we considered
12 it and we don't think it's appropriate. So that's the only
13 comment I was going to make based on the comments that I
14 made and that Judge Jordan made. It was never a concession
15 that it would be appropriate later. It was a discussion
16 that it wasn't appropriate to consider then but that we
17 would talk about it later.
18     THE COURT: Don't worry, I read the stuff that
19 was before, not just the stuff that was highlighted.
20     I like Judge Jordan's comments on page 43: "I
21 say this with some trepidation. Is there anyone else who
22 feels like they need to be heard on the same motion?"
23     (Pause.)
24     THE COURT: Under the present schedule, when is
25 the trial date for the first phase?

**39**

1      MR. ROVNER: There is no trial date.
2      THE COURT: There is no trial date. Well, when
3  was it?
4      MR. WOODS: It was February. It was the end of
5  January, beginning of February, Your Honor, of '08.
6      THE COURT: Of '08. Okay. Thank you for that.
7      MR. ROVNER: Your Honor, I think there are some
8  others who want to speak on the commercial success issue.
9      THE COURT: Sure. I think I have a very good
10 flavor of what he was saying.
11     MR. ROSENTHAL: Your Honor, Lawrence Rosenthal
12 for Fuji.
13     The commercial success issue is an interesting
14 technical legal issue in this case because we have a patent
15 that was taken out in 1993 and first enforced at the end
16 of 2004. We also have a lot of defendants, including my
17 client, who contend that there were many noninfringing
18 arrangements available to them if they had known about the
19 patent and had warning that there was a risk. And, in fact,
20 some defendants we understand have adopted what they contend
21 are noninfringing structures. So I think that one of the in
22 limine motions before the first trial is going to be how
23 much of this so-called commercial success, whether it be the
24 customers or by the manufacturers, is even relevant to the
25 issue under Graham v Deere.

**40**

1      THE COURT: And I think you end up possibly
2  losing that motion and having it put before the jury because
3  I do think what I heard on that part of your argument and
4  the argument that I heard before really goes to it's more
5  likely a jury question than not.
6      MR. ROSENTHAL: Well, Your Honor, it's even
7  more complicated than that. This is not only the time frame
8  of the noninfringing uses. The claim is directed to a
9  combination, one element of which is rotating a lens array
10 for the purpose of avoiding moire.
11     THE COURT: Sure.
12     MR. ROSENTHAL: But the feature of the structure
13 which creates the brightness, which creates the energy,
14 usage which affects batteries is in the prior art. That's
15 the Avalet reference (phonetic). And again I think, and
16 this is perhaps an even stronger argument, the commercial --
17 the sale of a product, the sale of one of these modules
18 for the purpose of enhancing brightness or reducing power
19 loss is not what the claim protects. The claim protects
20 a combination that include the additional step because
21 during prosecution, they actually gave up the combination
22 described in the patent which is cited for this argument
23 that the patent talks about enhancing brightness, saving
24 power. That part of the invention was found not patentable
25 and, therefore, I think that frankly, Your Honor, it's my

**41**

1  view that that position is a lot stronger than Your Honor
2  has indicated and is a great opportunity for jury prejudice
3  which goes to the issue of whether it should be presented
4  to the jury because the dog-and-pony show about commercial
5  success takes away from the real issues in this case on
6  validity and otherwise. So it's an issue that is going to
7  have to be resolved by the trier of fact when and if --
8  but at least by the judge at the end of the day.
9      I think commercial success is not as clear and
10 relevant as made. And I think when we get to the customers
11 sales, we are light years beyond any area of relevance. We
12 are carrying into something that has nothing at all to do
13 with the patent and whether or not a customer specifies that
14 I want something of a certain brightness or certain viewing
15 angle, that is something that can be achieved by a number
16 of ways. And that was I think Mr. Horwitz's observation
17 on behalf of the customers that it's not the patent or the
18 claim that dictates what happens, it's how the manufacturer
19 carries out that request.
20     So I question, although I'm participating in
21 discovery on sales and we'll resist the use of that in a
22 validity trial, but to go to the next step, the customers,
23 is to carry it way beyond any rationale ambit and the mere
24 fact that, as I said, a battery of a lower voltage is
25 capable of being used or a lighter weight has nothing at

42

1   all to do with the commercial success issue in this case.
2   And to the extent that it does, it can be dealt with with
3   the manufacturer defendants.
4           THE COURT:  How?  How is it dealt with with the
5   manufacturer defendants?
6           MR. ROSENTHAL:  The manufacturer defendants
7   are going to tell you, are capable of saying that if I may
8   ask to have a battery, a device that requires X watts of
9   power or amps of current, this is how I achieve that result.
10  And I think to the extent that customers specify, the
11  manufacturer can say yes, a customer says this.  And the
12  documents which were produced or cited to and not attached
13  in the letter, the discovery documents, what they will say
14  to you is a customer wants something of a certain luminance,
15  a certain uniformity, a certain viewing angle, but it
16  doesn't say how to do it.  None of the documents produced
17  or cited to, and I collected them, none of them say that.
18  And, in fact, I have a set here.
19          The other point from the viewpoint of the
20  manufacturer defendants is one of cost.  Three months vs.
21  six months, discovery of another 30 people, 20 or 10,
22  however many defendants only cost the people who are
23  participating in this case more money.  Lawyers have a
24  way of occupying the time and space and that's one of the
25  reasons, one of the motivations for why we agreed to the

43

1   three months, four months, fine, but we don't want to
2   carry this out forever.  We really do want to bring this
3   case to a judgment.  Because we think however it comes out,
4   whether the decision on validity is for us or against us,
5   we're going to know a lot about infringement which is going
6   to affect the amount of product that is at issue, the number
7   of defendants that are at issue.  It has consequences and
8   ramifications beyond merely validity and I think that is
9   what Judge Jordan appreciated.  That after we go through
10  this step, there is going to be a great big fallout, maybe a
11  race to take licenses or a race to go away.
12          So I think that it does affect the manufacturer
13  defendants if we open up the discovery to the horde.  In
14  this case, it's a relative horde of customers and it does
15  affect the manufacturer defendants how long we extend the
16  discovery period.
17          Now, if we don't go to the customers, the six
18  months is only occupied among us, maybe it's not as painful.
19  But if we do the combination of six months out plus bringing
20  in discovery of another 15 or 20 parties, I think it just
21  is a burden on the manufacturer defendants, which is unfair;
22  especially since this is an issue that could have been
23  raised last year, could have been raised in June, July,
24  August, September of 2005.
25          THE COURT:  And it was actually raised on May

44

1   16th, 2005.
2           MR. ROSENTHAL:  No.  It was raised, but if one
3   reads the transcript the way Honeywell chooses to raise it,
4   that it was contemplated it would be raised again, why wait
5   until now?  Discovery takes time.  Everybody knows it
6   takes time.  Why not race to recapture the customers for
7   the purpose of discovery?  And the reason I think is that I
8   don't think Judge Jordan looked very far along from where we
9   are.
10          THE COURT:  I don't necessarily agree with
11  you totally on that point, but at the end of May 16th
12  conference, you guys were supposed to get together and
13  resolve some stuff and I don't know how successful you
14  were in doing that.
15          MR. ROSENTHAL:  Well, I, for one, have no
16  recollection of being approached on the discovery of the
17  customers.
18          THE COURT:  No, no, no.  But what had ended at
19  that conference on May 16th at 2005 was there are certain
20  things that everybody had to do.  They were going to make
21  suggestions.  They were going to come up with a proposal.
22  Judge Jordan gave you further guidance about how far out it
23  was going to be for trial, that type of thing.  I have no
24  idea how long that took before you started bringing up,
25  rehashing issues if you hadn't even gotten to the stage of

45

1   having a schedule.
2           MR. ROSENTHAL:  Well, Your Honor, in March of
3   '06, all the discovery that the judge contemplated was
4   completed.  The parties were sorted out.  We knew who the
5   manufacturer defendants were.  We knew who the customer
6   defendants were.  We knew who the hybrids were.  And at that
7   point, Judge Jordan said let's have a schedule.  It took
8   probably a month for the parties to come up with what they
9   agreed to and what they didn't.  In point of fact, there
10  were three versions that were given to the judge.
11          THE COURT:  I know.
12          MR. ROSENTHAL:  Three parallel versions.
13          THE COURT:  I know.
14          MR. ROSENTHAL:  And at the end of the day, there
15  was a telephone conference with the judge and he picked and
16  chose what he wanted and that's in a March '06 transcript.
17  So in terms of the discovery that was had of the customers,
18  which was initially contemplated in May of '05, that did go
19  forward.
20          THE COURT:  I know that.
21          MR. ROSENTHAL:  And that went forward to a
22  mutually satisfactory result because it resulted in sorting
23  out who the manufacturers were.  It didn't result as Judge
24  Jordan repeatedly resisted in the shifting of the burden of
25  naming the products from Honeywell to the defendants, but it

46

1   certainly did result in a resorting out of the case of the
2   parties and the present scheme that we're proceeding on.
3           Thank you, Your Honor.
4           THE COURT:  Does anybody else wish to address
5   the Court?  Does anybody on the phone wish to address the
6   Court?  Are you still there?
7           MR. VEZEAU:  Yes, Your Honor.  At least on my
8   end.  This is Tim Vezeau.
9           THE COURT:  Okay.
10          MR. OLLIS:  Your Honor, this is Andy Ollis on
11  behalf of Optrex.  I'd like to very briefly follow-up on
12  Larry's comments.
13          First, with respect to the three-month
14  extension, I don't think we had a specific discussion that I
15  was aware of, although I wasn't in on the last discussion
16  with counsel as to potentially six months.  But from the
17  perspective of Optrex, I think the other manufacturing
18  defendants who are quite actively participating in the case
19  just wanted to again echo the sentiments expressed that
20  more time really just results in more costs to our clients
21  and, consequently, we would like to keep it as close to
22  three months as possible.
23          With respect to the situation in fact that there
24  have been some documents produced more recently, and without
25  getting into detailed discussions, in the Optrex situation

47

1   for example, there is a follow-up 30(b)(6) deposition
2   scheduled in approximately the middle of April.  As I
3   understand, the schedule that has been agreed upon already
4   between the parties contemplates expert reports about June
5   1st on the issues of invalidity and unenforceability.
6           At this point, I'm not aware of that Honeywell
7   would be submitting any expert reports, perhaps Mr. Woods
8   can correct me if I'm wrong, at that time.  So that the
9   first expert report --
10          THE COURT:  Not on the first go-around, I
11  wouldn't expect.
12          MR. OLLIS:  Right, there was an issue I'm not
13  appreciating.  And so their first expert report in fact
14  wouldn't be submitted until the middle of July, assuming
15  that three-month extension, and that still seems like we're
16  quite a ways from that and I would hope that would be a
17  sufficient amount of time for Honeywell to accomplish what
18  it needs.
19          I won't say too much more.  I think commercial
20  success has been addressed fairly extensively.  We support
21  what Mr. Rosenthal and Mr. Horwitz stated.  Optrex agrees
22  with the basic proposition, the decision as to what
23  structure is ultimately contained in the modules at issue
24  is, at least from Optrex's perspective, something that
25  Optrex decides.  There are indeed performance specifications

48

1   that are provided by the customers and costs, and there are
2   discussions about those issues, but the actual structural
3   elements that are at issue here in these modules and that
4   information is all in the hands of the customer defendants.
5           MR. ROVNER:  No.
6           THE COURT:  All in the hands of the customer
7   defendants?
8           MR. OLLIS:  Excuse me, manufacturing defendants.
9   Thank you.  And, consequently, we also agree with the view
10  that looking to further appeal to the customer defendants is
11  just really not warranted in this instance.
12          THE COURT:  All right.  If you want to do any
13  follow-up, Matt, that's fine.
14          MR. WOODS:  I'll be very brief, Your Honor.  But
15  I think there is just a point that is worth bringing home
16  here.
17          When Judge Jordan ordered the defendants to
18  make their document production substantially complete by
19  October 31st of last year, it was with a scheduling order
20  that said that would give us ten months to do discovery,
21  because it was set to end at that point in time, or eight
22  months, excuse me.  At this point in time, that has been
23  eroded because document productions are still going on.
24          Now, Mr. Rosenthal pointed out that all the
25  documents were produced and everything is now in our hands.

49

1   I'm switching topics now to commercial success.
2           THE COURT:  Okay.
3           MR. WOODS:  So from a timing standpoint, we
4   simply want to preserve the same amount, whatever.  Whenever
5   the manufacturer defendants want to tell us we're done,
6   we're done.  And I asked them that specific question when we
7   had a meet and confer:  Are you done?  When they tell us
8   we're done, we're saying we should have the same amount of
9   time between that and the discovery cutoff as was originally
10  calculated by looking at October 31st to whenever the
11  original scheduling order was.
12          THE COURT:  And that was October 31 of 2000 --
13          MR. WOODS:  Of 2005.
14          THE COURT:  Okay.
15          MR. WOODS:  2006.  Excuse me.  It makes sense to
16  preserve that.  I think by six months, that would actually
17  even cut us a little bit quicker.
18          THE COURT:  So what you are saying is that the
19  manufacturing defendants haven't told you they've done
20  producing all these documents?
21          MR. WOODS:  We are have not received definitive.
22  Some defendants have.  For example, I believe Fuji has made
23  a declarative statement to that effect.
24          MR. ROSENTHAL:  Yes, Your Honor, substantial,
25  but one of the difficulties at least that we've experienced

50

1  is a request to produce information about new products.  And
2  we hope next week or the week after, we will have carried
3  out that.  We found documents that were defectively
4  produced.  We're curing that.  Somebody found notebooks,
5  we're producing them.  But I think the operative word is
6  "substantial" and I think that we are substantial.
7          THE COURT:  And I'm not saying that is 100
8  percent.  Nobody can say that about substantial.
9          MR. WOODS:  I would agree, Your Honor.  Nobody
10 can say it has to be 100 percent.  But 20,000, 10,000,
11 that's kind of what we've seen since we originally proposed
12 three months.
13         THE COURT:  Well, let me back up a little bit,
14 Matt.  Explain to me what you are going to get or what you
15 would be looking for.  I'm having a hard time understanding
16 this commercial success argument that you need this
17 information or what you need from the customer.
18         MR. WOODS:  I'll switch to that, Your Honor.
19 Mr. Rosenthal gave a very good example about how he has his
20 client.  In his case, it's actually he is on both sides of
21 the equation.  Fuji is kind of unique because they're a
22 hybrid here, but what you often see as we're going through
23 the documents is you will see a specification that says we
24 want a particular luminance, we want a particular viewing
25 angle and, in some stages, we see we want a particular power

51

1  consumption.
2          We strongly disagree with the characterization
3  that Mr. Horwitz and Mr. Rovner and Mr. Rosenthal have said
4  with regard to the scope of this patent, statements made in
5  the prosecution history.  I'm not going to get to that right
6  now, Your Honor.  I just want the record very clear we
7  disagree with that.
8          What is clear is that the patent itself and
9  the articles that were written about the patent, which the
10 defendants have spent a lot of time talking about with our
11 inventors, all talk about the fact that when you use this
12 invention, it's going to translate to a lot of different
13 things, cleaner image, better brightness, battery power
14 savings, smaller devices, all of those things.
15         Not a single document that we have seen to date,
16 nor any testimony that we've been unable to you uncover to
17 date has been able to tell us, okay, all right.  So you are
18 using this module.  How much smaller of a battery do you
19 need?  Can you now afford?  And smaller is better.  Now, if
20 we're all willing to stipulate on the record here that use
21 of this invention allowed you to use smaller batteries,
22 smaller batteries means less weight, customers like those
23 issues, then maybe we can move forward, but I don't think
24 that is going to happen, I don't think that is what they're
25 prepared to do.  And so what really is the focal point

52

1  here is who is going to be able to say that by using this
2  invention, I don't have to use a big, fat battery.  I can
3  use a smaller, thinner battery and customers will like it.
4          THE COURT:  This is where I'm having the
5  problem.  The connection with you is that the manufacturers
6  are the one who decides what goes into the module to
7  accomplish what the customers are asking for.  How do the
8  customers know it's even your product or your invention that
9  is in there?  I mean if the customers are saying you've
10 got to meet these standards, standard X for brightness,
11 standard J for battery consumption, why aren't you getting
12 all the commercial success information in any event from
13 the manufacturers?
14         To the extent a manufacturer sits there and
15 says I don't get any information from my customers and I
16 just build them the way I want to, that is kind of an
17 interesting situation.  But the read I have gotten from
18 the manufacturers is our customers say we need these
19 following characteristics.  And you need to make sure
20 that the products, the modules you give us have these
21 characteristics that we'll plop in or we may plop in to
22 our product, we may not, and it could be an end user.  And
23 it's going to be up to you to show the nexus that your
24 invention accomplished this.  So if it accomplishes that
25 and that is what the customers want, isn't that a showing

53

1  that the customers keep buying, it's commercially
2  successful so what do you need to get from the customers?
3          MR. WOODS:  What we don't have, we've got part
4  of that equation, Your Honor and I agree we're going to need
5  to show a nexus and the defendants.  The manufacturer
6  defendants have part of that nexus right now.
7          THE COURT:  What part of the nexus is missing?
8          MR. WOODS:  All right.  A good example, a
9  tangible example is, what, how much smaller of a battery
10 can you use in a device because of the power savings of
11 this display.
12         THE COURT:  Well, who decides that?
13         MR. WOODS:  That is the customers' decision.
14         THE COURT:  Okay.  But if you are saying to me
15 this is the standard, I don't want this product to output
16 more than whatever it is, I have no idea what the battery
17 measurements are, that you've got to give me a module that
18 lets me run on a battery for ten hours or the battery
19 would have a life expectancy of 20 hours or whatever the
20 measurement is, doesn't that answer your question?
21         MR. WOODS:  Your Honor, we have seen no
22 documents that go to that level.  They will say we need this
23 kind of power output, stop.  It doesn't translate into the
24 size of the battery, the dimensionalities of the battery
25 and the impact of the battery on the size of the battery on

54

1  the sales of what customers want out there.
2       A similar analysis applies to luminance.  Yes,
3  we have a piece of information with regard to the
4  manufacturer defendants saying our displays give this amount
5  of luminance, but that is a technical evaluation.  To link
6  up the commercial success, you need to be able to ask the
7  people who are selling the devices to the consuming public.
8  Why is that important?  Why is that display important and
9  what would the impact be if it was different?  What would be
10 the impact if you had a display with moire?  Would it make a
11 difference?  Because as Mr. Rosenthal said, I'm going to get
12 confronted, whether this is tried in January or whatever,
13 I'm going to get confronted with, oh, your invention has
14 nothing to do with it.  Customers don't care about it.
15 There are many other ways of doing this.
16      The only way I can confront that absent some
17 types of stipulations or something is to be able to say no,
18 no, no, the customer defendants are using these types of
19 modules for a very specific reasons.  And, yes, they only
20 have part of the equation.  Manufacturer defendants have
21 part of the equation.  We need to link it up.
22      In terms of the amount of discovery, at least
23 on the manufacturers' standpoint, the parties have all
24 agreed or the judge, Judge Jordan ordered specific limits
25 on discovery so that is going to stay static regardless of

55

1  whether we accommodate it over three months, four months,
2  five months, whatever, that discovery.
3       So what really focused it on the customer
4  defendants, and I fully acknowledge, as Judge Jordan
5  acknowledged to Mr. Lueck, the burden is on us.  The problem
6  we're having right now is that it's very tough to even get
7  past the discussion when the defendants are saying under no
8  circumstances.  And so that is why our view is if you say
9  we could get some guidance, that we can at least explore
10 this and work with them to try to keep it very focused and
11 narrow.  The burden is on Honeywell.  I see a lot of heads
12 smiling and nodding, and we acknowledge that.  The burden
13 is on us.  But we think to deny us the ability to link up
14 this testimony and show in fact how the technical meets
15 the market and meets the commercial, we're not going to be
16 able to complete commercial success and, more importantly,
17 we're going to be denied a very important aspect of what
18 we think is why this invention has become the standard in
19 the industry and such a tremendous success.
20      Thank you, Your Honor.
21      THE COURT:  The way I interpreted what you
22 said --
23      MR. WOODS:  I'm sorry.
24      THE COURT:  -- Mr. Woods, and I'm sorry I had
25 sort of a delayed response, is you want to know why the

56

1  customer defendants are wanting certain types of
2  characteristics for luminescence, battery life, that type of
3  thing.
4       MR. WOODS:  Yes, we're saying that will hinge up
5  the technical aspects with the real world.  I mean to say to
6  a juror this module has a luminance of X number of luminance
7  per foot lamp, that doesn't mean anything.  It has to be put
8  into a real world and the Y is a very general way of viewing
9  it.  And that is exactly right, Your Honor.
10      THE COURT:  All right.  Let's take a few
11 minute break, please.  And I will give you the opportunity,
12 Mr. Horwitz to respond, because I think this is going to be
13 one of the major issues and will directly affect in part the
14 rest of my decision such as how long and whether or not
15 there is going to be anything exchanged concerning advice
16 of counsel.  All right?
17      If you want a break, you know where all the
18 facilities are.  If you want to go downstairs and get
19 something to drink, you can.
20      MR. WOODS:  Thank you, Your Honor.
21      MR. HORWITZ:  How long do you want to take?
22      THE COURT:  I know there is people on the phone.
23 Is there anybody else on the phone besides you, Tim?
24      MR. VEZEAU:  Yes.  Robert Benson, counsel for
25 Seiko Epson.

