IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC.<br><br>Plaintiffs,<br><br>v.<br><br>APPLE COMPUTER, INC; ALL AROUND CO., LTD.; ARGUS A/K/A HARTFORD COMPUTER GROUP, INC.; BOE-HYDIS TECHNOLOGY CO., LTD.; CITIZEN WATCH CO., LTD.; CITIZEN DISPLAYS CO., LTD.; CONCORD CAMERAS; DELL INC.; EASTMAN KODAK CO.; FUJIFILM CORP.; FUJIFILM U.S.A., INC.; FUJITSU LTD.; FUJITSU AMERICA INC.; FUJITSU COMPUTER PRODUCTS OF AMERICA, INC.; INNOLUX DISPLAY CORP.; KYOCERA WIRELESS CORP.; MATSUSHITA ELECTRICAL INDUSTRIAL CO., MATSUSHITA ELECTRICAL CORP. OF AMERICA; NAVMAN NZ LTD.; NAVMAN U.S.A. INC.; OLYMPUS CORP.; OLYMPUS AMERICA, INC.; PENTAX CORP.; PENTAX U.S.A., INC., PICVUE ELECTRONICS LTD.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SONY CORP.; SONY CORP. OF AMERICA; SONY ERICSSON MOBILE COMMUNICATIONS AB; SONY ERICSSON MOBILE COMMUNICATIONS (USA) INC.; TOSHIBA CORP.; and TOSHIBA AMERICA, INC.;<br><br>Defendants | C.A. No. 04-1338-JJF-MPT<br><br>JURY TRIAL DEMANDED |

### INNOLUX DISPLAY CORPORATION'S CLAIM CONSTRUCTION BRIEF

<div style="text-align: right;">

Matt Neiderman
DUANE MORRIS LLP
1100 North Market Street
Wilmington, DE 19801-1246
(302)657-4900

Donald R. McPhail
DUANE MORRIS LLP
505 9th Street, NW
Washington, DC 20006
(202) 776-7800
*Attorneys for Defendant InnoLux Display Corporation*

</div>

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   OVERVIEW OF THE TECHNOLOGY ...................................................................2

      A.   LCD Technology ..............................................................................................2

      B.   The Patent-in-Suit .............................................................................................3

III.  PRINCIPLES OF CLAIM CONSTRUCTION ..........................................................4

IV.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS ......................................6

      A.   The Intrinsic Evidence ......................................................................................7

      B.   Honeywell's Proposed Construction Renders Claim 3 Ambiguous
           And is Not Supported by the Intrinsic Evidence ............................................11

      C    Extrinsic Evidence ..........................................................................................13

V.    CONCLUSION ........................................................................................................14

# TABLE OF AUTHORITIES

**Cases:**

*Bell Atlantic Network Servs., v. Covad Communications Group, Inc.,*
 262 F.3d 1258 (Fed. Cir. 2001)..................................................................................4, 5

*Cross Medical Prods., Inc. v. Medtronic Sofamore Danek, Inc.,*
 424 F.3d 1293 (Fed. Cir. 2005)........................................................................................6

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
 460 F.3d 1349 (Fed. Cir. 2006)......................................................................................11

*Elkay Mfg. Co. v. Ebco Mfg. Co.,*
 192 F.3d 973 (Fed. Cir. 1999), *cert. denied,* 529 U.S. 1066 (2000)..................................4

*Gentry Gallery, Inc. v. Berkline Corp.,*
 134 F.3d 1473 (Fed. Cir. 1998)........................................................................................6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
 381 F.3d 1111 (Fed. Cir. 2004)................................................................................12, 13

*Intellicall, Inc. v. Phonometrics, Inc.,*
 952 F.2d 1384 (Fed. Cir. 1992)........................................................................................4

*Markman v. Westview Instruments, Inc.,*
 52 F.3d 967 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996).............................................4, 5, 6

*Markman v. Westview Instruments, Inc.,*
 517 U.S. 370 (1996).........................................................................................................4

