# EXHIBIT A

```
                                                                    1


 1                    IN THE UNITED STATES DISTRICT COURT
                       IN AND FOR THE DISTRICT OF DELAWARE
 2
                                    - - -
 3
      HONEYWELL INTERNATIONAL, INC.    :    CIVIL ACTIONS
 4    et al.                           :
                                       :
 5               Plaintiffs,           :
                                       :
 6         v.                          :
                                       :
 7    AUDIOVOX COMMUNICATIONS CORP.,   :
      et al.                           :
 8                                     :
                 Defendants            :    NO. 04-1337 (KAJ)
 9    ----------------------------------
      HONEYWELL INTERNATIONAL, INC.    :
10    et al.                           :
                                       :
11               Plaintiffs,           :
                                       :
12         v.                          :
                                       :
13    APPLE COMPUTER, INC., et al.,    :
                                       :
14               Defendants            :    NO. 04-1338 (KAJ)
      ----------------------------------
15    OPTREX AMERICA, INC.,            :
                                       :
16               Plaintiff,            :
                                       :
17         v.                          :
                                       :
18    HONEYWELL INTERNATIONAL, INC.,   :
      et al.                           :
19                                     :
                 Defendants            :    NO. 04-1536 (KAJ)
20                                  - - -

21                          Wilmington, Delaware
                       Monday, May 16, 2005 at 9:30 a.m.
22                           STATUS CONFERENCE

23                                  - - -

24    BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

25                                  - - -
```

18

first and that is, as in the CEA case, certainly an approach that is often taken, but I'm not aware of any case in which the manufacturers and the customers were in a case together and the Court stayed the manufacturer, the real party in interest, while the customers went first.

And so to the extent that that is the limited issue presented by plaintiffs in opposition to our motion to intervene, I would suggest there is no precedent for it. And it is not logical or efficient for the Court.

THE COURT: Okay. Sir, can I have your name one more time?

MR. BENSON: Robert Benson from Hogan & Hartson.

THE COURT: Okay. Thanks, Mr. Benson. Who is speaking on this on behalf of Honeywell?

MR. LUECK: I'll speak for it, Your Honor. Martin Lueck.

THE COURT: Okay.

MR. LUECK: If I could take just a moment and explain to the Court why we structured the case the way we did and why we believe that the Seiko Epson intervener should go after the suit against the end product manufacturers. And I realize some of this might get ahead a little bit on the stay motion. I'll try to limit myself.

THE COURT: In fact, you don't need to limit

19

yourself because even though the stay motions are by other people, you're right that these are all very tightly interwoven and I'm eager to have you do just what you said. Explain to me why you folks have set it up the way you intend to set it up.

MR. LUECK: I'm sure you are. And I'm sure that looking at this room, I feel it's quite appropriate for you to feel that I have some explanation to give you as to why we structured the case the way we did, just looking at the very large number of people and the issues that will be involved.

But basically what it comes down to is this: We looked at it from a tactical and structural standpoint. And there are basically three reasons why we sued. But I will not call them customers. We are going to call them end product manufacturers, and I'll tell the Court why in a moment, but we sued the end product manufacturers for three reasons:

First, they were the ones we could get complete relief against by hailing them into court in the United States. A lot of the products, if you look at the modules, many of them are made overseas. Where those transactions take place, frankly, we don't know. And so one component of this is there is a very large unknown. We don't know who the suppliers are to each of the defendants. And if the

20

Court looks at the papers that have been submitted, you can see there are some affidavits for five or six of the defendants but the majority of the defendants have taken no position on who their suppliers are. We don't know who those companies are. We don't know how to bring them to court. We don't even know if they are all subject to jurisdiction in the United States.

Secondly, the sales transactions. Now, I said earlier that we sued end product manufacturers. Well, the LCD module that is asserted to be the item that should be tried for infringement is not the product that is sold in the U.S. The product that is sold in the United States are cell phones, PDAs, digital still cameras, digital video recorders, games and so on. And in each of those in instances, someone has made a conscious decision to incorporate that piece of technology into their product.

THE COURT: Okay. Let me interrupt you, though. You're not disagreeing, though, are you, that your patent covers LCDs? I mean the liability, if any, of what you call end product manufacturers depends entirely upon a decision about the LCD component infringing your client's patent; is that right?

