IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 04-1338- JJF (Consolidated) |
| APPLE COMPUTER, INC., et al., | ) ) | PUBLIC VERSION |
| Defendants. | ) ) | |

**HONEYWELL'S RESPONSIVE MEMORANDUM
REGARDING CONSTRUCTION OF U.S. PATENT NUMBER 5,280,371**

OF COUNSEL:

Martin R. Lueck
Matthew L. Woods
Stacie E. Oberts
Denise S. Rahne
Peter N. Surdo
Amy N. Softich
Daniel M. White
ROBINS, KAPLAN, MILLER
  & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
(612) 349-8500

Anthony A. Froio
Marc N. Henschke
Alan E. McKenna
Michael J. Garko
ROBINS, KAPLAN, MILLER
  & CIRESI L.L.P.
800 Boylston Street, 25th Floor
Boston, MA  02199
(617) 267-2300

Confidential Version Filed: June 2, 2008

Public Version Filed: June 6, 2008

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
tgrimm@mnat.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

I.    INTRODUCTION. ..........................................................................................1

II.   DEFENDANTS INJECT SEVERAL DISPUTED ISSUES INTO
      CLAIM CONSTRUCTION THAT THIS COURT DOES NOT
      NEED TO CONSIDER AT THIS TIME.............................................................2

III.  ARGUMENT...................................................................................................3

      A.   Legal Standards........................................................................................3

      B.   Construction of Disputed Claim Terms ......................................................4

           1.   A display apparatus..........................................................................4

           2.   a light source ...................................................................................6

           3.   a liquid crystal panel mounted adjacent to said light
                source for receiving light from said light source;
                and.....................................................................................................10

           4.   first and second lens arrays, each having a plurality
                of individual lenslets ......................................................................10

                a.   The '371 Patent does not Require that the
                     Lens Arrays be Separate from the Light
                     Source. ...............................................................................11

                b.   The '371 Patent does not Require that the
                     Lens Arrays Must Face the Liquid Crystal
                     Panel....................................................................................12

                c.   The '371 Patent does not Require
                     Horizontally-Aligned Lens Arrays or
                     Control in Only the Vertical Axis.....................................13

                     (i)   Horizontal Alignment Provides
                           Predominantly Vertical Control in
                           the Same Way Vertical Alignment
                           Provides Predominantly Horizontal
                           Control.                                              14

(ii)     The Summary of the Invention is not
         Limited to Vertical Control.                    17

d.     The '371 Patent does not Require that the
       First and Second Lens Arrays have Different
       Pitches..................................................................19

5.     Claim 3 Does Not Require an Air Gap. ........................................20

6.     for providing predetermined variation with viewing
       angle.................................................................................22

7.     wherein at least one of said first and second lens
       arrays is rotated about an axis perpendicular to said
       liquid crystal panel in order to provide a slight
       misalignment between said lenslets and said liquid
       crystal panel. ...................................................................23

CONCLUSION.......................................................................................28

TABLE OF AUTHORITIES

Page(s)

CASES

*Agfa Corp. v. Creo Prods.*,
    451 F.3d 1366 (Fed. Cir. 2006).................................................................................15, 18, 26

*AllVoice Comp. PLC v. Nuance Comm., Inc.*,
    504 F.3d 1236 (Fed. Cir. 2007).................................................................................19

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
    126 F. Supp. 2d 69 (D. Mass. 2001) .......................................................................3

*AstraZeneca Pharms., LP v. Mayned Pharma (USA) Inc.*,
    352 F. Supp. 2d 403 (S.D.N.Y. 2004).....................................................................9, 17

*C.R. Bard, Inc. v. United States Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004).................................................................................3

*Caterpillar Inc. v. Deere & Co.*,
    224 F.3d 1374 (Fed. Cir. 2000).................................................................................12

*Computer Docking Station Corp. v. Dell, Inc.*,
    No. 2007-1169, 2007-1316, 2008 U.S. App. LEXIS 5893 (Fed. Cir. March 21, 2008) .........18

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006).................................................................................20

*D.M.I., Inc. v. Deere & Co.*,
    755 F.2d 1570 (Fed. Cir. 1985).................................................................................24

*Gentry Gallery, Inc. v. Berkline Corp.*,
    134 F.3d 1473 (Fed. Cir. 1998).................................................................................15-16

*Honeywell Inc. v. Victor Co. of Japan, LTD*,
    298 F.3d 1317 (Fed. Cir. 2002).................................................................................20

*Hoyt v. Horne*,
    145 U.S. 302 (1892).................................................................................................7

*Ideal Instruments, Inc. v. Rivard Instruments, Inc.*,
    498 F. Supp. 2d 1131 (N.D. IA 2007) .....................................................................10

*Innovad Inc. v. Microsoft Corp.*,
    260 F.3d 1326 (Fed. Cir. 2001).................................................................................24

*Int'l Nickel Co., Inc. v. Ford Motor Co.,*
    166 F. Supp. 551 (S.D.N.Y. 1958)...................................................................24

*JVW Enterprises, Inc. v. Interact Accessories, Inc.,*
    424 F.3d 1324 (Fed. Cir. 2005)........................................................................7

*Key Pharms v. Hercon Labs Corp.*
    161 F. 3d 709 (Fed. Cir. 1998)........................................................................27

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004)....................................................................3, 18

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)..................................................................................3, 5

*Metabolite Labs, Inc. v. Corp. of Am. Holdings,*
    370 F. 3d 1354 (Fed Cir 2004)........................................................................6

*Modine Mfg. Co. v. United States I.T.C.,*
    75 F.3d 1545 (Fed. Cir. 1996).........................................................................24

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................15

*Rambus Inc. v. Infineon Techs. Ag,*
    318 F.3d 1081 (Fed. Cir. 2003)....................................................................9, 17

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001)........................................................................18

*Rhine v. Casio, Inc.,*
    183 F.3d 1342 (Fed. Cir. 1999)..........................................................................3

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001).........................................................................3

*SRI Int'l v. Matsushita Elec. Corp. of Am.,*
    775 F.2d 1107 (Fed. Cir. 1985) (en banc)..............................................3, 19, 27

*Tex. Digital Sys., Inc. v. Telegenix, Inc.,*
    308 F. 3d 1193 (Fed. Cir. 2002)........................................................................23

*Whapeton Canvas Co., Inc. v. Frontier, Inc.*
    870 F.2d 1546 (Fed. Cir. 1989).....................................................................6, 9

## OTHER AUTHORITIES

*Chisum on Patents* §18.03 ...............................................................................5, 12

Plaintiffs Honeywell Intellectual Properties, Inc. and Honeywell International Inc. (collectively hereinafter, "Honeywell") respectfully submit this memorandum in support of its proposed claim construction and in response to the Defendants' proffered construction and argument.

