# EXHIBIT L

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Page 147

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - -

HONEYWELL INTERNATIONAL INC. and
HONEYWELL INTELLECTUAL PROPERTIES
INC,

             Plaintiffs,

                        C.A. No. 04-1338-KAJ
  v.
                        (Consolidated)

APPLE COMPUTER, INC., et al.,

             Defendants.

- - - - - - - - - - - - - - - - - -

DEPOSITION OF IAN LEWIN

VOLUME II, PAGES 147 - 408

MARCH 6, 2008

     (The following is the continued deposition of IAN LEWIN, taken pursuant to the Federal Rules of Civil Procedure, via videotape, at the offices of Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, Minnesota, commencing at approximately 8:31 a.m. on March 6, 2008.)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Page 192

1   A. Right.
2   Q. And I then asked the question if we assumed
3   that a module is being manufactured and we assumed
4   that Honeywell's proposed claim interpretation was in
5   place and that module had two lens arrays and
6   otherwise satisfied the limitations of claim three,
7   and a person who was responsible for manufacturing
8   that module came to you and said, "Dr. Lewin, I want
9   to make sure that all the modules I make are safely
10  not going to infringe claim three," what would you
11  advise them as to what sort of manufacturing tolerance
12  they should have in construction of those modules with
13  respect to the angle of rotation of the lens arrays?
14  A. I would advise them to have close
15  manufacturing tolerances and to be sure that their
16  rotation that might occur because of manufacturing
17  tolerances would be less than two degrees.
18  Q. And if they had a manufacturing tolerance
19  that was less than two degrees, is it your
20  understanding that -- and -- and there was -- the
21  rotation was not done for reasons of avoiding moire --
22      MR. WOODS: Oh, and that -- that -- yeah.
23  Let's -- let's get that clearly stated in your
24  hypothetical because, --
25      MR. OLLIS: Right.

Page 193

1       MR. WOODS: -- with respect, Andy, you're
2   kind of moving all around.
3       MR. OLLIS: I'm -- I'm -- I'm adding that
4   back in.
5   Q. We agreed that that was not the reason at
6   the beginning of the hypothetical for the rotation.
7   A. I understand.
8   Q. That they would be comfortable that such a
9   module would not infringe the '371 patent; is that
10  correct?
11  A. I think I would agree with that.
12  Q. And that's your opinion.
13  A. Yes.
14  Q. How did you determine that a rotation -- or
15  a misalignment of less than two degrees that is not
16  present for reasons of avoiding moire would not
17  infringe the '371 patent?
18  A. Well I think that the claim three talks
19  about, of course, a slight rotation of two to 16
20  degrees. The word "typically" is in there, which is
21  what gave me some trepidation in initially answering
22  your inquiry, and I think that any claim has to be
23  read with regard to the -- what the specification
24  teaches, and the specification teaches that the
25  rotation is for the purposes of removing moire.

Page 194

1   Q. Okay. I'd like to shift to another topic
2   and that is the question -- or the issue of
3   orientation of lens arrays in an LCD module.
4       Is it your understanding that the
5   orientations, for example, that Honeywell relies on
6   for its early invention date, include at least one
7   lens array where the one -- the lens array has prisms
8   or lenticules, whatever you wish to call them, facing
9   away from the LCD panel?
10  A. Yes.
11  Q. Do you know what the emission profile would
12  look like in a backlight having a single lens array
13  where the lens array is flipped upside down so that it
14  faces the light guide or lamp?
15  A. No, I don't.
16  Q. Do you know --
17      And if you wish, we can refer to what has
18  been previously marked as Exhibit 32.
19  A. Do I have that one in my pile?
20  Q. I believe it should be --
21      Perhaps the court reporter can assist.
22      (Discussion off the stenographic record.)
23  A. I have 32.
24  Q. Dr. Lewin, you've seen Exhibit 32; is that
25  correct?

Page 195

1   A. Yes, I have.
2   Q. Okay. And -- I'm sorry. Let's shift to a
3   different one.
4       I would like you to refer a couple of
5   exhibits further, to Exhibit 39. There's a structure
6   shown more clearly.
7   A. Excuse me, Exhibit 39?
8   Q. Yes, please.
9   A. Yes.
10  Q. All right. And if you look at the second
11  page of Exhibit 39, there is a structure shown there;
12  is that correct?
13  A. Correct.
14  Q. And is it your understanding that Honeywell
15  reduced this structure to practice? Is that correct?
16  A. That is my understanding.
17  Q. And they are relying on that reduction to
18  practice, among other things, for evidence of an early
19  invention date; is that correct?
20  A. I believe so.
21  Q. And in the structure that is shown in
22  Exhibit 39, there are two lens arrays with the lenses
23  rotated at 16 degrees from either the horizontal or
24  vertical axis; is that correct?
25  A. Correct.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN   1-800-553-1953   info@stirewalt.com
8bc16cb0-e04e-4c13-a67a-00e8ff2ed656

