IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HONEYWELL INTERNATIONAL INC.; and )
HONEYWELL INTELLECTUAL PROPERTIES )
INC.; )
                 Plaintiffs, )
  )
v. )
  )
APPLE COMPUTER, INC., et al. )
  )
                 Defendants. )

Public Version- Filed June 9, 2008

Civil Action No. 04-1338-JJF
Civil Action No. 04-1337-JJF
Civil Action No. 04-1536-JJF
[CONSOLIDATED]

**DEFENDANTS OPTREX'S, FUJIFILM'S, SAMSUNG SDI'S, AND CITIZEN'S
OPPOSITION MEMORANDUM OF LAW
IN SUPPORT OF THEIR PROPOSED CLAIM CONSTRUCTION**

Karen L. Pascale (#2903)
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kpascale@ycst.com
*Attorneys for Optrex America, Inc.*

OF COUNSEL:

Richard D. Kelly
Andrew M. Ollis
Alexander A. Gasser
OBLON, SPIVAK, MCCLELLAND,
  MAIER & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA 22314
(703) 413-3000

Philip A. Rovner (#3215)
POTTER, ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
provner@potteranderson.com
*Attorneys for FUJIFILM Corporation and
FUJIFILM U.S.A. Inc.*

OF COUNSEL:

Lawrence Rosenthal
Ian G. DiBernardo
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038-4982
(212) 806-5400

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER, ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
*Attorneys for Samsung SDI Co., Ltd. and*
*Samsung SDI America, Inc.*

OF COUNSEL:

Stephen S. Korniczky
Elizabeth L. Brann
PAUL HASTINGS JANOFSKY & WALKER LLP
3579 Valley Centre Drive
San Diego, CA 92130
(858) 720-2500

David J. Margules (#2254)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
dmargules@bmf-law.com
*Attorneys for Citizen Watch Co. Ltd. and*
*Citizen Displays Co. Ltd.*

OF COUNSEL:

David H. Ben-Meir
Rose A. Hickman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067-6047
(310) 785-4600

June 2, 2008

# TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ...................................................................................1

II.   FACTUAL BACKGROUND ....................................................................................1

III.  LEGAL STANDARDS .............................................................................................3

      A.    Claim limitations cannot cover more than the disclosed invention .........................3

      B.    Characterizing a Feature as the "Invention" Dictates that the
            Feature be Incorporated in the Claim Construction.................................................6

      C.    Only Clear Statements of Scope in the Prosecution History Can
            Affect Claim Construction......................................................................................7

      D.    Courts Should Construe Claims to Preserve Validity ............................................8

IV.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS .............................................8

      A.    Construction of "A display apparatus" ...................................................................8

      B.    Construction of "a light source" ...........................................................................11

      C.    Construction of "first and second lens arrays, each having a
            plurality of individual lenslets ... for providing a predetermined
            variation with viewing angle of light transmission from said light
            source through said lens arrays and said liquid crystal panel" .............................14

            1.    The Term "Lenslets" Requires No Further Definition And
                  In Any Event Do Not Operate Independently.............................................14

            2.    Honeywell's Comments on Defendants' Constructions...........................16

                  a.    Separate Members........................................................................16

                  b.    The Lens Arrays Face the Liquid Crystal Panel ............................17

                  c.    Parallel and Horizontal ................................................................18

                  d.    Pitch .............................................................................................18

                  e.    Vertical Viewing Angle ................................................................19

      D.    Construction of "first and second lens arrays . . . disposed between
            said light source and said liquid crystal panel"....................................................23

E.    Construction of "wherein at least one of the lens arrays is rotated about an axis perpendicular to the liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel." ........................................................................................26

V.    CONCLUSION.................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Affymetrix, Inc. v. Illumina, Inc.*,
    446 F. Supp. 2d 277 (D. Del. 2006)...................................................................4

*Agfa Corp. v. Creo Products, Inc.*,
    451 F.3d 1366 (Fed. Cir. 2006)...........................................17, 21, 22, 23

*Akeva L.L.C. v. Adidas-Salomon AG*,
    208 Fed. Appx. 861 (Fed. Cir. 2006).........................................19, 20

*Alloc, Inc. v. International Trade Commission*,
    342 F.3d 1361 (Fed. Cir. 2003).....................................................4

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007).....................................................6

*Athletic Alternatives, Inc. v. Prince Manufacturing*,
    73 F.3d 1573 (Fed. Cir. 1996).....................................................30

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed.Cir. 2004),.................................................20, 22

*Caterpillar Inc. v. Deere & Co.*,
    224 F.3d 1374 (Fed. Cir. 2000)...................................................16

*Cephalon, Inc v. Barr Laboratories, Inc.*,
    389 F. Supp. 2d 602 (D. Del. 2005)..........................................5, 7, 20

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008).....................................................8

*Cook Biotech, Inc. v. Acell, Inc.*,
    460 F.3d 1365 (Fed. Cir. 2006).....................................................6

*DMI, Inc. v. Deere & Co.*,
    755 F.2d 1570 (Fed. Cir. 1995)...................................................28

*Data Encryption Corp. v. Microsoft Corp.*,
    2007 U.S. App. LEXIS 21270 (Fed. Cir. Sept. 6, 2007) ......................7

*Habasit Belting Inc. v. Rexnord Industies., Inc.*,
    340 F. Supp. 2d 518 (D. Del. 2004).................................................8

*Honeywell International Inc. v. Hamilton Sundstrand Corp,*
    320 F.3d 1131 (Fed Cir. 2004)................................................................................27

*Honeywell International, Inc. v ITT Industries, Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006)..................................................................6, 7, 19

*Innovad Inc. v. Microsoft Corp.,*
    260 F.3d 1326 (Fed. Cir. 2001)................................................................................28

*Inpro II Licensing S.A.R.L. v. T Mobile USA, Inc.,*
    450 F.3d 1350 (Fed. Cir. 2006)..........................................................................4, 19

*International Nickel Co. v. Ford Motor Co.,*
    166 F. Supp. 551 (S.D.N.Y. 1958) ........................................................................28

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
    383 F.3d 1295 (Fed. Cir. 2004)................................................................................22

*Key Pharms v. Hercan Laboratoriess Corp.,*
    161 F.3d 709 (Fed. Cir. 1998)................................................................................29

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004)........................................................8, 17, 21, 22, 23

*Lucas Aerospace, Ltd. v. Unison Industrial, L.P.,*
    890 F. Supp. 329 (D. Del. 1995) ..............................................................................8

*Markman v. Westview Instruments,*
    52 F.3d 967 (Fed. Cir. 1995)....................................................................................28

*Modine Manufacturing Co. v. International Trade Commission,*
    75 F.3d 1545 (Fed. Cir. 1996)..................................................................................28

*In re Morris,*
    127 F.3d 1048 (Fed. Cir. 1997)..................................................................................8

*North American Vaccine, Inc. v. American Cyanamid Co.,*
    7 F.3d 1571 (Fed. Cir. 1993)......................................................................................8

*On Demand Machine Corp. v. Ingram Industries, Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006)..................................................................4, 5, 7, 20, 24

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)..........................................................................*passim*

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.,*
    441 F.3d 1332 (Fed. Cir. 2005)..................................................................................10

*Prism Technologies. LLC v. Verisign Inc.,*
    512 F. Supp. 2d 174 (D. Del. 2007).............................................................................8

*SafeTCare Manufacturing Inc. v. Tele-Made, Inc.,*
    497 F.3d 1262 (Fed. Cir. 2007)...............................................................................7, 20

*SciMed Life Systems Inc. v. Advanced Cardiovascular Systems Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001)..................................................................................19

*Sinorgchem Co. v. International Trade Commission,*
    511 F.3d 1132 (Fed. Cir. 2007)..................................................................................29

*Sun Studs v. ATA Equipment. Leasing, Inc.,*
    872 F.2d 978 (Fed. Cir. 1989)....................................................................................16

*Verizon Services Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007)...........................................................................5, 14, 20

*Vitronics Corp. v. Conceptronics, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................................15

*Wyeth v. Impax Laboratories, Inc.,*
    526 F. Supp. 2d 474 (D. Del. 2007).............................................................................8

*In re Yamamoto,*
    740 F.2d 1569 (Fed. Cir. 1984)....................................................................................8

FUJIFILM Corporation, FUJIFILM USA, Inc. (collectively, "Fuji"), Optrex America Inc. ("Optrex"), Samsung SDI Co., Ltd., Samsung SDI America, Inc. (collectively, "Samsung SDI"), Citizen Watch Co., Ltd., and Citizen Displays Co., Ltd. (collectively, "Citizen") (collectively, "Defendants") submit this memorandum in response to Honeywell's proposed constructions of the disputed claim terms of U.S. Patent No. 5,280,371 (the "371 patent"). Also submitted under seal are an Opposition Declaration of Dr. Elliott Schlam and an Opposition Declaration of Alexander E. Gasser.

