
# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC.; and HONEYWELL INTELLECTUAL PROPERTIES INC.;<br><br>Plaintiffs,<br><br>v.<br><br>APPLE COMPUTER, INC., et al.<br><br>Defendants. | Public Version- Filed June 9, 2008<br><br>Civil Action No. 04-1338-JJF<br>Civil Action No. 04-1337-JJF<br>Civil Action No. 04-1536-JJF<br>[CONSOLIDATED] |

**OPPOSITION DECLARATION OF ELLIOTT SCHLAM IN SUPPORT OF DEFENDANTS OPTREX'S, FUJIFILM'S, SAMSUNG SDI'S, AND CITIZEN'S OPPOSITION MEMORANDUM OF LAW IN SUPPORT OF THEIR PROPOSED CLAIM CONSTRUCTION**

Karen L. Pascale (#2903)
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kpascale@ycst.com
*Attorneys for Optrex America, Inc.*

OF COUNSEL:

Richard D. Kelly
Andrew M. Ollis
Alexander A. Gasser
OBLON, SPIVAK, MCCLELLAND,
  MAIER & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA 22314
(703) 413-3000

Philip A. Rovner (#3215)
POTTER, ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
provner@potteranderson.com
*Attorneys for FUJIFILM Corporation and FUJIFILM U.S.A. Inc.*

OF COUNSEL:

Lawrence Rosenthal
Ian G. DiBernardo
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038-4982
(212) 806-5400

<div style="column-count:2">

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER, ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
*Attorneys for Samsung SDI Co., Ltd. and Samsung SDI America, Inc.*

OF COUNSEL:

Stephen S. Korniczky
Elizabeth L. Brann
PAUL HASTINGS JANOFSKY & WALKER LLP
3579 Valley Centre Drive
San Diego, CA 92130
(858) 720-2500

David J. Margules (#2254)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
dmargules@bmf-law.com
*Attorneys for Citizen Watch Co. Ltd. and Citizen Displays Co. Ltd.*

OF COUNSEL:

David H. Ben-Meir
Rose A. Hickman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067-6047
(310) 785-4600

</div>

June 2, 2008

Elliott Schlam hereby declares that:

1.  I offer this declaration in support of the Responsive Memorandum on Claim Construction (Markman) of the defendants FUJIFILM Corporation, FUJIFILM U.S.A., Inc., Samsung SDI, Ltd., Samsung SDI America, Inc., Optrex America Inc., Citizen Watch Co., Ltd. and Citizen Displays Co., Ltd. (the "Defendants"). In connection with preparing this Declaration, I have reviewed Honeywell's Opening Claims Construction Brief Regarding U.S. Patent Number 5,280,371 ("HW Brief"). This declaration is in addition to and does not supercede my prior declaration in support of Defendants' Opening Memorandum on Claim Construction (referenced to as "Schlam Opening Decl."). My qualifications are summarized in my Opening declaration.

I.   **Claim Construction and Analysis**

   A.   **A display apparatus**

2.  The Hamada Patent (Ex. 13) discloses a projection-type LCD-based image displaying apparatus, as shown in Fig. 6 reproduced below. The apparatus includes two lenticular arrays 2a and 2b of different pitch that are on each side of the liquid crystal panel 1, to enhance the overall functionality of an LCD projection apparatus. Each array consists of a group of circular, concave microlenses, which face the panel so that one microlens on each array is associated with each pixel of the liquid crystal panel.

2



FIG.6

More specifically, the dual microlens arrays 2a, 2b of the Hamada Patent (which are on each side of the liquid crystal panel) function to focus light through the pixels of the liquid crystal panel to avoid darkened areas at the center and periphery of the display. In this regard, the Hamada patent states:

> That is, if the pixel pitch and the pitches of the microlenses are selected in [the disclosed] relationship as expressed in the above equalities (1) and (2), the light from the light source passes through the central portions of the microlenses and the pixels. *As a result, a projected image does not become darker at the central portion of the display panel nor at the peripheral portion thereof in the projection type image display apparatus such as the active matrix type liquid crystal display apparatus.*

Ex. 13, col. 5, lines 28-36 (emphasis added). The Hamada Patent also points out that if such pitch arrangement is not employed, only a portion of the projection screen is effectively used. Hamda Patent, col. 6, lines 6-13 ("Only the central portion of the screen is effectively used for projection in the one in which the pitch correction of the microlens array is *not* carried out.")(emphasis added). The microlens arrays of the Hamada Patent do not function in the same

3

manner as the lens arrays of the '371 patent. The problem solved by Hamada was neither moiré interference nor the reduction of luminance with every viewing angle.

