# EXHIBIT M

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

THOMAS C. GRIMM
302 351 9595
302 425 4661 FAX
tgrimm@mnat.com

January 24, 2007

**BY E-FILING**

The Honorable Mary Pat Thynge
United States Magistrate Judge
United States District Court
    for the District of Delaware
844 North King Street
Wilmington, DE 19801

Re:    *Honeywell International Inc., et al. v. Apple Computer, Inc., et al.*
       C.A. No. 04-1338-KAJ (Consolidated)

Dear Magistrate Judge Thynge:

I am writing pursuant to the Court's Order from January 18, 2007, asking for the parties' thoughts regarding strategies for the efficient handling of the remainder of the case. In summary, in light of the position taken by several of the Manufacturer Defendants (described below), Honeywell submits that a discussion regarding such strategies first requires clarity on the fundamental issue of who will answer Honeywell's charge of infringement at trial in the first instance: the Manufacturer Defendants or the Customer Defendants?

The original Scheduling Order, entered by Judge Jordan, did not specify how, when, and against whom infringement issues would be tried. Judge Jordan stayed the original action against the Customer Defendants on the assumption that the Manufacturer Defendants would stand behind their customers in a manner that would substantially reduce, if not eliminate entirely, the need for further proceedings. However, contrary to Judge Jordan's expectations, the Manufacturer Defendants, by their actions, have not committed to defending their customers from Honeywell's allegations.

For example, the issue of indirect sales figured prominently in the mediations held in December. The Manufacturer Defendants are clearly relying on their assertion that a substantial portion of sales to the Customer Defendants occurs outside the United States in order to avoid liability for those sales. To compound this, the Manufacturer Defendants are now requesting that

The Honorable Mary Pat Thynge
January 24, 2007
Page 2

the damages issues be put off to some indeterminate future date.[1]  By this recent conduct, the Manufacturer Defendants apparently prefer to avoid, rather than embrace, the potential liability of their customers.

Indeed, the different legal status of the Manufacturer Defendants may require Honeywell to resort to indirect infringement theories under the patent law—theories that require different elements of proof than direct infringement against the Customer Defendants.  The differences between these two types of infringement claims (indirect versus direct) have been heightened by the Federal Circuit's recent change in the standard for proving indirect infringement under 35 U.S.C. §271(b).  *See DSU Med. Corp. v. JMS Co., Ltd.*, 04-1620, 05-1048, -1052, slip op. (Fed. Cir. Dec. 13, 2006) (*en banc* in pertinent part).  A copy of that decision is attached hereto for the Court's convenience.  Essentially, the Federal Circuit now requires that allegations of inducement be supported by proof that a defendant both: (1) knew of the patent in suit; and (2) knew that its activities were causing others to directly infringe the patent.  These new standards do not apply to direct infringers such as the stayed Customer Defendants.

The new inducement standards have implications on both the scope of discovery and on the efficient handling of the case.  Discovery regarding certain issues will now take on newly increased importance; such discovery includes: (1) any opinions of counsel and related requests for legal advice sought regarding Honeywell's original allegations; (2) communications between manufacturers and customers regarding those allegations, including customer requests for indemnification and responses thereto; and (3) a precise date upon which each Manufacturer Defendant became aware of the patent.  Honeywell has not had an opportunity to fully explore these topics, and relevant information is likely to be in the hands of the Customer Defendants (*e.g.*, their expectations with regard to indemnification).

More fundamentally, the impact of the *DSU* decision could undermine the fundamental premise of Judge Jordan's reorganization of the case.  The Manufacturer Defendants may seek to avoid—in whole or in part—answering for the infringement and damages caused by their customers on the grounds that they did not know of the patent, or did not believe direct infringement was occurring.  If that becomes the case, then it makes little sense to proceed against them in the first instance because resolution of these unique inducement issues would, at best, resolve only a small portion of Honeywell's direct claims against the Customer Defendants.  In that event, what Judge Jordan intended as an efficient means for handling this action could become a wasteful rehearsal for the real trial.

Accordingly, to efficiently handle the remainder of the case, Honeywell suggests the following. First, the Court should direct the Manufacturer Defendants and the Customer Defendants to caucus among themselves and decide whether the former intends to defend the latter against the full extent of Honeywell's allegations, regardless of whether the sales were direct or indirect.  If they do, then all parties can be reassured that proceeding against the

---

[1]      The Manufacturer Defendants do not appear to be requesting that damages discovery itself be stayed, only damages expert reports and the damages component of the trial.

The Honorable Mary Pat Thynge
January 24, 2007
Page 3

Manufacturer Defendants first will still likely resolve the majority of Honeywell's allegations. If not, then the Court should schedule a subsequent hearing to address why the first trials should not be against the Customer Defendants.[2]

Second, once it is clear which class of defendants is best suited to answer Honeywell's infringement allegations in the first instance, Honeywell will work with these defendants to develop a timetable and plan for trying infringement and damages.

To avoid delay, the current stay against the Customer Defendants should be lifted so that Honeywell can obtain information regarding the commercial success of end products incorporating the accused modules (relevant to the issues of validity and damages) and to begin developing a record that addresses the new standards set forth in *DSU* (to the extent necessary).

As the Court is aware, Honeywell and the Manufacturer Defendants have agreed to a three-month extension of all the deadlines set forth in the current Scheduling Order (D.I. 376). While the agreed-upon extension provides short-term relief, it does not address this broader issue of a global strategy for efficiently handling the remainder of the case.

Honeywell looks forward to discussing this issue with the Court on Thursday.

Respectfully,

Thomas C. Grimm

Enclosure
cc:    All Counsel of Record—All Defendants (via e-filing, w/encl.)
       Matthew L. Woods, Esquire (via e-mail, w/encl.)
       Seong Yoon Jeong, BOE Hydis Technology (via Fed. Ex., w/encl.)

---

[2]    It may well be that the substantial settlements executed to date will impact the scope of the remaining claims against the Customer Defendants, and Honeywell would work with the Customer Defendants to ensure that further proceedings reflect the scope of those settlements.

# United States Court of Appeals for the Federal Circuit

04-1620, 05-1048, -1052

DSU MEDICAL CORPORATION and MEDISYSTEMS CORPORATION,

Plaintiffs-Appellants,

v.

JMS CO., LTD. and JMS NORTH AMERICA CORPORATION,

Defendants-Cross Appellants,

and

ITL CORPORATION PTY, LTD.,

Defendant-Cross Appellant.

---------------------------------------------------------------------------------------

ITL CORPORATION PTY, LTD.,

Plaintiff-Cross Appellant,

v.

DSU MEDICAL CORPORATION,

Defendant-Appellant.

William J. O'Brien, Alschuler Grossman Stein & Kahan LLP, of Santa Monica, California, argued for plaintiffs-appellants.  Of counsel on the brief was Alan H. Blankenheimer, Heller Ehrman White & McAuliffe LLP, of San Diego, California.

Richard H. Zaitlen, Pillsbury Winthrop Shaw Pittman LLP, of Los Angeles, California, argued for defendants-cross appellants JMS Co., Ltd., et al.  With him on the brief were Julian D. Forman; and Kevin T. Kramer, of Washington, DC.  Of counsel were Ross R. Barton, of McLean, Virginia; and Blair M. Jacobs, Sutherland, Asbill & Brennan LLP, of Washington, DC.

-2-

Marc N. Bernstein, The Bernstein Law Group, of San Francisco, California, argued for defendant-cross appellant, ITL Corporation PTY, Ltd.  With him on the brief were Ronald P. Flynn and Sarah Botz.

Appealed from:  United States District Court for the Northern District of California

Senior Judge D. Lowell Jensen

# United States Court of Appeals for the Federal Circuit

04-1620, 05-1048, -1052

DSU MEDICAL CORPORATION and MEDISYSTEMS CORPORATION,

Plaintiffs-Appellants,

v.

JMS CO., LTD. and JMS NORTH AMERICA CORPORATION,

Defendants-Cross Appellants,

and

ITL CORPORATION PTY, LTD.,

Defendant-Cross Appellant.

-------------------------------------------------------------------------------------

ITL CORPORATION PTY, LTD.,

Plaintiff-Cross-Appellant,

v.

DSU MEDICAL CORPORATION,

Defendant-Appellant.

_____

DECIDED:  December 13, 2006
_____

Before RADER, SCHALL, and LINN, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> RADER.  Concurring opinion filed by <u>Chief Judge</u> MICHEL, and <u>Circuit Judge</u> MAYER on en banc Section III B.

RADER, Circuit Judge.

DSU Medical Corporation (DSU) and Medisystems Corporation (MDS) (collectively DSU) sued JMS Company, Limited (JMS) and JMS North America (collectively JMS) and ITL Corporation Pty, Limited (ITL) for patent infringement, inducement to infringe, and contributory infringement of United States Patent Nos. 5,112,311 ('311) and 5,266,072 ('072). After a six-week jury trial produced a unanimous verdict, the United States District Court for the Northern District of California entered a final judgment finding claims 46-47, and 50-52 of the '311 patent invalid as obvious. The trial court also entered a final judgment, pursuant to the unanimous verdict, of infringement against JMS and JMS North American on claims 49, 53, and 54 of the '311 patent, and of non-infringement for ITL. DSU Med. Corp. v. JMS Co., JMS N. Am. Corp., & ITL Corp. PTY, Nos. C-00-1826-DLJ, C-99-2690-DLJ, slip op. at 3-4 (N.D. Cal. May 7, 2004) (Judgment). The jury awarded total damages of $5,055,211 for infringement against JMS and JMS North America, and the trial court entered a final judgment holding both jointly and severally liable for the award. Finding no reversible error, this court affirms.

I.

The '311 and '072 patents claim a guarded, winged-needle assembly. The invention reduces the risk of accidental needle-stick injuries. Needle puncture wounds can transmit blood-borne diseases such as Hepatitis B and AIDS. The '311 and '072 patented inventions effectively guard standard winged-needle-sets to prevent needle-stick injuries.

04-1620, 05-1048,-1052                    2

The '311 patent claims a "slotted, locking guard for shielding a needle, and a winged needle assembly including a needle, a winged needle hub, and a slotted, locking guard." '311, col.1, l. 8-11.  This invention includes both "[a] slotted guard for locking a needle in a shielded position as the needle is removed from the patient", and "a guarded winged needle assembly . . . slidably mounted within the guard." Id., abstract.  Figures 5-6 illustrate one embodiment of the patented invention:



Figure 5 is a side view of a needle, winged needle hub (3), and slotted needle guard (1). '311 patent, col. 3, ll. 4-6.  In this depiction, the needle (5) remains retracted within the needle guard (1).  Id.  Figure 6 shows the same needle from above.  '311 patent, col. 3, ll. 7-10.

Mr. David Utterberg, a co-inventor of the '311 patent, owns DSU and MDS.  DSU owns the '311 patent; MDS has an exclusive license to make and sell the '311 invention for large-bore needles, including Arterial-Venous Fistula (AVF) sets used for dialysis and

aphaeresis.  MDS markets AVF needles under the brand names "MasterGuard" and "PointGuard."

The alleged infringing device, made by ITL (an Australian company) sells under the name Platypus™ Needle Guard (Platypus).  ITL manufactures the Platypus in Malaysia and Singapore.  The Platypus needle guard is a "stand-alone" product:  a small configured piece of plastic.  This plastic guard structure is not attached to any other device.   In other words, the Platypus does not include a needle, but only a sheathing structure.  Some claims of the '311 patent recite both a slotted guard and a guarded winged needle assembly.  Before use, the Platypus resembles an open clamshell (open-shell configuration).  During use, the halves of the clam shell close to form the needle guard (closed-shell configuration).  The following illustration shows the Platypus in open- and closed-shell configuration:



open-shell configuration        closed-shell configuration

Transcript of Record at 18685, 18629, <u>DSU Medical Corp. v. JMS Co., JMS North America Corp., & ITL Corp. PTY</u>, Nos. 04-1620, 05-1048, 05-1052 (Fed. Cir. Sept. 21, 2004) (<u>Transcript</u>).  The Platypus has an upper and a lower "jaw."  When closed, the upper jaw extends around and overlaps the inner, lower jaw.  During use, a medical

technician closes the Platypus and locks it around tubing connected to the winged needle assembly. When the technician removes the needle from a patient, the worker slides the guard down the tube until the needle assembly's wings meet and pry the jaws apart. The wings and their attached needle assembly slide into and through the guard, forcing the jaws ever wider as the wings make their way into a notched opening at the guard's back. Ultimately the wings slide into the rear opening. At that point, the jaws close around the used needle.

JMS is a large Japanese medical supply business that competes with MDS in the United States market. Beginning in June 1999, JMS purchased Platypus needle guards from ITL, entering into an agreement to distribute the Platypus worldwide (the Supply Agreement). Under the Supply Agreement, JMS bought open-shell configuration Platypus guard units from ITL in Singapore and Malaysia. JMS generally closed the Platypus guards around needle sets before distributing them to customers.

DSU alleges that the Platypus infringes the '311 patent. DSU also alleges that JMS and ITL contributed to and induced each other's infringement. JMS sought to sell ITL's infringing Platypus until it could produce its substitute non-infringing product, the WingEater. ITL offered to supply its infringing Platypus. DSU additionally seeks damages from JMS because it "stole" MDS's ability to renew a MasterGuard exclusive license with a former customer, Fresenius USA Manufacturing, Inc. (Fresenius).

II.

On February 5, 2001, the trial court entered a claim construction order. <u>DSU Med. Corp. v. JMS Co., JMS N. Am. Corp., & ITL Corp. PTY</u>, Nos. C-00-1826-DLJ, C-99-2690-DLJ (N.D. Cal. Feb. 5, 2001) (<u>Claim Construction Order</u>). This court reviews claim

construction without deference. <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 340 (1996).  "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citing <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("We look to the words of the claims themselves . . . to define the scope of the patented invention")).  This court recently enunciated predominant claim construction principles in <u>Phillips</u>.  415 F.3d at 1312-24.

The trial court construed "slidably enclosing" in claim 1 of the '311 patent:

1.  A guard <u>slidably enclosing</u> a sliding assembly comprising a needle and a winged needle hub . . . .

'311 patent, col. 15, ll. 46-47 (emphasis added).  The trial court concluded that this term in claim 1 "requires that the guard substantially contain the needle-assembly at all times." <u>Claim Construction Order</u>, slip op. at 9.  Because the Platypus is a "stand-alone guard" without a needle, the trial court granted summary judgment of non-infringement to the defendants on multiple claims.[1]  <u>Id.</u>, slip op. at 15-19.

The language and context of the claims support the trial court's construction of "<u>slidably enclosing</u> a sliding assembly."  Again, the trial court read the claim to require that the guard substantially contain the needle-assembly at all times.  <u>Claim Construction Order</u>, slip op. at 9.  In the first place, claim 1 expressly recites the presence of a needle as part of the sliding assembly.  Thus, the claimed "assembly" would not be complete without a needle.  The claim also uses the term "enclosing."  In the context of an invention "for locking a needle in a shielded position as the needle is removed from a

---

[1]    The trial court granted a summary judgment of non-infringement on claims 1, 4-9, 12, 19, 20, 22-23 of the '311 patent, and on claims 1, 6, and 7 of the '072 patent.

patient," that language suggests constant shielding or covering of the sharp.  '311 patent, col. 2, ll. 8-9.  The specification reinforces that suggestion:

> [T]he guard is folded about its hinge position and locked . . . into a generally cylindrical, folded configuration. Alternatively, the guard may be molded . . . to enclose a sliding hub/needle assembly that has been positioned between the two pieces.

'311 patent, col. 2, ll. 53-58.  By emphasizing that the guard is locked in a protective configuration, or molded to enclose the needle assembly, the specification conveys the concept of a permanent cover for the needle.  Indeed, the figures in the specification show a completely enclosed, and thus guarded, needle.  Figures 15-19 also show the needle hub as permanently housed in the guard.  '311 patent, figures 15-19.  The trial court also methodically considered and rejected each of DSU's arguments that the term means only generally surrounding the needle and hub.  Claim Construction Order, slip. op. 8-15.  This court concurs in the district court's analysis.

The court also construed "slot," as used in claims 1, 46, and 52.  Claim Construction Order, slip op. at 19-24.  The relevant portion of claim 46 is:

> 46. A guard for slidably enclosing a sliding assembly . . . said guard comprising . . .

> a hollow member proportioned for receiving said needle and winged needle hub, said hollow member defining at least one longitudinal slot proportioned to receive a wing of said needle hub projecting outwardly through the slot when the needle hub resides within the hollow member in sliding relation thereto, and means, associated with the hollow member, for engaging said wing projecting through said slot when the needle and hub are in a slidingly retracted position in which the needle is enclosed by the hollow member for locking said needle hub and needle in said retracted position.

'311 patent, col. 20, ll. 20-39 (emphases added).   Claim 52 is:

52. The guard of claim 46 in which said <u>slot</u> extends in a longitudinal direction through one end of said hollow member, to provide sliding access to said wing.

'311 patent, col. 20, ll. 63-65 (emphasis added). The trial court held that the term did not require "a defined width." <u>Claim Construction Order</u>, slip op. at 19. Later the district court, at the request of defendants, clarified that "'[s]lot' shall mean 'an opening in the guard capable of receiving a wing that projects through the opening and having both an upper edge and a lower edge that are defined by the sidewall of the guard.'" <u>DSU Med. Corp. v. JMS Co., JMS N. Am. Corp., & ITL Corp. PTY</u>, Nos. C-00-1826-DLJ, C-99-2690-DLJ (N.D. Cal. Apr. 30, 2001) (<u>Construction Clarification Order I</u>). In claim 46, because "proportioned to receive" modifies "slot," the trial court explained that "slot" "shall mean 'sized relative to the wing so that the wing extends through the slot when the hub is within the hollow member and so said slot can accommodate the wing's movement as it translates the length of the slot.'" <u>Id.</u>; <u>see also</u> <u>DSU Med. Corp. v. JMS Co., JMS N. Am. Corp., & ITL Corp. PTY</u>, Nos. C-00-1826-DLJ, C-99-2690-DLJ, slip op. at 29 (N.D. Cal. Jan 16, 2002) (<u>Construction Clarification II & SJ Order</u>).

The trial court identified the crux of the dispute over "slot" as "whether . . . the slots for the wings should have defined widths closely approximating the wings' thickness." <u>Construction Clarification Order I</u>, slip op. at 19. If "slot" limits the size of the opening to accommodate the "minor" thickness of the '311 patent's wings, the Platypus would not infringe because its jaws accommodate any thickness. <u>Claim Construction Order</u>, slip op. at 19. On the other hand, if "slot" contains no thickness limitation, the Platypus would infringe because it opens to receive a wing of any size. <u>Id.</u>, at 19.

The claim language recites only "slot." Thus, the claim itself does not incorporate any thickness limitation. Moreover, the specification provided no size limitation on the opening. In a tribute to its complete analysis, the trial court went beyond those primary sources to also consult the prosecution history. Phillips, 415 F.3d at 1317 (a court "should also consider the patent's prosecution history, if it is in evidence"). The record before the Patent Office shows that the patentees amended the claims of Application Serial Number 252,564, which is the application from which the '311 patent (and '072 patent) derived, to avoid U.S. Patent No. 4,840,619 (Hughes Patent).

In amending the claims to avoid the Hughes Patent, however, the applicant did not limit the size of the slot, as argued by JMS and ITL. The amendments concerned only the orientation of the needle wings that moved back and forth through the slot. To distinguish the Hughes Patent, the patentee did not have to, and did not actually, limit the width of the slot. Thus, the trial court correctly construed "slot" as not requiring a defined width, as long as it was capable of receiving a wing. Construction Clarification Order I, slip op. at 14.

Under this claim construction, the trial court found that "as a matter of law, every reasonable jury would find that there is a slot in the [Platypus] closed-shell configuration." Construction Clarification II & SJ Order, slip op. at 29. Therefore, the trial court held that when sold in the United States in its "closed-shell" configuration, the Platypus literally infringed claims 46–47, 49, and 52–53 of '311 patent, when closed over the tubing of a needle-set. Id.

Viewing the evidence in the light most favorable to the nonmoving party, this court holds that the trial court correctly concluded that the closed-shell configuration of the

Platypus does have a slot. As applied to the Platypus, its slot is an opening in a needle guard capable of receiving a wing that projects through the opening. Further, the slot has both an upper edge and a lower edge defined by the sidewall of the guard. The Platypus's slot is also sized relative to the wing and can accommodate the needle wing as it moves through the length of the slot. Furthermore, the Platypus contains the other limitations of claims 46–47, 49, and 52–53 of the '311 patent. Therefore, in its closed-shell configuration, the Platypus does infringe claims 46–47, 49, and 52–53 of the '311 patent. This court affirms the trial court's summary judgment ruling.

III.

The jury found that JMS North America and JMS directly and contributorily infringed, and that JMS additionally induced JMS North America to infringe. Transcript, at 453. However, the jury returned a verdict of non-infringement in favor of ITL. Id., at 453-54. The jury entered a verdict finding that ITL did not engage in contributory infringement or inducement to infringe. Id., at 453. The trial court denied DSU's motion for new trial on the jury's verdict that ITL did not contributorily infringe or induce infringement. This court reviews a denial of a motion for a new trial after a jury trial for an abuse of discretion. Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1258 (Fed. Cir. 2004) (citing De Saracho v. Custom Food Mach., Inc., 206 F.3d 874, 880 (9th Cir. 2000)).

A.

On appeal, DSU argues that ITL committed contributory infringement. According to DSU, the Platypus, which ITL sold to JMS, had no substantial noninfringing use. Therefore, DSU argues, ITL committed contributory infringement as a matter of law. ITL

responds that it made and sold "most Platypus guards" outside of the United States. ITL

also contends that the record contains no evidence that the Platypus was used in an

infringing manner in the United States.

> The Platypus sets that came into the United States fall within three categories:
>
> (1) JMS imported into the United States approximately 30 million Platypus guards that, prior to importation into the United States, it had already assembled into the closed-shell configuration, combined with needle sets. These units accounted for the vast majority of Platypus sales in the United States.
>
> (2) Fresenius purchased approximately 3.5 million Platypus guards, in the open-shell configuration without needle sets. ITL billed JMS for the shipments and shipped them to Fresenius in the United States at JMS's request. Fresenius ultimately decided that guards without needle sets did not meet FDA regulations, and it returned about 3 million.
>
> (3) ITL sent approximately 15,000 Platypus in the open-shell configuration to JMS in San Francisco. DSU introduced no evidence that those units were ever put into the closed-shell configuration in the United States.

Additionally, the record contained evidence that when instructed to do so by JMS, ITL

would ship Platypus guard units F.O.B. into the United States. The record also shows,

however, that ITL only sold the Platypus in its open-shell configuration.

> Therefore, this court must determine whether the jury's verdict is against the clear

weight of the evidence. Under § 271(c):

> [w]hoever offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition . . . constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c) (2000) (emphases added). In discussing 35 U.S.C. § 271(c), the

Supreme Court stated:

> One who makes and sells articles which are only adapted to be used in a patented combination will be presumed to intend the natural consequences

of his acts; he will be presumed to intend that they shall be used in the combination of the patent.

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 125 S. Ct. 2764, 2777 (2005). In addition, the patentee always has the burden to show direct infringement for each instance of indirect infringement. Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004); Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993) ("Liability for either active inducement of infringement or contributory infringement is dependent upon the existence of direct infringement."). Thus, to prevail on contributory infringement, DSU must have shown that ITL made and sold the Platypus, that the Platypus has no substantial non-infringing uses in its closed-shell configuration, that ITL engaged in conduct (made sales) within the United States that contributed to another's direct infringement, and that JMS engaged in an act of direct infringement on those sales that ITL made in the United States.

The trial court properly applied these legal principles. The trial court determined that the record showed that ITL supplied the Platypus, that the Platypus had no substantial non-infringing uses in its closed-shell configuration, and that ITL intended to make the Platypus that resulted in the potential for contributory infringement as a product designed for use in the patented combination. DSU Med. Corp. v. JMS Co., JMS N. Am. Corp., & ITL Corp. PTY, Nos. C-00-1826-DLJ, C-99-2690-DLJ, slip op. at 1-3 (N.D. Cal. Sept. 20, 2004) (Post Trial Motions' Order). In fact, even beyond the minimal intent requirement for contributory infringement, ITL acted with the knowledge of the '311 patent and knowledge that the component was especially made or adapted for use in an infringing manner. Id., slip op. at 22-24. However, the district court denied the motion for a new trial because the record does not show that "the alleged contributory act ha[d] a

direct nexus to a specific act of direct infringement." Id., slip op. at 25.  In denying the

new trial, the court stated:

> And while it is true that Plaintiffs introduced evidence that "ITL sold and
> shipped millions of 'stand alone' guards directly to United States
> customers, including JMS [North America] and end-users like Fresenius,"
> there was no direct evidence at trial establishing that these guards were
> actually closed and used as an act of direct infringement in the United
> States.

Id., slip op. at 26.

