# Exhibit B



**Potter Anderson & Corroon LLP**

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Philip A. Rovner
Partner
provner@potteranderson.com
302 984-6140 Direct Phone
302 658-1192 Fax

March 12, 2007

**BY E-FILE**

The Honorable Mary Pat Thynge
United States Magistrate Judge
United States District Court
U.S. Courthouse
844 King Street
Wilmington, DE 19801

> Re:  Honeywell International, Inc. et al. v. Apple Computer, Inc. *et al.*
> D. Del., C.A. Nos. 04-1338, 04-1337, 04-1536

Dear Magistrate Judge Thynge:

We write on behalf of co-defendants Epson Imaging Devices, Fuji Photo Film Co, Ltd.,
now FUJIFILM Corporation, Fuji Photo Film U.S.A., Inc., now FUJIFILM U.S.A., Inc., Hitachi
Displays, Ltd., Optrex America, Inc., Samsung SDI Co., Ltd., Samsung SDI America, Inc., Seiko
Epson Corp., Wintek Corp. and Wintek Electro-Optics Corporation ("Manufacturer Defendants")
to oppose Plaintiffs' ("Honeywell") application to take discovery of the stayed Customer
Defendants, allegedly to seek evidence to support its claim of commercial success, a secondary
consideration in the analysis of the obviousness of the claimed invention. Such discovery is only
permitted if reasonably calculated to lead to admissible evidence, and then only if it is not unduly
burdensome on the stayed Customer Defendants. Fed R. Civ. P. 26(b)(1) and (2). Honeywell
has failed to satisfy this threshold requirement.

Honeywell correctly cites the Federal Circuit precedent that requires a nexus between the
claimed invention and the commercial success sought to be proved. Grimm 3/2/07 letter at first

The Honorable Mary Pat Thynge
March 12, 2007
Page 2

half of 4. "[Commercial] success must be shown to have in some way been due to the nature of the claimed invention, as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Electric Prods., Inc. v. Genmark Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985). Where Honeywell goes wrong is in relying on two improper and incorrect presumptions, that the success of every "Accused Product" and "Accused Module" is attributable to the claimed "invention", and that every such product and module infringes claim 3 of the '371 patent. Strip away these presumptions and examine the facts and it becomes clear that the discovery sought of the Customer Defendants cannot lead to admissible evidence.

## I.    Honeywell's Requested Discovery Focuses On Advantages of Structures In The Prior Art And Will Not Lead To Admissible Evidence

Not every sale of a product which includes a patented component supports, or is even relevant to, a finding of commercial success. "[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco Corp. v. Align Technology, Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006). The same is true if commercial success is the result of unclaimed features. *Id.* "[T]he asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art." *J. T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997), *see also, In Re Paulsen,* 30 F.3d 1475, 1482–83 (Fed. Cir. 1994) (commercial success of product was attributable to aspects of claims in prior art and thus was accorded no weight).

Honeywell has argued that the benefits obtained by the '371 patent technology are "a brighter, cleaner display, longer battery life and lower weight." Grimm 3/2/07 letter at 9. However, these benefits are the result of structures that were already known in the prior art more than a year before the filing date of the application for the '371 patent (July 9, 1992). A copy of the '371 patent is annexed as Exhibit 1. Honeywell relinquished claims to these structures during prosecution of the '371 patent, and cannot recapture them in this case.

The Honorable Mary Pat Thynge
March 12, 2007
Page 3

The application for the '371 patent was filed with very broad claims, not limited to a liquid crystal panel or lens arrays. Ex. 2 at 14. Upon rejection of these broad claims, Honeywell amended the application to present an independent claim 10, which read:

> 10.  A display apparatus comprising;
> a light source;
>
> a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and
>
> first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source though said lens arrays and said liquid crystal panel.

Ex. 3 at 2. This claim differs from the '371 patent claim 3 only in the recitation in claim 3 of the moiré minimizing technique of rotating at least one of the two lens arrays to provide a "slight misalignment" between the lenslets of the lens array and the liquid crystal panel (Ex. 1 at col. 6, lines 27-42), a limitation which was claimed in application dependant claim 9. Ex. 3 at 1.

In an Office Action dated May 6, 1993 (Ex. 4 at 1), the Examiner ruled that application claim 10 was anticipated by U.S. Patent No. 5,161,041 ("Abileah et al."; Ex. 5), which was based on an application filed April 26, 1990. Honeywell acquiesced in the finding of the Examiner by combining application claims 9 and 10 to form what became claim 3 of the '371 patent. Ex. 6. Abileah et al. teach two crossed lens arrays between a liquid crystal panel and a light source. Ex. 5 at FIG. 6. Abileah et al. list the advantages of their new LCD backlight in essentially the same terms as Honeywell now claims for the invention of claim 3, namely:

> a bright uniform image of high contrast and capable of being viewed over a wide viewing angle, while maintaining a narrow profile and minimizing power consumption and thermal inconveniences.

Ex. 5 at col. 4, lines 26-29. Abileah et al repeatedly characterize their invention as providing improvements in brightness and energy efficiency:

> In order for electronic displays to gain increased acceptance in
> military and avionic applications, the backlighting of flat panel
> displays, and particularly active matrix liquid crystal displays,
> **must be improved in light efficiency** and reliability. In order for a
> full color liquid crystal display to possess acceptable contrast
> under high ambient lighting conditions, the backlighting
> arrangement **must be bright**. While current backlighting systems
> have the requisite light output, they still require high power (on the
> order of 2.4 watts/square inch) and a depth dimension of about two
> inches. In contrast thereto, **the backlight assembly of the instant
> invention consumes only about 1.2 watts/square inch of power**
> with a depth dimension of only about one inch.

Ex. 5 at col. 7, lines 5-15 (emphasis added).

Rotation of the lens array, the only feature of claim 3 not taught in Abileah et al.,

contributes to eliminating moiré, and not to the enhancement of brightness and energy efficiency

of the module. Ex. 1 at col. 4, lines 26-34; col. 5, lines 16-28.

Honeywell's justification for the requested discovery of the stayed Customer Defendants

focuses on advantages of LCD modules which are attributable to the prior art, and cannot be

considered as evidence of commercial success. *See, supra, Ormco Corp., J. T. Eaton, Paulson.*

As such it is not reasonably calculated to lead to the discovery of admissible evidence and should

not be permitted.

Furthermore, Honeywell claims that the patented invention produces longer battery life

and lower weight have no basis in the '371 patent. Nowhere does the '371 patent describe these

features as attributes of the invention. In fact, Honeywell's patent does not even discuss

consumer electronics. The only "application" discussed in the patent is aircraft cockpit displays

(the same application noted in Abileah et al, *see supra*), and the object of the invention is "to

provide a tailored variation of luminance with viewing angle" to focus the light of the display in

a particular viewing angle. Ex. 1 at col. 1, lines 40-45. Thus, to the extent the commercial

success of Customer Defendants' products may be connected to energy efficiency, longer battery

life, or lower weight, these attributes cannot support the non-obviousness of the '371 patent. *See*

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (evidence

that invention solved certain problem was irrelevant to non-obviousness when "this problem is not even mentioned in the [ ] patent.").

As Honeywell points out, the specification of the '371 patent describes which structural features result in the benefits identified by Honeywell, namely, enhanced brightness and energy efficiency. Indeed, the portion of the '371 patent relied upon by Honeywell states that inserting a lens array between the light source and the liquid crystal panel provides the benefits of increased energy efficiency and increased luminance. Ex. 1 at col. 3, lines 15-36. The portion of the '371 patent specification cited by Honeywell as explaining the benefits of the patent describes an *unclaimed* embodiment. An embodiment having a single lens array provides the benefits of energy efficiency and brightness, whereas the claims of the '371 patent are limited to modules having multiple lens arrays. Thus, even assuming that the benefits alleged by Honeywell and the '371 patent were not found in the prior art, they are provided by an unclaimed feature and, as such, commercial success based on those benefits is irrelevant to validity of the '371 patent. *Ormco Corp.*, 463 F.3d at 1312 ("if the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant").

## II. Honeywell Has Failed To Demonstrate The Necessary Nexus Between Claim 3 And The Customer Defendants' Products.

The Federal Circuit has ruled that: "if the patented invention is only a component of a commercially successful machine or process - the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). In the present case, to demonstrate commercial success based on the end products rather than the LCD modules (the accused products), Honeywell must establish both (1) that the commercial success of the end products are attributable to certain characteristics of the LCD modules (brightness and energy consumption), and (2) that the brightness and energy consumption of the LCD modules are attributable to use of the claimed invention within the modules, as opposed to other embodiments or the prior art. Honeywell fails to make either showing.

The Honorable Mary Pat Thynge
March 12, 2007
Page 6

In no way does Honeywell suggest how the success of a portable consumer product, such as a digital still camera, a cell phone, a laptop or the other myriad of portable consumer products sold by the Customer Defendants, is attributable to the brightness of the LCD or the weight of the battery, as opposed to the many other features of such devices, both technical (e.g., CPU power, memory volume, camera lens, mobile phone antenna and software) and non-technical (e.g., aesthetic design, advertising, price, sales channel). As discussed above, there is no nexus between the commercial success of the liquid crystal modules at issue and the "invention" of claim 3 of the '371 patent.

The commercial success of the Customer Defendants' Products is even further removed from the alleged success of the Manufacturer Defendants' modules, which are the products at issue. Honeywell cannot maintain that commercial success is unique to LCD modules that contain the accused features. Honeywell's own analysis of the modules within end products successful enough to be considered resulted in only about fifty percent being deemed by Honeywell to infringe. September 9, 2005 Transcript at 22-23, Ex. 7. Thus, by Honeywell's own admission, the fifty percent of defendants' commercially successful products deemed not to infringe must owe their commercial success to features not claimed in the '371 patent. There can be no nexus between the claimed invention and commercial success of the end products when the end products are commercially successful regardless of whether they make use of the accused modules. Where commercial success is attributable to unclaimed features and features found in the prior art, such commercial success cannot be considered. *See, supra, Ormco Corp., J. T. Eaton, Paulson.* The existence of such other features makes Honeywell's proof of the requisite nexus implausible.

The requested discovery is hardly limited. It takes three pages to describe and is, on its face, unduly burdensome on the stayed Customer Defendants at this stage of this case. Given the lack of nexus between the advantages and sales Honeywell seeks to discover and the claimed invention, the failure to explain why evidence adduced from the Manufacturer Defendants is

The Honorable Mary Pat Thynge
March 12, 2007
Page 7

insufficient, and the existence of non-infringing structures which may have been incorporated in

the Customer Defendants' products, it is submitted that Honeywell has failed to demonstrate a

need for the discovery sufficient to justify modifying the stay. The requested discovery defeats

the purpose of the stay and unduly burdens the Manufacturer Defendants, who would need to

monitor the discovery.

Respectfully,

/s/ Philip A. Rovner

Philip A. Rovner
provner@potteranderson.com

PAR/mes/783007
Enc.

cc:     All counsel of record – by ECF

# 1.

# U.S. PATENT NO. 5,280,371



# United States Patent [19]

## McCartney, Jr. et al.

US005280371A

[11] Patent Number: **5,280,371**

[45] Date of Patent: **Jan. 18, 1994**

[54] **DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY**

[75] Inventors: **Richard I. McCartney, Jr.,** Scottsdale; **Daniel D. Syrold,** Glendale; **Karen E. Jachimowicz,** Goodyear, all of Ariz.

[73] Assignee: **Honeywell Inc.,** Minneapolis, Minn.

[21] Appl. No.: **911,547**

[22] Filed: **Jul. 9, 1992**

[51] Int. Cl.⁵ .............................................. G02F 1/133

[52] U.S. Cl. .......................................... 359/40; 359/69

[58] Field of Search ...................... 359/69, 40, 41

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,416,515 | 11/1983 | Fumada et al. | 359/69 |
| 5,052,783 | 10/1991 | Hamada | 359/41 |
| 5,101,279 | 3/1992 | Kurematsu et al. | 359/40 |
| 5,128,783 | 7/1992 | Abileah et al. | 359/40 |
| 5,161,041 | 11/1992 | Abileah et al. | 359/40 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0068400 | 10/1977 | Japan | 359/69 |
| 2-14822 | 8/1990 | Japan | 359/69 |

### OTHER PUBLICATIONS

IBM Corp., "Polarized backlight for liquid crystal display", IBM Technical Disclosure Bulletin, vol. 33, No. 1B, Jun. 1990, pp. 143–144.

*Primary Examiner*—William L. Sikes
*Assistant Examiner*—Huy Mai
*Attorney, Agent, or Firm*—Dale E. Jepsen; A. Medved

[57] **ABSTRACT**

A display apparatus including a light source, a liquid crystal panel, and one or more directional diffuser lens arrays disposed therebetween provides a tailored variation of luminance with viewing angle, a uniform variation of luminance with viewing angle within a first predetermined range of viewing angles and a concentration of light energy within a second predetermined range of viewing angles.

**3 Claims, 11 Drawing Sheets**





*Fig.1*
*PRIOR ART*



*Fig.2*



Fig. 3



*Fig. 4A*



*Fig. 4B*



Fig. 5



*Fig.6*



*Fig. 7*



$\Theta_V$ = VERTICAL VIEW ANGLE

*Fig. 10*



Fig.8

Case 1:04-cv-01338-JJF    Document 1349-23    Filed 08/25/2008    Page 19 of 89



*Fig. 9*



*Fig.11*



θ ≈ 2° TO 16°

θ

40

30

*Fig.12*

5,280,371

# DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY

## BACKGROUND OF THE INVENTION

This invention relates in general to flat panel liquid crystal displays and, more particularly, to a liquid crystal display (LCD) having a directional diffuser to provide a tailored variation of luminance with viewing angle.

There are commercially available liquid crystal displays for use in various applications, including for example aircraft cockpit displays. However, a typical characteristic of the liquid crystal panel used therein is a wide variation of the light transmission of the liquid crystal panel with viewing angle, especially the vertical viewing angle. This results in gray-scale errors and off-state errors with viewing angle. That is to say, the brightness of certain areas of the display when viewed at angles above or below a vertical viewing angle normal to the display surface, may be substantially different than the brightness of those areas when viewed at an angle normal to the display surface. This variation of brightness or luminance with viewing angle is generally undesirable and particularly undesirable in those cases where the information being displayed on the liquid crystal display is critical to an operation such as controlling or navigating an aircraft.

In addition, a typical diffuser used to provide a light source for backlighting a typical liquid crystal display ordinarily provides a constant luminance with viewing angle and therefore provides the same amount of energy for any given viewing angle of the display. In certain applications, such as for example an aircraft cockpit, the typical vertical viewing angle is fixed within a relatively narrow range and it would therefore be desirable to concentrate a higher percentage of the energy from the light source within a particular range of viewing angles.

It would therefore be desirable to provide a directional diffuser for use with a liquid crystal display to provide a tailored variation of luminance with viewing angle while also providing a concentration of the light energy from the light source within a predetermined range of viewing angles.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a directional diffuser element for a liquid crystal display to provide a tailored variation of luminance with viewing angle.

It is a further object of the present invention to provide a liquid crystal display having less variation of intermediate gray-level luminance with viewing angle.

It is still further an object of the present invention to provide a liquid crystal display combining the above features to provide a higher concentration of light energy, and therefore increased luminance, within a particular range of viewing angles thereby providing a more efficient use of light energy available from a light source.

The foregoing and other objects are achieved in the present invention wherein there is provided a liquid crystal display apparatus comprising a light source, a liquid crystal planar array of pixels for creating an image by controlling the amount of light allowed to pass through each of the pixels, and one or more directional diffuser lens arrays disposed between the light source and the liquid crystal array for providing a tailored variation of luminance from the liquid crystal display as a function of vertical viewing angle.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above mentioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of alternative embodiments of the invention taken in conjunction with the accompanying drawings wherein:

FIG. 1 is an exploded view of a typical prior art backlit liquid crystal display;

FIG. 2 is an exploded view of the liquid crystal display of the present invention, having a directional diffuser lens array;

FIG. 3 illustrates a typical prior art LCD gray-level response showing the variation of luminance with vertical viewing angle;

FIGS. 4A and 4B show cross sectional side and top views of a typical assembly including the lens array of the present invention;

FIG. 5 illustrates the variation of luminance with viewing angle for a light source alone and a light source combined with a single lens array;

FIG. 6 illustrates the path of various light rays when striking the lens array at various angles;

FIG. 7 is a cross sectional view of a preferred embodiment of the present invention with two lens arrays;

FIG. 8 illustrates the variation of luminance with viewing angle for the dual lens array configuration;

FIG. 9 illustrates the variation of luminance with viewing angle for a triple lens array configuration;

FIG. 10 is a cross sectional view of a configuration utilizing a triangular shaped lens array;

FIG. 11 illustrates the variation of luminance with viewing angle for the triangular shaped lens array; and

FIG. 12 shows the angular rotation of the lens array with respect to the LCD matrix array to eliminate residual moire effects.

## DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now to FIG. 1 there is shown a cross section of a typical prior art liquid crystal display apparatus including backlight array 25 comprising lamp 10, rear reflecting surface 15 and lambertian diffuser 20. The backlight array provides a source of light which impinges on liquid crystal panel 30 comprised of a number of individual liquid crystal elements which are alternately energized in order to form a desired pattern or image for viewing from the front of the liquid crystal display.

While this typical prior art liquid crystal panel may be adequate for certain applications where the normal viewing angle is more or less at an angle normal to the display surface, this display is not optimum for applications wherein the typical viewing angle is other than at an angle normal to the display surface. This prior art display exhibits a relatively wide variation of light transmission with viewing angle, especially the vertical viewing angle. As illustrated in FIG. 3 this variation also changes with the level of lumination for various gray-levels or intermediate intensities for a given display.

3

As can be seen in the curves of FIG. 3, the luminance emitted from the lower gray-levels of the LCD system increases significantly with increasing vertical viewing angle. This variation presents an undesirably large luminance increase with angle when the information being presented is low-level luminance information, such as for avionics applications including weather radar or attitude director indicator presentations. As a pilot viewing the display moves his vertical perspective, or his viewing angle, higher above a normal angle to the display (larger vertical viewing angles), he observes a low luminance field increase significantly in luminance, thereby causing confusion in interpretation of critical display information.

In addition, the lambertian diffuser of the typical prior art display, element 20 of FIG. 1, provides for a nearly equal luminance in all angular viewing directions. In most applications a 180° field of view in both horizonal and vertical directions is not required. It would therefore be more energy efficient if a substantial portion of the light energy could be redirected so as to be concentrated in the viewing angles of interest for a particular application.

The apparatus of the present invention includes the backlight array and liquid crystal of the prior art as shown in FIG. 1 with the addition of a lens array 40 inserted between the lambertian diffuser 20 of the prior art and liquid crystal display panel 30, as shown in FIG. 2. It was found that by inserting a directional diffuser consisting of a cylindrical lens array 40 between the lambertian diffuser and the liquid crystal panel that both of the desired effects could be accomplished. That is, the overall light energy could be concentrated within a desired rang of viewing angles and the variation of luminance with viewing angle is tailored to offset that which is obtained through the liquid crystal display alone.

For example, FIG. 5 illustrates that with the insertion of lens array 40 as shown in FIGS. 4A and 4B, the overall luminance has increased approximately 20 percent within a range from −20° to +20° viewing angle and the desired decrease in luminance with increased vertical viewing angle is obtained between approximately +10° and +35° of vertical viewing angle. Curve 110 of FIG. 5 illustrates the variation of luminance with viewing angle for the lambertian light source only, in both the horizontal and vertical angles while curves 120 and 130 respectively represent a variation of luminance with vertical and horizontal viewing angles for the backlight including lens array 40.

The effect which results from the insertion of the cylindrical lens array is explained by reference to FIG. 6 wherein there are shown light rays from the lambertian (having uniform luminance with angle) source diffuser impinging on the lens array from various angles. An air gap must be present at the interface of the lambertian diffuser and the lens array. The normal 4 percent loss per surface due to fresnel reflections is not incurred, because the surface reflections are returned to the diffuser and reflected again.

Those rays that are normal to the source diffuser but less than the critical angle within the lens array are passed through the lens array materially unobstructed, except for a small amount of surface reflection. Rays which enter at oblique angles and are greater than the critical angle of the lens array undergo total internal reflection at the inside of the lens surface as illustrated by ray tracing 70. These rays are reflected with no loss due to the total internal reflection effect around the lens

4

periphery. They exit the rear of the lens array and return to the source diffuser where they undergo a secondary diffuse reflection from the source diffuser.

However, because the source diffuser is not totally reflective, some of the returned rays are transmitted through the diffuser and are then reflected from the backlight enclosure surface 15 of FIG. 4A. Some fraction of these rays are reflected internally to exit the diffuser again. These reflected rays again have a lambertian distribution at the surface of lambertian diffuser 20. It is apparent from this interaction between the lens array and the backlight that rays which impinge close to the normal tend to be intensified while those rays which impinge at oblique angles undergo total internal reflection and are returned to the diffuser and diminished somewhat from this statistical process.

However, the roll off or variation with vertical viewing angle for this single directional diffuser cylindrical lens array was not sufficient to offset the effects of the liquid crystal display, and there were significant moire patterns caused by the interference between the lens array and the display panel wherein the lens array contained 142 lenses per inch and the display panel matrix had a spatial frequency resolution of 172 dots or pixels per inch.

For the desired specific implementation it was discovered that the adverse interaction producing moire patterns could be eliminated by including a second lens array with a different number of lenses per inch. The combination of the dual lenses increased the desired reduction in luminance with increased viewing angle, and in addition reduced or eliminated the moire patterns with the selection of an appropriate pitch, or number of lenses per inch, for the two lenses in question.