57

1       THE COURT:  I don't know, and I asked a couple
2  times, whether or not anybody wished to comment and so far
3  it's only been limited from the phone people.  I don't know
4  whether they're mostly manufacturers, hybrids or customers.
5  I have no idea.  But in any event, we're going to take about
6  a ten minute break and then I'm going to allow Mr. Horwitz
7  to respond.  I don't know, Rich, if you want to talk to any
8  of them or not or if you want to meet someplace to talk to
9  the customer defendants, you certainly can in the conference
10 room in here.
11      MR. HORWITZ:  All right.
12      THE COURT:  We're in recess.
13      (Brief recess taken.)
14      THE COURT:  Mr. Horwitz.
15      MR. HORWITZ:  Thank you, Your Honor.  One thing
16 I thought was very telling in Mr. Woods' comment, we were
17 specific.  We said that you measured validity and commercial
18 success of the patent against the patented invention.  That
19 is what is in the claims.  Mr. Woods says I'm not going to
20 get into those details today, Your Honor.  We just really
21 need this information.
22      Well, they're not going to get into that detail
23 because they can't show us the detail.  And if Your Honor is
24 inclined to consider this at all, we would ask that they be
25 required to put it in writing and then on a short turnaround

58

1  we respond because this is a very significant issue of
2  customer defendants.
3          Now, again, Mr. Woods talked about we need to
4  know what the customers say about this. Well, you know
5  what? They know what the customers say about this. Because
6  the customers don't say we need this size battery vs. that
7  size battery. They have these documents. What they give to
8  the manufacturers are we need this much power, we need this
9  much brightness, we need this much whatever else. You know
10 what else they say? We need this much cost. And then it's
11 up to the manufacturer to decide how it's going to meet all
12 those performance features. It's not up to the customer.
13 The customer has no clue. The customer could not say the
14 module with the invention is what we want. They don't know
15 that.
16         THE COURT: I understand that. But I think
17 what Mr. Woods was saying -- that's the reason why I asked
18 the last question that I did -- was why are the customer
19 defendants requesting these type specifications within these
20 costs? I mean I think that is basically what he said to me.
21         MR. HORWITZ: But that is not the relevant
22 inquiry and that is why we want to go back to what the
23 patent says. That is not what the invention is. And
24 perhaps they want to get discovery from a battery
25 manufacturer next. I don't know. Who knows what goes

59

1  into this, unless you go back to what their invention is,
2  which is the module, and the kind of things that they say
3  they want.
4          Well, first, we want sales information. Then
5  using that sales information, we want summary marketing
6  information regarding how products using the accused modules
7  are advertised. Now, we're not talking about the module,
8  we're talking about the end product and the end product will
9  never say anything about we got the Honeywell '337 patent,
10 if that is the number. I forget the number. And then we
11 need some discussion of the features and functionalities
12 of the end product in question perhaps in comparison to
13 how products that do not use such market, such modules are
14 marketed.
15         They think they're going to get that information
16 from us? This is crazy. This is a wild goose chase. We're
17 talking about trying to keep the model that we have in place
18 for an efficient case.
19         The information that they're going to get from
20 the manufacturers is going to give them that. It talks
21 about the customers say what they want and the manufacturers
22 decide how they're going to get there. And they're either
23 going to get there using something that Honeywell says
24 infringes or they're not, but that is the source for what
25 is commercially successful or not commercially successful.

60

1          THE COURT: Isn't your argument down to this,
2  Rich? That if the customers are making a request for cer-
3  tain characteristics that by meeting those characteristics
4  you satisfy the customers and that is your evidence of
5  commercial success if they can link it up to the invention,
6  itself?
7          MR. HORWITZ: Sure. I think it's the way that
8  the module manufacturers decide to meet what their customers
9  ask for, not what you and I ask for on a cell phone.
10         THE COURT: Is that evidence of commercial
11 success?
12         MR. HORWITZ: I think that would be evidence
13 that they would say would be evidence of commercial success,
14 sure. And then we argue all the other things that we would
15 argue for why it's not, all the design-around. It could
16 have happened back then that have happened since then. But
17 you don't get to what the customers say because.
18         THE COURT: Well, you're using "customers." Are
19 you talking about somebody like me and you on the street?
20         MR. HORWITZ: I'm talking about those customers
21 as well as the customer defendants because as -- I feel like
22 a broken record. All we say is we want certain performance
23 features. The manufacturers decide how they're going to
24 meet those performance features at whatever cost construct
25 they have to work with.

61

1          THE COURT: And I think what they're saying is
2  that those performance features are accomplished by their
3  invention. That is what they're saying. You may disagree.
4  We're not at that point now for me to decide it, one way or
5  another. I mean that is not it. We haven't had claim
6  construction yet.
7          MR. HORWITZ: Whether that is true or not, the
8  customers have had nothing to say about that because they
9  don't care how their performance features are met, all they
10 want is that they are met.
11         THE COURT: All right.
12         MR. HORWITZ: Thank you.
13         THE COURT: The issue that is going to be
14 going to trial is the validity of the patent. And my
15 understanding is it's going to be the validity of the
16 patent in relationship to the manufacturers; correct?
17         MR. WOODS: I don't know what -- I would
18 disagree, Your Honor, in relationship to the manufacturers.
19 The patent is either valid or it is invalid.
20         THE COURT: I understand that, but the only
21 parties that are going to be involved in contesting validity
22 will be the manufacturers.
23         MR. WOODS: In the first trial.
24         THE COURT: That's what I meant.
25         MR. WOODS: I think that is correct.

62

1    THE COURT:  That's what I meant in the first
2  trial.  And right now, when Judge Jordan ruled before, he
3  did not say he will not get any discovery from the customers
4  down the road.  What he said was we were proceeding along a
5  trial, setting this case up to get discovery from the
6  manufacturers.  There was never a comment or a limitation
7  placed by Judge Jordan, nor would there be a limitation
8  placed by me that some time down the road, depending upon it
9  could happen now, it could happen some time in the future,
10  you are still going to be allowed to take discovery from
11  the customer defendants.  Nothing that has happened so far
12  in any of these scheduling orders has eliminated that
13  right from what I have read so far in this, concerning
14  any of the -- you don't have to stand, Matt.  You can sit
15  -- concerning any of the scheduling orders that have been
16  entered.
17    The whole purpose was to get a scheduling
18  order in as to the dispute between Honeywell and the
19  manufacturers.  It had no effect on what was going to happen
20  with what discovery could come from the customers later
21  only.  If there is somebody in this room or somebody on the
22  phone that disagrees with me on that, I want to know about
23  that now.
24    (Pause.)
25    THE COURT:  And by counsel's overwhelming

63

1  silence, I understand there is no disagreement.
2    MR. HORWITZ:  Your Honor, the discovery is
3  stayed against, or the whole case is stayed against the
4  customer defendants.
5    THE COURT:  That's right.  That's right.  So
6  there is nothing, in light of that, there is no way that
7  any of what is happening now eliminates Honeywell's right
8  to take discovery from them some time either now or in the
9  future or whatever.
10    Okay.  On commercial success, then the issue of
11  the only entities that will be defending, will be contesting
12  that the patent is invalid at the time we go to trial are
13  going to be the manufacturing defendants.  Commercial
14  success to them is something different than commercial
15  success to the customer defendants; correct?
16    MR. WOODS:  I would respectfully disagree,
17  Your Honor, that that is an erroneous inquiry because the
18  commercial success is the commercial success of the patent.
19    THE COURT:  That's right.
20    MR. WOODS:  And to try to carve it up into
21  pieces --
22    THE COURT:  But, no, what I'm saying is the
23  entities that you are dealing with on the commercial
24  success of the patent as a whole are the entities of the
25  manufacturers; correct?

64

1    MR. WOODS:  No, I would disagree with that.  I
2  would disagree that is the relevant inquiry.  The relevant
3  inquiry is the commercial success in its entirety, so I
4  would respectfully disagree.
5    THE COURT:  I see what you are saying.
6    MR. HORWITZ:  Your Honor, that is where the rub
7  is.  The commercial success is of the invention, the claimed
8  invention.
9    THE COURT:  Oh, I understand that.
10    MR. HORWITZ:  And they want to make it a much
11  broader view than we believe is proper under patent law.
12  It's that simple.
13    MR. WOODS:  Your Honor, I would agree with
14  Mr. Horwitz that is in fact the rub.  And maybe the best
15  solution would be to brief this.  We could brief it very
16  quickly, limited, short, because I realize Your Honor's time
17  is pressing, but I do believe that there is a fundamental
18  disagreement here as to what should be a relevant inquiry
19  even in a scenario when the first trial will be against the
20  manufacturers.  And I believe we could provide some law that
21  would elucidate that point.
22    THE COURT:  All right.  Since you're the one who
23  has the burden on that, today is, what, the 22nd?
24    By March 2nd, I want a five page -- seven page
25  double spaced brief by Honeywell.

65

1    And by March 9th, I want one brief on behalf of
2  the customer defendants, seven pages, double spaced and it's
3  limited to the issue of really what is commercial success
4  and what evidence is necessary in that regard and what the
5  Fed Circuit has said about that.
6    MR. WOODS:  Thank you, Your Honor.
7    MR. HORWITZ:  Your Honor, I don't have my
8  calendar with me.  The 2nd and the 9th, what day of the week
9  are they?
10    THE COURT:  Those are Fridays.
11    MR. HORWITZ:  Those are Fridays?  Your Honor, if
12  we could have until the following Monday?  Because if we're
13  going to get that on a Friday, in order to try to coordinate
14  a short filing from several defendants, it really would be
15  very helpful to have until the following Monday.
16    THE COURT:  I don't have a problem with that
17  because I already gave them an extra day, technically.  Do
18  you want to count from here?  But I want a short filing.
19  I want a nub to the point give me the case law, don't sit
20  there and give me a bunch of string cites.  Find the
21  cases that you say, judge, if you look at this, you will
22  understand it completely.  Now, I recognize that trying to
23  hunt that up from the Fed Circuit may be a major, major
24  problem but I want it pointed and direct and that's it.
25    So for right now, first of all, I'm not going

66

1  to authorize the disclosure of opinions of counsel at this
2  stage.
3          You can assume that you have at least three
4  months. You will probably get more. The question is
5  whether you get six. And I think you can fairly assume that
6  I am not going to give you a written opinion on this. What
7  I will try to do, after I have had a chance to absorb it
8  and look at the cases, is to -- and maybe what I should do,
9  because if I don't do this, it will just drag on -- and you
10 know what? I don't want to set up another teleconference
11 for the simple reason we have all sorts of problems with
12 this. So if I set up a teleconference on this point in the
13 future, in the very near future after this, can we limit it
14 to a discrete amount of individuals? I know it's really
15 tough but it's just very, very difficult to, when everybody
16 is on the phone and I'm using a speakerphone, the last time
17 was horrible.
18         MR. HORWITZ: Your Honor, if I could make a
19 suggestion? Perhaps you should wait and see after you
20 receive the submissions if you need it. And then if you
21 just put out a scheduling order, it will say whatever it
22 says.
23         THE COURT: Oh, thank you. If you don't want my
24 reasoning, that's fine.
25         (Laughter.)

67

1          MR. HORWITZ: I don't know what others think.
2          THE COURT: Tim, I heard your voice. You seemed
3  to enjoy that comment.
4          MR. HORWITZ: I did, Your Honor. Thank you. I
5  have a suggestion. Perhaps those who are willing customer
6  defendants who are willing to engage in discovery can be on
7  the line and those that aren't won't be on the line.
8          THE COURT: Well, I think what I'm going to do;
9  and I like your suggestion, too, Tim but I happen to like
10 Rich's better because I don't have to give you any logic as
11 to how I came to my conclusion because it will be read. But
12 the one concern I have is that if I decide that they are
13 allowed to have discovery, it's not going to be along the
14 lines of what I just heard. It isn't going to happen that
15 way at all, because that sounded to me to be extremely broad
16 and extremely unfocused.
17         MR. HORWITZ: Your Honor, would it be
18 appropriate for the letters to address, for them to address
19 what they really want as opposed to just address the law?
20         THE COURT: I think they can attach it as an
21 exhibit as to what they're really looking for. And I think
22 you need to explain that because what I have heard so far,
23 Matt, is well beyond what I think is appropriate for
24 commercial success under your analysis.
25         MR. WOODS: Fair enough. We will tie our

68

1  request, Your Honor, to the law that we're citing. Our only
2  point on that is it's hard to have a discussion when one
3  side is saying "under no circumstances."
4          THE COURT: Well, I understand. But if you are
5  sitting there saying -- this is what you are saying to me:
6  Judge, listen. There is a group of people who have not
7  participated in this case from whom we need evidence of
8  commercial success. And here are the points that we need
9  for our commercial success and they're the ones who
10 potentially have this information because we haven't gotten
11 from the manufacturer. The case law should tell you,
12 hopefully it will, what exploration of commercial success
13 is appropriate under these circumstances.
14         MR. WOODS: Understood.
15         THE COURT: Tom.
16         MR. HALKOWSKI: Your Honor, if we're kind of
17 wrapped up on that point, I just would like to make a brief
18 comment, if I could, on another issue.
19         THE COURT: Okay. What is the issue?
20         MR. HORWITZ: Should we wrap up exactly what
21 we're going to do? Because I'm still a little unsure.
22 We'll respond to whatever they put in their letter. One
23 concern I have, though, Your Honor, is I hope that the text
24 of their letter does focus on why things are relevant rather
25 than just attaching some discovery because then we're going

69

1  to end up spending --
2          THE COURT: Oh, no. If they don't tell me why
3  it's relevant, then I think you can fairly assume that if
4  they can't tell me why it's relevant and what they need it
5  for, the nexus, they're not getting it.
6          MR. HORWITZ: Understood.
7          THE COURT: So that is a risk that they run, and
8  you run the opposite risk that if you don't tell me why
9  they're wrong, without going into great detail on the
10 patent, although there is some degree I know that has to be
11 some discussion, then you lose, if their arguments are very
12 good. If their arguments are good. I mean there is a basis
13 for them.
14         MR. HORWITZ: I don't want to disappoint Your
15 Honor by going back on what I said before, but if we're
16 going to get into the details of the discovery, it may be
17 appropriate to have another session like this so that we can
18 argue again.
19         THE COURT: How about if I look and see what
20 you guys give to me by March 12th and then I'll figure out
21 whether I need to talk to you anymore? I'll leave it that
22 way.
23         MR. HORWITZ: That's fine.
24         THE COURT: Because if it is a decision that I
25 think some limited discovery should be allowed on this

**70**

1    issue, I definitely do think we probably do need to have
2    another discussion. I really do because I think there is
3    going to be a whole host of problems out there that nobody
4    is going to agree with what everybody said be despite what
5    the written word says.
6         MR. HORWITZ:  And we would be happy to avoid
7    that problem by no discovery, Your Honor.
8         (Laughter.)
9         MR. WOODS:  Your Honor, would it make sense to
10    have the manufacturer defendants respond to our letter as
11    well since what we're trying to say -- our point is that
12    there is some relevant information. Our view is we just
13    don't have half the puzzle. And if the manufacturer
14    defendants could address that aspect, I think that would be
15    helpful, too. It's a helpful piece of information. There
16    is another part or a set of parties at this table.
17         THE COURT:  Well, I know that there are a couple
18    manufacturer defendants that wanted to stand up and give
19    their own two cents to this whole ordeal. So the fact they
20    decided to do that, the question I have is are the
21    manufacturer defendants at all interested?
22         (Pause.)
23         THE COURT:  Oh, boy. Overwhelming silence.
24         MR. ROSENTHAL:  I think we do have an interest,
25    Your Honor, because for the reasons that I expressed.