*MBO Labs., Inc. v. Becton, Dickinson & Co.,*
 474 F.3d 1323 (Fed. Cir. 2007)........................................................................................4

*Medrad, Inc. v. MRI Devices Corp.,*
 401 F.3d 1313 (Fed. Cir. 2005)........................................................................................5

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
 357 F.3d 1340 (Fed. Cir. 2004)........................................................................................5

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n,*
 75 F.3d 1545 (Fed. Cir. 1996)........................................................................................11

*MultiForm Desiccants, Inc. v. Medzam, Ltd.,*
 133 F.3d 1473 (Fed. Cir. 1998).....................................................................................5, 6

*Phillips v. AWH Corp.,*
 415 F.3d 1303 (Fed. Cir. 2005) (en banc)..........................................................4, 5, 6, 12

Case 1:04-cv-01338-JJF    Document 1000    Filed 04/25/2008    Page 4 of 20

*Pickholz v. Rainbow Techs., Inc.*,
    284 F.3d 1365 (Fed. Cir. 2002)............................................................................................13

*Texas Instrucments Inc. v. U.S. Int'l Trade Comm'n*,
    988 F.2d 1165 (Fed. Cir. 1993)..............................................................................................5

*United States v. Adams*,
    383 U.S. 39 (1966)..................................................................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1371 (Fed. Cir. 1996).............................................................................................4, 5

**Other Authorities:**

*Cambridge Dictionary of American English* (2nd ed. 2007) ............................................................13

*The American Heritage Dictionary of the English Language* (4th ed. 2006) ...................................14

*Webster's Revised Unabridged Dictionary* (1998) ...........................................................................14

*Webster's New World Dictionary* (3rd College Ed. 1988) ..............................................................14

*Webster's Ninth New Collegiate Dictionary* (1983) ........................................................................14

I.   **INTRODUCTION**

Honeywell International, Inc. and Honeywell Intellectual Properties Inc. (collectively "Honeywell") assert that domestic and foreign companies, including InnoLux Display Corporation ("InnoLux"), have infringed and continue to infringe United States Patent No. 5,280,371 ("the '371 Patent"). InnoLux had filed a motion (D.I. 536) with this Court seeking to dismiss Honeywell's complaint against InnoLux for lack of personal jurisdiction. On April 22, 2008, the Court issued an order (D.I. 999) denying InnoLux's motion to dismiss with leave to renew.

Pursuant to the Court's amended Scheduling Order No. 2 (D.I. 937), Honeywell and certain other defendants (*viz.* Optrex America, Inc.; FUJIFILM Corporation; FUJIFILM U.S.A. Inc.; Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Citizen Watch Co. Ltd.; and Citizen Displays Co. Ltd.; collectively referred to by themselves and Honeywell as "the Manufacturer Defendants"[1]) submitted a Joint Claim Construction Chart (D.I. 991) to this Court on March 24, 2008, setting forth various claim terms from the '371 patent that require construction.

InnoLux respectfully maintains that this Court cannot properly exercise personal jurisdiction over InnoLux for at least the reasons set forth in its motion to dismiss (D.I. 536) and its supporting brief (D.I. 538) and reply (D.I. 598). Nevertheless, InnoLux understands that it is subject to this Court's orders, including amended Scheduling Order No. 2 (D.I. 937). Accordingly, solely to preserve its rights, InnoLux respectfully submits this brief in support of the Manufacturer Defendants' proposed construction of the disputed term "wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to

---

[1] Even though InnoLux is a manufacturer of LCD modules, InnoLux will also use the designation "the Manufacturer Defendants" to collectively refer to defendants Optrex America, Inc.; FUJIFILM Corporation; FUJIFILM U.S.A. Inc.; Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Citizen Watch Co. Ltd.; and Citizen Displays Co. Ltd. so as to prevent any unnecessary confusion.

provide a slight misalignment between said lenslets and said liquid crystal panel" as used in claim 3 of the '371 Patent.