MR. LUECK: I agree with that.

THE COURT: There is nothing is about that, nothing else going on with these manufacturers that leads to

21

liability, is there?

MR. LUECK: Not on the specific elemental test, but it does affect the scope of the infringement. So if a module is sold in a transaction to someone who is going to -- for example, let's say a cell phone. That cell phone may get sold in the United States but the module may have been sold in a transaction between Korea and Japan. Under the United States patent laws, we arguably can't reach the transaction between Korea and Japan but can reach the transaction of the cell phone in the United States.

THE COURT: I understand your point. But I want to make sure. And I think I understand the answer given to my question, which is it's not as if they were doing some other or different thing with their products that you say independently created some infringement liability. It's the use of what you allege to be the infringing LCD components in their products that gives rise to liability, if any; right?

MR. LUECK: That is correct, Your Honor.

THE COURT: Okay. That's two of your three reasons, I think.

MR. LUECK: And then the third reason is from a reasonable royalty standpoint, which is what Honeywell will be seeking here, the United States patent laws give us the right to recover for the extent of use made of the invention

22

1  by the infringer. And in our view, the extent of use is
2  different for the end product manufacturer than it is for
3  the module maker. And if one looks at the patent, one
4  will see in the specification that the reasons that this
5  invention is useful in an end product is that it allows for
6  light to be directed to the region of interest for off-angle
7  viewing, which if someone is looking at the LCD panel from
8  the side or an angle, they can still have that light visible
9  to them and they can read the information on the screen.
10         And, secondly, and just as important, by using
11 that light energy efficiently, that conserves power for
12 devices. So if we think about the modern world, where we're
13 carrying everything that has a battery attached to it, the
14 amount of battery power available becomes very important to
15 a device. And this invention enables the end product
16 manufacturers to conserve that energy and use it in the best
17 way possible.
18         The only people that will be able to answer
19 those questions are the end product manufacturers. The
20 module makers will have no information as to what consider-
21 ations went into the selection of this particular technology
22 for these particular devices. And, furthermore, we believe
23 that if you look at it just from a Georgia-Pacific
24 standpoint, the value of the invention is greater in that
25 end product because of the benefits that the end product

23

1  maker realized by using the invention than does the module
2  maker.
3          THE COURT: Okay. Well, let's say that I were
4  to accept the assertions you have made on that last point.
5  Logically, why does that mean they should get sued first?
6          MR. LUECK: Well, because we should be entitled
7  to get into the information. For example, what studies have
8  you done for marketing these devices using the benefits of
9  the invention?
10         THE COURT: I'm sorry. I'm not making myself
11 clear.
12         MR. LUECK: Okay.
13         THE COURT: To me, the question isn't "do you
14 ever get to sue them." The question is "who goes first"
15 because we're not all -- you can take this as a given.
16 We're not all going at once.
17         MR. LUECK: Right.
18         THE COURT: I mean this answers the question
19 about that. Look at the courtroom. It can't happen.
20         MR. LUECK: Sure.
21         THE COURT: It's not just impractical, it's
22 impracticable. I think it's not physically not doable to do
23 that in any kind of sensible way.
24         So the question for me becomes how do I
25 structure this in a way that preserves your client's rights

24

1  and opportunities and yet achieves some sensible
2  administration of justice? So what I'm dealing with is this
3  "who goes first."
4          Your papers say let's have these folks all go
5  first and keep the manufacturers at the back of the line.
6  Of the three things you have told me, frankly only one of
7  them strikes me in a way that carries a lot of, carries
8  significant weight, and that is the damages, if you are
9  entitled to them. There is no reason why your reasonable
10 royalty couldn't be figured after a liability finding,
11 theoretically; right?
12         MR. LUECK: True, though that would require us
13 to go through another round of discovery with the end
14 product manufacturers.
15         THE COURT: Which you would have to be doing
16 anyway. I guess I mean it doesn't appear to me to be
17 duplicative. If they're the only ones that have the
18 information, which is what you said to me, then you will be
19 getting it from them. It's just a question whether you get
20 it from them now or get it from them later. It's not as if
21 -- and I'm sorry, I don't want to fall into the pattern of
22 argument with you but I want to pull out from you, because
23 if there is something I'm not understanding, I want you to
24 straighten me out. You're not being duplicative by doing it
25 later, you are just doing it later.