## I.     INTRODUCTION.

Defendants' opening brief requests the Court to drastically narrow claim 3 of U.S. Patent 5,280,371 ("the '371 patent") by injecting many limiting words found nowhere in the plain meaning of the claim language.  The lengths to which Defendants apparently feel the need to go in order to obtain a construction that would support their defenses is illustrated by the following quotation from Defendants' brief in which all the language they improperly seek to import into the claim is highlighted in yellow:

> Defendants' construction of claim 3 requires (1) a distributed source of light separate from the lens arrays; (2) two lens arrays with lenslets extending horizontally, facing in the direction of the liquid crystal panel and having different pitches to produce a predetermined variation of light transmission with vertical viewing angle; (3) at least one of the lens arrays being rotated relative to the horizontal axis by no less than 2 degrees and no more than 16 degrees; and (4) a defined air gap between the light source and the lens arrays.

Def. Br. p. 2 (emphasis added).[1]  None of the highlighted language is required by, or otherwise derived from, the actual claim language.

Notwithstanding the lip service Defendants pay to the Supreme Court and Federal Circuit directives to focus on the intrinsic record, it is notable that Defendants repeatedly resort

---

[1]     The joint opening brief submitted by Fuji, Samsung SDI, Optrex, and Citizen will be cited as Def. Br. p. ___, and the opening brief submitted by Innolux Display will be cited as Innolux Br. p. ___.  Attachments will retain consecutive alphabetical designation from
(Continued . . .)

to citing to their expert's extrinsic "declaration"[2] in support of their proffered construction.  *See* Def. Br, *passim* (citing to Dr. Schlam's declaration in at least 20 different instances).  That "declaration" itself cites to further extrinsic evidence.

As to the intrinsic record, Defendants' opening brief is highly selective, ignoring many passages that do not support their positions and taking many other references out of context—all in an effort to limit the claim to the preferred embodiment.  This lack of fidelity to the intrinsic record is particularly troubling given the time and effort expended by the parties in identifying that relevant record in the Joint Claim Construction Statement submitted to the Court.

In short, the Defendants' claim construction should be rejected because it seeks to drastically rewrite claim 3 based upon a selective and inaccurate rendering of the intrinsic record and is otherwise contrary to established legal principles regarding claim construction.

## II.    DEFENDANTS INJECT SEVERAL DISPUTED ISSUES INTO CLAIM CONSTRUCTION THAT THIS COURT DOES NOT NEED TO CONSIDER AT THIS TIME.

The Defendants' Brief refers to several disputed issues in this case, none of which the Court needs to determine in order to properly construe the '371 patent.  Although providing the Court with some context for claim construction is entirely proper, the Defendants' reliance on their arguments relating to infringement and validity (including the prior art, the level of one of ordinary skill in the art, the field of art, and Honeywell's invention date) is misplaced.

---

(. . . continued)
      Honeywell's Opening Memorandum (Exhibits A through I), and begin with Exhibit J for this Responsive Memorandum.

[2]    Honeywell is concerned that Defendants' proffered declaration of Dr. Elliot Schlam contains new opinions regarding Defendants' invalidity challenge that were not in his original and supplemental reports.  These new opinions have no bearing on claim construction *per se*, but Honeywell will address this untimely submission prior to trial.

Invalidity and noninfringement arguments are not an appropriate topic for claim construction and should not play a role in construing the claims of the patent in suit. *E.g.*, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) (one of the rationales for a two-step process is to separate construction from infringement); *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1346 (Fed. Cir. 1999) (warning against "raising the specter of invalidity during the claim construction phase"); *accord Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 126 F. Supp. 2d 69, 84 (D. Mass. 2001) (rev'd on other grounds, 314 F.3d 1313 (Fed Cir. 2003)).

## III.   ARGUMENT.

### A.   Legal Standards

As Honeywell cautioned in its Opening Brief, Defendants improperly seek to rewrite claim 3, based largely on the disclosed preferred embodiments. It is generally error to limit the claims to the preferred embodiment described in the specification. The law "does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Only where the patentee makes clear that the invention *does not* include a particular feature or makes a *specific disclaimer* should the claim be so limited. *Id.*; *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001); *see also C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 865, (Fed. Cir. 2004).

The Defendants repeatedly invite this Court to violate this black-letter legal standard by referring to the preferred embodiment and insisting that the claim should be so limited. The fundamental problem with the Defendants' approach, as explained below, is that they consistently conflate the preferred embodiment with the scope of the claim without marshalling the entirety of the type of intrinsic record necessary to support such a finding. To the contrary, a full and fair consideration of the entirety of the record confirms the breadth of claim 3.

### B. Construction of Disputed Claim Terms

### 1. A display apparatus

As argued in Honeywell's Opening Brief, the proper construction of "A display apparatus" is "A direct-view liquid-crystal display." The specification specifically discloses that the liquid crystal panel is to be directly viewed, as opposed to used to project an image onto a screen. Col. 2, ll. 51-55 ("from the front of the liquid crystal display"). The specification depicts the viewer's eye directly viewing the liquid crystal panel; on the other hand, there is no depiction of any type of projection display and screen configuration. Figs. 4A and 4B. Moreover, there is absolutely no disclosure of how projection optics could be used without interfering with the predetermined variation function of the claimed lens arrays. Thus, the specification references a direct-view display and is not directed to a projection apparatus.