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Page 196

1  Q. And the two lens arrays have lenslets that
2  face each other; is that correct?
3  A. Correct.
4  Q. And so one of -- set of the lenslets is
5  facing away from the LCD panel; is that correct?
6  A. Right.
7  Q. Do you have an understanding of what the
8  emission profile would look like for the LCD backlight
9  that is shown in Exhibit 39?
10     MR. WOODS: Are you asking specific or
11  general?
12     MR. OLLIS: General.
13     MR. WOODS: Okay.
14     MR. OLLIS: I'm -- I'm happy with general.
15     THE WITNESS: Good, as I would --
16     MR. OLLIS: I don't need to know the exact
17  79 degrees --
18     MR. WOODS: You could do ray tracing, sir,
19  you know.
20  Q. Yeah. But can you generally just describe
21  to me what that emission profile would look like?
22  A. I would generally expect a bell-shaped
23  curve.
24  Q. A bell-shaped curve.
25  A. A bell-shaped curve. So in other words,

Page 197

1  there would be narrowing of the distribution from what
2  the distribution would be if just, let's say, a
3  diffuser were present.
4  Q. Can you have an understanding as to how that
5  bell-shaped curve would differ from a situation where
6  the two lens arrays were facing forward?
7  A. All I would say is that the bell-shaped
8  curve is likely to change. The extent of that change,
9  I really don't know.
10  Q. You don't have any understanding.
11  A. No.
12  Q. Does the '371 patent provide any
13  understanding as the -- to the extent of the change
14  that would occur?
15  A. I think it just talks about a predetermined
16  distribution. Certainly, some examples are given.
17  Q. But it --
18     The '371 patent doesn't provide any teaching
19  as to how flipping over a lens array would change the
20  luminance profile of an LCD backlight; is that
21  correct?
22  A. The '371 patent provides general principles
23  and it does provide a best mode. That best mode does
24  not include the flipped lens.
25  Q. Right. At least the best mode does not.

Page 198

1  And there is no specific teaching anywhere relating --
2  in the '371 patent text concerning lens arrays that
3  are flipped over; is that correct?
4     MR. WOODS: Objection, form.
5  A. Well there is no specific teaching, but
6  there's certainly no exclusion to say you couldn't do
7  that.
8  Q. Okay. I'm just interested in the teaching
9  at this point.
10  A. I understand.
11  Q. Now in your --
12     You have offered an opinion relating to the
13  person of ordinary skill in the art in this case; is
14  that correct?
15  A. Right.
16  Q. And I'm sure there will be some discussion
17  of that in due course. But using your understanding
18  of a person of ordinary skill in the art who has read
19  the '371 patent, and -- would they have an
20  understanding of what -- the emission profile of an
21  LCD backlight that has a single lens array in it with
22  the lens array flipped over so that the lenslets face
23  the lamp?
24  A. I -- I think they would when they tried it.
25  Q. But before they tried it, would they have

Page 199

1  any understanding of what that emission profile would
2  look like?
3  A. No. That is not part of the data that's
4  provided in the '371. The '371 provides a tool kit
5  where various things can be done.
6  Q. Now let me ask the same question for the
7  person of ordinary skill in the art as you have
8  defined them. If they were to build an LCD module
9  that had the structure shown in Exhibit 39, would they
10  have any understanding, prior to building that module,
11  what the luminance profile would look like?
12  A. Prior to --
13  Q. Prior to building it, prior to trying --
14  actually building it.
15  A. Prior to trying it? There is not data given
16  in the '371 that would say what ultimate constructions
17  provide. They --
18     The detail is for the best mode.
19  Q. Right. And for that reason they would not
20  have an understanding as to what the luminance profile
21  of the structure shown in Exhibit 39 would look like;
22  is that correct?
23     MR. WOODS: Objection, form.
24  A. I think the principles outlined in the '371
25  patent are rather general. They talk about a

Page 200

1  predetermined variation with viewing angle.
2       No, they wouldn't know the exact breadth of
3  the curve that would be produced. I think it would be
4  taken that double lenses could be used and that there
5  would be a predetermined variation no matter which way
6  the lenses faced.
7       Q. They would have an understanding that there
8  would be a predetermined variation; is that correct?
9       A. Yes.
10      Q. Would they have any understanding as to what
11 that predetermined variation was?
12      A. No, I think that that is not the case. That
13 is not part of the best mode that is detailed in the
14 '371.
15      Q. And it's not part of the teaching of the
16 '371 patent either; is it -- is that correct?
17      MR. WOODS: Objection, form.
18      A. The teaching is very general, and I -- I was
19 quite specific a few moments ago when I said that the
20 way I look at the '371 patent is that it is a -- it's
21 a tool kit. It's a tool box --
22      Q. Right. I under --
23      MR. WOODS: Let him finish.
24      A. -- that can be used, and I don't think the
25 '371 patent -- a patent can't teach the various