## I.    SUMMARY OF ARGUMENT

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit stated that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316. In light of that guidance, Defendants' claim constructions are closely tailored to the language of claim 3 of the '371 patent and the patent specification. Honeywell's construction, however, renders the specification and many of the claim terms meaningless. For example, Honeywell construes "rotated . . . in order to provide a *slight* misalignment" to encompass products with both the maximum amount of rotation or no rotation at all, effectively depriving the word "slight" of any meaning. As another example, Honeywell construes the claim term "lens arrays" so broadly as to render the claim invalid while adding a requirement ("independently operating" lenslets) found nowhere in the patent. Therefore, Defendants' claim construction should be adopted.

## II.    FACTUAL BACKGROUND

The '371 patent was never considered groundbreaking by Honeywell, its expert, its customers, or anyone else. In fact, Honeywell's commentary about the '371 patent's significance attempts to rewrite history by omitting facts. (Honeywell Opening Brief ("HW Br.") at 1, 7.)

**CONFIDENTIAL**
**Material Redacted**

1

**CONFIDENTIAL**
**Material Redacted**

Third, Honeywell's expert, Dr. Lewin, surveyed LCD developments in 1993, 1994 and 1997 and took no notice of the '371 patent or the related *Japan Display '92* Inventor's Article. (Gasser Opp'n Decl., Exs. 10-13.) He did, however, report in a 1993 paper published by the Society for Information Display (SID), the leading world-wide organization devoted to display technology, on the use of brightness advancement sheets (of the type accused by Honeywell of being lens arrays) distributed by 3M to increase gain in LCDs in the general forward direction at the expense of viewing angle. (Gasser Opp'n Decl., Ex. 10 at m-9/17.)

**CONFIDENTIAL**
**Material Redacted**                              Finally, although Honeywell takes credit for inventing both the use of lens arrays to increase brightness without requiring extra power and rotation to reduce moiré interference (HW Br. at 4, 7), neither claim is true because these concepts were already disclosed in the prior art. (Schlam Opening Decl. at ¶¶ 9-17.)[1] In light of this evidence, Honeywell cannot now claim that the '371 patent was pioneering in any way.

In fact, the '371 patent specification is an intentionally narrow disclosure of a single embodiment directed towards the one application of commercial interest to Honeywell (aircraft displays). Honeywell's opening brief ignores the inventors' 1992 article in *Japan Display* (the "Inventors' Article") (Gasser Opp'n Decl., Ex. 5), an SID publication, which was published several months after the '371 patent filing, because the Inventors' Article does not fit Honeywell's story. The Inventors' Article taught both broad applications and several orientations of lens arrays in LCDs absent from the '371 patent. The Inventors' Article disclosed to the public that Honeywell's development had myriad applications beyond the aircraft cockpit

---

[1] While it should not make a difference in claim construction, Honeywell directs the Court to its version of the state of the art in 1988 and 1989. (HW Br. at 4,7). The application for the '371 patent was filed on July 9, 1992. Honeywell claims to be able to swear behind that date to as early as February 8, 1990. (Schlam Opening Decl. ¶¶ 44-48, Exs. 9, 10). Defendants dispute that claim both on the law and the facts. There is no basis for treating other than the filing date as the relevant date for determining the level of skill in the art in this claim construction proceeding.

displays described in the '371 patent, including uses in consumer electronics such as portable devices, laptop computers, and video camera viewfinders. (Gasser Opp'n Decl., Ex. 5 at 259, 262.) These applications were all omitted from the '371 patent. Yet, Honeywell now accuses these applications of infringing its patent.

The only embodiment described in the '371 patent depicts two parallel, horizontal, forward-facing lens arrays of different pitch. This design, according to the patent, achieves the vertical tailoring of luminance taught as "the invention." Unlike the '371 patent, the Inventors' Article teaches various lens array orientations. These embodiments include lens arrays crossed at 90 degrees to one another and lens arrays arranged to face away from the LCD panel. (Gasser Opp'n Decl., Ex. 5 at 260–61.) These alternative configurations provide different light output than the sole lens array orientation taught in the '371 patent and would not be known to a person to ordinary skill in the art from reading the '371 patent. Given these intentional differences, it can only be concluded that Honeywell dedicated the undisclosed orientations to the public.

## III.    LEGAL STANDARDS

### A.    Claim limitations cannot cover more than the disclosed invention.

The specification's description of the character of the invention may limit the scope of the claims. The Federal Circuit has provided an approach for determining when the specification limits the claims:

> In this respect, this court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or *whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment*. For example, it is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention. On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (citations omitted) (emphasis added).

The Federal Circuit's seminal *Phillips* decision is consistent with this "character of the invention" test and does not, as Honeywell suggests, emphasize the proposition that claim terms are simply to be given their ordinary and customary meaning, which may involve "little more than the application of the widely accepted meaning of commonly understood words." (HW Br. at 13–14 (citing *Phillips*, 415 F.3d 1303)). To the contrary, throughout the decision, *Phillips* emphasizes the importance of interpreting the claims in the context of the invention and, in so doing, downplays reliance on dictionaries and ordinary meanings and elevates the importance of the patent specification. *See, e.g., id.* at 1313 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."); *id.* at 1316 ("It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims."). This court has recognized that "a claim term can be given its correct construction only within the context of 'what the inventors actually invented and intended to envelop with the claim.'" *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277, 281 (D. Del. 2006) (Farnan, J.) (quoting *Phillips*, 415 F.3d at 1316).

A patent cannot be interpreted to cover broader subject matter than what is disclosed in its specification. *See, e.g., On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006) (noting that "the scope and outer boundary of claims is set by the patentee's description of his invention" in the patent specification); *Inpro II Licensing S.A.R.L. v. T Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006) (affirming construction of "host interface" as limited to parallel interfaces despite the fact that serial interfaces, which were disparaged in the specification, are within the common definition of "interface"). "Although claims need not be limited to the preferred embodiment when the invention is more broadly described, *'neither do the claims enlarge what is patented beyond what the inventor has described as the invention.'*" *Id.* (citation omitted) (emphasis added). This rule is rooted in the role of the specification as providing an enabling disclosure and enriching the public knowledge in return for the grant of the so-called patent monopoly. "[T]he role of the specification is to

4

describe and enable the invention. In turn, the claims cannot be of broader scope than the invention that is set forth in the specification". *On-Demand,* 442 F.3d at 1340 (reversing district court claim construction that failed to recognize the consistent description of "sales information" in the specification).

Honeywell incorrectly states that "where the intrinsic record demonstrates no 'clear disavowal' of the plain and ordinary meaning of the claim, it is not appropriate to limit the claim to the disclosed embodiments." (HW Br. at 14-16.) This statement is contrary to law. Disavowal is not a requirement for narrowly interpreting claims, it is just one of many ways an applicant can limit his claims. Claim terms can also be limited, for example, when the patentee refers to "the invention" as having specific features or attributes. *On-Demand.,* 442 F.3d at 1340 ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). *See also Cephalon, Inc v. Barr Labs, Inc.,* 389 F.Supp. 2d 602, 606 (D. Del. 2005); *Verizon Services Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1308 (Fed. Cir. 2007).

Honeywell also misleads the Court when it asserts that the lens array limitations cannot limit the claims because the specification does not expressly state these limitations are "critical." (HW Br. at 27.) Criticality is not the test. Criticality, like disavowal, is simply one of many ways an inventor can communicate required elements of his invention. Instead, the overarching question is: at the time of the invention, how would a person of ordinary skill in the art understand the term after reading the entire patent and file history. *Cephalon,* 389 F. Supp. 2d at 604.

**B.**    **Characterizing a Feature as the "Invention" Dictates that the Feature**
**be Incorporated in the Claim Construction.**

The Courts have consistently held that the public is entitled to take the patentee at his

word. Where, as here, a patentee describes his "invention," and not merely a particular

embodiment, the patent will be limited to that description. In *Andersen Corp. v. Fiber*

*Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007), the Court limited claims reciting a "composite

composition" to pellet or linear extrudate forms based on the specification's characterizations of

"the invention," explaining that:

> [T]he specification of the '334 patent states that "*[t]he invention*
> relates to a composition comprising a polymer and wood fiber
> composite that can be used in the form of a linear extrudate or
> thermoplastic pellet to manufacture structural members." . . .
> Those statements are not descriptions of particular embodiments,
> but are characterizations directed to the invention as a whole. As
> such, they make clear that the term "composite composition," as
> used in the Group I patents, does not encompass broader subject
> matter.