### B. a light source

3. Honeywell asserts that "a lamp alone is sufficient to be a light source within the meaning of the claim language" and that the light source need not provide a source of distributed light. HW Brief at 19-20. For the pixels of a liquid crystal panel to function, light must be applied to all of them. Therefore, the light from the light source must be distributed across the useful surface of the liquid crystal panel so as to essentially uniformly illuminate every pixel. In the embodiments shown and described in the '371 patent, the light source achieves this distribution of light by use of a lamp, reflector and lambertian diffuser 20. However, I believe that use of a lambertian diffuser is not part of the definition of "light source" since a person of ordinary skill in the art would know that a distributed source of light could be achieved in other ways, for example by use of a side or edge-lit light guide (which can also be used with a diffuser). See, e.g., Schlam Opening Decl. Exs. 5 and 6. In an LCD module using a side or edge-lit light guide, as is common in cell phones, PDAs and digital still cameras, the lamps or LEDs are incapable, by themselves, of "illuminating" the liquid crystal panel as claimed by Honeywell because they are not aligned with the panel.

4. U.S. Patent No. 5,128,783 to Abileah et al ("'783 Abileah patent") is annexed hereto as Exhibit 14. The '783 Abileah patent discloses the use of a lenticular array having embedded glass beads between a liquid crystal panel and a backlight to enhance and direct the light emanating from the LCD. The LCD includes a backlight consisting of an array of fluorescent lamps 100 in front of a reflector 98. The array of lamps 100 of the '783 Abileah patent is not just a lamp, but rather, an array of fluorescent lamp elements which, "regardless of configuration,

4

will be arranged to uniformly distribute radiation emanating therefrom *over the entire surface area of the matrix of rows and columns of picture elements.*" See Ex. 13 at Col. 9, lines 43-46. Thus, the array of lamps 100 of the '783 Abileah patent is a source of distributed light.

> **C. first and second lens arrays, each having a plurality of individual lenslets . . . for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel**
>
>> **(i) Each lens array consists of a member separate from the light source and having a plurality of lenslets**

5.  Honeywell's construction of "first and second lens arrays, each having a plurality of individual lenslets" defines "lenslet" as a "light-refracting structure" and "lens array" as "a structure that contains a pattern of *independently operating* light refracting structures (lenslet)." HW Brief at 22 (emphasis added). "Refraction" is the changing of direction of a light ray as it passes from a material of one coefficient of refraction into a material with a different coefficient of refraction. This effect is illustrated by light ray 70 which changes direction as it passed from the air into lens array 40 in Fig. 6 of the '371 patent. The total internal reflection ("TIR") of some of the light within the lens array, also shown by ray 70 in Fig. 6 of the '371 patent reproduced below, plays an important role in the narrowing of the viewing angle, recycling of light and operation of the "invention" taught in the '371 patent.

5



Specifically, TIR only allows light within a particular angle to enter the liquid crystal panel and increases the amount of light reaching the liquid crystal panel by returning light which would otherwise be lost or not be useful to the light source where it is emitted again toward the lens arrays and liquid crystal panel to increase the "gain" of the liquid crystal module.

6. The second aspect of Honeywells' claim construction requires that the lenslets be "independently operating". I find no such requirement in the specification or drawings. I understand that the addition of such a requirement is an attempt by Honeywell to remove from consideration as part of the prior art, at least one prior art reference. That reference, Japanese Utility Model Application JA58-109786 ("the JP '786 Matsuyama publication") (published on July 26, 1983) (a copy of which is annexed as Exhibit 15 with English translation), teaches modules with a light source and one or two lens arrays in the form of cylindrical (also known as linear) Fresnel lenses between the light source and the liquid crystal panel. In one embodiment the lenslets of the two cylindrical Fresnel lenses extend parallel to each other while in another they extend perpendicular to each other to provide predetermined variations with viewing angle. See Figs. 3 and 4 and the description of the third and fourth embodiment at pages and 4 and 5 of the English translation (Ex. 15). A "cylindrical Fresnel lens" has a series of parallel lenslets on a