Upon review of the record, this court perceives, as well, an absence of evidence of

direct infringement to which ITL contributed in the United States.  Under the terms of the

'311 patent, the Platypus only infringes in the closed-shell configuration.  When open, the

Platypus, for instance, lacks a "slot" as well as other claimed features.  ITL only

contributed to placing the Platypus into the closed-shell configuration in Malaysia

(category 1, above); not in the United States.  Section 271(c) has a territorial limitation

requiring contributory acts to occur in the United States.  Furthermore, this court cannot

reverse a jury verdict of non-infringement on mere inferences that the Platypus guard

units sold in the United States (i.e., the open-shell configuration in categories 2 and 3,

above) were put into the infringing closed-shell configuration.  The record does not show

that the Platypus guards ITL shipped into the United States in the open-shell

configuration were ever put into an infringing configuration, i.e., closed-shell.  On

categories 2 and 3, above, the record contains no evidence of direct infringement, i.e.,

that the open-shell Platypus guards imported by ITL were sold or used in their closed-

shell configuration.  As a result, the trial court did not abuse its discretion in denying

DSU's motion for new trial on ITL's contributory infringement.

On the issue of induced infringement, DSU argues that ITL induced infringement by inducing JMS to sell the closed-shell configuration in the United States. The district court denied DSU's motion for a new trial on the ground that, although JMS directly infringed, ITL did not intend JMS to infringe.

B.

RESOLUTION OF CONFLICTING PRECEDENT

Section III. B., only, is considered en banc.

Opinion for the court filed by Circuit Judge RADER, with NEWMAN, LOURIE, SCHALL, BRYSON, GAJARSA, LINN, DYK, PROST, and MOORE, Circuit Judges, join. Concurring opinion filed by MICHEL, Chief Judge, and MAYER, Circuit Judge.

This court addresses Part III. B., of this opinion en banc. This section addresses, in the context of induced infringement, "the required intent . . . to induce the specific acts of [infringement] or additionally to cause an infringement." MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1378 n.4 (Fed. Cir. 2005) (citing MercExchange, L.L.C. v. eBay, Inc., 401 F.3d 1323, 1332 (Fed. Cir. 2005)). This section clarifies that intent requirement by holding en banc that, as was stated in Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 554 (Fed. Cir. 1990), "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent. See Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354, 1364 n.4 (Fed. Cir. 2006) (citing Manville and explaining that the inducing infringement standard

was satisfied "because it is undisputed that [the alleged infringer] had notice of the patent").

DSU claims the district court improperly instructed the jury on the state of mind necessary to prove inducement to infringe under 35 U.S.C. § 271(b). This court reviews the legal sufficiency of jury instructions on an issue of patent law without deference to the district court. Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000). "This Court reviews jury instructions in their entirety and 'only orders a new trial when errors in the instructions as a whole clearly mislead the jury.'" Chiron, 363 F.3d at 1258 (quoting Delta-X Corp. v. Baker Hughes Prod. Tools, Inc., 984 F.2d 410, 415 (Fed. Cir. 1993)).

Under section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they "actively and knowingly aid[ed] and abett[ed] another's direct infringement." Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir. 1988) (emphasis in original). However, "knowledge of the acts alleged to constitute infringement" is not enough. Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363 (Fed. Cir. 2003) (citation omitted). The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." Id. at 1364 (citing Manville, 917 F.2d at 554).

DSU asked the court to instruct the jury, purportedly in accordance with Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464 (Fed. Cir. 1990), that to induce

infringement, the inducer need only intend to cause the <u>acts</u> of the third party that

constitute direct infringement.  The trial court gave the following instruction to the jury:

> In order to induce infringement, there must first be an act of direct
> infringement and proof that the defendant knowingly induced infringement
> with the intent to encourage the infringement.  The defendant must have
> intended to cause the acts that constitute the direct infringement and must
> have known or should have known than[sic] its action would cause the
> direct infringement.  Unlike direct infringement, which must take place
> within the United States, induced infringement does not require any
> activity by the indirect infringer in this country, as long as the direct
> infringement occurs here.

<u>Transcript</u>, at 432.  Thus, the court charged the jury in accordance with <u>Manville</u>.  The

statute does not define whether the purported infringer must intend to induce the

infringement or whether the purported infringer must merely intend to engage in the acts

that induce the infringement regardless of whether it knows it is causing another to

infringe.  DSU complains that the instruction is incorrect because it requires that the

inducer possess specific intent to encourage another's infringement, and not merely that

the inducer had knowledge of the acts alleged to constitute infringement.[2]

In <u>Grokster</u>, which was a copyright case, the Supreme Court cited with approval

this court's decision in <u>Water Technologies</u> when it discussed inducement of

infringement, stating:

> The rule on inducement of infringement as developed in the early
> cases is no different today.  Evidence of "active steps . . . taken to
> encourage direct infringement," such as advertising an infringing use or
> instructing how to engage in an infringing use, show an affirmative intent
> that the product be used to infringe, and a showing that infringement was
> encouraged overcomes the law's reluctance to find liability when a

---

[2]    In <u>Hewlett-Packard Co. v. Bausch & Lomb, Inc.</u>, 909 F.2d 1464, 1469 (Fed.
Cir. 1990), this court stated that "[p]roof of actual intent to cause the acts which constitute
infringement is a necessary prerequisite to finding active infringement."  DSU reads this
statement as standing for the proposition that proof of intent to cause infringing acts is all
that is required in order to establish inducement of infringement.

> defendant merely sells a commercial product suitable for some lawful
> use.

Grokster, 125 S. Ct. at 2779 (citation and footnote omitted).  As a result, if an entity offers

a product with the object of promoting its use to infringe, as shown by clear expression or

other affirmative steps taken to foster infringement, it is then liable for the resulting acts

of infringement by third parties.  Id. at 2780.  "The inducement rule . . . premises liability

on purposeful, culpable expression and conduct . . . ."  Id.

Grokster, thus, validates this court's articulation of the state of mind requirement

for inducement.  See Manville, 917 F.2d at 544.  In Manville, this court held that the

"alleged infringer must be shown . . . to have knowingly induced infringement," 917 F.2d

at 553, not merely knowingly induced the acts that constitute direct infringement.  This

court explained its "knowing" requirement:

> It must be established that the defendant possessed specific intent to
> encourage another's infringement and not merely that the defendant had
> knowledge of the acts alleged to constitute inducement.  The plaintiff has
> the burden of showing that the alleged infringer's actions induced
> infringing acts and that he knew or should have known his actions would
> induce actual infringements.

Id. at 553.  In Water Technologies, also cited with approval by the Supreme Court, 125 S.

Ct. at 2779, this court clarified:  "While proof of intent is necessary, direct evidence is not

required; rather, circumstantial evidence may suffice."  850 F.2d at 668.[3]  Although this

court stated "that proof of actual intent to cause the acts which constitute the

infringement is a necessary prerequisite to finding active inducement," Hewlett-Packard,

---

[3]    See also nCube Corp. v. Seachange Int'l, Inc., 436 F.3d 1317, 1325 (Fed.
Cir. 2006) (This court noted that "at least . . . the alleged inducer had [to have] knowledge
of the infringing acts," which included evidence of SeaChange's intent that its customers
use the ITV systems it sold with Scientific-Atlanta equipment to perform the patented
method.)

909 F.2d at 1469, Grokster has clarified that the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement. In the words of a recent decision, inducement requires "'that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'" MEMC Elec., 420 F.3d at 1378 (Fed. Cir. 2005) (quoting Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1304-05 (Fed. Cir. 2002)). Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities. Grokster, 125 S. Ct. at 2780; Manville, 917 F.2d at 553. Accordingly, the district court correctly instructed the jury in this case.

C.

The district court denied DSU's motion for a new trial on the issue of inducement to infringe. This court reviews a denial of a motion for a new trial after a jury trial for abuse of discretion, affirming on any basis that supports the verdict. Chiron, 363 F.3d at 1258. In denying the motion for new trial, the trial court stated:

> Fundamental principles of law hold that it is up to the jury to make determinations of witness credibility, to decide the existence of any factual inferences, and to determine the weight to be attributed to any direct or indirect evidence. Although Plaintiffs introduced circumstantial evidence which permitted inferences of ITL's intentions, it is up to the Jury to decide whether or not to draw any inference and to consider the weight of any such evidence. Assessing competing evidence is what the law asks juries to do, and the Court declines to take over this fundamental role of the Jury.

Post Trial Motions Order, slip op. at 15. The jury heard evidence about the commercial transactions between ITL and JMS, including JMS's intention to sell ITL's Platypus to Fresenius until JMS could get its own WingEater approved by the Food and Drug

Administration (FDA) and ready for market.  The jury also heard evidence that Mr. Utterberg's lawyer informed ITL in January 1997 that the Platypus infringed the '311 patent.  Additionally, the jury learned that ITL contacted an Australian attorney, who concluded that its Platypus would not infringe.  JMS and ITL then also obtained letters from U.S. patent counsel advising that the Platypus did not infringe.  Mr. William Mobbs, one of the owners of ITL who had participated in the design of the Platypus, testified that ITL had no intent to infringe the '311 patent.  Post Trial Motions Order, slip op. at 15.

Thus, on this record, the jury was well within the law to conclude that ITL did not induce JMS to infringe by purposefully and culpably encouraging JMS's infringement.  To the contrary, the record contains evidence that ITL did not believe its Platypus infringed.  Therefore, it had no intent to infringe.  Accordingly, the record supports the jury's verdict based on the evidence showing a lack of the necessary specific intent.  The trial court certainly did not abuse its discretion.

IV.

Based on a finding that MDS became the exclusive licensee of the '311 patent on July 17, 2001, the jury awarded MDS lost profit damages in the amount of $4,400,000.  Transcript, at 455.  It also awarded DSU a reasonably royalty for sales of the Platypus, at a rate of 5¢ per unit, totaling $655,211.  Id. at 456.

DSU appeals the trial court's denial of its motion for a new trial on price erosion damages and for three additional months of lost profits damages.  Post Trial Motions Order, slip op. at 67.  This court reviews a district court's denial of a motion for a new trial on the amount of damages for an abuse of discretion.  Micro Chem., Inc. v. Lextron, Inc.,

317 F.3d 1387, 1394 (Fed. Cir. 2003); Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995).

### A.

DSU complains that it was entitled to a new trial because the jury did not award its requested price erosion damages. On these points, the verdict form does not segregate the damages award into categories beyond lost profits and reasonable royalties. However, the jury had before it evidence of price erosion. Accordingly, this court has no basis to speculate that the jury did not award price erosion damages as part of its lost profits or reasonable royalty analysis. Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l, Inc., 246 F.3d 1336, 1360 (Fed. Cir. 2001). The trial court properly denied DSU's motion for new trial on price erosion damages.

DSU also complains that it deserves a new trial because the jury should have decided that MDS was an exclusive licensee on April 5, 2001. The jury entered a verdict that the date on which MDS became an exclusive licensee of DSU, and thus, the date on which it would be entitled to collect infringement damages, was July 17, 2001. The trial court allowed the jury to make this determination, instructing it that MDS became an exclusive licensee of the '311 patent sometime between April 5, 2001 and July 17, 2001. Substantial evidence supports the jury's decision to reject any contract between MDS and DSU earlier than July 17, 2001. The jury was free to determine, for instance, that Mr. Utterberg's testimony on this point was simply not credible. Mr. Utterberg testified that he "shook hands with himself" on an earlier date—as president and sole owner of both contracting parties. Post Trial Motions Order, slip op. at 56-57. At other times, however, he also contradicted himself and undermined the suggestion that a contract

was entered into earlier than July 17, 2001.  Id. at 57.  Thus, the trial court did not abuse its discretion in denying a new trial on the date of the contract.

B.

The trial court excluded testimony from DSU's expert witness, Dr. Stephen A. Degnan, on "the hypothetical existence or hypothetical terms of a contract between [MDS] and Fresenius . . . [and] as to any calculation or measure of patent infringement damages based upon any sale of the WingEater needle guard." DSU Med. Corp. v. JMS Co., 296 F. Supp. 2d 1140, 1159 (N.D. Cal. 2003) (In Limine Order).  According to DSU, JMS's infringement interfered with MDS's "decade-long" contractual relationship with Fresenius.  Specifically, MDS contended that JMS used sales of the infringing Platypus guard to "steal" the contract with Fresenius, with the intent to later replace the infringing Platypus with its non-infringing WingEater.  Thus, MDS sought lost profit damages, not only for the award it received from lost sales to the infringing Platypus, but also for sales it lost to the non-infringing WingEater.  The trial court disallowed Dr. Degnan's testimony on this subject because "sales of acceptable noninfringing substitute products [could not] be the basis of legally compensable patent damages," and the WingEater was an acceptable noninfringing substitute for the patented products.  Id.

Although reviewing a district court's "Daubert" ruling to exclude testimony for an abuse of discretion, this court reviews eligibility for lost profits damages without deference.  Micro Chem., 317 F.3d at 1391 (decision to admit expert testimony reviewed under regional circuit law); Genentech, Inc. v. Amgen, Inc., 289 F.3d 761, 768 (Fed. Cir. 2002) (Ninth Circuit reviews evidentiary rulings for abuse of discretion); Rite Hite Corp. v.

Kelley Co., 56 F.3d 1538, 1544 (Fed. Cir. 1995) (whether the lost profits are legally compensable is a question of law this court reviews de novo).

As noted above, the trial court reasoned that MDS "cannot be awarded lost profit damages based upon any sale by the defendant of the noninfringing WingEater needle guard." In Limine Order, 296 F. Supp. 2d at 1156. It also reasoned that Dr. Degnan's proffered methodology, "requiring inter alia hypothesized terms in hypothesized contracts, is not grounded on established legal principle and is far too remote factually to be within the line drawn for legally compensable patent injuries." Id. Specifically, the trial court faulted Dr. Degnan's "accelerated market entry" notion that MDS would have captured the market in advance of the introduction of the WingEater, but for the infringing sales of the Platypus. Id. at 1151.

MDS, however, also argues that the foreseeability principle in Rite-Hite supports its case for lost profits on the WingEater. While it may be possible for an infringement to have a foreseeable, and therefore compensable, effect on future contracts, the trial court was correct to perceive that it could not occur when the future contract was itself for a non-infringing substitute. In Grain Processing Corp. v. American Maize-Prods. Co., 185 F.3d 1341 (Fed. Cir. 1999), this court observed that "[m]arket sales of an acceptable noninfringing substitute often suffice alone to defeat a case for lost profits." Id. at 1352. Indeed in Grain Processing, as in this case, the noninfringing substitute that defeated the claim for lost profits was not yet offered for sale in the marketplace. Id. at 1354-55. Here, Dr. Degnan admitted that the WingEater was available in October 2001, and the FDA approved the WingEater for sale on June 20, 2001. Thus, Dr. Degnan's failure to

consider the effect of the availability of the WingEater supports the trial court's exclusion of the hypothetical contract theory.

In addition, Grain Processing stands for another proposition as well: "To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement out of the picture." 185 F.3d at 1350. Indeed, the concept of sound economic proof requires some grounding in "sound economic and factual predicates." Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002). The trial court perceived that Dr. Degnan did not ground his "accelerated market entry" theory in sound economic principle. The trial court perceived that Dr. Degnan relied too heavily on hypothesized contracts in hypothesized markets that lacked sound economic grounding. While damages analysis invariably involves hypothetical reconstruction of a "but for" marketplace, that reconstruction must include some footing in economic principle, which the trial court found lacking. Thus, this court detects no abuse of discretion in the trial court's exclusion of Dr. Degnan's testimony on lost profits damages.

V.

The trial court denied JMS's and ITL's motions for Judgment as a Matter of Law (JMOL) contesting the $4.4 million award for lack of support with substantial evidence. Post Trial Motions Order, slip op. at 55. This court reviews a trial court's JMOL rulings after a jury verdict by reapplying the district court's own standard. Applied Med. Res. Corp. v. United States Surgical Corp., 147 F.3d 1374, 1376 (Fed. Cir. 1998). To prevail on appeal, JMS and ITL must show that substantial evidence does not support the jury's

factual findings or that the trial court erred in applying the law on JMOL motions. <u>Perkin-Elmer Corp. v. Computervision Corp.</u>, 732 F.2d 888, 893 (Fed. Cir. 1984).

This court sustains a jury's award of damages "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." <u>Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.</u>, 249 F.3d 1341, 1355 (Fed. Cir. 2001). The jury was accorded discretion to resolve conflicts in the evidence of damages. <u>Brooktree Corp. v. Advanced Micro Devices, Inc.</u>, 977 F.2d 1555, 1580 (Fed. Cir. 1992). Moreover, this court will resolve "any doubts about the amount . . . against the infringer." <u>Kalman v. Berlyn Corp.</u>, 914 F.2d 1473, 1482 (Fed. Cir. 1990) (quoting <u>Ryco, Inc. v. Ag-Bag Corp.</u>, 857 F.2d 1418, 1428 (Fed. Cir. 1988)).

In an attempt to question the jury's lost profits verdict, JMS attempts to suggest that the market included numerous other noninfringing alternatives to the Platypus. Nevertheless, the jury awarded MDS lost profits beginning April 17, 2001. JMS acknowledged that it could not bring a guarded needle to the market by that date. JMS acknowledged that, as a result of its inability to bring its own guarded needle to market by that date, MDS could tie-up customers with multi-year MasterGuard contracts. Thus, even though the FDA approved the WingEater for sale in June 2001, it could not have replaced any sales of the patented invention, according to JMS's own admission, until its first commercial sale in October 2001. Furthermore, DSU provided evidence that no other non-infringing alternatives were acceptable during the necessary time periods. Though Nipro Medical Corporation distributed a guarded needle set called the "SafeTouch," it had design flaws that led to two FDA-published recalls, and prior to recall,

it had limited geographical distribution and unsatisfactory manufacturing capacity. Though Diasol Inc. distributed, in the United States, a guarded needle set called the "Shelly," an independent rating agency (Emergency Care Research Insitute)[4] called Diasol's "Shelly" "unacceptable." In Limine Order, slip op. at 16. The record also shows that the "Shelly" sold only in very small quantities, and was not available to distributors like Fresenius.

Thus, substantial evidence supports the jury award for lost profits due to lost sales to the infringing Platypus guard. Further, this court does not perceive that the jury award is grossly excessive or monstrous, or based only on speculation or guesswork.

VI.

DSU also appeals the denial of all of its motions for new trial on various of the trial court's evidentiary rulings. Post Trial Motions' Order, slip op. at 3-4. DSU based its motions on a variety of alleged errors in admitting or excluding evidence. For instance, DSU faults the district court for admitting the testimony of Mr. Timothy Erskine on the question of obviousness of the '311 patent, for admitting evidence about the prosecution history of the related '072 patent, and for excluding evidence of ITL's patent infringement insurance from the consideration of willfulness. The Ninth Circuit reviews "decisions regarding admission of evidence for abuse of discretion," Rogers v. Raymark Indus., Inc., 922 F.2d 1426, 1429 (9th Cir. 1991) (citing Daily Herald Co. v. Munro, 838 F.2d 380, 388 (9th Cir. 1988)). This court detects no abuse of discretion in any of these rulings.

---

[4]    Emergency Care Research Institute is a non-profit health services research agency that has been providing information and technical assistance to the healthcare community to support safe and cost-effective patient care for over 30 years. It has been called the "Consumer Reports for medical devices" and the "preeminent source for healthcare risk management information and advice."

DSU also asserts that the jury's verdict, finding claims 46-47 and 50-52 obvious, is against the great weight of the evidence.  However, the lengthy trial record showed that the prior art contained all elements of claims 46-47, 50-52 of the '311 patent.  This record includes: the testimony of Mr. Erskine; United States Patent No. 4,935,012 (Magre patent) and United States Patent No. 3,572,334, which disclose every element of '311 patent's claims 46, and 50-51; the Magre patent and United States Patent No. 3,463,152, which disclose every element of '311 patent's claims 46-47 and 50; the Magre patent and United States Patent No. 4,170,933, which disclose every element of claim 46; and the Magre patent and the Hughes patent, which disclose every element of claims 46-47 and 52.    The record also showed evidence of adequate motivation to combine these references to reach a decision of obviousness.  In addition, the jury heard adequate evidence on the objective indicia of non-obviousness.  As a result, substantial evidence supports the obviousness verdict.  The trial court properly denied a new trial on this basis as well.

DSU also appeals the trial court's response to a question from the jury during jury deliberations.  During deliberations, the jury requested a clarification on the hindsight jury instruction.  Transcript, at 14984-85, 15019, 15036.  The trial court responded by referring the jury back to the jury instructions on invalidity.  Id. at 14985, 15019.  Both parties had earlier accepted those instructions.  Thus, the trial court did not abuse its "wide discretion" in responding to a jury question.  Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003).

VII.

In conclusion, this court affirms the trial court's grant of summary judgment of non-infringement on the combination claims (combination of guard and needle assembly) and on the open-shell configuration of the stand-alone claims.  This court affirms the trial court's evidentiary rulings.  This court also affirms the trial court's denial of all of the post-trial motions, affirming entry of the final judgment in its entirety.

COSTS

Each party shall bear its own costs.

<u>AFFIRMED</u>

# United States Court of Appeals for the Federal Circuit

04-1620, 05-1048, -1052

DSU MEDICAL CORPORATION and MEDISYSTEMS CORPORATION,

Plaintiff-Appellants,

v.

JMS CO., LTD. and JMS NORTH AMERICA CORPORATION,

Defendant-Cross-Appellants,

and

ITL CORPORATION PTY, LTD.,

Defendant-Cross-Appellant.

-----------------------------------------------------------------------------------

ITL CORPORATION PTY, LTD.,

Plaintiff-Cross-Appellant,

v.

DSU MEDICAL CORPORATION,

Defendant-Appellant,

MICHEL, Chief Judge, and MAYER, Circuit Judge, concurring.

Although we agree with the court's analysis in Section III.B, we do not consider it necessary to address this issue en banc. DSU misreads Hewlett-Packard as if we had said "proof of actual intent to cause the acts which constitute the infringement is a necessary and sufficient prerequisite to finding active inducement," but we did not.

There is no actual conflict between <u>Hewlett-Packard</u> and <u>Manville</u> and, thus, no need for intervention by the full court. Such rare intervention should be reserved for real conflicts as well as cases of exceptional importance. <u>See</u> Fed. R. App. P. 35(a). In our opinion, the panel was free to conclude that the district court correctly rejected DSU's proffered jury instruction because, misunderstanding <u>Hewlett-Packard</u>, DSU did not correctly state the law.

Moreover, we write to make clear that we do not set forth a new standard here as to what satisfies the "knowledge of the patent" requirement in cases brought under 35 U.S.C. § 271(b). <u>See, e.g.</u>, <u>Insituform Techs., Inc. v. CAT Contr. Inc.</u>, 161 F.3d 688, 695 (Fed. Cir. 1998) (analyzing section 271(b) liability under both actual and constructive knowledge standards). There is no dispute that ITL Corporation Pty, Ltd., had actual knowledge of United States Patent No. 5,112,311. Accordingly, the "knowledge of the patent" issue is not before us.