As illustrated in FIG. 7, one of the lens arrays 42 was selected to have a relatively coarse pitch with respect to that of the liquid crystal display and the second lens array 44 was selected to have a relatively fine pitch with respect to that of liquid crystal display. FIG. 8 illustrates again the relatively flat response of the lambertian source diffuser alone curve 110, and the increased roll off with vertical viewing angle of curve 125 as well as the corresponding variation of luminance with horizonal viewing angle as illustrated by curve 135 for the dual lens array of FIG. 8.

In general it was discovered that the addition of additional lens arrays caused a steeper or more rapid variation of the change in luminance with vertical viewing angle, which was desirable, but the corresponding change in luminance with variations in horizonal viewing angle also became steeper, which was not desirable for the particular application in question. For the particular application in question the preferred embodiment included two lens arrays in series which provided the best tradeoff of decrease in luminance with variation of vertical viewing angle, while not adversely affecting the variation in luminance with horizonal viewing angle.

In addition, since moire effects result when both of the lens arrays have the same spatial frequency, the rear array 42 should have a coarse resolution or low spatial frequency while the front lens array 44 should have a fine resolution or high spatial frequency. The lens arrays and the panel spatial frequencies should be selected to avoid integral multiples of the other. Thus the fine lens array should be as high a spatial frequency as is practical and should be a non integral multiple of the panel frequency. According to these guidelines the fine

5

array frequency becomes approximately 2.5 times the display spatial frequency and the coarse array frequency should be approximately the fine array frequency divided by 3.5, 4.5, 5.5 or as required for the most convenient fabrication.

It was also discovered that the maximum increase in luminance was obtained using a triangular lens array having an included angle of 90° as illustrated in FIG. 10. This configuration resulted in a variation of luminance with vertical and horizonal viewing angles which was quite steep as illustrated by curves 160 and 170 of FIG. 11. Other lens array shapes may be selected as desired to obtain the required concentration of luminance and variation of luminance with vertical and horizonal viewing angle for a particular application.

Even though the spatial frequencies of the directional diffuser lens array and LCD panel have been selected to be greatly different and non-integer multiples, some visual banding effects or moire pattern effects may still be apparent to the viewer. This is especially true at off-axis viewing conditions. This residual moire can be removed by rotating the lens array 40 with the respect to the LCD array 30, as illustrated in FIG. 12. This rotation of the lens array by a few degrees (Typically 2 to 16 degrees) from the horizontal axis causes a small change in the effective spatial frequency difference of the two arrays and thereby eliminates the residual moire.

In addition to the angular redistribution of the light from the directional diffuser, the lens array also provides an additional diffusing effect, especially for any step variations in luminance that are parallel to (or nearly parallel to within a few degrees) the axis of the lens array. This allows the reduction of the thickness or optical density of the conventional diffuser while still achieving the same system luminance uniformity and masking of undesired spatial artifacts from the light source, but with higher luminance at the output.

While there have been described above the principals of invention in conjunction with several specific embodiments, it is to be clearly understood that these descriptions are made only by way of example and not as a limitation to the scope of the invention.

6

We claim:

1. A display apparatus comprising:

a light source;

a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein said liquid crystal panel comprises a plurality of pixels arranged in rows and columns, and wherein the number of rows of pixels per unit height, or pitch, of the liquid crystal panel is a first value; the number of lenslets per unit height, or pitch, of said first lens array is a second value which is less than said first value; and the number of lenslets per unit height, or pitch, of said second lens array is a third value which is greater than said first value.

2. A display apparatus in accordance with claim 1 wherein said third value is a non-integral multiple of said first value and is also a non-integral multiple of said second value.

3. A display apparatus comprising:

a light source;

a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.

* * * * *

# 2.

# PATENT APPLICATION FOR
# A DIRECTIONAL DIFFUSER FOR
# A LIQUID CRYSTAL DISPLAY



07 911547

MAIL ROOM
JUL 9 1992
PAT. & TRADEMARK OFF.

A DIRECTIONAL DIFFUSER FOR A
LIQUID CRYSTAL DISPLAY

## BACKGROUND OF THE INVENTION

This invention relates in general to flat panel liquid crystal displays and, more particularly, to a liquid crystal display (LCD) having a directional diffuser to provide a tailored variation of luminance with viewing angle.

There are commercially available liquid crystal displays for use in various applications, including for example aircraft cockpit displays. However, a typical characteristic of the liquid crystal panel used therein is a wide variation of the light transmission of the liquid crystal panel with viewing angle, especially the vertical viewing angle. This results in gray-scale errors and off-state errors with viewing angle. That is to say, the brightness of certain areas of the display when viewed at angles above or below a vertical viewing angle normal to the display surface, may be substantially different than the brightness of those areas when viewed at an angle normal to the display surface. This variation of brightness or luminance with viewing angle is generally undesirable and particularly undesirable in those cases where the information being displayed on the liquid crystal display is critical to an operation such as controlling or navigating an aircraft.

**20**

Docket No. A6213491                1                7 July 1992

In addition, a typical diffuser used to provide a light source for backlighting a typical liquid crystal display ordinarily provides a constant luminance with viewing angle and therefore provides the same amount of energy for any given viewing angle of the display.  In certain applications, such as for example an aircraft cockpit, the typical vertical viewing angle is fixed within a relatively narrow range and it would therefore be desirable to concentrate a higher percentage of the energy from the light source within a particular range of viewing angles.

It would therefore be desirable to provide a directional diffuser for use with a liquid crystal display to provide a tailored variation of luminance with viewing angle while also providing a concentration of the light energy from the light source within a predetermined range of viewing angles.

**21**

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a directional diffuser element for a liquid crystal display to provide a tailored variation of luminance with viewing angle.

It is a further object of the present invention to provide a liquid crystal display having less variation of intermediate gray-level luminance with viewing angle.

It is still further an object of the present invention to provide a liquid crystal display combining the above features to provide a higher concentration of light energy, and therefore increased luminance, within a particular range of viewing angles thereby providing a more efficient use of light energy available from a light source.

The foregoing and other objects are achieved in the present invention wherein there is provided a liquid crystal display apparatus comprising a light source, a liquid crystal planar array of pixels for creating an image by controlling the amount of light allowed to pass through each of the pixels, and one or more directional diffuser lens arrays disposed between the light source and the liquid crystal array for providing a tailored variation of luminance from the liquid crystal display as a function of vertical viewing angle.

**22**

Docket No. A6213491                3                7 July 1992

## BRIEF DESCRIPTION OF THE DRAWINGS

The above mentioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of alternative embodiments of the invention taken in conjunction with the accompanying drawings wherein:

Figure 1 is an exploded view of a typical prior art backlit liquid crystal display;

Figure 2 is an exploded view of the liquid crystal display of the present invention, having a directional diffuser lens array;

Figure 3 illustrates a typical prior art LCD gray-level response showing the variation of luminance with vertical viewing angle;

Figures 4A and 4B show cross sectional side and top views of a typical assembly including the lens array of the present invention;

Figure 5 illustrates the variation of luminance with viewing angle for a light source alone and a light source combined with a single lens array;

**23**

Docket No. A6213491                4                7 July 1992

Figure 6 illustrates the path of various light rays when striking the lens array at various angles;

Figure 7 is a cross sectional view of a preferred embodiment of the present invention with two lens arrays;

Figure 8 illustrates the variation of luminance with viewing angle for the dual lens array configuration;

Figure 9 illustrates the variation of luminance with viewing angle for a triple lens array configuration;

Figure 10 is a cross sectional view of a configuration utilizing a triangular shaped lens array;

Figure 11 illustrates the variation of luminance with viewing angle for the triangular shaped lens array; and

Figure 12 shows the angular rotation of the lens array with respect to the LCD matrix array to eliminate residual moire effects.

**24**

## DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now to Figure 1 there is shown a cross section of a typical prior art liquid crystal display apparatus including backlight array 25 comprising lamp 10, rear reflecting surface 15 and lambertian diffuser 20. The backlight array provides a source of light which impinges on liquid crystal panel 30 comprised of a number of individual liquid crystal elements which are alternately energized in order to form a desired pattern or image for viewing from the front of the liquid crystal display.

While this typical prior art liquid crystal panel may be adequate for certain applications where the normal viewing angle is more or less at an angle normal to the display surface, this display is not optimum for applications wherein the typical viewing angle is other than at an angle normal to the display surface. This prior art display exhibits a relatively wide variation of light transmission with viewing angle, especially the vertical viewing angle. As illustrated in Figure 3, this variation also changes with the level of lumination for various gray-levels or intermediate intensities for a given display.

As can be seen in the curves of Figure 3, the luminance emitted from the lower gray-levels of the LCD system increases significantly with increasing vertical viewing angle. This variation presents an undesirably large luminance increase

with angle when the information being presented is low-level luminance information, such as for avionics applications including weather radar or attitude director indicator presentations.  As a pilot viewing the display moves his vertical perspective, or his viewing angle, higher above a normal angle to the display (larger vertical viewing angles), he observes a low luminance field increase significantly in luminance, thereby causing confusion in interpretation of critical display information.

In addition, the lambertian diffuser of the typical prior art display, element 20 of Figure 1, provides for a nearly equal luminance in all angular viewing directions.  In most applications a 180° field of view in both horizonal and vertical directions is not required.  It would therefore be more energy efficient if a substantial portion of the light energy could be redirected so as to be concentrated in the viewing angles of interest for a particular application.

The apparatus of the present invention includes the backlight array and liquid crystal of the prior art as shown in Figure 1 with the addition of a lens array 40 inserted between the lambertian diffuser 20 of the prior art and liquid crystal display panel 30, as shown in Figure 2.  It was found that by inserting a directional diffuser consisting of a cylindrical lens array 40 between the lambertian diffuser and the liquid crystal panel that both of the desired effects could be accomplished.  That is, the overall light energy is

concentrated within a desired range of viewing angles and the variation of luminance with viewing angle is tailored to offset that which is obtained through the liquid crystal display alone.

For example, Figure 5 illustrates that with the insertion of lens array 40 as shown in Figures 4A and 4B, the overall luminance has increased approximately 20 percent within a range from -20° to + 20° viewing angle and the desired decrease in luminance with increased vertical viewing angle is obtained between approximately +10° and +35° of vertical viewing angle. Curve 110 of Figure 5 illustrates the variation of luminance with viewing angle for the lambertian light source only, in both the horizontal and vertical angles while curves 120 and 130 respectively represent a variation of luminance with vertical and horizontal viewing angles for the backlight including lens array 40.

The effect which results from the insertion of the cylindrical lens array is explained by reference to Figure 6 wherein there are shown light rays from the lambertian (having uniform luminance with angle) source diffuser impinging on the lens array from various angles. An air gap must be present at the interface of the lambertian diffuser and the lens array. The normal 4 percent loss per surface due to fresnel reflections is not incurred, because the surface reflections are returned to the diffuser and reflected again.

Those rays that are normal to the source diffuser but

less than the critical angle within the lens array are passed through the lens array materially unobstructed, except for a small amount of surface reflection. Rays which enter at oblique angles and are greater than the critical angle of the lens array undergo total internal reflection at the inside of the lens surface as illustrated by ray tracing 70. These rays are reflected with no loss due to the total internal reflection effect around the lens periphery. They exit the rear of the lens array and return to the source diffuser where they undergo a secondary diffuse reflection from the source diffuser.

However, because the source diffuser is not totally reflective, some of the returned rays are transmitted through the diffuser and are then reflected from the backlight enclosure surface 15 of Figure 4A. Some fraction of these rays are reflected internally to exit the diffuser again. These reflected rays again have a lambertian distribution at the surface of lambertian diffuser 20. It is apparent from this interaction between the lens array and the backlight that rays which impinge close to the normal tend to be intensified while those rays which impinge at oblique angles undergo total internal reflection and are returned to the diffuser and diminished somewhat from this statistical process.

However, the roll off or variation with vertical viewing angle for this single directional diffuser cylindrical lens array was not sufficient to offset the effects of the

**28**    Docket No. A6213491    9    7 July 1992

liquid crystal display, and there were significant moire
patterns caused by the interference between the lens array and
the display panel wherein the lens array contained 142 lenses
per inch and the display panel matrix had a spatial frequency
resolution of 172 dots or pixels per inch.

For the desired specific implementation it was discovered
that the adverse interaction producing moire patterns could be
eliminated by including a second lens array with a different
number of lenses per inch. The combination of the dual lenses
increased the desired reduction in luminance with increased
viewing angle, and in addition reduced or eliminated the moire
patterns with the selection of an appropriate pitch, or number
of lenses per inch, for the two lenses in question.

As illustrated in Figure 7, one of the lens arrays 42 was
selected to have a relatively coarse pitch with respect to
that of the liquid crystal display and the second lens array
44 was selected to have a relatively fine pitch with respect
to that of liquid crystal display. Figure 8 illustrates again
the relatively flat response of the lambertian source diffuser
alone curve 110, and the increased roll off with vertical
viewing angle of curve 125 as well as the corresponding
variation of luminance with horizonal viewing angle as
illustrated by curve 135 for the dual lens array of Figure 8.

In general it was discovered that the addition of
additional lens arrays caused a steeper or more rapid varia-

tion of the change in luminance with vertical viewing angle, which was desirable, but the corresponding change in luminance with variations in horizonal viewing angle also became steeper, which was not desirable for the particular application in question.  For the particular application in question the preferred embodiment included two lens arrays in series which provided the best tradeoff of decrease in luminance with variation of vertical viewing angle, while not adversely affecting the variation in luminance with horizonal viewing angle.

In addition, since moire effects result when both of the lens arrays have the same spatial frequency, the rear array 42 should have a coarse resolution or low spatial frequency while the front lens array 44 should have a fine resolution or high spatial frequency.  The lens arrays and the panel spatial frequencies should be selected to avoid integral multiples of the other.  Thus the fine lens array should be as high a spatial frequency as is practical and should be a non-integral multiple of the panel frequency.  According to these guidelines the fine array frequency becomes approximately 2.5 times the display spatial frequency and the coarse array frequency should be approximately the fine array frequency divided by 3.5, 4.5, 5.5 or as required for the most convenient fabrication.

It was also discovered that the maximum increase in luminance was obtained using a triangular lens array having an

Docket No. A6213491          11          7 July 1992

**30**

included angle of 90° as illustrated in Figure 10. This configuration resulted in a variation of luminance with vertical and horizonal viewing angles which was quite steep as illustrated by curves 160 and 170 of Figure 11. Other lens array shapes may be selected as desired to obtain the required concentration of luminance and variation of luminance with vertical and horizonal viewing angle for a particular application.

Even though the spatial frequencies of the directional diffuser lens array and LCD panel have been selected to be greatly different and non-integer multiples, some visual banding effects or moire pattern effects may still be apparent to the viewer. This is especially true at off-axis viewing conditions. This residual moire can be removed by rotating the lens array 40 with the respect to the LCD array 30, as illustrated in Figure 12. This rotation of the lens array by a few degrees (Typically 2 to 16 degrees) from the horizontal axis causes a small change in the effective spatial frequency difference of the two arrays and thereby eliminates the residual moire.

In addition to the angular redistribution of the light from the directional diffuser, the lens array also provides an additional diffusing effect, especially for any step variations in luminance that are parallel to (or nearly parallel to within a few degrees) the axis of the lens array. This allows the reduction of the thickness or optical density of the

Docket No. A6213491                12                7 July 1992

conventional diffuser while still achieving the same system luminance uniformity and masking of undesired spatial artifacts from the light source, but with higher luminance at the output.

While there have been described above the principals of invention in conjunction with several specific embodiments, it is to be clearly understood that these descriptions are made only by way of example and not as a limitation to the scope of the invention.

**32**

Docket No. A6213491          13          7 July 1992

## CLAIMS

Claim 1. A display apparatus comprising:

a light source;

a substantially planar array mounted adjacent to said light source for receiving light from said light source, said array comprising a plurality of controllable apertures for creating an image by controlling the amount of light from said light source which is allowed to pass through each of said apertures; and

luminance control means disposed between said light source and said planar array for providing a predetermined variation with viewing angle of light transmission from said light source through said luminance control means and said planar array.

Claim 2. A display apparatus in accordance with Claim 1 wherein said planar array comprises a liquid crystal panel having a characteristic variation of light transmission with viewing angle.

Claim 3. A display apparatus in accordance with Claim 2 wherein said luminance control means comprises a first lens array having a plurality of individual lenslets.

**33**

**Claim 4.** A display apparatus in accordance with ~~Claim 3~~ Claim 10 wherein each of said lenslets has a semi-cylindrical shape.

**Claim 5.** A display apparatus in accordance with ~~Claim 3~~ Claim 10 wherein each of said lenslets has a triangular cross section.

**Claim 6.** A display apparatus in accordance with Claim 3 wherein said luminance control means further comprises a second lens array disposed between said first lens array and said liquid crystal panel.

**Claim 7.** A display apparatus in accordance with ~~Claim 6~~ Claim 10 wherein said liquid crystal panel comprises a plurality of pixels arranged in rows and columns, and wherein the number of rows of pixels per unit height, or pitch, of the liquid crystal panel is a first value; the number of lenslets per unit height, or pitch, of said first lens array is a second value which is less than said first value; and the number of lenslets per unit height, or pitch, of said second lens array is a third value which is greater than said first value.

**Claim 8.** A display apparatus in accordance with Claim 7 wherein said third value is a non-integral multiple of said first value and is also a non-integral multiple of said second value.

**34**

Claim 9. A display apparatus in accordance with Claim 3 wherein said first lens array is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenlets and said liquid crystal panel.

**35**

07/911547

## ABSTRACT OF THE DISCLOSURE

A display apparatus including a light source, a liquid crystal panel, and one or more directional diffuser lens arrays disposed therebetween provides a tailored variation of luminance with viewing angle, a uniform variation of luminance with viewing angle within a first predetermined range of viewing angles and a concentration of light energy within a second predetermined range of viewing angles.

**36**

Docket No. A6213491          17          7 July 1992

# 3.

# AMENDMENT DATED
# FEBRUARY 2, 1993

MAIL ROOM
FEB
18  2  93
PAT. & TRADEMARK

$6\ 2504$
#4/a
"PATENT"

$2/03/93$
AS

Applicant:  R. McCartney et al  )  Art Unit: 2504

Serial No.:  07/911,547  )  Examiner: H. Mai

Filed:  9 July 1992  )  Docket No.: A6213491

For:  "A DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY"

-----------------------------------------------------------------

AMENDMENT

Honorable Commissioner of
    Patents and Trademarks
Washington, D.C.   20231

RECEIVED

FEB 23 1993

GROUP 2500

Dear Sir:

In response to the Office Action mailed on 2 October
1992, please amend the above-identified application as
follows:

### IN THE CLAIMS

**58**

Kindly delete claims 1, 2 and 3.

Kindly amend claims 4, 5, 7 and 9 as follows:

In claims 4 and 5, at line 1, delete "Claim 3", and
substitute therefor - - Claim 10 - -.

In claim 7, at line 1, delete "Claim 6", and substitute
therefor - - Claim 10 - -.

Claim 9. (Amended) A display apparatus in accordance with
Claim [3] 10 wherein at least one of said first and second
lens arrays is rotated about an axis perpendicular to said
liquid crystal panel in order to provide a slight misalignment
between said lenslets and said liquid crystal panel.

Docket No. A6213491          1          2 February 1993

SC13613  02/22/93  07911547        08-2727  130  115      110.00CH

Kindly add new claim 10 as follows:

Claim 10.  A display apparatus comprising:

a light source;

a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel.

## REMARKS

The applicants wish to thank the Examiner for his citation to the noted references and his accompanying remarks. While the cited references are certainly pertinent to the claimed invention, applicants respectfully disagree with the interpretation of the cited references by the Examiner and his conclusions drawn therefrom.

The Examiner has rejected claims 1-5 under 35 USC 102 (a or b) as being clearly anticipated by Abileah et al or the cited IBM article.  While not necessarily providing the same function, the structure of these references does appear to be similar to that of applicants' invention.  In order to further prosecution of the application, claims 1-3 have been deleted

**59**

Docket No. A6213491          2          2 February 1993

and claims 4 and 5 amended to depend from new claim 10.

In addition, the Examiner has rejected claims 1-3 and 6-9 under 35 USC 103 as being unpatentable over Abileah et al or the IBM article in view of Hamada. Applicants have added new claim 10 which essentially includes the limitations of claims 1-3 and 6, resulting in a new claim for an apparatus having two lens arrays.

The Examiner contends that it would have been obvious, in view of Hamada, to add a second lens array to the structure of Abileah or IBM. In order to support a combination of references under 35 USC 103 there must be some suggestion for the combination. As the Hamada reference is concerned with a projection apparatus, there would be no suggestion to use the dual lens arrays of Hamada in the direct view apparatus of Abileah or IBM. Particularly since the dual lens array of Hamada is used to overcome a problem specifically associated with projection displays.

The two lens arrays of Hamada are used in a projection device to reduce the dimming at the outer edges. As such the dual lens arrays would not be suggested to the direct view display of Abileah or IBM.

In addition, at no point in any of the references is there any discussion of eliminating moire effects with appropriate selection of the relative pitch of the two lens arrays as specifically described and claimed by the applicants. Also, there is no discussion of rotating one of the

lens arrays with respect to the liquid crystal panel as specifically claimed in applicants' claim 9.

Based on the foregoing, applicants contend that claims 4, 5, 7, 9 and 10, as amended, are in condition for allowance and respecfully request same at the earliest opportunity.

Respectfully submitted,

Dale E. Jepsen
Attorney for Applicants
Reg. No. 32, 379

602/436-1336

**61**

Docket No. A6213491          4          2 February 1993

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: R. McCARTNEY ET AL
Serial No.: 07/911,547     Group No.: 2504 √
Filed: 9 JULY 1992     Examiner: H. MAI
For: "A DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY"

Commissioner of Patents and Trademarks
Washington, D.C. 20231

### AMENDMENT TRANSMITTAL

**RECEIVED**

FEB 2 3 1993

GROUP 2500

1.     Transmitted herewith is an amendment for this application

### STATUS

2.     Applicant is

    ☐    a small entity — verified statement:

      ☐    attached.