**71**

1         THE COURT:  What I don't want to hear is, gee,
2    judge, if you push us out for six months, it's time spent.
3    I don't want to hear that.
4         MR. ROSENTHAL:  No, the only thing I was
5    thinking we would want to address is the technical issue of
6    commercial success because who in this room has a greater
7    stake in that than the manufacturer defendants who have to
8    try it. So I do want to have an opportunity to have our own
9    seven-page letter.
10         MR. WOODS:  That's fine here, Your Honor. I
11    think it's good to get all the pieces of the puzzle
12    together.
13         THE COURT:  All right. Honeywell, since you
14    have to address it for two parties, I'll let your letter go
15    to ten pages; seven and seven for the others. You need to
16    understand 12 point font, double spaced is just easier for
17    me to read.
18         All right. Tom, there was an issue that you
19    wanted to address.
20         MR. HALKOWSKI:  Yes, Apple raised an issue --
21         THE COURT:  I know.
22         MR. HALKOWSKI:  -- in the prior conference and
23    particularly with the specter of maybe some discovery coming
24    the way of customer defendants, I think certainly it's
25    something that is an issue that we would like to again at

**72**

1    least get the Court's temperature on in terms of the fact
2    that we are customer defendants and we've got manufacturers
3    that are all licensed up. We don't see any reason why we
4    need to continue to be in the case. And since the
5    conference call, I've actually learned that there are at
6    least a few others that are in the same boat as Apple and
7    would simply like the opportunity to present a short brief
8    to you as to why we should be dismissed.
9         THE COURT:  Well, let me put it this way. Until
10    I decide the issue whether there will be any discovery from
11    the customer defendants, why don't we put that off.
12         MR. HALKOWSKI:  Okay.
13         THE COURT:  And I recognize that that issue is
14    out there and I remember it and it's a concern. It sounds
15    to me it's not just Apple's concern, there might be other
16    customer defendants.
17         MR. HALKOWSKI:  That's correct.
18         THE COURT:  So I don't want to do it piecemeal.
19    And I'd rather do it in at least some fashion so that it
20    appears to be organized. And I also encourage that if that
21    is the case, then I don't know whether further discussions
22    with Honeywell during that time period would be productive
23    or counterproductive. I have no idea.
24         And so why don't we hold that off? And I note
25    and I recognize there is a concern that there are customer

**73**

1    defendants out there who feel that all the products that
2    have been identified by Honeywell were covered in
3    settlements and, therefore, why are we still around waiting
4    and why should we get stuck with doing any form of
5    discovery. So I do understand that is there.
6         MR. HALKOWSKI:  Thank you, Your Honor.
7         THE COURT:  And I will say this much: I will
8    try to address that issue before they have to be involved in
9    any type of discovery production.
10         MR. HALKOWSKI:  Thank you, Your Honor.
11         THE COURT:  Okay. It would also be helpful that
12    when you do this, Matt, that you kind of give me an idea of
13    what type of discovery, what is that going to entail? Are
14    you looking for just -- because I'm not even sure. You
15    said discovery, and some of the information I've gotten is
16    document production but I have no idea what Honeywell is
17    looking for or how extensive, how far it goes, just how far.
18    Does it go beyond document production? Does it go ... What
19    does it go to?
20         MR. WOODS:  Your Honor, I could see a situation
21    where it's limited to document production but that also
22    depends upon how the manufacturer defendants view that
23    document production. You know, are we going to all agree
24    it's admissible? Do we have to take a 30(b)(6) to
25    authenticate documents, things of that nature.

74

1   THE COURT: I always think authentication is
2 probably one of the worst things to try to exclude on an
3 evidence basis. I really do.
4   MR. WOODS: I would agree, Your Honor. And I
5 hope that is how we can proceed, but again that is the type
6 of dialogue that we would like to have with the manufacturer
7 defendants but haven't been able to have yet. I think those
8 are the kind of issues we could be --
9   THE COURT: Are you talking about if the
10 Court -- and I'm not saying the Court is going to because
11 I'm not certain I will -- allow some limited discovery from
12 the customer defendants; once that discovery is obtained, if
13 it's documents, whether the manufacturers are going to be
14 agreeable to allow, so it didn't come from them? It hasn't
15 been authenticated, for example, or some other reason there
16 could be relevance. I know there are relevance arguments.
17 Everybody makes a relevance argument about every piece of
18 discovery, it seems. That you don't want to get suddenly
19 stuck because it came from a customer and you can't get it
20 authenticated. That you can't use it at trial.
21   MR. WOODS: Exactly. And can an expert rely on
22 it? I know it doesn't have to be admissible but they might
23 make a motion in limine to exclude a portion of an expert
24 testimony because. We're trying to think down the road
25 here, and we hope that --

75

1   THE COURT: I understand.
2   MR. ROVNER: Well, we do think, Your Honor, on
3 behalf of manufacturer defendants that is premature since
4 Your Honor has yet to rule. We've opposed the discovery so
5 it would be we never even began a dialogue about the scope
6 of it.
7   THE COURT: And I wasn't suggesting you had an
8 obligation to do so since you opposed it. But what I was
9 concerned with was just exactly the vision of the
10 extensiveness of this and I was trying to get a feel of
11 this. Is this going to be a concentration? Is this type of
12 discovery going to be concentrated on documents or are now
13 are we going to have to depose 35 people or something like
14 that? That is going to play a factor, too. Because if you
15 have to depose 35 people in my mind or 100 people in my mind
16 to show commercial success, it kind of says something about
17 commercial success.
18   All right. Does everybody understand what I
19 outlined today?
20   I'm not going to be sending out a separate
21 order. Please get a copy of the transcript. And I will be
22 issuing an order incorporating the transcript as an order
23 of the Court. The dates that are included for when the
24 submissions are due will be included in that transcript.
25 I'll even do a separate order for that.

76

1   And you, right now, have, I understand, at least
2 the relief for three months. I'm seriously considering, and
3 whether I allow the commercial success discovery to occur
4 against the customer defendants, I'm seriously thinking that
5 I'm going to probably allow discovery to go beyond three
6 months with or without that discovery. All right?
7   MR. ROSENTHAL: Your Honor, before we break?
8   THE COURT: Yes.
9   MR. ROSENTHAL: I have an emergent issue --
10   THE COURT: An emergent issue.
11   MR. ROSENTHAL: -- with Mr. Woods that was less
12 than satisfactory and I need to raise it now.
13   Under the protective order, paragraph 19, if a
14 party decides that a document was inadvertently produced
15 which it deems privileged, all the parties then have to
16 destroy all the copies of the document. And, in this
17 particular case, we received, on the 14th and today is the
18 fifth day, a letter.
19   THE COURT: That is important because?
20   MR. ROSENTHAL: That is important because we
21 don't want to destroy the document.
22   THE COURT: No, no, no. Back up. You said to
23 me it was the fifth day.
24   MR. ROSENTHAL: Because today I have to produce,
25 I have to start the destruction process. That's why today

77

1 is the day.
2   THE COURT: Thank you.
3   MR. ROSENTHAL: The document in question was
4 used in a deposition in December.
5   THE COURT: By whom?
6   MR. ROSENTHAL: By the defendants in a 30(b)(6)
7 deposition of the Honeywell designee without question. The
8 letter which says it's protected identifies "the recipient"
9 as being lawyer when in fact the document and why I don't
10 want to let loose of the document, the document itself on
11 its face says that the recipients are this gentleman who I
12 don't know if he is or isn't a lawyer and a whole team of
13 Honeywell people called the -- what are they called? The
14 Japan Display Team, core, are the recipient with this person
15 and then there is a cc, somebody called, a group called the
16 Japan Display Team Support. And from the depositions we've
17 taken so far, that's a lot of people.
18   So with those two sets of facts, we would like
19 relief from the requirement to destroy the document and we
20 would tee up the issue in the normal course in the normal
21 way if we can't reach agreement with Mr. Woods that it is in
22 fact not privileged. But I think the destruction is very
23 destructive to our ability to argue the issue.
24   MR. WOODS: Your Honor, I told Mr. Rosenthal
25 this morning or this afternoon when he raised this issue

78

1  with me we didn't have any objection because this issue was
2  just raised this afternoon and we don't have an objection.
3  They do not need to destroy this document at this point in
4  time until we can do a meet and confer so I'm not sure what
5  was unsatisfactory.
6              MR. ROSENTHAL: Well, Your Honor, it's until
7  we have a meet and confer. I would like the deadline for
8  destruction to be extended until after this issue is aired
9  and decided.
10             THE COURT: You didn't mean literally until you
11  have the meet and confer. If the meet and confer and you
12  can't come to an agreement, did you expect him to destroy it
13  immediately after the meet and confer?
14             MR. WOODS: The procedure in that situation,
15  Your Honor, would be we submit it to Your Honor in camera.
16             THE COURT: That's what I thought.
17             MR. WOODS: That's how we normally go about
18  doing it.
19             MR. ROSENTHAL: As long as that is the
20  understanding. That is not what I walked away with, Your
21  Honor.
22             THE COURT: That's my impression I was left
23  with. If you have a discovery issue, I think Judge Jordan
24  had it in his scheduling order, I have not changed that, my
25  understanding is it's you contact me, say we have a problem.

79

1  I give you a date and time. Forty-eight hours before that
2  time -- and please, do not file it after 5:00 o'clock
3  because I'm not going to sit around until 11:49 to find out
4  if you filed a document. You have 48 hours to explain what
5  the problem is, 24 hours to the other side. And we have a
6  teleconference.
7              MR. ROSENTHAL: Your Honor, that's all I'm
8  asking for. And apparently that is not what I walked away
9  with before, but I'm satisfied now that is what I'm going to
10  get.
11             THE COURT: All right.
12             MR. ROSENTHAL: Thank you very much, Your Honor.
13             THE COURT: Thank you.
14             (Oral Argument Hearing ends at 6:35 p.m.)
15
16
17
18
19
20
21
22
23
24
25

United States District Court - Honorable Mary Pat Thynge

'05 [2] - 29:9, 45:18
'06 [2] - 45:3, 45:16
'08 [2] - 39:5, 39:6
'337 [1] - 59:9

# 0

04-1338 [1] - 1:8

# 1

10 [1] - 42:21
10,000 [1] - 50:10
100 [3] - 50:7, 50:10, 75:15
11:49 [1] - 79:3
12 [1] - 71:16
12th [1] - 69:20
14th [2] - 35:2, 76:17
15 [1] - 43:20
16 [2] - 20:5, 36:18
16th [3] - 44:1, 44:11, 44:19
19 [1] - 76:13
1993 [1] - 39:15
1995 [1] - 19:23
1st [1] - 47:5

# 2

20 [3] - 42:21, 43:20, 53:19
20,000 [1] - 50:10
2000 [1] - 49:12
2004 [1] - 39:16
2005 [10] - 14:5, 19:25, 20:1, 20:16, 36:18, 37:7, 43:24, 44:1, 44:19, 49:13
2006 [1] - 49:15
2007 [3] - 1:11, 25:23, 25:25
2008 [1] - 27:21
22 [1] - 1:11
22nd [1] - 64:23
24 [2] - 14:24, 79:5
2nd [2] - 64:24, 65:8

# 3

30 [2] - 35:11, 42:21
30(b)(6 [3] - 47:1, 73:24, 77:6
30th [1] - 35:7

31 [3] - 24:5, 25:19, 49:12
31st [3] - 35:7, 48:19, 49:10
35 [2] - 75:13, 75:15
36 [1] - 14:24

# 4

41 [3] - 37:19, 37:20, 37:23
43 [1] - 38:20
45 [2] - 37:20, 37:23
46 [1] - 37:20
48 [1] - 79:4
4:37 [2] - 1:11, 5:13

# 5

5:00 [1] - 79:2

# 6

6:35 [1] - 79:14

# 9

90 [2] - 24:17, 32:10
9th [2] - 65:1, 65:8

# A

AB [1] - 3:23
ability [2] - 55:13, 77:23
able [11] - 6:10, 6:12, 7:15, 23:25, 34:2, 51:17, 52:1, 54:6, 54:17, 55:16, 74:7
abreast [1] - 16:4
absent [1] - 54:16
Absolutely [1] - 34:5
absolutely [1] - 13:18
absorb [1] - 66:7
accommodate [1] - 55:1
accomplish [2] - 47:17, 52:7
accomplished [2] - 52:24, 61:2
accomplishes [1] - 52:24
accused [1] - 59:6
achieve [1] - 42:9
achieved [1] - 41:15
acknowledge [2] -

55:4, 55:12
acknowledged [3] - 13:1, 32:21, 55:5
ACTION [1] - 1:4
actively [1] - 46:18
actual [1] - 48:2
add [1] - 30:20
additional [4] - 15:11, 21:18, 31:1, 40:20
address [20] - 6:9, 6:24, 8:12, 8:14, 10:12, 10:18, 13:25, 21:10, 22:13, 22:16, 46:4, 46:5, 67:18, 67:19, 70:14, 71:5, 71:14, 71:19, 73:8
addressed [7] - 11:18, 14:5, 21:19, 22:5, 36:23, 37:24, 47:20
addressing [1] - 22:19
admissible [2] - 73:24, 74:22
adopted [1] - 39:20
advertised [1] - 59:7
advice [1] - 56:15
affect [4] - 43:6, 43:12, 43:15, 56:13
affects [1] - 40:14
afford [1] - 51:19
afforded [1] - 16:6
afternoon [2] - 77:25, 78:2
afterwards [2] - 30:16, 37:25
ago [3] - 23:12, 23:13
agree [20] - 12:22, 16:21, 20:3, 21:15, 22:24, 25:1, 27:4, 27:6, 33:6, 34:7, 34:10, 35:22, 44:10, 48:9, 50:9, 53:4, 64:13, 70:4, 73:23, 74:4
agreeable [1] - 74:14
agreed [5] - 8:15, 8:17, 23:15, 23:24, 24:20, 28:7, 31:25, 42:25, 45:9, 47:3, 54:24
agreement [12] - 8:2, 8:8, 8:16, 8:24, 9:1, 19:20, 23:2, 23:3, 23:8, 24:6, 77:21, 78:12
agrees [1] - 47:21
aired [1] - 78:8
al [2] - 1:4, 1:7
Alexandria [1] - 2:6
allow [6] - 13:16, 57:6, 74:11, 74:14, 76:3,

76:5
allowed [4] - 51:21, 62:10, 67:13, 69:25
allows [1] - 21:17
aloud [1] - 28:20
alternatives [2] - 19:4, 19:7
ambit [1] - 41:23
America [8] - 2:7, 2:10, 2:11, 2:15, 3:5, 3:20, 3:20, 5:4
amount [11] - 11:3, 14:3, 16:17, 31:11, 43:6, 47:17, 49:4, 49:8, 54:4, 54:22, 66:14
amounts [1] - 16:24
amps [1] - 42:9
analysis [5] - 12:10, 13:19, 21:12, 54:2, 67:24
analyze [1] - 10:9
AND [1] - 1:2
and-a-half [2] - 27:10, 28:2
ANDERSON [2] - 2:17, 3:2
ANDREW [2] - 2:5, 4:9
Andy [1] - 46:10
Angeles [1] - 4:22
angle [3] - 41:15, 42:15, 50:25
answer [2] - 26:9, 53:20
appeal [1] - 48:10
APPEARANCES [5] - 1:15, 2:1, 3:1, 4:1, 5:1
Apple [3] - 4:13, 71:20, 72:6
APPLE [1] - 1:7
Apple's [1] - 72:15
applied [1] - 21:12
applies [1] - 54:2
apply [2] - 18:11, 18:12
appreciated [1] - 43:9
appreciating [1] - 47:13
approached [1] - 44:16
Approaching [1] - 17:7
appropriate [13] - 8:13, 13:20, 14:13, 28:15, 28:17, 34:9, 38:12, 38:15, 38:16, 67:18, 67:23, 68:13, 69:17
April [1] - 47:2

area [1] - 41:11
argue [5] - 20:14, 60:14, 60:15, 69:18, 77:23
argument [7] - 40:3, 40:4, 40:16, 40:22, 50:16, 60:1, 74:17
Argument [1] - 79:14
arguments [3] - 69:11, 69:12, 74:16
arrangements [1] - 39:18
array [1] - 40:9
ARSHT [1] - 1:17
art [1] - 40:14
articles [1] - 51:9
Asian [1] - 31:9
aside [1] - 31:16
aspect [4] - 15:6, 25:13, 55:17, 70:14
aspects [1] - 56:5
assertions [1] - 15:8
assigned [1] - 27:15
assume [4] - 29:2, 66:3, 66:5, 69:3
Assuming [1] - 14:1
assuming [3] - 29:1, 34:10, 47:14
ation [1] - 7:21
attach [1] - 67:20
attached [1] - 42:12
attaching [1] - 68:25
attending [2] - 5:6, 5:15
August [5] - 24:5, 24:12, 25:2, 25:19, 43:24
authenticate [1] - 73:25
authenticated [2] - 74:15, 74:20
authentication [1] - 74:1
authorize [1] - 66:1
available [1] - 39:18
Avalet [1] - 40:15
avoid [2] - 6:18, 70:6
avoiding [1] - 40:10
awaiting [1] - 29:14
aware [2] - 46:15, 47:6
awhile [2] - 5:21, 28:25

# B

bad [1] - 31:24
BAKER [1] - 3:12
based [2] - 34:23, 38:13

**basic** [1] - 47:22
**basis** [4] - 10:12, 10:19, 69:12, 74:3
**batteries** [3] - 40:14, 51:21, 51:22
**battery** [22] - 12:15, 18:8, 18:15, 41:24, 42:8, 51:13, 51:18, 52:2, 52:3, 52:11, 53:9, 53:16, 53:18, 53:24, 53:25, 56:2, 53:6, 58:7, 58:24
**bear** [1] - 16:14
**bearing** [1] - 32:22
**bears** [2] - 11:3, 14:3
**became** [1] - 10:22
**become** [1] - 55:18
**Beeping** [1] - 6:2
**beeps** [2] - 5:21, 6:15
**BEFORE** [1] - 1:13
**beforehand** [1] - 11:16
**began** [1] - 75:5
**begin** [2] - 13:11, 24:17
**beginning** [2] - 5:13, 39:5
**behalf** [9] - 1:21, 3:23, 4:10, 5:4, 22:23, 41:17, 46:11, 65:1, 75:3
**behind** [1] - 13:23
**bench** [4] - 29:17, 29:21, 29:23, 30:16
**BENSON** [1] - 4:22
**Benson** [1] - 56:24
**best** [1] - 64:14
**BESTE** [1] - 4:19
**better** [4] - 12:14, 51:13, 51:19, 67:10
**between** [7] - 8:8, 11:21, 20:16, 21:23, 47:4, 49:9, 62:18
**beyond** [7] - 15:1, 41:11, 41:23, 43:8, 67:23, 73:18, 76:5
**bifurcation** [2] - 30:24, 33:17
**big** [3] - 11:1, 43:10, 52:2
**bit** [3] - 24:2, 49:17, 50:13
**blame** [1] - 23:23
**boat** [1] - 72:6
**Bob** [1] - 21:2
**BOTTS** [1] - 3:12
**BOUCHARD** [1] - 4:15
**bound** [4] - 16:2, 16:5, 19:20, 20:8
**BOVE** [1] - 3:22