## II. OVERVIEW OF THE TECHNOLOGY

### A. LCD Technology

A liquid crystal display (LCD) device is a thin, flat display device fundamentally composed of an array of pixels in front of a light source.

Each pixel of an LCD typically consists of a liquid crystal material layer between two transparent electrodes and two polarizing filters. The polarizing filters are usually arranged so that the axes of transmission are perpendicular to one other.

This perpendicular arrangement should preclude light from passing through these filters. Because the liquid crystal material is birefringent, however, light passing through one polarizing filter is rotated by the liquid crystal material, which thereby permits that light to pass through the second polarizing filter. The magnitude of rotation by the liquid crystal material depends upon the structure and orientation of the liquid crystal molecules.

When manufactured, the surface of the electrodes that are in contact with the liquid crystal material layer are treated so as to align substantially all of the liquid crystal molecules in a particular direction. In the absence of an electric field, the orientation of the liquid crystal molecules is determined by this alignment at the electrode surfaces.

Applying a voltage across the electrodes changes the orientation of the liquid crystal molecules. This change in orientation reduces the rotation of the polarization of the incident light by the liquid crystal material, and so, in the case of monochrome pixels, the LCD device appears gray.

If the applied voltage is large enough, the orientation of the liquid crystal molecules in the center of the layer is so changed that the polarization of the incident light is not rotated as it passes through the liquid crystal layer. Consequently, this light will be mainly polarized perpendicular to the second polarizing filter, and thus be blocked by that filter. Monochrome pixel(s) will then appear black.

Thus, by varying the voltage applied, varying amounts of light are allowed through the liquid crystal material and different levels of gray can be displayed.

### B. The Patent-in-Suit

The '371 Patent is entitled "Directional Diffuser for A Liquid Crystal Display" and was issued on January 18, 1994 to Richard McCartney, Jr. *et al.* The specification of the '371 Patent describes the purported invention as generally relating to "flat panel liquid crystal displays and, more particularly, to a liquid crystal display (LCD) having a directional diffuser to provide a tailored variation of luminance with view angle." *See* the '371 Patent, at column 1, lines 6-10.

The only claim of the '371 Patent at issue in this case is claim 3. The language of asserted claim 3 reads:

> 3. A display apparatus comprising:
> a light source;
> a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and
> first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.

*See* the '371 patent at column 6, lines 27-42.

3

III.     PRINCIPLES OF CLAIM CONSTRUCTION

The construction of patent claims is a matter of law reserved exclusively for the Court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 976 (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1066 (2000). In construing patent claims, the Court "should seek" the meaning of the claims from the public record (*i.e.* the "intrinsic evidence") – the claims, the specification, and the prosecution history – without reference to ex post facto subjective impressions or opinions of the inventor or prosecution attorney. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 987 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). Indeed, the U.S. Court of Appeals for the Federal Circuit has recently reiterated the importance of the intrinsic evidence when construing a disputed claim term:

> The most relevant source is the patent's specification, which "is the single best guide to the meaning of a disputed term." Next in importance is the prosecution history, which is also part of the "intrinsic evidence" that directly reflects how the patentee has characterized the invention. Extrinsic evidence – testimony, dictionaries, learned treatises, or other material not part of the public record associated with the patent- may be helpful but is "less significant than the intrinsic record in determining the legally operative meaning of claim language." The words of the patent claims have the meaning and scope with which they are used in the specification and the prosecution history.

*MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007) (internal citations omitted).

Proper construction of claim terms therefore focuses first on the words of the claims themselves. *Phillips v. AWH Corp.* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1371, 1583 (Fed. Cir. 1996) (the starting point for any claim construction analysis is the words of the claims themselves); *Bell Atlantic Network Servs., v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001) (the Court "look[s] first to the claim language itself to define the scope of the patented invention"). Claim terms must be interpreted in a way that gives meaning to each and every word. *See, e.g., Phillips*, 415 F.3d at 1314 (explaining that

4

"steel baffles" must have a different meaning that "baffles"); *Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (rejecting a construction that would "render the disputed claim language mere surplusage" and therefore "read an express limitation out of the claims").