25

1          Is there something different about how the
2  discovery would be taken if you are taking it a year from
3  now as opposed to now?
4          MR. LUECK: Well, I think there would be some
5  duplication but I can't a stand here and tell you, Your
6  Honor, with great accuracy without any discovery exactly how
7  that would play out.
8          The answer to your question from my standpoint
9  is this: If we start with the products that we know are
10 going to be sold in the United States, which is the end
11 products, that the transactions take place here, and we
12 try that case, we have corralled the entire scope of the
13 infringement.
14         If we go with the product manufacturer or the
15 module manufacturers first, then what we're going to do is
16 we're going to have some modules that will be included and
17 some modules that won't. And I think that does lead to a
18 confusing and duplicative effort. And if the issue is the
19 complexity of figuring out the infringement for the end
20 product manufacturers, I'd like to address that for just a
21 moment, because I don't think that complicates the action.
22         THE COURT: I will hear you on that, but I also
23 want to hear you a little further. And I'm going to ask
24 somebody in this group, whoever is speaking in response to
25 it, to speak to me about the first point you made which was

26

1  the one that intrigued me which is your assertion that you
2  don't know who is doing what. That is what I hear you
3  telling me. Maybe we could sue Dell's supplier of LCDs if
4  we only knew who that person was.
5          And I guess my question in the first instance is
6  twofold: First, I got to believe then that an outfit as
7  savvy as Honeywell has got some fix on the market for the
8  supply of LCDs and knows who the players are in the world.
9  Am I wrong about that? You don't? Now, you may not know
10 who goes into what product but you know who the universe of
11 LCD manufacturers are, don't you?
12         MR. LUECK: Well, I can't say with certainty
13 that we know everyone. We believe we know in general who
14 they are.
15         THE COURT: Right.
16         MR. LUECK: But whether or not we know those
17 specific corporate entities and whether they are people that
18 we can actually serve with process and bring into court, we
19 do not know that.
20         THE COURT: Yes, I'm acutely aware of the
21 challenges associated with personal jurisdiction in this
22 court.
23         Second, if you had the opportunity to take
24 discovery from the end product manufacturers, is there any
25 reason to believe you wouldn't know who their manufacturers

27

1  are? Do you have some reason to believe that these folks
2  will not tell you if they're served with proper discovery
3  requests or third-party discovery requests?
4          MR. LUECK: No, I believe we can find out
5  through discovery.
6          THE COURT: Okay.
7          All right. Well, you wanted to tell me
8  something about another issue. I'll go ahead and hear you
9  on that.
10         MR. LUECK: I can do it now or I can do it
11 later.
12         THE COURT: That's fine.
13         MR. LUECK: I think one of the arguments that
14 has been made it is very complicated to understand the
15 infringement and for that reason --
16         MR. HORWITZ: (Gesturing for permission to move
17 about the courtroom.)
18         THE COURT: Sure. You can come over here.
19         MR. LUECK: I think the best I can do is to get
20 a group of us here. But you know the idea that we don't
21 really know what is in our products, this is the argument
22 that is made by some of the end product manufacturers. And
23 what we've done is created just a simple drawing that is an
24 example of how Claim 3 would read on an embodiment of the
25 invention. I'm not representing that this is exactly the

28

1  way all of these modules are laid out. But I think at the
2  end of the day, we'll see that proof of infringement I think
3  compared to other patent cases is going to be relatively
4  straightforward. You have an LCD panel, a pair of lens
5  arrays and a light source. Honeywell has been able to
6  disassemble them and determine where the infringe- ment lies
7  and we believe that all of the end product manufacturers are
8  capable of doing the same thing.
9          And the Court can't see it right here but the
10 lens array in the middle is slightly off-angle to deal with
11 more ray effects and that also can be observed through
12 disassembly of the module if, in fact, they're unable to get
13 that information from the module supplier. So I don't think
14 that complexity of the infringement issue is really one that
15 should drive the decision, from our standpoint.
16         And I'm not going to argue with the Court. I do
17 think the issue of where the transaction takes place is an
18 important one and one that will ultimately complicate the
19 action if we proceed just against the module manufacturers
20 because they may very well take the position that sales
21 outside of the United States simply cannot be reached, and
22 yet many of those modules may find their way in the United
23 States and in end products. And I think that does create a
24 very confusing and complicated situation for the present-
25 ation of the case.