These disclosures should be further considered in the context of the express teaching away found in the prosecution history. There, Honeywell argued to the Examiner that one of ordinary skill in the art would not combine the teaching of a projection apparatus such as in the Hamada reference with a direct-view apparatus such as Abileah or IBM:

> As the Hamada reference is concerned with a projection apparatus, there would be no suggestion to use the dual lens arrays of Hamada

in the **direct view apparatus** of Abileah or IBM.   Particularly since the dual lens array of Hamada is used to overcome a problem specifically associated with projection displays.   The two lens arrays of Hamada are used in a projection device to reduce the dimming at the outer edges.   As such the dual lens arrays would not be suggested to the **direct-view display** of Abileah or IBM.

Ex. B (Prosecution History, p. 60 (Response to Office Action of October 2, 1992, p. 3)) (emphasis added).   It is telling that after Honeywell made this argument, the Examiner essentially ceased relying upon projection references to evaluate the claims and focused further prosecution solely on direct-view displays.

The exchange described above is a potent example of how Defendants are incorrect when they wrote "Office Actions and Responses thereto are not relevant to claim construction."   Def. Br. p. 4.   Such documents are key portions of the prosecution history—intrinsic evidence that must be considered during claim construction.   *E.g.*, *Markman*, 52 F.3d at 979 ("To construe claim language, the court should ... consider the patent's prosecution history, if it is in evidence. . . . This 'undisputed public record' of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims."); *Chisum on Patents* §18.03[2][d][i]   ("most court decisions since the mid-1990s treat prosecution history as a primary source, *i.e.* intrinsic evidence, of the meaning of a claim").

This clear distinction from projection art, together with the several references in the specification to direct-viewing, makes clear that the Defendants are incorrect when they write "Nothing in the '371 patent requires a further limiting of the construction of 'a display apparatus' . . ." Def. Br. p. 11.   On the contrary, the intrinsic record confirms that Honeywell sought to distinguish its invention from projection art.   Thus, Honeywell's construction of the preamble is compelled by the full intrinsic record of the '371 patent.

It bears noting that the likely reason behind Defendants' effort to avoid the preamble is that they wish to rely upon references from the projection display field in their challenge to the '371 patent's validity. Although the Court does not need to define the relevant field of art at this time, this issue overlaps with the construction of the preamble. It is well-settled that the preamble sets the background for practicing the claim, and in this case, the preamble clearly signals that the invention is directed to a direct-view application. *Metabolite Labs, Inc. v. Corp. of Am. Holdings*, 370 F. 3d 1354, 1358-62 (Fed Cir. 2004) (a "preamble may provide context for claim construction, particularly where . . . that preamble's statement of intended use forms the basis for distinguishing the prior art in the patent's prosecution history.")

### 2. a light source

Defendants seek to rewrite the claim to include a requirement that the light source be "distributed." Significantly, the adjective "distributed" does not appear in the claim or anywhere in the specification. Furthermore, the word "light" and the word "source" are both commonly-understood English terms whose plain meanings are not limited by the word "distributed." Defendants do not identify what word in the claim compels the additional limitation.

Fundamentally, then, the Defendants do not rely upon anything that is inherent to the definition of a light source, but rather upon certain details of the preferred embodiment as to how the light emanating from the source can be further conditioned by a diffuser to optimize the impact of the lens arrays. Such conditioning and optimization, however, is not required by any language in claim 3. Put simply, a device may practice all of the claimed elements of claim 3 without utilizing the "typical" backlight array of the prior art. Such a device might be superior or inferior to the inventors' preferred embodiment, but it would still infringe. *E.g. Whapeton*

*Canvas Co., Inc. v. Frontier, Inc.* 870 F.2d 1546, 1548 (Fed. Cir. 1989) (inferior devices may infringe); *Hoyt v. Horne*, 145 U.S. 302 (1892) (improving upon a patented device does not avoid infringement); *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1333 (Fed. Cir. 2005) (same). Honeywell's plain-meaning construction is confirmed by the prosecution history in which the Examiner noted that the lamps (element 100) disclosed in the Abileah 5,128,783 patent ("the '783 patent") were a "light source" as claimed in the '371 patent:



Ex. H ('783 patent, Fig. 3 (color added)); Ex. B (Prosecution History, p. 53 (Office Action, dated September 30, 1992, p. 2)). This is intrinsic evidence that the lamp alone can constitute a light source, regardless of the condition of the light—distributed or not.

The specification is also consistent with the understanding that the lamp alone constitutes the light source. Particularly, the specification recognized that it may be desirable to mask the lamp to reduce spatial artifacts, which are edges, hotspots, or other areas of variation.

> This allows the reduction of the thickness or optical density of the conventional diffuser while still achieving the same system luminance uniformity **and masking of undesired spatial artifacts from the light source**, but with higher luminance at the output.

Col. 5, lines 29-38.  If "light source" was understood to be an already "distributed" source of light (as Defendants contend), then there would be no need to mask spatial artifacts created by that source.

Defendants rely on the "present invention" passage at Column 3, lines 24-28, which states that the present invention "includes" the backlight array shown in Figure 1.  This reliance is flawed for two reasons.  First, not even the Defendants go so far as to argue that the invention is actually limited to an embodiment having a diffuser sheet (20), a serpentine lamp positioned directly behind the liquid crystal panel (15), and a reflective box (10), even though that is what is shown in Figure 1.  Indeed, it bears noting that the apparatus shown in Figure 1 is disclosed in Column 2 as "typical."  Instead, the Defendants implicitly concede that the invention is *not limited* to such a specific backlight array, particularly because their construction does not preclude alternative configurations, including: (1) a side-lit module (using a wedge light pipe) instead of a direct-lit arrangement; (2) LEDs or a straight-tube lamp instead of a serpentine lamp; (3) an already-distributed light source—such as an electroluminescent display—instead a point source and diffuser;[3] and (4) a box-like reflective cavity for housing the lamps.  Instead,

---

[3]    Critically, Defendants do not take the position that claim 3 requires a diffuser.  Indeed, Defendants' experts have admitted that a device without a diffuser could still work in some respects.

>    Q.    Sir, would a device construction in – constructed in accordance with the teachings of the '371 patent work, maybe not very well, but would it work with an undistributed light source?
>
>    A.    It depends, I guess, which – which embodiment you're talking about.  I – I think perhaps it might work with – with like the prismatic style as opposed to the lenticulars.