Page 201

1  permutations and combinations that -- that might be
2  achieved, it teaches the best mode.
3       Q. Well, but if it's a tool box, it could teach
4  the reasons why you would select specific tools; is
5  that correct?
6       A. It could, but I don't know of any reason
7  that it has to. And I -- and here the requirements of
8  the specification I think are getting into legal
9  issues that I possibly don't understand, --
10      Q. Well --
11      A. -- but my -- my understanding is that it has
12 to teach the best mode.
13      Q. Okay. Let's -- let's set aside the legal
14 issues for the moment. I'm simply trying to
15 understand if a person of ordinary skill in the art,
16 your person as you've defined him, read the '371
17 patent, based on that reading in its entirety, not
18 just the best mode but their entire reading of the
19 '371 patent, would they have an understanding of what
20 the luminance profile would generally look like for
21 the structure shown in Exhibit 39?
22      MR. WOODS: Generally as opposed to
23 specific.
24      A. The specific light-distribution pattern
25 would not be known, but I think the teaching of the

Page 202

1  '371 patent is general enough that they would know
2  that there would be some predetermined distribution
3  obtained.
4       Q. But they wouldn't know what that
5  predetermined distribution would be; is that correct?
6       A. Not precisely.
7       Q. Would they have any understanding other than
8  the fact that there would be a predetermined
9  distribution as to what that predetermined
10 distribution would look like?
11      MR. WOODS: Objection.
12      A. I think the teaching of the patent is
13 generally a narrowing of the distribution, which is
14 what I would expect Exhibit 39 to produce.
15      Q. I understand that's your expectation. But
16 would a person of ordinary skill in the art expect an
17 embodiment of Exhibit 39 to produce a narrowing of the
18 distribution?
19      A. Yes, I believe so.
20      Q. I'd like to turn to another exhibit that I
21 believe has been previously marked. It's the Oe
22 patent, which is Exhibit 485.
23      A. Thank you. I have it.
24      Q. You're ahead of me, so if you give me one
25 moment.

Page 203

1       Dr. Lewin, you've seen the Oe patent before;
2  is that correct?
3       A. Yes, I have.
4       Q. And -- and you're familiar with it; is that
5  correct?
6       A. Yes, I am.
7       Q. You've opined or offered opinions concerning
8  it in your expert report; is that -- that correct?
9       A. I have.
10      Q. Now if we turn to page 65 of your expert
11 report.
12      A. Okay.
13      Q. For reference, if you wish to flip to the
14 preceding page, 64, I think you'll agree with me that
15 this is the first portion of your discussion relating
16 to the Oe patent; is that correct?
17      A. Yes.
18      Q. Okay. And at the top of 37 -- 65 -- excuse
19 me. Start that again.
20      At the top of page 65, before the first
21 bullet point, you have a statement that begins,
22 "Despite some similarities to the '371 patent..." Do
23 you see that?
24      A. I do.
25      Q. What similarities are you referring to?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN   1-800-553-1953   info@stirewalt.com
8bc16cb0-e04e-4c13-a67a-00e8ff2ed656

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) | C.A. No. 04-1338-MBT (Consolidated) |
| Plaintiffs, | ) ) | |
| v. | ) ) | **CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER – OUTSIDE COUNSEL'S EYES ONLY** |
| APPLE COMPUTER, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

**Expert Report for Defendants FUJIFILM Corporation, FUJIFILM U.S.A., Inc., Samsung SDI Co., Ltd., Samsung SDI America, Inc., and Optrex America Inc. on Invalidity and Unenforceability**
**by**

**Dr. Elliott Schlam**

and row pattern shown in the '371 patent, that does not alter the interpretation of claim 3 which I have reached.

171. I understand that Honeywell adopts such a broad interpretation to support the allegation that a Fuji LCD module with a delta pattern LCD panel and a lens array rotated 35° from the horizontal, defines an angle of between 2 and 16 degrees between the lens array and a diagonal line of pixels of the same color in the delta pattern LCD pattern. Since one skilled in the art at the time of the filing of the '371 patent application would know the source of potentially meaningful moiré interference would be the interference between the pattern of horizontally (or possibly vertically) extending boundaries between the LCD pixels and the lenslets of the lens arrays, such a person would have no reason to include a diagonal axis. This is especially true since the diagonal axis postulated by Honeywell can only exist if the pixel is activated with a single color (monochromatically), a rare, if not unlikely, event.

## IX.  DESCRIPTION OF RELEVANT REFERENCES

172. It is my opinion that claim 3 of the '371 patent, as interpreted above, is rendered obvious by one or more of the prior art references that I reviewed. The basis for my opinion is set forth below as well as in the claim charts attached as charts A-H. Ex. J.

173. I understand that discovery is ongoing and that additional materials, including additional prior art references, may be made available to Defendants. If additional information is provided to me by Defendants and bears on the validity of the '371 patent, I may supplement this Report. Additionally, I may supplement this Report upon further analysis of any of the materials identified in this Report or the Exhibits attached to this Report.