*Id.* at 1367 (emphasis added).

Similarly, in *Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365 (Fed. Cir. 2006), the court,

confronted with several patents having claims requiring the construction of the phrase "urinary

bladder submucosa," looked to the Detailed Description of the Invention section, which stated:

> The tissue graft of composition in accordance with *the present*
> *invention* comprises urinary bladder submucosa of a warm-blooded
> vertebrate delaminated from adjacent bladder tissue layers. The
> present tissue graft composition thus comprises the bladder
> submucosa delaminated from abluminal muscle cell layers and at
> least the luminal portion of the mucosal layer . . .

*Id.* at 1374 (emphasis added). Accordingly, the Court concluded that "urinary bladder

submucosa" means "urinary bladder submucosa delaminated from abluminal muscle cell layers

and at least the luminal portion of the tunica mucosa of the urinary bladder tissue." *Id.*

As another example, in *Honeywell v. ITT*, the Court interpreted the phrase "fuel injection

system component" to be limited to a fuel filter, reasoning that:

6

> Here, the written description uses language that leads us to the conclusion that a fuel filter is the only "fuel injection system component" that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment. On at least four occasions, *the written description refers to the fuel filter as "this invention" or "the present invention".* . . . The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter.

*Honeywell Int'l., Inc. v ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (emphasis added).

In *Cephalon*, this Court construed four phrases, including "substantially powdered form," to include the requirement "absent the presence of free liquid." This Court explained that "[h]ere, the inventors consistently referred to 'the present invention' as teaching the formation of drug-containing lollipops through the compression of 'dry' or 'solid' powders." *Cephalon, Inc v. Barr Labs, Inc.*, 389 F. Supp. 2d at 606. Other courts have reached similar conclusions. *See SafeTCare Mfg. Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1269 (Fed. Cir. 2007) (limiting claims due to statements made in specification, where "[i]n this case, despite the fact that Claim 12 makes no mention of actuators or lift dogs, the patentee repeatedly emphasized its invention as applying pushing forces as opposed to pulling forces against the lift dogs"); *On Demand*, 442 F.3d at 1340 ("[T]he focus of the Ross patent is immediate single-copy printing and binding initiated by the customer and conducted at the customer's site. The district court's definition of 'customer' cannot eliminate these constraints in order to embrace the remote large-scale production of books for publishers and retailers."); *Data Encryption Corp.* v. *Microsoft Corp.*, No. 06-1603, 2007 U.S. App. LEXIS 21270 (Fed. Cir. Sept. 6, 2007) (limiting claims to data systems that store data in unencrypted state in memory buffer pool when specification characterized the invention as such).

### C.    Only Clear Statements of Scope in the Prosecution History Can Affect Claim Construction.

Because the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the

specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Examiners do not undertake the same claim construction analysis as do courts, instead giving the claims their "broadest reasonable interpretation." *See, e.g., In re Morris*, 127 F.3d 1048, 1053–54 (Fed. Cir. 1997); *see also* Manual Of Patent Examining Procedure, § 2111 (Gasser Opp'n Decl., Ex. 19). Not surprisingly, only clear statements of claim scope in the prosecution history can either narrow or broaden the scope of a claim. *See, e.g., Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply to an ambiguous disavowal."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898., 903 (Fed. Cir. 2004) (finding an intent to broaden the scope of a claim in an explicit statement to that effect during prosecution). Therefore, absent such statements, the prosecution history cannot be used to narrow or broaden the scope of a claim term.

### D.    Courts Should Construe Claims to Preserve Validity.

"If possible, claims should be construed to uphold validity." *See, e.g., Wyeth v. Impax Lab., Inc.*, 526 F. Supp. 2d 474, 477–78 (D. Del. 2007) (citing *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984)); *Prism Techs. LLC v. Verisign Inc.*, 512 F. Supp. 2d 174, 181 (D. Del. 2007); *Habasit Belting Inc. v. Rexnord Indus., Inc.*, 340 F. Supp. 2d 518, 521 (D. Del. 2004). For example, where a proposed claim construction would be so broad as to encompass subject matter not enabled by the specification, or would render the scope of the claim indefinite, such a construction should be avoided. *See, e.g., Lucas Aerospace, Ltd. v. Unison Indus., L.P.*, 890 F. Supp. 329, 341 (D. Del. 1995) (rejecting defendant's broad construction which would render patents invalid for failure to disclose embodiment covered thereby and citing *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993)).

## IV.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS

### A.    Construction of "A display apparatus"

The preamble "[a] display apparatus" should be construed, if at all, to mean a liquid crystal display apparatus, i.e., the combination of a light source, lens array, and liquid crystal

8

panel. Without support from the claims, specification, or prosecution history, Honeywell
requires that the "display apparatus" be "direct view." In so doing, Honeywell attempts to
exclude highly relevant prior art references from the projection display art. Those references
teach both: a) the use of multiple lens arrays to provide a predetermined variation with viewing
angle of light transmission from a projection screen; and b) rotation and pitch selection of such
lens arrays to minimize moiré interference between a lens array and the projected image from a
liquid crystal panel. (Schlam Opening Decl. ¶¶ 11, 12, 16, 17.)

Honeywell improperly cites to the '371 patent prosecution history to manufacture a
"direct-view" limitation. The inventors made an argument specific to the particular prior art
references cited by the examiner in response to the first Office Action and did not explicitly
disavow projection display art. (Gasser Opening Decl., Ex. 3 at 60.) Specifically, the examiner
cited the Hamada Patent (Schlam Opp'n Decl., Ex. 13) as teaching a second lens array. (Gasser
Opening Decl., Ex. 3 at 60.) The inventors distinguished the Hamada Patent from the
application on the ground that its particular "dual lens array" was "used to overcome a problem
specifically associated with projection displays" (namely reduction of dimming at the outer
edges) and therefore would not be used in combination with the two direct-view based references
cited by the examiner, namely the Abileah '783 Patent and the IBM Polarized Backlight Article.
(Gasser Opening Decl., Ex. 3 at 60) The inventors did not distinguish the Hamada Patent from
the application on the basis of the Hamada Patent teaching a projection display. Tellingly, the
inventors also did not distinguish the Hamada Patent on the ground that the two lens arrays of
Hamada were on opposite sides of the liquid crystal panel, while the application claim at issue
(claim 6) required the two lens arrays to be between the light source and the liquid crystal panel.
(Schlam Opp'n Decl., ¶ 2, Ex. 13 at Fig. 6; Gasser Opening Decl., Ex. 3 at 33–34.)

Mere reference in the '371 patent specification to viewing the produced image "from the
front of the liquid crystal display" does not require the display to be a direct-view display. For
example, LCD projection displays, which include a lens and screen in front of the panel for
enlarging the image, are viewed from the front by viewing the front of the screen on which the

image on the LCD panel is projected. (Schlam Opening Decl., ¶¶ 11, 12.) Indeed, given the agreed to definition of the "comprising" transition of the preamble, such other structures are not excluded from the claimed display apparatus. Contrary to Honeywell's assertion that the notion of the LCD's viewing angle would have no meaning in a projection display, viewing angle plays an important role in the design of projection screens and, as in the case of direct view LCD displays, is controlled by means of lens arrays. *Id.*

Honeywell's attempt to import the "direct-view" modifier into the claim is an attempt to circumvent the law regarding claim construction and validity. Claims are construed and invalidity is determined in the context of the hypothetical person of ordinary skill in the relevant art. *See Phillips*, 415 F.3d at 1313. The relevant art includes art from the same field of endeavor of the inventor and analogous art, namely art that is reasonably pertinent to the particular problem that the inventor sought to solve, even if not within the same field of endeavor. *See Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 441 F.3d 1332, 1339 (Fed. Cir. 2005). Here, one of the named inventors (Karen E. Jachimowicz) worked on projection displays before suggesting the use of rotation as a partial solution to the moiré problem. (Gasser Opp'n Decl., Ex. 15 at 12:13-13:12; Gasser Opening Decl., Ex. 5 at HW 004224 (Acknowledgements).) Indeed, as noted above, the projection display art, like the LCD art, uses lenticular arrays to tailor light and additionally employs rotation of such arrays to combat moiré interference caused by interaction of such arrays and the projected image of the black horizontal and vertical pixel boundaries of the liquid crystal panel. (Schlam Opening Decl. ¶¶ 10, 12.) Therefore, Honeywell's unjustified addition of "direct-view" into the construction of "display apparatus" should be rejected.