6

flat sheet which are shaped to simulate a cylindrical lens with a semi-cylindrical cross section. The lenslets do act together in simulating the cylindrical lens but nonetheless are "individual lenslets" within the terms of the first and second lens array limitation of the '371 patent. Honeywell's attempt to remove from consideration Fresnel lenses fails to address cylindrical Fresnel lens, such as those of the JP '786 Matsuyama publication, and instead addresses only circular Fresnel lenses. The Fresnel lens described and depicted by Honeywell at pages 22-23 of its Brief is a circular Fresnel lens, which is comprised of a series of concentric (not parallel) lenses that simulate a single plano-convex (i.e., a semi-spherical) lens. The passage from column 5, line 6-15 of the '371 patent specification relied upon by Honeywell (HW Brief at 22) in fact supports the proposition that there is no required shape to the lenslets, and therefore no requirements of uniform shape or independent operation. Thus, the last sentence of the quoted passage reads:

> **Other lens array shapes may be selected as desired** to obtain the required concentration of luminance and variation of luminance with vertical and horizontal viewing angle for a particular application.

Column 5, lines 12-15 (emphasis added).

7.  In several of the embodiments of liquid crystal modules assembled by defendant FUJIFILM Corporation ("Fuji") for incorporation in Fuji digital still cameras sold in the United States, there is only a single lens array but Honeywell points to structures on the top or bottom surfaces of a wedge-shape light guide as constituting a second "lens array," while Fuji contends that they are part of the light source. See Exs. 5 and 7 and the discussion of the two Fuji modules in questions (Types a and c) in paragraphs 27-31 and 37-40 of my Opening Declaration. On the other hand, when a lens-like structure appears on a prior art light guide, Honeywell

7

argues that the lens structure is not a "lens array" but merely for purposes of extracting light from the light guide.

8.  The latter is the case with the structures on the top surface of the light guides disclosed in U.S. Patent No. 5,126,882 (the "Oe '882 patent") (annexed hereto as Ex.16). The '882 Oe patent is directed to a plane light source that can be used as a backlight for a liquid crystal display. Col. 1, lines 5-9. The '882 Oe patent begins by describing various types of light guides known at the time, including those designed to provide a uniform light source, as well as those designed to provide light concentrated in a particular direction. See, generally, Background of the Invention; col. 1, lines 41-45. The '882 Oe patent recognizes that known, prior art side-lit backlights providing a diffuse light source included structures on the surfaces of the light guide. See col. 5, lines 15-21; Fig. 2(b). Narrowing of the viewing angle is recognized as a way to reduce power consumption. See col. 2, lines 2-6.

9.  The '882 Oe patent discloses several embodiments of side-lit backlights having structures on the light wedge for use in tailoring luminance in a desired direction. Figure 10 illustrates one embodiment of a light source having convex lenses 16 on the light emitting surface 12 of the light guide (element 50), which are opposite a reflective surface 13. A second optical element 51, which is essentially a prismatic array, sits on top of the light-emitting surface 12 with the prismatic lenslets (referred to as prism units) 40 facing the surface 12. Both the convex lenses 16 and prismatic lenslets run parallel to each other and the lamp 15. Light rays emerge from the second optical element 51 at a predetermined angle. See col. 7, line 50 – col. 8, line 8. If the structures on the Fuji light guides constitute "lens arrays," then the '882 Oe patent teaches two lens arrays that satisfy the lens arrays limitation of claim 3.

8

### (ii) The lens arrays arranged such that the lenslets on the first and second lens arrays face toward the liquid crystal panel

10. The second element of Defendants' construction of the two lens arrays limitation, that the lens arrays are arranged such that the lenslets on the first and second lens arrays face toward the liquid crystal panel, is well supported by the specification and drawings of the '371 patent. The '371 patent teaches one of ordinary skill in the art only to orient a lens array with the lenslet side facing the viewer. Each and every showing of the lens arrays in the drawings have the lenslets facing toward the liquid crystal panel. *See* Figs. 2, 4A, 6, 7 and 10. Fig. 10 is described as showing "a cross sectional view of a configuration utilizing a triangular shape lens array" (column 2, lines 36-37) and "[f]or the particular application in question the preferred embodiment included two lens arrays in series .... " Column 4, lines 52-54 (emphasis added); See also Column 5, lines 6-8. I understand that the term "in series" refers to the fact that the two lens arrays are facing in the same direction. The luminance curves of Figs. 5, 8, 9 and 11 are all consistent with the lenslets facing towards the liquid crystal panel.