## Hubred, Kelly A.

| | |
|---|---|
| **From:** | Allaband, Donna [DAllaband@MNAT.com] |
| **Sent:** | Wednesday, January 24, 2007 4:19 PM |
| **To:** | McKenna, Alan E.; Allaband, Donna; Softich, Amy N.; Froio, Anthony A.; Ketterling, Carrie R.; Rahne, Denise S.; Prentice, Emily J.; Granovsky, Maria; Grimm, Thomas; Madia, J. Ashwin; McDiarmid, Jeremy C.; Lemke, Deborah; Leslie A. Polizoti; Woods, Matthew L.; Okerlund, Michael D.; MNAT Internal; Mull, Kadra; Surdo, Peter N.; Oberts, Stacie E.; Gustafson, Stacy D. |
| **Subject:** | Honeywell/Apple 04-1338: Letter from Grimm to Judge Thynge re: strategies (D.I. 693) |
| **Attachments:** | 012407 Grimm to Thynge.pdf; 012407 DSU v. JMS.pdf |

On behalf of Thomas C. Grimm and Leslie Polizoti, attached please find the above-referenced letter and its attachment:

Letter to Judge Thynge       Attachment (case)
    <<012407 Grimm to Thynge.pdf>>        <<012407 DSU v. JMS.pdf>>
**Docket Text:**
Letter to The Honorable Mary Pat Thynge from Thomas C. Grimm regarding strategies for the efficient handling of the remainder of the case - re [688] Order Setting Teleconference. (Attachments: # (1) DSU Med. Corp. v. JMS Co., Ltd.)(Grimm, Thomas)

*Donna L. Allaband*
*Administrative Assistant*
*MORRIS, NICHOLS, ARSHT & TUNNELL LLP*
*1201 N. Market Street, P.O. Box 1347*
*Wilmington, DE 19899-1347*
*Direct: 302-351-9251*
*Fax: 302-658-3989*

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

# EXHIBIT N

1            IN THE UNITED STATES DISTRICT COURT
             IN AND FOR THE DISTRICT OF DELAWARE
2
                              - - -
3
     HONEYWELL INTERNATIONAL, INC.,        :    CIVIL ACTION
4    et al.                                 :
                                            :
5                      Plaintiffs,          :
                                            :
6              v.                           :
                                            :
7    APPLE COMPUTER, INC.,  et al.,         :
                                            :
8                      Defendants.          :    NO. 04-1338 (***)

9                              - - -

10                     Wilmington, Delaware
               Thursday, January 25, 2007 at 3:02 p.m.
11                     TELEPHONE CONFERENCE

12                             - - -

13   BEFORE:   HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE

14                             - - -

     APPEARANCES:
15

16           MORRIS NICHOLS ARSHT & TUNNELL
             BY:  THOMAS C. GRIMM, ESQ.
17
                     and
18
             ROBINS KAPLAN MILLER & CIRESI, L.L.P
19           BY:  MATTHEW L. WOODS, ESQ.
                  (Minneapolis, Minnesota)
20
                     Counsel on behalf of Honeywell
21                   International, Inc., and Honeywell
                     Intellectual Properties, Inc.
22

23

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

SHEET 2

**2**

1    APPEARANCES: (Continued)

2

3        YOUNG CONAWAY STARGATT & TAYLOR
         BY:  KAREN L. PASCALE, ESQ.

4            and

5        OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
6        BY:  RICHARD D. KELLY, ESQ.
             (Alexandria, Virginia)

7                Counsel for Optrex America, Inc.

8

9        BOUCHARD MARGULES & FRIEDLANDER
         BY:  JOHN M. SEAMAN, ESQ.

10

11       HOGAN & HARTSON
         BY:  DAVID H. BEN-MEIR, ESQ.

12           (Los Angeles, California)

13           Counsel for Citizen Watch Co., Ltd.;
             Citizen Displays Co., Ltd.

14

15       SMITH KATZENSTEIN & FURLOW
         BY:  ROBERT J. KATZENSTEIN, ESQ.

16

17           and

18       HOGAN & HARTSON, LLP
         BY:  ROBERT J. BENSON, ESQ.

19           (Los Angeles, California)

20           Counsel for Seiko Epson Corp.,
             Sanyo Epson Imaging Devices Corporation,

21           and Kyocera Wireless Corp.

22       DUANE MORRIS, LLP
         BY:  DONALD R. McPHAIL, ESQ.

23           (Washington, District of Columbia)

24           Counsel for Innolux Display Corporation

25

**3**

1    APPEARANCES: (Continued)

2

3        POTTER ANDERSON & CORROON, LLP
         BY:  PHILIP A. ROVNER, ESQ.

4            and

5        STROOCK & STROOCK & LAVAN LLP
         BY:  LAWRENCE ROSENTHAL, ESQ.

6            (New York, New York)

7                Counsel for Fuji Photo Film Co., Ltd.
                 and Fuji Photo Film U.S.A. Inc.

8

9        FISH & RICHARDSON, P.C.
         BY:  THOMAS L. HALKOWSKI, ESQ.

10

11           Counsel for Nokia, Inc., Casio, Inc., Casio
             Computer and Apple Computer Inc.

12           and

13       FISH & RICHARDSON, P.C.
14       BY:  KELLY C. HUNSAKER, ESQ.
             (Redwood City, California)

15           Counsel for Apple Computer Inc.

16           and

17       FISH & RICHARDSON, P.C.
18       BY:  ANDREW R. KOPSIDAS, ESQ.
             (Washington, District of Columbia)

19           Counsel for Nokia, Inc., Casio, Inc., Casio
20           Computer

21

22       WEIL GOTSHAL & MANGES
         BY:  STEPHEN J. RIZZI, ESQ.

23           (New York, New York)

24           Counsel for Matsushita Electrical
             Industrial Co. and Matsushita
25           Electical Corporation of America

**4**

1    APPEARANCES: (Continued)

2

3        POTTER ANDERSON & CORROON, LLP
         BY:  RICHARD L. HORWITZ, ESQ.

4            Local counsel below-named defendants and
5            counsel for Toshiba and Concord Camera

6            and

7        FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
         BY:  DARREN M. JIRON, ESQ.
             (Reston, Virginia)

8

9            Counsel for Nikon Corporation, Nikon Inc.

10           and

11       FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
         BY:  MAXIMILIENNE BISHOP, ESQ.

12           (Washington, District of Columbia)

13           Counsel for Toppoly Optoelectronics, Wintek
             Corp., Wintek Electro-Optics Corporation

14

15       PAUL HASTINGS JANOFSKY & WALKER, LLP
         BY:  ELIZABETH L. BRANN, ESQ., and

16           STEPHEN S. KORNICZKY, ESQ.
             (San Diego, California)

17           Counsel for Samsung SDI

18

19           and

20       BAKER BOTTS, L.L.P.
         BY:  ROBERT C. SCHEINFELD, ESQ.

21           (New York, New York)

22           Counsel for Hitachi, Ltd., Hitachi
             Displays, Ltd., Hitachi Display Devices,

23           Ltd., Hitachi Electronic Devices (USA),
             Inc.

24

25           and

**5**

1    APPEARANCES: (Continued)

2

3        KATTEN MUCHIN ROSENMAN
         BY:  TIMOTHY J. VEZEAU, ESQ.
             (Chicago, Illinois)

4

5            Counsel for Sanyo Electric Co. Ltd.
             and Sanyo North America

6            and

7        VINSON & ELKINS
         BY:  AVELYN M. ROSS, ESQ.
             (Austin, Texas)

8

9            Counsel for Dell, Inc.

10           and

11       MILBANK TWEEK HADLEY & McCLOY, LLP
         BY:  CHRISTOPHER E. CHALSEN, ESQ., and

12           CHRISTOPHER J. GASPAR, ESQ.
             (New York, New York)

13

14           Counsel for Fujitsu Limited, Fujitsu
             America, Inc., Fujitsu Computer Products
15           of America, Inc.

16       CONNOLLY BOVE LODGE & HUTZ
         BY:  N. RICHARD POWERS, ESQ.

17

18           Counsel on behalf of Sony Ericsson AB
             and Sony Ericsson, Inc.

19

20       CONNOLLY BOVE LODGE & HUTZ
         BY:  ARTHUR J. CONNOLLY, III, ESQ.

21           Counsel on behalf of  Navman NZ Limited
             and Navman U.S.A. Inc.

22

23

24

25

SHEET 3

**6**

1  APPEARANCES: (Continued)

2

3     YOUNG CONAWAY STARGATT & TAYLOR
   BY:  JOHN W. SHAW, ESQ.

4          Counsel for Olympus Corporation,
        Olympus America, Inc., Sony Corporation,

5          and Sony Corporation of America

6          and

7

8     KENYON & KENYON
   BY:  ROBERT L. HAILS, ESQ.

9          (Washington, District of Columbia)

10         and

11    KENYON & KENYON
   BY:  JOHN FLOCK, ESQ.

12         (New York, New York)

13         Counsel for Sony Corporation, and Sony
        Corporation of America

14         and

15    KENYON & KENYON
   BY:  RICHARD M. ROSATI, ESQ.

16         (New York, New York)

17         Counsel for Olympus Corporation, and
        Olympus America, Inc.

18

19    CROSS & SIMON, LLC
   BY:  AMY ELIZABETH EVANS, ESQ.

20

21         and

22    SACHNOFF & WEAVER
   BY:  BRIAN D. ROCHE, ESQ.

23         (Chicago, Illinois)

24         Counsel for Argus a/k/a Hartford
        Computer Group, Inc.

25

---

**7**

1  APPEARANCES: (Continued)

2

3     HARRIS BEACH, LLP
   BY:  LAURA W. SMALLEY, ESQ.

4          (Pittsford, New York)

5          Counsel for Eastman Kodak

6     YOUNG CONAWAY STARGATT & TAYLOR
   BY:  ADAM WYATT POFF, ESQ.

7          and

8

9     GREENBLUM and BERNSTEIN, PLC
   BY:  P. BRANKO PEJIC, ESQ.

10         (Reston, Virginia)

11         Counsel for Pentax Corporation,
        Pentax U.S.A, Inc.

12

13

14

15

16         - oOo -

17       P R O C E E D I N G S

18     REPORTER'S NOTE:  The following telephone

19 conference was held in chambers, beginning at 3:02 p.m.)

20     THE COURT:  Good afternoon.  This is Judge

21 Thynge.  Just to get introductions so I know who is on the

22 line, why don't we start off with the plaintiff and move

23 along and I'll just call out the entities' names.

24     We also have on this phone call I understand the

25 nonmanufacturer defendants?

---

**8**

1      (Unidentified Speaker):  Correct, Your Honor.

2      THE COURT:  Okay.  All right.  On behalf of

3  Honeywell?

4      MR. GRIMM:  Good afternoon, Your Honor.  Tom

5  Grimm, and with me is Matt Woods.  And I'm not sure if there

6  is someone from Ashby & Geddes on the line.

7      (Pause.)

8      MR. GRIMM:  Not this afternoon, I guess.

9      MR. WOODS:  Good afternoon, Your Honor.  Matt

10 Woods here.

11     THE COURT:  Good afternoon.

12     The next name is Optrex.

13     MS. PASCALE:  Good afternoon, Your Honor.  Karen

14 Pascale from Young Conaway for Optrex and also on the line

15 from the Oblon Spivack firm is Dick Kelly.

16     MR. KELLY:  Good afternoon, Your Honor.

17     THE COURT:  Good afternoon.

18     I don't think -- let me just see.  I'm trying to

19 go through these lists.  Fuji?

20     MR. ROVNER:  Yes, Your Honor.  This is Phil

21 Rovner on the line, and I also have Lawrence Rosenthal from

22 Stroock in New York is on.  Larry, are you on?

23     MR. ROSENTHAL:  I'm on.

24     Good afternoon, Your Honor.

25     THE COURT:  Good afternoon.

---

**9**

1      How about for TPO and Wintek?

2      MR. HORWITZ:  Your Honor, it's Rich Horwitz from

3  Potter Anderson, and there were so many people coming on the

4  call, I'm not sure if York Faulkner or Elizabeth Niemeyer is

5  on from Finnegan Henderson.

6      MS. BISHOP:  They could not make it, but I'm

7  sitting in on the call.  My name is Max Bishop.  I'm with

8  Finnegan Henderson.

9      THE COURT:  I'm sorry, I didn't get your name.

10     MS. BISHOP:  Max, M-A-X, Bishop.

11     THE COURT:  Okay.  Samsung?  No.

12     MR. HORWITZ:  Yes.  Samsung SDI, Your Honor.

13     THE COURT:  Yes.

14     MR. HORWITZ:  Rich Horwitz and I believe.

15 Steve Korniczky and Elizabeth Brann are on the line from

16 Paul Hastings.

17     MR. KORNICZKY:  Hello, Your Honor.

18     MS. BRANN:  Good afternoon, Your Honor.

19     THE COURT:  Hello.

20     Let me just check.  The Hitachi entities?

21     MR. HORWITZ:  Rich Horwitz again, and I am not

22 sure who was on from Hitachi.

23     MR. SCHEINFELD:  Yes, you have me, Rich.  This

24 is Rob Scheinfeld.

25     Hi, Your Honor.

10

```
1         THE COURT:  Hi.
2         Okay.  Now, who else is on the line for whom?
3         MR. KATZENSTEIN:  Your Honor, this is Robert
4  Katzenstein, local counsel for Seiko Epson, Sanyo Epson and
5  stayed customer defendant Kyocera Wireless.  I believe that
6  Robert Benson is also on the line.
7         MR. BENSON:  Yes, I am.  Robert Benson of Hogan
8  & Hartson.
9         Good morning, Your Honor.
10        THE COURT:  Good morning.
11        MS. EVANS:  Good afternoon, Your Honor.  This is
12 Amy Evans from Cross and Simon.  We are local counsel for
13 the Hartford Computer Group, one of the customer defendants;
14 and lead counsel on the phone is Brian Roche from Sachnoff &
15 Weaver in Chicago.
16        MR. ROCHE:  Good afternoon, Your Honor.
17        THE COURT:  Good afternoon.
18        MS. EVANS:  With your permission, Your Honor, I
19 will have to leave partway through this teleconference.
20        THE COURT:  That's fine.
21        MS. EVANS:  Thank you.
22        MR. HALKOWSKI:  Good afternoon, Your Honor.
23 This is Tom Halkowski with Fish & Richardson.
24        THE COURT:  Yes.
25        MR. HALKOWSKI:  And with me on the phone on
```

11

```
1  behalf of Nokia is Andrea Kopsidas, K-o-p-s-i-d-a-s; and
2  also with me on the phone on behalf of Apple is Kelly
3  Hunsaker, H-u-n-s-a-k-e-r.
4         MS. HUNSAKER:  Good afternoon, Your Honor.
5         THE COURT:  Good afternoon.
6         MR. HALKOWSKI:  And she will speak with regard
7  to the letters submitted by Apple yesterday.
8         THE COURT:  I understand.
9         MR. HALKOWSKI:  Thank you.
10        MR. HORWITZ:  Your Honor, Rich Horwitz again on
11 behalf of a number of the stayed customer defendants.
12        THE COURT:  Yes.
13        MR. HORWITZ:  For Toshiba and Concord Camera, I
14 know that I'm the only one on the line.  Also for Nikon, and
15 I'm not sure if Mary Graham is on as well.
16        Mr. JIRON:  Rich, this is Darren Jiron from
17 Finnegan Henderson.
18        MR. HORWITZ:  For Sanyo, and I don't know if
19 anyone from Katten Muchin is on.
20        MR. VEZEAU:  Yes, Your Honor.  This is Tim
21 Vezeau at Muchin for the two Sanyo entities.
22        THE COURT:  Okay.
23        MR. HORWITZ:  Also for Dell, and finally for
24 Fujitsu.
25        MS. ROSS:  And, Your Honor, this is Avelyn Ross
```

12

```
1  on behalf of Dell as well.
2         MR. CHALSEN:  Your Honor, this is Chris Chalsen
3  and Chris Gasper from Milbank also on behalf of Fujitsu.
4         MR. CONNOLLY:  Your Honor, this is Arthur
5  Connolly, III, from Connolly Bove for stayed customer
6  defendants Navman NZ Limited and Navman USA.
7         MR. PEJIC:  And, Your Honor, this is Branko
8  Pejic with Greenblum and Bernstein on behalf of the stayed
9  customer Pentax Corporation.
10        MR. POFF:  Your Honor, this is Adam Poff from
11 Young Conaway also on behalf of Pentax.
12        MR. SHAW:  Your Honor, John Shaw at Young
13 Conaway on for the stayed defendant Sony Corporation; John
14 Flock and Bob Hails from Kenyon & Kenyon.  And also on
15 behalf of the stayed Olympus defendants, I believe Rich
16 Rosati may be on the line from Kenyon & Kenyon.
17        MR. ROSATI:  Yes, Your Honor.  Rich Rosati for
18 Olympus.
19        MR. POWERS:  Your Honor, this is Richard Powers
20 from Connolly Bove representing the Sony Ericsson entities
21 which are customer defendants.
22        MR. RIZZI:  Your Honor, Stephen Rizzi from Weil,
23 Gotshal & Manges on behalf of the stayed customer defendants
24 Matsushita.
25        THE DEPUTY CLERK:  Your Honor, John Seaman,
```

13

```
1  Bouchard Margules & Friedlander on behalf of manufacturing
2  defendants Citizen; and on the line with me is David
3  Ben-Meir from Hogan & Hartson.
4         MR. BEN-MEIR:  Yes, this is David Ben-Meir.
5  Good afternoon, Your Honor.
6         THE COURT:  Hi.
7         MS. SMALLEY:  This is Laurie Smalley from Harris
8  Beach.  And we're on behalf of Kodak, customer defendants.
9         MR. McPHAIL:  This is Don McPhail of Duane
10 Morris.  I represent the Innolux Display Corporation.
11        THE COURT:  Okay.  Thank you.  It sounds like we
12 got the list done.
13        I understand a couple things are on the plate
14 today.  First up is about the scheduling order.  And when I
15 start off with that, I need to talk to you about a few
16 things about what is happening in this case.
17        As you know, all of the cases that Judge Jordan
18 handled; and I'm referring to these cases as the Honeywell
19 LCD cases; whether they were initiated by Honeywell or
20 initiated by another party, I understand they've all been
21 consolidated.  Those cases are part of the vacant judgeship
22 and, as a result, the matter has been referred to me to
23 basically manage.  I've also done mediation in this case
24 with I believe all of the manufacturing defendants involved.
25        Having said that, if the parties haven't agreed
```

14

1 or consented to my jurisdiction, then that means that once
2 you get through the case dispositive motions, the case will
3 probably sit until we either have a new District Court Judge
4 or one of the District Court Judges that are presently on
5 this bench available to be able to take over the case. And
6 that's the way it stands.
7        So there are a number of issues I guess I kind
8 of tee up today because I can decide those and I can decide
9 any of the discovery matters, but anything that is a case
10 dispositive motion I will not be deciding because it doesn't
11 make sense for me to do it, then somebody who is not pleased
12 with the decision decides to ask for the de novo review and
13 we're right back in the same spot we were before, that is,
14 having a District Court Judge having to look it over. It's
15 a colossal waste of judicial resources when we're already
16 down one judge and we're in the process of hopefully getting
17 a second Magistrate Judge.
18        All right. That brings me directly to, in part,
19 and some of the issues that were raised may also affect the
20 scheduling order itself that was proposed between Honeywell
21 itself and the manufacturing defendants. We talked before
22 about pushing it out three months. I certainly don't have a
23 problem with doing that, but I'll really wondering if the
24 rest of the dates make any difference now after a certain
25 point and whether three months is going to be enough in

15

1 light of some of the issues that were raised in the
2 submissions that I received from all parties.
3        MR. HORWITZ: Your Honor, this is Rich Horwitz.
4        If I could just raise one point. I apologize
5 that this was not in the letter, and I'm speaking now on
6 behalf of the stayed customer defendants. The proposed
7 scheduling order that Honeywell submitted, and I think it
8 was stated in the letter that it was submitted on behalf
9 of Honeywell and the manufacturing defendants, the first
10 whereas clause refers to the plaintiffs and the
11 manufacturing defendants and the customer defendants and
12 then refers to all three of those going forward as the
13 parties and that really should not be written that way with
14 whatever goes forward given the current posture of the case
15 because the customer defendants who were stayed were not
16 involved in the process and did not agree to that just
17 because they weren't involved in it. So I just wanted to
18 make that clear that was one thing in the language of the
19 order that really needs to be addressed.
20        MR. WOODS: Your Honor, this is Matt Woods. I
21 agree with Rich. I think that is unfortunately just a
22 lingering leftover from the document in its earlier form;
23 and Rich is correct in his earlier characterization.
24        THE COURT: All right.
25        MR. WOODS: I would be prepared to speak on

16

1 behalf of Honeywell, if that is a good place to start.
2        THE COURT: That's fine. And I really don't
3 want to hear from all the customer defendants, nor
4 necessarily from all the manufacturing defendants. My hope
5 is that you possibly designated on one or two people to
6 speak on behalf of those groups. I realize Apple may have
7 its own issue and I understand it filed a separate letter.
8 In other words, what I'm saying, I don't want to hear from
9 each individual manufacturing defendant, I don't want to
10 hear from each customer defendant. I think somebody could
11 speak for each of the groups and summarize what the issues
12 are.
13        All right. So why don't you begin, Matt.
14        MR. WOODS: All right. Thank you, Your Honor.
15 And we appreciate the opportunity to have this conversation
16 with all the patties here. We believe it's the kind of
17 conversation that needs to be had at this point in time
18 which we see as a critical crossroads in the case.
19        Clearly, the case needs to have some continued
20 effective management, and I believe that that is what Your
21 Honor was asking for our thoughts on in initially the order
22 in its initial stages when it was initially ordered. We do
23 believe there are a number of ways that the parties could
24 work together to move this case efficiently forward, but
25 they all depend on answering what we see as a fundamental

17

1 threshold question at this crossroads. And that question
2 is, as outlined in our letter, is a very simple one, it's a
3 very direct one, and that is who is going to really answer
4 for Honeywell's initial allegations of infringement in this
5 case?
6        When Judge Jordan began the process of getting
7 his hands wrapped around the case and issuing the orders he
8 did, it was clear to us at least and we believe the record
9 is very clear on that, and I know Your Honor has talked to
10 Judge Jordan as well, that there was a sense here that the
11 efficient way of proceeding was in a way which was going to
12 resolve the bulk of the claims quickly and in the most
13 comprehensive manner. And that was with a view that the
14 manufacturer defendants, what we call the manufacturer
15 defendants would essentially defend their customers. And
16 that is how we've been proceeding since Judge Jordan's
17 original order.
18        In December, some things happened. Some things
19 happened that were very troubling to Honeywell. We heard
20 through the course of the mediations -- and I don't want to
21 get into too much detail there, but we heard a lot of the
22 defendants, the manufacturer defendants were claiming that
23 they could avoid liability to Honeywell on the grounds of
24 indirect sales because Honeywell was not going to be able to
25 rely on direct infringement theories, that we would have

SHEET 6

**18**

1  to resort to indirect infringement theories.  That was
2  troubling to us because that puts Honeywell in a whipsaw
3  position.
4          The efficient process Judge Jordan set up now
5  becomes a situation where we may have to go through a
6  process of trials and further lengthy proceedings and it may
7  in fact, because it's carrying this additional burden of
8  what could be inducement infringement, could end up not
9  resolving much of anything and we would still have to
10 proceed against the customer defendants because these unique
11 defenses that may apply on the indirect sales piece have no
12 impact on the customer defendants.
13         And so when that issue is coupled with the
14 very recent change in the law from the Federal Circuit
15 with regard to the standards to apply, our question became
16 are the assumptions that underpinned Judge Jordan's initial
17 views on how to handle the case still valid?
18         From our standpoint, we're basically of the view
19 that this case can go in a number of ways.  We're not
20 suggesting at this point in time that it has to proceed
21 against the customer defendants.  What we think has to
22 happen, there has to be a conversation and a commitment
23 that needs to clarify on who is truly answering for the
24 initial allegations that Honeywell made.
25         If the manufacturer defendants at this point

**19**

1  say, yes, they are going to really stand in whether because
2  of indemnification, because of customer relationships or
3  whatever, and they're going to answer for the full array,
4  the totality of Honeywell claims, then perhaps we can move
5  forward with very minimal adjustments to the personal
6  jurisdiction.
7          THE COURT:  Okay.  Before you go on, Matt, is
8  anybody on a speakerphone besides me?
9          (Pause.)
10         THE COURT:  Okay.
11         MR. WOODS:  I am not, Your Honor.
12         THE COURT:  Because I'm getting a very bad buzz
13 back and I don't know if that is from that.
14         (Unidentified Speaker):  Me, too.
15         THE COURT:  Okay.  You may proceed, Matt.
16         MR. WOODS:  So our point, Your Honor, is we're
17 simply at a crossroads where we need clarity.  We need
18 clarity, we need a commitment.  And what we're seeking is
19 clarity as to who is in fact going to defend the totality
20 against Honeywell's claims.  That can be some subset, that
21 can go a number of different ways, but we need to have an
22 answer.
23         And that is why we have suggested that at the
24 start, what would be useful would be for the customer
25 defendants and the manufacturer defendants to caucus among

**20**

1  themselves and decide.  It may be that certain manufacturer
2  defendants are willing to do it and others aren't, but we
3  are never going to know unless that conversation is had.
4  And that conversation hasn't been had yet, at least it
5  hasn't been communicated to Honeywell and I don't believe it
6  has been communicated to the Court.
7          So our view is once we get clarity on that
8  piece, we can make decisions.  For example, Judge Jordan had
9  originally intended that the defendants designate what we
10 call the Fab Five.  It was a subset of the group about which
11 the first trial was going to happen and the defendants could
12 not agree upon who those were going to be and so that
13 decision or concept was tabled for awhile.
14         I raise that only because it's an example of
15 some ways of trying to handle this matter efficiently but it
16 presumes we know who really going to try to engage and
17 commit to resolving the majority of Honeywell's claims.
18 Our ultimate view is it is inefficient to proceed down a
19 path against the manufacturer defendants if the Court
20 and Honeywell are going to have to face summary judgment
21 motions based upon indirect sales and those types of issues
22 which don't have any bearing and would have no impact
23 upon Honeywell's initial and original claims against the
24 customers, because that would proceed just against them and
25 from our standpoint that is inefficient and respectfully