      ☐    already filed.

    ☒    other than a small entity.

---

"EXPRESS MAIL" Date of Deposit   2 FEBRUARY 1993
Mailing Label No. 1B2793044200S
I hereby certify that this paper or fee is being deposited with
the United States Postal Service "Express Mail Post Office to
Addressee" service under 37 CFR 1.10 on the date indicated
above and is addressed to the Commissioner of Patents and
Trademarks, Washington, D.C. 20231
DALE E. JEPSEN
(Typed or printed name of person mailing paper or fee)

(Signature of person mailing paper or fee)

**62**

# 4.

# USPTO Office Action
## Dated May 6, 1993



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/911,547 | 07/09/92 | MC CARTNEY | R | A6213491 |

B5H2

|  | EXAMINER |
|---|---|
| | MATSH |

DALE E. JEPSEN
HONEYWELL INC.
21,111 N. 19TH AVENUE, DV9L
PHOENIX, AZ 85027

| ART UNIT | PAPER NUMBER |
|---|---|
| 2504 | 5 |

DATE MAILED: 05/06/93

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined   ☑ Responsive to communication filed on 2/2/93   ☑ This action is made final.

A shortened statutory period for response to this action is set to expire ___3___ month(s), ___0___ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned.   35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☑ Notice of References Cited by Examiner, PTO-892.   2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.   4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.   6. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☑ Claims _____1-10_____ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☑ Claims _____1-3_____ have been canceled.

3. ☐ Claims _____ are allowed.

4. ☑ Claims _____4-6 & 10_____ are rejected.

5. ☑ Claims _____7-9_____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☑ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
    are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the
     examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed on _____ has been ☐ approved. ☐ disapproved (see explanation).

12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
     ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
     accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**66**

EXAMINER'S ACTION

Serial No. 911,547                    -2-

Art Unit   2504

Applicant's arguments with respect to claims 4-10 have been considered but are deemed to be moot in view of the new grounds of rejection.

Claim 6 is rejected under 35 U.S.C. § 112, fourth paragraph, as being of improper dependent form for failing to further limit the subject matter of a previous claim.

Claim 6 depends from claim 3 which has been canceled. Therefore, claim 6 is not treated on the merits.

The following is a quotation of the appropriate paragraphs of 35 U.S.C. § 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless --
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent.

Claims 5 and 10 are rejected under 35 U.S.C. § 102(e) as being clearly anticipated by Abileah et al ('041) or Yoshida et al.

The recited limitations of claims 5 and 10 are shown in Abileah et al's Figs. 6, 8, column 13, line 18 through column 14, line 44 or Yoshida et al's Figs. 3, 5.

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject

**67**

Serial No. 911,547                    -3-

Art Unit   2504

    matter sought to be patented and the prior art are such that
the subject matter as a whole would have been obvious at the
time the invention was made to a person having ordinary
skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which
the invention was made.

    Subject matter developed by another person, which qualifies
as prior art only under subsection (f) or (g) of section 102
of this title, shall not preclude patentability under this
section where the subject matter and the claimed invention
were, at the time the invention was made, owned by the same
person or subject to an obligation of assignment to the same
person.

    Claim 4 is rejected under 35 U.S.C. § 103 as being

unpatentable over Abileah et al ('041) in view of Abileah et al

('783).

    The '041 patent discloses in Figs. 6, 8 a display apparatus

having first and second lens arrays with lenslets having a

triangular cross section.  The '041 patent lacks a teaching the

lenslets having a semi-cylindrical shape.

    The '783 patent teaches in Fig. 3 a lens array having

lenslets disposed between a liquid crystal panel and a light

source wherein the lenslets have semi-cylindrical shape for

improving the brightness of the display device.  Therefore, it

would have been obvious at the time the invention was made to a

person skilled in this art to modify the '041 patent by

substituting the lens arrays with lenslets having semi-

cylindrical shape for the lens arrays with triangular-cross-

section lenslets for improving the brightness of the display as

taught by the '783 patent.

**68**

Serial No. 911,547           -4-

Art Unit  2504

    Claims 7 and 9 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

    Claim 8 is objected to as being dependent upon an objected claim which has allowable subject matter.

    Applicant's amendment necessitated the new grounds of rejection. Accordingly, THIS ACTION IS MADE FINAL. See M.P.E.P. § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 C.F.R. § 1.136(a).

    A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS ACTION. IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE MAILING DATE OF THE ADVISORY ACTION. IN NO EVENT WILL THE STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM THE DATE OF THIS FINAL ACTION.

    Any inquiry concerning this communication or earlier communications from the examiner should be directed to Huy K. Mai whose telephone number is (703) 308-4874.

    Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0956.

**69**

Mai/ks

April 26, 1993

WILLIAM L. SIKES
SUPERVISORY PATENT EXAMINER
GROUP 2500

# 5.

# U.S. PATENT NO. 5,161,041

US005161041A

# United States Patent [19]

## Abileah et al.

[11] **Patent Number:** **5,161,041**

[45] **Date of Patent:** **Nov. 3, 1992**

[54] **LIGHTING ASSEMBLY FOR A BACKLIT ELECTRONIC DISPLAY INCLUDING AN INTEGRAL IMAGE SPLITTING AND COLLIMATING MEANS**

[75] Inventors: **Adiel Abileah**, Farmington Hills; **Charles Sherman**, Royal Oak; **Robert M. Cammarata**, Sterling Heights, all of Mich.

[73] Assignee: **OIS Optical Imaging Systems, Inc.,** Troy, Mich.

[21] Appl. No.: **514,737**

[22] Filed: **Apr. 26, 1990**

[51] Int. Cl.⁵ ............................................. G02F 1/1335

[52] U.S. Cl. ...................................... 359/40; 359/49

[58] Field of Search ................. 350/334, 345; 359/40, 359/49

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,171,874 | 10/1979 | Bigelow et al. | 350/345 |
| 4,616,295 | 10/1986 | Jewell et al. | 350/345 |
| 4,660,936 | 4/1987 | Nosker | 350/339 D |
| 4,686,519 | 8/1987 | Yoshida et al. | 350/345 |
| 4,704,004 | 11/1987 | Nosker | 350/345 |
| 4,798,448 | 1/1989 | van Raalte | 350/345 |
| 4,915,479 | 4/1990 | Clarke | 350/345 |
| 4,936,659 | 6/1990 | Anderson et al. | 350/339 D |
| 4,984,872 | 1/1991 | Vick | 350/345 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0030875 | 6/1981 | European Pat. Off. | |
| 2471012 | 6/1981 | France | 350/345 |
| 0066862 | 5/1979 | Japan . | |
| 0201326 | 10/1985 | Japan | 350/334 |
| 0110422 | 5/1988 | Japan . | |
| 0118125 | 5/1988 | Japan | 350/334 |
| 2198867 | 6/1988 | United Kingdom . | |
| 8808149 | 10/1988 | World Int. Prop. O. | 350/345 |

### OTHER PUBLICATIONS

3M Scotch ™ Optical Lighting Film Application Bulletin Thin Light Box, Preliminary Nov. 1988.
3M Scotch ™ Optical Lighting Film General Theory, Preliminary Nov. 1988.
"Polarized Backlight for LCD" Technical (IBM) Disclosure Bulletin; vol. 33, No. 1B, Jun. 1990.

*Primary Examiner*—Stanley D. Miller
*Assistant Examiner*—Anita Pellman Gross
*Attorney, Agent, or Firm*—Myers, Liniak & Berenato

[57] **ABSTRACT**

An improved lighting assembly for a backlit electronic display includes an integrally formed image splitting-/collimating lens for effectively enlarging the area illuminated by any one or part of one of the lamps of the source of backlighting. Through the use of the improved optical assembly described herein, there is provided a backlit electronic display characterized by fewer lamps, reduced heating, and vastly improved intensity of illumination per unit area in a lower profile package.

**22 Claims, 4 Drawing Sheets**







*Fig.1*

*Fig.2A*

*Fig.2B*

*Fig.2C*



*Fig.3*

*Fig.4*



Fig.5

Fig.6

*Fig.7*



*Fig.8*          A ~ EYE



5,161,041

1

# LIGHTING ASSEMBLY FOR A BACKLIT ELECTRONIC DISPLAY INCLUDING AN INTEGRAL IMAGE SPLITTING AND COLLIMATING MEANS

## FIELD OF THE INVENTION

The instant invention relates generally to the field of electronic two dimensional liquid crystal displays, which displays are adapted to provide either still or video images to a remotely positioned viewing audience. The instant invention more particularly relates to the field of backlit liquid crystal displays particularly adapted for military and avionic applications and which are specially designed to present a bright, uniform distribution of light to said viewing audience in a low profile, i.e., minimum depth assembly.

The unique and improved backlit module disclosed in the instant specification finds an important use in full color active matrix liquid crystal displays, particularly those adapted for military and avionic use. This module achieves about one order of magnitude improvement in a figure of merit (FOM) described by the function: FOM =(lamp power/viewing angle) * (backlight thickness/ lamp life), which improvement has been achieved by decreasing the needed lamp power thereby resulting in an increase in lamp life. Additionally, the lighting arrangement set forth in the instant invention features a redundant configuration, intense illumination, uniform illumination, thermal control of the lamps and thin packaging.

## BACKGROUND OF THE INVENTION

In recent years, a considerable amount of research has been conducted in an effort to develop a low profile (thin), full color, electronic display system which does not rely upon conventional cathode ray tube technology. In systems such as television receivers, computer monitors, avionic displays, aerospace displays, and other military-related displays, the elimination of cathode ray tube technology is desirable for several reasons, which reasons will be detailed in the following paragraphs.

More particularly, cathode ray tubes are typically characterized by extremely large depth dimensions and thus occupy a considerable amount of floor or counter space. As a matter of fact, the depth dimension may equal the length and width dimensions of the viewing screen. Also, because cathode ray tubes require an elongated neck portion to provide for the acceleration of an electron beam from the electron gun to the faceplate of the cathode ray tube, they are quite irregular in shape. Additionally, since cathode ray tubes are fabricated from relatively thick glass, they are inordinately heavy, extremely fragile and readily breakable. Finally, cathode ray tubes require a relatively high voltage power supply in order to sufficiently accelerate the electron beam and thus sustain the displayed image.

The reader can readily appreciate the fact that all of the foregoing problems experienced with or shortcomings of cathode ray tubes are exacerbated as the size of the viewing screen increases. Since the current trend, and in fact consumer demand, is toward larger screens; weight, breakability, placement, etc. represent significant commercial considerations. Accordingly, it should be apparent that cathode ray tubes are and will continue

2

to be inappropriate for those applications in which weight, fragility and portability are important factors.

One system which can eliminate all of the aforementioned shortcomings of the present day cathode ray tube is the flat panel liquid crystal display in which a matrix array of liquid crystal picture elements or pixels are arranged in a plurality of rows and columns. Liquid crystal displays may typically be either reflective or transmissive. A reflective display is one which depends upon ambient light conditions in order to be viewed, i.e., light from the surrounding environment incident upon the side of the display facing the viewer is reflected back to the viewer. Differences in the orientation of the liquid crystal material within each liquid crystal pixel cause those pixels to appear either darkened or transparent. In this manner, a pattern of information is defined by the two dimensional matrix array of darkened (or transparent) pixels. However, and as should by now be apparent, reflective liquid crystal displays cannot be used in a dark or low light environment since there is no light available for reflection off the viewing surface of the display.

Conversely, transmissive liquid crystal displays require the use of illuminating means such as a lamp array operatively disposed on the side of the matrix array of picture elements opposite the viewer. This illumination means or backlight may further include a backreflector adapted to efficiently redirect any stray illumination towards the matrix array of rows and columns of picture elements, thus ensuring that the displayed image is as bright as possible (given the lighting capabilities and characteristics of the backlighting scheme being employed). The instant invention is specifically directed to the field of backlit, high resolution liquid crystal electronic displays.

The characteristics of the backlighting scheme are very important to both the quality of the image displayed by the matrix array of picture elements of the liquid crystal display and the profile, i.e., the thickness dimension, of that liquid crystal display. Accordingly, a great deal of the aforementioned research in the field of said flat panel electronic displays has been dedicated to the design and fabrication of backlighting systems which optimize certain viewing and structural parameters of those flat panel displays. Characteristics which are acknowledged by experts as the most important in the design of optimized backlighting assemblies include: 1) uniformity across the large surface areas illuminated by the light provided by the backlight, i.e., the intensity of the light must be substantially the same at each pixel of the large area liquid crystal display; 2) high brightness illumination provided by the backlight thus yielding a sharp, readily readable image to a remotely positioned viewing audience; 3) a low profile so that a flat panel liquid crystal display is substantially flat and can be operatively disposed for viewing without occupying an undue amount of available space; 4) the overall design of the backlight which takes into consideration the number, configuration, and redundancy of lamps; 5) the heat effect caused by the number, configuration, redundancy and type of the lamps; and 6) the total power consumed by the lighting scheme which represents an extremely important consideration in hand held (portable) television units.

A number of different backlight configurations, all of which included a plurality of discrete optical components disposed between the plane of the source of backlit radiation and the plane of the matrix array of liquid

crystal pixels, have been designed in an effort to maximize each of the desirable characteristics recited hereinabove. For example, those of ordinary skill in the art of liquid crystal display backlighting have attempted to use light diffusers in an effort to achieve a more uniform distribution of projected light across the entire viewing surface of the liquid crystal display. This technique, while useful for improving the uniformity of projected light, deleteriously affected the intensity of that projected light resulting in light appearing soft or washed-out. Thus, additional lamps were required when such light diffusers were employed, resulting in an increased heating effect upon the display. Further, due to the fact that such light diffusers were, of necessity, positioned an operative distance from both the source of backlighting as well as from the matrix array of liquid crystal pixels, the depth dimension or profile of the electronic, flat panel display was significantly increased.

A second technique employed to enhance the quality of the backlight (and hence the quality of the displayed image) is to operatively dispose a light collimating lens, such as a fresnel lens, between the source of the backlight and the matrix array of liquid crystal picture elements. This design expedient has the effect of producing an intense, sharp image from a minimal number of lamps, while simultaneously providing a high degree of uniformity of projected radiation across the entire viewing surface of even large area displays. However, due to the nature of collimated light, the viewing angle of a display equipped with such a light collimating lens is limited. Indeed, viewing of the displayed image is impossible from any angle other than directly straight-on. Accordingly, a backlight display which employs only a light collimator without a mechanism for increasing the viewing angle has limited commercial applicability, and is wholly inappropriate for the gigantic markets related to television and computer monitors. Additionally, collimating means, such as fresnel lenses, are characterized by an operative focal length. (The focal length is that distance from the light source at which said lens must be disposed in order to properly collimate light emanating from said light source.) Thus, the light collimator has the undesirable effect o increasing the profile of the liquid crystal display. Also, backreflectors are inappropriate for use with light collimating. This is because light reflected from the backreflector does not originate from a position which is at the focal length of the collimating lens. Hence, light reflected from said backreflector will not be collimated. This results in localized bright spots on the surface of large area displays, degrading the quality of the displayed image.

In a effort to achieve the advantages of both light collimation and light diffusion, routineers in the backlit, flat panel liquid crystal display art have attempted to incorporate both a discrete light diffuser and a discrete light collimator into the same backlit liquid crystal display. Optically speaking, the results have been satisfactory only to the extent that the quality of the displayed image is relatively sharp, intense and uniform; while said image is visible over a relatively wide viewing angle. However, in order to maximize the optical effect of utilizing the diffuser-collimator combination, it was necessary to operatively space the collimator from the source of backlighting radiation, and then to space the diffuser from both the plane of the collimator and the plane of the matrix array of liquid crystal pixels. The result was a substantial increase in the profile, i.e., the depth dimension of the liquid crystal display. Indeed, in

typical liquid low profile crystal display systems which include both a light collimator and a light diffuser, the distance from the light source to the diffuser is approximately 17 millimeters. It can thus be seen that by including both diffusing and collimating optical components, the profile of a typical flat panel liquid crystal display is significantly increased, thus eliminating one of the principle advantages of liquid crystal display systems; i.e., compactness. One method of reducing the depth profile and providing the foredescribed improved optical effect is disclosed in copending United States patent application No. 473,039, filed Jan. 31, 1990, assigned to the assignees of the instant application, the disclosure of which is incorporated herein by reference.

While the commonly assigned and copending application improved the profile and optical characteristics of prior art electronic displays having a given figure of merit for intensity of illumination per unit area, that application did not deal with improvements in the lighting efficiencies so as to reduce the number of lamps, the thermal effects of those lamps and the power consumption of those lamps. Accordingly, there still exists a need in the flat panel liquid crystal display art for an improved lighting/optical arrangement which provides a bright, uniform image of high contrast and capable of being viewed over a wide viewing angle, while maintaining a narrow profile and minimizing power consumption and thermal inconveniences.

## BRIEF SUMMARY OF THE INVENTION

There is disclosed herein an improved backlit electronic display and specifically a liquid crystal display adapted to provide an image to one or more remotely positioned observers. The improved liquid crystal display is defined by a matrix array of rows and columns of liquid crystal picture elements spacedly disposed from one side of a light source, and means for collimating light operatively disposed between said light source and said rows and columns of liquid crystal picture elements. The improvement in the display of the instant invention residing in the incorporation therein of an image splitting means adapted to enlarge the area effectively illuminated by said light source, said image splitting means and said collimating means forming an integral image splitting/collimating lens. In this manner, a bright, uniform distribution of light is provided in a low profile display.

The display preferably includes a backreflector which is operatively disposed on the side of the light source opposite the image splitting/collimating lens. The display preferably further includes means for diffusing light emanating from the light source, the light diffusing means operatively disposed between said image splitting/collimating lens and said rows and columns of liquid crystal picture elements. In one preferred embodiment, the light source is configured as a single, elongated, serpentine, tubular lamp arranged in a series of elongated parallel lobes. In a second, equally preferred embodiment, the light source may be configured as a plurality of discrete tubular lamps, said lamps defining a given lighting configuration. Regardless of whether the light source defines a lighting configuration formed of a single elongated tubular lamp or a plurality of discrete lamps, said image splitting/collimating lens will comprise a substantially planar thin film sheet having multi-faceted prisms formed on one surface thereof.

The prisms formed on said image splitting/collimating lens are operatively disposed so as to provide an image splitting effect in one dimension of the sheet. In alternative embodiments, the image splitting/collimating film may either be laminated onto a substrate or actually formed thereupon. The substrate is thin and transparent and formed of glass, a ceramic or a synthetic plastic resin. Regardless of the material from which the substrate is fabricated, the direction in which the image splitting/collimating lens is adapted to split radiation corresponds to the longitudinal dimension of the light source. More specifically, rays of light emanating from said light source are refracted on each side of said image splitting/collimating lens to provide two similar images thereof. Of course, the distance between the two similar images is controlled by the operative spacing of s id image splitting/collimating means from said light source. In a preferred embodiment, the image splitting/collimating means is operatively spaced from said light source so that said two similar images are operatively disposed immediately adjacent to one another.

It must be emphasized that the improved backlighting arrangement of the instant invention will operate with equal effectiveness in passive displays as well as in active matrix electronic displays. In such active matrix liquid crystal displays, each picture element will include a pair of electrodes having liquid crystal material operatively disposed therebetween and at least one threshold device. The threshold devices may either be diodes or field effect transistors. Where two threshold devices are employed, they are electrically coupled together at a common node in non-opposing series relationship. The threshold devices preferably comprise diodes formed from deposited thin film layers of amorphous silicon alloy material of p-i-n construction.

In one final embodiment of the invention, the light source can be defined by a plurality of lamps operatively disposed in two orthogonal directions. In such an embodiment, it is necessary to employ a set of two image splitting/collimating lenses. One of those image splitting/collimating lenses will be operatively disposed on top of the second and offset by 90 degrees therefrom. This combination of image splitting, light collimation and light diffusion provides for a thin and efficient assembly which yields a uniform distribution of light over the large surface areas of the display.

These and other objects and advantages of the instant invention will become apparent to the reader from a perusal of the Detailed Description Of The Invention, the Drawings and the claims, all of which follow immediately hereinafter.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded perspective view illustrating the component elements typically present in a liquid crystal display adapted for use in military and avionic applications;

FIG. 2A is a graph of light intensity distribution in which the intensity of illumination is plotted o the ordi-nate and the horizontal position across the viewing surface of an electronic display of the type illustrated in FIG. 1 is plotted on the abscissa;

FIG. 2B is a graph of light intensity distribution in which the intensity of illumination is plotted on the ordinate and the horizontal position across the viewing surface of an electronic display of the type illustrated in FIG. 1, including a reflector, is plotted on the abscissa;

FIG. 2C is a graph of light intensity distribution in which the intensity of illumination is plotted on the ordinate and the horizontal position across the viewing surface of an electronic display is plotted on the abscissa, and illustrating in curve I a conventional backlighting arrangement and in curve I' the improved backlighting arrangement of the instant invention;

FIG. 3 is a stylistic front elevational view of the matrix array of rows and columns of liquid crystal picture elements of the active matrix embodiment of the electronic display o the instant invention schematically illustrating the manner in which the threshold switching elements are operatively disposed between the address lines and one of the picture element electrodes;

FIG. 4 is an equivalent circuit diagram of the active matrix embodiment of the array of FIG. 3, illustrating the relationship between the liquid crystal picture elements and the anode-to-cathode connected diodes by which individual ones of the picture elements schematically depicted in FIG. 3 are addressed;

FIG. 5 is a fragmentary perspective view illustrating the relative disposition of one preferred embodiment of the image splitting/collimating lens array of the instant invention relative to a first embodiment of an axially aligned array of tubular lamps;

FIG. 6 is a fragmentary perspective view illustrating the relative disposition of the image splitting/collimating lens array of the instant invention relative to a second embodiment of a square helical array of tubular lamps; and

FIG. 7 is a cross-sectional view of FIG. 5 and illustrating the manner in which rays of light emanating from the axially aligned lighting configuration of FIG. 5 are split and collimated by the optical media of the image splitting/collimating lens array of the instant invention.