**boy** [1] - 70:23
**break** [4] - 56:11, 56:17, 57:6, 76:7
**Brian** [3] - 1:24, 5:16, 7:15
**Brief** [2] - 26:3, 57:13
**brief** [9] - 14:2, 30:8, 48:14, 64:15, 64:25, 65:1, 68:17, 72:7
**briefing** [10] - 13:16, 23:5, 24:14, 25:7, 25:8, 26:7, 27:14, 27:18, 27:19, 30:5
**briefly** [1] - 46:11
**brightness** [7] - 40:13, 40:18, 40:23, 41:14, 51:13, 52:10, 58:9
**bring** [2] - 28:5, 43:2
**bringing** [3] - 43:19, 44:24, 48:15
**brings** [2] - 7:20, 12:21
**broad** [1] - 67:15
**broader** [1] - 64:11
**broken** [1] - 60:22
**build** [3] - 10:10, 31:1, 52:16
**bunch** [1] - 65:20
**burden** [6] - 43:21, 45:24, 55:5, 55:11, 55:12, 64:23
**buying** [1] - 53:1
**BY** [21] - 1:17, 1:20, 2:3, 2:5, 2:9, 2:13, 2:17, 2:20, 3:3, 3:8, 3:12, 3:18, 3:22, 4:3, 4:5, 4:9, 4:12, 4:16, 4:19, 4:22, 5:3

## C

**calculated** [1] - 49:10
**calendar** [1] - 65:8
**California** [1] - 4:22
**camera** [1] - 78:15
**Candidly** [1] - 14:18
**candidly** [1] - 14:19
**capable** [2] - 41:25, 42:7
**care** [3] - 26:19, 54:14, 61:9
**carried** [1] - 50:2
**carries** [1] - 41:19
**carry** [2] - 41:23, 43:2
**carrying** [1] - 41:12
**carve** [1] - 63:20
**case** [37] - 6:23, 9:14, 11:13, 14:15, 15:10, 17:14, 17:18, 18:3,
18:12, 19:12, 20:1, 23:22, 25:13, 29:4, 30:11, 31:8, 31:24, 32:21, 36:11, 39:14, 41:5, 42:1, 42:23, 43:3, 43:14, 46:1, 46:18, 50:20, 59:18, 62:5, 63:3, 65:19, 68:7, 68:11, 72:4, 72:21, 76:17
**cases** [2] - 65:21, 66:8
**caveat** [1] - 22:18
**cc** [1] - 77:15
**cease** [1] - 8:21
**cede** [1] - 16:25
**cell** [1] - 60:9
**cent** [1] - 30:16
**cents** [2] - 30:15, 70:19
**cer** [1] - 60:2
**certain** [11] - 13:6, 22:1, 41:14, 42:14, 42:15, 44:19, 56:1, 60:22, 74:11
**Certainly** [1] - 7:8
**certainly** [5] - 13:9, 37:7, 46:1, 57:9, 71:24
**cetera** [2] - 33:4
**chambers** [1] - 5:13
**chance** [3] - 14:24, 20:13, 66:7
**changed** [2] - 20:15, 78:24
**characteristics** [5] - 52:19, 52:21, 56:2, 60:3
**characterization** [1] - 51:2
**chase** [1] - 59:16
**check** [1] - 5:22
**Chicago** [1] - 5:3
**chooses** [1] - 44:3
**chose** [2] - 18:18, 45:16
**chosen** [1] - 16:7
**CHRISTOPHER** [1] - 3:18
**Circuit** [5] - 13:21, 32:21, 33:2, 65:5, 65:23
**circum** [1] - 22:12
**circumstance** [1] - 13:10
**circumstances** [9] - 12:9, 19:18, 20:15, 20:24, 21:24, 22:1, 55:8, 68:3, 68:13
**CIRESI** [1] - 1:19
**citations** [1] - 38:3

**cited** [4] - 37:22, 40:22, 42:12, 42:17
**cites** [1] - 65:20
**citing** [1] - 68:1
**Citizen** [2] - 4:17, 4:17
**CIVIL** [1] - 1:4
**claim** [10] - 23:5, 23:7, 24:15, 25:7, 25:10, 40:8, 40:19, 41:18, 61:5
**claimed** [3] - 11:14, 18:9, 64:7
**claiming** [1] - 10:4
**claims** [4] - 15:20, 17:24, 17:25, 57:19
**Claims** [1] - 18:6
**clarifications** [1] - 22:25
**cleaner** [1] - 51:13
**clear** [7] - 10:22, 14:6, 18:14, 32:4, 41:9, 51:6, 51:8
**clearly** [6] - 12:13, 16:1, 28:12, 30:21, 31:14, 32:25
**client** [2] - 39:17, 50:20
**clients** [1] - 46:20
**close** [2] - 24:17, 46:21
**closer** [1] - 30:7
**closes** [1] - 32:24
**clue** [1] - 58:13
**Co** [4] - 2:21, 3:5, 4:17, 4:17
**collected** [1] - 42:17
**colloquy** [2] - 14:9, 38:4
**Columbia** [3] - 2:14, 3:8, 4:6
**combination** [4] - 40:9, 40:20, 40:21, 43:19
**coming** [3] - 27:8, 27:10, 71:23
**comment** [7] - 35:13, 38:13, 57:2, 57:16, 62:6, 67:3, 68:18
**comments** [12] - 13:6, 13:25, 20:22, 22:16, 22:17, 32:11, 35:13, 37:9, 37:14, 38:13, 38:20, 46:12
**commercial** [47] - 11:9, 11:13, 12:1, 12:4, 14:12, 15:6, 17:23, 18:5, 19:1, 19:11, 19:12, 32:14, 35:14, 39:8, 39:13, 39:23, 40:16, 41:4,

**cited** ...

41:9, 42:1, 47:19, 49:1, 50:16, 52:12, 54:6, 55:15, 55:16, 57:17, 60:5, 60:10, 60:13, 63:10, 63:14, 63:18, 63:23, 64:3, 64:7, 65:3, 67:24, 68:8, 68:9, 68:12, 71:6, 75:16, 75:17, 76:3
**Commercial** [1] - 63:13
**commercially** [5] - 18:1, 53:1, 59:25
**comparison** [1] - 59:12
**complete** [6] - 9:23, 10:24, 10:25, 34:20, 48:18, 55:16
**completed** [2] - 27:20, 45:4
**completely** [1] - 65:22
**completing** [1] - 28:16
**compliance** [1] - 26:17
**complicated** [1] - 40:7
**compromise** [1] - 28:3
**Computer** [2] - 3:20, 4:13
**COMPUTER** [1] - 1:7
**CONAWAY** [3] - 2:2, 2:8, 4:8
**conceivable** [1] - 30:8
**concentrated** [1] - 75:12
**concentration** [1] - 75:11
**concern** [13] - 9:17, 11:2, 26:24, 27:3, 27:19, 33:16, 33:25, 34:19, 67:12, 68:23, 72:14, 72:15, 72:25
**concerned** [5] - 7:9, 9:6, 9:7, 14:17, 75:9
**concerning** [4] - 35:14, 56:15, 62:13, 62:15
**concerns** [2] - 22:19, 26:5
**concession** [1] - 38:14
**concluded** [1] - 9:3
**conclusion** [1] - 67:11
**confer** [8] - 11:15, 23:25, 49:7, 78:4, 78:7, 78:11, 78:13
**CONFERENCE** [1] - 1:11
**conference** [10] - 5:13, 9:4, 17:8,

36:18, 44:12, 44:19, 45:15, 57:9, 71:22, 72:5
confirmed [1] - 11:10
confront [1] - 54:16
confronted [2] - 54:12, 54:13
connection [1] - 52:5
CONNOLLY [1] - 3:22
consequences [1] - 43:7
consequently [2] - 45:21, 48:9
consider [3] - 14:13, 33:16, 57:24
considered [3] - 20:20, 38:11
considering [1] - 76:2
consistent [1] - 36:10
constrain [1] - 22:14
construct [1] - 60:24
construction [5] - 23:5, 23:7, 24:15, 25:10, 61:6
constructions [1] - 25:7
consulted [1] - 31:23
consuming [1] - 54:7
consumption [3] - 12:16, 51:1, 52:11
contact [1] - 78:25
contacted [1] - 23:13
contained [1] - 47:23
contemplated [3] - 44:4, 45:3, 45:18
contemplates [1] - 47:4
contend [2] - 39:17, 39:20
contesting [2] - 61:21, 63:11
context [1] - 18:25, 36:9
continue [4] - 10:1, 10:2, 30:6, 72:4
Continued [4] - 2:1, 3:1, 4:1, 5:1
conversation [1] - 15:18
conversations [1] - 19:22
coordinate [1] - 65:13
copied [1] - 36:22
copies [1] - 76:16
copy [1] - 75:21
core [1] - 77:14
Corp [4] - 3:4, 3:10, 4:23, 4:24
Corporation [12] - 2:10, 2:10, 2:15,

2:15, 3:4, 3:10, 4:7, 4:10, 4:24, 5:5, 21:3
Correct [2] - 21:19, 29:22, 33:15
correct [12] - 7:20, 21:5, 29:6, 31:13, 37:3, 38:1, 47:8, 61:16, 61:25, 63:15, 63:25, 72:17
correctly [1] - 22:4
correspondence [4] - 7:24, 11:19, 12:3, 17:9
CORROON [2] - 2:17, 3:2
cost [4] - 42:20, 42:22, 58:10, 60:24
costs [3] - 46:20, 48:1, 58:20
counsel [17] - 16:11, 16:13, 28:9, 32:16, 32:17, 32:18, 32:22, 33:3, 33:4, 35:2, 36:23, 37:12, 37:23, 46:16, 56:16, 56:24, 66:1
Counsel [17] - 1:21, 2:7, 2:10, 2:15, 2:21, 3:4, 3:9, 3:14, 3:19, 3:23, 4:7, 4:10, 4:13, 4:17, 4:23, 5:4, 5:6
counsel's [1] - 62:25
count [1] - 65:18
counter [1] - 38:3
counterproductive [1] - 72:23
countries [1] - 31:10
couple [3] - 37:11, 57:1, 70:17
course [1] - 77:20
court [2] - 6:8, 27:5
COURT [160] - 1:1, 5:14, 5:17, 5:18, 5:25, 6:4, 6:13, 6:19, 7:10, 7:12, 7:14, 7:18, 8:3, 8:7, 17:1, 17:4, 19:25, 20:3, 21:4, 21:15, 21:20, 22:8, 22:18, 22:22, 23:16, 23:20, 24:9, 24:24, 25:6, 25:12, 25:15, 25:21, 26:2, 26:4, 26:24, 27:19, 27:23, 28:4, 28:20, 29:16, 29:18, 29:20, 29:23, 30:19, 31:3, 31:7, 31:19, 32:2, 32:6, 32:17, 33:5, 33:11, 33:14, 33:24, 34:6, 34:12, 34:15,

34:24, 35:12, 35:16, 35:24, 36:2, 36:16, 37:6, 37:8, 37:11, 37:16, 37:19, 38:7, 38:18, 38:24, 39:2, 39:6, 39:9, 40:1, 40:11, 42:4, 43:25, 44:10, 44:18, 45:11, 45:13, 45:20, 46:4, 46:9, 47:10, 48:6, 48:12, 49:2, 49:12, 49:14, 49:18, 50:7, 50:13, 52:4, 53:7, 53:12, 53:14, 55:21, 55:24, 56:10, 56:22, 57:1, 57:12, 57:14, 58:16, 60:1, 60:10, 60:18, 61:1, 61:11, 61:13, 61:20, 61:24, 62:1, 62:25, 63:5, 63:19, 63:22, 64:5, 64:9, 64:22, 65:10, 65:16, 66:23, 67:2, 67:8, 67:20, 68:4, 68:15, 68:19, 69:2, 69:7, 69:19, 69:24, 70:17, 70:23, 71:1, 71:13, 71:21, 72:9, 72:13, 72:18, 73:7, 73:11, 74:1, 74:9, 75:1, 75:7, 76:8, 76:10, 76:19, 76:22, 77:2, 77:5, 78:10, 78:16, 78:22, 79:11, 79:13
Court [13] - 6:9, 19:5, 20:18, 21:17, 21:21, 25:22, 25:25, 26:24, 46:5, 46:6, 74:10, 75:23
Court's [1] - 72:1
courtroom [3] - 11:23, 25:21, 31:21
covered [2] - 31:11, 73:2
covers [1] - 17:24
cows [1] - 30:9
crazy [1] - 59:16
creates [2] - 40:13
critical [1] - 13:18
curing [1] - 50:4
current [4] - 11:11, 15:14, 31:15, 42:9
customer [48] - 11:4, 11:8, 11:22, 12:7, 12:22, 13:5, 13:7, 13:12, 15:19, 16:1, 17:3, 17:5, 17:14, 20:23, 21:24, 35:17, 36:20, 41:13, 42:11,

42:14, 45:5, 48:4, 48:6, 48:10, 50:17, 54:18, 55:3, 56:1, 57:9, 58:2, 58:12, 58:13, 58:18, 60:21, 62:11, 63:4, 63:15, 65:2, 67:5, 71:24, 72:2, 72:11, 72:16, 72:25, 74:12, 74:19, 76:4
Customers [1] - 54:14
customers [44] - 18:11, 18:13, 18:21, 19:14, 19:17, 22:14, 32:14, 34:22, 39:24, 41:10, 41:17, 41:22, 42:10, 43:14, 43:17, 44:6, 44:17, 45:17, 48:1, 51:22, 52:3, 52:7, 52:8, 52:9, 52:15, 52:18, 52:25, 53:1, 53:2, 54:1, 57:4, 58:4, 58:5, 58:6, 59:21, 60:2, 60:4, 60:8, 60:17, 60:18, 60:20, 61:8, 62:3, 62:20
customers' [1] - 53:13
cut [1] - 49:17
cutoff [3] - 24:5, 27:17, 49:9

D

damage [1] - 34:4
damages [5] - 8:19, 18:4, 24:19, 25:5, 32:5
data [2] - 12:11, 12:12
databases [1] - 10:16
date [8] - 28:9, 29:8, 38:25, 39:1, 39:2, 51:15, 51:17, 79:1
dates [5] - 23:3, 23:6, 23:9, 27:6, 75:23
days [1] - 24:17
deadline [3] - 16:16, 16:21, 78:7
deal [1] - 10:15
dealing [2] - 32:23, 63:23
dealt [2] - 42:2, 42:4
December [5] - 20:3, 35:7, 35:11, 77:4
decide [2] - 18:16, 20:18, 58:11, 59:22, 60:8, 60:23, 61:4, 67:12, 72:10
decided [4] - 29:7,

29:11, 70:20, 78:9
decides [4] - 47:25, 52:6, 53:12, 76:14
decision [9] - 28:11, 29:15, 30:13, 30:14, 43:4, 47:22, 53:13, 56:14, 69:24
declarative [1] - 49:23
deems [1] - 76:15
Deere [3] - 12:10, 13:17, 39:25
defectively [1] - 50:3
defendant [3] - 10:19, 33:3, 34:14
defendants [102] - 8:9, 8:17, 9:20, 11:4, 11:8, 11:22, 11:24, 12:7, 12:12, 12:22, 13:5, 13:7, 13:12, 14:25, 15:7, 15:9, 15:18, 15:19, 15:22, 16:1, 16:12, 16:21, 17:3, 17:5, 17:14, 19:9, 20:23, 21:24, 22:20, 22:24, 23:13, 24:1, 30:2, 35:8, 35:13, 35:17, 35:18, 35:21, 35:23, 36:10, 36:21, 39:16, 39:20, 42:3, 42:5, 42:6, 42:20, 42:22, 43:7, 43:13, 43:15, 43:21, 45:5, 45:6, 45:25, 46:18, 48:4, 48:7, 48:8, 48:10, 48:17, 49:5, 49:19, 49:22, 51:10, 53:5, 53:6, 54:4, 54:18, 54:20, 55:4, 55:7, 56:1, 57:9, 58:2, 58:19, 60:21, 62:11, 63:4, 63:13, 63:15, 63:15, 65:2, 65:14, 67:6, 70:10, 70:14, 70:18, 70:21, 71:7, 71:24, 72:2, 72:11, 72:16, 73:1, 73:22, 74:7, 74:12, 75:3, 76:4, 77:6
Defendants [1] - 1:8
defendants' [4] - 9:18, 11:25, 15:14, 28:13
defending [1] - 63:11
defer [6] - 8:17, 24:20, 24:21, 28:14, 31:25
deferral [1] - 8:21
deferred [2] - 8:21, 28:14
deferring [2] - 28:7, 32:4
definitely [1] - 70:1

definitive [1] - 49:21
degree [1] - 69:10
DELAWARE [1] - 1:2
Delaware [2] - 1:10, 25:24
delay [1] - 31:1
delayed [1] - 55:25
denied [1] - 55:17
deny [1] - 55:13
depose [2] - 75:13, 75:15
deposition [3] - 47:1, 77:4, 77:7
depositions [2] - 10:21, 77:16
described [1] - 40:22
description [1] - 17:16
design [2] - 21:8, 60:15
design-around [1] - 60:15
designee [1] - 77:7
desire [1] - 9:14
despite [1] - 70:4
destroy [5] - 76:16, 76:21, 77:19, 78:3, 78:12
destruction [2] - 76:25, 77:22, 78:8
destructive [1] - 77:23
detail [4] - 12:20, 57:22, 57:23, 69:9
detailed [2] - 10:17, 46:25
details [3] - 17:15, 57:20, 69:16
device [2] - 42:8, 53:10
devices [2] - 51:14, 54:7
Devices [3] - 3:14, 3:15, 4:24
dialogue [2] - 74:6, 75:5
dictates [1] - 41:18
differ [1] - 24:20
difference [2] - 31:16, 54:11
differences [1] - 15:12
different [4] - 26:15, 51:12, 54:9, 63:14
difficult [1] - 66:15
difficulties [1] - 49:25
DiGIOVANNI [1] - 3:22
dimensionalities [1] - 53:24
direct [1] - 65:24
directed [2] - 13:2, 40:8
directly [1] - 56:13

disagree [12] - 18:19, 19:9, 28:8, 30:9, 51:2, 51:7, 61:3, 61:18, 63:16, 64:1, 64:2, 64:4
disagreement [2] - 63:1, 64:18
disagrees [1] - 62:22
disappoint [1] - 69:14
disclosing [1] - 28:8
disclosure [2] - 16:11, 66:1
discovered [2] - 15:23, 30:25
Discovery [1] - 44:5
discovery [97] - 9:15, 9:21, 10:11, 11:8, 12:2, 12:8, 12:23, 12:24, 13:2, 13:4, 13:8, 14:1, 14:12, 15:6, 16:17, 16:19, 17:10, 17:13, 21:16, 22:1, 22:14, 23:4, 24:5, 24:16, 24:18, 24:24, 24:25, 25:3, 25:18, 26:14, 27:13, 27:17, 28:16, 30:21, 30:23, 30:24, 31:8, 31:11, 31:14, 32:4, 32:20, 32:24, 33:10, 33:11, 33:17, 33:18, 34:20, 34:21, 36:11, 36:12, 41:21, 42:13, 42:21, 43:13, 43:16, 43:20, 44:7, 44:16, 45:3, 45:17, 48:20, 49:9, 54:22, 54:25, 55:2, 58:24, 62:3, 62:5, 62:10, 62:20, 63:2, 63:8, 67:6, 67:13, 68:25, 69:16, 69:25, 70:7, 71:23, 72:10, 73:5, 73:9, 73:13, 73:15, 74:11, 74:12, 74:18, 75:4, 75:12, 76:3, 76:5, 76:6, 78:23
discrete [1] - 66:14
discussed [2] - 6:24, 36:5
discussing [1] - 6:22
discussion [11] - 8:4, 13:12, 26:3, 38:15, 46:14, 46:15, 55:7, 59:11, 68:2, 69:11, 70:2
discussions [4] - 12:23, 46:25, 48:2, 72:21
dismissed [1] - 72:8

display [3] - 53:11, 54:8, 54:10
Display [4] - 3:14, 4:7, 77:14, 77:16
displays [1] - 54:4
Displays [3] - 3:4, 3:14, 4:17
dispute [3] - 12:5, 33:12, 62:18
DISTRICT [2] - 1:1, 1:2
District [5] - 2:14, 3:8, 4:6, 25:22, 25:25
divergence [1] - 21:14
document [24] - 9:18, 9:23, 10:1, 10:24, 14:17, 26:17, 34:20, 48:18, 48:23, 51:15, 73:16, 73:18, 73:21, 73:23, 76:14, 76:16, 76:21, 77:3, 77:9, 77:10, 77:19, 78:3, 79:4
documents [17] - 10:8, 10:13, 10:22, 42:12, 42:13, 42:16, 46:24, 48:25, 49:20, 50:3, 50:23, 53:22, 58:7, 73:25, 74:13, 75:12
dog [1] - 41:4
dog-and-pony [1] - 41:4
DONALD [1] - 4:5
done [25] - 9:10, 11:1, 14:18, 15:24, 23:24, 25:1, 25:2, 26:7, 26:11, 27:13, 27:14, 27:16, 28:23, 29:25, 30:5, 31:20, 32:8, 32:9, 49:5, 49:6, 49:7, 49:8, 49:19
double [3] - 64:25, 65:2, 71:16
doubling [1] - 26:21
down [6] - 21:11, 31:1, 60:1, 62:4, 62:8, 74:24
downstairs [1] - 56:18
drag [1] - 66:9
drink [1] - 56:19
DSU [4] - 16:14, 16:15, 32:20, 33:1
DUANE [2] - 4:2, 4:5
duced [1] - 16:19
due [1] - 75:24
DUNNER [1] - 3:7
during [3] - 28:9, 40:21, 72:22