Upon reviewing the words of the claims themselves, the Court attempts to give each claim term its ordinary and customary meaning as it would have been understood by a person of ordinary skill in the relevant art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *see also Bell Atlantic*, 262 F.3d at 1268 ("Generally, there is a 'heavy presumption' in favor of the ordinary meaning of claim language" as opposed to an "unconventional meaning."). The person of ordinary skill, however, is not deemed to have read the claim terms in a vacuum, but rather in the context of both the specification and the prosecution history (*i.e.* the intrinsic evidence). *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1219 (Fed. Cir. 2005).

More particularly, it is "fundamental that claims are to be construed in the light of the specifications, and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49 (1966); *see also Markman*, 52 F.3d at 969 ("[Claims] must be read in view of the specification, of which they are a part."); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004) (same); *Vitronics*, 90 F.3d at 1582 (the specification is highly relevant to claim construction analysis, as "it is the single best guide to the meaning of a disputed term"); *MultiForm Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) (the "best source for understanding a technical term is the specification from which it arose").

The specification is such a critical source in determining the meaning of disputed claim terms it may well be dispositive as to the proper construction of a term. *See Phillips* at 1315; *see also Vitronics*, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). Indeed, "[w]hen the specification

5

explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *MultiForm Desiccants*, 133 F.3d at 1478.

Nevertheless, while the specification is important in claim construction, the Court must be mindful not to limit the claims to the preferred embodiments disclosed in the specification. *Phillips*, 415 F.3d at 1323. Conversely, however, claims "may be no broader than the supporting disclosure, and therefore . . . a narrow disclosure will limit claim breadth." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998).

Although the emphasis in claim construction should remain on the intrinsic evidence, the Courts have been authorized to rely on extrinsic evidence as well. *See Philips*, 415 F.3d at 1317. Such extrinsic evidence includes dictionaries, which may be considered if the Court "deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Id.*, 415 F.3d at 1318 (citing *Markman*, 52 F.3d at 980). Indeed, "[a] dictionary definition has the value of being an unbiased source accessible to the public in advance of litigation." *Id.*, 415 F.3d at 1322. Thus, "a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term." *Id.*, 415 F.3d at 1324.

Finally, if analysis of all the evidence, both intrinsic and extrinsic, fails to resolve an ambiguity, then a court may resort to the maxim of construing a claim, if possible, to preserve its validity. *See, e.g., Philips*, 415 F.3d at 1327; *Cross Medical Prods., Inc. v. Medtronic Sofamore Danek, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir. 2005).

### IV.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS

Honeywell and the Manufacturer Defendants have disputed the construction of a number of terms used in claim 3 of the '371 Patent. Among these disputed terms is the following limitation:

6

> wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal pannel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.

*See* Joint Claim Construction Chart (D.I. 991), Exhibit A at pages 11-12.

The Manufacturer Defendants have proposed that this term should be construed by this Court to mean:

> One or more of the lens arrays is intentional rotated at angle of not less than 2 degrees and not more than 16 degrees in relation to the horizontal axis of the liquid crystal display.

*See id.*, Exhibit A at page 11. Because the Manufacturer Defendants' construction is fully supported by the specification, the drawings and the claims of the '371 Patent and, concomitantly, because Honeywell's proposed construction introduces unnecessary ambiguity and is not supported by the intrinsic evidence, InnoLux respectfully urges this Court to adopt the Manufacturer Defendants' construction in its entirety.

### A. The Intrinsic Evidence

As set forth in more detail below, the Manufacturer Defendants' proposed construction is fully supported by the intrinsic evidence.