29

1          And with that, I think, if I have answered your
2  immediate questions, perhaps I'll sit down and let counsel
3  explain their point of view.
4          THE COURT: Yes, I'll hear from Mr. Horwitz.
5  Thank you.
6          MR. HORWITZ: Thank you, Your Honor. Preparing
7  for today reminded me of one of our countries great
8  philosophers, Yogi Berra. I'm going to change his words a
9  little bit to apply to the facts of this case and that is:
10 "It's like deja vu all over again except it's only worse."
11 And I say that because of where I was in this courtroom 13
12 months ago with Your Honor making many of the same arguments
13 in the CEA case. We didn't hear any mention of CEA by Mr.
14 Lueck, it wasn't in their first round of briefs but I think
15 that is where we have to start in terms of case management
16 to get our arms around this case.
17         Now, I said I think this case is more
18 complicated than CEA because of the potential products that
19 are involved, the parties that are involved. We've got over
20 10 years when they didn't say anything to anyone. As of
21 now, Your Honor, in their papers they have not limited even
22 to the Claim 3 in the patent. They just say products with
23 LCDs. They already served discovery. We think that was too
24 early. It just says LCDs. There are potentially thousands
25 of products in this case right now. And that's one reason

42

1    MR. LUECK: No, I think I stated our argument as
2 succinctly as I can.
3    THE COURT: All right. Thanks, sir.
4    MR. GRAHAM: Your Honor, Barry Graham for Nikon
5 Corporation, Nikon Inc. I'd just like to state briefly for
6 Nikon the term "end product manufacturers" is probably
7 not -- is not completely accurate. Nikon, for the Court's
8 information is, call us what you want, a "100 percent pure
9 customer" defendant. And we're the defendant -- Nikon
10 Corp., Nikon Inc. are the defendants in the 1337 case and
11 all their suppliers are in the lawsuit already.
12    The reason why Nikon is not an independent
13 product manufacturer is the bulk -- there have been two
14 accused cameras, specifically accused cameras. And I, not
15 knowingly -- I hope I'm not violating any court rule -- I
16 have the batteries out of this but I bought this Nikon
17 camera a year ago before the lawsuit. It's a CoolPix 3100.
18 It is now a specifically accused product. It has Nikon on
19 it and I thought it was a Nikon camera but it's actually
20 manufactured by another defendant. And the LCD panel that
21 is the subject of the litigation is also manufactured by
22 that other defendant.
23    If you go outside of the two specifically
24 accused cameras and look at all of Nikon's digital still
25 cameras that have LCD screens in them, the vast bulk of them

43

1 are not manufactured by Nikon, they're OEM by another
2 defendant. So Nikon is not truly an end product
3 manufacturer of them.
4    With respect to, just like Dell, last fall I
5 spoke to Matt Woods, Honeywell counsel, one of the counsel
6 saying, look, this really is a customer defendant stay
7 situation. Nikon would like to be out. We'll give the
8 supplier information and let us go. Well, we gave them the
9 supplier information but they didn't let us go and we have
10 been very busy since then trying to orchestrate the
11 propriety, the setting up of the stay motions.
12    And one thing I tried to do is answer the
13 Court's anticipated question: What is the percentage of the
14 market share? It was impossible to try to find out given
15 the way that Honeywell has asserted its claim against so
16 many people and so many products, but I can stand here today
17 and say Nikon is a pure customer defendant and the supplier
18 is in the courtroom already.
19    THE COURT: I say this with some trepidation.
20 Is there anybody else who feels like they need to be heard
21 on the stay motion?
22    Okay. Good enough.
23    Well, I was particularly struck by some language
24 in one of Honeywell's brief that they had tried to structure
25 the case to avoid the complications encountered in CEA. And