Ex. J (Smith-Gillespie Dep., p. 507); *see also* Ex. K (Schlam Dep., pp. 175-177, 182-83).  Accordingly, this Court should not rewrite the claim with additional limitations just

(Continued . . .)

recognizing that the claim should not be limited to the backlight array shown in element 25, the Defendants simply call for the claim to be rewritten as "a source of distributed light"—a phrase which has no intrinsic basis in the claim, the specification, or the very "present invention" passage upon which they rely.

Second, under the law, the use of "present invention" language does not necessarily result in claim limitation, particularly where it uses the word "includes" and where the entire intrinsic record supports a broader claim construction. In the '371 patent, the passage in question describes the present invention as *including* the backlight array element 25, but does not say that the invention is limited to or requires that array. As a matter of English, the word "includes" means "including, but not limited to . . ." It is not viewed as exclusive of different or additional items, and in this case, it means that the invention covers at least the typical backlight array of the prior art. This common English understanding has figured in other cases. *See, e.g.*, *AstraZeneca Pharms., LP v. Mayned Pharma (USA) Inc.*, 352 F. Supp. 2d 403, 413-14 (S.D.N.Y. 2004).

In *AstraZeneca*, the specification stated that present invention *included* three different "derivatives"—and all three listed "derivatives" were salts. Nevertheless, the court did not limit the term "derivatives" to *only* salts because "no portion of the specification expressly limits the definition of the derivatives to the enumerated examples or disclaims derivatives not specified." *Id.* Like in *AstraZeneca*, the Federal Circuit has clarified that "includes" is not necessarily limiting and must be read in the context of the intrinsic record. *Rambus Inc. v.*

---

(. . . continued)

      because the best way to practice the invention is to use a diffused or distributed "light source." As described above, inferior infringement is still infringement. *Whapeton*, 870 F.2d at 1548.

*Infineon Techs. Ag*, 318 F.3d 1081, 1094-95 (Fed. Cir. 2003) (even where the summary of the invention contains "present invention includes" language, it must be taken in context of the specification and prosecution history; where the patentee had not clearly disclaimed or disavowed a broader claim scope, the patent should not be so limited); *accord Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 498 F. Supp. 2d 1131, 1200-1201 (N.D. IA 2007) (considering "present invention includes" to incorporate more than the particular embodiment shown).

Finally, the "distributed" limitation should not be injected into the construction of "light source" because it would introduce ambiguity into the term, requiring construction of the construction. Defendants have not defined what it means for light to be distributed. When is light "distributed" versus "non-distributed"? The '371 patent discloses that there is a range of potential diffusion. Indeed, that diffusion could be anywhere from barely-scattering to perfectly-lambertion. At which point would it be fair to characterize the light as distributed? Defendants do not answer this important question. Thus, inserting the word "distributed" only creates uncertainty by begging further definition and construction.

### 3. a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

The parties agree that this phrase means "a liquid crystal panel is mounted near the light source and receives light from the light source."

### 4. first and second lens arrays, each having a plurality of individual lenslets

The major differences between the parties' respective constructions relate to the orientation and configuration of the claimed lens arrays. Honeywell's proffered construction properly defines what lenses and lens arrays are, giving meaning to all 9 of the claim's original language, including the requirement that the lens arrays have a plurality of ***individual*** lenslets.

- 10 -

On the other hand, the Defendants' proffered construction is a prime example of Defendants' desire to rewrite the claim language into a restrictive recitation of the preferred embodiment.

For example, in construing the straightforward phrase, "first and second lens arrays, each having a plurality of individual lenslets," Defendants contend that the claim language actually means the following:

> **I) Two lens arrays each consisting of a member separate from the light source and having a plurality of lenslets.**
>
> **II) The lens arrays are arranged such that the lenslets on the first and second lens arrays:**
>
> **a) face toward the liquid crystal panel;**
>
> **b) are parallel to each other, and parallel to the horizontal axis of the liquid crystal panel (aside from any "slight misalignment");**
>
> **c) have different pitches from each other and from the liquid crystal panel; and**
>
> **d) provide a variation of light transmission with vertical viewing angle.**

Ex. C (Joint Claim Construction Statement, p. 3(citations omitted)).  One would be hard-pressed to come up with a "definition" that is further away from the plain and ordinary meaning of the claim words than this one.

> **a.    The '371 Patent does not Require that the Lens Arrays be Separate from the Light Source.[4]**

As discussed in Honeywell's opening memorandum, the Defendants' proffered requirement that the lens array be separate from the light source is intended to support a

_____

[4]    This corresponds to Defendants' proffered construction part I.

noninfringement argument with regard to the design of certain Defendants' products. However, Defendants have created this requirement out of whole cloth; it is not found in the plain meaning of the claim language. Just because the claim recites two elements—a light source and a lens array—does not exclude a single physical structure from satisfying both elements. To the contrary, the Federal Circuit has repeatedly held that a single structure can satisfy two claimed elements. *E.g.*, *Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1380-81 (Fed. Cir. 2000); *see generally Chisum on Patents* § 18.03[4][a] (a claim reads on any device that contains all the elements of the claim, regardless of what structures contain those elements).

Defendants' construction also finds no support in the specification. While the embodiment in Figure 7 shows a configuration using separate structures for these elements, that illustration does not turn into a claim limitation in the absence of an explicit disavowal of claim scope. As discussed throughout Honeywell's claim construction briefing, the simple fact that the preferred embodiment shows the use of particular structures is not tantamount to a claim limitation. There simply is no language in the specification disavowing the possibility of combining the light source and a lens array into a unitary structure.

> **b.    The '371 Patent does not Require that the Lens Arrays Must Face the Liquid Crystal Panel.[5]**

The '371 patent claims "first and second lens arrays" without restricting the direction that their lenslets face. There is absolutely no language in the claim in which to find Defendants' desired requirement that the lens arrays "face" the liquid crystal panel. Once again, the only intrinsic evidence Defendants can muster for their proposal is the mere fact that the

---

[5]    This corresponds to Defendants' proffered construction part II(a).

preferred embodiment depicted in Figure 7 shows the lens arrays oriented that way.  Def. Br. at

16.  Thus, the Defendants' argument again improperly seeks to turn the unclaimed details of the

preferred embodiment into an affirmative limitation without any clear disavowal by the patentee.