Finally, Honeywell complains about Defendants' reference to additional recitations of the elements of the display apparatus more particularly described in the body of the claim. (HW Br. at 18–19.) Yet, Honeywell has demanded damages based on the price of the cell phone, laptop, PDA or digital still camera in which the LCD module is incorporated, not the price of the module

10

itself. If Honeywell conceded that such a downstream product could not be a "display apparatus," no construction of the preamble would be required.

   **B.    Construction of "a light source"**

   The term "light source" should be construed to mean "a source of distributed light." The claimed light source must distribute light over the area of the liquid crystal panel for it to work and provide the claimed function. Limiting "light source" to a lamp alone would potentially allow Honeywell to argue that structures on the light guides of Fuji's side-lit LCD modules are lens arrays. (Schlam Opening Decl. ¶¶ 21–24, 27–31, 37–40, Exs. 5, 7.) Therefore, Honeywell parses the term "light source," arguing that the individual words "light" and "source" require no "specialized knowledge to understand." (HW Br. at 19.) Honeywell construes the constituent words without reference to the '371 patent specification and without consideration of the relevant technological field or the perspective of one of ordinary skill in the relevant art. This approach applies the wrong legal standard. Whether the constituent words separately require specialized knowledge to understand is irrelevant. Rather the issue is how one of ordinary skill would understand the complete term in the context of the claim and the entire patent. *See Phillips*, 415 F.3d at 1313.

   One of ordinary skill in the art would understand the term "light source" to require a source of distributed light, namely light that is distributed over the area of the liquid crystal panel it illuminates. For an LCD to work, a distributed source of light is required. Pixels of liquid crystal panels do not generate light; they merely block or allow light to pass through. Thus, for a liquid crystal panel to function, light must be distributed across the area of the panel to all of the pixels. A point light source illuminating only a portion of the panel, which is encompassed by Honeywell's proposed definition, would not function, nor could lamps or LEDs on the edge of a light guide function without the light guide. (Schlam Opp'n Decl. ¶ 14.) Even Honeywell acknowledges that LCD backlights provide a source of distributed light. (HW Br. at 4.) Further, the 3M tutorial, teaches that an edge-lit light guide "*distributes* the light evenly across the back

11

of the LCD panel" and that diffusers can be placed between the light guide and the LCD panel "to further *distribute* the light uniformly across the display ...." (Honeywell App., Ex. I at 7 (emphasis added).)

The term "light source" must be construed in the context of the entire claim. *Phillips*, 415 F.3d at 1314. Claim 3 states that the light source must illuminate the liquid crystal panel, reciting that the liquid crystal panel is "mounted adjacent to said light source for receiving light from said light source." Honeywell includes "for illuminating the claimed liquid crystal panel" in its definition of "light source," only to run away from this clear functional relation by arguing that it is "not absolutely necessary" to the construction. (HW Br. at 19-20 and n.7.)

As described in Defendant's Opening Brief at 12-13, but ignored by Honeywell, the specification also confirms that the light source must be a source of distributed light, illuminating the entire useful area of the panel. The specification and drawings teach to one of ordinary skill in the art that the backlight array 25 (including reflector housing 15, lamp 10 and diffuser 20) "*of the present invention*" provides a source of light having an area equal to that of the liquid crystal panel and "provides a *source of light* which *impinges* on liquid crystal panel 30 . . . ." (Gasser Opening Decl., Ex. 1 at Col. 2, lines 46–51 (emphasis added).) Even Honeywell agrees that the diffusers used in such LCD backlights serve "to spread the light uniformly over a desired area" (HW Br. at 5), but Defendants do not suggest that a diffuser is a necessary element of a light source. Thus, the backlight array of the invention does not provide merely a point source that illuminates only a portion of the panel, an arrangement that could not work. Rather, the '371 patent teaches only a distributed source of light. (Gasser Opening Decl., Ex. 1, Figs. 2, 4A, 4B, 7, 10.)

The examiner of the '371 patent application understood the term "light source" to mean a source of distributed light. During prosecution of the '371 patent application, the examiner cited U.S. Patent No. 5,128,783 to Abileah et al ("the '783 Abileah patent") (Schlam Opp'n Decl., Ex. 14) as teaching "a light source 100." (Gasser Opening Decl., Ex. 3 at 53.) The examiner's reliance on lamp 100 of the '783 Abileah patent does not support the proposition that every lamp

is a "light source" as Honeywell contends. The lamp 100 of the '783 Abileah patent is not just any lamp, but as expressly taught in the patent, is an array of fluorescent lamp elements which, "regardless of configuration, will be arranged to *uniformly distribute* radiation emanating therefrom *over the entire surface area of the matrix of rows and columns of picture elements.*" (Schlam Opp'n Decl., Ex. 14 at 9:43 - 46 (emphasis added).) Thus, contrary to Honeywell's contention, the examiner recognized the need for a "source of distributed light," not merely a lamp. Indeed, this explicit teaching in the '783 Abileah patent indicates that one of ordinary skill in the art would understand that an LCD "light source" should distribute light over the area of the liquid crystal panel.

The only ambiguity regarding construction of "light source" arises from the question left unanswered by Honeywell's interpretation: when do structures on a light guide of a side-lit LCD module constitute a lens array, as opposed to part of the light source? Several of the embodiments of LCD modules incorporated in Fuji digital still cameras include a light guide and only a single lens array. (Schlam Opening Decl. ¶¶ 27-31, 37-40, Exs. 5 and 7) (types a and c LCD modules).) Even though the claim explicitly requires two lens arrays, Honeywell has accused these single-lens-array modules of infringement, pointing to structures on the top or bottom surfaces of the light guides as constituting the second lens array, while Fuji contends that they are part of the light source. On the other hand, when seeking to avoid prior art, Honeywell argues that similar structures on the surface of prior art light guides are *not* lens arrays, but rather are merely for the purpose of extracting light from the light guide. For example, prior art U.S. Patent No. 5,126,882 (the "Oe '882 patent") includes lens structures 16 on the top surface of light guide 50 and a lens array 51, yet, Honeywell argues that the Oe '882 patent teaches only a single lens array. (Schlam Opp'n Decl. ¶¶ 8, 7, Ex. 16.) Therefore, not only is Honeywell's proposed construction of "light source" contrary to the teachings of the '371 patent, the failure to segregate the "light source" from the "lens arrays" renders Honeywell's construction ambiguous and impossible for a jury to apply.

13

**C.    Construction of "first and second lens arrays, each having a plurality of individual lenslets ... for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel"**

**1.    The Term "Lenslets" Requires No Further Definition And In Any Event Do Not Operate Independently**

Honeywell argues that the claimed lenslets should be further defined as "light refracting structures." Honeywell provides no reasons drawn from the '371 disclosure that require such a construction. Honeywell's construction also posits a new requirement that the lenslets operate "independently" from one another. (HW Br. at 21–23.) Honeywell argues that "the function of the lenslets is not to focus the light to a particular image plane, but rather to orient the light rays to a particular range of angles." (HW Br. at 22.) Honeywell further argues that the lenslets are "essentially working independently of each other in performing the reorientation without regard to focus or focal length." (HW Br. at 23.) The Defendants oppose Honeywell's construction for several reasons.

First, Honeywell's proposal has no support in the patent specification. Honeywell's brief offers no specific cites to the patent for the "independently operating" limitation. (HW Br. at 22–23.) Where is this found in the written description? This construction ignores the fact that the desired compression in luminance with vertical viewing angle allegedly obtained by the only embodiment disclosed in the patent results from the collective effect of all of the lenslets working together, not independently. Any interpretation which excludes the only embodiment of the invention is highly suspect. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting proposed claim interpretation that would exclude disclosed examples in the specification); *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a claim interpretation that excludes a preferred embodiment is "rarely, if ever, correct"). The patent does not preclude the lenslets from having a focal length. Rather, it expressly teaches the "lens array shapes may be selected as desired." (Gasser Opening Decl., Ex. 1 at Col. 5, line 12.) This language encompasses focusing lenslets, and nothing teaches

14

avoiding such structures. The specification, the most important source of guidance in interpreting claims, thus counsels against Honeywell's interpretation.

Honeywell's definition is a naked attempt to add a limitation for the sole purpose of avoiding the prior art. Honeywell implies that lens arrays of the fresnel type should not be used and will not work in the claimed invention. (HW Br. at 23.) Yet the prior art Matsuyama patent belies Honeywell's assertion. (Schlam Opp'n Decl., ¶ 6, Ex. 15.) Matsuyama, which predates Honeywell's earliest alleged date of invention by many years, shows cylindrical (linear) Fresnel-type lens arrays in a direct view LCD backlight. By redirecting light from a linear lamp, for example, the cylindrical (linear) Fresnel lens directs light into desired viewing angles, which is precisely the objective of the '371 patent.