11. Nothing in the '371 patent teaches one of ordinary skill in the art how orienting a lens array with the lenslets facing the light source would function. Although Honeywell's expert Dr. Lewin has suggested that a lens array of the type shown in Fig. 6 of the '371 patent would operate in a similar manner if reversed to face the light source (Lewin Report at 14-15; 91 annexed as Ex. 17), that is not the case and, in any event, one of ordinary skill in the art would not expect that to have been the case. Of the four pairs of lens arrays shown at page 25 of Honeywell's Brief, only the rightmost (assuming the light source is below the lens arrays and assuming that the two lens arrays have different pitches from one another) is suggested in the '371 patent and is the only one that a person of ordinary skill in the art would know could

9

function as contemplated in the '371 patent to produce the desired predetermined variation in vertical viewing angle.

12.  Honeywell argues that "all that is required to refract light is a difference in the index of refraction" and concludes that the arrays can thus face any direction, including the various orientations illustrated in its brief. (HW Brief at 25.) However, a mere change in the index of refraction alone is not sufficient to produce the claimed "predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel." Similarly, not every optical element that causes a change in the index of refraction can provide such predetermined variation.

> (iii) **First and second lens arrays ... for providing a predetermined variation of viewing angle ...**

13.  Honeywell separately construes "for providing a predetermined variation with viewing angle of light transmission from said light source through said lens array and said liquid crystal panel", as meaning: "[t]the lens arrays provide a variation of light transmission with viewing angle. As a result of the arrays, the transmission of light through the liquid crystal panel varies with the angle from which the panel is viewed." Honeywell Brief at 30. Honeywell's construction ignores the statement in the "SUMMARY OF THE INVENTION" of the '371 patent that:

> The foregoing and other objects are achieved in the present invention wherein there is provided a liquid crystal display apparatus comprising a light source, a liquid crystal planar array of pixels for creating an image by controlling the amount of light allowed to pass through each of the pixels, and one or more directional diffuser lens arrays disposed between the light source and liquid crystal array for providing **a tailored variation of luminance from the liquid crystal display as a function of vertical viewing angle.**

10

Column 1, line 62-Column 2, line 3 (emphasis added). The specification and drawings when taken as a whole, would be understood by one of ordinary skill in the relevant art as teaching a liquid crystal display module to solve the problem created where, as in a cockpit, viewers are side-by-side with their vertical viewing angle relatively fixed. In such an arrangement narrowing the vertical viewing angle is desirable since it permits an increase in gain, but materially narrowing the horizontal viewing angle is not desired since it adversely affects the ability of the side-by-side viewers to see the display. Thus, where the structure causes excessive roll off in horizontal viewing angle, as in the case of three or more lens arrays, the '371 patent teaches against its use. Column 4, lines 46-58; Fig. 9. A person of ordinary skill in the relevant art would not know, from the '371 patent, to intentionally narrow both the horizontal and vertical viewing angles by the use of two crossed lens arrays, which Honeywell seeks to cover by eliminating "vertical" from the definition of this element, despite the clear language of the SUMMARY OF THE INVENTION. Nor would such a person know, from the '371 patent, to intentionally widen the horizontal viewing angle by use of a lens array with lenslets extending vertically (aside from a slight misalignment) but facing toward the light source as in the case of the two alleged reductions to practice in 1990 which Honeywell also seeks to cover. Schlam Opening Decl., ¶¶ 44-48, Exs. 9 and 10.

**D.     Disposed between said light source and said liquid crystal panel**

14.     Defendants' construe the limitation "disposed between said light source and said liquid crystal panel" to require that the first and second lens arrays be positioned between the light source and the liquid crystal panel, with a purposeful and defined air gap at the interface of the light source and the one of the lens arrays closest to the light source. Honeywell contends that the air gap is not required, despite the unequivocal teaching that the "air gap **must** be present ...