**21**

1  we believe that almost borders on abuse of due process
2  because Honeywell's claims are sitting there waiting to
3  be tried.
4          So that I think outlines our position, Your
5  Honor.  I can answer any questions that you may have.
6          THE COURT:  Okay.  Who am I going to hear from
7  on behalf of the manufacturer defendants?
8          MR. ROVNER:  Your Honor, this Phil Rovner on
9  behalf of manufacturer defendant Fuji but speaking at least
10 preliminarily on behalf of all the manufacturer defendants.
11         I guess you have to indulge me for a bit, if you
12 don't mind, Your Honor.  What we've all, on the phone, other
13 than Your Honor, have heard is we heard from Mr. Woods
14 repeatedly and what Judge Jordan heard for practically the
15 first 18 months of this case.  We have been through all of
16 this and it's very frustrating to those of us who had to
17 spend so much time getting this case pared down and make it
18 as efficient as a multiple defendant case can be.  And Judge
19 Jordan, after hearing numerous arguments, ruling on this
20 issue many, many times, decided that the best way to handle
21 this case was the way he outlined it in the scheduling
22 order.  That basically occurred after 18 months of this
23 case.  And nothing that Mr. Woods has said is new and
24 everything that he has said has been addressed.
25         And, frankly, the customer defendants, and I'm

22

1    not representing them and I think that Rich Horwitz will
2    be speaking on their behalf, but they don't really have
3    knowledge of the structure of the modules sold. That's
4    why in large part Judge Jordan said that the manufacturer
5    defendants will be the defendants that go to trial first.
6    The customer defendants are stayed.
7         The effort that would go into undoing this
8    scheduling order that took so long to put into place would
9    be prejudicial to the manufacturer defendants and is
10   absolutely unnecessary. So we believe, the manufacturer
11   defendants at least believe there is no reason to undo what
12   has been done, and we absolutely disagree with Mr. Woods and
13   ask Your Honor to maintain the schedule.
14        We do agree to the three-month extension, it
15   was first proposed by Honeywell, because we believe the
16   discovery alone we have to complete, that which was
17   contemplated by Judge Jordan in the original scheduling
18   order, needs an additional three months. It would further
19   complicate things to the Nth degree to add the customer
20   defendants.
21        The one thing that Mr. Woods mentioned that is
22   also alarming is that when he talked about the so-called Fab
23   Five, those were five manufacturer defendants that will
24   ultimately be responsible for trying the first stage of this
25   case, which is limited to validity and unenforceability

23

1    issues, and we feel that that is appropriate. And so that
2    is what we plan to do. In fact, the customer defendants
3    have been uninvolved in the case since the stay went into
4    place.
5         So, Your Honor, those are our points on that
6    particular issue. We do have the issue of the damages
7    expert report which I think probably should wait until the
8    customer defendants say their piece.
9         THE COURT: Okay. But I just have a question.
10   Was the issue of indirect infringement brought up before
11   Judge Jordan before? Indirect sales in relationship to
12   indirect infringement?
13        MR. ROVNER: My recollection is that that was
14   addressed and that Judge Jordan said that his finding
15   was based on that. And he said that, concluded that the
16   manufacturer defendants were the groups that should go
17   forward.
18        MR. WOODS: Your Honor?
19        THE COURT: Wait a minute. I have a next
20   question. Did he base his finding consistent with what
21   the Fed Circuit recently did in resolution of conflicting
22   precedent, in that section that was decided en banc in the
23   DSU Medical Corporation vs. JMS case in December of 2006, in
24   his discussions? Because I went through his opinions and
25   I didn't find anything in his opinions that discussed the

24

1    indirect infringement. I found his opinion being more
2    focused on what he considered to be an orderly fashion in
3    which to handle this but in the discussions on indirect
4    infringement, was the representation made about what the law
5    was consistent with what the Fed Circuit is now saying the
6    law is in light of the conflicting precedent that existed
7    before December 2006?
8         MR. ROVNER: Well, Your Honor, Judge Jordan
9    obviously didn't. The ruling came significantly before
10   the recent Fed Circuit decision, but we really don't
11   believe that it changed all that much in terms of what the
12   obligations are. So I don't think, at least in part on the
13   concurring decision in that case, we don't believe there is
14   a dramatic difference. And the arguments that Mr. Wood has
15   made were considered -- my recollection was that they were
16   considered by Judge Jordan.
17        MR. WOODS: Your Honor, this is Matt Woods.
18        THE COURT: Okay. Go ahead, Matt.
19        MR. WOODS: I just respectfully disagree with
20   Mr. Rovner. I'm not aware of any instance where Judge
21   Jordan wrestled with the indirect sales issue. And that's
22   exactly part of the change that has occurred. Mr. Rovner
23   says this is the same speech he heard before. Respectfully,
24   I disagree because there has been a change because instead
25   of the customers defending, or instead of the manufacturers

25

1    defending the customers, that concept is replete in all of
2    Judge Jordan's orders and the transcripts of the hearing,
3    now what we're hearing in December is no, no, no, wait a
4    second. Some of these sales, a lot of these sales, perhaps
5    a majority are indirect sales and Honeywell will not get
6    recovery on those, and now we get that on top of DSU. So
7    there has been a significant change. I don't believe that
8    Judge Jordan ever wrestled with this concept.
9         THE COURT: Somebody else was about ready to
10   speak when Mr. Rovner was speaking. I heard a voice and I
11   asked them to wait. Who was that individual?
12        MR. WOODS: I think that was me, Your Honor.
13        THE COURT: Was that you? Okay.
14        MR. WOODS: Yes.
15        MR. ROSENTHAL: Your Honor, this is Lawrence
16   Rosenthal for Fuji, and I would just like to weigh in on the
17   issue of whether there has been a change.
18        Your Honor, first of all, the manufacturer
19   defendants have always been largely Asian. Maybe they're
20   U.S. subsidiaries but the actual manufacturing has occurred
21   in Asia. It was no mystery and, in fact, there were
22   discussions about motion practice and demands by Mr. Woods
23   to get the issue of indirect liability resolved early on and
24   which were resisted by Judge Jordan, maybe not in a writing
25   but certainly the net effect of what he did was to resist

26

1  that whole thought.
2      The other observation I will make is that there
3  was no specific discussion of inducement, liability per se,
4  but I'm very familiar with the DSU case and the precedents
5  that had come before.  And there was a perceived conflict by
6  some of the courts between Manville and a case that was
7  decided on the same day.  But in every instance up until
8  this case, the Court ruled that no harm/no foul because no
9  matter which standard you apply, either there would be or
10  wouldn't be infringement, inducement liability.
11      In this case, obviously there is some sense
12  among the two concurring judges.  There was a ruling that I
13  consider is inapplicable.  I'm aware of no case that ever
14  ruled, even the case which created the conflict, ever ruled
15  that merely having knowledge of the act without having
16  knowledge of the patent was enough to create inducement.
17  I just, I've never even seen that argument stated except
18  in the hypotheticals, but it's telling that the jury
19  instruction used in DSU was sustained, and that is the kind
20  of jury instruction that I have used in cases of mine, and
21  it is based on a fair reading of Manville which was always
22  there and it doesn't require an intent to infringe.  It's
23  written in terms of the "knew or should have known that it
24  would resulted in an act of infringement."
25      I just second Mr. Rovner's view that there is,

27

1  in fact, nothing new based on the indirect infringement
2  argument.  This was always on the table, always a risk.  I
3  think it was bizarre for anyone to assume that, for example,
4  a Taiwanese defendant selling to a Japanese company would be
5  raising an indirect defense.
6      I don't think Judge Jordan made his
7  organizational decision after 18 months of manipulation.
8  First, he stayed the defendants after almost a year or
9  10 months and then stayed the customers.  Then it took
10  another six months to sort out among the manufacturer
11  defendants as to who is on the hook for what product, which
12  is a specific order that Judge Jordan entered.
13      So this is nothing knew but what I sense is a
14  request to start again.  Couched in terms of a conversation
15  in my mind, there is nothing to talk about starting again.
16  The only thing to talk about is how do we finish the first
17  stage that Judge Jordan has dictated that we should.
18      THE COURT:  Do the customer defendants wish to
19  state anything?
20      MR. HORWITZ:  Yes, Your Honor.  This is Rich
21  Horwitz on behalf of the customer defendants.
22      Basically, Your Honor, we view this as really
23  just an opportunistic chance by Honeywell, now that they
24  have the new audience and after spending a few weeks with
25  Your Honor during the mediation and seeing the practical

28

1  problems that they face.  And I think other than Honeywell,
2  I was there more than anybody else and --
3      THE COURT:  Well, I think I was there pretty
4  much, too, Rich.
5      MR. HORWITZ:  No, I understand.  I'm just
6  talking about counsel.  You obviously lived through every
7  minute of it.  And I know the parties appreciate all of
8  your efforts.
9      THE COURT:  A little tongue in cheek.
10      MR. HORWITZ:  Well, I just want to start and say
11  that if Judge Jordan were still on this case, we would never
12  be having this conversation.  And to suggest that it was
13  presumed, in Judge Jordan's hard work and effort to put this
14  in place, that the manufacturing defendants were going to
15  stand behind and defend all of the customers without regard
16  to these foreign sales to foreign entities issues, that is
17  just incredible to me.  There were conversations with
18  Honeywell about these issues.
19      I'm not in my office.  I don't have all the
20  papers.  My recollection is there were mention of issues
21  relating to foreign sales.  And whether or not that is
22  explicitly listed in an order, those issues were certainly
23  talked about among the parties and I believe were also put
24  in front of Judge Jordan.
25      The next point on behalf of the customer

29

1  defendants, Your Honor, is that Honeywell never spoke to
2  anyone on behalf of a customer defendant before filing its
3  papers.  And we just want to note that for the record,
4  because if there is going to be any kind of a change to
5  this case, which we believe should not happen, it certainly
6  shouldn't happen the way that Honeywell has started down
7  that path.
8      And, finally, just to reiterate a little bit
9  some of the points that have already been said.  In general,
10  these arguments have all been made before.  Judge Jordan
11  said the way this case is going to go forward.  And remember
12  the first stage is on invalidity and unenforceability.  It
13  has nothing to do with the issues that Mr. Woods is talking
14  about.  He said that Judge Jordan said that's the way it's
15  going to be.  And you know what?  This isn't Honeywell's
16  first choice, but that is too bad because he has to worry
17  about case management and the efficient use of the Court's
18  resources.  He said that the customer defendants had to do
19  certain things.
20      THE COURT:  It was very limited.
21      MR. HORWITZ:  I'm sorry?
22      THE COURT:  It was very limited.
23      MR. HORWITZ:  That's right, but that's what he
24  said they had to do and then they were on the sidelines.
25  They had to indicate who the manufacturers were and that

30

1  was it.  And, believe me, there were fights about what
2  information should be provided.  This is a motion for
3  reargument in front of Your Honor which I don't think they
4  even would have made if we were still in front of Judge
5  Jordan at this time.
6       And, again, because we're in the first phase of
7  this case which deals with invalidity and unenforceability
8  issues, some of the discovery that they are talking about
9  that they would want from the stayed customer defendants
10  may never be needed.  And this is not the time to change
11  direction in a case where we're already asking to extend
12  the schedule so that we can burden stayed parties with
13  discovery that may never be needed.
14       MR. HALKOWSKI:  And, Your Honor, this is Tom
15  Halkowski.  One other point on behalf of the stayed
16  defendants is that this entire proceeding was set out for
17  the first phase to address validity and enforceability, so
18  the entire discussion that we have heard initially from
19  Mr. Woods seems to be rather beside the point.  We're
20  focused on the first phase that is going to address
21  validity, enforceability; and as Rich rightly points out,
22  we may never even get there in terms of the other issues of
23  infringement and/or damages.  Thank you.
24       MS. HUNSAKER:  Your Honor, this is Kelly
25  Hunsaker on behalf of Apple.  With the Court's permission,

31

1  I'd like to address the question regarding whether Judge
2  Jordan had looked at the indirect infringement issue before.
3       THE COURT:  Yes.  Go ahead, Kelly.
4       MS. HUNSAKER:  In the May 16th, 2005 hearing
5  on the customer defendants motions to stay in which Judge
6  Jordan was addressing in the first instance how this case
7  was going to be structured, Honeywell's counsel, Mr. Lueck,
8  beginning at page 19 of the transcript, did direct the issue
9  of extraterritorial sales directly and raised an issue with
10  the Court that most of these modules were sold outside the
11  United States with the end product being the products that
12  are sold in the United States.
13       In the context of that hearing, Judge Jordan did
14  address it and his question back to Mr. Lueck was whether in
15  fact the proof of infringement relied on the LCD modules
16  themselves, and it's this information that Judge Jordan
17  believed was what the manufacturer defendants would have in
18  their possession rather than the customers, and he asked
19  Mr. Lueck if the infringement showing depended on how that
20  product was incorporated to the end products that were sold
21  in the United States, and Mr. Lueck said no.
22       That part of the discussion goes from page 19 to
23  page 21 of the transcript.  And it was after that discussion
24  that Judge Jordan believed that the way he structured the
25  case was the appropriate way to structure it in the first

32

1  instance.  Ultimately, the extraterritorial nature of the
2  sales goes to damages.
3       THE COURT:  Again, I'm going to ask, I've got a
4  horrible buzzing that is making it very difficult to hear
5  some people so I don't know what is happening.  It could be
6  my line, I don't know, but I don't know what is happening
7  with the line.
8       (Pause.)
9       THE COURT:  Okay.  I've had a chance to look
10  this over and at this point, I'm not inclined to necessarily
11  change the format that this case is proceeding.  If it's
12  working towards invalidity and unenforceability, then the
13  issues of whether or not the manufacturing defendants
14  infringe directly or indirectly -- directly is probably
15  going to be much easier but indirectly does not bring the
16  customer defendants into the issues.  It's whether or not
17  the patents are going to survive, and depending I guess
18  upon the outcome of that aspect of it will lead us into
19  whether the issue of direct or indirect infringement becomes
20  important.  If it should, then it makes all the sense in
21  the world to me that the customer defendants, if not fully
22  participate, at least partially participate in the issues;
23  specifically, the issue dealing with indirect infringement.
24       The read that I got was that Judge Jordan was
25  going to be trying this case with one or more or maybe

33

1  individual trials for the manufacturers, at least that is
2  what he was thinking about.  He had not made a decision on
3  how the case was going to be tried, who was necessarily
4  going to be at each trial.  And I looked over what his order
5  indicated, a previous order in May and then his subsequent
6  order later on in 2005, about how little the case had moved
7  forward, and it seemed to me a couple things:
8       One, that he never determined or limited what
9  type of discovery would be allowed later on, depending upon
10  what the status of this case was through the first process.
11  He never said that Honeywell's identification of products
12  was necessarily all that there was because this is a
13  continuing process to some extent.
14       So I think that if we're looking at this case
15  from the standpoint of whether this patent can survive the
16  arguments of invalidity or unenforceability, then I don't
17  see how the issue of infringement, whether it's direct or
18  indirect, is that pertinent, at least in the first stages.
19  It may be later on but not right now.
20       Now, when this trial was planned to have in this
21  order, was it going to include infringement, direct or
22  indirect?
23       MR. WOODS:  It's Matt Woods.  It was our
24  understanding that the first trial would be limited to
25  the issues of validity and enforceability.

**34**

1      THE COURT:  Okay.
2      MR. WOODS:  But the question of how and when the
3 trial would then proceed to infringement and damages was
4 left open.
5      THE COURT:  Yes.  And I think under that
6 circumstance, if you've been prevented from getting the
7 information; for example, some of the information, you'd be
8 asking, for example, a Japanese company about their sales
9 and their information concerning what they were doing with
10 the Korean company, who, in the end, was the company that
11 sold to the United States or through those steps; I think at
12 the stage when we get to that, this is going to be done in
13 steps and segments, it may make sense, quite frankly, to,
14 depending upon how many manufacturers are left, to have all
15 the manufacturers involved in the trial of invalidity and
16 unenforceability.  Certainly, the discovery is going along
17 that way.  And then you take a break and, depending upon
18 what the outcome of that trial is, then your next step
19 would be a break, figuring out how you are going to do the
20 scheduling order because at that time, if those patents
21 survive, if the patent survives, then information that the
22 customer defendants may have on indirect infringement may
23 very well become relevant.  But at this stage, no, I don't
24 see how it is necessarily relevant because there is no
25 indication what Judge Jordan was going to do, nor had it

**35**

1 been fully discussed what was going to happen regarding the
2 infringement issues.  I just can't imagine that if he was
3 limiting you, limiting Honeywell to the minimal discovery
4 from the customer defendants, that you were suddenly going
5 to immediately go into a trial on direct or indirect
6 infringement.
7      MR. WOODS:  Your Honor, could I make two points
8 quickly?
9      THE COURT:  Sure.
10      MR. WOODS:  What Your Honor has outlined is, in
11 fact, what appears to be an express bifurcation of the case.
12      THE COURT:  Yes.
13      MR. WOODS:  Judge Jordan said very clearly he
14 was not going to bifurcate discovery.  In fact, he wanted to
15 hold the parties' feet to the fire.  And what Your Honor has
16 outlined respectfully is a more formalized bifurcation, and
17 that is obviously where Your Honor is going.
18      Under those kind of circumstances, if that is
19 how Your Honor is viewing the case, we would have two quick
20 comments.  And that would be, one, at that point in time, it
21 doesn't seem to make sense to do either infringement or
22 damages reports if the whole idea is we're simply working
23 toward a validity and enforceability trial.
24      The second piece of that is we will have to,
25 nonetheless, and this was addressed in the earliest hearing

**36**

1 with Judge Jordan, we still need to get some discovery from
2 the customer defendants because its bears on commercial
3 success with regard to validity.  And so we will still be
4 needing to take some limited discovery from the customer
5 defendants in order to establish some basic information that
6 is going to bear on those first trials on validity.  So to a
7 certain extent, we're going to have to move forward on that.
8      THE COURT:  Well, I point out that part of my
9 ruling is based upon what everybody seems to have represent-
10 ed, that it's invalidity and enforceability and the strong
11 arguments that the manufacturing defendants and the customer
12 defendants are making in that regard.  To the extent in
13 the future they may have hoisted themselves on their own
14 petards, you will have to deal with it, or the defendants
15 in this case as well as Honeywell.  But the parties who are
16 saying it's only invalidity and unenforceability so how can
17 possibly infringement, direct or indirect, even be relevant
18 to what we're doing, that is the argument.  That is the
19 argument that came through loud and clear from the
20 defendants.
21      MR. ROSENTHAL:  Your Honor, this is Lawrence
22 Rosenthal.  There was a recent Federal Circuit decision.
23      THE COURT:  Lawrence.  Larry, Larry, if you are
24 talking on a cellphone, I mean on a speakerphone, I cannot
25 hear you and your voice is very muffled.

**37**

1      MR. ROSENTHAL:  Unfortunately, I stepped out of
2 a trial.  I'm on a cellphone.
3      THE COURT:  That's what I thought.  Okay.  I
4 can't hear you.
5      MR. ROSENTHAL:  Can you hear me?
6      THE COURT:  No.
7      MR. ROSENTHAL:  Is this louder?
8      THE COURT:  What happens is you end up becoming
9 muffled and blurred.  Your voice becomes blurred.
10      MR. ROSENTHAL:  Let me try, Your Honor.
11      THE COURT:  Okay.
12      MR. ROSENTHAL:  A recent Federal Circuit
13 decision by Judge Rader complains that judges making Markman
14 decisions must have information about the products at issue
15 so that we're not just making advisory opinions.
16      THE COURT:  Oh, I understand that.
17      MR. ROSENTHAL:  So while it is true that
18 infringement per se is not at issue, it comes pretty close
19 because I think what we're going to have to hear is some
20 expert testimony as to what various structures that are
21 used by the various defendants at issue are using.  I'm
22 not locked to the thought that we need a damages expert but
23 I fear that we need a technical expert on the products whose
24 report will be required under the current Federal Circuit
25 thinking.

38

```
 1          THE COURT:  And I wasn't taking that away,
 2   Larry, in my analysis.  Because obviously when it comes to
 3   invalidity and infringement, claim construction and those
 4   aspects, those technical aspects are important.  Because you
 5   can't figure out if it's based upon prior art, what is prior
 6   art until you have that.
 7          But, at the same time, I'm not going to let what
 8   I think is starting to happen, a whipsaw effect as described
 9   by Honeywell that, okay, we have a group of defendants who
10   asked for this case to be stayed.  They provided limited
11   discovery pursuant to what Judge Jordan said and then they
12   say, well, now let us out.  Now let us do some certain
13   things or let us move just to file a motion.  I'm not
14   interested in letting that happen because I do think, in
15   essence, that is a whipsaw effect.  That's one example.  And
16   that does have me concerned.  And to the extent -- can
17   counsel hear me?
18          MR. ROVNER:  No, Your Honor.
19          (Unidentified Speaker):  Just barely, Your
20   Honor.
21          (Unidentified Speaker):  Just barely, Your
22   Honor.
23          THE COURT:  To the extent that defendants are
24   arguing that certain information may very well be irrelevant
25   and are making the argument that Honeywell shouldn't be
```

39

```
 1   allowed at this stage to investigate that, if that inform-
 2   ation such as finding out, beyond just asking a represent-
 3   ative of a manufacturing defendant whether or not they knew
 4   about the patent and just saying you've got to rely upon
 5   what our clients said without being allowed to investigate
 6   that further, I've got some concerns about that.
 7          MR. BENSON:  Your Honor, this is Robert Benson
 8   just chiming in here on behalf of Seiko Epson.  I know we
 9   are one of the manufacturer defendants who, at the end of
10   the day, will litigate issues of inducement.  But we are, at
11   the current time, providing Honeywell with the discovery
12   that it is seeking as to when we first learned of the patent
13   and as to each of the modules, the seven modules that
14   they've accused of infringement.  So in terms of Honeywell
15   getting information about the structure of all of the
16   modules they've accused, which is the information they need
17   from a manufacturer, in terms of them conducting discovery
18   when we first learned of the patent and those types of
19   issues, we're not relying on inducement to deny them
20   discovery on those issues, though we may certainly, at the
21   end of the day, litigate inducement as to whether we're
22   ultimately liable.
23          THE COURT:  Excuse me.  As to what?
24          MR. BENSON:  As to whether we're ultimately
25   liable.
```

40

```
 1          THE COURT:  Oh, that I do understand.  But what
 2   I am saying is it's not just necessarily one source for
 3   discovery purposes on that issue.
 4          MR. BENSON:  Right, and we're not using
 5   inducement as a basis for denying them discovery as to these
 6   accused products or when we learned of the patent.
 7          THE COURT:  No.  And in the sense that since
 8   the manufacturer defendants are in this case, I really do
 9   expect discovery to continue on along those lines.  What
10   the warning I'm giving is to the extent that discovery
11   was denied either by the manufacturer defendants or the
12   customer defendants and then they turn around, that wasn't
13   allowed because this is --
14          MR. HORWITZ:  Your Honor, this is Rich Horwitz.
15          THE COURT:  Yes.
16          MR. HORWITZ:  You are totally breaking up.  I'm
17   on a landline so I don't know what is causing it.
18          THE COURT:  I don't know either.
19          (Unidentified Speaker):  If everyone who is on
20   the phone would mute it, that would be helpful.
21          THE COURT:  And I can't do that to mine because
22   we have a court reporter taking this.
23          What I am saying is, the arguments that I am
24   hearing from all parties -- and I'm not agreeing with
25   Honeywell 100 percent.  I'm just saying there was limited
```

41

```
 1   discovery that was allowed from one group of defendants
 2   and they asked for the case to be stayed against them.  That
 3   information that they may have concerning the issues of
 4   infringement or inducement may very well become relevant as
 5   against the manufacturers.  That's why the discovery that is
 6   going on between the manufacturers and Honeywell is full
 7   discovery and will continue in that regard.
 8          But I'm just trying to make it as clear as I
 9   possibly can, don't turn around and say to me they don't
10   have this evidence when, at the same time, they weren't
11   allowed to get it, or they weren't allowed to take certain
12   discovery.  I'm not calling it, what is happening now,
13   necessarily the case.  I'm just saying this is a warning.
14   That's all.  And it's a warning not just to the defendants,
15   it's a warning to Honeywell as well.
16          MR. VEZEAU:  Your Honor, this is Tim Vezeau for
17   Sanyo Epson.  I can barely hear you.  Your voice is in and
18   out.  The connection is very bad.
19          THE COURT:  And I can't help you, Tim.  I've
20   been screaming into the phone.
21          MR. VEZEAU:  I know.
22          THE COURT:  I don't know what to do about the
23   connection.  It's been very difficult for me to hear you as
24   well.  I'm wondering if I should just require everybody to
25   show up here one day and let us just get this resolved.
```

42

1  That's the only thing I can think of.
2       MR. WOODS:  Your Honor, this is Matt Woods.
3  Your Honor has given us some direction.  Candidly, I think
4  that it would be useful to have an in-person hearing,
5  perhaps even with just designated representatives.  I think
6  it's very clear; that the macro picture that you have
7  outlined is very clear.  I think that to turn that into a
8  micro picture, I think we probably will need some more
9  guidance.
10      For example, to the extent now that we're
11 proceeding to the validity trial, the question becomes is
12 Honeywell going to be entitled to get some limited discovery
13 from the customer defendants that would bear on commercial
14 success, again, acknowledging that it has to be limited
15 discovery under the macro perspective you have outlined
16 here.  But those kind of details, respectfully, are ones
17 which have unfortunately dogged the parties during the
18 course of litigation, and I think those kind of micro
19 details would be useful to have some face time with Your
20 Honor on these issues.
21      THE COURT:  I don't know exactly, Matt, when
22 we're going to be able to do it.  I know that Apple had an
23 issue out there about potentially wanting to bring a motion
24 to dismiss in the near future.
25      MS. HUNSAKER:  Yes, Your Honor.  Kelly Hunsaker.