FIG. 8 is a partial cross-sectional schematic view of FIG. 7 illustrating the manner in which the rays of light emanating from the light source are refracted on each side of the integral image splitting/collimating lens to provide two similar images thereof.

## DETAILED DESCRIPTION OF THE INVENTION

Disclosed as part of the instant invention is an improved backlighting assembly for an electronic display, such as a liquid crystal display and most specifically, by way of example and not by way of limitation, to an active matrix liquid crystal display for military and avionic applications. Active matrix liquid crystal displays, which operate in full color and in the transmissive mode, represent the primary choice of flat panel technologies for avionic and military applications because of their sunlight readability, high resolution, color and gray scale capability, low power consumption and thin profile. It is to be specifically noted that while an active matrix liquid crystal display will be described in detail hereinafter as a preferred embodiment, the instant invention can be used with equal advantage in any type of backlit electronic display known to routineers in the art. Therefore, the improved backlighting assembly described herein is adapted to enhance lighting parameters such as brightness, redundancy of lamps, low heat effects, while simultaneously providing a low profile to the overall depth dimension of the display structure. With the foregoing objectives clearly in mind, the improved assembly will be described in greater detail in the following paragraphs.

7

In order for electronic displays to gain increased acceptance in military and avionic applications, the backlighting of flat panel displays, and particularly active matrix liquid crystal displays, must be improved in light efficiency and reliability. In order for a full color liquid crystal display to possess acceptable contrast under high ambient lighting conditions, the backlighting arrangement must be bright. While current backlighting systems have the requisite light output, they still require high power (on the order of 2.4 watts/-square inch) and a depth dimension of about two inches. In contrast thereto, the backlight assembly of the instant invention consumes only about 1.2 watts/square inch of power with a depth dimension of only about one inch. In addition, this design increases lamp life, a critical parameter in the design and successful marketing of electronic displays, to approximately 8,000 hours or more from the typical values of about 4,000 hours exhibited by prior art lighting arrangements.

Liquid crystal displays operate as light modulators and do not emit light. Therefore, liquid crystal displays rely upon ambient illumination or backlighting to provide the light necessary for reading. Active matrix liquid crystal displays use a twisted nematic liquid crystal material and two polarizers as the optical components in the modulating mechanism. These materials, together with the color filters, result in a color display panel which can only transmit about 5% of radiation incident thereupon. Therefore, a bright backlight is necessary in order for full color displays to be clearly readable in bright ambient environments.

All backlighting assemblies designed for active matrix liquid crystal display applications have the same basic components. More specifically, each backlighting assembly includes a light source, an optical system comprising one or more lenses for altering the nature of the light emanating from said light source, and light source control electronics (ballast). An exploded perspective view of a fluorescent lamp-based backlight assembly is illustrated in FIG. 1. The backlight assembly depicted therein is represented generally by the reference numeral and, as is typical in the industry, employs a tubular fluorescent lamp 2 as the light source. Of course, the lamp 2 may be arranged in any one of a plurality of well known configurations: it may be serpentine as shown in FIG. 1, alternatively the lamp may be "U-Shaped", or straight.

Returning now to FIG. 1, the typical backlight system further includes a backreflector 3, a lens element 4, and a diffuser 5. Of course, disposed in front of the backlight assembly 1 is a display element comprising a plurality of rows and columns of liquid crystal picture elements adapted to be illuminated by said backlight assembly. The purpose of the backreflector 3 is to redirect light which is not initially directed towards the display element so that the maximum amount of light available from a given light source is directed towards the display 6.

Generally speaking, the optical element 4 is provided to alter or enhance the quality of the light emanating from the light source. While the optical element is an important, indeed necessary, component of the backlight system, it is often the primary cause of increased profile (i.e., increased thickness) in a liquid crystal display system. This is due to the fact that in order to achieve the desired optical effect, it is often necessary to operatively space the plurality of lenses which make up the optical element a preselected distance from one

8

another. For example, a collimating lens such as a Fresnel lens is characterized by a focal length which defines the operative spacing from the light source necessary for the lens to effectively collimate the light. This spacing, along with the operative spacing required by, for example a diffuser significantly increases the profile of the backlight assembly.

It is to the end of reducing the profile of the liquid crystal display system that the instant invention is directed. This is accomplished by incorporating two necessary optical components, an image splitting lens and a collimating lens into a single, integral image splitting-/collimating lens. More particularly, the instant invention includes an image splitting lens for effectively doubling the area which the light source can uniformly and effectively illuminate. The image splitting lens is however further adapted to collimate the light emanating from the lamp 2 for uniform distribution onto the back of the matrix forming the liquid crystal display 6. There are several ways to obtain light collimation, such as, for example, through the use of various combinations of parabolic shaped reflectors and lens elements. However, the image splitting means of the instant invention is adapted to collimate light passing therethrough due to the presence of multi-faceted prisms formed on the surface thereof. Specifically, engineered facets of close tolerances will not only achieve the desired optical effect of splitting the image of the light source, but will also collimate each image.

The instant inventors have found that a material ideally suited for use as an image splitting/collimating lens is Optical Lighting Film (registered Trademark of 3M Scotch) which is subsequently laminated onto a transparent substrate such as glass, other ceramic or a synthetic plastic resin. By employing an integrally formed image splitting/collimating lens it is thus possible to achieve two desired optical effects with a decrease in the profile of the display as compared to other non-integrally formed optical systems. Indeed, since the distance between the two similar images provided by the image splitting lens is controlled by the operative spacing of the lens from the light source (i.e, the more distant the lens from the light source, the farther apart said two images appear) and since it is desired that the distance between the two images be controlled so that said two images are immediately adjacent one another, it is possible, indeed desirable to dispose the image splitting-/collimating lens in close proximity to the light source 2.

Returning now to FIG. 1, a diffuser 5 is provided to scatter the collimated light so that it will illuminate the display matrix 6 in all directions and provide acceptable off axis (wide angle) viewing. However due to the high degree of uniformity of light provided by the image splitting/collimating lens it is not necessary to diffuse the light to the extent necessary in prior art backlight assemblies, and thus the profile of the backlight assembly is further reduced. The backlight assembly 1 further includes lamp control electronics having provisions for lamp starting, a ballast 7 and dimming circuitry.

The light output of the light source 2 disposed behind prior art assemblies such as the liquid crystal display 6 of FIG. 1 is not uniform and will be dependent upon the configuration of the lamps employed and the type of optical system if any, employed. FIG. 2A illustrates the distribution of light intensity directly in front of the serpentine arrangement of fluorescent lamps 2 depicted in FIG. 1, as unenhanced by an optical system (i.e.,

without any collimating, image splitting or diffusing elements). As can be easily discerned from FIG. 2A, unenhanced light emanating from the light source will inevitably lead to areas of localized high intensity of illumination on the array of liquid crystal pixels. This, of course, results in local bright spots, such as b, and local pale spots, such as p, in the displayed image and therefore degraded image quality.

Of course, it is one of the purposes of an optical system, such as 4 in FIG. 1, to redistribute the intensity of radiation from the high intensity areas to the areas of lower intensity while maintaining the total integrated light output from the lamp assembly 2. FIG. 2B depicts the typical distribution of light intensity of the serpentine arrangement of fluorescent lamps 2 of FIG. 2A to which a backreflector 3 has been added. Acceptable uniformity across the viewing surface of the liquid crystal display requires optimization of the backreflector 3 in conjunction with the other optical components. Current backlighting arrangements have been configured to provide acceptable uniformity thereacross, but they lose about one-half of the energy emanating from the lamps. The curve marked as I in FIG. 2C illustrates an intensity of illumination that can be expected from current backlighting designs. In the detailed description 25 which follows hereinafter, a highly efficient optical system will be disclosed that maximizes light output while achieving a high degree of uniformity across the viewing screen, in the manner shown by the curve I'.

The lamp and optical configurations are critical elements in the design of such systems because the characteristics thereof determine the final performance parameters and the overall structural profile of the display. In achieving an optical system characterized by such performance, fluorescent lamps will be capable of operation at a substantially reduced power level, which results in prolonged life. This also reduces heat build-up, thereby reducing thermal management requirements and permitting a more compact design. These improvements not only result in an improved backlighting arrangement in terms of uniformity and intensity, but one that is more reliable and less expensive to build and maintain.

Referring now to FIG. 3, there is depicted therein a matrix array of rows and columns of discrete liquid crystal display picture elements, said matrix array being generally designated by the reference numeral 10. Each liquid crystal display picture element, or pixel, 12 includes two spacedly disposed pixel electrode plates with a light influencing material, such as a liquid crystal composition, operatively captured therebetween. (The electrode plates and the light influencing material will be discussed in detail with respect to FIG. 5.) Each of the pixels 12 further includes a threshold switching device or a plurality of threshold switching devices for selectively applying an electric field across the liquid crystal composition when the electric field exceeds a predetermined threshold value.

More specifically, the matrix array 10 which defines the liquid crystal display of the instant invention includes a first set of X address lines 20, 22 and 24: a second set of Y address lines 26, 28 and 30; and a plurality liquid crystal picture elements 32, 34, 36, 38, 40, 42, 44, 46 and 48. The display further includes at least one isolation or addressing element 50, 52, 54, 56, 58, 60, 62, 64 and 66 operatively associated with and electrically connected to each respective one of the picture elements. As should be readily apparent to the reader from even a cursory review of FIG. 1, the X address lines 20, 22 and 24 and the Y address lines 26, 28 and 30 cross over one another at an angle so as to define a plurality of spaced crossover points associated with respective ones of the liquid crystal picture elements 32-48. The picture elements are formed on a transparent substrate, such as glass, and are distributed thereover in spacedly disposed relation so as to define interstitial spaces therebetween.

As can be ascertained from a perusal of FIGS. 3 and 4, each of the threshold devices 50-66 is preferably coupled in nonopposing series relation with a first one of the pixel electrodes. This type of switching arrangement will now be described in greater detail with respect to FIG. 4. In FIG. 4, the matrix array 10' includes a plurality of substantially parallel address line pairs 20, 20', 22, 22', 24 and 24' which are the row select lines and a plurality of substantially parallel column address lines 26 and 28. The column address lines 26, 28, and 30 cross the row select address line pairs at an angle and are spaced from the row select address line pairs to form a plurality of crossover points therewith. Preferably, the column address lines cross the row select line pairs at an angle which is substantially perpendicular thereto.

Since, as mentioned hereinabove, each of the pixels are identical, only pixel 12 will be described in detail in the following paragraphs. Pixel 12, as can be seen from the figures, includes a pair of threshold devices 74 and 76 which are electrically coupled together at common node 78. The threshold devices 74 and 76 are preferably diodes and are electrically coupled together in nonopposing series relationship between the row select address line pair 20 and 20'. Although the threshold devices, in accordance with the preferred embodiment of the invention are diodes, said devices can be of any type which provides a high impedance to current flow when reverse biased and a comparatively low impedance to current flow when forward biased. Therefore, any bidirectional threshold switch or field effect transistor can be utilized with equal advantage. Of course, more conventional electrical interconnections would be employed with field effect transistors.

The picture element or pixel 12 further includes a pair of electrode plates 80 and 82 which are spaced apart and facing one another. Operatively disposed in the space between the electrodes 80 and 82 is a light influencing material 84. The term "light influencing material" is defined and will be used herein to include any material which emits light or can be used to selectively vary the intensity, phase, or polarization of light either being reflected from or transmitted through the material. In accordance with the preferred embodiment of the invention, the light influencing material is a liquid crystal display material, such as a nematic liquid crystal material. In any event, the electrodes 80 and 82 with the liquid crystal material 84 disposed therebetween form a storage element 86 (or capacitor) in which electric charge can be stored. As illustrated, the storage element 86 is coupled between the common node 78, formed by the electrically connected diodes 74 and 76, and the column address line 26.

Still referring to FIG. 4, the display 10 further includes a row select driver 90 having outputs R-1a, R-1b, R-2a, R-2b, R-3a, and R-3b electrically coupled to the row select line pairs 20, 20', 22, 22', 24, and 24'. The row select driver 50 provides drive signals at the outputs thereof to apply first operating potentials which are substantially equal in magnitude and opposite in polar-

ity between the row select address line pairs to forward bias the threshold devices to in turn facilitate the storage of electric charge in the storage elements coupled thereto. The row select driver also applies second operating potentials which are substantially equal in magnitude and opposite in polarity between the row select address line pairs to reverse bias the threshold devices to facilitate the retention of the electric charge stored in the storage elements coupled thereto.

Lastly, the electronic display 10 includes a column driver 92. The column driver 92 includes a plurality of outputs, C1 and C2, which are coupled to column address lines 26 and 28 respectively. The column driver is adapted to apply a charging potential to selected ones of the column address lines for providing electric charge to be stored in selected storage elements during the application of the first operating potentials to the row select address line pairs by the row select driver 50.

It is preferred that the matrix array of rows and columns of picture elements that combine to make up the improved electronic display 10 of the instant invention utilize a "balanced drive" scheme for addressing each discrete one of the pixels thereof. In this driving scheme, the operating potentials applied to the row select address line pairs are always substantially equal but opposite in polarity. Assuming that the current-voltage characteristics of each of the diodes are substantially equal, a voltage of substantially zero volts will be maintained at the common node 78, at least when the diodes are forward biased. Thus, the voltage applied on the column address line 26 to charge storage element 86 no longer needs to take into account the voltage drop across and/or parasitic charge build-up on one or both of the diodes 74 and 76. Therefore, each pixel in the matrix array of rows and columns may be charged to a known and repeatable value regardless of its position in that matrix array. This permits improved gray scale operation resulting in at least 15 levels of gray scale in large area active matrix displays of the twisted nematic liquid crystal type using normal fluorescent back illumination. The pixels can also be charged more rapidly since the retained charge in the diodes associated with each pixel when they are reverse biased need not be initially dissipated to charge the storage elements. This is because this charge is dissipated when the diodes are first forward biased. A complete description of this driving scheme can be found in U.S. Pat. No. 4,731,610 issued on Mar. 15, 1988 to Yair Baron et al and entitled "Balanced Drive Electronic Matrix System And Method Of Operating The Same", the disclosure of which is incorporated herein by reference.

Turning now to FIG. 5, there is depicted in a fragmentary perspective view, one preferred embodiment of the instant invention. In this embodiment of the invention, the image splitting/collimating lens 102 is operatively disposed so as to provide for a low profile electronic display assembly 11. The low profile or depth dimension of the display is especially important and is dependent on the type of lighting assembly, the material from which the threshold devices are fabricated, the on-board electronics, the multiplexing schemes, and most importantly, the optical arrangement by which light is diffused, collimated and transmitted to the viewing audience. It is, inter alia, the depth dimension of liquid crystal displays that has been significantly improved by the inventive concept set forth herein.

There are four basic elements which combine to form the electronic display 11 depicted in FIG. 5. The upper-

most element is the generally rectangularly-shaped glass panel 10 upon which the rows and columns of active matrix liquid crystal picture elements as well as the associated drive circuitry, described in the preceding paragraphs, are disposed. The lowermost element is the thin, generally rectangularly-shaped back reflector panel 98 upon the interior surface of which one or more thin film layers of highly reflective material, such as aluminum or silver and a light transparent material having a low index of refraction, are deposited. Disposed immediately above the highly reflective panel 98 is an array of light sources 100 from which radiation emanates and either passes directly towards the matrix array of picture elements or is reflected off of the highly reflective panel and then passes upwardly toward said matrix array. Finally, the improved image splitting/collimating lens 102 of the instant invention is operatively located between the array of light sources 100 and the matrix array of picture elements 10. It is the combination of these elements which define the profile, preferably the low profile, of the electronic display of the instant invention.

More specifically, it is important to note that lighting is one of the critical parameters which is employed in assessing the visual appearance of a liquid crystal display. Not only is it essential that the image of the display appear clear and bright to the viewers thereof, but it is also important that the image be substantially as clear to viewers disposed at an angle relative to the vertical plane of the viewing screen of the display. The structural and optical relationship existing between the array of light sources and the image splitting/collimating lens 102 helps to determine the clarity and viewing angle of the display.

In the preferred embodiment of the invention illustrated in FIG. 5, the array of light sources 100 is configured as one elongated, serpentine fluorescent lamp (although it must be appreciated that a plurality of discrete elongated tubular lamps could be employed without departing from the spirit or scope of the instant invention) arranged in a specific pattern or lighting configuration and having each section of lamp disposed in a generally horizontal plane. More specifically, the array, regardless of configuration, will be arranged to uniformly distribute radiation emanating therefrom over the entire surface area of the matrix of rows and columns of picture elements 105. To this end, the lighting array is shaped in a serpentine pattern which may include a plurality of elongated lamps, such as 100a–100e, each lamp of which has a longitudinal axis parallel to the longitudinal axis of the other major lamp sections The length of each longitudinal lamp axis is generally coextensive with the length dimension of the matrix array of picture elements. The configuration of the lighting array 100 also includes curved end sections, such as 101c–101d. The number of the elongated axial sections of the lamps and the number of the curved end sections of the lamps must be sufficient to bathe the entire width dimension of the matrix array of picture elements 105 with a uniform shower of illumination.

The image splitting/collimating lens 102 is formed as an integral unit, vis-a-vis, prior art image splitters and collimators which were formed as two distinct elements. The integrally formed image splitting/collimating lens is, as discussed hereinabove, fabricated of Optical Lighting Film (registered Trademark of 3M Scotch) which is subsequently laminated onto a transparent substrate such as glass, a ceramic or plastic. By employ-

13

ing an integrally formed image splitting/collimating lens it is thus possible to achieve two desired optical effects without an increase in the profile of the display. Indeed, since the distance between the two similar images provided by the image splitting effect of the image splitting/collimating lens is controlled by the operative spacing of the lens from the light source (i.e, the more distant the lens 102 from the light source, the farther apart said two images appear) and since it is desired that the distance between the two images to be controlled so that said two images are immediately adjacent one another, it is possible, indeed desirable, to dispose the image splitting/collimating lens in close proximity to the light source 100. As is illustrated in FIG. 5, the image splitting/collimating lens can be used in conjunction with a diffuser 104 to further enhance the uniformity of the light emanating from the light source 100.

In a second preferred embodiment of the invention illustrated in FIG. 6, the array of light sources 200 is configured as square, helical fluorescent lamp (although it must be appreciated that a plurality of discrete elongated tubular lamps could be employed without departing from the spirit or scope of the instant invention) arranged in a specific pattern or lighting configuration and having each section of lamp disposed in a generally horizontal plane. As stated hereinabove, the array, regardless of configuration, will be arranged to uniformly distribute radiation emanating therefrom over the entire surface area of the matrix of rows and columns of picture elements 205. To this end, the lighting array is shaped in a square, helical pattern which may include at least a pair of squarely configured, elongated lamps, such as 200a–200b, each portion of each squarely configured lamp being parallel to the squarely configured portions of the other lamp. The configuration of the lighting array 200 also includes curved sections, such as 201c–201d. The number of the elongated portions of the lamps is generally equal to eight in the square helical configuration.

The image splitting/collimating lens 202 is formed as an integral unit, vis-a-vis, prior art image splitters and collimators which were formed as two distinct elements. The integrally formed image splitting/collimating lens is, as discussed hereinabove, fabricate of Optical Lighting Film (registered Trademark of 3M Scotch) which is subsequently laminated onto a transparent substrate such as glass, a ceramic or plastic. By employing an integrally formed image splitting/collimating lens it is thus possible to achieve two desired optical effects without an increase in the profile of the display. Indeed, since the distance between the two similar images provided by the image splitting effect of the image splitting/collimating lens is controlled by the operative spacing of the lens from the light source (i.e, the more distant the lens 202 from the light source, the farther apart said two images appear) and since it is desired that the distance between the two images be controlled so that said two images are immediately adjacent one another, it is possible, indeed desirable, to dispose the image splitting/collimating lens in close proximity to the light source 200. As is illustrated in FIG. 6, the image splitting/collimating lens can be used in conjunction with a diffuser 204 to further enhance the uniformity of the light emanating from the light source 200.

Turning now to FIG. 7, there is depicted therein a cross-sectional view of FIG. 5, said cross-sectional view provided to demonstrate the manner in which rays of light "r" emanating from the lamps 100b–100c of the

14

lighting configuration 100 are collimated to present a sharp image to the viewing audience of the liquid crystal display of the instant invention. More particularly, there is depicted a plurality of lamps, such as 101b, 101c, and 101d, of the embodiment of the lighting configuration wherein the longitudinal axes thereof are disposed in substantially parallel alignment. As can be seen from a perusal of FIG. 7, the rays of light "r" emanating from the three parallel, but spacedly disposed lamps are directed upwardly through the relatively thin image splitting/collimating lens 102. The upper surface, the surface opposite the light source 100, of the image splitting/collimating lens 102 is engineered so as to comprise a series of aligned multi-faceted prisms 103. The prisms 103 are aligned such that the longitudinal extents thereof are substantially parallel to the longitudinal extents of the substantially parallel lamps 100a and 100b. At both the planar air-to-material interface 102x and the faceted L material-to-air interface 102y thereof, the rays of light are collimated and transmitted to the viewers in that collimated fashion. Note that for purposes of illustrating the collimating effect of the lens array of the instant invention, neither the reflector plate 98 nor the matrix array 10 of rows and columns of liquid crystal picture elements are depicted in FIG. 7. Of course, it is the aligned facets of said prisms 103 that provide the image splitting effect which is critical to the improved performance provided by the instant invention.