E

e-mails [1] - 10:16
easier [1] - 71:16
echo [1] - 46:19
effect [2] - 49:23, 62:19
efficiency [2] - 12:14, 16:8
efficient [1] - 59:18
effort [1] - 7:5
efforts [1] - 10:11
eight [4] - 48:21, 79:1
either [1,1] - 14:1, 17:25, 59:22, 61:19, 63:8
elect [1] - 15:10
election [2] - 15:16, 28:13
Electro [2] - 3:4, 3:10
Electro-Optics [2] - 3:4, 3:10
electronic [1] - 10:16
Electronic [1] - 3:15
element [1] - 40:9
elements [1] - 48:3
eliminated [1] - 62:12
eliminates [1] - 63:7
ELIZABETH [1] - 3:8
elucidate [1] - 64:21
emergent [2] - 76:9, 76:10
encountered [1] - 10:21
encourage [1] - 72:20
end [24] - 12:17, 24:6, 25:18, 25:19, 25:22, 25:25, 26:22, 27:1, 27:17, 34:18, 36:11, 39:4, 39:15, 40:11, 41:8, 44:11, 45:14, 46:8, 48:21, 52:22, 59:8, 59:12, 69:1
ended [1] - 44:18
ends [2] - 33:19, 79:14
energy [3] - 12:14, 12:16, 40:13
enforced [1] - 39:15
engage [1] - 67:6
enhancing [2] - 40:18, 40:23
enjoy [1] - 67:3
enlarge [2] - 26:13, 36:12
entail [1] - 73:13
entered [2] - 20:11, 62:16
entertain [1] - 34:11
entirety [1] - 64:3

entities [3] - 63:11, 63:23, 63:24
entitled [2] - 11:7, 34:8
envisioned [2] - 22:15, 30:22
Epson [3] - 4:23, 4:24, 56:25
equation [4] - 50:21, 53:4, 54:20, 54:21
Ericsson [2] - 3:23, 3:24
eroded [1] - 48:23
erroneous [1] - 63:17
especially [1] - 43:22
ESQ [21] - 1:17, 1:20, 2:3, 2:5, 2:9, 2:13, 2:17, 2:20, 3:3, 3:8, 3:12, 3:18, 3:22, 4:3, 4:5, 4:9, 4:12, 4:16, 4:19, 4:22, 5:3
essentially [3] - 12:21, 16:8, 33:20
et [4] - 1:4, 1:7, 33:4
evaluation [1] - 54:5
event [3] - 32:12, 52:12, 57:5
evidence [19] - 19:3, 19:10, 60:4, 60:10, 60:12, 60:13, 65:4, 68:7, 74:3
exactly [3] - 56:9, 68:20, 75:9
Exactly [2] - 33:13, 74:21
example [6] - 47:1, 49:22, 50:19, 53:8, 53:9, 74:15
exception [1] - 24:18
excerpts [1] - 37:22
exchanged [2] - 7:24, 11:19, 56:15
exclude [2] - 74:2, 74:23
excuse [2] - 35:7, 48:22
Excuse [2] - 48:8, 49:15
exhibit [1] - 67:21
exist [1] - 21:23
expanding [1] - 26:21
expect [2] - 47:11, 78:12
expectancy [1] - 53:19
experienced [1] - 49:25
Expert [1] - 24:16
expert [16] - 8:18, 24:16, 24:18, 25:3, 27:13, 28:7, 28:16,

31:18, 31:22, 31:24, 47:4, 47:7, 47:9, 47:13, 74:21, 74:23
**experts** [2] - 31:24, 32:1
**Experts** [1] - 32:8
**Explain** [1] - 50:14
**explain** [4] - 12:20, 14:3, 67:22, 79:4
**explained** [1] - 11:15
**exploration** [1] - 68:12
**explore** [1] - 55:9
**expressed** [2] - 46:19, 70:25
**expressly** [5] - 14:8, 33:2, 36:21, 36:23, 36:25
**extend** [6] - 8:9, 8:13, 8:15, 15:1, 27:17, 43:15
**extended** [2] - 25:17, 78:8
**extension** [22] - 15:2, 23:3, 23:4, 23:9, 23:11, 23:14, 23:17, 23:19, 24:12, 26:16, 26:21, 26:22, 26:25, 27:9, 27:25, 28:6, 36:9, 37:5, 46:14, 47:15
**extensive** [1] - 73:17
**extensively** [1] - 47:20
**extensiveness** [1] - 75:10
**extent** [5] - 12:24, 16:12, 42:2, 42:10, 52:14
**extra** [1] - 65:17
**extremely** [2] - 67:15, 67:16

# F

**face** [1] - 77:11
**facilities** [1] - 56:18
**fact** [27] - 7:25, 11:14, 12:4, 12:21, 13:17, 16:18, 23:4, 24:4, 24:18, 25:18, 27:17, 30:21, 38:3, 39:19, 41:7, 41:24, 42:18, 45:9, 46:23, 47:13, 51:11, 55:14, 64:14, 70:19, 72:1, 77:9, 77:22
**factor** [2] - 34:16, 75:14
**factors** [2] - 11:12, 33:1

**facts** [2] - 18:20, 77:18
**fail** [1] - 18:15
**Fair** [1] - 67:25
**fair** [2] - 13:4, 16:24
**fairer** [1] - 28:3
**fairly** [3] - 47:20, 66:5, 69:3
**fallout** [1] - 43:10
**far** [10] - 21:21, 44:8, 44:22, 57:2, 62:11, 62:13, 67:22, 73:17, 77:17
**FARABOW** [1] - 3:7
**fashion** [1] - 72:19
**fat** [1] - 52:2
**favor** [1] - 34:2
**feature** [1] - 40:12
**features** [6] - 58:12, 59:11, 60:23, 60:24, 61:2, 61:9
**February** [5] - 1:11, 10:2, 35:2, 39:4, 39:5
**Fed** [2] - 65:5, 65:23
**Federal** [3] - 13:21, 32:21, 33:2
**felt** [1] - 30:17
**few** [5] - 15:5, 22:25, 27:5, 56:10, 72:6
**field** [1] - 15:13
**fifth** [2] - 76:18, 76:23
**fighting** [1] - 13:23
**fights** [1] - 18:2
**figure** [1] - 69:20
**file** [1] - 79:2
**filed** [2] - 8:25, 79:4
**filing** [4] - 8:18, 31:17, 65:14, 65:18
**Film** [2] - 2:21, 2:22
**final** [1] - 16:10
**fine** [7] - 6:20, 7:12, 43:1, 48:13, 66:24, 69:23, 71:10
**fingers** [1] - 10:4
**finished** [1] - 6:4
**FINNEGAN** [1] - 3:7
**First** [1] - 46:13
**first** [35] - 9:17, 11:11, 15:10, 15:20, 15:21, 16:2, 17:11, 18:3, 20:8, 24:22, 25:12, 28:12, 28:15, 29:2, 29:9, 29:10, 29:14, 29:25, 30:22, 34:10, 34:25, 35:3, 36:17, 37:1, 38:25, 39:15, 39:22, 47:9, 47:10, 47:13, 59:4, 61:23, 62:1, 64:19, 65:25
**FISH** [1] - 4:12

**fit** [3] - 13:10, 17:12, 22:3
**five** [3] - 23:13, 55:2, 64:24
**flavor** [1] - 19:10
**flexible** [1] - 16:20
**focal** [1] - 51:25
**focus** [5] - 9:5, 10:6, 33:5, 68:24
**focused** [2] - 55:3, 55:10
**focusing** [1] - 10:5
**folks** [1] - 7:9
**follow** [4] - 16:19, 46:11, 47:1, 48:13
**follow-on** [1] - 16:19
**follow-up** [3] - 46:11, 47:1, 48:13
**following** [6] - 5:12, 31:6, 36:24, 52:19, 65:12, 65:15
**font** [1] - 71:16
**foot** [1] - 56:7
**FOR** [1] - 1:2
**forced** [1] - 20:20
**foreign** [1] - 10:14
**forever** [2] - 20:2, 43:2
**forget** [1] - 59:10
**form** [3] - 13:1, 20:7, 73:4
**formally** [1] - 7:6
**forms** [1] - 20:6
**forth** [1] - 17:9
**Forty** [1] - 79:1
**Forty-eight** [1] - 79:1
**forward** [8] - 9:3, 9:14, 12:24, 24:25, 32:5, 45:19, 45:21, 51:23
**four** [11] - 23:12, 24:2, 24:3, 26:20, 27:9, 28:2, 33:19, 43:1, 55:1
**frame** [4] - 9:11, 13:3, 31:17, 40:7
**framework** [1] - 34:3
**FRANCIS** [1] - 3:22
**frankly** [1] - 40:25
**Friday** [1] - 65:13
**Fridays** [2] - 65:10, 65:11
**FRIEDLANDER** [1] - 4:15
**front** [2] - 24:11, 36:18
**fronts** [1] - 31:14
**Fuji** [5] - 2:21, 2:22, 13:2, 49:22, 50:21
**Fujitsu** [3] - 3:19, 3:20
**full** [1] - 38:5
**fully** [3] - 15:23, 55:4

**functionalities** [1] - 59:11
**fundamental** [2] - 12:7, 64:17
**FURLOW** [1] - 4:19
**future** [5] - 6:22, 62:9, 63:9, 66:13

# G

**Gaffigan** [1] - 1:24
**GARRETT** [1] - 3:7
**GARY** [1] - 4:3
**GASPAR** [1] - 3:18
**gee** [2] - 35:17, 71:1
**general** [4] - 8:23, 10:12, 34:14, 56:8
**gentleman** [1] - 77:11
**gin** [1] - 34:22
**given** [4] - 14:16, 19:23, 45:10
**gladly** [1] - 30:15
**go-around** [1] - 47:10
**goal** [2] - 18:24, 26:10
**goals** [2] - 18:16, 18:18
**goose** [1] - 59:16
**Graham** [3] - 12:10, 13:17, 39:25
**great** [3] - 41:2, 43:10, 69:9
**greater** [1] - 71:6
**GRIMM** [1] - 1:17
**group** [7] - 15:10, 22:20, 30:17, 34:14, 36:3, 68:6, 77:15
**guess** [1] - 30:1
**guidance** [4] - 7:21, 13:14, 44:22, 55:9
**gun** [1] - 10:25
**guys** [2] - 44:12, 69:20

# H

**HADLEY** [1] - 3:17
**Hails** [2] - 21:2, 21:21
**HAILS** [5] - 2:13, 21:2, 21:5, 21:18, 22:4
**half** [3] - 27:10, 28:2, 70:13
**halfway** [1] - 27:25
**HALKOWSKI** [8] - 4:12, 68:16, 71:20, 71:22, 72:12, 72:17, 73:6, 73:10
**hand** [1] - 13:23
**handle** [1] - 21:7
**hands** [3] - 48:4, 48:6,

48:25
**happy** [1] - 70:6
**hard** [2] - 60:15, 68:2
**HARTSON** [1] - 4:21
**headed** [1] - 6:8
**heads** [1] - 55:11
**hear** [9] - 5:16, 5:25, 6:8, 6:10, 6:12, 7:15, 17:6, 71:1, 71:3
**heard** [8] - 35:3, 35:5, 38:22, 40:3, 40:4, 67:2, 67:14, 67:22
**hearing** [7] - 22, 19:24, 20:5, 23:7, 23:8
**Hearing** [1] - 79:14
**held** [4] - 5:13, 26:3, 29:1, 29:2
**help** [1] - 7:7
**helpful** [4] - 65:15, 70:15, 73:11
**HENDERSON** [1] - 3:7
**highlighted** [2] - 36:24, 38:19
**hinge** [1] - 56:4
**history** [1] - 51:5
**Hitachi** [5] - 3:4, 3:14, 3:14, 3:15
**hoe** [2] - 30:14, 33:7
**HOGAN** [1] - 4:21
**hold** [1] - 72:24
**Hold** [1] - 24:9
**home** [2] - 30:9, 48:15
**HONEYWELL** [1] - 1:4
**Honeywell** [39] - 1:21, 1:22, 8:9, 8:17, 9:7, 9:19, 9:21, 11:7, 11:21, 13:9, 13:22, 15:12, 15:19, 16:7, 16:18, 16:19, 18:17, 19:5, 21:22, 21:23, 22:2, 26:25, 32:13, 37:1, 44:3, 45:25, 47:6, 47:17, 55:11, 59:9, 59:23, 62:18, 64:25, 71:13, 72:22, 73:2, 73:16, 77:7, 77:13
**Honeywell's** [6] - 8:11, 10:6, 12:25, 16:5, 20:7, 63:7
**Honor** [100] - 5:17, 6:1, 6:11, 7:8, 7:13, 7:19, 8:6, 9:2, 9:8, 9:16, 10:18, 11:10, 11:17, 12:20, 12:25, 13:11, 13:15, 14:7, 14:17, 16:10, 16:24, 17:2, 20:22, 21:2, 22:10, 22:21, 22:23,

26:9, 27:8, 27:10, 30:21, 31:5, 31:13, 31:25, 32:19, 33:17, 34:5, 34:18, 35:4, 36:15, 37:3, 37:21, 38:5, 38:9, 39:5, 39:7, 39:11, 40:6, 40:25, 41:1, 45:2, 46:3, 46:7, 46:10, 48:14, 49:24, 50:9, 50:18, 51:6, 53:4, 53:21, 55:20, 56:9, 56:20, 57:15, 57:20, 57:23, 61:18, 63:2, 63:17, 64:6, 64:13, 65:6, 65:7, 65:11, 66:18, 67:4, 67:17, 68:1, 68:16, 68:23, 69:15, 70:7, 70:9, 70:25, 71:10, 73:6, 73:10, 73:20, 74:4, 75:2, 75:4, 76:7, 77:24, 78:6, 78:15, 78:21, 79:7, 79:12
Honor's [2] - 7:21, 64:16
HONORABLE [1] - 1:13
hope [5] - 47:16, 50:2, 68:23, 74:5, 74:25
hopefully [1] - 68:12
hoping [1] - 6:18
horde [2] - 43:13, 43:14
horrible [1] - 66:17
HORWITZ [32] - 3:3, 5:20, 17:2, 17:7, 20:1, 20:5, 37:15, 38:5, 38:9, 56:21, 57:11, 57:15, 58:21, 60:7, 60:12, 60:20, 61:7, 61:12, 63:2, 64:6, 64:10, 65:7, 65:11, 66:18, 67:1, 67:4, 67:17, 68:20, 69:6, 69:14, 69:23, 70:6
Horwitz [18] - 14:10, 16:25, 17:5, 21:11, 21:16, 35:25, 36:13, 36:19, 36:23, 37:13, 38:1, 38:2, 47:21, 51:3, 56:12, 57:6, 57:14, 64:14
Horwitz's [1] - 41:16
host [1] - 70:3
hours [6] - 14:24, 53:18, 53:19, 79:1, 79:4, 79:5
hunt [1] - 65:23

hurry [1] - 26:6
HUTZ [1] - 3:22
hybrid [1] - 50:22
hybrids [2] - 45:6, 57:4

## I

i.e [1] - 12:4
idea [6] - 44:24, 53:16, 57:5, 72:23, 73:12, 73:16
ideas [1] - 7:25
identified [1] - 73:2
identifies [1] - 77:8
III [1] - 4:19
Illinois [1] - 5:3
image [1] - 51:13
Imaging [1] - 4:24
immediately [1] - 78:13
impact [4] - 13:5, 53:25, 54:9, 54:10
implement [1] - 7:20
implemented [1] - 19:7
important [7] - 7:14, 16:7, 54:8, 55:17, 76:19, 76:20
importantly [1] - 55:16
impression [1] - 78:22
IN [1] - 1:2
inadvertently [1] - 76:14
inappropriate [1] - 10:5
INC [2] - 1:4, 1:7
Inc [13] - 1:22, 1:22, 2:7, 2:11, 2:22, 3:5, 3:15, 3:20, 3:20, 3:24, 4:10, 4:13, 4:14
inclined [1] - 57:24
include [3] - 20:10, 25:3, 40:20
included [3] - 20:10, 75:23, 75:24
including [1] - 39:16
incorporating [1] - 75:22
indeed [1] - 47:25
indicated [1] - 41:2
indication [1] - 22:2
indicia [1] - 13:19
individual [4] - 10:19, 13:7, 19:16, 35:21
individualized [2] - 10:12, 10:18
individuals [1] - 66:14

inducement [2] - 16:14, 22:23
industry [1] - 55:19
information [23] - 12:5, 12:17, 12:18, 14:23, 17:18, 17:19, 18:11, 35:19, 48:4, 50:1, 50:17, 52:12, 52:15, 54:3, 57:21, 59:4, 59:6, 59:15, 59:19, 68:10, 70:12, 70:15, 73:15
Information [1] - 59:5
infringe [2] - 16:14, 18:18
infringement [15] - 24:19, 25:5, 28:11, 28:16, 29:4, 30:7, 31:12, 31:18, 32:5, 32:20, 33:22, 34:4, 35:1, 43:5
infringements [1] - 8:19
infringes [1] - 59:24
Innolux [1] - 4:7
inquiry [5] - 58:22, 63:17, 64:2, 64:3, 64:18
instance [1] - 48:11
Intellectual [1] - 1:22
intent [1] - 10:3
interest [1] - 70:24
interested [3] - 13:13, 14:7, 70:21
interesting [2] - 39:13, 52:17
INTERNATIONAL [1] - 1:4
International [1] - 1:22
interpreted [1] - 55:21
invalid [3] - 30:3, 61:19, 63:12
invalidity [4] - 15:8, 25:3, 25:13, 47:5
invention [19] - 12:14, 18:9, 19:12, 40:24, 51:12, 51:21, 52:2, 52:8, 52:24, 54:13, 55:18, 57:18, 58:14, 58:23, 59:1, 60:5, 61:3, 64:7, 64:8
inventors [1] - 51:11
involved [2] - 61:21, 73:8
Ironically [1] - 23:11
issue [77] - 8:20, 9:2, 11:3, 11:5, 11:9, 11:15, 11:21, 12:1, 12:4, 12:7, 14:3,