First, in the "Background of the Invention" section, the '371 Patent teaches that LCD devices can exhibit a wide variation in luminescence based on viewing angle, particularly vertical viewing angle. *See* the '371 Patent at column 1, lines 13-17. That is, the brightness of these LCD devices may show a substantial difference based on whether one is viewing it directly head on (*i.e.* normal to the surface of the LCD device) or viewing it from an angle above or below. *See id.* at column 1, lines 18-23. This is apparently an undesirable characteristic, particularly in certain applications. *See id.* at column 1, lines 23-28. The '371 Patent states that it is therefore an object of the purported invention to solve this problem by "provid[ing] a directional diffuser element for a

liquid crystal display to provide a tailored variation of luminance with viewing angle." *See id.* at column 1, lines 40-51.

Second, in characterizing the broadest scope of the purported invention, the specification's "Summary of the Invention" states that:

> The foregoing and other objects are achieved in the present invention wherein there is provided a liquid crystal display apparatus comprising a light source, a liquid crystal planar array of pixels for creating an image by controlling the amount of light allowed to pass through each of the pixels, and one or more directional diffuser lens arrays disposed between the light source and the liquid crystal array for providing a tailored variation of luminescence from the liquid crystal display as a function of vertical viewing angle.

*See id.* at column 1, line 62, to column 2, line 3. Significantly, this "Summary of the Invention" sets forth no other purported inventions.

Getting more specific, the "Detailed Description of a Preferred Embodiment" includes the description of four distinct arrangements of lens array(s) in the embodiments of the purported invention: (i) a single cylindrical lens array as shown in FIG. 4A and 4B (*see id.* at column 3, lines 20-36); (ii) two cylindrical lens arrays as shown in FIG. 7 (*see id.* at column 4, lines 26-45); (iii) more than two cylindrical lens arrays (*see id.* at column 4, lines 46-58); and (iv) a single triangular lens array as shown in FIG. 10 and FIG. 12 (*see id.* at column 5, lines 6-8 and 21-28). Each of these embodiments requires the long axis of the lens array to be parallel to the horizontal axis of the LCD panel, as shown, *e.g.*, in FIG. 4A and 4B and in FIG. 12, reproduced below:



*Fig. 4A*    *Fig. 4B*

*Fig. 12*

Indeed, in the drawings originally filed with the application, the non-rotated arrangement shown on the left in FIG. 12 is expressly labeled "Lens Array Axis Horizontal".

The "Summary of the Invention" makes it quite clear why this parallel arrangement is required – because the invention is concerned with controlling the luminance <u>as a function of vertical viewing angle</u>. This is explained in the "Detailed Description of a Preferred Embodiment" with reference to FIG. 6, which shows that the lens array is used to reflect back those light rays (**70**) that would exit the LCD at vertical viewing angles higher or lower than desired. *See id.* at column 3, line 50, to column 4, line 16. Because the purported invention of the '371 Patent is not concerned with controlling luminance as a function of horizontal viewing angle, there is no need for the lens array(s) to reflect light dispersed across the horizontal viewing angle.

Although this arrangement permits reduced luminance as a function of increased vertical viewing angle, the '371 Patent specifically notes that the parallel alignment of the lenslets on a lens array and the LCD matrix array can cause significant interference, which is visible as moiré patterns. *See id.* at column 4, lines 17-25. To solve this problem, the '371 Patent discloses an embodiment[2] in

---

[2] The only other disclosed embodiment addressing moiré reduction relates to pitch variation between two lens arrays. *See id.* at column 4, line 59 to column 5, line 5. This embodiment, however, is indisputably outside the scope of asserted claim 3 and therefore not germane to the construction of the "slight misalignment" term.

which the lens array has been rotated by a few degrees from the horizontal axis of the LCD matrix array. *See id.* at column 5, lines 16-28.

This rotation is illustrated in FIG. 12 of the '371 Patent, which is reproduced above. The rotation of the lens array "by a few degrees . . . from the horizontal axis" of the LCD matrix array apparently causes a small change in the effective spatial frequency difference between the two arrays. *See id.* at column 5, lines 23-28. By changing the effective spatial frequency difference by a small amount, the residual moiré is reduced or eliminated. *See id.*

With respect to the magnitude of this rotation, the specification of the '371 Patent states the angle of rotation of the lens array is "a few degrees (Typically 2 to 16 degrees) from the horizontal axis" of the LCD matrix array. *See id.* at column 5, lines 24-25. Similarly, the rotation of the lens array from alignment with the LCD matrix array is shown in FIG. 12 as being "~ 2° TO 16°" from the horizontal axis.