44

1 I wasn't all together sure what was meant by that but
2 putting the best spin on it, I would take it to mean that,
3 well, you know, we saw the Court struggle there with "who
4 ought to be first," suppliers or manufacturers and so we
5 thought we would deal with it by not naming any of the
6 manufacturers here. Maybe I got you wrong on that but that
7 is sort of how I understood it.
8    But while I appreciate the effort, it doesn't
9 solve the problem for me because what I think was
10 predictable has happened, and that is the people who have a
11 real stake in terms of keeping their customers happy are the
12 manufacturers and suppliers, and they have been subject no
13 doubt to a whole lot of communication from their customers,
14 including demands for indemnification and third-party
15 complaints and probably less formal demands and requests.
16    So I feel like I do have a circumstance that
17 is very akin to the CEA case, whether they brought the
18 suppliers in in the first instance or not. And that is why
19 I'm going to structure this case in roughly the same way.
20 Now, I say "roughly" because, you know, no two cases are
21 exactly alike, particularly when you have two cases which
22 are orchestrated on an operatic scale like these two are
23 with dozens and dozens of defendants, literally.
24    So I'm sure there are things, Mr. Lueck, in your
25 case that are not going to be like CEA's case, and so I

45

1 don't want you to be concerned that everything that happens
2 there, you are going to be in the same mold, because there
3 may be sound reasons to do things somewhat differently.
4    But I don't think there is a sound reason to
5 depart from the traditional rule which is in many cases and
6 has reached a point of being memorialized in the manual on
7 complex litigation that says you ought to give the people
8 who are making the accused device face the music, and let
9 them face it in the first instance, particularly in a case
10 like this where there is not something else going on where
11 these people are infringing. They're taking something that
12 you say infringes and they're putting it into the stuff they
13 sell. And so settling whether those components infringe,
14 if we got all the manufacturers in, would settle the thing
15 entirely. If we don't get them all in, we will have
16 substantially reduced the universe of litigation that has to
17 go forward against the -- and I will use the term "end
18 product manufacturers" for ease of reference, with all due
19 respect to the folks from Nikon. It's just likely to make
20 things more manageable in a way that is consistent with the
21 fair administration of justice.
22    So I'm going to grant some type of stay to the
23 end product manufacturers but the contours of that are
24 something that I'm open to discuss within bounds of reason.
25 In short, I think you made a persuasive case for needing to

**46**

1  find out from these people who is supplying what to who and
2  for what products.
3  And I will let the plaintiffs go after that in
4  discovery. I'll open that as the first front in your war.
5  You find out who is doing the manufacturing and supplying
6  for who and for what products.
7  It may be that down the road, I'll lift the stay
8  again to some limited extent to allow product's success,
9  secondary consideration kind of discovery, but that is to me
10 an issue for another day. Right now, the issue is who does
11 it make sense for you to get in here first and start suing.
12 Well, you got Optrex who is here saying "I want
13 in." You got Seiko Epson who is here saying "I want in."
14 These are my customers and I want to stand behind my product
15 and make them sue them first because I'm the one who can
16 tell you whether it's infringing or not.
17 And I am going to grant Seiko Epson's motion
18 and let them in. And I'm going to grant your motion to
19 consolidate because this is all one big happy family of
20 problems now and everybody is going to be in the same case,
21 and we'll come up with some kind of appropriate consolidated
22 case caption.
23 And I will give you a generous time period but
24 not overly generous to figure out who else you want to try
25 to haul in here on the manufacturers side, and then we'll

**47**

1  get that case on.
2  Now, let's talk about the questions of
3  bifurcation. You have people who are trying to say we want
4  not only to have the manufacturers go first but we want them
5  to be first in a bifurcated manner.
6  I want to you speak to that specific issue of
7  bifurcation, Mr. Lueck, unless you have somebody is on your
8  team to do that.
9  MR. LUECK: I'll speak to it, Your Honor. And
10 I would say, I think if Your Honor is inclined to go with
11 some sort of a stay and tailor the contours, I would propose
12 that we handle the issue of bifurcation within that
13 approach. And I think, at the end of the day, yes, you can
14 do infringement by going after the module manufacturers, if
15 we can get them. I respectfully continue to believe that to
16 afford full relief, the end product manufacturers have to
17 answer for the extent of use.
18 THE COURT: I'm not disagreeing with you.
19 MR. LUECK: So what I would propose, what I
20 would propose, Your Honor, is that you let us conduct some
21 limited discovery, let us make the proposal to find out who
22 should be here within the module manufacturer appellation,
23 try to figure out who we can get here and you can put the
24 burden on us to say what discovery should be, should go
25 forward in parallel with that discovery for the efficient