Defendants also rely on an article published by the inventors at a trade

conference, a reference clearly extrinsic to the patent.  *Compare* Def. Br. pp. 1, 17.  Because

there is nothing ambiguous about the claim language at issue that would justify resorting to

extrinsic evidence, the article should not be considered by this Court, especially insofar as there

is nothing ambiguous about the claim that would justify resorting to such evidence.  To the

extent this Court considers the article, Honeywell disputes Dr. Schlam's declaration as to how an

inverted lens array would operate, especially because lens arrays "facing" away from the liquid

crystal panel will still provide some form of control over the light distribution and predetermined

viewing angle. *See* Def. Br. at 17 (quoting. A. Gasser Decl. Ex. 5 (SID Article), p. 260) (extrinsic

article authored by the '371 patent's inventors explaining that a lens array facing the diffuser still

provides control that may be desirable in certain applications, as it "can aid in cases where

display brightness suffers off-axis"); *accord* Ex. L (Lewin Dep., pp. 195-202).[6]

       **c.**  **The '371 Patent does not Require
Horizontally-Aligned Lens Arrays
or Control in Only the Vertical
Axis.[7]**

Defendants return to their improper imposition of a horizontal-alignment

requirement throughout their claim construction.  *E.g.*, Ex. C (Joint Claim Construction

---

[6]  Honeywell does not believe that this Court will need to resort to extrinsic evidence to
construe this term, but if it is to consider the Defendants' extrinsic support, Honeywell's
case is supported by the Defendants' own extrinsic citations and Dr. Lewin's deposition
testimony.

Statement, pp. 3, 8); *see also* Def. Br. p. 13 (§ V.B.3.a); Def. Br. pp. 18-20 (§ V.B.3.e); Def. Br. p. 23 (§ V.B.5).   For the sake of clarity, Honeywell will discuss horizontal and vertical orientations here, covering Defendant's various arguments on the issue as they relate to the construction of "first and second lens arrays" and the "predetermined variation" of light transmission that they provide.

> **(i)    Horizontal Alignment Provides Predominantly Vertical Control in the Same Way Vertical Alignment Provides Predominantly Horizontal Control.**

The '371 patent teaches that lens arrays control light in both axes regardless of their orientation.   Although the majority of the control is along the axis perpendicular to the direction that the lenslets run, *every* luminance profile accompanying the patent measures the effect of the lens array (Fig. 5) or lens arrays (Figs. 8, 9, and 11) in **both** the vertical and horizontal axes, and the specification discussing these figures expressly notes the impact in both axes:



Fig.5        Fig.8

---

(. . . continued)
    This corresponds to Defendants' construction parts II(b) and II(d).



'371 patent, Figs. 5, 8, 9, 11 (highlighting added); Col. 3, ll. 43-49 (Fig. 5); Col. 4, ll. 39-58 (Fig. 8); Col. 5, ll. 9-12 (Fig. 11). Defendants' proposed limitation that the claimed "predetermined variation" must occur in only the vertical axis is absolutely contrary to this ample disclosure.

Because there are various applications for the claimed technology, all with different desired viewing angles, the **particular application** will determine the details of how to orient the lens arrays. Col. 1, ll. 56-61 (particular application); Col. 3, ll. 11, 19-23 (same); Col. 4, ll. 46-58 (same). Col. 5, ll. 5-15 (same). These explicit teachings note the importance of using the lens arrays to obtain the desired luminance profile. *Id.* One of ordinary skill would understand other embodiments could use the '371 patent to tailor light in a predominantly horizontal or vertical direction. Indeed, persons of ordinary skill do not "confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005); *see also Agfa* 451 F.3d at 1375-77 (a "stack" of plates includes any orientation of the plates, not just horizontal).[8] Clearly, the plain meaning of the phrase "for

---

[8]     The Defendants' cite to *Gentry Gallery*, therefore is misplaced. Def. Br. p. 14; *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998). That case applies only where the claims are broader than the concepts taught in the specification. As is briefed herein, and as is described in Honeywell's Opening Brief, the '371's specification
                                                                        (Continued . . .)

providing a predetermined variation with viewing angle of light transmission" refers to angular control in the broadest sense and is not restricted to a single direction, whether vertical, horizontal, or any other axis. The lens arrays vary the amount of light transmitted through the liquid crystal panel at different angles, thus impacting the relative brightness of the display when viewed from different angles. *See e.g.,* Col. 1, ll. 8-10; Col. 3, ll. 19-24; Fig. 5.

Finally, the Defendants' argument that both lens arrays must be horizontal and cannot be crossed at 90 degrees runs flatly contrary to the prosecution history of the '371 patent. Much of the prosecution history centers on the Examiner's consideration of the Abileah 5,161,041 patent.[9] The Examiner expressly noted that the recited two lens arrays of Honeywell's application claim 10: "[t]he '041 patent discloses in Figs. 6, 8 a display apparatus having first and second lens arrays with lenslets having a triangular cross section"  Ex. B (Prosecution History, pp. 67-68).  Figure 6 of the Abileah '041, reproduced below, clearly shows two lens arrays crossed at 90 degrees, with one oriented vertically and the other oriented horizontally.

---

(. . . continued)
>        teaches concepts broader than the claims—not the other way around as the Defendants'
>        cite to *Gentry Gallery* assumes.

[9]      The prosecution history references two separate Abileah patents: the '783 and the '041
         patents.



Ex. F (Abileah 5,161,041 patent, Fig. 6).[10] This intrinsic record confirms that the two lens arrays

can be configured in both the horizontal and vertical direction, and that the Examiner understood

the term "lens arrays" to include such configurations.

**(ii)    The Summary of the Invention is not Limited to Vertical Control.**

Defendants cite to the Summary of Invention as supporting their argument that the

claim should be rewritten so that the predetermined variation controls in *only* the vertical

direction.  Def. Br. pp. 8, 18; Col. 2, ll. 1-3.  This argument, however, ignores the rest of the

specification. *See AstraZeneca* 352 F. Supp. 2d 413-14 (the summary of invention must be read

in the context of the rest of the patent); *Rambus* 318 F.3d 1094-95 (same).  The specification

contains numerous references to controlling in both the horizontal and vertical directions, as

cited above and in Honeywell's Opening Brief.  These include the various figures showing

---

[10]    The parties agree that elements 202a and 202b should apply to the two lens arrays depicted.

measurement and control in both directions discussed above, Figs. 5, 8, 9, 11, and other passages in the summary where the concept of controlling viewing angles is described without limitation. *E.g.*, Col. 1, ll. 48-51, 58-59.  Defendants' argument ignores this disclosure.