Thus, for example, Figure 2 below from the Matsuyama prior art teaches a linear lamp 1', a cylindrical (linear) Fresnel lens 2', and an LCD panel 4 to produce light of relatively even intensity. (Schlam Opp'n Decl., Ex.15.)



Matsuyama also teaches embodiments with two parallel extending linear Fresnel lenses and two crossed linear Fresnel lenses. (Schlam Opp'n Decl., ¶ 6, Ex. 15 at FIGS. 3 and 4.) Honeywell sought broad original claims, and the specification explicitly contemplates other shapes of the lenslets. (Gasser Opening Decl., Ex. 1, Col. 5, Lines 13-15.) Therefore, Honeywell's attempt to redefine the claim, divorced from the '371 patent teachings, should be rejected.

### 2.    Honeywell's Comments on Defendants' Constructions

In addition to offering its own constructions, Honeywell's brief commented on Defendants' claim constructions. Those comments are addressed below.

#### a.    Separate Members

The lens arrays should be construed to be members separate from the light source. Honeywell argues that this interpretation is improper because it lacks support in the '371 patent. However, asserted claim 3 explicitly provides that the lens arrays be "disposed between said light source and said liquid crystal panel." *Phillips*, 415 F.3d at 1313 (holding the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction). For a lens array to be "between" the light source and panel, it cannot be the light source or panel. Furthermore, as discussed below in Section IV (D), there must be an air gap between the light source and the adjacent lens array, thus confirming that the lens array cannot be part of the light source.

Honeywell also argues that this interpretation "disregards the well-accepted legal proposition that a single physical structure can satisfy two separate claim elements." (HW Br. at 24.) However, each of the cases cited by Honeywell is inapposite to interpretation of the '371 patent claim 3. *Caterpillar Inc. v. Deere & Co.*, 224 F. 3d 1374 (Fed. Cir. 2000) addresses means-plus-function claim limitations, which are not found in asserted claim 3, and the infringement analysis specific to such limitations. *Id.* at 1380. Similarly, *Sun Studs v. ATA Equip. Leasing, Inc.,* 872 F. 2d 978 (Fed. Cir. 1989), addresses the application of the doctrine of equivalents in determining infringement of means-plus-function limitations. *Id.* at 989. Honeywell also cites to a section of Chisum which simply addresses the doctrine of equivalents and the requirement that every claim limitation be found in an accused device to establish infringement. Honeywell thus points to no legal principle that would prevent the lens arrays from being interpreted as members separate from the light source.

### b.  The Lens Arrays Face the Liquid Crystal Panel

In challenging Defendants' construction requiring the lens arrays to face the liquid crystal panel, Honeywell oversimplifies the technology.  Honeywell states: "all that is required to refract light is a difference in the index of refraction" and concludes that the arrays can thus face any direction.  (HW Br. at 25.)  This assertion is false.  An index change alone is not sufficient to produce the claimed "predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel." (Schlam Opp'n Decl., ¶ 12).  Moreover, as discussed in Defendants' and Honeywell's opening briefs, the lens arrays of the invention produce on-axis gain resulting in Honeywell's much touted improved power savings and battery life.  (Defs.' Opening Br. at 15–16, 20; HW Br. at 9; Gasser Opening Decl., Ex. 1 at Col. 4, lines 46-58 (teaching that additional lens arrays caused steeper fall-off in vertical viewing angle).)  Flipped over lens arrays do precisely the opposite.  (Gasser Opening Decl., Ex. 5 at 260 (noting that flipped over lens arrays throw light into off-axis angles resulting in "on-axis gain slightly less than one").)  See Schlam Decl., ¶¶ 10, 11.

Honeywell also points to *Liebel-Flarsheim* and *Agfa,* which arose from drastically different facts, as discussed below in Section IV (C) (2)(e) below.  Unlike those cases, there are no dependent claims addressing whether the lens arrays face toward or away from the LCD in the '371 patent, this requirement was not deleted from the original claims, and it was not discussed in the prosecution history.  Instead, the specification recites objectives that can only be achieved if the lenslets face forward.  Specifically, to achieve the objectives of "increasing luminance" to make "more efficient use of light energy" the lenslets must face forward.  (Gasser Opening Decl., Ex. 1 at Col. 1, line 55 to col. 2, line 3.)

Honeywell briefly points to a prior art patent (Hamada (Schlam Decl., Ex. 13)) cited by the Examiner to support its position that the claimed lens arrays could face away from the liquid crystal panel.  However, Honeywell did not endorse the Examiner's application of the Hamada arrays and, in fact, attacked the Examiner's application of Hamada as irrelevant.  (Gasser Opening Decl., Ex. 3 at 60.)  The two Hamada lens arrays are on opposite sides of the liquid

17

crystal panel and are incapable of providing the requisite "predetermined variation." (Schlam Opp'n Decl., ¶ 2.)

### c.    Parallel and Horizontal

Honeywell briefly asserts that the lens arrays should not be construed as parallel and states that the figures in the specification "happen" to depict such an arrangement. (HW Br. at 26.) The depictions in the specification are far more than mere happenstance. Every figure, every luminance profile, and every discussion of the lens arrays in the specification depicts them as parallel both to the horizontal axis and to one another. (Defs.' Opening Br. at 6–7, 13–15.) Equally importantly, the objects of "the invention" are achieved by tailoring luminance "as a function of vertical viewing angle." (Gasser Opening Decl., Ex. 1 at Col. 1, line 62 to col. 2, line 3.) Horizontally oriented lens arrays tailor the vertical viewing angle.

Honeywell also later asserts that the patent is concerned with both horizontal and vertical viewing angle. As discussed in Section IV (C) (2) (e) below, the patent mentions horizontal viewing angle because it seeks to avoid disturbing luminance with horizontal viewing angle, not tailor it.

### d.    Pitch

In discussing the pitch requirement, Honeywell incorrectly argues that claim differentiation precludes Defendants' construction. Defendants' construction does not make claim 1 superfluous. Claim 1 requires a very specific three way relationship in pitch among the two lens arrays and the LCD. Defendants' construction of claim 3 only requires the two lens arrays to have a different pitch from one another. Mathematically, the pitch differences of the claimed elements can be clearly expressed as follows (where L1 is the pitch of the first lens array, L2 is the pitch of the second lens array, and LC is the pitch of the liquid crystal panel):

- Claim 1:  $L1 < LC < L2$
- Claim 3:  $L1 \neq L2$

Therefore, Defendants' construction of claim 3 is distinct from the pitch limitations of claim 1.

In addition, Honeywell's comments ignore the teaching of the '371 patent against use of lens arrays with the same pitch. (Gasser Opening Decl., Ex. 1 at Col. 4, lines 59–60 (warning against undesirable "moiré effects [which] result when both of the lens arrays have the same spatial frequency" (pitch))). Such teachings against the arrays having the same pitch disclaim this arrangement and limit the claim language. *SciMed Life Systems Inc. v. Advanced Cardiovascular Systems Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("[W]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent."); *Inpro II Licensing, S.A.R.L. v. T-Mobile, USA, Inc.*, 450 F.3d 1350, 1355–57 (Fed. Cir. 2006) (limiting the phrase "host interface" to a "parallel bus interface" where the patent specification disparaged serial interfaces); *Honeywell v. ITT*, 452 F.3d at 1319–20 ("[B]ased on the disclosure in the written description, which demeaned the properties of carbon fibers, we conclude that the patentee thereby disavowed carbon fibers from the scope of the '879 patent's claims.... If the written description could talk, it would say, 'Do not use carbon fibers.'"); *Akeva L.L.C. v. Adidas-Salomon AG*, 208 Fed. Appx. 861, 864–65 (Fed. Cir. 2006) (nonprecedential) (Gasser Opp'n Decl., Ex. 16). Similarly, an important purpose in introducing the second lens array is to break up the moiré interference between the lens array and the liquid crystal panel. This purpose requires the arrays to have a different pitch. (Gasser Opening Decl., Ex. 1 at Col. 4, lines 26–29 ("[M]oiré interference patterns could be eliminated by including a second lens array with a different number of lenses per inch.")).