11

", and the teaching of Fig. 6 (and all other figures depicting the components) of the patent and Fig. 6 as originally filed. Column 3, lines 55-56.

15.  In general, optical components in an LCD module can be stacked, purposefully spaced apart or optically bonded together, for example, by the addition of a wetting fluid between components. In the absence of teachings to optically bond the light source to the adjacent lens array or, as is the case in the '371 patent, to purposefully include an air gap, one of ordinary skill in the art would simply stack the components since stacking of components is the typical method; creating an air gap as described in the '371 patent and optically bonding components to avoid any air gap or space require the designer of an LCD module to take affirmative steps. Stacking components, such as a light source and lens array, may create random, minute spaces between components due to imperfections on the surfaces of the components or dust particles between components; however, such spaces do not prevent points of contact between the components where there is no change in index of refraction. These can cause defects to appear in the display.

> E.  **Wherein in at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel**

16.  The defendants construe the limitation that "at least one of said first and second lens arrays is *rotated* about an axis perpendicular to said liquid crystal panel in order to provide a *slight misalignment* between said lenslets and said liquid crystal panel" as meaning that one or more of the lens arrays is intentionally rotated at an angle of not less then 2 degrees and not more then 16 degrees in relation to the horizontal axis of the liquid crystal panel. Honeywell construes the "slight misalignment" limitation as being: "a misalignment of typically 2-16 degrees

12

between an axis of the lens array and an axis of the pixel arrangement in the liquid crystal panel," citing Column 5, lines 21-28 and Fig. 12. HW Brief at 33.

17.     Honeywell's construction has the rotation of the at least one lens array relative to *"an axis of the pixel arrangement* in the liquid crystal panel" (emphasis added), while the specification and Fig. 12 of the '371 patent clearly and unequivocally teach rotation relative to the horizontal axis of the liquid crystal panel. The lens arrays taught in the '371 patent all extend horizontally and the principal source of moiré interference in a liquid crystal panel is the relatively thick black horizontally extending boundary layer between rows of pixels. See paragraph 10 of my Opening Declaration. Specifically, I understand from the testimony of Honeywell's experts that Honeywell cites a diagonal line of pixels of the same color in a delta pattern liquid crystal panel as being a source of moiré interference from which rotation is to be measured ("an axis of pixel arrangements"). See, e.g., Lewin Dep. Tr. at 50-53; 56-57; 373-74, annexed as Exhibit 18. For such a diagonal line to even be visible, the image must be of a single color exactly the same as the color of a subpixel so that only subpixels of that color are activated. (Red, green and blue subpixels make up each pixel. See paragraph 10 of my Opening Declaration.) Such a condition is unlikely to occur since most colors are mixtures of these particular subpixel colors of red, green and blue of the pixels. Where a color to be displayed is not exactly the same as the color of red, green or blue of the subpixels, a single color of subpixels will not be activated. For example, a picture of the blue sky is unlikely to be the color of the blue subpixels and will also require the activation of red and/or green subpixels to be accurately depicted. It would be extremely rare for a single color of subpixels to be the only color activated in a liquid crystal display. One designing a liquid crystal module for use in a

13

digital still camera, cell phone, laptop, PDA or the like would not take steps to avoid such a rare potential source of moiré interference.

18.  One of ordinary skill in the art would understand the "slight" modifier in the "slight misalignment" limitation of claim 3 to be material and technically meaningful. The recited purpose of the lens arrays is to provide "a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel ...." Limiting the amount of rotation of one of the two recited lens arrays to a "slight" misalignment is necessary to prevent the rotation from altering and adversely affecting the recited predetermined variation with viewing angle. In the '371 patent, lens arrays having horizontally oriented lenslets concentrate light in the vertical direction, thus creating a relatively narrow band of light. Excessive rotation of the lens array would cause this concentrated band of light to also rotate, thus altering the light transmission through the liquid crystal panel. Such alteration of light transmission would be particularly troublesome in airplane cockpit applications, such as those being developed by the inventors when arriving at the subject matter of the '371 patent. Airplane cockpit applications, in which the display and the viewers' eyes (i.e., viewing angle) are stationary, are more sensitive to changes in light transmission verses viewing angle than portable devices, such as cellular telephones, PDAs and digital still cameras, because portable devices can be readily moved and viewed at diffcrent angles.