43

1       THE COURT:  And it would require you to lift of
2  the stay because, right now, you are a stayed defendant.  Is
3  that correct?
4       MS. HUNSAKER:  If we need to request relief from
5  the motion to stay so that Apple could file and have that
6  motion decided, then we would request that relief from the
7  Court.
8       THE COURT:  Well, I'm not inclined at this stage
9  to lift the stay to let you file a motion to dismiss.  Not
10 at this stage.
11      MS. HUNSAKER:  So may I speak to the issue, Your
12 Honor?
13      THE COURT:  Go right ahead.
14      MS. HUNSAKER:  At this point in time, there is
15 nothing in issue in this case that any longer implicates
16 Apple.  All of the manufacturers of the accused Apple
17 products, both past and present, are now licensed.  There
18 are no accused LCD modules in the case that are sold to
19 Apple.  There is just nothing left.
20      And with respect to the Court's comments before
21 about the identification of product, I guess two points as
22 to that:
23      The first is whether or not Honeywell's May 2005
24 list was set in stone.  It has been 20 months since that
25 time and they have still not identified anything else that

44

1  creates any case or controversy at this time with respect to
2  Apple.
3       And, secondly, the idea that the issue would
4  never be resolved, that the list of accused products would
5  not be final at some point, it was clear that products had
6  to be identified.  They had to be identified, Judge Jordan's
7  term was, with reasonable dispatch as soon as they have any
8  information that the product had to be identified.  And at
9  this point in time, there is nothing against our client.
10      THE COURT:  I told you right now I'm not going
11 to lift the stay to let you file a motion.  I didn't say I
12 wouldn't in the future.  Maybe in the near future, but right
13 now I'm not going to lift it.  So I'm asking you not to file
14 something right now until we get the overall picture of how
15 this case, in general, is going to proceed.
16      MS. HUNSAKER:  Okay.
17      THE COURT:  And we'll deal with those issues.
18 And from what I understand, it should be a limited pain
19 expense for Apple because, being a customer defendant, after
20 it did the responsibility it was supposed to do, I'm hoping
21 that the involvement of counsel would have been minimal in
22 comparison to what has happened between the manufacturer
23 defendants.  So I don't want to address that issue right now
24 because I do think it is separate and distinct from the rest
25 of the issues that are necessarily coming up.

45

1  Neil, could you please get me my calendar?
2       THE DEPUTY CLERK:  Sure.
3       THE COURT:  I encourage, strongly encourage
4  counsel to talk about what they want to do with this case.
5  I am certainly not pushing that you necessarily consent to
6  my jurisdiction at all.  I've had a lot of involvement in
7  this case from the aspect of the mediation and that may
8  cause some people serious concern and I can understand why.
9  And I'm not pushing myself out there.  But for us to get to
10 go to talk about where this case is going to go, I'm not
11 certain when I have the time.
12      MR. WOODS:  Well, Your Honor, then maybe I would
13 respectfully suggest that given Your Honor's admonition and
14 suggestion that we talk.  I am happy to undertake that
15 conversation with the speakers, those who have spoken for
16 customer defendants and others, whoever wants to.  I think
17 it should be our obligation to try to talk and work on some
18 of the details that I was referencing and then present
19 something to you.
20      THE COURT:  Well, you are going to have a short
21 leash to get that done.  Because if you don't, then I will
22 just enter an order indicating how this case will proceed up
23 through and including case dispositive motions, and not have
24 a date and time in there for claim construction or for the
25 tutorial, just have dates in there for you to do the

46

1  exchange of the information and also, which you have already
2  done.  I understand it was supposed to have been done
3  November 9th, 2006 on the issue of the terms that were in
4  dispute or is that a typo?
5          MR. WOODS:  I'm sorry, Your Honor.  You were
6  fading out.
7          THE COURT:  I'm sorry.  Paragraph six of claim
8  construction of the proposed order that you sent indicates
9  that November 9th, 2006, the parties were to have exchanged
10  the list of those claim terms and phrases that they believed
11  to be in dispute or needed construction.  Is that a correct
12  date?  And did that occur?
13          MR. WOODS:  That process already occurred.
14          THE COURT:  That's what I wanted to make sure.
15          MR. WOODS:  Yes, the exchange occurred.
16          THE COURT:  Okay.  So that the issue of claim
17  construction later on, to be submitted for a claim chart
18  and everything else, it's stuff like that that I'm going to
19  probably continue, have in the schedule, but it's a matter
20  of giving me a tutorial or doing your argument before me for
21  Markman; and then argument for case dispositive makes
22  absolutely no sense if I'm not going to be deciding it.  So
23  those are the issues that I think are going to be hanging
24  out there, no matter what.
25          MR. WOODS:  Thank you, Your Honor.  We will

47

1  undertake continued communication here.
2          THE COURT:  I think there ought to be a date and
3  time, though, that you either get back to me or we can
4  try to have another phone call, but this wasn't all that
5  successful.
6          MR. ROVNER:  Your Honor, this is Phil Rovner.
7  I'm sure Mr. Woods will correct me if I'm wrong but I
8  thought I heard him say in light of Your Honor's comments
9  today that he would agree now to deferring the expert
10  reports on damages at this point.
11          MR. WOODS:  No, that is not correct, Phil.  What
12  is correct is that, to me, if we're going to do that micro
13  perspective, then we should be postponing both infringement
14  and damages reports.  That is Honeywell's view.  They are
15  a package because that relates to Honeywell's claims.
16  That is, in fact, the only issues of validity and
17  enforceability.  I respectfully disagree with Larry
18  Rosenthal's characterizations and I think that is something
19  we should talk some more about.
20          MR. ROVNER:  Okay.  We'll agree to talk more,
21  Your Honor, but I do think that the positions that we've
22  taken in our letters and today is correct, but it doesn't
23  hurt to further communicate it, if it will help sort of
24  narrow the issues.
25          THE COURT:  And my expectation is that is

48

1  exactly what you are going to do is narrow it.
2          I'm looking at Thursday, February 22nd, having a
3  teleconference that day, if need be.  And it would probably
4  occur around, let's look at 4:30 in the afternoon, Eastern
5  time.
6          MR. WOODS:  Your Honor, that works here.  I know
7  there are some depositions scheduled for that day but a
8  representative from Honeywell with knowledge and authority
9  would attend such a conference, it might be my partner
10  Mr. Lueck, or some combination thereof.
11          THE COURT:  And I don't know what to suggest
12  about the use of the phone in that regard but it might be
13  better if we did it face-to-face at that time because it was
14  very, very difficult hearing you, and I know it was very
15  difficult for you to hear me.
16          MR. VEZEAU:  Your Honor, I apologize.  This is
17  Tim Vezeau for Sanyo.  Would it be possible if you have an
18  in-court hearing for those of us who represent, for example,
19  some of the stayed customer defendants to listen in at
20  least?
21          THE COURT:  It would be difficult.  We could
22  certainly do it in the conference room and it might be
23  easier for you in that regard but, again, I think the same
24  problem may happen.  I think part of the problem is just
25  the sheer number of people that are on the line.  I think

49

1  that is part of the problem, although it's calmed down now.
2          So please issue an order, get me an order, Matt,
3  about having an in-person conference.
4          MR. WOODS:  We'll do so, Your Honor.
5          THE COURT:  And it will be on Thursday,
6  February 22nd at 4:30.  We'll have it in my conference room.
7  I can seat, including myself, 13 people comfortably, and we
8  could include some of the customer defense counsel.  But if
9  there is going to be somebody who is going to be speaking on
10  behalf of the customer defendants' counsel, then I want that
11  person present here so that we don't have a problem with
12  communications.  All right?
13          MR. VEZEAU:  Thank you.
14          MR. WOODS:  All right.  Thank you, Your Honor.
15          THE COURT:  It's going to be the responsibility
16  of anybody who wants to just attend by phone to notify --
17  I'm sorry -- the gentleman I just talked to.  I apologize.
18          MR. VEZEAU:  Tim Vezeau, Your Honor.
19          THE COURT:  Tim?
20          MR. BENSON:  Yes.
21          THE COURT:  To get included in the conference
22  call, if he wants to bring it in, because I'm not going to
23  make that arrangement.  You will have to do that and we'll
24  just put you on the Polycom, the group on the Polycom that
25  are listening in on the discussions.