FIG. 8 is presented to schematically illustrate how the above-referenced aligned facets of the prisms 103 inherently operate to provide the image splitting effect. This, of course, also illustrates the inherent characteristics of operation of the aforesaid 3M Optical Lighting Film when used in this invention. As illustrated with reference to a segmented arc of lamp 100c having a mid-point B and extremities A and C (these points being designated for convenience of illustration, it being understood that lamp 100c is a circular tube), certain rays of light are reflected backwardly while others are allowed to exit in collimated fashion from lens 102. To the observer located at "eye" this inherently results in a "split image" 1 and 2, the spacing of which, as aforesaid, is governed by the distance between the lamp 100c, and the lens 102.

While the foregoing paragraphs have described the inventive concept set forth in the this specification, the instant inventors do not intend to have the disclosed invention limited by the detailed embodiments, drawings or description; rather, it is intended that the instant invention should only be limited by the scope of the claims which follow hereinafter, as well as all equivalents thereof which would be obvious to those routineers of ordinary skill in the art.

What is claimed is:

1. In a backlit liquid crystal display which includes a source of light; a matrix array of rows and columns of liquid crystal picture elements spacedly disposed from one side of said light source; and means for collimating light, said collimating means operatively disposed between said light source and said matrix array of rows and columns of liquid crystal picture elements; said liquid crystal display capable of providing an image to a remotely positioned observer; the improvement comprising, in combination:

an integral collimating and image splitting means for collimating light from said light source and for refracting light rays emanating from said light source to provide two similar images thereof,

| 15 | 16 |
|---|---|

thereby enlarging the area effectively illuminated by said light source, whereby a bright, uniform, light distribution is provided in a low profile assembly.

2. A display as in claim 1, further including a backreflector operatively disposed on the side of said light source opposite said image splitting/collimating lens.

3. A display as in claim 1, further including means for diffusing light emanating from said light source, said light diffusing means operatively disposed between said image splitting/collimating lens and said rows and columns of liquid crystal picture elements.

4. A display as in claim 1, wherein said light source is a single, elongated, serpentined, tubular lamp arranged in a series of elongated parallel lobes.

5. A display as in claim 1, wherein said light source is a multi-tube lamp array wherein each of said lamps are elongated tubular lamps arranged in substantially parallel fashion.

6. A display as in claim 1, wherein said light source is at least a pair of tubular lamps arranged in a square helical configuration.

7. A display as in claim 1, wherein said image splitting/collimating lens comprises a film having prisms formed on one face thereof.

8. A display as in claim 7, wherein the image splitting/collimating film is laminated to a substrate.

9. A display as in claim 8, wherein said substrate is a thin transparent substrate.

10. A display as in claim 9, wherein the substrate is glass.

11. A display as in claim 1 wherein said integral collimating and image splitting means includes a thin film having faceted prisms formed on one face thereof and wherein said light rays are refracted by the said facets of said prisms.

12. A display as in claim 1, wherein the distance between said two similar images is controlled by the operative spacing of said image splitting/collimating means from said light source.

13. A display as in claim 12, wherein said image splitting/collimating means is operatively spaced from said light source so that said two similar images are immediately adjacent one another.

14. A display as in claim 1, wherein the liquid crystal display is an active matrix liquid crystal display.

15. A display as in claim 1, wherein each liquid crystal picture element comprises a pair of electrodes having liquid crystal material disposed therebetween and at least one threshold device connected at one of the terminals thereof to one of said electrodes.

16. A display as in claim 15, wherein a pair of threshold devices are provided, said threshold devices electrically coupled together at a common node in nonopposing, series relationship.

17. A display as in claim 15, wherein said at least one threshold device comprises a transistor formed from deposited layers of semiconductor material.

18. A display as in claim 15, wherein the threshold devices comprise diodes formed from deposited layers of semiconductor material.

19. A display as in claim 18, wherein the semiconductor material is an amorphous silicon alloy material.

20. A display as in claim 1, wherein the light source comprises lamps arranged in two orthogonal directions.

21. A display as in claim 20, further including two image splitting/collimating lenses arranged to provide perpendicular image splitting effects.

22. A display as in claim 21, wherein said image splitting/collimating lenses each comprise thin films disposed one atop the other, and wherein the dimension in which one of said image splitting/collimating lenses provides an image splitting effect is offset by 90 degrees relative to the other lens.

* * * * *

40

45

50

55

60

65

# 6.

## AMENDMENT AFTER FINAL REJECTION DATED JULY 1, 1993

MAIL ROOM
JUL 2 1993
PAT. & TRADEMARK OFFICE

PATENT

IN UNITED STATES
PATENT AND TRADEMARKS OFFICE

Applicant:  Richard I. McCartney, et al )  Art Unit: 2504

Serial No.:  007/911,547              )  Examiner: H. Mai

Filed:     09 July 1992               )  Doc. No.:A6213491

For:  "A DIRECTIONAL DIFFUSER FOR A LIQUID CRYSTAL DISPLAY"

------------------------------------------------------------
AMENDMENT AFTER FINAL REJECTION
------------------------------------------------------------

Commissioner of U.S.
  Patent and Trademark Office
Washington, D.C.  20231

Dear Sir:

    In response to the Office Action mailed on 06 May 1993,
please amend the above-identified application as follows:

IN THE CLAIMS

    Kindly delete Claims 4, 5, 6 and 10.

    Kindly amend Claims 7 and 9 as follows:

    Claim 7 (Twice Amended)  A display apparatus comprising:

    a light source;

    a liquid crystal panel mounted adjacent to said light
source for receiving light from said light source; and

**75**

Docket No. A6213491          1          01 July 1993

first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel. [A display apparatus in accordance with Claim 10] wherein said liquid crystal panel comprises a plurality of pixels arranged in rows and columns, and wherein the number of rows of pixels per unit height, or pitch, of the liquid crystal panel is a first value; the number of lenslets per unit height, or pitch, of said first lens array is a second value which is less than said first value; and the number of lenslets per unit height, or pitch, of said second lens array is a third value which is greater than said first value.

Claim 3 (Twice Amended)  A display apparatus comprising:
    a light source;
    a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and
    first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel. [A display apparatus in accordance with Claim 10]

**76**

Docket No. A6213491            2            01 July 1993

*omit by* (handwritten) wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.

**77**



<u>REMARKS</u>

The Examiner has finally rejected Claims 4-6 and 10. Applicants have deleted Claims 4-6 and 10.

The Examiner has objected to Claims 7 and 9, indicating that they would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims. Claims 7 and 9 have been amended as suggested by the Examiner.

The Examiner has objected to Claim 8 as being dependent on an objected claim. Claim 7 has been amended to overcome the noted objection and claim 8, which depends therefrom, should now be allowable.

Applicants having amended Claims 7 and 9 to overcome the Examiner's objections, Claim 8 now depending from allowable Claim 7, and all remaining claims having been canceled, hereby request a Notice of Allowance for Claims 7, 8 and 9, as amended, at the earliest opportunity.

Respectfully Submitted,

Dale E. Jeppsen
Reg. No. 17,379
Attorney for Applicants
602/436-1336

"EXPRESS MAIL" Date of Deposit _7-2-93_
Mailing Label No. _IB379304794_
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231
_JOANNA JOHNSON_
(Typed or printed name of person mailing paper or fee)
_Joanna C. Johnson_
(Signature of person mailing paper or fee)

**78**

Docket No. A6213491          4          01 July 1993

# 7.

# TRANSCRIPT OF TELEPHONE CONFERENCE ON 9/9/2005

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

```
                                              1
1          THE UNITED STATES DISTRICT COURT
2        IN AND FOR THE DISTRICT OF DELAWARE
3                      - - -
4   HONEYWELL INTERNATIONAL, INC.    :  CIVIL ACTIONS
    et al.                          :
5                                   :
              Plaintiffs,           :
6                                   :
         v.                         :
7                                   :
    AUDIOVOX COMMUNICATIONS CORP.,   :
8   et al.                          :
                                    :   NO. 04-1337 (KAJ)
9             Defendants.           :
    ──────────────────────         :
10  HONEYWELL INTERNATIONAL, INC.    :
    et al.                          :
11                                  :
              Plaintiffs,           :
12                                  :
         v.                         :
13                                  :
    APPLE COMPUTER, INC., et al.,    :
14                                  :   NO. 04-1338 (KAJ)
              Defendants.           :
15                    - - -
16              Wilmington, Delaware
        Friday, September 9, 2005 at 10:40 a.m.
17            TELEPHONE CONFERENCE
18                    - - -
19  BEFORE:    HONORABLE KENT A. JORDAN, U.S.D.C.J.
20                    - - -
    APPEARANCES:
21
22      ASHBY & GEDDES
        BY:  STEVEN J. BALICK, ESQ.
23
            and
24
25              Brian P. Gaffigan
                Registered Merit Reporter
```

```
                                              3
1   APPEARANCES: (Continued)
2
3       KENYON & KENYON
        BY:  ROBERT L. HAILS, ESQ.
4            (Washington, District of Columbia)

5            and

6       KENYON & KENYON
        BY:  JOHN FLOCK, ESQ.
7            (New York, New York)

8            Counsel for Sony Corporation, and Sony
             Corporation of America
9            and
10      KENYON & KENYON
        BY:  RICHARD M. ROSATI, ESQ.
11           (New York, New York)
12           Counsel for Olympus Corporation, and
             Olympus America, Inc.
13
14      RICHARDS LAYTON & FINGER
        BY:  WILLIAM J. WADE, ESQ.
15
16           and

17      WEIL GOTSHAL & MANGES
        BY:  STEPHEN J. RIZZI, ESQ.
        (New York, New York)
18
19           Counsel for Matsushita Electrical
             Industrial Co. And Matsushita
20           Electical Corporation of America
21
22
23
24
25
```

```
                                              2
1   APPEARANCES: (Continued)
2
        MORRIS NICHOLS ARSHT & TUNNELL
3       BY:  THOMAS C. GRIMM, ESQ.,
4            and
5       ROBINS KAPLAN MILLER & CIRESI, L.L.P
        BY:  MARTIN R. LUECK, ESQ.,
6            MATTHEW L. WOODS, ESQ., and
             STACIE E. OBERTS, ESQ.
7            (Minneapolis, Minnesota)
8            and
9       HONEYWELL INTERNATIONAL
        BY:  J. DAVID BRAFMAN, ESQ.
10
             Counsel on behalf of Honeywell
11           International, Inc., and Honeywell
             Intellectual Properties, Inc.
12
13      SMITH KATZENSTEIN & FURLOW
        BY:  ROBERT J. KATZENSTEIN, ESQ.
14
15
16      HOGAN & HARTSON, LLP
        BY:  ROBERT J. BENSON, ESQ.
             (Los Angeles, California)
17
             Counsel for Seiko Epson Corp.,
18           Kyocera Wireless Corp.
19
        YOUNG CONAWAY STARGATT & TAYLOR
20      BY:  JOHN W. SHAW, ESQ.
21           Counsel for Olympus Corporation,
             Olympus America, Inc., Sony Corporation,
22           And Sony Corporation of America
23           and
24
25
```

```
                                              4
1   APPEARANCES:  (Continued)
2
        FISH & RICHARDSON, P.C.
3       BY:  THOMAS L. HALKOWSKI, ESQ.
             Counsel for Nokia, Inc., Casio, Inc., Casio
4            Computer and Apple Computer Inc.
5
             and
6
        FISH & RICHARDSON, P.C.
7       BY:  JOHN T. JOHNSON, ESQ., and
             LEWIS E. HUDNELL, III, ESQ.
8            (New York, New York)
9            Counsel for Casio, Inc., Casio Computer
10           and
11      FISH & RICHARDSON, P.C.
        BY:  KELLY C. HUNSAKER, ESQ.
12           (Redwood City, California)
13           Counsel for Apple Computer Inc.
14           and
15      FISH & RICHARDSON, P.C.
        BY:  LAUREN A. DEGNAN, ESQ.
16           (Washington, District of Columbia)
17           Counsel for Nokia, Inc.
18
        RICHARDS LAYTON & FINGER
19      BY:  CHAD M. SHANDLER, ESQ.
20           and
21      HARRIS BEACH, LLP
        BY:  NEAL L. SLIFKIN, ESQ.
22           (Pittsford, New York)
23           Counsel for Eastman Kodak
24
25
```

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

**5**

1  APPEARANCES: (Continued)
2
3  POTTER ANDERSON & CORROON, LLP
   BY: RICHARD L. HORWITZ, ESQ.
4
       Counsel for Concord Cameras, Dell, Inc.
5      Fujitsu Limited, Fujitsu America, Inc.,
       Fujitsu Computer Products of America, Inc.,
6      Toshiba Corporation, Toshiba America, Inc.,
       Wintek Electro-Optics Corporation, Sanyo
7      Electric Co. Ltd. and Sanyo North America,
       Philips Electronics North America Corp.
8      and Samsung SDI
9      and
10 FINNEGAN HENDERSON FARABOW GARRETT & DUNNI
   BY: BARRY W. GRAHAM, ESQ.
11     (Washington, District of Columbia)
12         Counsel for Nikon Corporation, Nikon Inc.
13     and
14 KATTEN MUCHIN ROSENMAN
   BY: MICHAEL A. DORFMAN  ESQ.
15     (Chicago, Illinois)
16         Counsel for Sanyo Electric Co. Ltd.
       and Sanyo North America
17
       and
18
   OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
19 BY: CARL E. SCHLIER, ESQ.
       (Alexandria, Virginia)
20
       Counsel for Toshiba America
21
       and
22
   VINSON & ELKINS
23 BY: RODERICK B. WILLIAMS, ESQ.
       (Austin, Texas)
24
       Counsel for Dell, Inc.
25
       and

**6**

1  APPEARANCES: (Continued)
2
3  MILBANK TWEEK HADLEY & McCLOY, LLP
   BY: CHRISTOPHER E. CHALSEN, ESQ.
4      (New York, New York)
5      Counsel for Fujitsu Limited, Fujitsu
       America, Inc., Fujitsu Computer Products
6      of America, Inc.
7      and
8  FINNEGAN HENDERSON FARABOW GARRETT & DUNNI
   BY: YORK FAULKNER, ESQ.
9      (Reston, Virginia)
10         Counsel for Wintek Electro-Optics
       Corporation
11
       and
12
   HOWREY SIMON ARNOLD & WHITE, LLP
13 BY: ALAN M. GRIMALDI, and
       NELSON M. KEE, ESQ.
14     (Washington, District of Columbia)
15         Counsel for Philips Electronics
       North America Corp.
16
       and
17
   PAUL HASTINGS JANOFSKY & WALKER, LLP
18 BY: STEPHEN S. KORNICZKY, ESQ.
       (San Diego, California)
19
       Counsel for Samsung SDI
20
       and
21
   CONCORD CAMERA CORP.
22 BY: SCOTT L. LAMPERT, ESQ.
       (Hollywood, Florida)
23
       Counsel for Concord Camera
24
25

**7**

1  APPEARANCES: (Continued)
2
3  SACHNOFF & WEAVER
   BY: BRIAN D. ROCHE, ESQ.
4      (Chicago, Illinois)
5      Counsel for Argus a/k/a Hartford
       Computer Group, Inc.
6
7  POTTER ANDERSON & CORROON, LLP
   BY: PHILIP A. ROVNER, ESQ.
8
9      and
10 STROOCK & STROOCK & LAVAN LLP
   BY: LAWRENCE ROSENTHAL, ESQ.
       (New York, New York)
11
       Counsel for Fuji Photo Film Co., Ltd.
12     And Fuji Photo Film U.S.A. Inc.
13
   DUANE MORRIS
14 BY: D. JOSEPH ENGLISH, ESQ.
       (Washington, District of Columbia)
15
       Counsel for Audiovox Communications Corp.
16
17 YOUNG CONAWAY STARGATT & TAYLOR
   BY: ADAM WYATT POFF, ESQ.
18
       and
19
   GREENBLUM and BERNSTEIN, PLC
20 BY: MICHAEL J. FINK, ESQ.
       (Reston, Virginia)
21
22     Counsel for Pentax Corporation,
23     Pentax U.S.A, Inc.
24
25

**8**

1  APPEARANCES: (Continued)
2
3  BOUCHARD MARGULES & FRIEDLANDER
   BY: KAREN L. PASCALE, ESQ.
4
       and
5
   OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
6  BY: ANDREW M. OLLIS, ESQ.
       (Alexandria, Virginia)
7
       Counsel for Optrex America, Inc.
8
9  McCARTER & ENGLISH
   BY: THOMAS D. WALSH, ESQ.
10
       Counsel on behalf of Optrex America
11
12 CONNOLLY BOVE LODGE & HUTZ
   BY: JAMES MICHAEL OLSEN, ESQ.
13
14     Counsel on behalf of Sony Ericsson AB
15     and Sony Ericsson, Inc.
16
17
18
19
20
21         - oOo -
22
23      P R O C E E D I N G S
24     REPORTER'S NOTE: The following proceedings were
25 held in open court, beginning at 10:40 a.m.)

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

9

1  THE COURT: Counsel, this is Judge Jordan. I
2  apologize keeping you waiting.  The folks who were in the
3  queue ahead of you exceeded their allotted time but we were
4  able to work some things out and I appreciate your patience.
5  Why don't we go ahead and I'll get a roll call
6  from you folks of who is on the line and who you represent.
7  Okay?  Let's start with the plaintiff.
8  MR. GRIMM:  Good morning, Your Honor.  It's Tom
9  Grimm at Morris Nichols for Honeywell.  On the line with me
10  today; first, Your Honor may recall Honeywell filed two
11  separate actions so on the line with me also is John Day of
12  the Ashby & Geddes firm.
13  Our co-counsel on the line with us this morning
14  are Martin Lueck, Matt Woods and Stacie Roberts at the
15  Robins Kaplan Miller & Ciresi firm.  And also on the line
16  this morning with us is David Brafman, Intellectual Property
17  counsel for Honeywell.  And that's for all plaintiff
18  Honeywell.
19  THE COURT:  All right.  Let's just start down
20  the list of defendants.  Go ahead.
21  MR. HORWITZ:  Your Honor, this is Rich Horwitz
22  at Potter Anderson on behalf of a number of defendants.  And
23  with me on the line, I'll go through the list.
24  THE COURT:  Well, you need to tell me which
25  defendants you are here for.  I know this is --

10

1  MR. HORWITZ:  That's fine.  I'm on the line for
2  Dell, Fujitsu, Concord Camera, Toshiba, Nikon, Samsung SDI,
3  Sanyo, Wintek and Philips.
4  And with me on the line for Dell, Rick Williams;
5  for Philips, Alan Grimaldi and Nelson Kee; for Fujitsu,
6  Christopher Chalsen; for Sanyo, Michael Dorfman; for
7  Toshiba, Carl Schlier; for Nikon, Barry Graham; for Wintek,
8  York Faulkner.  We are on alone for Concord Camera.  And for
9  Samsung SDI, Stephen Komiczky.
10  MR. LAMPERT:  One correction.  This is Scott
11  Lampert for Concord Camera.
12  MR. HORWITZ:  I'm sorry, Scott.  I didn't
13  realize you were on.
14  THE COURT:  All right.  Thanks.
15  Is there anybody else on?
16  MR. WADE:  Your Honor, it's Bill Wade at
17  Richards Layton & Finger, and I'm on for the Matsushita
18  defendants along with Steve Rizzi and perhaps David Lender
19  from Weil, Gotshal & Manges.
20  MR. BENSON:  Your Honor, this is Robert Benson
21  of Hogan & Hartson on for Seiko Epson and Kyocera Wireless.
22  MR. KATZENSTEIN:  Your Honor, this is Robert
23  Katzenstein.  I'm Mr. Benson's local counsel.
24  MR. HALKOWSKI:  Your Honor, this is Tom
25  Halkowski on behalf of Nokia, Apple and Casio.  And with me

11

1  on the line on behalf of Nokia is Lauren Degnan; and on
2  behalf of Apple, Kelly Hunsaker; and on behalf of Casio,
3  John Johnson and Lewis Hudnell.  Thank you.
4  THE COURT:  All right.
5  MR. ROVNER:  Your Honor, this is Phil Rovner for
6  the Fuji Photo Film defendant.  With me on the line is Larry
7  Rosenthal from Stroock Stroock & Lavan in New York.
8  THE COURT:  Okay.
9  MR. ROCHE:  Your Honor, Brian Roche in Chicago
10  for Hartford Computer Group.
11  THE COURT:  And is somebody on with you, sir, as
12  local counsel?
13  MR. ROCHE:  No.
14  THE COURT:  Have you arranged for local counsel?
15  MR. ROCHE:  Yes, we have local counsel from
16  Cross & Simon.
17  THE COURT:  All right.  Typically, we look for
18  those folks to be on those calls too unless excused.  But
19  thanks for identifying yourself.
20  Who else is on?
21  MR. SHANDLER:  Your Honor, Chad Shandler for
22  Richard Layton for Eastman Kodak.  With me on the line is
23  Neal Slifkin from Harris Beach.
24  THE COURT:  Anybody else?
25  MR. WALSH:  Your Honor, Tom Walsh with McCarter

12

1  & English on behalf of Audiovox Electronics Corporation.
2  MR. POFF:  Your Honor, Adam Poff from Young
3  Conaway on behalf of the Pentax defendants.  And also
4  Michael Fink from Greenblum and Bernstein on behalf of
5  Pentax.
6  MR. SHAW:  Your Honor, John Shaw for the Olympus
7  and Sony defendants, and I believe Richard Rosati and Bob
8  Hails is for Olympus.
9  MR. ROSATI:  Rich Rosati for Olympus.
10  MR. SHAW:  And Bob Hails is for the Sony
11  defendants.
12  THE COURT:  Okay.
13  MR. OLSEN:  Your Honor, James Olsen from
14  Connolly Bove for the Sony Ericsson defendants.
15  MR. ENGLISH:  Your Honor, this is Joe English
16  from Duane Morris on behalf of Audiovox Communications Corp.
17  THE COURT:  And do we have anybody else on?
18  MR. FLOCK:  Your Honor, this is John Flock from
19  Kenyon & Kenyon, also on for Sony corporation.
20  THE COURT:  Thank you.
21  MS. PASCALE:  Your Honor, this is Karen Pascale
22  from Bouchard Margules & Friedlander for Optrex America
23  which is the named plaintiffs in the 04-1536 action; and on
24  the line with me is Andrew Ollis from the Oblong Spivack
25  firm.