14:5, 14:6, 14:8, 14:11, 14:16, 15:6, 16:9, 16:14, 16:22, 17:11, 17:20, 19:20, 20:16, 21:7, 24:23, 27:2, 28:12, 29:7, 32:1, 32:12, 32:13, 32:15, 35:1, 35:6, 35:22, 36:6, 36:7, 36:25, 37:2, 39:8, 39:13, 39:14, 39:25, 41:3, 41:6, 42:1, 43:6, 43:7, 43:22, 47:12, 47:23, 48:3, 58:1, 61:13, 63:10, 65:3, 68:18, 68:19, 70:1, 71:5, 71:18, 71:20, 71:25, 72:10, 72:13, 73:8, 76:9, 76:10, 77:20, 77:23, 77:25, 78:1, 78:8, 78:23
issues [48] - 8:11, 8:19, 9:6, 10:17, 15:5, 15:20, 15:21, 15:22, 16:24, 17:3, 21:1, 21:9, 21:18, 22:7, 24:21, 25:4, 25:11, 26:16, 26:18, 26:19, 27:18, 28:17, 29:8, 29:10, 29:14, 29:15, 30:22, 30:23, 30:25, 31:4, 31:12, 31:15, 32:5, 32:23, 33:22, 34:1, 34:4, 34:13, 34:23, 37:25, 41:5, 44:25, 47:5, 48:2, 51:23, 56:13, 74:8
issuing [1] - 75:22
itself [3] - 51:8, 60:6, 77:10

## J

January [10] - 7:22, 9:9, 10:1, 11:6, 16:16, 20:13, 27:21, 33:23, 39:5, 54:12
January's [1] - 9:4
Japan [3] - 31:9, 77:14, 77:16
JMOL [1] - 28:24
JMOLs [1] - 29:3
John [2] - 12:10, 13:17
JOHN [1] - 4:16
join [1] - 21:10
Jordan [22] - 9:22, 14:4, 14:9, 15:8,

15:15, 18:3, 19:21, 19:23, 29:7, 36:18, 38:14, 43:9, 44:8, 44:22, 45:7, 45:24, 48:17, 54:24, 55:4, 62:2, 62:7, 78:23
Jordan's [2] - 11:9, 38:20
judge [12] - 20:7, 20:9, 20:14, 27:15, 36:24, 41:8, 45:3, 45:10, 45:15, 54:24, 65:21, 71:2
Judge [27] - 9:22, 11:9, 14:4, 14:9, 15:8, 15:15, 18:3, 19:21, 19:23, 25:22, 25:25, 29:7, 36:18, 38:14, 38:20, 43:9, 44:8, 44:22, 45:7, 45:23, 48:17, 54:24, 55:4, 62:2, 62:7, 68:6, 78:23
JUDGE [1] - 1:13
judgment [2] - 23:8, 24:15, 25:9, 25:11, 43:3
July [2] - 43:23, 47:14
jumps [1] - 37:20
June [2] - 43:23, 47:4
juror [1] - 56:6
jury [9] - 29:15, 29:16, 29:19, 29:20, 30:9, 40:2, 40:5, 41:2, 41:4

## K

KAPLAN [1] - 1:19
KAREN [1] - 2:3
KARL [1] - 4:19
KATTEN [1] - 5:2
KATZENSTEIN [1] - 4:19
keep [4] - 46:21, 53:1, 55:10, 59:17
KENYON [2] - 2:13
kept [1] - 16:4
key [1] - 11:12
kind [11] - 21:8, 26:6, 50:11, 50:21, 52:16, 53:23, 59:2, 68:16, 73:12, 74:8, 75:16
kinds [1] - 18:6
known [1] - 39:18
knows [2] - 44:5, 58:25
Kyocera [1] - 4:24

# L

L.L.P [2] - 1:19, 3:12
lamp [1] - 56:7
languages [1] - 10:14
largely [1] - 9:2
Larry's [1] - 46:12
last [8] - 9:22, 16:15, 34:25, 43:23, 46:15, 48:19, 58:18, 66:16
Laughter [4] - 6:3, 26:1, 66:25, 70:8
LAVAN [1] - 2:19
law [8] - 20:19, 64:11, 64:20, 65:19, 67:19, 68:1, 68:11
Lawrence [1] - 39:11
LAWRENCE [1] - 2:20
lawyer [2] - 77:9, 77:12
Lawyers [1] - 42:23
layer [1] - 21:12
layers [1] - 12:19
LCD [1] - 17:25
learned [1] - 72:5
least [22] - 7:6, 8:9, 8:10, 8:25, 13:16, 14:2, 14:25, 15:2, 15:3, 22:7, 37:13, 41:8, 46:7, 47:24, 49:25, 54:22, 55:9, 66:3, 72:1, 72:6, 72:19, 76:1
leave [2] - 29:7, 69:21
left [5] - 21:8, 23:6, 31:3, 31:7, 78:22
legal [1] - 39:14
lengthy [1] - 6:18
lens [1] - 40:9
less [2] - 51:22, 76:11
letter [14] - 17:17, 35:2, 35:6, 36:20, 37:23, 38:2, 42:13, 68:22, 68:24, 70:10, 71:9, 71:14, 76:18, 77:8
letters [2] - 18:8, 67:18
level [1] - 53:22
licensed [1] - 72:3
licenses [1] - 43:11
life [3] - 18:8, 53:19, 56:2
lifted [1] - 35:23
light [3] - 7:21, 41:11, 63:6
lighter [1] - 41:25
likely [2] - 28:16, 40:5
limine [2] - 39:22,

74:23
limit [1] - 66:13
limitation [2] - 62:6, 62:7
limited [11] - 11:7, 13:2, 17:16, 21:25, 57:3, 64:16, 65:3, 69:25, 73:21, 74:11
Limited [1] - 3:19
limits [2] - 34:21, 54:24
line [5] - 6:17, 17:6, 31:17, 67:7
lined [1] - 31:21
lines [2] - 24:2, 67:14
lingering [2] - 8:11, 8:20
link [4] - 54:5, 54:21, 55:13, 60:5
LIPKIN [1] - 4:3
List [1] - 5:6
list [2] - 5:21, 6:16
listen [1] - 68:6
literally [2] - 36:17, 78:10
live [2] - 26:20, 27:24
LLP [9] - 2:17, 2:19, 3:2, 3:7, 3:17, 4:2, 4:5, 4:21, 5:2
Local [1] - 2:10
LODGE [1] - 3:22
logic [1] - 67:10
look [3] - 65:21, 66:8, 69:19
looked [1] - 44:8
looking [8] - 11:22, 17:10, 48:10, 49:10, 50:15, 67:21, 73:14, 73:17
loose [1] - 77:10
Los [1] - 4:22
lose [1] - 69:11
losing [1] - 40:2
loss [1] - 40:19
loud [1] - 6:6
love [1] - 38:7
lower [1] - 41:24
Ltd [8] - 2:21, 3:4, 3:5, 3:14, 3:14, 3:15, 4:17, 4:17
Lueck [3] - 14:10, 36:21, 55:5
luminance [6] - 42:14, 50:24, 54:2, 54:5, 56:6
luminescence [1] - 56:2
LUNDGREN [1] - 4:9

# M

MAGISTRATE [1] - 1:13
MAIER [1] - 2:5
mails [1] - 10:16
major [3] - 56:13, 65:23
maker [2] - 12:16, 12:17
Manufacturer [1] - 54:20
manufacturer [51] - 8:9, 8:17, 9:20, 11:23, 11:25, 12:12, 14:25, 15:7, 15:18, 15:21, 16:12, 16:20, 18:15, 18:17, 18:23, 19:9, 22:20, 22:24, 23:13, 24:1, 34:14, 35:8, 35:21, 35:22, 36:10, 36:20, 41:18, 42:3, 42:5, 42:6, 42:11, 42:20, 43:12, 43:15, 43:21, 45:5, 49:5, 52:14, 53:5, 54:4, 58:11, 58:25, 68:11, 70:10, 70:13, 70:18, 70:21, 71:7, 73:22, 74:6, 75:3
manufacturers [24] - 17:22, 18:19, 19:2, 19:14, 39:24, 45:23, 52:5, 52:13, 52:18, 57:4, 58:8, 59:20, 59:21, 60:8, 60:23, 61:16, 61:18, 61:22, 62:6, 62:19, 63:25, 64:20, 72:2, 74:13
manufacturers' [1] - 54:23
manufacturing [7] - 30:2, 35:12, 35:18, 46:17, 48:8, 49:19, 63:13
March [9] - 9:21, 10:2, 10:25, 34:21, 45:2, 45:16, 64:24, 65:1, 69:20
MARGULES [1] - 4:15
market [2] - 55:15, 59:13
marketed [1] - 59:14
marketing [1] - 59:5
marshal [1] - 13:20
MARY [1] - 1:13
materials [1] - 14:8
Matt [8] - 6:25, 22:13, 28:22, 48:13, 50:14,

62:14, 67:23, 73:12
matter [2] - 8:23, 10:13
matters [1] - 6:24
MATTHEW [1] - 1:20
McCLELLAND [1] - 2:5
McCLOY [1] - 3:17
McPHAIL [1] - 4:5
mean [11] - 27:24, 28:2, 31:20, 35:16, 52:9, 56:5, 56:7, 58:20, 61:5, 69:12, 78:10
means [3] - 36:12, 37:1, 51:22
meant [1] - 37:4, 61:24, 62:1
measured [1] - 57:17
measurement [1] - 53:20
measurements [1] - 53:17
meet [17] - 11:15, 18:16, 18:18, 18:23, 23:10, 27:25, 49:7, 52:10, 57:8, 58:11, 60:8, 60:24, 78:4, 78:7, 78:11, 78:13
meeting [1] - 60:3
meets [2] - 55:14, 55:15
mentioned [1] - 36:14
mere [1] - 41:23
merely [1] - 43:8
Merit [1] - 1:25
met [2] - 61:9, 61:10
microphone [2] - 7:3, 7:5
microphones [1] - 7:6
mid [1] - 10:25
middle [2] - 47:2, 47:14
might [7] - 5:24, 8:1, 13:9, 20:24, 29:15, 72:15, 74:22
MILBANK [1] - 3:17
MILLER [1] - 1:19
mind [4] - 13:9, 37:12, 75:15
minimizes [1] - 13:4
minimum [1] - 8:14
Minneapolis [1] - 1:20
Minnesota [1] - 1:20
minute [4] - 8:14, 19:18, 56:11, 57:6
minutes [1] - 37:11
missing [1] - 53:7
model [1] - 59:17
module [12] - 12:16,

17:25, 18:4, 19:13, 51:18, 52:6, 53:17, 56:6, 58:14, 59:2, 59:7, 60:8
modules [8] - 11:14, 40:17, 47:23, 48:3, 52:20, 54:19, 59:6, 59:13
moire [2] - 40:10, 54:10
moment [1] - 10:3
Monday [2] - 65:12, 65:15
money [1] - 42:23
MONTE' [1] - 2:9
month [15] - 23:3, 23:9, 23:11, 23:14, 23:17, 23:19, 24:12, 26:16, 26:23, 36:9, 37:5, 45:8, 46:13, 47:15
months [49] - 8:10, 8:15, 9:8, 11:1, 14:18, 14:20, 15:2, 15:3, 23:24, 24:2, 24:3, 24:4, 24:7, 25:16, 25:17, 25:19, 26:12, 26:19, 27:5, 27:7, 27:9, 27:10, 28:1, 32:13, 33:19, 33:20, 34:16, 42:20, 42:21, 43:1, 43:18, 43:19, 46:16, 46:22, 48:20, 48:22, 49:16, 50:12, 55:1, 55:2, 66:4, 71:2, 76:2, 76:6
morning [1] - 77:25
MORRIS [3] - 1:17, 4:2, 4:5
most [5] - 7:14, 22:24, 23:3, 24:15, 28:16, 34:23
mostly [1] - 57:4
motion [4] - 9:22, 38:22, 40:2, 74:23
motions [1] - 39:22
motivations [1] - 42:25
move [6] - 7:1, 7:3, 9:3, 30:6, 34:2, 51:23
moving [1] - 9:14
MR [167] - 5:20, 6:1, 6:11, 6:15, 7:8, 7:11, 7:13, 7:19, 8:5, 8:8, 17:2, 17:7, 20:1, 20:5, 21:2, 21:5, 21:18, 22:4, 22:10, 22:21, 22:23, 23:18,

23:21, 24:14, 25:4, 25:10, 25:14, 25:18, 26:9, 27:4, 27:22, 27:24, 28:6, 29:5, 29:17, 29:19, 29:22, 30:17, 30:20, 31:5, 31:13, 31:25, 32:3, 32:16, 32:19, 33:9, 33:13, 33:15, 33:16, 34:5, 34:7, 34:13, 34:17, 34:25, 35:4, 35:5, 35:6, 35:10, 35:15, 35:20, 35:25, 36:4, 36:15, 36:17, 37:3, 37:7, 37:10, 37:15, 37:21, 38:5, 38:9, 39:1, 39:4, 39:7, 39:11, 40:6, 40:12, 42:6, 44:2, 44:15, 45:2, 45:12, 45:14, 45:21, 46:7, 46:10, 47:12, 48:5, 48:8, 48:14, 49:3, 49:13, 49:15, 49:21, 49:24, 50:9, 50:18, 53:3, 53:8, 53:13, 53:21, 55:23, 56:4, 56:20, 56:21, 56:24, 57:11, 57:15, 58:21, 60:7, 60:12, 60:20, 61:7, 61:12, 61:17, 61:23, 61:25, 63:2, 63:16, 63:20, 64:1, 64:6, 64:10, 64:13, 65:6, 65:7, 65:11, 66:18, 67:1, 67:4, 67:17, 67:25, 68:14, 68:16, 68:20, 69:6, 69:14, 69:23, 70:6, 70:9, 70:24, 71:4, 71:10, 71:20, 71:22, 72:12, 72:17, 73:6, 73:10, 73:20, 74:4, 74:21, 75:2, 76:7, 76:9, 76:11, 76:20, 76:24, 77:3, 77:6, 77:24, 78:6, 78:14, 78:17, 78:19, 79:7, 79:12
MUCHIN [1] - 5:2
mutually [1] - 45:22

**N**

name [1] - 21:2
naming [1] - 45:25
narrow [2] - 22:7, 55:11
narrowed [1] - 15:13
nature [1] - 73:25

near [2] - 8:25, 66:13
necessarily [3] - 7:16, 29:24, 44:10
necessary [7] - 14:4, 22:17, 23:22, 24:8, 26:22, 36:13, 65:4
need [43] - 6:24, 7:5, 8:24, 12:2, 12:13, 15:22, 15:23, 17:22, 23:23, 27:7, 27:8, 32:18, 34:16, 38:22, 50:16, 50:17, 51:19, 52:18, 52:19, 53:2, 53:4, 53:22, 54:6, 54:21, 57:21, 58:3, 58:6, 58:8, 58:9, 58:10, 59:11, 66:20, 67:22, 68:7, 68:8, 69:4, 69:21, 70:1, 71:15, 72:4, 76:12, 78:3
needed [1] - 9:3
needs [5] - 15:17, 16:16, 28:18, 47:18
NEIL [1] - 3:12
NEUSTADT [1] - 2:5
never [10] - 20:10, 30:23, 33:17, 36:8, 37:5, 38:14, 59:9, 62:6, 75:5
new [4] - 16:15, 20:14, 33:1, 50:1
New [6] - 2:20, 3:13, 3:18
next [4] - 30:6, 41:22, 50:2, 58:25
nexus [5] - 52:23, 53:5, 53:6, 53:7, 69:5
NICHOLS [1] - 1:17
NIEMEYER [1] - 3:8
NO [1] - 1:8
Nobody [2] - 50:8, 50:9
nobody [2] - 31:20, 70:3
Nokia [1] - 4:14
none [1] - 42:17
None [1] - 42:16
noninfringing [5] - 19:4, 19:6, 39:17, 39:21, 40:8
nonobviousness [1] - 13:20
normal [2] - 77:20
normally [1] - 78:17
North [1] - 5:4
note [1] - 72:24
NOTE [1] - 5:12
notebooks [1] - 50:4

nothing [5] - 41:12, 41:25, 54:14, 61:8, 63:6
Nothing [1] - 62:11
notion [1] - 19:19
November [4] - 25:20, 25:23, 25:25, 27:17
nub [2] - 17:20, 65:19
number [6] - 15:11, 41:15, 43:6, 56:6, 59:10
nutshell [1] - 16:23