Further guidance regarding the magnitude of rotation intended by the term "slight misalignment" is shown by the inventor's use of the term "a few degrees" elsewhere in the specification of the '371 Patent. More specifically, the specification makes it clear that "a few degrees" is intended to mean "nearly parallel" in the context of the purported invention. *See id.* at column 5, lines 29-34 ( "the lens array also provides an additional diffusing effect, especially for any step variations in luminance that are parallel to (or nearly parallel to within a few degrees) the axis of the lens array."). This is further support that the angle of rotation intended by the claimed "slight misalignment" must be no greater than 16 degrees, or else the horizontal axis of the lens array and the horizontal axis of the LCD matrix array would not remain "nearly parallel" (parallel being 0 degrees).

10

B.   **Honeywell's Proposed Construction Renders Claim 3 Ambiguous and is Not Supported by the Intrinsic Evidence**

Both Honeywell and the Manufacturer Defendants generally agree that the term "slight misalignment" includes a rotation of from 2 degrees to 16 degrees between the horizontal axis of a lens array and the horizontal axis of the pixel arrangement on the liquid crystal panel. Where the parties differ substantially is on the issue of whether any other rotation angles are included within a "slight misalignment". Honeywell appears to suggest by its construction that rotation angles outside of the 2 to 16 degree range are included within this "slight misalignment". Conversely, the Manufacturer Defendants are quite adamant that any rotation angle less than 2 degrees or greater than 16 degrees is outside the scope of the claimed "slight misalignment".

More specifically, the Manufacturer Defendants' proposed construction limits the term "slight misalignment" to a rotation angle "of <u>not less than</u> 2 degrees and <u>not more than</u> 16 degrees" (emphasis added) from the horizontal axis of the LCD matrix array. In contrast, Honeywell's proposed construction provides that a "slight misalignment" is "a misalignment of <u>typically</u> 2-16 degrees" (emphasis added) without reference to which axis is it measured against. Thus, the Manufacturer Defendants seek to limit "slight misalignment" to the specific range and the specific reference axis disclosed in the specification. Honeywell, however, seeks to keep the term at least somewhat ambiguous by characterizing the range of 2 to 16 degrees as only "typical" rather than as a clear restriction and not defining a reference axis.

With respect to the range of 2 to 16 degrees, it is generally improper to import a numerical limitation into a patent claim that contains no numerical limitation. *See, e.g., Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006); *see also Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("Ordinarily a claim element that is claimed in general descriptive words, when a numerical range appears in the specification and in other claims, is not limited to the numbers in the specification or other claims."). In this case, however, failure to limit

11

the "slight misalignment" to the disclosed range of 2 to 16 degrees, as proposed by Honeywell, would vitiate the notice function of the patent claim because the public cannot fairly determine what angles of rotation are <u>not</u> encompassed by the disputed language.

Significantly, particularly for resolution of the issues of infringement in this case, Honeywell's proposed construction leaves open the question of what other rotation angles fall within the scope of the claim. It is axiomatic, however, that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Philips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). With Honeywell's use of "typically" to characterize the 2 to 16 degree range in its proposed construction, the relevant public cannot possibly know what is outside the scope of claim 3 of the '371 Patent. There is no condition or basis disclosed in the specification of the '371 patent that would guide one skilled in the art to determine when a "typical" rotation should be used and when a "typical" rotation should be abandoned.

Moreover, Honeywell's proposed construction is not fairly supported by intrinsic evidence, *viz.* the language of claim 3 itself and the specification and drawings of the '371 Patent.