**48**

1  administration of the case. And from my standpoint, it
2  would be where did the modules end up? What are the
3  reasons for using it in the end product? And the issues on
4  commercial success. Put that burden on us. We'll come to
5  you and tell you why it is we need it, when? And ask you
6  have the stay somewhat malleable, in that vein. And I
7  believe the issue of bifurcation can appropriately be put
8  off until a later date when we have more information.
9  Alternatively, if the Court is going to proceed
10 in the fashion that you have indicated, and I'm sure you are
11 and I'm not going to argue that point any further, you know,
12 it would be possible to have an infringement trial against
13 the module makers.
14 I do think in the validity case, we ought to
15 be entitled to bring in some evidence from the end product
16 manufacturers in some fashion. Whether they have to be
17 there or not is a different question and they might want to
18 be. And then a damages trial against the end product
19 makers. And we wouldn't be opposed to a phased approach
20 along that line.
21 But where I see things being unduly complicated
22 is if we're unable to conduct the discovery all the way
23 along in a way that makes sense from the standpoint of the
24 overall issues. And I'm cognizant of the Court's need to
25 maintain control over the case and we would be entirely

**49**

1  willing to make an application and lay out what it is we
2  think we need and why.
3  THE COURT: All right. Mr. Horwitz.
4  MR. HORWITZ: Your Honor, I think we've got some
5  good input from the Court today as well as some statements
6  that Mr. Lueck made that went further than anything that we
7  had when we met with Honeywell before coming to this
8  conference this morning.
9  I think one thing that would be important in
10 this phase that Your Honor is talking about -- and I think
11 the parties should get together, having heard what you said
12 today and try to hash some of this out. But one thing that
13 we think is very significant is they should step up now
14 and tell us which products they really are accusing of
15 infringement. That would be important up front as well.
16 And I think also we would like to get an
17 agreement that the general discovery that they've served on
18 all parties right now is just stayed. Nobody has to respond
19 to that and we should deal with whatever narrow discovery
20 they're going to propose to us and to the Court. Otherwise,
21 we're going to have to come in for many of the defendants
22 and seek relief because of the things that we've already
23 talked about today.
24 Much of what Mr. Lueck talked about before and
25 now again really does go to damages, and we think that it

# EXHIBIT B

## FULLY REDACTED

# EXHIBIT C

## FULLY REDACTED

# EXHIBIT D

```
                                                                        1


   1                  THE UNITED STATES DISTRICT COURT

   2                 IN AND FOR THE DISTRICT OF DELAWARE

   3                              - - -

   4   HONEYWELL INTERNATIONAL, INC.      :    CIVIL ACTIONS
       et al.                             :
   5                                      :
                     Plaintiffs,          :
   6                                      :
             v.                           :
   7                                      :
       AUDIOVOX COMMUNICATIONS CORP.,     :
   8   et al.                             :
                                          :    NO. 04-1337 (KAJ)
   9                 Defendants.          :
       -----------------------------------
  10   HONEYWELL INTERNATIONAL, INC.      :
       et al.                             :
  11                                      :
                     Plaintiffs,          :
  12                                      :
             v.                           :
  13                                      :
       APPLE COMPUTER, INC., et al.,      :
  14                                      :    NO. 04-1338 (KAJ)
                     Defendants.          :
  15   -----------------------------------
       OPTREX AMERICA, INC.,              :
  16                                      :
                     Plaintiff,           :
  17                                      :
             v.                           :
  18                                      :
       HONEYWELL INTERNATIONAL, INC.      :
  19   et al.                             :
                                          :    NO. 04-1536 (KAJ)
  20                 Defendants.          :
                                  - - -
  21
                              Wilmington, Delaware
  22                   Monday, March 13, 2006 at 10:00 a.m.
                              TELEPHONE CONFERENCE
  23
                                  - - -
  24
       BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.
  25
                                  - - -
```