It bears emphasizing that the passage on which Defendants rely does not exclude or even criticize the notion of controlling luminance along the horizontal axis, and is therefore not the sort of disavowal that should cause this Court to rewrite the claim to impose an additional limitation.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d at 906; *Computer Docking Station Corp. v. Dell, Inc.*, No. 2007-1169, 2007-1316, 2008 U.S. App. LEXIS 5893,*24 (Fed. Cir. March 21, 2008) (requiring "a clear and unmistakable disavowal"); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001); *see also* Honeywell's Opening Brief Section V.A. (string-citing cases requiring a clear disavowal of certain subject matter before limiting an otherwise broadly-written claim).

Taken in context, then, the reference to "vertical" in this one passage relates to the particular problems presented by the application being considered by the inventors; *i.e.* an airplane cockpit.  *E.g.*, Col. 1, ll. 13-17 (noting that high-angle viewing, especially in the vertical direction, is problematic).  The Defendants' argument regarding the Summary of Invention relies on the "mere absence" of the word "horizontal," not an express disavowal of horizontal control, which is an insufficient basis for limiting claim 3.  *See Liebel-Flarsheim*, 358 F.3d at 906. Indeed, the Court in *Liebel-Flarsheim* did not limit the claims to the preferred embodiment even though the specification wholly failed to disclose alternative configurations.   Here, where the specification makes numerous disclosures referencing control in both directions, there is simply no basis for limiting the claim to horizontal arrays controlling in the vertical direction.   *Agfa* 451 F.3d at 1375-77 (a "stack" of plates includes any orientation of the plates, not just horizontal).

- 18 -

d.    **The '371 Patent does not Require that the First and Second Lens Arrays have Different Pitches.[11]**

The '371 patent teaches that one way to eliminate moiré interference is to use two lens arrays, one with a pitch greater than the LCD pixels, and the other with a pitch smaller than the LCD pixels.  This concept is plainly included in claim 1.  *See* claim 1, Col. 6, ll. 15-22.  Just as plainly, however, this concept is not included in claim 3, the claim at issue in this litigation.  Rather, claim 3 requires rotating at least one lens array, an entirely different way to eliminate moiré interference.  Indeed, there is no reference to the pitches of the lens arrays in claim 3 whatsoever; Defendants' attempt to restrict claim 3 this way is yet another attempt to avoid infringement by importing a limitation into the claim that is completely unsupported by the actual claim language without any clear disavowal in the intrinsic evidence requiring such a drastic construction.

Notably, Defendants' attempt to collapse claim 1 and claim 3 together is also contrary to the concept of claim differentiation.  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc) (holding that it "is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.").  In *SRI*, like in this case, a non-asserted claim was specifically directed to one structure, and the asserted claims did not contain that structure.  The Federal Circuit ruled that it was improper to construe the asserted claims as necessarily including the same structure as that would render the asserted claims superfluous.  *Id.; see also AllVoice Comp. PLC v. Nuance Comm., Inc.*, 504 F.3d 1236, 1247

---

[11]    This corresponds to Defendants' proffered construction part II(c).

(Fed. Cir. 2007); *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous").

      Nothing in the specification prohibits the independent use of the two solutions. The mere fact that they *can* be used together and that certain benefits arise from such joint use, does not mean that they *must* be used together. "Should" does not mean "must." *See Honeywell Inc. v. Victor Co. of Japan, LTD*, 298 F.3d 1317, 1327 (Fed. Cir. 2002) (alternative configurations of invention need not solve all prior art problems in the same way). The word "should" is not a "clear and unmistakable" indication that the patentee sought to limit the invention.

### 5. Claim 3 Does Not Require an Air Gap.

      The claim requires that the lens arrays simply be disposed between the light source and the LCD panel; it says nothing about how the lens arrays should be mounted, or the dimensions of such assembly. Nevertheless, relying on the passage found at Column 3, lines 55-56, Defendants insist that the claim requires an air gap between the lens arrays and the light source ("an air gap must be present at the interface of the lambertian diffuser and the lens array"). Notwithstanding this passage's use of the term "must," Defendants' argument fails for several reasons.

      First, the passage in question is expressly directed to an air gap between the lens array and the lambertian diffuser, not between the lens array and the light source, as Defendants posit. Defendants' air gap argument thus depends upon the Court first adopting their construction of light source, and then further limiting even that construction to require a lambertian diffuser (something which not even Defendants have argued). For the reasons

already described in Honeywell's Opening Brief and above, "light source" is any source of light, such as a lamp, and not a completed backlight assembly. What the Defendants ignore, however, is that claim 3 does not even require the presence of a diffuser; thus, this description of the preferred embodiment plainly includes features and details that are not a part of claim 3. Defendants' argument thus substitutes a manufacturing detail for the metes and bounds of the claim.

Indeed, the Defendants rely upon the originally-filed Figure 6, because it labels the space between the diffuser and the lens array as an "AIR GAP." Defendants scrupulously avoid the fact that this label was omitted in the Figure as issued. If anything, the omission of that limitation in the figure as-issued demonstrates that it was not intended as an absolute requirement of the invention.

Second, one of ordinary skill would understand that the purpose of the referenced air gap is to ensure an optical discontinuity between the two layers to ensure a different index of refraction. Light refracts when it encounters a material with a sufficiently-different index of refraction; the actual size of the air gap is necessarily irrelevant. Fig. 6; Col. 3, ll. 50-63.

> Q.     As a technical matter you don't need to have an air gap as long as there's an optical discontinuity, correct?
>
> A.     Yes, as long as there's an optical discontinuity.