### e.    Vertical Viewing Angle

Honeywell asserts that "nowhere does the specification contain a clear expression of intent to limit the scope of the invention to varying the effect of the invention only in the vertical direction." (HW Br. at 31.) Honeywell ignores the concluding statement of general applicability in the Summary of the Invention covering all the patent's objectives: "The foregoing and other objects are achieved *in the present invention* wherein there is provided ... directional diffuser lens arrays ... for providing a tailored variation of luminance from the liquid crystal display *as a*

19

*function of vertical viewing angle.*" (Gasser Opening Decl., Ex. 1 at Col. 1, line 62 to col. 2, line

3 (emphasis added). As discussed in greater detail in Section III (B) above, the case law is

replete with instances where such statements of "the invention" were held to define the claimed

invention. E.g., *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed.Cir. 2004)

(noting that where two general statements of "the invention" recite the claimed chuck as having

pleats, "chuck" must be defined accordingly even though pleats not recited in the claim);

*SafeTCare*, 497 F.3d at 1269; *Cephalon*, 389 F. Supp. 2d at 606; *Verizon Services*, 503 F.3d at

1308; *On-Demand*, 442 F.3d at 1340.

Honeywell also urges a rejection of the tailored vertical viewing angle interpretation by

arguing that all applications, and not just aircraft cockpits, are contemplated by the '371 patent.

In support of this view Honeywell cites several places where the patent refers to a "particular

embodiment." (HW Br. at 31.) The problem with Honeywell's argument is that no other

applications or embodiments are taught or even suggested. Consequently, these statements

provide no reason to override the statement of "the invention" provided in the Summary of the

Invention. *See Akeva*, 208 Fed. Appx. at 863 (noting that statements in specification that

invention intended to cover all possible combinations, modifications, and variations did not

support broad claim construction where specification, read as a whole, demonstrated that claimed

invention was limited to rear soles that were detachable).

Honeywell notes instances in the patent where "horizontal" viewing angle is mentioned.

But Honeywell ignores the patent's objective to avoid tailoring the horizontal viewing angle:

> In general it was discovered that the addition of additional lens
> arrays caused a steeper or more rapid variation of the change in
> luminance with vertical viewing angle, which was desirable, but
> the corresponding change in luminance with variations in horizonal
> [*sic.*] viewing angle also became steeper, *which was not desirable*
> for the particular application in question. For the particular
> application in question the preferred embodiment included two
> lens arrays in series which provided the best tradeoff of decrease in
> luminance with variation of vertical viewing angle, while not
> adversely affecting the variation in luminance with horizontal [*sic.*]
> viewing angle.

Col. 4, lines 46–58 (emphasis added). Nothing in the specification contradicts this teaching. (Gasser Opening Decl., Ex. 1 at Col. 3, lines 37–49 (explaining Fig. 5's illustration of vertical and horizontal viewing angle after teaching "desired decrease in luminance with increased vertical viewing angle"), Col. 5, lines 6–12.) The cited references to "horizontal viewing angle" are all in the context of reporting the degree of effect (narrowing) on horizontal viewing angle from one or more lens arrays extending horizontally and therefore designed to narrow the vertical viewing angle, with the conclusion that the narrowing of horizontal viewing angle where three horizontally extending lens arrays are used is excessive, so that only two lens arrays can be used. (Gasser Opening Decl., Ex. 1 at col. 4, lines 46-58.)

Honeywell also relies heavily on *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004) and *Agfa Corp. v. Creo Products, Inc.*, 451 F.3d 1366 (Fed. Cir. 2006). In fact, those cases highlight the correctness of Defendants' claim construction.

In *Liebel-Flarsheim*, the court declined to narrow the claim to require a certain structure in the face of "applicants' clearly stated intention" in the prosecution history that such structures were not required. *Liebel-Flarsheim*, 358 F.3d at 903. The claims at issue were directed to a high-pressure power injector and syringe. The defendant argued that the claims should be construed to require the use of a pressure jacket for the syringe because that was the only disclosed embodiment. The court rejected defendant's argument because during prosecution applicants replaced claims that included a pressure jacket with claims that did not include the pressure jacket and "clearly stated that '[i]n the claims as amended herein, the locking structure is not necessarily present . . . *nor is there necessarily a pressure jacket*.'" *Id.* at 909 (quoting the relevant prosecution history) (emphasis added). Thus, "even if the original disclosure supported [requiring] the use of a pressure jacket, the prosecution history of the [asserted patents] makes clear that the patentee drafted the asserted claims to cover injectors lacking pressure jackets." *Id.* at 903. In contrast, here Honeywell cannot point to any broadening language in the prosecution history. In fact, the '371 patent claims were amended to add the restriction to two lens arrays. (Gasser Opening Decl., Ex. 3 at 33–35, 75–77.)

21

The Federal Circuit subsequently limited *Liebel-Flarsheim* to its facts and declined to apply it on the grounds that the decision was based on a clear statement in the prosecution. *See C.R. Bard*, 388 F.3d at 864–65; *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1302 (Fed. Cir. 2004). Furthermore, unlike the defendant in *Liebel-Flarsheim*, Defendants here propose a construction that is based on affirmative statements in the specification, not simply the disclosure of only a single embodiment.

Honeywell's reliance on *Agfa* is also misplaced. In *Agfa*, the court ruled that the claimed "stacks of plates" of a printing system were not limited to a particular orientation (e.g., horizontal, but not vertical). The Court found nothing in the patent to limit the claimed plates to a horizontal orientation and noted that a dependent claim separately referred to the plates as horizontally oriented. 451 F.3d at 1376–77. Here, the "invention" is defined in terms of vertical viewing angle and no claims depend from claim 3. Indeed, the original claims would have encompassed both the structures Honeywell now seeks to capture and the prior art as evidenced by the patent examiner's initial rejection of those original claims. (Gasser Opening Decl., Ex 3, at 33–35, 52–54.) The amendments to the original claims, combined with the limited disclosure, compel a narrow claim construction of the "lens arrays" term.

Although the disputed construction of "lens arrays" revolves in part around whether the lens arrays are oriented horizontally, the claim terms and arguments in *Agfa* were very different. Consistent with the guidance in *Phillips* that the claims be construed in the context of the invention, the *Agfa* court reasoned that the orientation of the stack of plates was *immaterial* to the functioning of the claimed device and method; all that was important was that the plates be in a stack. *Agfa*, 451 F.3d at 1376. In contrast, the orientation of the lens arrays in the '371 patent is material and directly related to the functioning of the other claimed elements and the claimed purpose of "providing a predetermined variation with viewing angle of light transmission . . . ." (Schlam Opp'n Decl. ¶¶ 11, 13.)

The *Agfa* decision is further distinguishable because there (as in *Liebel-Flarsheim*) the defendant simply relied on the disclosure of a single embodiment as the basis for limiting the

claim. *See, e.g., Agfa*, 451 F.3d at 1376–77. With regard to the disputed terms of claim 3 of the '371 patent, the specification not only discloses a specific arrangement, but also includes explicit disavowals and characterizations of certain features as being "the invention."

> **D.     Construction of "first and second lens arrays . . . disposed between said light source and said liquid crystal panel"**

Because the '371 patent states that "[a]n air gap must be present" between the light source and lens arrays (Gasser Opening Decl., Ex. 1, Col. 3, lines 55-59), the phrase must be construed to require that the lens arrays be positioned between the light source and the liquid crystal panel, with a purposeful and defined air gap at the interface of the light source and the lens array closest to the light source. Honeywell seeks to minimize the impact of the specification's absolute reference to an air gap being required as relating only to a particular example (HW Br. at 28–29), but this mischaracterizes the specification and ignores the surrounding claim language.

Claim 3 tells the reader why the lens arrays are between the light source and panel: "first and second lens arrays . . . disposed between said light source and said liquid crystal panel *for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel . . . .*" The specification explains that the air gap is required to achieve this claimed variation. (Gasser Opening Decl., Ex. 1 at Col. 3, lines 55–56 ("An air gap must be present at the interface of the lambertian diffuser and the lens array.")). The air gap is shown in and described with reference to Figure 6 reproduced below (and even labeled "AIR GAP" in the Fig. 6 as originally filed). (Gasser Opening Decl., Ex. 3 at 44.)



*Fig.6*

The '371 patent imposes a specific and unequivocal requirement for an air gap which, on its face, limits the scope of the claims. *See On-Demand*, 442 F.3d at 1340 ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). Yet, Honeywell seeks, without support, to avoid the consequences of the use of "must" in the '371 patent application by arguing that "must" only applies where a diffuser is used. Therefore, according to Honeywell, since diffusers are not expressly claimed, the "must" restriction does not apply to Claim 3. (HW Br. at 28–29.) This argument has two deficiencies. First, the "lambertian diffuser" referred to in the "must" clause is not an independent element, but is part of the light source (backlight array 25). (Gasser Opening Decl., Ex. 1 at Col. 2, lines 46–49.) Second, the "must" teaching is part of the explanation of FIG. 6, which, as even Honeywell concedes, explains the theory of operation of the claimed invention. (HW Br. at 10.) Nowhere in the '371 patent is there a suggestion that the "must" language is limited to a specific embodiment, rather than to the entire "invention."