**REDACTED**

**REDACTED**

II.  **Miscellaneous**

19.   Honeywell refers to the diffuser shown in the '371 patent as a "white diffuser." HW Brief at 5, 6. There is no explicit teaching in the '371 patent as to the nature of the diffuser. There are two general types of diffusers. A surface diffuser diffuses light as the light impinges the diffuser's irregular or textured surface, whereas a bulk diffuser diffuses light as it passes through the body of the diffuser, which is made of a diffusing material. A "white diffuser" is an example of a bulk diffuser.

20.

**REDACTED**

**REDACTED**

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 2, 2008

_____
Elliott Schlam

**CERTIFICATE OF SERVICE**

I, Karen L. Pascale, hereby certify that on June 9, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to the CM/ECF counsel of record.

I further certify that on June 9, 2008, I caused a copy of the foregoing document to be served upon the following counsel of record as indicated below:

*__By E-Mail__*

Thomas C. Grimm [tgrimm@mnat.com]
Benjamin J. Schladweiler [bschladweiler@mnat.com]
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899-1347
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Steven J. Balick [sbalick@ashby-geddes.com]
John G. Day [jday@ashby-geddes.com]
ASHBY & GEDDES
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Philip A. Rovner [provner@potteranderson.com]
POTTER, ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
Wilmington, DE 19801
*Attorneys for FUJIFILM Corporation and FUJIFILM U.S.A. Inc.*

Richard L. Horwitz [rhorwitz@potteranderson.com]
David E. Moore [dmoore@potteranderson.com]
POTTER ANDERSON & CORROON
6th Floor, Hercules Plaza
1313 N. Market Street
P.O. Box. 951
Wilmington, DE 19801
*Attorneys for Samsung SDI America, Inc., and Samsung SDI Co., Ltd.*

David J. Margules [dmargules@bmf-law.com]
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
*Attorneys for Citizen Watch Co., Ltd., and Citizen Displays Co., Ltd.*

Matt Neiderman [MNeiderman@duanemorris.com]
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
*Attorneys for InnoLux Display Corporation*


Martin R. Lueck [MRLueck@rkmc.com]
Matthew L. Woods [MLWoods@rkmc.com]
Jacob S. Zimmerman [JSZimmerman@rkmc.com]
Marta M. Chou [MMChou@rkmc.com]
Stacie E. Oberts, Esquire [SEOoberts@rkmc.com]
ROBINS, KAPLAN, MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Alan E. McKenna [AEMckenna@rkmc.com]
Anthony A. Froio [AAFroio@rkmc.com]
ROBINS, KAPLAN, MILLER & CIRESI LLP
111 Huntington Avenue, Suite 1300
Boston, MA 02199-7610
*Attorneys for Honeywell International Inc. and Honeywell Intellectual Properties Inc.*

Lawrence Rosenthal [lrosenthal@stroock.com]
Ian G. DiBernardo [idibernardo@stroock.com]
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
*Attorneys for FUJIFILM Corporation and FUJIFILM U.S.A. Inc.*

Stephen S. Korniczky [stephenkorniczky@paulhastings.com]
Elizabeth L. Brann [elizabethbrann@paulhastings.com]
PAUL, HASTINGS, JANOFSKY & WALKER LLP
3579 Valley Centre Drive
San Diego, CA 92130
*Attorneys for Samsung SDI America, Inc., and Samsung SDI Co., Ltd.*

David H. Ben-Meir [dhben-meir@hhlaw.com]
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
*Attorneys for Citizen Watch Co., Ltd., and Citizen Displays Co., Ltd.*

Donald R. McPhail [DRMcPhail@duanemorris.com]
DUANE MORRIS LLP
1667 K Street, N.W.
Washington, DC 20006-1608
*Attorneys for InnoLux Display Corporation*

          YOUNG CONAWAY STARGATT & TAYLOR LLP

          */s/ Karen L. Pascale*

June 9, 2008

          Karen L. Pascale (#2903) [kpascale@ycst.com]
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, DE 19801
          (302) 571-6600
             *Attorneys for Optrex America, Inc.*