Thursday, January 25, 2007

50

```
 1              And include that in the order, too, Matt,
 2    please.
 3              MR. WOODS:  I will do so.
 4              THE COURT:  Okay.  Thank you.
 5              MR. WOODS:  Thank you, Your Honor.
 6              THE COURT:  All right.  Nothing further?
 7              MR. WOODS:  Nothing here, Your Honor.
 8              THE COURT:  All right.  Thank you all.  Take
 9    care.
10              (The attorneys respond, "Thank you.")
11              (Telephone conference ends at 4:06 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**0**

04-1338 [1] - 1:8

**1**

10 [1] - 27:9
100 [1] - 40:25
13 [1] - 49:7
16th [1] - 31:4
18 [3] - 21:15, 21:22, 27:7
19 [2] - 31:8, 31:22

**2**

20 [1] - 43:24
2005 [3] - 31:4, 33:6, 43:23
2006 [4] - 23:23, 24:7, 46:3, 46:9
2007 [1] - 1:10
21 [1] - 31:23
22nd [2] - 48:2, 49:6
25 [1] - 1:10

**3**

3:02 [2] - 1:10, 7:19

**4**

4:06 [1] - 50:11
4:30 [2] - 48:4, 49:6

**9**

9th [2] - 46:3, 46:9

**A**

a/k/a [1] - 6:24
AB [1] - 5:18
able [3] - 14:5, 17:24, 42:22
absolutely [3] - 22:10, 22:12, 46:22
abuse [1] - 21:1
accused [6] - 39:14, 39:16, 40:6, 43:16, 43:18, 44:4
acknowledging [1] - 42:14
act [2] - 26:15, 26:24
ACTION [1] - 1:3

actual [1] - 25:20
ADAM [1] - 7:7
Adam [1] - 12:10
add [1] - 22:19
additional [2] - 18:7, 22:18
address [5] - 30:17, 30:20, 31:1, 31:14, 44:23
addressed [4] - 15:19, 21:24, 23:14, 35:25
addressing [1] - 31:6
adjustments [1] - 19:5
admonition [1] - 45:13
advisory [1] - 37:15
affect [1] - 14:19
afternoon [19] - 7:20, 8:4, 8:8, 8:9, 8:11, 8:13, 8:16, 8:17, 8:24, 8:25, 9:18, 10:11, 10:16, 10:17, 10:22, 11:4, 11:5, 13:5, 48:4
agree [6] - 15:16, 15:21, 20:12, 22:14, 47:9, 47:20
agreed [1] - 13:25
agreeing [1] - 40:24
ahead [3] - 24:18, 31:3, 43:13
al [2] - 1:4, 1:7
alarming [1] - 22:22
Alexandria [1] - 2:6
allegations [2] - 17:4, 18:24
allowed [7] - 33:9, 39:1, 39:5, 40:13, 41:1, 41:11
almost [2] - 21:1, 27:8
alone [1] - 22:16
America [9] - 2:7, 3:25, 5:5, 5:14, 5:15, 6:5, 6:5, 6:13, 6:18
AMY [1] - 6:20
Amy [1] - 10:12
analysis [1] - 38:2
AND [1] - 1:1
Anderson [1] - 9:3
ANDERSON [2] - 3:3, 4:3
Andrea [1] - 11:1
ANDREW [1] - 3:18
Angeles [2] - 2:12, 2:18
answer [4] - 17:3, 19:3, 19:22, 21:5
answering [2] - 16:25, 18:23
apologize [3] - 15:4, 48:16, 49:17

APPEARANCES [7] - 1:14, 2:1, 3:1, 4:1, 5:1, 6:1, 7:1
Apple [13] - 3:11, 3:15, 11:2, 11:7, 16:6, 30:25, 42:22, 43:5, 43:16, 43:19, 44:2, 44:19
APPLE [1] - 1:7
apply [3] - 18:11, 18:15, 26:9
appreciate [2] - 16:15, 28:7
appropriate [2] - 23:1, 31:25
arguing [1] - 38:24
argument [7] - 26:17, 27:2, 36:18, 36:19, 38:25, 46:20, 46:21
arguments [6] - 21:19, 24:14, 29:10, 33:16, 36:11, 40:23
Argus [1] - 6:24
arrangement [1] - 49:23
array [1] - 19:3
ARSHT [1] - 1:16
art [2] - 38:5, 38:6
ARTHUR [1] - 5:20
Arthur [1] - 12:4
Ashby [1] - 8:6
Asia [1] - 25:21
Asian [1] - 25:19
aspect [2] - 32:18, 45:7
aspects [1] - 38:4
assume [1] - 27:3
assumptions [1] - 18:16
ation [1] - 39:2
ative [1] - 39:3
attend [2] - 48:9, 49:16
attorneys [1] - 50:10
audience [1] - 27:24
Austin [1] - 5:8
authority [1] - 48:8
available [1] - 14:5
AVELYN [1] - 5:8
Avelyn [1] - 11:25
avoid [1] - 17:23
aware [2] - 24:20, 26:13
awhile [1] - 20:13

**B**

bad [3] - 19:12, 29:16, 41:18

BAKER [1] - 4:20
banc [1] - 23:22
barely [3] - 38:19, 38:21, 41:17
base [1] - 23:20
based [6] - 20:21, 23:15, 26:21, 27:1, 36:9, 38:5
basic [1] - 36:5
basis [1] - 40:5
BEACH [1] - 7:3
Beach [1] - 13:8
bear [2] - 36:6, 42:13
bearing [1] - 20:22
bears [1] - 36:2
became [1] - 18:15
become [2] - 34:23, 41:4
becomes [4] - 18:5, 32:19, 37:9, 42:11
becoming [1] - 37:8
BEFORE [1] - 1:13
began [1] - 17:6
begin [1] - 16:13
beginning [2] - 7:19, 31:8
behalf [30] - 1:20, 5:18, 5:21, 8:2, 11:1, 11:2, 11:11, 12:1, 12:3, 12:8, 12:11, 12:15, 12:23, 13:1, 13:8, 15:6, 15:8, 16:1, 16:6, 21:7, 21:9, 21:10, 22:2, 27:21, 28:25, 29:2, 30:15, 30:25, 39:8, 49:10
behind [1] - 28:15
below [1] - 4:4
below-named [1] - 4:4
Ben [2] - 13:3, 13:4
BEN [2] - 2:11, 13:4
Ben-Meir [2] - 13:3, 13:4
BEN-MEIR [2] - 2:11, 13:4
bench [1] - 14:5
BENSON [6] - 2:18, 10:7, 39:7, 39:24, 40:4, 49:20
Benson [3] - 10:6, 10:7, 39:7
Bernstein [1] - 12:8
BERNSTEIN [1] - 7:9
beside [1] - 30:19
best [1] - 21:20
better [1] - 48:13
between [4] - 14:20, 26:6, 41:6, 44:22
beyond [1] - 39:2

bifurcate [1] - 35:14
bifurcation [2] - 35:11, 35:16
Bishop [2] - 9:7, 9:10
BISHOP [3] - 4:11, 9:6, 9:10
bit [2] - 21:11, 29:8
bizarre [1] - 27:3
blurred [1] - 37:9
Bob [1] - 12:14
borders [1] - 21:1
BOTTS [1] - 4:20
Bouchard [1] - 13:1
BOUCHARD [1] - 2:8
Bove [2] - 12:5, 12:20
BOVE [2] - 5:16, 5:20
BRANKO [1] - 7:9
Branko [1] - 12:7
Brann [1] - 9:15
BRANN [2] - 4:16, 9:18
break [2] - 34:17, 34:19
breaking [1] - 40:16
Brian [2] - 1:24, 10:14
BRIAN [1] - 6:23
bring [3] - 32:15, 42:23, 49:22
brings [1] - 14:18
brought [1] - 23:10
bulk [1] - 17:12
burden [2] - 18:7, 30:12
buzz [1] - 19:12
buzzing [1] - 32:4
BY [34] - 1:16, 1:19, 2:3, 2:5, 2:9, 2:11, 2:15, 2:18, 2:22, 3:3, 3:6, 3:10, 3:14, 3:18, 3:22, 4:3, 4:7, 4:11, 4:16, 4:21, 5:3, 5:8, 5:12, 5:17, 5:20, 6:3, 6:8, 6:11, 6:16, 6:20, 6:23, 7:3, 7:7, 7:9

**C**

calendar [1] - 45:1
California [4] - 2:12, 2:18, 3:14, 4:17
calmed [1] - 49:1
Camera [2] - 4:5, 11:13
Candidly [1] - 42:3
cannot [1] - 36:24
care [1] - 50:9
carrying [1] - 18:7
case [60] - 13:16, 13:23, 14:2, 14:5,

14:9, 15:14, 16:18, 16:19, 16:24, 17:5, 17:7, 18:17, 18:19, 21:15, 21:17, 21:18, 21:21, 21:23, 22:25, 23:3, 23:23, 24:13, 26:4, 26:6, 26:8, 26:11, 26:13, 26:14, 28:11, 29:5, 29:11, 29:17, 30:7, 30:11, 31:6, 31:25, 32:11, 32:25, 33:3, 33:6, 33:10, 33:14, 35:11, 35:19, 36:15, 38:10, 40:8, 41:2, 41:13, 43:15, 43:18, 44:1, 44:15, 45:4, 45:7, 45:10, 45:22, 45:23, 46:21

**cases** [3] - 13:17, 13:18, 13:19, 13:21, 26:20

**Casio** [4] - 3:11, 3:19

**caucus** [1] - 19:25

**causing** [1] - 40:17

**cellphone** [2] - 36:24, 37:2

**certain** [8] - 14:24, 20:1, 29:19, 36:7, 38:12, 38:24, 41:11, 45:11

**Certainly** [1] - 34:16

**certainly** [7] - 14:22, 25:25, 28:22, 29:5, 39:20, 45:5, 48:22

**CHALSEN** [2] - 5:12, 12:2

**Chalsen** [1] - 12:2

**chambers** [1] - 7:19

**chance** [2] - 27:23, 32:9

**change** [8] - 18:14, 24:22, 24:24, 25:7, 25:17, 29:4, 30:10, 32:11

**changed** [1] - 24:11

**characterization** [1] - 15:23

**characterizations** [1] - 47:18

**chart** [1] - 46:17

**check** [1] - 9:20

**cheek** [1] - 28:9

**Chicago** [3] - 5:4, 6:23, 10:15

**chiming** [1] - 39:8

**choice** [1] - 29:16

**Chris** [2] - 12:2, 12:3

**CHRISTOPHER** [2] - 5:12, 5:12

**Circuit** [7] - 18:14, 23:21, 24:5, 24:10, 36:22, 37:12, 37:24

**circumstance** [1] - 34:6

**circumstances** [1] - 35:18

**CIRESI** [1] - 1:18

**Citizen** [3] - 2:13, 2:13, 13:2

**City** [1] - 3:14

**CIVIL** [1] - 1:3

**claim** [6] - 38:3, 45:24, 46:7, 46:10, 46:16, 46:17

**claiming** [1] - 17:22

**claims** [7] - 17:12, 19:4, 19:20, 20:17, 20:23, 21:2, 47:15

**clarify** [1] - 18:23

**clarity** [4] - 19:17, 19:18, 19:19, 20:7

**clause** [1] - 15:10

**clear** [8] - 15:18, 17:8, 17:9, 36:19, 41:8, 42:6, 42:7, 44:5

**clearly** [1] - 35:13

**Clearly** [1] - 16:19

**CLERK** [2] - 12:25, 45:2

**client** [1] - 44:9

**clients** [1] - 39:5

**close** [1] - 37:18

**Co** [5] - 2:13, 2:13, 3:7, 3:24, 5:5

**colossal** [1] - 14:15

**Columbia** [4] - 2:23, 3:18, 4:12, 6:9

**combination** [1] - 48:10

**comfortably** [1] - 49:7

**coming** [2] - 9:3, 44:25

**comments** [3] - 35:20, 43:20, 47:8

**commercial** [2] - 36:2, 42:13

**commit** [1] - 20:17

**commitment** [2] - 18:22, 19:18

**communicate** [1] - 47:23

**communicated** [2] - 20:5, 20:6

**communication** [1] - 47:1

**communications** [1] - 49:12

**company** [4] - 27:4, 34:8, 34:10

**comparison** [1] - 44:22

**complains** [1] - 37:13

**complete** [1] - 22:16

**complicate** [1] - 22:19

**comprehensive** [1] - 17:13

**Computer** [7] - 3:11, 3:15, 3:20, 5:14, 6:25, 10:13

**COMPUTER** [1] - 1:7

**CONAWAY** [3] - 2:2, 6:3, 7:6

**Conaway** [3] - 8:14, 12:11, 12:13

**concept** [3] - 20:13, 25:1, 25:8

**concern** [1] - 45:8

**concerned** [1] - 38:16

**concerning** [2] - 34:9, 41:3

**concerns** [1] - 39:6

**concluded** [1] - 23:15

**Concord** [2] - 4:5, 11:13

**concurring** [2] - 24:13, 26:12

**conducting** [1] - 39:17

**conference** [7] - 7:19, 48:9, 48:22, 49:3, 49:6, 49:21, 50:11

**CONFERENCE** [1] - 1:11

**conflict** [2] - 26:5, 26:14

**conflicting** [2] - 23:21, 24:6

**connection** [2] - 41:18, 41:23

**Connolly** [3] - 12:5, 12:20

**CONNOLLY** [4] - 5:16, 5:20, 5:20, 12:4

**consent** [1] - 45:5

**consented** [1] - 14:1

**consider** [1] - 26:13

**considered** [3] - 24:2, 24:15, 24:16

**consistent** [2] - 23:20, 24:5

**consolidated** [1] - 13:21

**construction** [5] - 38:3, 45:24, 46:8, 46:11, 46:17

**contemplated** [1] - 22:17

**context** [1] - 31:13

**continue** [3] - 40:9, 41:7, 46:19

**continued** [2] - 16:19, 47:1

**Continued** [6] - 2:1, 3:1, 4:1, 5:1, 6:1, 7:1

**continuing** [1] - 33:13

**controversy** [1] - 44:1

**conversation** [8] - 16:15, 16:17, 18:22, 20:3, 20:4, 27:14, 28:12, 45:15

**conversations** [1] - 28:17

**Corp** [3] - 2:19, 2:20, 4:13

**Corporation** [16] - 2:20, 2:24, 3:25, 4:9, 4:13, 6:4, 6:5, 6:5, 6:13, 6:13, 6:17, 7:11, 12:9, 12:13, 13:10, 23:23

**Correct** [1] - 8:1

**correct** [7] - 15:23, 43:3, 46:11, 47:7, 47:11, 47:12, 47:22

**CORROON** [2] - 3:3, 4:3

**Couched** [1] - 27:14

**counsel** [12] - 4:4, 4:5, 10:4, 10:12, 10:14, 28:6, 31:7, 38:17, 44:21, 45:4, 49:8, 49:10

**Counsel** [25] - 1:20, 2:7, 2:13, 2:19, 2:24, 3:7, 3:11, 3:15, 3:19, 3:24, 4:9, 4:13, 4:18, 4:22, 5:5, 5:9, 5:14, 5:18, 5:21, 6:4, 6:13, 6:17, 6:24, 7:5, 7:11

**couple** [2] - 13:13, 33:7

**coupled** [1] - 18:13

**course** [2] - 17:20, 42:18

**COURT** [84] - 1:1, 7:20, 8:2, 8:11, 8:17, 8:25, 9:9, 9:11, 9:13, 9:19, 10:1, 10:10, 10:17, 10:20, 10:24, 11:5, 11:8, 11:12, 11:22, 13:6, 13:11, 15:24, 16:2, 19:7, 19:10, 19:12, 19:15, 21:6, 23:9, 23:19, 24:18, 25:9, 25:13, 27:18, 28:3, 28:9, 29:20, 29:22, 31:3, 32:3, 32:9, 34:1, 34:5, 35:9, 35:12, 36:8, 36:23, 37:3, 37:6, 37:8, 37:11, 37:16, 38:1, 38:23, 39:23, 40:1, 40:7, 40:15, 40:18, 40:21, 41:19, 41:22, 42:21, 43:1, 43:8, 43:13, 44:10, 44:17, 45:3, 45:20, 46:7, 46:14, 46:16, 47:2, 47:25, 48:11, 48:21, 49:5, 49:15, 49:19, 49:21, 50:4, 50:6, 50:8

**Court** [8] - 14:3, 14:4, 14:14, 20:6, 20:19, 26:8, 31:10, 43:7

**court** [2] - 40:22, 48:18

**Court's** [3] - 29:17, 30:25, 43:20

**courts** [1] - 26:6

**create** [1] - 26:16

**created** [1] - 26:14

**creates** [1] - 44:1

**critical** [1] - 16:18

**Cross** [1] - 10:12

**CROSS** [1] - 6:19

**crossroads** [3] - 16:18, 17:1, 19:17

**current** [3] - 15:14, 37:24, 39:11

**customer** [44] - 10:5, 10:13, 11:11, 12:5, 12:9, 12:21, 12:23, 13:8, 15:6, 15:11, 15:15, 16:3, 16:10, 18:10, 18:12, 18:21, 19:2, 19:24, 21:25, 22:6, 22:19, 23:2, 23:8, 27:18, 27:21, 28:25, 29:2, 29:18, 30:9, 31:5, 32:16, 32:21, 34:22, 35:4, 36:2, 36:4, 36:11, 40:12, 42:13, 44:19, 45:16, 48:19, 49:8, 49:10

**customers** [7] - 17:15, 20:24, 24:25, 25:1, 27:9, 28:15, 31:18

# D

**damages** [8] - 23:6, 30:23, 32:2, 34:3, 35:22, 37:22, 47:10, 47:14

**Darren** [1] - 11:16

**DARREN** [1] - 4:7

**date** [3] - 45:24, 46:12,

47:2
**dates** [2] - 14:24, 45:25
**DAVID** [1] - 2:11
**David** [2] - 13:2, 13:4
**de** [1] - 14:12
**deal** [2] - 36:14, 44:17
**dealing** [1] - 32:23
**deals** [1] - 30:7
**December** [4] - 17:18, 23:23, 24:7, 25:3
**decide** [3] - 14:8, 20:1
**decided** [4] - 21:20, 23:22, 26:7, 43:6
**decides** [1] - 14:12
**deciding** [2] - 14:10, 46:22
**decision** [8] - 14:12, 20:13, 24:10, 24:13, 27:7, 33:2, 36:22, 37:13
**decisions** [2] - 20:8, 37:14
**defend** [3] - 17:15, 19:19, 28:15
**defendant** [11] - 10:5, 12:13, 16:9, 16:10, 21:9, 21:18, 27:4, 29:2, 39:3, 43:2, 44:19
**Defendants** [1] - 1:8
**defendants** [82] - 4:4, 7:25, 10:13, 11:11, 12:6, 12:15, 12:21, 12:23, 13:2, 13:8, 13:24, 14:21, 15:6, 15:9, 15:11, 15:15, 16:3, 16:4, 17:14, 17:15, 17:22, 18:10, 18:12, 18:21, 18:25, 19:25, 20:2, 20:9, 20:11, 20:19, 21:7, 21:10, 21:25, 22:5, 22:6, 22:9, 22:11, 22:20, 22:23, 23:2, 23:8, 23:16, 25:19, 27:8, 27:11, 27:18, 27:21, 28:14, 29:1, 29:18, 30:9, 30:16, 31:5, 31:17, 32:13, 32:16, 32:21, 34:22, 35:4, 36:2, 36:5, 36:11, 36:12, 36:14, 36:20, 37:21, 38:9, 38:23, 39:9, 40:8, 40:11, 40:12, 41:1, 41:14, 42:13, 44:23, 45:16, 48:19
**defendants'** [1] - 49:10

**defending** [2] - 24:25, 25:1
**defense** [2] - 27:5, 49:8
**defenses** [1] - 18:11
**deferring** [1] - 47:9
**degree** [1] - 22:19
**DELAWARE** [1] - 1:1
**Delaware** [1] - 1:10
**Dell** [3] - 5:9, 11:23, 12:1
**demands** [1] - 25:22
**denied** [1] - 40:11
**deny** [1] - 39:19
**denying** [1] - 40:5
**depended** [1] - 31:19
**depositions** [1] - 48:7
**DEPUTY** [2] - 12:25, 45:2
**described** [1] - 38:8
**designate** [1] - 20:9
**designated** [2] - 16:5, 42:5
**detail** [1] - 17:21
**details** [3] - 42:16, 42:19, 45:18
**determined** [1] - 33:8
**Devices** [3] - 2:20, 4:23, 4:23
**Dick** [1] - 8:15
**dictated** [1] - 27:17
**Diego** [1] - 4:17
**difference** [2] - 14:24, 24:14
**different** [1] - 19:21
**difficult** [5] - 32:4, 41:23, 48:14, 48:15, 48:21
**direct** [8] - 17:3, 17:25, 31:8, 32:19, 33:17, 33:21, 35:5, 36:17
**direction** [2] - 30:11, 42:3
**directly** [4] - 14:18, 31:9, 32:14
**disagree** [4] - 22:12, 24:19, 24:24, 47:17
**discovery** [24] - 14:9, 22:16, 30:8, 30:13, 33:9, 34:16, 35:3, 35:14, 36:1, 36:4, 38:11, 39:11, 39:17, 39:20, 40:3, 40:5, 40:9, 40:10, 41:1, 41:5, 41:7, 41:12, 42:12, 42:15
**discussed** [2] - 23:25, 35:1
**discussion** [4] - 26:3,

30:18, 31:22, 31:23
**discussions** [4] - 23:24, 24:3, 25:22, 49:25
**dismiss** [2] - 42:24, 43:9
**dispatch** [1] - 44:7
**Display** [3] - 2:24, 4:23, 13:10
**Displays** [2] - 2:13, 4:23
**dispositive** [4] - 14:2, 14:10, 45:23, 46:21
**dispute** [2] - 46:4, 46:11
**distinct** [1] - 44:24
**District** [7] - 2:23, 3:18, 4:12, 6:9, 14:3, 14:4, 14:14
**DISTRICT** [2] - 1:1, 1:1
**document** [1] - 15:22
**dogged** [1] - 42:17
**Don** [1] - 13:9
**DONALD** [1] - 2:22
**done** [7] - 13:12, 13:23, 22:12, 34:12, 45:21, 46:2
**down** [5] - 14:16, 20:18, 21:17, 29:6, 49:1
**dramatic** [1] - 24:14
**DSU** [4] - 23:23, 25:6, 26:4, 26:19
**DUANE** [1] - 2:22
**Duane** [1] - 13:9
**due** [1] - 21:1
**DUNNER** [2] - 4:7, 4:11
**during** [2] - 27:25, 42:17

**E**

**earliest** [1] - 35:25
**early** [1] - 25:23
**easier** [2] - 32:15, 48:23
**Eastern** [1] - 48:4
**Eastman** [1] - 7:5
**ed** [1] - 36:10
**effect** [3] - 25:25, 38:8, 38:15
**effective** [1] - 16:20
**efficient** [4] - 17:11, 18:4, 21:18, 29:17
**efficiently** [2] - 16:24, 20:15
**effort** [2] - 22:7, 28:13
**efforts** [1] - 28:8

**either** [6] - 14:3, 26:9, 35:21, 40:11, 40:18, 47:3
**Electical** [1] - 3:25
**Electric** [1] - 5:5
**Electrical** [1] - 3:24
**Electro** [1] - 4:13
**Electro-Optics** [1] - 4:13
**Electronic** [1] - 4:23
**Elizabeth** [2] - 9:4, 9:15
**ELIZABETH** [2] - 4:16, 6:20
**ELKINS** [1] - 5:7
**en** [1] - 23:22
**encourage** [2] - 45:3
**end** [7] - 18:8, 31:11, 31:20, 34:10, 37:8, 39:9, 39:21
**ends** [1] - 50:11
**enforceability** [6] - 30:17, 30:21, 33:25, 35:23, 36:10, 47:17
**engage** [1] - 20:16
**enter** [1] - 45:22
**entered** [1] - 27:12
**entire** [2] - 30:16, 30:18
**entities** [4] - 9:20, 11:21, 12:20, 28:16
**entities'** [1] - 7:23
**entitled** [1] - 42:12
**Epson** [6] - 2:19, 2:20, 10:4, 39:8, 41:17
**Ericsson** [3] - 5:18, 5:18, 12:20
**ESQ** [36] - 1:16, 1:19, 2:3, 2:5, 2:9, 2:11, 2:15, 2:18, 2:22, 3:3, 3:6, 3:10, 3:14, 3:18, 3:22, 4:3, 4:7, 4:11, 4:16, 4:16, 4:21, 5:3, 5:8, 5:12, 5:12, 5:17, 5:20, 6:3, 6:8, 6:11, 6:16, 6:20, 6:23, 7:3, 7:7, 7:9
**essence** [1] - 38:15
**essentially** [1] - 17:15
**establish** [1] - 36:5
**et** [2] - 1:4, 1:7
**Evans** [1] - 10:12
**EVANS** [4] - 6:20, 10:11, 10:18, 10:21
**evidence** [1] - 41:10
**exactly** [3] - 24:22, 42:21, 48:1
**example** [8] - 20:8, 20:14, 27:3, 34:7, 34:8, 38:15, 42:10,

48:18
**except** [1] - 26:17
**exchange** [2] - 46:1, 46:15
**exchanged** [1] - 46:9
**Excuse** [1] - 39:23
**existed** [1] - 24:6
**expect** [1] - 40:9
**expectation** [1] - 47:25
**expense** [1] - 44:19
**expert** [5] - 23:7, 37:20, 37:22, 37:23, 47:9
**explicitly** [1] - 28:22
**express** [1] - 35:11
**extend** [1] - 30:11
**extension** [1] - 22:14
**extent** [7] - 33:13, 36:7, 36:12, 38:16, 38:23, 40:10, 42:10
**extraterritorial** [2] - 31:9, 32:1

**F**

**Fab** [2] - 20:10, 22:22
**face** [5] - 20:20, 28:1, 42:19, 48:13
**face-to-face** [1] - 48:13
**fact** [9] - 18:7, 19:19, 23:2, 25:21, 27:1, 31:15, 35:11, 35:14, 47:16
**fading** [1] - 46:6
**fair** [1] - 26:21
**familiar** [1] - 26:4
**FARABOW** [2] - 4:7, 4:11
**fashion** [1] - 24:2
**Faulkner** [1] - 9:4
**fear** [1] - 37:23
**February** [2] - 48:2, 49:6
**Fed** [3] - 23:21, 24:5, 24:10
**Federal** [3] - 18:14, 36:22, 37:12, 37:24
**feet** [1] - 35:15
**few** [3] - 13:15, 27:24
**fights** [1] - 30:1
**figure** [1] - 38:5
**figuring** [1] - 34:19
**file** [5] - 38:13, 43:5, 43:9, 44:11, 44:13
**filed** [1] - 16:7
**filing** [1] - 29:2
**Film** [2] - 3:7, 3:8

final [1] - 44:5
finally [2] - 11:23, 29:8
fine [2] - 10:20, 16:2
finish [1] - 27:16
Finnegan [3] - 9:5, 9:8, 11:17
FINNEGAN [2] - 4:7, 4:11
fire [1] - 35:15
firm [1] - 8:15
First [2] - 13:14, 27:8
first [22] - 15:9, 20:11, 21:15, 22:5, 22:15, 22:24, 25:18, 27:16, 29:12, 29:16, 30:6, 30:17, 30:20, 31:6, 31:25, 33:10, 33:18, 33:24, 36:6, 39:12, 39:18, 43:23
FISH [3] - 3:9, 3:13, 3:17
Fish [1] - 10:23
Five [2] - 20:10, 22:23
five [1] - 22:23
Flock [1] - 12:14
FLOCK [1] - 6:11
focused [2] - 24:2, 30:20
following [1] - 7:18
FOR [1] - 1:1
foreign [3] - 28:16, 28:21
form [1] - 15:22
formalized [1] - 35:16
format [1] - 32:11
forward [8] - 15:12, 15:14, 16:24, 19:5, 23:17, 29:11, 33:7, 36:7
foul [1] - 26:8
frankly [2] - 21:25, 34:13
FRIEDLANDER [1] - 2:8
Friedlander [1] - 13:1
front [3] - 28:24, 30:3, 30:4
frustrating [1] - 21:16
Fuji [5] - 3:7, 3:8, 8:19, 21:9, 25:16
Fujitsu [5] - 5:14, 5:14, 11:24, 12:3
full [2] - 19:3, 41:6
fully [2] - 32:21, 35:1
fundamental [1] - 16:25
FURLOW [1] - 2:15
future [4] - 36:13, 42:24, 44:12

G

Gaffigan [1] - 1:24
GARRETT [2] - 4:7, 4:11
GASPAR [1] - 5:12
Gasper [1] - 12:3
Geddes [1] - 8:6
general [2] - 29:9, 44:15
gentleman [1] - 49:17
given [3] - 15:14, 42:3, 45:13
Gotshal [1] - 12:23
GOTSHAL [1] - 3:22
Graham [1] - 11:15
GREENBLUM [1] - 7:9
Greenblum [1] - 12:8
GRIMM [3] - 1:16, 8:4, 8:8
Grimm [1] - 8:5
grounds [1] - 17:23
group [4] - 20:10, 38:9, 41:1, 49:24
Group [2] - 6:25, 10:13
groups [3] - 16:6, 16:11, 23:16
guess [5] - 8:8, 14:7, 21:11, 32:17, 43:21
guidance [1] - 42:9

H

H-u-n-s-a-k-e-r [1] - 11:3
HADLEY [1] - 5:11
Hails [1] - 12:14
HAILS [1] - 6:8
HALKOWSKI [6] - 3:10, 10:22, 10:25, 11:6, 11:9, 30:14
Halkowski [2] - 10:23, 30:15
handle [4] - 18:17, 20:15, 21:20, 24:3
handled [1] - 13:18
hands [1] - 17:7
hanging [1] - 46:23
happy [1] - 45:14
hard [1] - 28:13
harm/no [1] - 26:8
HARRIS [1] - 7:3
Harris [1] - 13:7
Hartford [2] - 6:24, 10:13
HARTSON [2] - 2:11, 2:17

Hartson [2] - 10:8, 13:3
HASTINGS [1] - 4:15
Hastings [1] - 9:16
hear [13] - 16:3, 16:8, 16:10, 21:6, 32:4, 36:25, 37:4, 37:5, 37:19, 38:17, 41:17, 41:23, 48:15
heard [9] - 17:19, 17:21, 21:13, 21:14, 24:23, 25:10, 30:18, 47:8
hearing [10] - 21:19, 25:2, 25:3, 31:4, 31:13, 35:25, 40:24, 42:4, 48:14, 48:18
held [1] - 7:19
Hello [2] - 9:17, 9:19
help [2] - 41:19, 47:23
helpful [1] - 47:8
Henderson [3] - 9:5, 9:8, 11:17
HENDERSON [2] - 4:7, 4:11
Hi [3] - 9:25, 10:1, 13:6
Hitachi [6] - 4:22, 4:23, 4:23, 9:20, 9:22
HOGAN [2] - 2:11, 2:17
Hogan [2] - 10:7, 13:3
hoisted [1] - 36:13
hold [1] - 35:15
HONEYWELL [1] - 1:3
Honeywell [35] - 1:20, 1:21, 8:3, 13:18, 13:19, 14:20, 15:7, 15:9, 16:1, 17:19, 17:23, 17:24, 18:2, 18:24, 19:4, 20:5, 20:20, 22:15, 25:5, 27:23, 28:1, 28:18, 29:1, 29:6, 35:3, 36:15, 38:9, 38:25, 39:11, 39:14, 40:25, 41:6, 41:15, 42:12, 48:8
Honeywell's [11] - 17:4, 19:20, 20:17, 20:23, 21:2, 29:15, 31:7, 33:11, 43:23, 47:14, 47:15
Honor [88] - 8:1, 8:4, 8:9, 8:13, 8:16, 8:20, 8:24, 9:2, 9:12, 9:17, 9:18, 9:25, 10:3, 10:9, 10:11, 10:16, 10:18, 10:22, 11:4,

11:10, 11:20, 11:25, 12:2, 12:4, 12:7, 12:10, 12:12, 12:17, 12:19, 12:22, 12:25, 13:5, 15:3, 15:20, 16:14, 16:21, 17:9, 19:11, 19:16, 21:5, 21:8, 21:12, 21:13, 22:13, 23:5, 23:18, 24:8, 24:17, 25:12, 25:15, 25:18, 27:20, 27:22, 27:25, 29:1, 30:3, 30:14, 30:24, 35:7, 35:10, 35:15, 35:17, 35:19, 36:21, 37:10, 38:18, 38:20, 38:22, 39:7, 40:14, 41:16, 42:2, 42:3, 42:20, 42:25, 43:12, 45:12, 46:5, 46:25, 47:6, 47:21, 48:6, 48:16, 49:4, 49:14, 49:18, 50:5, 50:7
Honor's [2] - 45:13, 47:8
HONORABLE [1] - 1:13
hook [1] - 27:11
hope [1] - 16:4
hopefully [1] - 14:16
hoping [1] - 44:20
horrible [1] - 32:4
Horwitz [8] - 9:2, 9:14, 9:21, 11:10, 15:3, 22:1, 27:21, 40:14
HORWITZ [17] - 4:3, 9:2, 9:12, 9:14, 9:21, 11:10, 11:13, 11:18, 11:23, 15:3, 27:20, 28:5, 28:10, 29:21, 29:23, 40:14, 40:16
Hunsaker [3] - 11:3, 30:25, 42:25
HUNSAKER [9] - 3:14, 11:4, 30:24, 31:4, 42:25, 43:4, 43:11, 43:14, 44:16
hurt [1] - 47:23
HUTZ [2] - 5:16, 5:20
hypotheticals [1] - 26:18

I

idea [2] - 35:22, 44:3
identification [2] - 33:11, 43:21