13

1    THE COURT: Okay. Do I have anybody else?
2    (Pause.)
3    THE COURT: All right. Well, thanks for
4    assembling. I'm glad the telephone company has got enough
5    lines to handle this call.
6    We are together because in spite of what I
7    thought was pretty clear direction a few months ago, we
8    still haven't been able to get plaintiffs and defendants
9    moving forward on this case, and I received a letter on
10   August 22nd from Mr. Grimm saying, "hey, since our
11   correspondence to you in June, we're still at odds."
12   So, I've taken a look at the correspondence but
13   why don't I give you a chance to tell me what you think the
14   points in dispute are that can't be resolved without my
15   intervention so we can get a scheduling order in place,
16   short of me just imposing one.
17   Who is speaking on behalf of the plaintiffs on
18   this?
19   MR. GRIMM: Your Honor, this is Tom Grimm.
20   Marty Lueck of the Robins Kaplan Miller & Ciresi firm will
21   speak.
22   THE COURT: Mr. Lueck.
23   MR. LUECK: Good morning, Your Honor. I think I
24   can give you a snapshot here of where we've made progress,
25   where we haven't and I think give the Court an idea of how

14

1    we might be able to resolve the logjam so we can transition
2    this case from the customer defendants to the module maker
3    defendants.
4    Basically, what we have asked for in discovery
5    from the customer defendants is a list of all products sold
6    in the United States in the categories that are set forth
7    in the complaint going back from October 6th, 1998 to the
8    present. And we've asked for the identity of a module maker
9    for each of those products and the LCD module model number.
10   And the reason we've asked for that information is so that
11   we can match up the LCD modules that were manufactured
12   overseas to the end products that were actually imported
13   into the United States and sold because those are the ones
14   that are going to be at issue for both liability and
15   ultimately, down the road, damage.
16   THE COURT: All right. I'm sorry to interrupt,
17   Mr. Lueck. Give it to me one more time. What is it that
18   you specifically asked for in discovery?
19   MR. LUECK: What we're asking for is a list of
20   all — and let me just back up. This is for the customer
21   defendants. A list of all products sold in the United
22   States in the categories set forth in the complaint from
23   October 6th, 1998 to the present. And that's consistent
24   with the patent statute of limitations, six years back from
25   the date of filings of the complaint. The products.

15

1    THE COURT: All right. Now, before you go
2    further, let me ask you what I took it to be the other
3    side's position and just have you respond to it directly.
4    I think they were saying to saying to me, these
5    guys should be identifying the products they think infringe
6    in the first instance. Am I right that that is a point of
7    contention or am I wrong about that?
8    MR. LUECK: You are correct, Your Honor, as to
9    some of the defendants.
10   THE COURT: What is your response?
11   MR. LUECK: Our response to that is we have
12   identified all of the products that we have purchased and
13   torn down and found specific instances of infringement.
14   We're unable to buy every product that is out there, and in
15   fact for the products that are in the past, we have no idea
16   whether we would have all of those or not have all of them.
17   And we don't believe on a going-forward basis, it should be
18   our burden to buy every single product of every single
19   company, tear it down and then make an individual charge of
20   infringement.
21   We have given them all the information we have
22   to date. And, in addition, we have offered to tear down
23   any products they want to send us and we will give them a
24   response on the results of that tear-down. And that really
25   is the logjam right there. We have resolved that issue with

16

1    three of the defendants, Nikon, Concord Camera and Fuji. I
2    believe we're close to resolving it with Nokia and Olympus
3    but were unable to make progress with the others.
4    THE COURT: All right. And what is the basis of
5    your agreement with the ones you have resolved it with?
6    MR. LUECK: In essence, Your Honor, they have
7    agreed to provide us that information: A historical list of
8    products going back to 1998, the identity of the module
9    maker for each product and the LCD module number that is in
10   the product.
11   THE COURT: All right. And is that really the
12   heart of the dispute? Is there some other thing going on
13   that I need to know about or is this really a kind of an
14   Alphonse-and-Gaston thing about who goes through the door
15   first?
16   MR. LUECK: Yes, I think that is correctly
17   summarized, Your Honor. I believe if we can resolve this
18   issue, we can make a lot of progress to resolving everything
19   else.
20   THE COURT: Okay. Who wants to take this up in
21   the first instance for the defendants?
22   MR. HORWITZ: Your Honor, this is Rich Horwitz.
23   I think that you have captured what the main
24   dispute is and, really, it boils down to who should go
25   first. Based on what Your Honor told us when we were in

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

17

1  front of you, I think we quoted the language from the
2  transcript where we think it's their obligation to come
3  first as the plaintiff charging infringement.
4      There may be some defendants who want to speak
5  specifically because the burdens on defendants are different
6  depending on how many products fall within the eight
7  categories that were mentioned in the complaint for the time
8  period that we're talking about here, to reach back and grab
9  things for plaintiff with no firm charge of infringement.
10  And I think that is the nub of the controversy.
11      There are some other issues that haven't been
12  discussed today that plaintiff raised in its submissions
13  and we responded to that we thought were outside the scope
14  of what the Court ordered, but that is kind of a collateral
15  matter to the main issue which is the one that you have been
16  focusing on so far.
17      So if there are individual defendants, I think
18  that they should be able to jump in at this point, if they
19  want to add argument on their specific circumstances.
20      THE COURT: Okay. Who wants to speak? Don't be
21  shy.
22      MR. GRAHAM: Your Honor, this is Barry Graham
23  for the Nikon defendants. And I hope everyone can hear me
24  well. I had to be on a cell phone today.
25      As Mr. Lueck acknowledged, which I appreciate,

18

1  that Nikon has resolved, has given Honeywell what it asked
2  for. We gave them specific information in July, and the way
3  I read the Court's May 18th order, Nikon and other customer
4  defendants were under basically a conditional stay. And I
5  would like, at least for Nikon, and there may be others, to
6  ask the Court to change the conditional stay into a real
7  stay while the other parties resolve their differences with
8  the plaintiff.
9      THE COURT: All right. Does anybody else want
10  to speak?
11      MR. ROSENTHAL: Your Honor, this is Lawrence
12  Rosenthal for Fuji.
13      In fairness to the other defendants who still
14  have this dispute, as you may recall, Fuji asked the Court
15  to limit the case to the eight categories. Honeywell has
16  now conceded the case is limited to. And if
17  the case is limited to eight categories, this case becomes a
18  single product case for Fuji and the burden became finite
19  and easy to satisfy. I think you will hear from other
20  defendants that that is not the case.
21      THE COURT: Is there anybody else?
22      MR. RIZZI: Your Honor, this is Stephen Rizzi of
23  Weil Gotshal for the Matsushita defendants.
24      Just to give you a sense of an example where
25  we're not similarly situated to some of these defendants

19

1  like Nikon and Fuji, Matsushita is a very diverse
2  electronics company and has products that span many of the
3  categories. And if you literately consider going back six
4  years, all LCD-containing products in those categories,
5  there are hundreds, if not perhaps more than a thousand
6  products in this action.
7      Honeywell has identified three products of
8  Matsushita that are accused of infringement. We, months
9  ago, told Honeywell who the LCD suppliers are for those
10  products: two cell phones and one laptop. And just as sort
11  of a fundamental matter of discovery and burden shifting,
12  we don't believe that identification of three products
13  justifies discovery of hundreds, if not perhaps a thousand
14  products that may or may not be accused of infringement.
15  The burden is squarely on Honeywell to identify which
16  products they believe infringe and the case should be framed
17  around those products. And we do not believe that merely
18  identifying three products justifies essentially a fishing
19  expedition into all products going backs six years which
20  could number well into the hundreds, if not more.
21      THE COURT: Okay. I got you.
22      Does anybody else feel like they want to say
23  something?
24      (Pause.)
25      THE COURT: All right. Hearing nothing,

20

1  Mr. Lueck, back to you. I'll give you a chance to rebut.
2      MR. LUECK: Thank you, Your Honor. Basically
3  it's hard for me to understand how the burden could be
4  greater on the defendants to provide this information than
5  on Honeywell to go out and try to uncover every product that
6  each of these defendants have sold in the past.
7      THE COURT: Well, wait. I've got to wrestle
8  with you on that premise because at the start, I moved from
9  the baseline understanding that the way our adversary system
10  works is you learn of something that tells you you've been
11  wronged and then you go and you draft a complaint that
12  identifies that wrong and you come to court and you bring
13  somebody in to answer for that wrong. So when you start by
14  saying, gee, let's look at who has got the greater burden
15  here, why is it the burden of defendants in the first
16  instance to tell you everything they ever made with an LCD
17  module in it when there's apparently a reluctance or
18  unwillingness or inability on your part in the first
19  instance to make a case that a product actually does
20  infringe?
21      I'm probably giving away the way I'm thinking
22  right now, aren't I? I'm having a real problem with the
23  fundamental premise with your argument which is we think
24  there is other stuff out there that infringes and we want to
25  know everything you made in the last six years so we can

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

21

1  decide whether we got a case against you or not.  That just
2  isn't how it works.
3         MR. LUECK:  Well, Your Honor, I believe we have
4  made that showing.  And what we have done is we've gone out
5  and bought a large number of products from a wide range of
6  customers or end manufacturing defendants.  We've torn them
7  down.  We've given the defendants detailed information on
8  what we believe is the infringement.  We identified the
9  eight product ranges where we found it.
10        The modules come from module makers overseas.
11 We have no access to those individuals.  And I think we've
12 satisfied our Rule 11 burden, we satisfied the pleading
13 burden on it, and then it becomes an issue of whether or
14 not this is reasonably calculated to lead to admissible
15 information, which we believe it is, and then it is an issue
16 of looking at the relative burdens.  And in our view on
17 burden, we have a right to recover for damages going six
18 years back from the date of the complaint.  These models
19 change rapidly and often.  And we simply have no access to
20 records that would show us what those models have been.
21        THE COURT:  Well, let me ask this, because
22 maybe we're talking past each other.  When you say you have
23 satisfied your initial burden, is the assertion that you are
24 making that we have identified products, we've told them the
25 products that infringe and the only question is whether,

22

1  through various generations of different models of this
2  product, somehow there is some difference?  Or is there
3  something else going on that I'm not getting.
4         MR. LUECK:  No, I think you have captured it.
5  We've identified what the products are that have infringed
6  and we've specified what those types of products are and
7  we've given them specific model numbers as to ones we've
8  been able to purchase and tear down, but that doesn't mean
9  that we know all of the generations of those products that
10 they have introduced in the past.
11        THE COURT:  All right.  I'm going to ask the
12 gentleman who spoke on behalf of Matsushita, the Weil
13 Gotshal attorney if he will speak up at this point and
14 answer that point, which is:  Hey, we're not just on some
15 wholesale fishing expedition.  We've identified a product
16 and a product line and we just need to know the different
17 model numbers in that product line so that we're sure that
18 we've had a chance to investigate this product thoroughly,
19 which is what I understand Mr. Lueck to be saying.  What is
20 your response to that?
21        MR. BRAFMAN:  Your Honor, this is David Brafman
22 from Honeywell.
23        I'd just like to add one further point which is
24 our tear-down rate, on average it's about a 50 percent hit
25 rate under our belief of infringement across all these

23

1  products.  So it's not a wild fishing expedition as it is
2  made to sound.  It is that we found products, a large
3  percentage of them do hit and we just don't have access to
4  the models that change every six months.
5         THE COURT:  All right.  Mr. -- I'm sorry, I've
6  forgotten your name, sir.
7         MR. RIZZI:  It's Steve Rizzi from Weil Gotshal.
8         THE COURT:  Mr. Rizzi, I apologize for not
9  holding on to that name.  Go ahead.
10        MR. RIZZI:  That's okay.  I think along those
11 lines, Your Honor, there is room to meet in the middle here
12 from our perspective and, in fact, one of the cases that
13 Honeywell cited in its correspondence I believe is
14 instructive -- the IP Innovation case out of the Northern
15 District of Illinois -- I think is somewhat similar in the
16 sense that case involved certain chips that were found
17 in various models of televisions that were accused of
18 infringement, the basis for infringement being this specific
19 chip.  And what the plaintiff did originally was identify
20 specific television models that they believe included the
21 chip and were infringing.  And there, the Court allowed
22 discovery of other models of televisions that included that
23 same chip.  So discovery in the case were structured
24 around other future generations or products but only those
25 products that included the same chip as the specific models

24

1  of televisions that were identified by plaintiff.
2         We think structuring it along those lines is
3  reasonable and does provide a framework that does allow
4  for a manageable case as well.  And that we believe it is
5  possible to identify, for example, other products that
6  utilize the same LCD modules incorporated in these specific
7  products that are alleged to infringe and that we don't
8  believe that that would present an unreasonable burden,
9  and we don't dispute that plaintiffs would be entitled to
10 that type of information.
11        THE COURT:  All right.  Mr. Lueck.
12        MR. LUECK:  Yes.  What we asked for, Your Honor,
13 is the modules that were identified in the infringing
14 products and similar modules.  And the problem we have is if
15 you were to go to these module makers, some of the modules
16 infringe, some of the modules don't.  The module makers do
17 not know what products they go into for the customers.
18 Literally, the only way for anyone to find that out is to
19 ask them for the historical products.  And we've offered to
20 take anything that they have and look at it and tell them
21 whether it infringes.
22        I don't believe the burden is as great as the
23 defendants are saying.  We've narrowed it down to specific
24 products we've torn down.  We don't know all of the
25 historical model numbers.  That's the information we're

Honey v. Audiovox/Apple: Telephone Conference   9/9/2005   10:40:00 AM

25

1  asking for.

2      THE COURT: All right.

3      MR. WILLIAMS: Your Honor, this is Rick Williams

4  for Dell.

5      THE COURT: Yes.

6      MR. WILLIAMS: I'd like to weigh in on this. In

7  the complaint, the products they're looking for include

8  cellular phones, digital cameras, PDAs, portable DVD

9  players, laptop computers. In the case of Dell, they

10 identified six models of Dell laptop computers out of a

11 total current 17 models.

12     The first thing, all of Dell's laptops are

13 readily available to purchase over the Internet and they can

14 get them within a week's time and evaluate them.

15     They have not identified any PDAs, which Dell

16 also sells.

17     Dell resells digital cameras and digital video

18 cameras. They have not identified any of those as being

19 accused against Dell.

20     So we're faced with the dilemma, out of all

21 these categories, they say they'd like information on --

22     THE COURT: We'll, we're not --

23     MR. WILLIAMS: -- them going down the list and

24 giving them information.

25     THE COURT: Hold on. Because I get the feeling

26

1  we're still talking past one another here. Maybe positions

2  have shifted as a result of the conversation we're having,

3  but what I hear what Mr. Lueck is saying is not I want

4  information about broad categories of products. I want

5  information about a specific product identified and

6  different generations of that same identified product. That

7  is, has a model changed? And if it has changed, would you

8  please identify what the newer different model is of that

9  identified product? Not category of products but a

10 specified product.

11     Mr. Lueck, have I misunderstood you?

12     MR. LUECK: Well, I think that is narrower than

13 we seek, Your Honor. I mean if it's going to be tied to

14 specific model numbers, we don't know what the past model

15 numbers these devices are marketed under. Basically what

16 we're asking for is which of your products had the modules

17 that had the infringing technology or the similar technology

18 in them so we can tie them back to the module makers and

19 know what modules were imported into the United States.

20     THE COURT: All right. I interrupted.

21     MR. LUECK: That could be a different model

22 number than what we have, we just don't know that, and we

23 have no other way of finding out.

24     THE COURT: The gentleman from Dell, I

25 interrupted you, sir. Go ahead.

27

1      MR. WILLIAMS: No, Your Honor. Again, they

2  identified six models out of 16-17. They could certainly

3  get the other models. Through the tear-down, they could

4  purchase them as easily as Dell could absorb the expense and

5  tell us the modules in fact they're accusing of infringement

6  rather than asking us to go back and conduct a unilateral

7  analysis of our products and say, well, maybe this module

8  infringes or maybe this one doesn't. And I think the burden

9  should be on them in the first instance to say a particular

10 LCD module in a particular computer model we contend meets

11 the elements of the claims in our patent instead of

12 vice-versa.

13     THE COURT: All right. And I am going to have

14 to get into a criminal proceeding here in a few minutes, so

15 I won't have an opportunity to resolve other issues that you

16 may have besides this one.

17     My understanding of what is being asked for has

18 shifted a little bit in the course of this conversation.

19 So instead of trying to speak in terms of what it is you

20 are asking for, let me tell you what I think you can

21 legitimately ask for and we can get this thing moving

22 forward.

23     I said in the order that I put out last May that

24 Honeywell was required to specifically identify accused

25 products. And that's what I meant. Not that Honeywell was

28

1  entitled to say, you know, we think all your cellular phones

2  infringe so we want you to tell us everything about all your

3  cellular phones. What I mean is if you've got a basis for

4  believing that a manufacturer's cellular phones are

5  infringing, and I mean you can say we've done this tear-down

6  on these specific products and these things appear to us to

7  infringe, well, then you are absolutely entitled to conduct

8  additional discovery with respect to those products, that

9  is, were earlier generations than the one you tore down.

10 Also, have they come out with subsequent generations of that

11 same model which could also be infringing?

12     But what you are not entitled to do is to say

13 you manufacture 15 different kinds of cell phones. We tore

14 down three. Tell us about your other 12. Because I agree

15 with the defendants that now what you are doing is you are

16 telling manufacturers, you know what? You got one or two

17 things that are bad. We want to you do an analysis of

18 everything you make and tell us whether you are guilty on

19 those fronts, too; and that is not what the law requires,

20 and it's not what I'm going to require them to do.

21     If you want to go out, you want to buy them, you

22 want to do the tear-downs, you want to get information that

23 prompts you to be able to say "now I know that this specific

24 model also infringes," then you can certainly do that. And

25 then you would be in an area where you could be requiring

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

29

1  additional discovery from them.  But to ask them to come
2  forward in the first instance, which is what it really comes
3  down to, is not right.
4      So I hope this straightens out where my thinking
5  is on it and gives you guidance about what I'm expecting the
6  parties to be willing to do.  To the extent manufacturers
7  are prepared to say, you know what?  For us, it's not such a
8  burden as to make it impossible to give you something more
9  broad than what the judge has ordered happen, that is fine
10  with me.  But what I do expect to happen at this juncture is
11  for you guys to come together with a specific set now of
12  identified products and manufacturers of the models of LCD
13  modules that go into those products so that we can go about
14  having the proper defendants in the suit.
15      To the extent there was any thought that I was
16  putting the burden exclusively on the defendant retailers or
17  intermediate sellers, to third-party people in, that is not
18  necessarily the case.  I'm not going to get to that issue
19  today, though, because we don't have time to fully explore
20  it, but I expect Honeywell to be active in finding out who
21  those manufacturers are and that is one of the reasons why
22  I gave only a conditional stay, because one of the pieces
23  of information Honeywell is entitled to get as to those
24  identified products and product lines is who is the maker of
25  the LCD that is going in to that product, that generation of

30

1  product and maybe, I don't know, the generations before and
2  after that model.
3      So you guys absolutely on the defense side have
4  to give that information up.  And then if we can't have some
5  sensible plan that the parties agree to on how to try to
6  bring those folks in, I'll get into the mix on that, too.  I
7  would think that overseas marketers of LCD modules who have
8  big clients in the United States incorporating those things
9  into their products are not going to want to upset their
10  clientele by playing games with jurisdiction.  And
11  particularly in the aftermath of the Federal Circuit's
12  CEA decision, which I remember well, I would think people
13  would be thinking hard about how they're going to play
14  the personal jurisdiction defenses here.  But that is a
15  discussion for another day.
16      For now, I want you to get off of the
17  who-goes-first issue because Honeywell you guys are going
18  first.  You identify what is infringing.  Let's get those
19  manufacturers on notice and let's get the case going
20  forward.
21      When can I expect to hear back from you about a
22  plan for getting that done, Mr. Lueck?
23      MR. LUECK:  Within a week, Your Honor.  If I
24  could ask for just one clarification, recognizing you have
25  something else going.