**O**

o'clock [1] - 79:2
objection [2] - 78:1, 78:2
obligation [2] - 16:3, 75:8
obligations [1] - 23:10
OBLON [1] - 2:5
observation [1] - 41:16
obtained [1] - 74:12
Obviously [1] - 18:19
obviously [1] - 19:9
occupied [1] - 43:18
occupying [1] - 42:24
occur [3] - 32:25, 33:14, 76:3
occurs [1] - 33:12
October [5] - 9:24, 24:7, 48:19, 49:10, 49:12
OF [1] - 1:2
office [1] - 5:22
often [1] - 50:22
Ollis [1] - 46:10
OLLIS [4] - 2:5, 46:10, 47:12, 48:8
Olympus [2] - 2:10, 2:11
once [8] - 9:11, 14:3, 14:21, 18:21, 27:12, 27:13, 33:25, 74:12
One [3] - 33:1, 57:15, 68:22
one [35] - 9:17, 11:1, 11:12, 11:24, 12:18, 13:9, 13:23, 15:5, 16:9, 17:12, 17:13, 22:3, 24:9, 29:5, 29:24, 30:1, 34:25, 35:16, 39:21, 40:9, 40:17, 42:20, 42:24, 42:25, 44:2, 44:15, 49:25, 52:6, 56:13, 61:4, 64:22, 65:1,

67:12, 68:2, 74:2
ones [2] - 37:22, 68:9
oOo [1] - 5:10
open [2] - 23:6, 43:13
operative [1] - 50:5
opinion [4] - 32:22, 33:3, 33:4, 66:6
opinions [11] - 16:11, 16:13, 16:18, 28:8, 32:16, 32:17, 32:18, 32:24, 34:16, 35:1, 66:1
opportunity [7] - 14:2, 16:6, 21:23, 41:2, 56:11, 71:8, 72:7
opposed [2] - 67:19, 75:4, 75:8
opposing [4] - 10:15, 33:6, 36:23, 37:22
opposite [1] - 69:8
Optics [2] - 3:4, 3:10
Optoelectronics [1] - 3:9
Optrex [6] - 2:7, 46:11, 46:17, 46:25, 47:21, 47:25
Optrex's [1] - 47:24
Oral [1] - 79:14
ordeal [1] - 70:19
order [23] - 6:23, 7:16, 7:21, 7:25, 10:5, 11:10, 11:11, 14:14, 20:6, 20:7, 20:11, 24:11, 48:19, 49:11, 62:18, 65:13, 66:21, 75:21, 75:22, 75:25, 76:13, 78:24
ordered [4] - 9:22, 12:25, 48:17, 54:24
orders [3] - 19:23, 62:12, 62:15
organized [1] - 72:20
original [3] - 11:10, 15:1, 49:11
originally [7] - 9:19, 9:21, 10:9, 14:5, 15:9, 49:9, 50:11
otherwise [1] - 41:6
outcome [2] - 28:24, 34:2
outlined [1] - 75:19
output [2] - 53:15, 53:23
outstanding [2] - 15:5, 16:9
Overwhelming [1] - 70:23
overwhelming [1] - 62:25
own [2] - 70:19, 71:8

**P**

P.C [2] - 2:5, 4:12
p.m [1] - 1:11, 5:13
p.m.)] [1] - 79:14
page [6] - 36:24, 37:20, 38:20, 64:24, 71:9
pages [6] - 32:10, 36:22, 37:19, 37:23, 65:2, 71:15
painful [1] - 43:18
paragraph [1] - 76:13
parallel [1] - 45:12
part [16] - 8:4, 16:4, 18:8, 22:24, 24:15, 26:4, 30:24, 40:3, 40:24, 53:3, 53:6, 53:7, 54:20, 54:21, 56:13, 70:16
participants [2] - 5:7, 5:16
participate [2] - 16:6, 19:20
participated [1] - 68:7
participating [3] - 41:20, 42:23, 46:18
particular [2] - 21:17, 50:24, 50:25, 76:17
particularized [1] - 13:25
particularly [2] - 13:8, 71:23
parties [25] - 7:23, 8:14, 10:15, 13:2, 15:11, 15:25, 19:22, 20:6, 20:8, 21:13, 23:9, 24:19, 25:1, 31:16, 31:23, 43:20, 45:4, 45:8, 46:2, 47:4, 54:23, 61:21, 70:16, 71:14, 76:15
partner [1] - 14:10
party [1] - 76:14
PASCALE [1] - 2:3
pass [1] - 9:25
past [3] - 13:11, 14:23, 55:7
PAT [1] - 1:13
patent [27] - 12:13, 17:24, 18:18, 19:8, 30:3, 39:14, 39:19, 40:22, 40:23, 41:13, 41:17, 51:4, 51:8, 51:9, 57:18, 58:23, 59:9, 61:14, 61:16, 61:19, 63:12, 63:18, 63:24, 64:11, 69:10
patentable [1] - 40:24

patented [1] - 57:18
patents [3] - 29:1, 29:2, 30:9
Pause [4] - 37:18, 38:23, 62:24, 70:22
peculiar [1] - 22:12
Pentax [2] - 4:10, 4:10
people [17] - 5:25, 6:16, 7:15, 15:10, 19:6, 29:6, 42:21, 42:22, 54:7, 56:22, 57:3, 68:6, 75:13, 75:15, 77:13, 77:17
per [1] - 56:7
percent [2] - 50:8, 50:10
perfectly [1] - 33:10
performance [8] - 18:22, 18:24, 47:25, 58:12, 60:22, 60:24, 61:2, 61:9
perhaps [5] - 33:21, 40:16, 47:7, 58:24, 59:12
Perhaps [2] - 66:19, 67:5
period [9] - 16:17, 26:23, 27:1, 33:19, 33:21, 34:8, 43:16, 72:22
periods [1] - 31:1
person [1] - 77:14
personal [1] - 30:15
personally [1] - 30:12
perspective [2] - 46:17, 47:24
phase [9] - 17:14, 28:9, 28:24, 29:1, 29:2, 29:25, 30:7, 30:10, 38:25
phases [1] - 18:12
phenomenon [1] - 35:11
Phil [2] - 24:9, 28:22
PHILIP [1] - 2:17
phone [15] - 5:20, 5:25, 6:7, 6:12, 6:13, 7:9, 20:13, 22:9, 46:5, 56:22, 56:23, 57:3, 60:9, 62:22, 66:16
phonetic [1] - 40:15
Photo [2] - 2:21, 2:22
phraseology [1] - 8:21
picked [1] - 45:15
picture [1] - 28:23
piece [5] - 11:2, 12:11, 54:3, 70:15, 74:17
piecemeal [1] - 72:18
pieces [2] - 63:21,

71:11
place [1] - 59:17
placed [2] - 62:7, 62:8
placing [1] - 7:25
Plaintiffs [1] - 1:5
plan [2] - 13:4, 21:8
play [1] - 75:14
plenty [1] - 27:11
plop [1] - 52:21
plus [1] - 43:19
podium [1] - 7:6
point [35] - 7:22, 8:16, 9:13, 10:20, 15:3, 15:16, 19:19, 23:23, 24:4, 26:12, 26:18, 27:7, 27:12, 28:5, 33:18, 33:21, 38:9, 42:19, 44:11, 45:7, 45:9, 47:6, 48:15, 48:21, 48:22, 51:25, 61:4, 64:21, 65:19, 66:12, 68:2, 68:17, 70:11, 71:16, 78:3
pointed [2] - 48:24, 65:24
pointing [1] - 10:4
points [4] - 9:1, 19:16, 31:22, 68:8
pony [1] - 41:4
portion [2] - 34:19, 74:23
position [6] - 8:11, 16:5, 17:12, 20:17, 35:8, 41:1
positions [1] - 11:25
possible [2] - 6:7, 46:22
possibly [2] - 12:2, 40:1
post [1] - 30:5
post-trial [1] - 30:5
potentially [2] - 46:16, 68:10
POTTER [2] - 2:17, 3:2
power [9] - 12:15, 40:18, 40:24, 42:9, 50:25, 51:13, 53:10, 53:23, 58:8
practical [1] - 30:1
practice [1] - 9:22
prejudice [1] - 41:2
premature [3] - 16:22, 21:10, 75:3
prepared [3] - 5:21, 13:15, 51:25
present [5] - 5:6, 25:1, 38:24, 46:2, 72:7
presented [4] - 6:16, 15:23, 28:18, 41:3
preserve [2] - 49:4,

49:16
preserving [1] - 14:6
pressing [1] - 64:17
pretrial [1] - 23:7
pretty [2] - 8:5, 30:13
primarily [2] - 11:4, 11:21
privileged [2] - 76:15, 77:22
pro [1] - 16:18
problem [15] - 13:10, 23:17, 23:18, 23:20, 23:21, 25:15, 35:19, 35:21, 52:5, 55:5, 65:16, 65:24, 70:7, 78:25, 79:5
problems [2] - 66:11, 70:3
procedure [1] - 78:14
proceed [3] - 13:24, 29:13, 74:5
proceeding [2] - 46:2, 62:4
process [2] - 5:19, 76:25
produce [3] - 16:19, 50:1, 76:24
produced [8] - 10:9, 10:22, 42:12, 42:16, 46:24, 48:25, 50:4, 76:14
producing [2] - 49:20, 50:5
product [10] - 12:17, 17:18, 40:17, 43:6, 52:8, 52:22, 53:15, 59:8, 59:12
production [7] - 26:17, 48:18, 73:9, 73:16, 73:18, 73:21, 73:23
productions [7] - 9:19, 9:23, 10:1, 10:24, 14:17, 34:20, 48:23
productive [1] - 72:22
products [8] - 11:13, 17:23, 45:25, 50:1, 52:20, 59:6, 59:13, 73:1
Products [1] - 3:20
progressing [1] - 31:14
project [1] - 7:7
proper [3] - 12:10, 13:19, 64:11
Properties [1] - 1:22
proposal [2] - 15:2, 22:6, 44:21
propose [1] - 23:14

proposed [5] - 19:22, 21:22, 23:14, 26:21, 50:11
proposition [1] - 47:22
prosecution [2] - 40:21, 51:5
protected [1] - 77:8
protective [1] - 76:13
protects [2] - 40:19
provide [4] - 13:13, 14:7, 18:23, 64:20
provided [2] - 36:22, 48:1
providing [2] - 12:14, 19:3
provision [3] - 20:8, 20:10, 20:11
public [1] - 54:7
purpose [6] - 18:25, 25:7, 40:10, 40:18, 44:7, 62:17
pursue [1] - 34:9
push [1] - 71:2
pushed [1] - 27:20
put [11] - 5:7, 7:20, 17:16, 26:7, 40:2, 56:7, 57:25, 66:21, 68:22, 72:9, 72:11
puts [1] - 10:25
putting [2] - 5:19, 23:23
puzzle [2] - 70:13, 71:11

Q

questioning [1] - 9:9
questions [2] - 16:25, 20:23
quicker [1] - 49:17
quickly [5] - 31:20, 32:8, 32:10, 34:3, 64:16
quite [4] - 6:17, 30:8, 46:18, 47:16

R

race [3] - 43:11, 44:6
raise [3] - 19:17, 44:3, 76:12
raised [29] - 9:9, 11:6, 12:3, 14:9, 18:3, 18:7, 19:19, 19:21, 19:22, 20:16, 26:16, 29:8, 35:6, 35:9, 36:8, 36:17, 36:21, 37:2, 37:5, 37:7,

43:23, 43:25, 44:2, 44:4, 71:20, 77:25, 78:2
raising [1] - 36:7
ramifications [1] - 43:8
rather [5] - 9:11, 14:21, 30:11, 68:24, 72:19
rationale [1] - 41:23
reach [2] - 23:8, 77:21
reached [2] - 23:2, 23:3
read [9] - 19:8, 37:12, 37:13, 38:18, 52:17, 62:13, 67:11, 71:17
reads [1] - 44:3
ready [1] - 27:14
real [3] - 41:5, 56:5, 56:8
realistic [4] - 9:8, 9:12, 14:19, 14:20
reality [1] - 10:7
realize [2] - 16:23, 64:16
really [27] - 9:10, 9:16, 10:22, 10:23, 12:22, 15:17, 15:22, 15:25, 17:20, 19:10, 26:14, 28:10, 28:18, 40:4, 43:2, 46:20, 48:11, 51:25, 55:3, 57:20, 65:3, 65:14, 66:14, 67:19, 67:21, 70:2, 74:3
reason [12] - 10:7, 28:14, 28:18, 30:12, 30:25, 35:25, 36:2, 44:7, 58:17, 66:11, 72:3, 74:15
reasonable [1] - 28:1
reasoning [1] - 66:24
reasons [4] - 36:13, 42:25, 54:19, 70:25
recapture [1] - 44:6
receive [1] - 66:20
received [3] - 17:21, 49:21, 76:17
receiving [1] - 10:8
recency [1] - 9:18
recent [1] - 35:11
recently [2] - 32:9, 46:24
recess [2] - 57:12, 57:13
recipient [2] - 77:8, 77:14
recipients [1] - 77:11
recognize [3] - 65:22, 72:13, 72:25

recognizes [1] - 22:3
recollection [2] - 29:13, 44:16
record [7] - 13:20, 21:6, 26:2, 26:3, 51:6, 51:20, 60:22
reducing [1] - 40:18
reference [1] - 40:15
referring [1] - 9:20
regard [9] - 7:24, 8:20, 1:8, 13:19, 14:25, 15:8, 51:4, 54:3, 65:4
regarding [3] - 22:20, 32:14, 59:6
regardless [2] - 26:22, 54:25
Registered [1] - 1:25
rehashing [1] - 44:25
relate [1] - 28:10
relates [2] - 11:4, 15:7
relationship [2] - 61:16, 61:18
relative [1] - 43:14
relatively [2] - 31:20, 32:8
relegated [1] - 13:23
relevance [4] - 41:11, 74:16, 74:17
relevant [13] - 12:1, 18:20, 33:1, 39:24, 41:10, 58:21, 64:2, 64:18, 68:24, 69:3, 69:4, 70:12
relief [2] - 76:2, 77:19
rely [2] - 16:12, 74:21
remain [1] - 8:12
remember [1] - 72:14
removed [1] - 18:21
repeat [1] - 16:8
repeatedly [1] - 45:24
report [2] - 47:9, 47:13
REPORTER [1] - 5:17
reporter [1] - 6:8
Reporter [1] - 1:25
REPORTER'S [1] - 5:12
reports [9] - 8:18, 8:24, 24:19, 28:8, 31:18, 32:1, 32:8, 47:4, 47:7
represent [1] - 21:3
represented [1] - 35:17
request [8] - 12:25, 23:12, 28:1, 36:9, 41:19, 50:1, 60:2, 68:1
requested [2] - 26:25, 36:8

requesting [1] - 58:19
require [2] - 10:13, 10:15
required [3] - 20:17, 20:18, 57:25
requirement [1] - 77:19
requires [1] - 42:8
reserve [2] - 14:11, 32:10
reserving [1] - 36:25
reset [1] - 27:6
resist [1] - 41:21
resisted [1] - 45:24
resolution [2] - 30:1
resolve [1] - 44:13
resolved [7] - 14:15, 15:12, 22:7, 33:23, 34:4, 36:11, 41:7
resorting [1] - 46:1
resources [1] - 18:23
respect [5] - 13:24, 19:17, 29:12, 46:13, 46:23
respectfully [2] - 63:16, 64:4
respond [5] - 56:12, 57:7, 58:1, 68:22, 70:10
response [1] - 55:25
responsive [1] - 38:2
rest [1] - 56:14
result [5] - 29:15, 42:9, 45:22, 45:23, 46:1
resulted [1] - 45:22
results [2] - 16:2, 46:20
review [1] - 16:18
revisiting [1] - 27:2
Rich [4] - 5:18, 6:16, 57:7, 60:2
Rich's [1] - 67:10
RICHARD [1] - 3:3
RICHARDSON [1] - 4:12
rigamarole [1] - 30:5
risk [3] - 39:19, 69:7, 69:8
road [6] - 30:14, 31:2, 33:7, 62:4, 62:8, 74:24
Robert [1] - 56:24
ROBERT [3] - 2:13, 4:19, 4:22
ROBINS [1] - 1:19
roll [1] - 6:18
room [7] - 7:4, 7:15, 19:6, 29:6, 57:10, 62:21, 71:6

ROSENMAN [1] - 5:2
Rosenthal [7] - 39:11, 47:21, 48:24, 50:19, 51:3, 54:11, 77:24
ROSENTHAL [25] - 2:20, 39:11, 40:6, 40:12, 42:6, 44:2, 44:15, 45:2, 45:12, 45:14, 45:21, 49:24, 70:24, 71:4, 76:7, 76:9, 76:11, 76:20, 76:24, 77:3, 77:6, 78:6, 78:19, 79:7, 79:12
rotating [1] - 40:9
round [1] - 10:21
route [1] - 21:22
Rovner [5] - 8:22, 16:25, 20:25, 22:19, 51:3
ROVNER [41] - 2:17, 22:21, 22:23, 23:18, 23:21, 24:14, 25:4, 25:10, 25:14, 25:18, 26:9, 27:4, 27:22, 27:24, 28:6, 29:5, 29:17, 29:19, 29:22, 30:17, 31:25, 32:3, 33:9, 33:13, 33:15, 34:7, 34:13, 34:25, 35:5, 35:10, 35:15, 35:20, 35:25, 36:4, 37:3, 37:7, 37:10, 39:1, 39:7, 48:5, 75:2
rub [2] - 64:6, 64:14
rule [1] - 75:4
ruled [1] - 62:2
run [3] - 53:18, 69:7, 69:8
running [1] - 27:16
rush [1] - 26:6

## S

safe [1] - 11:20
sale [1] - 40:17
sales [7] - 12:12, 17:18, 41:11, 41:21, 54:1, 59:4, 59:5
Samsung [2] - 3:5
Sanyo [3] - 4:24, 5:4, 22:12
satisfactory [2] - 45:22, 76:12
satisfied [1] - 79:9
satisfy [1] - 60:4
saving [1] - 40:23
savings [3] - 12:15,