With respect to the claim language, the disputed limitation at issue includes the term "<u>slight</u> misalignment" (emphasis added). In this case, Honeywell has asserted infringement against LCD modules having an angle of rotation as small as 1 degree and as great as 44 degrees. Because Honeywell's proposed construction does not include a reference axis (*e.g.* the horizontal axis of the LCD matrix array), Honeywell's construction covers <u>every possible angle of rotation</u> except for 45 degrees (which is the maximum possible misalignment from both the horizontal and vertical axes of the LCD matrix array). Given that the term "misalignment" is modified by the term "slight" in claim 3, it is quite unreasonable to construe the limitation at issue to cover <u>all</u> possible angles of rotation, with the sole exception of 45 degrees. Honeywell's construction would render the modifier

12

"slight" utterly superfluous and unnecessary. All terms in a claim, however, are presumed to have meaning in the claim. *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir 2004); *Pickholz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002). Honeywell's proposed construction therefore cannot be correct.

With respect to the specification, as noted above, the '371 Patent expressly discloses the angle of rotation is "<u>a few degrees</u> (Typically 2 to 16 degrees) from the horizontal axis" of the LCD matrix array. *See* the '371 Patent at column 5, lines 24-25 (emphasis added). As used in the specification of the '371 patent, the phrase "a few degrees" means "nearly parallel" (*i.e.* nearly 0 degrees). *See id.* at column 5, lines 29-34 ( "the lens array also provides an additional diffusing effect, especially for any step variations in luminance that are parallel to (or <u>nearly parallel to within a few degrees</u>) the axis of the lens array." (emphasis added)). Consequently, the angle of rotation intended to be covered by the claimed "slight misalignment" must be no greater than 16 degrees, or else the horizontal axis of the lens array and the horizontal axis of the LCD matrix array would not remain "nearly parallel".

Finally, the drawings in the '371 Patent also show the angle of rotation of the lens array as being "~ 2° TO 16°" from the horizontal axis of the LCD matrix array. *See id.* at FIGURE 12. No other possible angles of rotation are shown anywhere in the '371 Patent. Similarly, no other reference axis is shown anywhere in the '371 Patent. Honeywell's proposed construction is therefore not supported by the drawings of the '371 Patent.

C.    **Extrinsic Evidence**

Consideration of appropriate extrinsic evidence further supports the Manufacturer Defendants' proposed construction of the "slight misalignment" limitation. In particular, reference to any number of dictionaries shows that the word "slight" is and was commonly understood to have meanings such as "small", "insignificant", "inconsiderable" and the like. *See, e.g., Cambridge*

13

*Dictionary of American English* (2nd ed. 2007)("small in amount or degree"); *The American Heritage Dictionary of the English Language* (4th ed. 2006)("of small importance or consideration; trifling); *Webster's Revised Unabridged Dictionary* (1998)("not decidedly marked; not forcible; inconsiderable; unimportant; insignificant; not severe; weak; gentle"); *Webster's New World Dictionary* (3rd College Ed. 1988)("small in amount or extent; not great or intense"); *Webster's Ninth New Collegiate Dictionary* (1983)("small of its kind or in amount").

All of these extrinsic sources confirm that the word "slight" is ordinarily and customarily used in the English language as a qualifier indicating something small or minor. As such, these sources support the Manufacturer Defendants' proposed construction of "slight misalignment" as being not more than 16 degrees. In marked contrast, because Honeywell's proposed construction includes rotation angles at least as great as 44 degrees, Honeywell's proposed construction is quite beyond any of the accepted meanings of "slight" found in common dictionaries.

## V.   CONCLUSION

For at least the reasons above, InnoLux respectfully requests that this Court adopt the Manufacturer Defendants' proposed construction of the term "wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to

provide a slight misalignment between said lenslets and said liquid crystal panel" as used in claim 3 of the '371 Patent.

Dated: April 25, 2008

/s/ Matt Neiderman
DUANE MORRIS LLP
Matt Neiderman
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246
(302)657-4900

Donald R. McPhail
505 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 776-7800

*Attorneys for Defendant InnoLux Display Corporation*

DM1\1327588.1

15