30

1  way to go at this point is our proposal, which is to try
2  the common issues, the true common issues which we believe
3  are invalidity and unenforceability, and that is what our
4  proposal sets forth.
5         THE COURT: Now, let me ask a question of you.
6         Have you given any thought to whether, if I
7  were to accept your suggestion in that regard, how I would
8  nevertheless manage a case with this many defendants? In
9  other words, Optrex is making the pitch, hey, let us step
10 out front first and we'll carry the torch for everybody.
11 And you folks evidently think that is not a good idea. But
12 have you thought of what other things might be done besides
13 having 18 groups of companies with platoons of lawyers for
14 everybody in the courthouse or some third location or some
15 other different location, because trying it in this facility
16 would be perhaps impracticable?
17        MR. ROVNER: Well, on behalf of the manufacturer
18 defendants, we believe that with a lot of effort, we could
19 try the true common issues with the defense group that we
20 have; and we believe that would be the most efficient way
21 because you would have the most parties at trial. And as I
22 keep saying, the true common issues, that we believe could
23 be done. And that's why we certainly considered Honeywell's
24 proposal and we considered Optrex's; but we believe for the
25 great bulk of the defendants, our proposal, which is set

31

1  forth in the proposal that was provided to Your Honor last
2  week, is the one that would be the best for all concerned.
3         THE COURT: All right. Optrex, I'll give you a
4  chance to weigh in here; and then I'll turn back to you,
5  Mr. Lueck.
6         MR. KELLY: Your Honor, this is Dick Kelly for
7  Optrex.
8         Optrex doesn't believe that you can have a trial
9  with 18 defendants even if the so-called common issues are
10 there. There are going to be differences of opinion as to
11 what prior art to play and other things.
12        Second, I just wonder how are you going to
13 schedule something like that. This case has been going
14 on almost a year and-a-half now and we're no closer to
15 resolution than when the complaint was filed and Optrex
16 would like to get it over, and over as quickly as possible,
17 and we don't see that happening if this case is going to
18 have 18 or 19, whatever it winds up being, defendants at a
19 trial, even a trial on the so-called common issues.
20        THE COURT: Okay. Mr. Lueck.
21        MR. LUECK: Yes, Your Honor. I think, you know,
22 when we went back and set this structure up, the idea was
23 putting the manufacturing defendants in to stand in place
24 of the customer defendants on some of these issues would
25 streamline matters and speed up the resolution. We believe

32

1  that that can be accomplished. We think the issues of
2  validity are common and the issues of infringement.
3         Essentially, I recognize there are some differ-
4  ences in some of the ways that the invention is implemented
5  but overall the claim is really not complicated. And I
6  don't believe the proofs on that issue will be terribly
7  complicated.
8         THE COURT: All right.
9         MR. LUECK: And --
10        THE COURT: Well, I got your position. Thanks.
11        I have to say, bluntly, it's unworkable and it's
12 not going to happen. We're not taking this case to trial
13 on all issues against all defendants. We will take it to
14 trial on common issues in the first instance: validity and
15 unenforceability.
16        The only question I have in my mind is whether
17 it's really possible to try this case with all these people
18 at once. And I think it more likely than not that it is not
19 a practical way to approach it. And something that the
20 parties ought to be talking about is if there are, if there
21 is a logical group to stand in first. And this may be an
22 impossible thing to ask the people on this call to do,
23 certainly without having a chance to talk to each other and
24 talk to their clients, so I'm not expecting anybody to give
25 me an answer now. And we're not going to delay scheduling

33

1  for now.
2         Let me emphasize, by the time this call is over
3  there is going to be a scheduling order. The only question
4  is whether everybody is going to be on that same train or
5  not. You know, some people like Optrex may want to be on
6  that train. They may say I don't want to wait and see how
7  other people do at resolving the issue. I am ready to go
8  now, and I want to go now. And I'll count Optrex as one of
9  the folks that wants to be on a train and that is well and
10 good. There may be others who are delighted to let others
11 carry the water and sit back and see what happens.
12        But you folks ought to talk to each other on the
13 defense side and see if there isn't a more manageable group.
14 And by "manageable," I'm thinking something not in excess of
15 five; and less is better; so that we could actually fit in
16 a courtroom, in this building, and we could actually try a
17 case to a jury over the course of a reasonable length of
18 time, a couple weeks, and get a resolution.
19        But I'll leave for another day how we narrow
20 that. For now, it's enough to say that Optrex is not going
21 to go it alone and Honeywell's position is impractical and
22 is rejected. So we're going to go against the manufacturer
23 defendants; what group remains to be seen; and we're going
24 to get ourselves a schedule in place.
25        With that as background, I assume that everybody