Ex. K (Schlam Dep., p. 242); *see also* Ex. J (Smith-Gillespie Dep., pp 132-36). An air gap could (and likely would be) microscopic, so long as the materials are not optically bound. *Id*. One of ordinary skill would understand, by virtue of handling and observing the optical elements of a typical backlight assembly, that the materials were not generally optically bound (i.e., would not exhibit "wet-out") unless the designer took affirmative steps to bind them. In that sense, the

Defendants' claim construction is the opposite of the real-world experiences of one of ordinary skill, because it presumes that some affirmative steps must be taken to *prevent* optical bonding, whereas in reality, affirmative steps would have to be taken to bond the different backlight materials.[12]

Finally, requiring that the air gap be "purposeful and defined" renders the claim impermissibly indefinite because the Defendants provide no definition of that phrase. What are the dimensions of such a gap? Does use of the word "purposeful" mean that infringement must be intentional? Defendants' construction does not answer such salient questions. In fact, under the Defendants' experts' own understanding, an air gap between two layers of material need only be an optical discontinuity: to the extent Defendants posit a "purposeful and defined" air gap, they seek to impart a greater meaning to the words than even their own experts support. Clearly, Defendants' construction threatens to introduce subjectivity and ambiguity into otherwise clear language, and should be rejected.

### 6.    for providing predetermined variation with viewing angle

Defendants insist that the predetermined variation is limited to the vertical axis and affirmatively excludes control in the horizontal axis. Honeywell incorporates the discussion in Section III.B.4, *supra*, for all the reasons why this proffered limitation does violence to the unlimited claim language and the intrinsic record. Suffice it to say that there would be no reason

---

[12]    Indeed, the lens arrays in the accused products lack optical bonding material, yet do not exhibit "wet-out" and otherwise function normally. Accordingly, the products accused of infringement have a sufficient air gap (optical discontinuity) to operate, yet Defendants seek to manufacture a non-infringement argument out of vague phrases such as "purposeful" and "defined."

(Continued . . .)

- 22 -

to measure the impact of the lens arrays in both horizontal and vertical directions—as is shown and discussed in the Figures and text—unless both axes were of concern in implementing the technology. The patent clearly discloses measurements in both axes, and shows that the light output is tailored in both axes. Figs 5, 8, 9, 11. Indeed, the maximum on-axis luminance at 0 degrees is the same for both horizontal and vertical directions. On this basis alone, there is no reason to graft the word "vertical" upon the unencumbered claim.

> 7. **wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.**

Defendants wish to rewrite the construction of the "slight misalignment" term for two reasons: first, because some of their accused products include lens arrays rotated beyond the 2 to 16 degree range; second, because some of the accused products employ a lens array rotated from the vertical axis as opposed to the horizontal axis. Such noninfringement arguments thus prompt inquiry into the proper construction of "slight misalignment" and then a consideration of how the reference point from which that misalignment is measured.

Notably, the parties are in agreement that "slight misalignment" includes, at least as a starting point, the range of 2 to 16 degrees.[13] The dispute is whether that claim term can

---

(. . . continued)

[13]    Defendants' citation to dictionaries to define the term, "slight" is puzzling because they rely more on the intrinsic record in their own proffered construction. Indeed, the patent itself explains what constitutes the "slight" rotation, and the "the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F. 3d 1193, 1202-03 (Fed. Cir. 2002).

fairly be constructed as *limited* to that range.  Defendants' proffered construction of "not less than 2 degrees and not more than 16 degrees" is faulty because it both ignores, and is expressly contrary to, the express disclosure that the preferred range of 2 to 16 degrees is "typical" and "approximate."  Col. 5, ll. 24-25; Fig. 12.  Indeed, Defendants' overly-rigid definition runs afoul of well-established case law prohibiting the importation of specific numerical limitations to otherwise-general claim terms.  *Innovad Inc. v. Microsoft Corp*., 260 F.3d 1326, 1333 (Fed. Cir. 2001), (construing the claim term "small volume" as being related to the function of the volume; a numerical limitation was improper); *Modine Mfg. Co. v. United States I.T.C.*, 75 F.3d 1545, 1551-52 (Fed. Cir. 1996) (ruling that it was improper to impose a numerical limitation on "relatively small hydraulic diameter"); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985) (it is improper to read numerical precision into a claim from which it is absent); *Int'l Nickel Co., Inc. v. Ford Motor Co.*, 166 F. Supp. 551, 557 (S.D.N.Y. 1958).

In the context of the disclosed embodiment, the slight misalignment employed by the inventors (typically 2 to 16 degrees) was suitable because of the particular geometries and spatial frequencies of the lens array and liquid crystal panel being used; it stands to reason that different physical characteristics could require different degrees of rotation.  *See* Col. 4, ll. 17-28. The patent discloses that the goal of misaligning is to change the effective spatial frequency difference between the two arrays. Col. 5, ll. 25-28.  Given this goal, it again stands to reason that a greater or lesser degree of rotation may be necessary; thus it is understandable that the 2 to 16 degree range was disclosed as "typical" and "approximate" rather than absolute.  Given this disclosure, the imposition of an absolute numerical value would not be appropriate under the law.

Furthermore, and as fully discussed above in Sections III.B.4.c and III.B.6, the concept of a "slight misalignment" is not limited to misalignment from the horizontal axis. The claim says nothing about which axis can serve as the reference point for evaluating the misalignment. The Defendants admit, as they must, that the rotation is ***with respect to the liquid crystal panel***. Def. Br. p. 24. Interestingly, the figure demonstrating the misalignment shows two axes for that liquid crystal panel: a horizontal *and* a vertical:



*Fig.12*

Fig. 12. Note again that although the '371 patent sometimes uses notation specific to the horizontal and vertical directions where necessary, *see*, *e.g.*, Figs. 4A and 4B (using "$\theta_H$" and "$\theta_V$"), Figure 12 ("$\theta$") contains no such notation.

In any liquid crystal panel, there are a number of lines, or axes, formed by the geometry of the array of pixels (or sub-pixels). Typically, the electronics running along the pixel rows and columns create patterns in *both* the horizontal and vertical directions. *See* Def. Br. at 2. The Defendants admit that the liquid crystal panel's electronics create horizontal and vertical patterns, but then ignore that admission. Def. Br. p. 2. In addition to the Defendants' admission, the magnified depiction of a liquid crystal panel in the 3M tutorial shows pixels arranged in rows and columns, creating horizontal and vertical patterns:



Ex. I (Excerpted 3M Tutorial, p. 3).  Most significantly, the '371 also shows a vertical and horizontal pattern created by the liquid crystal pixel array.  Fig. 12.  Thus, it is simply untrue that a typical liquid crystal panel creates a series of *only* horizontal black lines.