Honeywell takes issue with Defendants' proposed requirement that the air gap be "purposeful and defined." This language finds support in FIG. 6 of the '371 patent, as issued and as filed. Further, this language is needed to avoid an ambiguity inherent in the claim and the technology. Construing the claim to merely require that any air gap, even an intermittent one, be present, would allow Honeywell to assert that random, incidental and localized spaces resulting from microscopic imperfections on the surfaces of the light source and closest lens array or dust on such surfaces would satisfy the limitation. Even when, as in Defendants' accused LCD

24

modules, components are stacked directly one on top of another, microscopic imperfections in the surfaces of the components may create minute, random spaces between the components. These incidental spaces do not prevent points of contact between the stacked components, which prevent the change of index of refraction envisioned by the '371 patent and which can cause defects in the display. (Schlam Opp'n Decl., ¶15.) Indeed, the '371 patent makes no mention of such incidental spaces, instead illustrating (in all views of the components, i.e., Figs. 4A, 4B, 6, 7 and 10) the light source and closest lens array as having no points of contact and a purposeful, defined air gap. Only when the air gap is purposeful and defined can the change of index of refraction, which the '371 patent teaches is required, be achieved.

Defendants' proposed construction is consistent with how one of ordinary skill in the art would construe the teachings in the '371 patent. Yet, Honeywell mischaracterizes the reports of Dr. Schlam and Mr. Smith-Gillespie. Dr. Schlam states that "[a]n LCD module normally does not have a built-in 'air gap' (as that term is used in the '371 patent) even though there may be random points between the lambertian diffuser and the lens array where the lens components do not touch." (Honeywell App., Ex. D at ¶ 68.)[2] In other words, to one of ordinary skill in the art, the "air gap" required by the '371 patent is different than the incidental spaces caused by irregularities on the surfaces of the typically stacked components or dust on such surfaces. If such incidental spaces were sufficient to practice the alleged invention, then there would have been no need to include the absolute teachings in the specification and figures that the air gap must be present, because one of skill in the art would have merely stacked the components as in the typical LCD module arrangement. (Schlam Opp'n Decl. ¶ 15.) Therefore, the "disposed between" limitation should be construed to require a purposeful and defined air gap between the light source and one of the lens arrays.

---

[2]  Honeywell cites to paragraphs 67 and 148 of Dr. Schlam's Report; however, nothing in those paragraphs relates to the definition of air gap. Honeywell's citation to Smith-Gillespie Report, ¶91, is equally misleading and puzzling, as it makes no such reference, either. (Honeywell App., Exs. D, E.)

E.    **Construction of "wherein at least one of the lens arrays is rotated about an axis perpendicular to the liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel."**

Honeywell's construction of "wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel" (hereinafter referred to as "slight misalignment") is purposely vague, indefinite, and intended to cover the total possible range of rotation of a lens array relative to the liquid crystal panel. Although Honeywell's seemingly innocuous definition is "a misalignment of typically 2-16 degrees between an axis of the lens array and an axis of the pixel arrangement in the liquid crystal panel," Honeywell exposes the real, intended meaning of its construction when it states that:

> Beyond that range [2-16 degrees] one of ordinary skill would understand that rotation that accomplished moiré-reducing function might be an "atypical" misalignment, *but still falls within the claim.*

(HW Br. at 35 (emphasis added).) Honeywell further states:

> A rotation of *30 degrees* from a horizontal axis would still reasonably be viewed as "slight" within the *literal meaning* of the claim *if that amount of rotation was necessary to change the effective spatial frequencies* or if the liquid crystal panel contains an axis other than the horizontal and vertical (e.g. a diagonal) that causes moiré.

(HW Br. at 38 (emphasis added).) Honeywell's experts go even further, concluding that a rotation of 2-16 degrees, no matter what the purpose, infringes, but that rotations between 0 and 90 degrees would infringe if made for the purpose of avoiding or reducing moiré interference. (Gasser Opp'n Decl., Ex. 17 at 284:1–17, 285:10–286:23, 328:19–330:17; Gasser Opp'n Decl., Ex. 18 at 49:17–50:11, 55:24–56, 70:6–11.)

While not readily apparent on its face, Honeywell's construction of this limitation is designed to effectively eliminate "slight" from the limitation in violation of established precedent, allowing any degree of rotation, and even including no rotation at all. Honeywell

26

grounds its construction on the word "Typically" found in the specification and the symbol "≈" found in Fig. 12. (HW Br. at 34–36.) The specification disclosed rotation in a single paragraph which reads, in pertinent part:

> The residual moiré can be removed by rotating the lens array 40 with the respect to the LCD array 30, as illustrated in Fig. 12. This rotation of the lens array by *a few degrees (Typically 2 to 16 degrees)* from the horizontal axis causes a small change in the effective spatial frequency difference of the two arrays and thereby eliminates the residual moiré.

(Gasser Opp'n Decl., Ex. 1 at Col. 5, lines 21-28.) Therefore, not only does Honeywell write "slight" out of the claim, it writes "few degrees" out of the specification.[3] In their place, Honeywell and its experts functionally expand the scope of claim 3 to encompass *any* rotation at which no moiré interference can be observed. (HW Br. at 33–38.)[4]

Under Honeywell's construction, products with the *maximum* rotation possible would still practice the "*slight* misalignment" (emphasis added) limitation, further rendering the word "slight" meaningless. Even products with lens arrays that are aligned with the horizontal axis, i.e., products with no rotation, could literally infringe claim 3, under Honeywell's construction. (Gasser Opp'n Decl., Ex.18 at 57:7–58:3 (stating that in combination with a liquid crystal panel with a diagonal row of pixels at 10 degrees that created moiré interference, a lens array aligned at 0 degrees would practice the "slight misalignment" limitation of claim 3)).

Honeywell cites five inapposite cases in an attempt to broaden the scope of claim 3 beyond the clear guidance of the specification that the "slight misalignment" refers to rotations within the numerical range of 2–16 degrees. (Honeywell Opening Br. at 35–36, 38.) First, *DMI,*

---

[3]  The extrinsic evidence confirms that applicants' use of "slight" was purposed and reflected a concern that rotation beyond the cited "shallow" range would adversely affect the desired variation with viewing angle. (Schlam Opp'n Decl. at ¶ 18.)

[4]  The inventors secured allowance of claim 3 by amending dependent application claim 9 to incorporate the limitations of the associated independent claim. (Gasser Opening Decl., Ex. 3 at 76–78.) Therefore, Honeywell is driven to this extraordinary construction by the fact that the doctrine of equivalents is unavailable to it. *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 320 F.3d 1131, 1134 (Fed Cir. 2004) *(en banc)*.

*Inc. v. Deere & Co.*, 755 F.2d 1570 (Fed. Cir. 1995), nowhere discusses the use of a numerical range to define a claim. Second, *Modine Mfg. Co. v. Int'l Trade Comm'n*, 75 F.3d 1545 (Fed. Cir. 1996), relies on the doctrine of claim differentiation to reject the use of a particular numerical limitation because that limitation was explicitly claimed in claims not in suit. *Id.* at 1551. The case is therefore inapposite because no other claim in the '371 patent includes a requirement similar to a "slight misalignment." Third, the fifty-year old, non-precedential case, *International Nickel Co. v. Ford Motor Co.*, 166 F. Supp. 551 (S.D.N.Y. 1958), is inapposite on procedural grounds. It reviews a special master's factual findings on claim construction under a "clearly erroneous" standard. *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995), however, held that claim construction was a matter of law. Therefore, this case is based on rejected law. Further, far from holding that numerical limitations are improper, the case merely states that the claim limitation "small but effective" should not be held to have a lower limit where the patent taught in a number of places that smaller or larger amounts might be necessary. *Id.* at 555–56. Fourth, in *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326 (Fed. Cir. 2001), the district court imported a numerical limitation from the prior art into the claim even though the claims, specification, and prosecution did not discuss that limitation. *Id.* at 1332. In contrast to the two latter cases, here the specification itself refines the plain meaning of "slight misalignment" by teaching that the lens arrays in a LCD module should be rotated by "a few degrees (Typically 2–16 degrees) from the horizontal axis." (Gasser Opening Decl., Ex. 1 at Col. 5:23–28.) Finally, in *Key Pharms v. Hercan Labs Corp.*, 161 F.3d 709 (Fed. Cir. 1998), the Federal Circuit affirmed a District Court's construction of a "pharmaceutically effective amount" limitation by reference to an FDA standard where the specification failed to define the amount. Contrary to Honeywell's contention, the court did not reject the specification's suggested ranges. The case is inapposite because the specification of the '371 patent clearly states a range for "slight misalignment."