identified [4] - 43:25, 44:6, 44:8

Ill [2] - 5:20, 12:5
Illinois [2] - 5:4, 6:23
imagine [1] - 35:2
Imaging [1] - 2:20
immediately [1] - 35:5
impact [2] - 18:12, 20:22
implicates [1] - 43:15
important [2] - 32:20, 38:4
IN [2] - 1:1, 1:1
in-court [1] - 48:18
in-person [2] - 42:4, 49:3
inapplicable [1] - 26:13
INC [2] - 1:3, 1:7
Inc [20] - 1:21, 1:21, 2:7, 3:8, 3:11, 3:11, 3:15, 3:19, 4:9, 4:24, 5:9, 5:14, 5:15, 5:18, 5:22, 6:5, 6:18, 6:25, 7:11
inclined [2] - 32:10, 43:8
include [3] - 33:21, 49:8, 50:1
included [1] - 49:21
including [2] - 45:23, 49:7
incorporated [1] - 31:20
incredible [1] - 28:17
indemnification [1] - 19:2
indicate [1] - 29:25
indicated [1] - 33:5
indicates [1] - 46:8
indicating [1] - 45:22
indication [1] - 34:25
Indirect [1] - 23:11
indirect [21] - 17:24, 18:1, 18:11, 20:21, 23:10, 23:12, 24:1, 24:3, 24:21, 25:5, 25:23, 27:1, 27:5, 31:2, 32:19, 32:23, 33:18, 33:22, 34:22, 35:5, 36:17
indirectly [2] - 32:14, 32:15
individual [3] - 16:9, 25:11, 33:1
inducement [9] - 18:8, 26:3, 26:10, 26:16, 39:10, 39:19, 39:21, 40:5, 41:4
indulge [1] - 21:11
Industrial [1] - 3:24
inefficient [2] - 20:18,

20:25
inform [1] - 39:1
information [14] -
  30:2, 31:16, 34:7,
  34:9, 34:21, 36:5,
  37:14, 38:24, 39:15,
  39:16, 41:3, 44:8,
  46:1
infringe [2] - 26:22,
  32:14
infringement [30] -
  17:4, 17:25, 18:1,
  18:8, 23:10, 23:12,
  24:1, 24:4, 26:10,
  26:24, 27:1, 30:23,
  31:2, 31:15, 31:19,
  32:19, 32:23, 33:17,
  33:21, 34:3, 34:22,
  35:2, 35:6, 35:21,
  36:17, 37:18, 38:3,
  39:14, 41:4, 47:13
initial [5] - 16:22, 17:4,
  18:16, 18:24, 20:23
initiated [2] - 13:19,
  13:20
Innolux [2] - 2:24,
  13:10
instance [4] - 24:20,
  26:7, 31:6, 32:1
instead [2] - 24:24,
  24:25
instruction [2] -
  26:19, 26:20
Intellectual [1] - 1:21
intended [1] - 20:9
intent [1] - 26:22
interested [1] - 38:14
INTERNATIONAL [1] -
  1:3
International [1] -
  1:21
introductions [1] -
  7:21
invalidity [8] - 29:12,
  30:7, 32:12, 33:16,
  34:15, 36:10, 36:16,
  38:3
investigate [2] - 39:1,
  39:5
involved [4] - 13:24,
  15:16, 15:17, 34:15
involvement [2] -
  44:21, 45:6
irrelevant [1] - 38:24
issue [27] - 16:7,
  18:13, 21:20, 23:6,
  23:10, 24:21, 25:17,
  25:23, 31:2, 31:8,
  31:9, 32:19, 32:23,
  33:17, 37:14, 37:18,

37:21, 40:3, 42:23,
43:11, 43:15, 44:3,
44:23, 46:3, 46:16,
49:2
issues [28] - 14:7,
  14:19, 15:1, 16:11,
  20:21, 23:1, 28:16,
  28:18, 28:20, 28:22,
  29:13, 30:8, 30:22,
  32:13, 32:16, 32:22,
  33:25, 35:2, 39:10,
  39:19, 39:20, 41:3,
  42:20, 44:17, 44:25,
  46:23, 47:16, 47:24
issuing [1] - 17:7
itself [2] - 14:20, 14:21

J

JANOFSKY [1] - 4:15
January [1] - 1:10
Japanese [2] - 27:4,
  34:8
JIRON [2] - 4:7, 11:16
Jiron [1] - 11:16
JMS [1] - 23:23
JOHN [3] - 2:9, 6:3,
  6:11
John [3] - 12:12,
  12:13, 12:25
Jordan [34] - 13:17,
  17:6, 17:10, 18:4,
  20:8, 21:14, 21:19,
  22:4, 22:17, 23:11,
  23:14, 24:8, 24:16,
  24:21, 25:8, 25:24,
  27:6, 27:12, 27:17,
  28:11, 28:24, 29:10,
  29:14, 30:5, 31:2,
  31:6, 31:13, 31:16,
  31:24, 32:24, 34:25,
  35:13, 36:1, 38:11
Jordan's [5] - 17:16,
  18:16, 25:2, 28:13,
  44:6
judge [1] - 14:16
JUDGE [1] - 1:13
Judge [44] - 7:20,
  13:17, 14:3, 14:14,
  14:17, 17:6, 17:10,
  17:16, 18:4, 18:16,
  20:8, 21:14, 21:18,
  22:4, 22:17, 23:11,
  23:14, 24:8, 24:16,
  24:20, 25:2, 25:8,
  25:24, 27:6, 27:12,
  27:17, 28:11, 28:13,
  28:24, 29:10, 29:14,
  30:4, 31:1, 31:5,
  31:13, 31:16, 31:24,

32:24, 34:25, 35:13,
36:1, 37:13, 38:11,
44:6
judges [2] - 26:12,
  37:13
Judges [1] - 14:4
judgeship [1] - 13:21
judgment [1] - 20:20
judicial [1] - 14:15
jurisdiction [3] - 14:1,
  19:6, 45:6
jury [2] - 26:18, 26:20

K

KAPLAN [1] - 1:18
KAREN [1] - 2:3
Karen [1] - 8:13
Katten [1] - 11:19
KATTEN [1] - 5:3
Katzenstein [1] - 10:4
KATZENSTEIN [3] -
  2:15, 2:15, 10:3
Kelly [5] - 8:15, 11:2,
  30:24, 31:3, 42:25
KELLY [3] - 2:5, 3:14,
  8:16
Kenyon [4] - 12:14,
  12:16
KENYON [6] - 6:8,
  6:11, 6:15
kind [7] - 14:7, 16:16,
  26:19, 29:4, 35:18,
  42:16, 42:18
knowledge [4] - 22:3,
  26:15, 26:16, 48:8
known [1] - 26:23
Kodak [2] - 7:5, 13:8
Kopsidas [1] - 11:1
KOPSIDAS [2] - 3:18,
  11:1
Korean [1] - 34:10
KORNICZKY [2] -
  4:16, 9:17
Korniczky [1] - 9:15
Kyocera [2] - 2:20,
  10:5

L

L.L.P [2] - 1:18, 4:20
landline [1] - 40:17
language [1] - 15:18
large [1] - 22:4
largely [1] - 25:19
Larry [5] - 8:22, 36:23,
  38:2, 47:17
LAURA [1] - 7:3

Laurie [1] - 13:7
LAVAN [1] - 3:5
law [3] - 18:14, 24:4,
  24:6
Lawrence [4] - 8:21,
  25:15, 36:21, 36:23
LAWRENCE [1] - 3:6
LCD [3] - 13:19, 31:15,
  43:18
lead [2] - 10:14, 32:18
learned [3] - 39:12,
  39:18, 40:6
leash [1] - 45:21
least [9] - 17:8, 20:4,
  21:9, 22:11, 24:12,
  32:22, 33:1, 33:18,
  48:20
leave [1] - 10:19
left [3] - 34:4, 34:14,
  43:19
leftover [1] - 15:22
lengthy [1] - 18:6
letter [4] - 15:5, 15:8,
  16:7, 17:2
letters [2] - 11:7,
  47:22
letting [1] - 38:14
liability [4] - 17:23,
  25:23, 26:3, 26:10
liable [2] - 39:22,
  39:25
licensed [1] - 43:17
lift [4] - 43:1, 43:9,
  44:11, 44:13
light [3] - 15:1, 24:6,
  47:8
limited [11] - 22:25,
  29:20, 29:22, 33:8,
  33:24, 36:4, 38:10,
  40:25, 42:12, 42:14,
  44:18
Limited [3] - 5:14,
  5:21, 12:6
limiting [2] - 35:3
line [13] - 7:22, 8:6,
  8:14, 8:21, 9:15,
  10:2, 10:6, 11:14,
  12:16, 13:2, 32:6,
  32:7, 48:25
lines [1] - 40:9
lingering [1] - 15:22
list [4] - 13:12, 43:24,
  44:4, 46:10
listed [1] - 28:22
listen [1] - 48:19
listening [1] - 49:25
lists [1] - 8:19
litigate [1] - 39:10,
  39:21
litigation [1] - 42:18

lived [1] - 28:6
LLC [1] - 6:19
LLP [10] - 2:17, 2:22,
  3:3, 3:5, 4:3, 4:7,
  4:11, 4:15, 5:11, 7:3
Local [1] - 4:4
local [2] - 10:4, 10:12
locked [1] - 37:22
LODGE [2] - 5:16,
  5:20
look [3] - 14:14, 32:9,
  48:4
looked [2] - 31:2, 33:4
looking [2] - 33:14,
  48:2
Los [2] - 2:12, 2:18
loud [1] - 36:19
louder [1] - 37:7
Ltd [7] - 2:13, 2:13,
  3:7, 4:22, 4:23, 4:23,
  5:5
Lueck [5] - 31:7,
  31:14, 31:19, 31:21,
  48:10

M

macro [2] - 42:6,
  42:15
Magistrate [1] - 14:17
MAGISTRATE [1] -
  1:13
MAIER [1] - 2:5
maintain [1] - 22:13
majority [2] - 20:17,
  25:5
manage [1] - 13:23
management [2] -
  16:20, 29:17
Manges [1] - 12:23
MANGES [1] - 3:22
manipulation [1] -
  27:7
manner [1] - 17:13
manufacturer [23] -
  17:14, 17:22, 18:25,
  19:25, 20:1, 20:19,
  21:7, 21:9, 21:10,
  22:4, 22:9, 22:10,
  22:23, 23:16, 25:18,
  27:10, 31:17, 39:9,
  39:17, 40:8, 40:11,
  44:22
manufacturers [8] -
  24:25, 29:25, 33:1,
  34:14, 34:15, 41:5,
  41:6, 43:16
manufacturing [12] -
  13:1, 13:24, 14:21,

15:9, 15:11, 16:4,
16:9, 25:20, 28:14,
32:13, 36:11, 39:3
**Manville** [2] - 26:6,
26:21
**Margules** [1] - 13:1
**MARGULES** [1] - 2:8
**Markman** [2] - 37:13,
46:21
**Mary** [1] - 11:15
**MARY** [1] - 1:13
**Matsushita** [3] - 3:24,
3:24, 12:24
**Matt** [13] - 8:5, 8:9,
15:20, 16:13, 19:7,
19:15, 24:17, 24:18,
33:23, 42:2, 42:21,
49:2, 50:1
**matter** [5] - 13:22,
20:15, 26:9, 46:19,
46:24
**matters** [1] - 14:9
**MATTHEW** [1] - 1:19
**Max** [2] - 9:7, 9:10
**MAX** [1] - 9:10
**MAXIMILIENNE** [1] -
4:11
**McCLELLAND** [1] -
2:5
**McCLOY** [1] - 5:11
**McPhail** [3] - 2:22,
13:9
**mean** [1] - 36:24
**means** [1] - 14:1
**mediation** [3] - 13:23,
27:25, 45:7
**mediations** [1] - 17:20
**Medical** [1] - 23:23
**MEIR** [2] - 2:11, 13:4
**Meir** [2] - 13:3, 13:4
**mention** [1] - 28:20
**mentioned** [1] - 22:21
**merely** [1] - 26:15
**Merit** [1] - 1:25
**micro** [3] - 42:8,
42:18, 47:12
**might** [3] - 48:9,
48:12, 48:22
**Milbank** [1] - 12:3
**MILBANK** [1] - 5:11
**MILLER** [1] - 1:18
**mind** [2] - 21:12,
27:15
**mine** [2] - 26:20, 40:21
**minimal** [3] - 19:5,
35:3, 44:21
**Minneapolis** [1] - 1:19
**Minnesota** [1] - 1:19
**minute** [2] - 23:19,
28:7

**modules** [7] - 22:3,
31:10, 31:15, 39:13,
39:16, 43:18
**month** [1] - 22:14
**months** [9] - 14:22,
14:25, 21:15, 21:22,
22:18, 27:7, 27:9,
27:10, 43:24
**morning** [2] - 10:9,
10:10
**MORRIS** [2] - 1:16,
2:22
**Morris** [1] - 13:10
**most** [2] - 17:12,
31:10
**motion** [9] - 14:10,
25:22, 30:2, 38:13,
42:23, 43:5, 43:6,
43:9, 44:11
**motions** [4] - 14:2,
20:21, 31:5, 45:23
**move** [5] - 7:22, 16:24,
19:4, 36:7, 38:13
**moved** [1] - 33:6
**MR** [94] - 8:4, 8:8, 8:9,
8:16, 8:20, 8:23, 9:2,
9:12, 9:14, 9:17,
9:21, 9:23, 10:3,
10:7, 10:16, 10:22,
10:25, 11:6, 11:9,
11:10, 11:13, 11:18,
11:20, 11:23, 12:2,
12:4, 12:7, 12:10,
12:12, 12:17, 12:19,
12:22, 13:4, 13:9,
15:3, 15:20, 15:25,
16:14, 19:11, 19:16,
21:8, 23:13, 23:18,
24:8, 24:17, 24:19,
25:12, 25:14, 25:15,
27:20, 28:5, 28:10,
29:21, 29:23, 30:14,
33:23, 34:2, 35:7,
37:1, 37:5, 37:7,
37:10, 37:12, 37:17,
38:18, 39:7, 39:24,
40:4, 40:14, 40:16,
41:16, 41:21, 42:2,
45:12, 46:5, 46:13,
46:15, 46:25, 47:6,
47:11, 47:20, 48:6,
48:16, 49:4, 49:13,
49:14, 49:18, 49:20,
50:3, 50:5, 50:7
**MS** [17] - 8:13, 9:6,
9:10, 9:18, 10:11,
10:18, 10:21, 11:4,
11:25, 13:7, 30:24,
31:4, 42:25, 43:4,

43:11, 43:14, 44:16
**Muchin** [2] - 11:19,
11:21
**MUCHIN** [1] - 5:3
**muffled** [2] - 36:25,
37:9
**multiple** [1] - 21:18
**must** [1] - 37:14
**mute** [1] - 40:20
**mystery** [1] - 25:21

## N

**name** [3] - 8:12, 9:7,
9:9
**named** [1] - 4:4
**names** [1] - 7:23
**narrow** [2] - 47:24,
48:1
**nature** [1] - 32:1
**Navman** [4] - 5:21,
5:22, 12:6
**near** [2] - 42:24, 44:12
**necessarily** [9] - 16:4,
32:10, 33:3, 33:12,
34:24, 40:2, 41:13,
44:25, 45:5
**need** [12] - 13:15,
19:17, 19:18, 19:21,
36:1, 37:22, 37:23,
39:16, 42:8, 43:4,
48:3
**needed** [3] - 30:10,
30:13, 46:11
**needing** [1] - 36:4
**needs** [5] - 15:19,
16:17, 16:19, 18:23,
22:18
**Neil** [1] - 45:1
**net** [1] - 25:25
**NEUSTADT** [1] - 2:5
**never** [10] - 20:3,
26:17, 28:11, 29:1,
30:10, 30:13, 30:22,
33:8, 33:11, 44:4
**New** [14] - 3:6, 3:23,
4:21, 5:13, 6:12,
6:16, 7:4, 8:22
**new** [4] - 14:3, 21:23,
27:1, 27:24
**next** [4] - 8:12, 23:19,
28:25, 34:18
**NICHOLS** [1] - 1:16
**Niemeyer** [1] - 9:4
**Nikon** [3] - 4:9, 11:14
**NO** [1] - 1:8
**Nokia** [3] - 3:11, 3:19,
11:1
**nonetheless** [1] -

35:25
**nonmanufacturer** [1]
- 7:25
**North** [1] - 5:5
**NOTE** [1] - 7:18
**note** [1] - 29:3
**nothing** [8] - 21:23,
27:1, 27:13, 27:15,
29:13, 43:15, 43:19,
44:9
**Nothing** [2] - 50:6,
50:7
**notify** [1] - 49:16
**November** [2] - 46:3,
46:9
**novo** [1] - 14:12
**Nth** [1] - 22:19
**number** [6] - 11:11,
14:7, 16:23, 18:19,
19:21, 48:25
**numerous** [1] - 21:19
**NZ** [2] - 5:21, 12:6

## O

**obligation** [1] - 45:17
**obligations** [1] - 24:12
**OBLON** [1] - 2:5
**Oblon** [1] - 8:15
**observation** [1] - 26:2
**obviously** [5] - 24:9,
26:11, 28:6, 35:17,
38:2
**occur** [2] - 46:12, 48:4
**occurred** [5] - 21:22,
24:22, 25:20, 46:13,
46:15
**OF** [1] - 1:1
**office** [1] - 28:19
**Olympus** [6] - 6:4, 6:5,
6:17, 6:18, 12:15,
12:18
**once** [2] - 14:1, 20:7
**one** [17] - 10:13,
11:14, 14:4, 14:16,
15:4, 15:18, 16:5,
17:2, 17:3, 22:21,
32:25, 35:20, 38:15,
39:9, 40:2, 41:1,
41:25
**One** [2] - 30:15, 33:8
**ones** [1] - 42:16
**oOo** [1] - 7:16
**open** [1] - 34:4
**opinion** [1] - 24:1
**opinions** [3] - 23:24,
23:25, 37:15
**opportunistic** [1] -
27:23

**opportunity** [1] -
16:15
**Optics** [1] - 4:13
**Optoelectronics** [1] -
4:13
**Optrex** [3] - 2:7, 8:12,
8:14
**order** [22] - 13:14,
14:20, 15:7, 15:19,
16:21, 17:17, 21:22,
22:8, 22:18, 27:12,
28:22, 33:4, 33:5,
33:6, 33:21, 34:20,
36:5, 45:22, 46:8,
49:2, 50:1
**ordered** [1] - 16:22
**orderly** [1] - 24:2
**orders** [2] - 17:7, 25:2
**organizational** [1] -
27:7
**original** [3] - 17:17,
20:23, 22:17
**originally** [1] - 20:9
**ought** [1] - 47:2
**outcome** [2] - 32:18,
34:18
**outlined** [6] - 17:2,
21:21, 35:10, 35:16,
42:7, 42:15
**outlines** [1] - 21:4
**outside** [1] - 31:10
**overall** [1] - 44:14
**own** [2] - 16:7, 36:13

## P

**P.C** [4] - 2:5, 3:9, 3:13,
3:17
**p.m** [3] - 1:10, 7:19,
50:11
**package** [1] - 47:15
**page** [3] - 31:8, 31:22,
31:23
**pain** [1] - 44:18
**papers** [2] - 28:20,
29:3
**Paragraph** [1] - 46:7
**pared** [1] - 21:17
**part** [9] - 13:21, 14:18,
22:4, 24:12, 24:22,
31:22, 36:8, 48:24,
49:1
**partially** [1] - 32:22
**participate** [1] - 32:22
**particular** [1] - 23:6
**parties** [11] - 13:25,
15:2, 15:13, 16:23,
28:7, 28:23, 30:12,
36:15, 40:24, 42:17,

46:9
**parties'** [1] - 35:15
**partner** [1] - 48:9
**partway** [1] - 10:19
**party** [1] - 13:20
**PASCALE** [2] - 2:3, 8:13
**Pascale** [1] - 8:14
**past** [1] - 43:17
**PAT** [1] - 1:13
**patent** [7] - 26:16, 33:15, 34:21, 39:4, 39:12, 39:18, 40:6
**patents** [2] - 32:17, 34:20
**path** [2] - 20:19, 29:7
**patties** [1] - 16:16
**PAUL** [1] - 4:15
**Paul** [1] - 9:16
**Pause** [3] - 8:7, 19:9, 32:8
**Pejic** [1] - 12:8
**PEJIC** [2] - 7:9, 12:7
**Pentax** [4] - 7:11, 7:11, 12:9, 12:11
**people** [6] - 9:3, 16:5, 32:5, 45:8, 48:25, 49:7
**per** [2] - 26:3, 37:18
**perceived** [1] - 26:5
**percent** [1] - 40:25
**perhaps** [3] - 19:4, 25:4, 42:5
**permission** [2] - 10:18, 30:25
**person** [3] - 42:4, 49:3, 49:11
**personal** [1] - 19:5
**perspective** [2] - 42:15, 47:13
**pertinent** [1] - 33:18
**petards** [1] - 36:14
**phase** [3] - 30:6, 30:17, 30:20
**Phil** [4] - 8:20, 21:8, 47:6, 47:11
**PHILIP** [1] - 3:3
**phone** [10] - 7:24, 10:14, 10:25, 11:2, 21:12, 40:20, 41:20, 47:4, 48:12, 49:16
**Photo** [2] - 3:7, 3:8
**phrases** [1] - 46:10
**picture** [3] - 42:6, 42:8, 44:14
**piece** [4] - 18:11, 20:8, 23:8, 35:24
**Pittsford** [1] - 7:4
**place** [4] - 16:1, 22:8, 23:4, 28:14

**plaintiff** [1] - 7:22
**plaintiffs** [1] - 15:10
**Plaintiffs** [1] - 1:5
**plan** [1] - 23:2
**planned** [1] - 33:20
**plate** [1] - 13:13
**PLC** [1] - 7:9
**pleased** [1] - 14:11
**Poff** [1] - 12:10
**POFF** [2] - 7:7, 12:10
**point** [16] - 14:25, 15:4, 16:17, 18:20, 18:25, 19:16, 28:25, 30:15, 30:19, 32:10, 35:20, 36:8, 43:14, 44:5, 44:9, 47:10
**points** [5] - 23:5, 29:9, 30:21, 35:7, 43:21
**Polycom** [2] - 49:24
**position** [2] - 18:3, 21:4
**positions** [1] - 47:21
**possession** [1] - 31:18
**possible** [1] - 48:17
**possibly** [3] - 16:5, 36:17, 41:9
**postponing** [1] - 47:13
**posture** [1] - 15:14
**potentially** [1] - 42:23
**POTTER** [2] - 3:3, 4:3
**Potter** [1] - 9:3
**Powers** [1] - 12:19
**POWERS** [2] - 5:17, 12:19
**practical** [1] - 27:25
**practically** [1] - 21:14
**practice** [1] - 25:22
**precedent** [2] - 23:22, 24:6
**precedents** [1] - 26:4
**prejudicial** [1] - 22:9
**preliminarily** [1] - 21:10
**prepared** [1] - 15:25
**present** [3] - 43:17, 45:18, 49:11
**presently** [1] - 14:4
**presumed** [1] - 28:13
**presumes** [1] - 20:16
**pretty** [1] - 28:3, 37:18
**prevented** [1] - 34:6
**previous** [1] - 33:5
**problem** [5] - 14:23, 48:24, 49:1, 49:11
**problems** [1] - 28:1
**proceed** [6] - 18:10, 18:20, 19:15, 20:18,

20:24, 34:3, 44:15, 45:22
**proceeding** [5] - 17:11, 17:16, 30:16, 32:11, 42:11
**proceedings** [1] - 18:6
**process** [9] - 14:16, 15:16, 17:6, 18:4, 18:6, 21:1, 33:10, 33:13, 46:13
**product** [5] - 27:11, 31:11, 31:20, 43:21, 44:8
**products** [9] - 31:11, 31:20, 33:11, 37:14, 37:23, 40:6, 43:17, 44:4, 44:5
**Products** [1] - 5:14
**proof** [1] - 31:15
**Properties** [1] - 1:21
**proposed** [4] - 14:20, 15:6, 22:15, 46:8
**provided** [2] - 30:2, 38:10
**providing** [1] - 39:11
**purposes** [1] - 40:3
**pursuant** [1] - 38:11
**pushing** [1] - 14:22, 45:5, 45:9
**put** [4] - 22:8, 28:13, 28:23, 49:24
**puts** [1] - 18:2

## Q

**questions** [1] - 21:5
**quick** [1] - 35:19
**quickly** [2] - 17:12, 35:8
**quite** [1] - 34:13

## R

**Rader** [1] - 37:13
**raise** [2] - 15:4, 20:14
**raised** [3] - 14:19, 15:1, 31:9
**raising** [1] - 27:5
**rather** [2] - 30:19, 31:18
**read** [1] - 32:24
**reading** [1] - 26:21
**ready** [1] - 25:9
**realize** [1] - 16:6
**really** [11] - 14:23, 15:13, 15:19, 16:2, 17:3, 19:1, 20:16, 22:2, 24:10, 27:22,

40:8
**reargument** [1] - 30:3
**reason** [1] - 22:11
**reasonable** [1] - 44:7
**received** [1] - 15:2
**recent** [4] - 18:14, 24:10, 36:22, 37:12
**recently** [1] - 23:21
**recollection** [3] - 23:13, 24:15, 28:20
**record** [2] - 17:8, 29:3
**recovery** [1] - 25:6
**Redwood** [1] - 3:14
**referencing** [1] - 45:18
**referred** [1] - 13:22
**referring** [1] - 13:18
**refers** [2] - 15:10, 15:12
**regard** [8] - 11:6, 18:15, 28:15, 36:3, 36:12, 41:7, 48:12, 48:23
**regarding** [2] - 31:1, 35:1
**Registered** [1] - 1:25
**reiterate** [1] - 29:8
**relates** [1] - 47:15
**relating** [1] - 28:21
**relationship** [1] - 23:11
**relationships** [1] - 19:2
**relevant** [4] - 34:23, 34:24, 36:17, 41:4
**relied** [1] - 31:15
**relief** [2] - 43:4, 43:6
**rely** [2] - 17:25, 39:4
**relying** [1] - 39:19
**remember** [1] - 29:11
**repeatedly** [1] - 21:14
**replete** [1] - 25:1
**report** [2] - 23:7, 37:24
**Reporter** [1] - 1:25
**reporter** [1] - 40:22
**REPORTER'S** [1] - 7:18
**reports** [3] - 35:22, 47:10, 47:14
**represent** [4] - 13:10, 36:9, 39:2, 48:18
**representation** [1] - 24:4
**representative** [1] - 48:8
**representatives** [1] - 42:5
**representing** [2] - 12:20, 22:1
**request** [2] - 27:14,

43:4, 43:6
**require** [3] - 26:22, 41:24, 43:1
**required** [1] - 37:24
**resist** [1] - 25:25
**resisted** [1] - 25:24
**resolution** [1] - 23:21
**resolve** [1] - 17:12
**resolved** [3] - 25:23, 41:25, 44:4
**resolving** [2] - 18:9, 20:17
**resort** [1] - 18:1
**resources** [2] - 14:15, 29:18
**respect** [2] - 43:20, 44:1
**respectfully** [6] - 20:25, 24:19, 35:16, 42:16, 45:13, 47:17
**Respectfully** [1] - 24:23
**respond** [1] - 50:10
**responsibility** [2] - 44:20, 49:15
**responsible** [1] - 22:24
**rest** [2] - 14:24, 44:24
**Reston** [2] - 4:8, 7:10
**result** [1] - 13:22
**resulted** [1] - 26:24
**review** [1] - 14:12
**Rich** [16] - 9:2, 9:14, 9:21, 9:23, 11:10, 11:16, 12:15, 12:17, 15:3, 15:21, 15:23, 22:1, 27:20, 28:4, 30:21, 40:14
**RICHARD** [4] - 2:5, 4:3, 5:17, 6:16
**Richard** [1] - 12:19
**RICHARDSON** [3] - 3:9, 3:13, 3:17
**Richardson** [1] - 10:23
**rightly** [1] - 30:21
**risk** [1] - 27:2
**RIZZI** [2] - 3:22, 12:22
**Rizzi** [1] - 12:22
**Rob** [1] - 9:24
**ROBERT** [4] - 2:15, 2:18, 4:21, 6:8
**Robert** [4] - 10:3, 10:6, 10:7, 39:7
**ROBINS** [1] - 1:18
**Roche** [1] - 10:14
**ROCHE** [2] - 6:23, 10:16
**room** [2] - 48:22, 49:6
**Rosati** [2] - 12:16,

12:17
**ROSATI** [2] - 6:16, 12:17
**ROSENMAN** [1] - 5:3
**Rosenthal** [3] - 8:21, 25:16, 36:22
**ROSENTHAL** [10] - 3:6, 8:23, 25:15, 36:21, 37:1, 37:5, 37:7, 37:10, 37:12, 37:17
**Rosenthal's** [1] - 47:18
**ROSS** [2] - 5:8, 11:25
**Ross** [1] - 11:25
**ROVNER** [8] - 3:3, 8:20, 21:8, 23:13, 24:8, 38:18, 47:6, 47:20
**Rovner** [6] - 8:21, 21:8, 24:20, 24:22, 25:10, 47:6
**Rovner's** [1] - 26:25
**ruled** [2] - 26:8, 26:14
**ruling** [4] - 21:19, 24:9, 26:12, 36:9

**S**

**SACHNOFF** [1] - 6:22
**Sachnoff** [1] - 10:14
**sales** [13] - 17:24, 18:11, 20:21, 23:11, 24:21, 25:4, 25:5, 28:16, 28:21, 31:9, 32:2, 34:8
**Samsung** [3] - 4:18, 9:11, 9:12
**San** [1] - 4:17
**Sanyo** [8] - 2:20, 5:5, 5:5, 10:4, 11:18, 11:21, 41:17, 48:17
**schedule** [3] - 22:13, 30:12, 46:19
**scheduled** [1] - 48:7
**scheduling** [7] - 13:14, 14:20, 15:7, 21:21, 22:8, 22:17, 34:20
**Scheinfeld** [1] - 9:24
**SCHEINFELD** [2] - 4:21, 9:23
**screaming** [1] - 41:20
**SDI** [2] - 4:18, 9:12
**se** [2] - 26:3, 37:18
**SEAMAN** [1] - 2:9
**Seaman** [1] - 12:25
**seat** [1] - 49:7
**second** [4] - 14:17,

25:4, 26:25, 35:24