31

1      The issue that we've had is just identifying who
2  the manufacturers of the modules are that are coming into
3  the U.S.  And hearing what Your Honor has said regarding
4  those modules, can we ask about historical products that
5  have those modules or similar modules in them?
6      THE COURT:  Well, when you say the "same" or
7  "similar," you know, the "same," absolutely.  When you say
8  "similar," that is a big deal, because, what do you mean
9  when you say "similar?"
10      MR. LUECK:  Right.  Here is what I mean when I
11  say "similar," Your Honor.  A light source, an LCD panel,
12  two lens arrays, one of which is misaligned.
13      THE COURT:  If you want to say, if you want to
14  frame your discovery in a manner that incorporates your
15  specific allegations of infringement, fine.
16      MR. LUECK:  That is exactly what we're asking
17  for.  And that we would frame it exactly that way.
18      THE COURT:  All right.  Does everybody
19  understand the discovery I'm telling them they're entitled
20  to?
21      (Pause.)
22      THE COURT:  I'm not hearing anybody say no.
23      MR. HORWITZ:  Your Honor?
24      THE COURT:  Yes, go ahead.
25      MR. HORWITZ:  This is Rich Horwitz.  And I'll

32

1  defer to others if I'm missing something here, but I think
2  the problem with what Mr. Lueck just said is he may be
3  asking for things that led us to the stay motion in the
4  first instance.
5      THE COURT:  No.  What led to the stay motion in
6  the first place is I'm not going to have the folks who are
7  reselling things, reselling the LCD module as a part of
8  their own product defending in the first instance.
9      MR. HORWITZ:  I'm sorry.  I understand that,
10  Your Honor.  What I meant was that some of the people that
11  are the resellers may not have the information that would
12  respond to the broad question that Mr. Lueck just posed.
13      THE COURT:  Well, and if you don't have it, you
14  don't have it.
15      MR. HORWITZ:  Okay.
16      THE COURT:  I mean I'm not saying anybody has to
17  make anything up, but if you've got the information, you
18  need to give it up because that's who they're entitled to get behind
19  your products and get it to people who are making them if
20  they can get jurisdiction over them.  And that's all.
21      Like I said, the personal jurisdiction issue,
22  that's for another day.  But finding out who the
23  manufacturers are, that's something that is supposed to have
24  been happening over the course the last four months and it's
25  distressing to hear that we've been not moving forward on

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

33

1  that front because we should be. We should be finding out
2  who this case is going to run against in the first instance.
3  So I'll ask the parties to move forward with that forthwith;
4  all right?
5       And, Mr. Lueck, I'll look forward to hearing
6  from you some time in the next few days in a fashion that
7  includes discussions to the extent you need to have it with
8  all defense counsel on how you folks intend to proceed so
9  that I can get a scheduling order in place.
10      I'm going to set a deadline on you folks
11  reporting back to me for two weeks from today; all right?
12  And hopefully that can be a joint submission. But if it
13  can't given, the number of parties involved, it may be
14  impracticable, I'll expect though to hear from everybody
15  with a position on scheduling because what you can expect
16  from me is I'm ready to put an order in place. I want to
17  get a schedule in place. So you should be talking about how
18  to make that happen.
19      All right. Is there any other matter which is
20  of such urgency we ought to address it right now while we're
21  all on the phone right now, Mr. Lueck?
22      MR. LUECK: No, Your Honor.
23      THE COURT: From the defense side, anything?
24      MR. HORWITZ: No, Your Honor.
25      THE COURT: Okay. I'm hearing --

34

1       MR. GRIMM: Your Honor?
2       THE COURT: Yes.
3       MR. GRIMM: Your Honor, this is Tom Grimm.
4       I do have a concern of letting this go on and on
5  because we've had such a hard time in the last three or four
6  months. And this has been very helpful to us but I'm
7  wondering if we could bother the Court for your permission
8  that in two weeks after we report, if there is still
9  differences, can we contact your clerk and ask for another
10  telephone conference?
11      THE COURT: Well, that is something you are
12  always free to do. If there is a problem in the case that I
13  can help you work out, I'm ready to help you work it out.
14  But I'm fully expecting on the basis of the discussion we
15  just had, for you to be able to take the next step, which is
16  set a schedule for getting this case transitioned to an
17  infringement suit against the manufacturers. All right?
18      MR. GRIMM: All right.
19      MR. GRAHAM: Your Honor, this is Barry Graham
20  for Nikon.
21      Nikon would like to be able to step aside. Do
22  we need to participate since we already provided the
23  information to Honeywell?
24      THE COURT: The short answer is if Honeywell
25  and you agree that you don't have anything else to say with

35

1  respect to the case, I'm not going to default you. And at a
2  certain point in time, there will be a transition from a
3  conditional stay to a full stay but I don't want to handle
4  that on a defendant-by-defendant basis if I can help it, so
5  I'm not moving on that request that you made earlier in this
6  call at this time.
7       MR. GRAHAM: All right. Thank you, Your Honor.
8  I'll speak with plaintiffs' counsel.
9       THE COURT: All right. Well, thanks for your
10  time this morning. Good-bye.
11      (The attorneys respond, "Thank you, Your
12  Honor.")
13      (Telephone conference ends at 11:18 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

**0**

04-1337 1:-
04-1338 1:14
04-1536 12:23

**1**

10:40 1:- 8:25
11 21:12
11:18 35:13
12 28:14
15 28:13
16-17 27:2
17 25:11
18th 18:3
1998 14:7,23 16:8

**2**

2005 1:-
22nd 13:10

**5**

50 22:24

**6**

6th 14:7,23

**9**

9 1:-

**A**

a.m 1:- 8:25 35:13
a/k/a 7:5
ab 8:-
able 9:4 13:8 14:1 17:18
  22:8 28:23 34:15,21
absolutely 28:7 30:3
  31:7
absorb 27:4
access 21:11,19 23:3
accused 19:8,14 23:17
  25:19 27:24
accusing 27:5
acknowledged 17:25
across 22:25
action 12:23 19:6
actions 1:4 9:11
active 29:20
actually 14:12 20:19
adam 7:- 12:2
add 17:19 22:23
addition 15:22
additional 28:8 29:1
address 33:20
admissible 21:14
adversary 20:9
aftermath 30:11
again 27:1
against 21:1 25:19 33:2

**0** (col 2)

34:17
ago 13:7 19:9
agree 28:14 30:5 34:25
agreed 16:7
agreement 16:5
ahead 9:3,5,20 23:9
  26:25 31:24
al 9:3,-,8,-,-
alan 6:13 10:5
alexandria 5:- 8:-
allegations 31:15
alleged 24:7
allotted 9:3
allow 24:3
allowed 23:21
alone 10:8
along 10:18 23:10 24:2
alphonse-and-gaston
  16:14
already 34:22
always 34:12
am 15:6,7 27:13
america 2:-,22 3:8,-,- 5:5
  ,-,6,7,-,-,- 6:-,6,- 8:-,-
  12:22
analysis 27:7 28:17
anderson 5:3 7:7 9:22
andrew 8:6 12:24
angeles 2:-
answer 20:13 22:14
  34:24
anybody 10:15 11:24
  12:17 13:1 18:9,21 19:22
  31:22 32:16
anyone 24:18
anything 24:20 32:17
  33:23 34:25
apologize 9:2 23:8
apparently 20:17
appear 28:6
appearances 1:- 2:1 3:1
  4:1 5:1 6:1 7:1 8:1
apple 1:- 4:-,13 10:25
  11:2
appreciate 9:4 17:25
area 28:25
aren't 20:22
argument 17:19 20:23
argus 7:5
arnold 6:-
around 19:17 23:24
arranged 11:14
arrays 31:12
arsht 2:-
ashby 1:22 9:12
aside 34:21
ask 15:2 18:6 21:21
  22:11 24:19 27:21 29:1
  30:24 31:4 33:3 34:9
asked 14:4,8,10,18 18:1

,14 24:12 27:17
asking 14:19 25:1 26:16
  27:6,20 31:16 32:3
assembling 13:4
assertion 21:23
attorney 22:13
attorneys 35:11
audiovox 1:- 7:- 12:1,16
august 13:10
austin 5:-
available 25:13
average 22:24
away 20:21

**B**

back 14:7,20,24 16:8
  17:8 19:3 20:1 21:18
  26:18 27:6 30:21 33:11
backs 19:19
bad 28:17
balick 1:-
barry 5:- 10:7 17:22
  34:19
based 16:25
baseline 20:9
basically 14:4 18:4 20:2
  26:15
basis 15:17 16:4 23:18
  28:3 34:14 35:4
beach 4:21 11:23
became 18:18
becomes 18:17 21:13
beginning 8:25
behalf 2:- 8:-,- 9:22
  10:25 11:1,2,2 12:1,3,4
  ,16 13:17 22:12
behind 32:18
belief 22:25
believe 6:17 15:17 16:2
  ,17 19:12,16,17 21:3,8
  ,15 23:13,20 24:4,8,22
believing 28:4
benson 2:16 10:20,20
benson's 10:23
bernstein 7:- 12:4
besides 27:16
big 30:8 31:8
bill 10:16
bit 27:18
bob 12:7,10
boils 16:24
bother 34:7
bouchard 8:3 12:22
bought 21:5
bove 8:12 12:14
brafman 2:- 9:16 22:21
  ,21
brian 1:25 7:- 11:9
bring 20:12 30:6
broad 26:4 29:9 32:12

burden 15:18 18:18
  19:11,15 20:3,14,15
  21:12,13,17,23 24:8,22
  27:8 29:8,16
burdens 17:5 21:16
buy 15:14,18 28:21

**C**

calculated 21:14
california 2:- 4:12 6:-
call 9:5 13:5 35:6
calls 11:18
camera 6:-,- 10:2,8,11
  16:1
cameras 5:- 25:8,17,18
can't 13:14 30:4 33:13
captured 16:23 22:4
carl 5:19 10:7
case 13:9 14:2 18:15,16
  ,17,17,18,20 19:16 20:19
  21:1 23:14,16,23 24:4
  25:9 29:18 30:19 33:2
  34:12,16 35:1
cases 23:12
casio 4:4,4,9,9 10:25
  11:2
categories 14:6,22 17:7
  18:15,17 19:3,4 25:21
  26:4
category 26:9
cea 30:12
cell 17:24 19:10 28:13
cellular 25:8 28:1,3,4
certain 23:16 35:2
certainly 27:2 28:24
chad 4:19 11:21
chalsen 6:- 10:6
chance 13:13 20:1 22:18
change 18:6 21:19 23:4
changed 26:7,7
charge 15:19 17:9
charging 17:3
chicago 5:15 7:4 11:9
chip 23:19,21,23,25
chips 23:16
christopher 6:- 10:6
circuit's 30:11
circumstances 17:19
ciresi 2:5 9:15 13:20
cited 23:13
city 4:12
civil 1:4
claims 27:11
clarification 30:24
clear 13:7
clerk 34:9
clientele 30:10
clients 30:8
close 16:2
co 3:19 5:7,16 7:-

co-counsel 9:13
collateral 17:14
columbia 3:- 4:16 5:11
  6:14 7:-
coming 31:2
communications 1:- 7:-
  12:16
company 13:4 15:19
  19:2
complaint 14:7,22,25
  17:7 20:11 21:18 25:7
computer 1:- 4:-,-,9,13
  5:- 6:- 7:- 11:10 27:10
computers 25:9,10
conaway 2:- 7:17 12:3
conceded 18:16
concern 34:4
concord 5:- 6:-,- 10:2,8
  ,11 16:1
conditional 18:4,6 29:22
  35:3
conduct 27:6 28:7
conference 1:17 34:10
  35:13
connolly 8:12 12:14
consider 19:3
consistent 14:23
contact 34:9
contend 27:10
contention 15:7
continued 2:1 3:1 4:1
  5:1 6:1 7:1 8:1
controversy 17:10
conversation 26:2 27:18
corp 1:- 2:-,18 5:- 6:-,- 7:-
  12:16
corporation 2:21,-,22 3:-
  ,8,12,- 5:6,-,12 6:- 7:-
  12:1,19
correct 15:8
correction 10:10
correctly 16:16
correspondence 13:11
  ,12 23:13
corroon 5:3 7:7
counsel 2:-,-,21 3:-,12,-
  4:4,9,13,17,23 5:-,12,16
  ,-,- 6:5,10,15,-,- 7:5,-,-,-
  8:-,-,- 9:1,17 10:23 11:12
  ,14,15 33:8 35:8
course 27:18 32:24
court 1:1 8:25 9:1,19,24
  10:14 11:4,8,11,14,17,24
  12:12,17,20 13:1,3,22,25
  14:16 15:1,10 16:4,11,20
  17:14,20 18:6,9,14,21
  19:21,25 20:7,12 21:21
  22:11 23:5,8,21 24:11
  25:2,5,22,25 26:20,24
  27:13 31:6,13,18,22,24

32:5,13,16 33:23,25 34:2
  ,7,11,24 35:9
court's 18:3
criminal 27:14
cross 11:16
current 25:11
customer 14:2,5,20 18:3
customers 21:6 24:17

D

damage 14:15
damages 21:17
date 14:25 15:22 21:18
david 2:- 9:16 10:18
  22:21
day 9:11 30:15 32:22
days 33:6
deadline 33:10
decide 21:1
decision 30:12
default 35:1
defendant 11:6 29:16
defendant-by-defendant
  35:4
defendants 1:9,- 9:20,22
  ,25 10:18 12:3,7,11,14
  13:8 14:2,3,5,21 15:9
  16:1,21 17:4,5,17,23
  18:4,13,20,23,25 20:4,6
  ,15 21:6,7 24:23 28:15
  29:14
defending 32:8
defense 30:3 33:8,23
defenses 30:14
defer 32:1
degnan 4:- 11:1
delaware 1:2,16
dell 5:-,- 10:2,4 25:4,9,10
  ,15,17,19 26:24 27:4
dell's 25:12
depending 17:6
detailed 21:7
devices 26:15
didn't 10:12
diego 6:-
difference 22:2
differences 18:7 34:9
different 17:5 22:1,16
  26:8,8,21 28:13
digital 25:8,17,17
dilemma 25:20
direction 13:7
directly 15:3
discovery 14:4,18 19:11
  ,13 23:22,23 28:8 29:1
  31:14,19
discussed 17:12
discussion 30:15 34:14
discussions 33:7
dispute 13:14 16:12,24

18:14 24:9
distressing 32:25
district 1:1,3 4:-,16
  5:11 6:14 7:- 23:15
diverse 19:-
doesn't 22:8 27:8
doing 28:15
don't 9:5 13:13 15:17
  17:20 19:12 23:3 24:7,9
  ,16,22,24 26:14,22 29:19
  30:1 32:13,14 34:25 35:3
done 21:4 28:5 30:22
door 16:14 31:8
dorfman 5:- 10:6
down 9:19 14:15 15:13
  ,19,22 16:24 21:7 22:8
  24:23,24 25:23 28:9,14
  29:3
draft 20:11
duane 7:- 12:16
dunner 5:10 6:8
dvd 25:8

E

earlier 28:9 35:5
easily 27:4
eastman 4:23 11:22
easy 18:19
eight 17:6 18:15,17 21:9
electical 3:-
electric 5:7,16
electrical 3:-
electro-optics 5:- 6:10
electronics 5:- 6:15 12:1
  19:2
elements 27:11
elkins 5:-
else 10:15 11:20,24
  12:17 13:1 16:19 18:9,21
  19:22 22:3 30:25 34:25
end 14:12 21:6
ends 35:13
english 7:14 8:9 12:1,15
  ,15
enough 13:4
entitled 24:9 28:1,7,12
  29:23 31:19 32:18
epson 2:- 10:21
ericsson 8:-,14 12:14
esq 1:- 2:3,-,6,-,-,16,20
  3:3,6,-,-,17 4:3,7,-,-,-,19
  ,- 5:-,-,-,19,23 6:-,-,-,18
  ,22 7:-,-,10,14,-,20 8:-,6,-
  ,-
essence 16:6
essentially 19:18
et 1:-,8,-,-
evaluate 25:14
ever 20:16
every 15:14,18,18 20:5

23:4
everybody 31:18 33:14
everyone 17:23
everything 16:18 20:16
  ,25 28:2,18
exactly 31:16,17
example 18:24 24:5
exceeded 9:3
exclusively 29:16
excused 11:18
expect 29:10,20 30:21
  33:14,15
expecting 29:5 34:14
expedition 19:19 22:15
  23:1
expense 27:4
explore 29:19
extent 29:6,15 33:7

F

faced 25:20
fact 15:15 23:12 27:5
fairness 18:13
fall 17:6
far 17:16
farabow 5:10 6:8
fashion 33:6
faulkner 6:- 10:8
federal 30:11
feel 19:22
feeling 25:25
few 13:7 27:14 33:6
filed 9:10
filings 14:5
film 7:-,12 11:6
find 24:18
finding 26:23 29:20
  32:22 33:1
fine 10:1 29:9 31:15
finger 3:14 4:- 10:17
finite 18:18
fink 7:20 12:4
finnegan 5:10 6:8
firm 9:12,15 12:25 13:20
  17:9
first 9:10 15:6 16:15,21
  ,25 17:3 20:15,18 25:12
  27:9 29:2 30:18 32:4,6,8
  33:2
fish 4:-,-,11,15
fishing 19:18 22:15 23:1
flock 3:6 12:18,18
florida 6:-
focusing 17:16
folks 9:2,6 11:18 30:6
  32:6 33:8,10
following 8:24
forgotten 23:6
forth 14:6,22
forthwith 33:3

Honey v. Audiovox/Apple: Telephone Conference 9/9/2005 10:40:00 AM

forward 13:9 27:22 29:2
  30:20 32:25 33:3,5
found 15:13 21:9 23:2,16
  ,22 34:19,19 35:7
four 32:24 34:5
frame 31:14,17
framed 19:16
framework 24:3
free 34:12
friday 1:-
friedlander 8:3 12:22
front 17:1 33:1
fronts 28:19
fuji 7:-,12 11:6 16:1
  18:12,14,18 19:1
fujitsu 5:5,5,- 6:5,5,-
  10:2,5
full 35:3
fully 29:19 34:14
fundamental 19:11
  20:23
furlow 2:13
further 15:2 22:23
future 23:24

G

gaffigan 1:25
games 30:10
garrett 5:10 6:8
gave 18:2 29:22
geddes 1:22 9:12
gee 20:14
generation 29:25
generations 22:1,9
  23:24 26:6 28:9,10 30:1
gentleman 22:12 26:24
getting 22:3 30:22 34:16
give 13:13,24,25 14:17
  15:23 18:24 20:1 29:8
  30:4 32:18
given 15:21 18:1 21:7
  22:7 33:13
gives 29:5
giving 20:21 25:24
glad 13:4
go 9:5,20,23 15:1 16:24
  20:5,11 23:9 24:15,17
  26:25 27:6 28:21 29:13
  ,13 31:24 34:4
goes 16:14
going 14:7,14 16:8,12
  19:3,19 21:17 22:3,11
  25:23 26:13 27:13 28:20
  29:18,25 30:9,13,17,19
  ,25 32:6 33:2,10 35:1
going-forward 15:17
gone 21:4
good 9:8 13:23
good-bye 35:10
gotshal 3:- 10:19 18:23
  22:13 23:7

grab 17:8
graham 5:- 10:7 17:22
  ,22 34:19,19 35:7
great 24:22
greater 20:4,14
greenblum 7:- 12:4
grimaldi 6:13 10:5
grimm 2:3 9:8,9 13:10,19
  ,19 34:1,3,3,18
group 7:- 11:10
guidance 29:5
guilty 28:18
guys 15:5 29:11 30:3,17

H

hadley 6:3
hails 3:3 12:8,10
halkowski 4:3 10:24,25
handle 13:5 35:3
happen 29:9,10 33:18
happening 32:24
hard 20:3 30:13 34:5
harris 4:21 11:23
hartford 7:5 11:10
hartson 2:- 10:21
hastings 6:-
haven't 13:8,25 17:11
having 20:22 26:2 29:14
  30:21 32:25 33:14
hear 17:23 18:19 26:3
  30:21 32:25 33:14
hearing 19:25 31:3,22
  33:5,25
heart 16:12
held 8:25
help 34:13,13 35:4
helpful 34:6
henderson 5:10 6:8
hey 13:10 22:14
historical 16:7 24:19,25
  31:4
hit 22:24 23:3
hogan 2:- 10:21
hold 25:25
holding 23:9
hollywood 6:-
honeywell 1:4,10 2:9,-
  ,11 9:9,10,17,18 18:1,15
  19:7,9,15 20:5 22:22
  23:13 27:24,25 29:20,23
  30:17 34:23,24
honor 9:8,10,21 10:16
  ,20,22,24 11:5,9,21,25
  12:2,6,13,15,18,21 13:11
  ,23 15:8 16:6,17,22,25
  17:22 18:11,22 20:2 21:3
  22:21 23:11 24:12 25:3
  26:13 27:1 30:23 31:3,11
  ,23 32:10 33:22,24 34:1
  ,3,19 35:7,12
honorable 1:19

hope 17:23 29:4
hopefully 33:12
horwitz 5:- 9:21,21 10:1
  ,12 16:22,22 31:23,25,25
  32:9,15 33:24
howrey 6:-
hudnell 4:- 11:3
hundreds 19:5,13,20
hunsaker 4:- 11:2
hutz 8:12

I

i'd 22:23 25:6
i'll 9:5,23 20:1 30:6 31:25
  33:3,5,14 35:8
i'm 10:1,12,17,23 13:4
  14:16 20:21,21,22 22:3
  ,11 23:5 28:20 29:5,18
  31:19,22 32:1,6,9,16
  33:10,16,25 34:6,13,14
  35:1,5
i've 13:12 20:7 23:5
idea 13:25 15:15
identification 19:12
identified 15:12 19:7
  21:8,24 22:5,15 24:1,13
  25:10,15,18 26:5,6,9
  27:2 29:12,24
identifies 20:12
identify 19:15 23:19 24:5
  26:8 27:24 30:18
identifying 11:19 15:5
  19:18 31:1
identity 14:8 16:8
iii 4:-
illinois 5:15 7:4 23:15
imported 14:12 26:19
imposing 13:16
impossible 29:8
impracticable 33:14
inability 20:18
inc 1:4,10,- 2:11,-,- 3:-
  4:4,4,-,9,13,17 5:-,5,-,6
  ,12,- 6:-,6 7:-,12,22 8:-
  ,14
include 25:7
included 23:20,22,25
includes 33:7
incorporated 24:6
incorporates 31:14
incorporating 30:8
individual 15:19 17:17
individuals 21:11
industrial 3:19
information 14:10 15:21
  16:7 18:2 20:4 21:7,15
  24:10,25 25:21,24 26:4,5
  28:22 29:23 30:4 32:11
  ,17 34:23
infringe 15:5 19:16