51:14, 53:10
scenario [1] - 64:19
schedule [7] - 8:10, 8:13, 24:13, 38:24, 45:1, 45:7, 47:3
scheduled [1] - 47:2
scheduling [15] - 6:23, 7:21, 7:25, 10:5, 11:11, 14:14, 20:11, 24:10, 48:19, 49:11, 62:12, 62:15, 62:17, 66:21, 78:24
scheme [1] - 46:2
scope [4] - 12:1, 12:24, 51:4, 75:5
scrutiny [1] - 13:21
SDI [2] - 3:5, 3:5
SEAMAN [1] - 4:16
seated [1] - 5:14
second [7] - 8:16, 11:3, 11:17, 12:11, 17:11, 21:12, 24:9
secondary [1] - 13:19
see [16] - 5:23, 21:13, 21:24, 30:12, 38:2, 38:6, 38:7, 50:22, 50:23, 50:25, 55:11, 64:5, 66:19, 69:19, 72:3, 73:20
seeks [1] - 26:14
seem [1] - 32:7
Seiko [4] - 4:23, 56:25
selling [1] - 54:7
sending [1] - 75:20
sense [7] - 7:11, 15:9, 30:4, 30:23, 33:17, 49:15, 70:9
sent [2] - 12:3, 36:20
sentiments [1] - 46:19
separate [2] - 75:20, 75:25
September [2] - 24:7, 43:24
seriously [2] - 76:2, 76:4
served [2] - 9:19, 9:21
session [1] - 69:17
set [7] - 16:16, 16:17, 42:18, 48:21, 66:10, 66:12, 70:16
sets [1] - 77:18
setting [3] - 28:9, 31:16, 62:5
settled [1] - 22:15
settlements [1] - 73:3
seven [5] - 64:24, 65:2, 71:9, 71:15
seven-page [1] - 71:9
several [1] - 65:14
share [2] - 9:14, 12:5

shared [2] - 36:5, 36:19
shifting [1] - 45:24
shooting [1] - 26:10
short [6] - 13:3, 57:25, 64:16, 65:14, 65:18, 72:7
shortest [1] - 8:3
show [7] - 13:17, 41:4, 52:23, 53:5, 55:14, 57:23, 75:16
showing [2] - 30:3, 52:25
side [4] - 24:6, 24:23, 68:3, 79:5
sides [1] - 50:20
significant [1] - 58:1
silence [2] - 63:1, 70:23
similar [1] - 54:2
simple [2] - 64:12, 66:11
simply [2] - 49:4, 72:7
single [1] - 51:15
SIROTA [1] - 3:12
sit [6] - 26:8, 28:23, 37:17, 62:14, 65:19, 79:3
sits [2] - 26:4, 52:14
sitting [3] - 26:6, 31:21, 68:5
situation [7] - 10:23, 25:1, 46:23, 46:25, 52:17, 73:20, 78:14
six [22] - 14:19, 15:3, 23:17, 23:19, 24:7, 25:16, 25:17, 26:12, 26:23, 27:7, 28:2, 32:13, 33:20, 34:16, 42:21, 43:17, 43:19, 46:16, 49:16, 66:5, 71:2
six-month [3] - 23:17, 23:19, 26:23
size [10] - 9:18, 13:9, 17:12, 17:13, 22:3, 53:24, 53:25, 58:6, 58:7
smaller [8] - 34:19, 51:14, 51:18, 51:19, 51:21, 51:22, 52:3, 53:9
smiling [1] - 55:12
SMITH [1] - 4:19
so-called [1] - 39:23
solution [2] - 64:15
someplace [1] - 57:8
somewhat [2] - 15:13, 24:20
somewhere [1] - 24:3

Sony [10] - 2:10, 2:15, 3:23, 3:24, 21:3, 21:4, 21:5, 22:12
soon [1] - 6:4
sooner [1] - 30:11
sorry [6] - 20:1, 21:4, 29:19, 31:5, 55:23, 55:24
sort [3] - 12:6, 16:22, 55:25
sorted [1] - 45:4
sorting [1] - 45:22
sorts [1] - 66:11
sought [1] - 26:15
sound [1] - 6:2
sounded [1] - 67:15
sounds [1] - 72:14
source [1] - 59:24
space [1] - 42:24
spaced [3] - 64:25, 65:2, 71:16
Spare [1] - 6:19
speakerphone [1] - 66:16
speaking [1] - 7:4
speaks [1] - 12:13
specific [8] - 20:7, 21:13, 37:25, 46:14, 49:6, 54:19, 54:24, 57:17
specifically [2] - 6:23, 20:24
specification [1] - 50:23
specifications [3] - 18:20, 47:25, 58:19
specifies [1] - 41:13
specify [1] - 42:10
specter [1] - 71:23
spending [1] - 69:1
spent [2] - 51:10, 71:2
SPIVAK [1] - 2:5
SQUIRE [1] - 2:9
stage [2] - 44:25, 66:2
stages [1] - 50:25
stake [1] - 71:7
stances [1] - 22:13
stand [5] - 7:6, 7:10, 37:16, 62:14, 70:18
standard [7] - 16:15, 33:1, 52:10, 52:11, 53:15, 55:18
standards [1] - 52:10
standpoint [2] - 49:3, 54:23
STARGATT [3] - 2:2, 2:8, 4:8
start [2] - 8:1, 76:25
started [3] - 6:25,

18:3, 44:24
starting [1] - 15:3
statement [1] - 49:23
statements [1] - 51:4
STATES [1] - 1:1
static [1] - 54:25
status [1] - 36:18
stay [2] - 35:23, 54:25
stayed [2] - 63:3
step [4] - 18:21, 40:20, 41:22, 43:10
still [8] - 10:8, 35:11, 46:6, 47:15, 48:23, 62:10, 68:21, 73:3
stipulate [1] - 51:20
stipulations [1] - 54:17
stop [1] - 53:23
story [1] - 10:19
street [1] - 60:19
string [1] - 65:20
stronger [2] - 40:16, 41:1
strongly [2] - 7:2, 51:2
STROOCK [2] - 2:19
structural [1] - 48:2
structure [3] - 11:14, 40:12, 47:23
structures [1] - 39:21
stuck [2] - 73:4, 74:19
stuff [3] - 38:18, 38:19, 44:13
sub [1] - 10:17
sub-detailed [1] - 10:17
sub-issues [1] - 9:16
sub-mission [2] - 8:18, 31:17
sub-missions [3] - 36:19, 66:20, 75:24
sub-mit [1] - 11:25, 20:6, 78:15
sub-mitted [1] - 47:14
sub-mitting [1] - 47:7
sub-sequent [1] - 11:19
sub-stantial [6] - 9:25, 26:17, 49:24, 50:6, 50:8
sub-stantially [3] - 9:23, 10:24, 48:18
success [47] - 11:9, 11:13, 12:1, 12:4, 14:12, 15:6, 17:23, 18:5, 19:1, 19:11, 19:12, 32:14, 35:14, 39:8, 39:13, 39:23, 41:5, 41:9, 42:1, 47:20, 49:1, 50:16, 52:12, 54:6, 55:16,

55:19, 57:18, 60:5, 60:11, 60:13, 63:10, 63:14, 63:15, 63:18, 63:24, 64:3, 64:7, 65:3, 67:24, 68:8, 68:9, 68:12, 71:6, 75:16, 75:17, 76:3
successful [6] - 18:1, 44:13, 53:2, 59:25
suddenly [1] - 74:18
sufficient [1] - 47:17
suggest [1] - 7:2
suggested [1] - 21:21
suggesting [2] - 15:24, 75:7
suggestion [3] - 66:19, 67:5, 67:9
suggestions [1] - 44:21
summary [5] - 23:8, 24:15, 25:8, 25:11, 59:5
Support [1] - 77:16
support [1] - 47:20
supposed [1] - 44:12
surprise [3] - 18:14, 19:2, 19:5
switch [1] - 50:18
switching [1] - 49:1
synthesize [1] - 10:10

### T

table [2] - 15:25, 70:16
tail [1] - 34:18
tain [1] - 60:3
talks [2] - 40:23, 59:20
tangible [1] - 53:9
TAYLOR [3] - 2:2, 2:8, 4:8
team [1] - 77:12
Team [2] - 77:14, 77:16
technical [3] - 18:11, 18:23, 39:14, 54:5, 55:14, 56:5, 71:5
technically [1] - 65:17
tee [1] - 77:20
teleconference [5] - 7:23, 11:20, 66:10, 66:12, 79:6
telephone [7] - 5:6, 5:7, 5:12, 5:16, 7:17, 7:7, 45:15
TELEPHONE [1] - 1:11
telephonically [1] - 11:18
temperature [1] - 72:1

ten [4] - 48:20, 53:18, 57:6, 71:15
tend [1] - 26:13
term [1] - 8:25
terms [5] - 9:7, 16:8, 45:17, 54:22, 72:1
TERRELL [1] - 2:9
testimony [3] - 51:16, 55:14, 74:24
text [1] - 68:23
THE [161] - 1:1, 1:2, 5:14, 5:17, 5:18, 5:25, 6:4, 6:13, 6:19, 7:10, 7:12, 7:14, 7:18, 8:3, 8:7, 17:1, 17:4, 19:25, 20:3, 21:4, 21:15, 21:20, 22:8, 22:18, 22:22, 23:16, 23:20, 24:9, 24:24, 25:6, 25:12, 25:15, 25:21, 26:2, 26:4, 26:24, 27:19, 27:23, 28:4, 28:20, 29:16, 29:18, 29:20, 29:23, 30:19, 31:3, 31:7, 31:19, 32:2, 32:6, 32:17, 33:5, 33:11, 33:14, 33:24, 34:6, 34:12, 34:15, 34:24, 35:12, 35:16, 35:24, 36:2, 36:16, 37:6, 37:8, 37:11, 37:16, 37:19, 38:7, 38:18, 38:24, 39:2, 39:6, 39:9, 40:1, 40:11, 42:4, 43:25, 44:10, 44:18, 45:11, 45:13, 45:20, 46:4, 46:9, 47:10, 48:6, 48:12, 49:2, 49:12, 49:14, 49:18, 50:7, 50:13, 52:4, 53:7, 53:12, 53:14, 55:21, 55:24, 56:10, 56:22, 57:1, 57:12, 57:14, 58:16, 60:1, 60:10, 60:18, 61:1, 61:11, 61:13, 61:20, 61:24, 62:1, 62:25, 63:5, 63:19, 63:22, 64:5, 64:9, 64:22, 65:10, 65:16, 66:23, 67:2, 67:8, 67:20, 68:4, 68:15, 68:19, 69:2, 69:7, 69:19, 69:24, 70:17, 70:23, 71:1, 71:13, 71:21, 72:9, 72:13, 72:18, 73:7, 73:11, 74:1, 74:9, 75:1, 75:7, 76:8,

76:10, 76:19, 76:22, 77:2, 77:5, 78:10, 78:16, 78:22, 79:11, 79:13
therefore [2] - 40:25, 73:3
they've [1] - 49:19
thinking [3] - 15:15, 15:17, 28:20, 71:5, 76:4
thinks [1] - 37:4
thinner [1] - 52:3
THOMAS [2] - 1:17, 4:12
three [33] - 8:10, 8:15, 9:7, 11:1, 14:18, 15:1, 15:17, 23:3, 23:9, 23:11, 23:14, 23:24, 24:4, 24:12, 25:19, 26:16, 26:19, 26:23, 28:1, 32:12, 33:19, 36:9, 37:5, 43:1, 45:10, 46:13, 46:22, 47:15, 50:12, 55:1, 66:3, 76:2, 76:5
Three [2] - 42:20, 45:12
three-month [11] - 23:3, 23:9, 23:11, 23:14, 24:12, 26:16, 26:23, 36:9, 37:5, 46:13, 47:15
three-way [1] - 15:17
threshold [3] - 11:21, 12:6, 21:7
throughout [1] - 18:10
throwing [1] - 28:21
Thursday [1] - 1:11
THYNGE [1] - 1:13
tie [1] - 67:25
tied [1] - 13:23
Tim [8] - 5:22, 6:11, 6:14, 22:10, 46:8, 56:23, 67:2, 67:9
timing [2] - 33:11, 49:3
TIMOTHY [1] - 5:3
Timothy [1] - 5:7
today [16] - 6:21, 7:20, 8:12, 10:8, 12:21, 12:25, 13:7, 13:16, 18:7, 20:16, 57:20, 64:23, 75:19, 76:17, 76:24, 76:25
together [7] - 5:7, 5:19, 7:23, 13:3, 23:15, 44:12, 71:12
Tom [2] - 68:15, 71:18
took [1] - 44:24, 45:7

topic [2] - 11:18, 37:25
topics [1] - 49:1
Toppoly [1] - 3:9
totally [1] - 44:11
tough [4] - 30:13, 33:7, 55:6, 66:15
toward [1] - 8:25
towards [2] - 6:8, 7:3
transcript [6] - 38:6, 44:3, 45:16, 75:21, 75:22, 75:24
translate [2] - 51:12, 53:23
translates [1] - 12:15
translation [1] - 10:14
tremendous [2] - 31:11, 55:19
trepidation [1] - 38:21
trial [36] - 11:12, 16:3, 16:9, 20:9, 23:7, 24:22, 25:13, 28:12, 28:15, 29:9, 29:10, 29:14, 29:16, 29:17, 29:19, 29:20, 29:21, 29:23, 30:5, 30:22, 34:1, 34:3, 34:10, 38:25, 39:1, 39:2, 39:22, 41:22, 44:23, 61:14, 61:23, 62:2, 62:5, 63:12, 64:19, 74:20
tried [3] - 5:22, 36:6, 54:12
trier [1] - 41:7
trips [1] - 31:9
true [2] - 35:4, 61:7
truly [2] - 9:8, 10:24
try [12] - 6:6, 7:4, 15:10, 15:20, 18:2, 55:10, 63:20, 65:13, 66:7, 71:8, 73:8, 74:2
trying [10] - 10:9, 10:10, 21:7, 32:3, 59:17, 65:22, 70:11, 74:24, 75:10
TUNNELL [1] - 1:17
turnaround [1] - 57:25
turned [1] - 6:7
turning [1] - 17:20
TWEED [1] - 3:17
two [10] - 7:14, 9:16, 26:18, 28:7, 30:15, 30:16, 34:23, 70:19, 71:14, 77:18
two-cent [1] - 30:16
type [11] - 12:8, 12:23, 22:6, 26:17, 44:23, 56:2, 58:19, 73:9,

73:13, 74:5, 75:11
types [4] - 23:5, 54:17, 54:18, 56:1

**U**

U.S [1] - 1:13
U.S.A [2] - 2:22, 4:10
ultimately [1] - 47:23
unable [1] - 51:16
unanswered [1] - 8:12
uncover [1] - 51:16
under [14] - 10:25, 12:8, 13:17, 13:21, 16:14, 25:1, 32:20, 33:1, 39:25, 55:7, 64:11, 67:24, 68:3, 68:13
Under [2] - 38:24, 76:13
Understood [2] - 68:14, 69:6
understood [1] - 37:8
unenforceability [1] - 47:5
unfair [1] - 43:21
unfocused [1] - 67:16
unfortunately [1] - 16:20
uniformity [1] - 42:15
unique [4] - 21:9, 21:24, 22:1, 50:21
UNITED [1] - 1:1
universe [1] - 5:24
unless [2] - 20:22, 59:1
Unless [1] - 16:24
unnecessarily [1] - 26:13
unnecessary [2] - 28:10, 36:1
unsatisfactory [1] - 78:5
unsuccessful [1] - 30:3
unsure [1] - 68:21
unwarranted [1] - 13:8
up [46] - 6:6, 6:9, 9:15, 11:17, 13:4, 17:4, 18:15, 18:22, 21:25, 22:6, 26:6, 28:5, 28:21, 31:21, 34:22, 35:2, 40:1, 40:21, 43:13, 44:21, 44:24, 45:8, 46:11, 47:1, 48:13, 50:13, 52:23, 54:6, 54:21, 55:13, 56:4, 58:11, 58:12,

60:5, 62:5, 63:20, 65:23, 66:10, 66:12, 68:17, 68:20, 69:1, 70:18, 72:3, 76:22, 77:20
USA [1] - 3:15
usage [1] - 40:14
user [1] - 52:22
uses [1] - 40:8

**V**

valid [4] - 29:1, 29:2, 30:10, 61:19
validity [14] - 11:12, 15:20, 25:7, 30:22, 31:12, 34:1, 41:6, 41:22, 43:4, 43:8, 57:17, 61:14, 61:15, 61:21
value [2] - 12:13, 18:4
variety [2] - 7:24, 10:17
versions [2] - 45:10, 45:12
VEZEAU [7] - 5:3, 6:1, 6:11, 6:15, 22:10, 46:7, 56:24
Vezeau [4] - 5:7, 6:11, 22:10, 46:8
Vezeau's [1] - 5:22
view [12] - 9:11, 12:6, 12:9, 15:15, 16:22, 36:5, 41:1, 48:9, 55:8, 64:11, 70:12, 73:22
viewing [4] - 41:14, 42:15, 50:24, 56:8
viewpoint [1] - 42:19
Virginia [1] - 2:6
vision [2] - 31:15, 75:9
voice [1] - 67:2
voltage [1] - 41:24
voluminous [1] - 6:17
vs [4] - 13:17, 32:13, 42:20, 58:6

**W**

wait [5] - 26:8, 26:11, 30:4, 44:4, 66:19
waiting [1] - 73:3
walked [2] - 78:20, 79:8
walks [1] - 7:17
wants [3] - 10:18, 22:9, 42:14
warning [1] - 39:19
warranted [2] - 12:8,

48:11
Washington [3] - 2:14, 3:8, 4:6
Watch [1] - 4:17
watts [1] - 42:8
ways [3] - 41:16, 47:16, 54:15
week [3] - 50:2, 65:8
weeks [2] - 23:12, 23:13
weighed [1] - 11:24
weight [2] - 41:25, 51:22
whatsoever [1] - 20:15
whole [7] - 30:5, 62:17, 63:3, 63:24, 70:3, 70:19, 77:12
wild [1] - 59:16
willful [4] - 28:11, 32:20, 34:15, 35:1
willfulness [1] - 16:13
willing [2] - 12:22, 16:21, 33:10, 51:20, 67:5, 67:6
willingness [1] - 15:1
Wilmington [1] - 1:10
Wintek [4] - 3:4, 3:4, 3:9, 3:10
Wireless [1] - 4:24
wish [3] - 28:5, 46:4, 46:5
wished [1] - 57:2
withstand [1] - 13:21
Wood [2] - 18:7, 38:11
WOODS [53] - 1:20, 7:8, 7:11, 7:13, 7:19, 8:5, 8:8, 30:20, 31:5, 31:13, 32:16, 32:19, 33:16, 34:5, 34:17, 35:4, 35:6, 36:15, 36:17, 37:21, 39:4, 48:14, 49:3, 49:13, 49:15, 49:21, 50:9, 50:18, 53:3, 53:8, 53:13, 53:21, 55:23, 56:4, 56:20, 61:17, 61:23, 61:25, 63:16, 63:20, 64:1, 64:13, 65:6, 67:25, 68:14, 70:9, 71:10, 73:20, 74:4, 74:21, 77:24, 78:14, 78:17
Woods [24] - 7:17, 17:8, 17:15, 19:19, 21:6, 22:2, 22:6, 22:25, 23:12, 24:22, 26:14, 27:4, 27:25, 28:18, 32:3, 36:7, 37:4, 47:7, 55:24,

57:19, 58:3, 58:17, 76:11, 77:21
Woods' [3] - 35:2, 35:13, 57:16
word [2] - 50:5, 70:5
world [2] - 56:5, 56:8
worry [1] - 38:18
worst [1] - 74:2
worth [1] - 48:15
wrap [1] - 68:20
wrapped [2] - 9:15, 68:17
writing [1] - 57:25
written [1] - 51:9, 66:6, 70:5

**Y**

year [3] - 9:22, 43:23, 48:19
years [2] - 29:3, 41:11
York [6] - 2:20, 3:13, 3:18
YOUNG [3] - 2:2, 2:8, 4:8