Moreover, in some instances, a liquid crystal panel can exhibit diagonal patterns rather than rectangular ones (not all liquid crystal panels use vertical columns; some use offset pixel rows that can create diagonal patterns).  Defendants have also acknowledged the potential for diagonal patterns.  Ex. M (Schlam Report, ¶ 171).  This is significant because it means that the claimed slight misalignment could be measured with regard to different reference points in different displays, depending on the nature of the display and the potential source of the moiré effect.

When a practitioner wishes to control the light distribution in a predominantly vertical direction, the lenslets should be aligned horizontally and rotated from the horizontal axis.  On the other hand, if one of ordinary skill were interested in controlling the light distribution in a predominantly horizontal direction, that practitioner would align the lenslets vertically and rotate from the vertical axis.  *See Agfa Corp. v. Creo Prods.*, 451 F.3d 1366, 1375-77 (Fed. Cir. 2006) (it is improper to limit "stack" to only a horizontal orientation even though that was how the specification described it, particularly where the claim itself was not so limited).  Consequently, Defendants' proffered construction is simply an extension of their steadfast refusal to

acknowledge that one of ordinary skill would understand that predominantly horizontal *or* predominantly vertical control could be achieved by the use of a lens array, depending on its alignment.

Finally, Defendants argue that Honeywell's construction leaves the claim indefinite. Honeywell notes that that is an issue best reserved for trial, not claim construction. *E.g.*, *SRI*, 775 F.2d 1107, 1121 ("Whether SRI is entitled to claims of the breadth urged by SRI is a question of patentability, an issue not before the court."). But even if it were relevant to claim construction, Honeywell's construction does not render the claim indefinite. As even Defendants acknowledge, one of ordinary skill in the art, having placed the lens arrays to achieve the desired predetermined variation, would find a sufficiently definite starting point in the disclosure of 2 to 16 degrees in the event moiré is encountered. It strains credulity to suggest that one of ordinary skill would not, from that disclosed typical and approximate starting point, and with the disclosed goal of creating a small change in the effective spatial frequency difference between the two arrays, continue rotating until moiré is sufficiently suppressed. Beyond the disclosed range, then, the word "slight" serves a functional role insofar as that rotation is intended to suppress or combat moiré. This both honors the intrinsic disclosure that the disclosed range is "approximate" or "typical," yet gives the word "slight" concrete meaning when the 2 to 16 degree range is exceeded.[14] S*ee Key Pharms v. Hercon Labs Corp.* 161 F. 3d 709 (Fed. Cir. 1998) (a claim to "pharmaceutically effective amount" of a drug was not limited by the specification's suggested ranges, but rather, the court considered what would be truly effective).

---

[14]    Note that during prosecution history, Honeywell never sought to distinguish "slight" rotations from "non-slight" rotations.

Honeywell's construction is thus consistent with these disclosures, and offers definite functional limits while not contravening the intrinsic record with artificial numerical cut-offs.

<u>CONCLUSION</u>

For all of the foregoing reasons, this Court should adopt Honeywell's proposed construction of claim 3 of the '371 patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Martin R. Lueck
Matthew L. Woods
Stacie E. Oberts
Denise S. Rahne
Peter N. Surdo
Amy N. Softich
Daniel M. White
ROBINS, KAPLAN, MILLER
 & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
(612) 349-8500

Anthony A. Froio
Marc N. Henschke
Alan E. McKenna
Michael J. Garko
ROBINS, KAPLAN, MILLER
 & CIRESI L.L.P.
800 Boylston Street, 25th Floor
Boston, MA  02199
(617) 267-2300

June 2, 2008
2349505

*/s/ Thomas C. Grimm*

_____
Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
tgrimm@mnat.com
bschladweiler@mnat.com
 *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered participants.

I also certify that on June 6, 2008, I caused to be served true and correct copies of the foregoing on the following as indicated below:

**<u>BY E-MAIL</u>:**

Karen L. Pascale
YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
The Brandywine Building, 17th floor
1000 West Street
Wilmington, DE 19801
kpascale@ycst.com

Richard D. Kelly
Andrew M. Ollis
OBLON, SPIVAK, McCLELLAND,
  MAIER & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA 22314
rkelly@oblon.com
aollis@oblon.com

*Attorneys for Optrex America, Inc.*

Matt Neiderman
DUANE MORRIS LLP
1100 North Market Street, 12th Floor
Wilmington, DE 19801-1246
MNeiderman@duanemorris.com

Donald R. McPhail
DUANE MORRIS LLP
1667 K Street, N.W., Suite 700
Washington, DC 20006
drmcphail@duanemorris.com

*Attorneys for InnoLux Display Corporation*

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Stephen S. Korniczky
Elizabeth L. Brann
PAUL, HASTINGS, JANOFSKY
  & WALKER LLP
3579 Valley Centre Drive
San Diego, CA 92130
stephenkorniczky@paulhastings.com
elizabethbrann@paulhastings.com

Hamilton Loeb
PAUL, HASTINGS, JANOFSKY
  & WALKER LLP
875 15th Street, N.W.
Washington, DC 20005
hamiltonloeb@paulhastings.com

*Attorneys for Samsung SDI America, Inc.*
*and Samsung SDI Co., Ltd.*

Philip A. Rovner
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899
provner@potteranderson.com

Lawrence Rosenthal
Matthew W. Siegal
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038-4982
lrosenthal@stroock.com
msiegal@stroock.com

*Attorneys for FUJIFILM Corporation
and FUJIFILM U.S.A., Inc.*

David J. Margules
BOUCHARD MARGULES
  & FRIEDLANDER, P.A.
222 Delaware Ave., Suite 1400
Wilmington DE 19801
dmargules@BMF-law.com

Stuart Lubitz
David H. Ben-Meir
Rose Hickman
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
slubitz@hhlaw.com
dhben-meir@hhlaw.com
rahickman@hhlaw.com

*Attorneys for Citizen Watch Co., Ltd.
and Citizen Displays Co., Ltd.*

/s/ *Thomas C. Grimm*
_____
Thomas C. Grimm (#1098)
tgrimm@mnat.com

734570

2