Contrary to Honeywell's assertions, the Federal Circuit recently permitted the construction of a term as a numerically precise range. In *Sinorgchem Co. v. Int'l Trade Comm'n*,

28

511 F.3d 1132 (Fed. Cir. 2007), the Federal Circuit stated that the term "controlled amount" covered processes using "at most 4% water" and held that a process using 10% water therefore could not literally infringe. *Id.* at 1140 (noting that the analysis in *Modine* did not bar the use of numerical limitations in all situations (*Id.* at 1136)).

One skilled in the art would understand from the '371 patent and Fig. 12 of the drawings of the application as filed that the moiré interference of concern to the inventors was between the two horizontally extending lens arrays and between a lens array and the horizontal axis of the "array" of the liquid crystal panel. Yet, Honeywell attempts to broaden the scope of the "slight misalignment" limitation by arguing that rotation can be measured from any axis on the liquid crystal panel, rather than the horizontal axis as expressly taught in the specification and depicted in the drawing. (*Compare* HW Br. at 36–37 *with* Defs.' Opening Br. at 23–24.) Indeed, the specification refers to rotation "from the horizontal axis." (Gasser Opening Decl., Ex. 1 at Col. 5, line 25.) Figure 12 also shows rotation relative to the horizontal axis of the liquid crystal array and, as originally filed, included legends which make it clear that the rotation was intended to be relative to that axis. (Gasser Opening Decl., Ex. 3 at 50.) Without any basis in the intrinsic or extrinsic evidence, Honeywell improperly attempts to contradict Figure 12's explicit guidance and argue that the "θ" in Figure 12 can be measured with respect to any axis by reference to the angles $\theta_H$ and $\theta_V$ in Figures 4A and 4B. $\theta_H$ and $\theta_V$, however, explicitly refer to a viewing angle, which is the angle of the viewer's eye with respect to the display, not an angle of rotation of a lens array.

Honeywell cites a diagonal line of sub-pixels of a single color as defining an axis of the liquid crystal panel from which rotation can be measured. This theory finds no support in the intrinsic or extrinsic evidence. (Schlam Dec., ¶ 17.) It is telling that Honeywell's expert Ian Lewin could not identify any time that he had observed moiré interference generated by diagonal rows of pixels in a liquid crystal panel and indeed only learned of such effects from Honeywell personnel after being retained for this litigation. (Gasser Opp'n Decl., Ex. 18 at 52:4–21, 55:4–11.) Therefore, Honeywell's construction was improperly created solely for the purpose of

expanding the scope of potentially infringing products to cover every possible device with a lens array rotated between 0 and 90 degrees. Indeed, every LCD module with two lens arrays would potentially practice claim 3 under Honeywell's advocated understanding of the claim.

Indeed, the only way to maintain the definiteness of the "slight misalignment" limitation is to construe it to literally require intentional rotations of not less than 2 and not more than 16 degrees with respect to the horizontal axis of the liquid crystal panel. *See Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) (finding a narrow claim construction appropriate when other potential constructions were ambiguous). A Honeywell expert testified that the description of 2–16 degree rotations in the specification is what makes the term "slight misalignment" definite, stating that the range taught in the specification gave "breadth and meaning" to the "slight misalignment" language. (Gasser Opp'n Decl., Ex. 17 at 329:7–14.) In light of its expert's testimony, Honeywell cannot defend its erroneous attempt to broaden the scope of "slight misalignment" beyond this range. Any boundary beyond the 2-16 degree range taught by the '371 patent must be otherwise determined under the doctrine of equivalents, but as noted above that doctrine is unavailable to Honeywell here.

## V.    CONCLUSION

In contrast with Honeywell's constructions, Defendants' claim constructions are closely tailored to the intrinsic record. Therefore, Defendants respectfully request that the Court adopt their proposed claim constructions.

DATED:  June 2, 2008

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*
Karen L. Pascale (#2903)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kpascale@ycst.com
*Attorneys for Optrex America, Inc.*

OF COUNSEL:

Richard D. Kelly
Andrew M. Ollis
Alexander A. Gasser
OBLON, SPIVAK, MCCLELLAND,
  MAIER & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA 22314
(703) 413-3000

POTTER, ANDERSON & CORROON

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
provner@potteranderson.com
*Attorneys for FUJIFILM Corporation and
FUJIFILM U.S.A. Inc.*

OF COUNSEL:

Lawrence Rosenthal
Ian G. DiBernardo
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY  10038-4982
(212) 806-5400


POTTER, ANDERSON & CORROON

*/s/ Richard L. Horwitz*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
rhorwitz@potteranderson.com
(302) 984-6000
*Attorneys for Samsung SDI Co., Ltd. and
Samsung SDI America, Inc.*

OF COUNSEL:

Stephen S. Korniczky
Elizabeth L. Brann
PAUL HASTINGS JANOFSKY & WALKER LLP
3579 Valley Centre Drive
San Diego, CA 92130
(858) 720-2500

BOUCHARD MARGULES & FRIEDLANDER, P.A.

*/s/ David J. Margules*
David J. Margules (#2254)
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
dmargules@bmf-law.com
(302) 573-3500
*Attorneys for Citizen Watch Co. Ltd. and
Citizen Displays Co. Ltd.*

OF COUNSEL:

David H. Ben-Meir
Rose A. Hickman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067-6047
(310) 785-4600

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, hereby certify that on June 9, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to the CM/ECF counsel of record.

I further certify that on June 9, 2008, I caused a copy of the foregoing document to be served upon the following counsel of record as indicated below:

### *By E-Mail*

Thomas C. Grimm [tgrimm@mnat.com]
Benjamin J. Schladweiler [bschladweiler@ mnat.com]
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE  19899-1347
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Steven J. Balick [sbalick@ashby-geddes.com]
John G. Day [jday@ashby-geddes.com]
ASHBY & GEDDES
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Philip A. Rovner [provner@potteranderson.com]
POTTER, ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
*Attorneys for FUJIFILM Corporation and FUJIFILM U.S.A. Inc.*

Richard L. Horwitz [rhorwitz@potteranderson.com]
David E. Moore [dmoore@potteranderson.com]
POTTER ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
P.O. Box. 951
Wilmington, DE 19801
*Attorneys for Samsung SDI America, Inc., and Samsung SDI Co., Ltd.*

David J. Margules [dmargules@bmf-law.com]
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
*Attorneys for Citizen Watch Co., Ltd., and Citizen Displays Co., Ltd.*

Matt Neiderman [MNeiderman@duanemorris.com]
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
*Attorneys for InnoLux Display Corporation*

Martin R. Lueck [MRLueck@rkmc.com]
Matthew L. Woods [MLWoods@rkmc.com]
Jacob S. Zimmerman [JSZimmerman@rkmc.com]
Marta M. Chou [MMChou@rkmc.com]
Stacie E. Oberts, Esquire [SEOoberts@rkmc.com]
ROBINS, KAPLAN, MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Alan E. McKenna [AEMckenna@rkmc.com]
Anthony A. Froio  [AAFroio@rkmc.com]
ROBINS, KAPLAN, MILLER & CIRESI LLP
111 Huntington Avenue, Suite 1300
Boston, MA 02199-7610
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Lawrence Rosenthal [lrosenthal@stroock.com]
Ian G. DiBernardo [idibernardo@stroock.com]
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
*Attorneys for FUJIFILM Corporation and FUJIFILM U.S.A. Inc.*

Stephen S. Korniczky [stephenkorniczky@paulhastings.com]
Elizabeth L. Brann [elizabethbrann@paulhastings.com]
PAUL, HASTINGS, JANOFSKY & WALKER LLP
3579 Valley Centre Drive
San Diego, CA 92130
*Attorneys for Samsung SDI America, Inc., and Samsung SDI Co., Ltd.*

David H. Ben-Meir [dhben-meir@hhlaw.com]
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
*Attorneys for Citizen Watch Co., Ltd., and Citizen Displays Co., Ltd.*

Donald R. McPhail [DRMcPhail@duanemorris.com]
DUANE MORRIS LLP
1667 K Street, N.W.
Washington, DC 20006-1608
*Attorneys for InnoLux Display Corporation*

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

June 9, 2008

Karen L. Pascale (#2903) [kpascale@ycst.com]
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
   *Attorneys for Optrex America, Inc.*