**secondly** [1] - 44:3
**section** [1] - 23:22
**see** [5] - 8:18, 16:18, 16:25, 33:17, 34:24
**seeing** [1] - 27:25
**seeking** [2] - 19:18, 39:12
**seem** [1] - 35:21
**segments** [1] - 34:13
**Seiko** [3] - 2:19, 10:4, 39:8
**selling** [1] - 27:4
**sense** [9] - 14:11, 17:10, 26:11, 27:13, 32:20, 34:13, 35:21, 40:7, 46:22
**sent** [1] - 46:8
**separate** [2] - 16:7, 44:24
**serious** [1] - 45:8
**set** [3] - 18:4, 30:16, 43:24
**seven** [1] - 39:13
**Shaw** [1] - 12:12
**SHAW** [2] - 6:3, 12:12
**sheer** [1] - 48:25
**short** [1] - 45:20
**show** [1] - 41:25
**showing** [1] - 31:19
**sidelines** [1] - 29:24
**significant** [1] - 25:7
**significantly** [1] - 24:9
**SIMON** [1] - 6:19
**Simon** [1] - 10:12
**simple** [1] - 17:2
**simply** [2] - 19:17, 35:22
**sit** [1] - 14:3
**sitting** [2] - 9:7, 21:2
**situation** [1] - 18:5
**six** [2] - 27:10, 46:7
**SMALLEY** [2] - 7:3, 13:7
**Smalley** [1] - 13:7
**SMITH** [1] - 2:15
**so-called** [1] - 22:22
**sold** [6] - 22:3, 31:10, 31:12, 31:20, 34:11, 43:18
**someone** [1] - 8:6
**Sony** [8] - 5:18, 5:18, 6:5, 6:5, 6:13, 12:13, 12:20
**soon** [1] - 44:7
**sorry** [5] - 9:9, 29:21, 46:5, 46:7, 49:17
**sort** [2] - 27:10, 47:23
**sounds** [1] - 13:11

**source** [1] - 40:2
**Speaker** [5] - 8:1, 19:14, 38:19, 38:21, 40:19
**speakerphone** [2] - 19:8, 36:24
**speakers** [1] - 45:15
**speaking** [5] - 15:5, 21:9, 22:2, 25:10, 49:9
**specific** [2] - 26:3, 27:12
**specifically** [1] - 32:23
**speech** [1] - 24:23
**spend** [1] - 21:17
**spending** [1] - 27:24
**Spivack** [1] - 8:15
**SPIVAK** [1] - 2:5
**spoken** [1] - 45:15
**spot** [1] - 14:13
**stage** [8] - 22:24, 27:17, 29:12, 34:12, 34:23, 39:1, 43:8, 43:10
**stages** [2] - 16:22, 33:18
**stand** [2] - 19:1, 28:15
**standard** [1] - 26:9
**standards** [1] - 18:15
**standpoint** [3] - 18:18, 20:25, 33:15
**stands** [1] - 14:6
**STARGATT** [3] - 2:2, 6:3, 7:6
**start** [6] - 7:22, 13:15, 16:1, 19:24, 27:14, 28:10
**started** [1] - 29:6
**starting** [2] - 27:15, 38:8
**state** [1] - 27:19
**States** [4] - 31:11, 31:12, 31:21, 34:11
**STATES** [1] - 1:1
**status** [1] - 33:10
**stay** [6] - 23:3, 31:5, 43:2, 43:5, 43:9, 44:11
**stayed** [19] - 10:5, 11:11, 12:5, 12:8, 12:13, 12:15, 12:23, 15:6, 15:15, 22:6, 27:8, 27:9, 30:9, 30:12, 30:15, 38:10, 41:2, 43:2, 48:19
**step** [1] - 34:18
**Stephen** [1] - 12:22
**STEPHEN** [2] - 3:22, 4:16
**stepped** [1] - 37:1

**steps** [2] - 34:11, 34:13
**Steve** [1] - 9:15
**still** [7] - 18:9, 18:17, 28:11, 30:4, 36:1, 36:3, 43:25
**stone** [1] - 43:24
**strong** [1] - 36:10
**strongly** [1] - 45:3
**Stroock** [1] - 8:22
**STROOCK** [2] - 3:5
**structure** [3] - 22:3, 31:25, 39:15
**structured** [2] - 31:7, 31:24
**structures** [1] - 37:20
**stuff** [1] - 46:18
**submissions** [1] - 15:2
**submitted** [4] - 11:7, 15:7, 15:8, 46:17
**subsequent** [1] - 33:5
**subset** [2] - 19:20, 20:10
**subsidiaries** [1] - 25:20
**success** [2] - 36:3, 42:14
**successful** [1] - 47:5
**suddenly** [1] - 35:4
**suggest** [3] - 28:12, 45:13, 48:11
**suggested** [1] - 19:23
**suggesting** [1] - 18:20
**suggestion** [1] - 45:14
**summarize** [1] - 16:11
**summary** [1] - 20:20
**supposed** [2] - 44:20, 46:2
**survive** [3] - 32:17, 33:15, 34:21
**survives** [1] - 34:21
**sustained** [1] - 26:19

**T**

**table** [1] - 27:2
**tabled** [1] - 20:13
**Taiwanese** [1] - 27:4
**TAYLOR** [3] - 2:2, 6:3, 7:6
**technical** [2] - 37:23, 38:4
**tee** [1] - 14:8
**teleconference** [2] - 10:19, 48:3
**telephone** [1] - 7:18
**TELEPHONE** [1] - 1:11

**Telephone** [1] - 50:11
**term** [1] - 44:7
**terms** [8] - 24:11, 26:23, 27:14, 30:22, 39:14, 39:17, 46:3, 46:10
**testimony** [1] - 37:20
**Texas** [1] - 5:8
**THE** [87] - 1:1, 1:1, 7:20, 8:2, 8:11, 8:17, 8:25, 9:9, 9:11, 9:13, 9:19, 10:1, 10:10, 10:17, 10:20, 10:24, 11:5, 11:8, 11:12, 11:22, 12:25, 13:6, 13:11, 15:24, 16:2, 19:7, 19:10, 19:12, 19:15, 21:6, 23:9, 23:19, 24:18, 25:9, 25:13, 27:18, 28:3, 28:9, 29:20, 29:22, 31:3, 32:3, 32:9, 34:1, 34:5, 35:9, 35:12, 36:8, 36:23, 37:3, 37:6, 37:8, 37:11, 37:16, 38:1, 38:23, 39:23, 40:1, 40:7, 40:15, 40:18, 40:21, 41:19, 41:22, 42:21, 43:1, 43:8, 43:13, 44:10, 44:17, 45:2, 45:3, 45:20, 46:7, 46:14, 46:16, 47:2, 47:25, 48:11, 48:21, 49:5, 49:15, 49:19, 49:21, 50:4, 50:6, 50:8
**themselves** [3] - 20:1, 31:16, 36:13
**theories** [2] - 17:25, 18:1
**thereof** [1] - 48:10
**they've** [3] - 13:20, 39:14, 39:16
**thinking** [2] - 33:2, 37:25
**THOMAS** [2] - 1:16, 3:10
**thoughts** [1] - 16:21
**three** [5] - 14:22, 14:25, 15:12, 22:14, 22:18
**three-month** [1] - 22:14
**threshold** [1] - 17:1
**Thursday** [3] - 1:10, 48:2, 49:5
**Thynge** [1] - 7:21
**THYNGE** [1] - 1:13
**Tim** [6] - 11:20, 41:16,

41:19, 48:17, 49:18,
49:19
**TIMOTHY** [1] - 5:3
**today** [4] - 13:14, 14:8,
47:9, 47:22
**together** [1] - 16:24
**Tom** [3] - 8:4, 10:23,
30:14
**tongue** [1] - 28:9
**took** [2] - 22:8, 27:9
**top** [1] - 25:6
**Toppoly** [1] - 4:13
**Toshiba** [2] - 4:5,
11:13
**totality** [2] - 19:4,
19:19
**totally** [1] - 40:16
**toward** [1] - 35:23
**towards** [1] - 32:12
**TPO** [1] - 9:1
**transcript** [2] - 31:8,
31:23
**transcripts** [1] - 25:2
**trial** [12] - 20:11, 22:5,
33:4, 33:20, 33:24,
34:3, 34:15, 34:18,
35:5, 35:23, 37:2,
42:11
**trials** [3] - 18:6, 33:1,
36:6
**tried** [2] - 21:3, 33:3
**troubling** [2] - 17:19,
18:2
**true** [1] - 37:17
**truly** [1] - 18:23
**try** [4] - 20:16, 37:10,
45:17, 47:4
**trying** [5] - 8:18,
20:15, 22:24, 32:25,
41:8
**TUNNELL** [1] - 1:16
**turn** [3] - 40:12, 41:9,
42:7
**tutorial** [2] - 45:25,
46:20
**TWEEK** [1] - 5:11
**two** [6] - 11:21, 16:5,
26:12, 35:7, 35:19,
43:21
**type** [1] - 33:9
**types** [2] - 20:21,
39:18
**typo** [1] - 46:4

## U

**U.S** [2] - 1:13, 25:20
**U.S.A** [3] - 3:8, 5:22,
7:11

**ultimate** [1] - 20:18
**Ultimately** [1] - 32:1
**ultimately** [3] - 22:24,
39:22, 39:24
**under** [3] - 34:5,
37:24, 42:15
**Under** [1] - 35:18
**underpinned** [1] -
18:16
**undertake** [2] - 45:14,
47:1
**undo** [1] - 22:11
**undoing** [1] - 22:7
**unenforceability** [7] -
22:25, 29:12, 30:7,
32:12, 33:16, 34:16,
36:16
**unfortunately** [2] -
15:21, 42:17
**Unfortunately** [1] -
37:1
**Unidentified** [5] - 8:1,
19:14, 38:19, 38:21,
40:19
**uninvolved** [1] - 23:3
**unique** [1] - 18:10
**UNITED** [1] - 1:1
**United** [4] - 31:11,
31:12, 31:21, 34:11
**unless** [1] - 20:3
**unnecessary** [1] -
22:10
**up** [11] - 13:14, 14:8,
18:4, 18:8, 23:10,
26:7, 37:8, 40:16,
41:25, 44:25, 45:22
**USA** [2] - 4:23, 12:6
**useful** [3] - 19:24,
42:4, 42:19

## V

**vacant** [1] - 13:21
**valid** [1] - 18:17
**validity** [9] - 22:25,
30:17, 30:21, 33:25,
35:23, 36:3, 36:6,
42:11, 47:16
**various** [2] - 37:20,
37:21
**VEZEAU** [7] - 5:3,
11:20, 41:16, 41:21,
48:16, 49:13, 49:18
**Vezeau** [4] - 11:21,
41:16, 48:17, 49:18
**view** [7] - 17:13,
18:18, 20:7, 20:18,
26:25, 27:22, 47:14
**viewing** [1] - 35:19

**views** [1] - 18:17
**VINSON** [1] - 5:7
**Virginia** [3] - 2:6, 4:8,
7:10
**voice** [4] - 25:10,
36:25, 37:9, 41:17
**vs** [1] - 23:23

## W

**wait** [3] - 23:7, 25:3,
25:11
**Wait** [1] - 23:19
**waiting** [1] - 21:2
**WALKER** [1] - 4:15
**wants** [3] - 45:16,
49:16, 49:22
**warning** [4] - 40:10,
41:13, 41:14, 41:15
**Washington** [4] -
2:23, 3:18, 4:12, 6:9
**waste** [1] - 14:15
**Watch** [1] - 2:13
**ways** [4] - 16:23,
18:19, 19:21, 20:15
**WEAVER** [1] - 6:22
**Weaver** [1] - 10:15
**weeks** [1] - 27:24
**weigh** [1] - 25:16
**WEIL** [1] - 3:22
**Well** [1] - 12:22
**whereas** [1] - 15:10
**whipsaw** [3] - 18:2,
38:8, 38:15
**whole** [2] - 26:1, 35:22
**willing** [1] - 20:2
**Wilmington** [1] - 1:10
**Wintek** [3] - 4:13,
4:13, 9:1
**Wireless** [2] - 2:20,
10:5
**wish** [1] - 27:18
**wondering** [2] - 14:23,
41:24
**Wood** [1] - 24:14
**Woods** [14] - 8:5,
8:10, 15:20, 21:13,
21:23, 22:12, 22:21,
24:17, 25:22, 29:13,
30:19, 33:23, 42:2,
47:7
**WOODS** [30] - 1:19,
8:9, 15:20, 15:25,
16:14, 19:11, 19:16,
23:18, 24:17, 24:19,
25:12, 25:14, 33:23,
34:2, 35:7, 35:10,
35:13, 42:2, 45:12,
46:5, 46:13, 46:15,

46:25, 47:11, 48:6,
49:4, 49:14, 50:3,
50:5, 50:7
**words** [1] - 16:8
**works** [1] - 48:6
**world** [1] - 32:21
**worry** [1] - 29:16
**wrapped** [1] - 17:7
**wrestled** [2] - 24:21,
25:8
**writing** [1] - 25:24
**written** [2] - 15:13,
26:23
**WYATT** [1] - 7:7

## Y

**year** [1] - 27:8
**yesterday** [1] - 11:7
**York** [15] - 3:6, 3:23,
4:21, 5:13, 6:12,
6:16, 7:4, 8:22, 9:4
**YOUNG** [3] - 2:2, 6:3,
7:6
**Young** [3] - 8:14,
12:11, 12:12

# EXHIBIT O

# HOGAN & HARTSON

Hogan & Hartson LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
+1.310.785.4600 Tel
+1.310.785.4601 Fax

**www.hhlaw.com**

VIA FedEx

September 11, 2006

Robins, Kaplan, Miller & Ciresi
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402

Re: Honeywell International Inc., et al v. Apple Computer Inc., et al

Dear Stacie Oberts:

Please find enclosed production documents bearing the bates numbers CTZN 000001 – CTZN 001762.

If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

Clarence Snodgrass
Hogan & Hartson L.L.P.

Enclosures (2) CDs

CC: David Ben-Meir. (w/o enclosures)

RECEIVED

DATE 9·12·06
BY    STACIE E. OBERTS
ROBINS, KAPLAN
MILLER & CIRESI, L.L.P.

\\\LA - 81859/0002 - 229251 v1

# EXHIBIT P

# HOGAN & HARTSON

Hogan & Hartson LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
+1.310.785.4600 Tel
+1.310.785.4601 Fax

www.hhlaw.com

December 21, 2007

David H. Ben-Meir
Partner
310.785.4796
rahickman@hhlaw.com

## BY FACSIMILE AND FIRST CLASS MAIL

Denise S. Rahne
Robins, Kaplan, Miller & Ciresi, LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015

Re: Honeywell v. Citizen

Dear Denise:

As we have discussed at various times during this litigation, it is Citizen's position that Honeywell has no basis for its infringement claims against Citizen. The absence of any direct infringement appears to be undisputed, and with respect to Honeywell's allegation of indirect infringement by Citizen, Honeywell's responses to Citizen's interrogatories on the issue lack any factual basis. Honeywell's stated excuse for its inadequate responses has been that it has been unable to take its requested "customer discovery."

In an effort to facilitate an end to Citizen's involvement in this litigation, we write to confirm a proposal we made to you by telephone yesterday, December 20, 2007. Honeywell's sought after "customer discovery" with respect to Citizen is from Matsushita, the sole end product seller of the sole accused Citizen model, the K1122H-HL. We propose that if Honeywell makes a motion for narrowly tailored discovery on Matsushita that is of proper scope and directed solely to Honeywell's current infringement claims against Citizen, then Citizen will not oppose the motion.

Please let us know by December 28, 2007 Honeywell's response to Citizen's proposal.

Very truly yours,

David H. Ben-Meir
of HOGAN & HARTSON, LLP

DHB/elm
cc:    Amy N. Softich
       Rose A. Hickman

WLA - 081700/000064 - 370285 v1

# TELECOPY/FACSIMILE

| To: | Company: | Fax Number: | Tel Number: |
|---|---|---|---|
| Denise S. Rahne | ROBINS, KAPLAN,<br>MILLER & CIRESI, LLP | (617) 267-8288 | (617) 267-2300 |

From:   David H. Ben-Meir

Date:   December 21, 2007

Time:

Total number of pages incl. cover page:   *2*

For internal purposes only: **Return to Elaine Mohr**

Client number:   81700.0064

Attorney billing number:   5599

Confirmation number:   Please return fax to Rowena

*The attached information is CONFIDENTIAL and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s), please note that any dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.*

**MESSAGE:**

WLA - 081700/000064 - 370280 v1

# EXHIBIT Q

# HOGAN & HARTSON

Hogan & Hartson LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
+1.310.785.4600 Tel
+1.310.785.4601 Fax

www.hhlaw.com

January 22, 2008

David H. Ben-Meir
Partner
310.785.4628
DHBen-Meir@hhlaw.com

*VIA ELECTRONIC MAIL*

Amy N. Softich, Esq.
Robins, Kaplan, Miller & Ciresi, LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Re:  **Honeywell v. Citizen**

Dear Amy:

I write in response to your letter of January 3, 2008.

On December 21, 2007, we asked you for your basis for referring to Panasonic North America ("PNA") in Honeywell's response to Citizen's Interrogatory No. 2.  Instead of doing so, you ask that we let you know whether the document, CTZN 001645, that references "Panasonic," refers to an entity other than Panasonic North America ("PNA").  Indeed, Citizen never understood the document to be referring to PNA, but rather believed that the end product maker was an Asian "Panasonic" entity such as Panasonic Mobile Communications Co., Ltd., a Japanese company.  Citizen also understood that the cellular phones incorporating the accused LCD modules were not destined for the United States.  Citizen stated this understanding long ago in responses to Honeywell's interrogatories and later produced documents corroborating this understanding.  See, e.g., Citizen's Responses to Honeywell's Interrogatories, First Set, Nos. 1, 2, and 17 and CTZN 001652-1653 and 001838.  With this clarification, we trust that Honeywell can now promptly supplement its response to Interrogatory No. 2.

In a separate letter dated December 21, 2007, we proposed that if Honeywell seeks relief from the stay on customer discovery to obtain narrowly tailored discovery on Matsushita relating to Honeywell's current infringement claims against Citizen, then Citizen would not oppose the request.  We are surprised and disappointed by your January 3rd letter rejecting Citizen's proposal.  You claim that Honeywell "is not allowed to" move for limited discovery on Matsushita directed to Citizen's alleged inducement of infringement because of a pending motion relating to customer discovery.  However, quite unlike this potential motion, Honeywell's pending motion seeks discovery on all customer defendants as opposed to just

Amy N. Softich, Esq.
January 22, 2008
Page 2

Citizen, is contested by the other defendants, relates to the very different issue of "commercial success," and is of a much broader scope than what Citizen is proposing.

Furthermore, a request for narrowly tailored discovery on Matsushita directed to the accused Citizen LCD part could well resolve this case as to Citizen. Perhaps more importantly for Honeywell, as Honeywell has consistently avoided articulating any legitimate basis for its case against Citizen by repeating its need for discovery on Matsushita, we frankly do not understand how, in good faith, Honeywell can maintain its unsupported claim, and at the same time reject Citizen's invitation to seek the supposedly needed discovery.

We are now well into the third year of this litigation. Yet even now, all we can discern from Honeywell's contentions is that its suit against Citizen appears to be founded on a supposed claim of inducement, and that as to the issue of intent, Honeywell can only point a document that vaguely references "Panasonic," which Citizen addressed in past interrogatory responses.

At the same time, Honeywell inexplicably ignores Citizen's documents and responses that affirmatively demonstrate the absence of any potential for inducement. Honeywell ignores, for example, evidence that until December 2005, after Honeywell brought this suit, Citizen believed that the accused K1122H-HL parts were to be incorporated into products sold outside the United States (CTZN 001838), and evidence that in December 2005 Citizen learned, *for the first time*, that in December 2004 Matsushita may have shipped a total of 1,000 cellular phones incorporating the accused LCD part into North America. CTZN 001652-1653.

Given the available evidence, we urge you to reconsider Citizen's proposal. If you continue to reject it, please fully explain your basis for doing so, and explain how Honeywell can continue to litigate this case against Citizen in good faith.

We look forward to hearing from you.

Very truly yours,

David H. Ben-Meir
of HOGAN & HARTSON, LLP

DHB/elm

cc:    Robins, Kaplan, Miller & Ciresi, LLP
       Attn: Denise S. Rahne

       Rose A. Hickman

# EXHIBIT R

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

**Matthew L. Woods**
612-349-8272

April 29, 2008

**VIA E-MAIL**

David H. Ben-Meir, Esq.
Hogan & Hart, LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067-6047

Re:     *Honeywell, et al. v. Apple Computer, et al.* **(consolidated)**
          Our File No.: 019896.0229

Dear David:

We have received Citizen's Motion for Summary Judgment, filed last Friday.  Please advise immediately whether you have provided a copy of these motion papers – which seek to avoid answering for the liability associated with modules provided by Citizen to Matsushita – to counsel for Matsushita?  If you have not, I presume you have no objection to Honeywell forwarding a copy to Matsushita's lawyers.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Matthew L. Woods

MLW/sdm
cc:    Thomas C. Grimm, Esq.
        Stacie E. Oberts, Esq.
        Steven J. Rizzi, Esq.

80069506.1

A T L A N T A · B O S T O N · L O S   A N G E L E S · MINNEAPOLIS · N A P L E S · S A I N T   P A U L · W A S H I N G T O N , D . C .

# EXHIBIT S

**Mattingly, Stacy D.**

| | |
|---|---|
| **From:** | Ben-Meir, David H. [DHBen-Meir@HHLAW.com] |
| **Sent:** | Tuesday, April 29, 2008 6:00 PM |
| **To:** | Mattingly, Stacy D. |
| **Cc:** | Grimm, Thomas; Oberts, Stacie E.; steven.rizzi@weil.com; Woods, Matthew L. |
| **Subject:** | RE: Honeywell v. Apple: Letter to David Ben-Meir 04-29-2008.pdf |

Dear Matt:

Subject to Matsushita's compliance with the protective order or agreement to treat of the confidential exhibits as attorneys' eyes only, Citizen has no objection to providing counsel for Matsushita a copy of the motion papers.

Best regards,

David Ben-Meir

-----Original Message-----
From: Mattingly, Stacy D. [mailto:SDMattingly@rkmc.com]
Sent: Tuesday, April 29, 2008 2:36 PM
To: Ben-Meir, David H.
Cc: Grimm, Thomas; Oberts, Stacie E.; steven.rizzi@weil.com; Woods, Matthew L.
Subject: Honeywell v. Apple: Letter to David Ben-Meir 04-29-2008.pdf

>>>> Please read the confidentiality statement below <<<<
 <<Letter to David Ben-Meir 04-29-2008.pdf>> Dear Mr. Ben-Meir:

Attached please find a letter from Matthew L. Woods.

Stacy D. Mattingly
Legal Administrative Assistant to
Matthew L. Woods and Peter N. Surdo
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN  55402
Direct Dial:  (612) 349-0907
Fax:  (612) 339-4181
Email:  sdmattingly@rkmc.com


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.

_____

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins, Kaplan, Miller & Ciresi L.L.P.
http://www.rkmc.com
_____

"EMF <HHLAW.COM>" made the following annotations.
-----------------------------------------------------------------------------
This electronic message transmission contains information from this law firm which may be
confidential or privileged. The information is intended to be for the use of the
individual or entity named above. If you are not the intended recipient, be aware that any
disclosure, copying, distribution or use of the contents of this information is
prohibited.

If you have received this electronic transmission in error, please notify us by telephone
(+1-202-637-5600) or by electronic mail (PostMaster@HHLAW.COM) immediately.

=============================================================================

# EXHIBIT T

**Mattingly, Stacy D.**

| | |
|---|---|
| **From:** | Ben-Meir, David H. [DHBen-Meir@HHLAW.com] |
| **Sent:** | Wednesday, April 30, 2008 7:05 PM |
| **To:** | Woods, Matthew L. |
| **Cc:** | steven.reiss@weil.com; Froio, Anthony A.; Oberts, Stacie E.; Lubitz, Stuart; Hickman, Rose |
| **Subject:** | RE: Citizen's Motion for Summary Judgment |

Dear Matt:

Responding to your email, our request that Matsushita/Panasonic agree to be bound by the terms of the protective order stems from the fundamental desire to maintain the confidentiality of Citizen's confidential documents. We have no issue with sharing the confidential exhibits supporting Citizen's MSJ with counsel for Matsushita and a few of Matsushita's personnel, as long as they respect the documents' confidential nature, including agreeing not to disseminate them within Matsushita or share them with others outside of Matsushita. That Matsushita has agreed to be bound by the protective order in this case is the easiest way to assure the maintenance of the documents' confidential status. Matsushita need not sign onto the protective order as long as our concerns are met.

Regarding your stated concern for a complete record, it is our view that the record on the issues raised in Citizen's MSJ is complete, particularly given our overtures last year for Honeywell to seek any discovery it claimed it needed.

Best regards,

David Ben-Meir

---

**From:** Mattingly, Stacy D. [mailto:SDMattingly@rkmc.com] **On Behalf Of** Woods, Matthew L.
**Sent:** Wednesday, April 30, 2008 2:37 PM
**To:** Ben-Meir, David H.
**Cc:** steven.reiss@weil.com; Froio, Anthony A.; Oberts, Stacie E.
**Subject:** Citizen's Motion for Summary Judgment

>>>>  Please read the confidentiality statement below  <<<<
Dear David:

Thank you for your prompt response to my letter yesterday.

Unfortunately, a fundamental question remains unanswered. Citizen's motion concerns its supply of certain modules for use in Panasonic/Matsushita products, yet the motion avoids the basic question of whether Matsushita and Citizen have discussed who will be accountable for this activity. For this reason, I do not understand why Citizen would insist on requiring Matsushita to sign on to a Protective Order prior to seeing information about the Citizen-Matsushita supply relationship.

Regardless, it is clear from your letter that Matsushita has not been apprised of Citizen's Summary Judgment Motion and that Citizen even objects to providing the motion papers to Matsushita unless or until it signs onto the Protective Order. By copy of this letter to Steven Reiss, I am asking if Matsushita will state its formal position regarding signing the Protective Order.

David, assuming that Matsushita is unwilling to sign the Protective Order, or otherwise does not

make its position known, it is clear that we do not and will not have a complete record regarding the activity which underlies Citizen's motion.

MLW

_____

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Thank you in advance for your cooperation.

Robins, Kaplan, Miller & Ciresi L.L.P.
http://www.rkmc.com
_____

"EMF <HHLAW.COM>" made the following annotations.
----------------------------------------------------------------------------
This electronic message transmission contains information from this law firm which m
copying, distribution or use of the contents of this information is prohibited.

If you have received this electronic transmission in error, please notify us by tele

============================================================================