20:20 21:25 24:7,16 28:2
  ,7
infringed 22:5
infringement 15:13,20
  17:3,9 19:8,14 21:8
  22:25 23:18,18 27:5
  31:15 34:17
infringes 20:24 24:21
  27:8 28:24
infringing 23:21 24:13
  26:17 28:5,11 30:18
initial 21:23
innovation 23:14
instance 15:6 16:21
  20:16,19 27:9 29:2 32:4
  ,8 33:2
instances 15:13
instead 27:11,19
instructive 23:14
intellectual 2:- 9:16
intend 33:8
intermediate 29:17
international 1:4,10 2:9
  ,11
internet 25:13
interrupt 14:16
interrupted 26:20,25
intervention 13:15
introduced 22:10
investigate 22:18
involved 23:16 33:13
ip 23:14
isn't 21:2
issue 14:14 15:25 16:18
  17:15 21:13,15 29:18
  30:17 31:1 32:21
issues 17:11 27:15
it's 9:8 10:16 17:2 20:3
  22:24 23:1,7 26:13 28:20
  29:7 32:24

J

james 8:- 12:13
janofsky 6:-
joe 12:15
john 2:20 3:6 4:7 9:11
  11:3 12:6,18
johnson 4:7 11:3
joint 33:12
jordan 1:19 9:1
joseph 7:14
judge 9:1 29:9
july 18:2
jump 17:18
juncture 29:10
june 13:11
jurisdiction 30:10,14
  32:20,21
justifies 19:13,18

## K

kaj 1:-,14
kaplan 2:5 9:15 13:20
karen 8:- 12:21
katten 5:14
katzenstein 2:13,- 10:22
,23
kee 6:- 10:5
keeping 9:2
kelly 4:- 11:2
kent 1:19
kenyon 3:-,-,-,-,10,10
12:19,19
kind 16:13 17:14
kinds 28:13
know 9:25 16:13 20:25
22:9,16 24:17,24 26:14
,19,22 28:1,16,23 29:7
30:1 31:7
kodak 4:23 11:22
korniczky 6:18 10:9
kyocera 2:18 10:21

## L

l.l.p 2:5
lampert 6:22 10:10,11
language 17:1
laptop 19:10 25:9,10
laptops 25:12
large 21:5 23:2
larry 11:6
last 20:25 27:23 32:24
34:5
lauren 4:- 11:1
lavan 7:- 11:7
law 28:19
lawrence 7:10 18:11
layton 3:14 4:- 10:17
11:22
lcd 14:9,11 16:9 19:9
20:16 24:6 27:10 29:12
,25 30:7 31:11 32:7
lcd-containing 19:4
lead 21:14
learn 20:10
least 18:5
led 32:3,5
legitimately 27:21
lender 10:18
lens 31:12
let 14:20 15:2 21:21
27:20
let's 9:7,19 20:14 30:18
,19
letter 13:9
letting 34:4
lewis 4:- 11:3
liability 14:14
light 31:11

limit 18:15
limitations 14:24
limited 5:5 6:5 18:16,17
line 9:6,9,11,13,15,23
10:1,4 11:1,6,22 12:24
22:16,17
lines 13:5 23:11 24:2
29:24
list 9:20,23 14:5,19,21
16:7 25:23
literally 24:18
literately 19:3
little 27:18
llp 2:- 4:21 5:3,10 6:3,8,-
,- 7:7,-
local 10:23 11:12,14,15
lodge 8:12
logjam 14:1 15:25
look 11:17 13:12 20:14
24:20 33:5
looking 21:16 25:7
los 2:-
lot 16:18
ltd 5:7,16 7:-
lueck 2:- 9:14 13:20,22
,23 14:17,19 15:8,11
16:6,16 17:25 20:1,2
21:3 22:4,19 24:11,12
26:3,11,12,21 30:22,23
31:10,16 32:2,12 33:5,21
,22

## M

maier 5:- 8:-
main 16:23 17:15
maker 14:2,8 16:9 29:24
makers 21:10 24:15,16
26:18
making 21:24 32:19
manageable 24:4
manges 3:- 10:19
manner 31:14
manufacture 28:13
manufactured 14:11
manufacturer's 28:4
manufacturers 28:16
29:6,12,21 30:19 31:2
32:23 34:17
manufacturing 21:6
margules 8:3 12:22
marketed 26:15
marketers 30:7
martin 2:- 9:14
marty 13:20
match 14:11
matsushita 3:-,19 10:17
18:23 19:1,8 22:12
matt 9:14
matter 17:15 19:11 33:19
matthew 2:6

may 9:10 17:4 18:3,5,14
19:14,14 27:16,23 32:2
,11 33:13
maybe 21:22 26:1 27:7,8
30:1
mccarter 8:9 11:25
mcclelland 5:- 8:-
mccloy 6:3
mean 22:8 26:13 28:3,5
31:8,10 32:16
meant 27:25 32:10
meet 23:11
meets 27:10
mentioned 17:7
merely 19:17
merit 1:-
michael 5:- 7:20 8:- 10:6
12:4
middle 23:11
milbank 6:3
miller 2:5 9:15 13:20
minneapolis 2:7
minnesota 2:7
minutes 27:14
misaligned 31:12
missing 32:1
misunderstood 26:11
mix 30:6
model 14:9 22:7,17
24:25 26:7,8,14,14,21
27:10 28:11,24 30:2
models 21:18,20 22:1
23:4,17,20,22,25 25:10
,11 27:2,3 29:12
module 14:2,8,9 16:8,9
20:17 21:10 24:15,16
26:18 27:7,10 32:7
modules 14:11 21:10
24:6,13,14,15,16 26:16
,19 27:5 29:13 30:7 31:2
,4,5,5
months 13:7 19:8 23:4
32:24 34:6
morning 9:8,13,16 13:23
35:10
morris 2:- 7:- 9:9 12:16
motion 32:3,5
move 33:3
moved 20:8
moving 13:9 27:21 32:25
35:5
mr 9:8,21 10:1,10,12,16
,20,22,23,24 11:5,9,13
,15,21,25 12:2,6,9,10,13
,15,18 13:10,19,22,23
14:17,19 15:8,11 16:6,16
,22 17:22,25 18:11,22
20:1,2 21:3 22:4,19,21
23:5,7,8,10 24:11,12
25:3,6,23 26:3,11,12,21

27:1 30:22,23 31:10,16
,23,25 32:2,9,12,15 33:5
,21,22,24 34:1,3,18,19
35:7
ms 12:21
muchin 5:14

## N

name 23:6,9
named 12:23
narrowed 24:23
narrower 26:12
neal 4:- 11:23
necessarily 29:18
need 9:24 16:13 22:16
32:18 33:7 34:22
nelson 6:- 10:5
neustadt 5:- 8:-
new 3:-,,11,11,-,- 4:8,8
,22 6:4,4 7:-,- 11:7
newer 26:8
next 33:6 34:15
nichols 2:- 9:9
nikon 5:12,12 10:2,7
16:1 17:23 18:1,3,5 19:1
34:20,21
no 1:-,14 11:13 15:15
17:9 21:11,19 22:4 26:23
27:1 31:22 32:5 33:22,24
nokia 4:4,17 10:25 11:1
16:2
north 5:7,-,- 6:-
northern 23:14
note 8:24
nothing 19:25
notice 30:19
nub 17:10
number 9:22 14:9 16:9
19:20 21:5 26:22 33:13
numbers 22:7,17 24:25
26:14,15

## O

oberts 2:-
obligation 17:2
oblon 5:- 8:-
oblong 12:24
october 14:7,23
odds 13:11
off 30:16
offered 15:22 24:19
often 21:19
okay 9:7 11:8 12:12 13:1
16:20 17:20 19:21 23:10
32:15 33:25
ollis 8:6 12:24
olsen 8:- 12:13,13
olympus 2:21,- 3:12,-
12:6,8,9 16:2
one 10:10 13:16 14:17

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

17:15 19:10 22:23 23:12
26:1 27:8,16 28:9,16
29:21,22 30:24 31:12
ones 14:13 16:5 22:7
ooo 8:22
open 8:25
opportunity 27:15
optrex 8:-,- 12:22
order 13:15 18:3 27:23
33:9,16
ordered 17:14 29:9
originally 23:19
ought 33:20
outside 17:13
overseas 14:12 21:10
30:7
own 32:8

P

p.c 4:-,-,11,15 5:- 8:-
panel 31:11
part 20:18 32:7
participate 34:22
particular 27:9,10
particularly 30:11
parties 18:7 29:6 30:5
33:3,13
pascale 8:- 12:21,21
past 15:15 20:6 21:22
22:10 26:1,14
patent 14:24 27:11
patience 9:4
paul 6:-
pause 13:2 19:24 31:21
pdas 25:8,15
pentax 7:-,22 12:3,5
people 29:17 30:12
32:10,19
percent 22:24
percentage 23:3
perhaps 10:18 19:5,13
period 17:8
permission 34:7
personal 30:14 32:21
perspective 23:12
phil 11:5
philip 7:-
philips 5:- 6:15 10:3,5
phone 17:24 33:21
phones 19:10 25:8 28:1
,3,4,13
photo 7:-,12 11:6
pieces 29:22
pittsford 4:22
place 13:15 32:6 33:9,16
,17
plaintiff 9:7,17 17:3,9,12
18:8 23:19 24:1
plaintiffs 1:-,- 12:23 13:8
,17 24:9 35:8

plan 30:5,22
play 30:13
players 25:9
playing 30:10
plc 7:-
pleading 21:12
please 26:8
poff 7:- 12:2,2
point 15:6 17:18 22:13
,14,23 35:2
points 13:14
portable 25:8
posed 32:12
position 15:3 33:15
positions 26:1
possible 24:5
potter 5:3 7:7 9:22
premise 20:8,23
prepared 29:7
present 14:8,23 24:8
pretty 13:7
probably 20:21
problem 20:22 24:14
32:2 34:12
proceed 33:8
proceeding 27:14
proceedings 8:24
product 15:14,18 16:9
,10 18:18 20:5,19 21:9
22:2,15,16,17,18 26:5,6
,9,10 29:24,25 30:1 32:8
products 5:- 6:- 14:5,9
,12,21,25 15:5,12,15,23
16:8 17:6 19:2,4,6,7,10
,12,14,16,17,18,19 21:5
,24,25 22:5,6,9 23:1,2,24
,25 24:5,7,14,17,19,24
25:7 26:4,9,16 27:7,25
28:6,8 29:12,13,24 30:9
31:4 32:19
progress 13:24 16:3,18
prompts 28:23
proper 29:14
properties 2:-
property 9:16
provide 16:7 20:4 24:3
provided 34:22
purchase 22:8 25:13
27:4
purchased 15:12
put 27:23 33:16
putting 29:16

Q

question 21:25 32:12
queue 9:3
quoted 17:1

R

raised 17:12

range 21:5
ranges 21:9
rapidly 21:19
rate 22:24,25
rather 27:6
reach 17:8
read 18:3
readily 25:13
ready 33:16 34:13
real 18:6 20:22
realize 10:13
really 15:24 16:11,13,24
29:2
reason 14:10
reasonable 24:3
reasonably 21:14
reasons 29:21
rebut 20:1
recall 9:10 18:14
received 13:9
recognizing 30:24
records 21:20
recover 21:17
redwood 4:12
regarding 31:3
registered 1:-
relative 21:14
reluctance 20:17
remember 30:12
report 34:8
reporter 1:-
reporter's 8:24
reporting 33:11
represent 9:6
request 35:5
require 28:20
required 27:24
requires 28:19
requiring 28:25
resellers 32:11
reselling 32:7,7
resells 25:17
resolve 14:1 16:17 18:7
27:15
resolved 13:14 15:25
16:5 18:1
resolving 16:2,18
respect 28:8 35:1
respond 15:3 32:12
35:11
responded 17:13
response 15:10,11,24
22:20
reston 6:9 7:-
result 26:2
results 15:24
retailers 29:16
rich 9:21 12:9 16:22
31:25
richard 3:- 5:- 11:22 12:7

richards 3:14 4:- 10:17
richardson 4:-,-,11,15
rick 10:4 25:3
right 9:19 10:14 11:4,17
13:3 14:16 15:1,6,25
16:4,11 18:9 19:25 20:22
21:17 22:11 23:5 24:11
25:2 26:20 27:13 29:3
31:10,18 33:4,11,19,20
,21 34:17,18 35:7,9
rizzi 3:17 10:18 18:22,22
23:7,7,8,10
road 14:15
robert 2:-,16 3:3 10:20
,22
roberts 9:14
robins 2:5 9:15 13:20
roche 7:- 11:9,9,13,15
roderick 5:23
roll 9:5
room 23:11
rosati 3:- 12:7,9,9
rosenman 5:14
rosenthal 7:10 11:7
18:11,12
rovner 7:- 11:5,5
rule 21:12
run 33:2

S

sachnoff 7:3
samsung 5:8 6:- 10:2,9
san 6:-
sanyo 5:-,7,16,- 10:3,6
satisfied 21:12,12,23
satisfy 18:19
say 19:22 21:22 25:21
27:7,9 28:1,5,12,23 29:7
31:6,7,9,11,13,22 34:25
saying 13:10 15:4,4
20:14 22:19 24:23 26:3
32:16
schedule 33:17 34:16
scheduling 13:15 33:9
,15
schlier 5:19 10:7
scope 17:13
scott 6:22 10:10,12
sdi 5:8 6:- 10:2,9
seek 26:13
seiko 2:- 10:21
sellers 29:17
sells 25:16
send 15:23
sense 18:24 23:16
sensible 30:5
separate 9:11
september 1:-
set 14:6,22 29:11 33:10
34:16

**shandler** 4:19 11:21,21
**shaw** 2:20 12:6,6,10
**shifted** 26:2 27:18
**shifting** 19:11
**short** 13:16 34:24
**show** 21:20
**showing** 21:4
**shy** 17:21
**side** 30:3 33:23
**side's** 15:3
**similar** 23:15 24:14
  26:17 31:5,7,8,9,11
**similarly** 18:25
**simon** 6:- 11:16
**simply** 21:19
**single** 15:18,18 18:18
**sir** 11:11 23:6 26:25
**situated** 18:25
**six** 14:24 19:3,19 20:5
  21:17 23:4 25:10 27:2
**slifkin** 4:- 11:23
**smith** 2:13
**snapshot** 13:24
**sold** 14:5,13,21 20:6
**somebody** 11:11 20:13
**somehow** 22:2
**something** 19:23 20:10
  22:3 29:8 30:25 32:1,23
  34:11
**somewhat** 23:15
**sony** 2:-,22 3:-,- 8:-,14
  12:7,10,14,19
**sorry** 10:12 14:16 23:5
  32:9
**sort** 19:10
**sound** 23:2
**source** 31:11
**span** 19:2
**speak** 13:21 17:4,20
  18:10 22:13 27:19 35:8
**speaking** 13:17
**specific** 15:13 17:19
  18:2 22:7 23:18,20,25
  24:6,23 26:5,14 28:6,23
  29:11 31:15
**specifically** 14:18 17:5
  27:24
**specified** 22:6 26:10
**spite** 13:6
**spivack** 12:24
**spivak** 5:- 8:-
**spoke** 22:12
**squarely** 19:15
**stacie** 2:- 9:14
**stargatt** 2:- 7:17
**start** 9:7,19 20:8,13
**states** 1:1 14:6,13,22
  26:19 30:8
**statute** 14:24
**stay** 18:4,6,7 29:22 32:3

,5 35:3,3
**step** 34:15,21
**stephen** 3:17 6:18 10:9
  18:22
**steve** 10:18 23:7
**steven** 1:-
**straightens** 29:4
**stroock** 7:-,- 11:7,7
**structured** 23:23
**structuring** 24:2
**stuff** 20:24
**submission** 33:12
**submissions** 17:12
**subsequent** 28:10
**suit** 29:14 34:17
**summarized** 16:17
**suppliers** 19:9
**supposed** 32:23
**sure** 22:17
**system** 20:9

**T**

**taken** 13:12
**talking** 17:8 21:22 26:1
  33:17
**taylor** 2:- 7:17
**tear** 15:19,22 22:8
**tear-down** 15:24 22:24
  27:3 28:5
**tear-downs** 28:22
**technology** 26:17,17
**telephone** 1:17 13:4
  34:10 35:13
**television** 23:20
**televisions** 23:17,22
  24:1
**tell** 9:24 13:13 20:16
  24:20 27:5,20 28:2,14,18
**telling** 28:16 31:19
**tells** 20:10
**terms** 27:19
**texas** 5:-
**thank** 11:3 12:20 20:2
  35:7,11
**thanks** 10:14 11:19 13:3
  35:9
**that's** 9:17 10:1 14:23
  23:10 24:25 27:25 32:20
  ,22,23
**there's** 20:17
**they'd** 25:21
**they're** 25:7 27:5 30:13
  31:19 32:18
**thing** 16:12,14 25:12
  27:21
**things** 9:4 17:9 28:6,17
  30:8 32:3,7
**think** 13:13,23,25 15:4,5
  16:16,23 17:1,2,10,17
  18:19 20:23 21:11 22:4

23:10,15 24:2 26:12 27:8
  ,20 28:1 30:7,12 32:1
**thinking** 20:21 29:4
  30:13
**third-party** 29:17
**thomas** 2:3 4:3 8:-
**thoroughly** 22:18
**though** 29:19 33:14
**thought** 13:7 17:13
  29:15
**thousand** 19:5,13
**three** 16:1 19:7,12,18
  28:14 34:5
**tie** 26:18
**tied** 26:13
**time** 9:3 14:17 17:7
  25:14 29:19 33:6 34:5
  35:2,6,10
**today** 9:10 17:12,24
  29:19 33:11
**together** 13:6 29:11
**told** 16:25 19:9 21:24
**tom** 9:8 10:24 11:25
  13:19 34:3
**took** 15:2
**tore** 28:9,13
**torn** 15:13 21:6 24:24
**toshiba** 5:6,6,- 10:2,7
**total** 25:11
**transcript** 17:2
**transition** 14:1 35:2
**transitioned** 34:16
**try** 20:5 30:5
**trying** 27:19
**tunnell** 2:-
**tweek** 6:3
**type** 24:10
**types** 22:6
**typically** 11:17

**U**

**u.s** 31:3
**u.s.a** 7:12,22
**u.s.d.c.j** 1:19
**ultimately** 14:15
**unable** 15:14 16:3
**uncover** 20:5
**understand** 20:3 22:19
  31:19 32:9
**understanding** 20:9
  27:17
**unilateral** 27:6
**united** 1:1 14:6,13,21
  26:19 30:8
**unless** 11:18
**unreasonable** 24:8
**unwillingness** 20:18
**upset** 30:9
**urgency** 33:20
**us** 9:13,16 15:23 16:7,25

21:20 27:5,6 28:2,6,14
  ,18 29:7 32:3 34:6
**utilize** 24:6

**V**

**various** 22:1 23:17
**vice-versa** 27:12
**video** 25:17
**view** 21:16
**vinson** 5:-
**virginia** 5:- 6:9 7:- 8:-

**W**

**wade** 3:- 10:16,16
**wait** 20:7
**waiting** 9:2
**walker** 6:-
**walsh** 8:- 11:25,25
**want** 15:23 17:4,19 18:9
  19:22 20:24 26:3,4 28:2
  ,17,21,21,22,22 30:9,16
  31:13,13 33:16 35:3
**wants** 16:20 17:20
**washington** 3:- 4:16
  5:11 6:14 7:-
**we'll** 25:22
**we're** 13:11 14:19 15:14
  16:2 17:8 18:25 21:22
  22:14,17 24:25 25:20,22
  26:1,2,16 31:16 33:20
**we've** 13:24 14:8,10 21:4
  ,6,7,11,24 22:5,6,7,7,15
  ,18 24:19,23,24 28:5
  31:1 32:25 34:5
**weaver** 7:3
**week** 30:23
**week's** 25:14
**weeks** 33:11 34:8
**weigh** 25:6
**weil** 3:- 10:19 18:23
  22:12 23:7
**well** 9:24 13:3 17:24
  19:20 20:7 21:3,21 24:4
  26:12 27:7 28:7 30:12
  31:6 32:13 34:11 35:9
**whether** 15:16 21:1,13
  ,25 24:21 28:18
**white** 6:-
**who-goes-first** 30:17
**wholesale** 22:15
**why** 9:5 13:13 20:15
  29:21
**wide** 21:5
**wild** 23:1
**will** 13:20 15:23 18:19
  22:13 35:2
**william** 3:-
**williams** 5:23 10:4 25:3,3
  ,6,23 27:1
**willing** 29:6

Honey v. Audiovox/Apple: Telephone Conference  9/9/2005  10:40:00 AM

**wilmington** 1:16
**wintek** 5:- 6:10 10:3,7
**wireless** 2:18 10:21
**within** 17:6 25:14 30:23
**without** 13:14
**won't** 27:15
**wondering** 34:7
**woods** 2:6 9:14
**work** 9:4 34:13,13
**works** 20:10 21:2
**wrestle** 20:7
**wrong** 15:7 20:12,13
**wronged** 20:11
**wyatt** 7:-

---

### Y

**years** 14:24 19:4,19
 20:25 21:18
**yes** 11:15 16:16 24:12
 25:5 31:24 34:2
**yet** 17:12
**york** 3:-,-,11,11,-,- 4:8,8
 ,22 6:4,4,- 7:-,- 10:8 11:7
**you've** 20:10 28:3 32:17
**young** 2:- 7:17 12:2
**yourself** 11:19